# EXHIBIT 1

# EXPERT WITNESS REPORT

Ronald M. Gonda
Plaintiff,

v.

Metropolitan Life Insurance Company and
William Freidt, Jr.,

Defendants.

Civil Action No. 00-2286

United States District Court
for the Western District of Pennsylvania
The Honorable Donetta W. Ambrose, District Judge

Submitted to:

McCarter & English, LLP

by
Kenneth I. Daniels
June 12, 2006

In connection with the above-referenced case, I have been asked to review Ronald Gonda's purchase of a whole life insurance policy from Metropolitan Life Insurance Company ("MetLife") in April 1992. The following is my expert opinion report with respect to these transactions. My opinions are based upon the material that I reviewed, my education, training, knowledge and relevant experience. My opinions may change or be supplemented if additional information becomes available through discovery, deposition or otherwise and it is made available to me. In that event, I will provide a supplemental report.

<u>Professional Qualifications and Experience</u>

I currently provide independent consulting services to the financial services industry. Additional detail regarding my education, professional qualifications and experience is attached hereto as Exhibit A.

<u>Materials Reviewed</u>

I reviewed the following documents in connection with the preparation of this Report: Plaintiff's Complaint with exhibits; Plaintiff's Answers to Defendants' First Set of Interrogatories; Plaintiff's Response to Defendants' First Request for Production of Documents and Supplemental Response; Plaintiff's and Defendants' Exhibit Lists; Defendants' Amended Answer; Transcripts of depositions of Ronald M. Gonda and William Freidt with exhibits; Defendants' Motion for Summary Judgment and Plaintiff's Reply and supporting Memoranda of Law; Plaintiff's Pretrial Statement and Expert Opinion; District Court and Court of Appeals opinions; Deposition Transcript of James Rayl and certain exhibits; policy history/status screens, various sales representative, sales management and compliance program manuals, including but not limited to MetLife's Enhanced Compliance Program; 1994 Pennsylvania Market Conduct Report and 1998 Connecticut Report on MetLife; documents identified as Defendants' Exhibits A-S.

<u>General Information</u>

**Whole life insurance** – Whole life insurance is issued with a fixed face amount of insurance and generally requires a policy owner to pay a pre-set premium amount regularly for a stated period of years, or until the death of the insured. The period of time that premium payments are required is stated in the policy. The face amount of insurance of the basic policy is fixed and cannot be changed.

Many whole life policies are "participating policies," that is, the issuing company annually determines if a surplus has accrued on the policies and, if so, distributes a share of that surplus to each policyholder as a dividend at the end of that policyholder's policy anniversary year. Dividends are not guaranteed and can change from year to year.[1] If

---

[1] Dividends are in essence the distribution of divisible surplus by an insurance company. The Company's Board of Directors has the responsibility to determine the amount of dividends, if any, to be declared. Since an insurance company's potential liabilities extend far into the future, who can say what amount of a company's reserves are surplus? The process by which dividends are determined is complex. Although it

dividends are paid, the policy owner has options to use them in several ways: (1) buy paid-up additional insurance, (2) leave them with the insurance company to accumulate interest, (3) apply them toward the payment of premiums, or (4) receive them in cash. A whole life insurance policy, in addition to providing life insurance, will accumulate guaranteed cash value over time. The cash value can be borrowed against for emergencies or other needs, to help with educational expenses or retirement, and can also be used to help reduce out-of-pocket premium payments.

Summary of the Case

Plaintiff, Ronald Gonda, purchased a whole life insurance policy from MetLife sales representative William Freidt, Jr. Plaintiff applied for a MetLife whole life insurance policy on March 25, 1992. At the time that application was made, Plaintiff owned at least two other life insurance policies – a $10,000 whole life policy and a $50,000 universal life policy – both issued by Prudential Life Insurance Company. Plaintiff acknowledges that Mr. Freidt recommended that Plaintiff keep the Prudential whole life policy and replace the $50,000 Prudential universal life policy with a MetLife whole life policy.

MetLife issued Whole Life Policy No. 925 207 015 A to Plaintiff on April 27, 1992, with a face amount of $64,667 ("1992 MetLife policy"). Plaintiff acknowledges that Mr. Freidt delivered the policy to him on or about May 2, 1992. Plaintiff later discontinued making premium payments and, on January 28, 1994, the policy was surrendered.

Plaintiff's Complaint essentially alleges that this policy was misrepresented in that he was told he would only have to pay premiums of $50 per month for 10 years and that misleading illustrations were used in connection with the sale.

Opinions

1. Based upon the documents and evidence I reviewed, it is my opinion that the 1992 MetLife whole life insurance policy purchased by Ronald Gonda provided him with valuable benefits and was appropriate to his circumstances at the time of purchase.

Whole Life insurance policies offer many benefits to the insured and can be used to meet many types of needs and circumstances. The benefits of a whole life policy include the following: guaranteed and level premiums, a guaranteed death benefit of at least the face amount of the policy (less any outstanding loans) for the insured's entire life, guaranteed non-forfeiture options, and the accumulation of cash value.

---

(footnote 1 continued) involves an actuarial evaluation of three major components: mortality, expense and earnings, these components are affected by economic and other factors, many of which are outside the company's control. It is not possible to predict with any degree of certainty how these factors will interact. Accordingly, future dividends are not, and cannot be, guaranteed.

In contrast, universal life insurance policies, such as the Pruco UL policy that Plaintiff owned and was considering replacing, have no fixed premium amount or fixed payment schedule. Premiums paid, less expense charges, are deposited into a policy account that earns interest. The cash value of the policy depends on the amount of interest earned by the money accumulating in the policy account. As the insured ages, the cost of insurance and other expenses deducted from the policy account increases. Insurance continues in force as long as the funds in the policy account are sufficient to pay current charges. If there is not sufficient cash value in the policy account to pay current charges, out-of-pocket payments must be made or the policy will lapse.

If Mr. Gonda became aware that his universal life policy was earning less interest in recent years; or he had concerns about the cost of his insurance going up, which would increase with his age, or the premiums he might need to pay in the future, it would be appropriate for him to consider replacing his universal life policy with a whole life policy. As discussed above, whole life insurance policies guarantee a level premium for life, payment of at least the face amount of insurance upon death (assuming no outstanding loans), and cash value accumulations at guaranteed minimum rates. Therefore, in a period of declining interest rates, such as existed in 1992, a whole life insurance policy would provide greater certainty and guarantees over an interest-dependent universal life policy.

2. Based upon the documents and evidence I have reviewed, it is my opinion that the replacement of Plaintiff's Prudential Universal Life policy ("Pruco UL policy") with the 1992 MetLife whole life policy was reasonable and consistent with applicable Pennsylvania Replacement regulations.

Although Plaintiff's Complaint alleges that Defendants made various misrepresentations or omissions with respect to the "replacement" of his $50,000 Prudential universal life policy ("Pruco UL policy") with the 1992 MetLife whole life policy, Plaintiff's deposition testimony and the documentary evidence does not support that allegation.[2]

Plaintiff acknowledged in his deposition testimony that he discussed the replacement of his Pruco UL policy with Mr. Freidt during their first meeting (Gonda Deposition pp. 30-31). Plaintiff's application for his 1992 policy, which he signed on 3/25/92, indicates "yes" to question 12(c) regarding replacement of existing insurance and states in the "Details" section that "APPLICANT IS REPLACING PRUCO LIFE POLICY". Moreover, Plaintiff signed a Notice Regarding Replacement of Life Insurance And Annuities ("Replacement Notice") on March 25, 1992, which lists his specific Pruco

---

[2] The use of cash value from Plaintiff's Pruco UL policy to purchase a MetLife whole life policy is commonly referred to as an "external" replacement because it involves replacing one issuing company's product with that of another. Accordingly, the extensive allegations in Plaintiff's Complaint referencing "internal" replacement practices, that is using cash values from one MetLife policy to purchase another MetLife policy, are not applicable. There is nothing inherently wrong with replacement of one policy by using values taken from another.

4

UL policy and policy number as a policy that may be replaced as a result of the MetLife transaction. This written information, provided to Plaintiff during the application process, was consistent with Pennsylvania Replacement regulations in effect at the time of the transaction.

The Replacement Notice, among other things, states that Plaintiff has indicated that he intends to replace existing life insurance coverage and urges him to read the notice carefully. The notice advises that only Plaintiff can decide if it is in his best interest to replace existing insurance coverage and urges him to obtain additional information and advice from his existing company. It also indicates that if the proposed coverage is participating, he should be aware that dividends may materially reduce the cost of insurance and are an important factor to consider, however dividends are not guaranteed. Mr. Gonda was further advised in the Replacement Notice that after MetLife issued the new policy, he would have 20 days from the date the new policy is received to notify MetLife if he wishes to cancel the policy issued on his application and he will receive back all premiums made to MetLife (Gonda Deposition Ex. 6).

At the time of the transaction, Plaintiff was aware both that the cash value from his Pruco UL policy was being put into his 1992 MetLife policy, (Gonda Deposition p. 33); and that the value of the Pruco UL policy that he relinquished was about $1800 (Gonda Deposition pp. 33, 37). This is also supported by a letter MetLife sent to Plaintiff dated April 28, 1992, confirming that it had received a payment of $1618.82 on April 27, 1992. The letter, however, clearly indicated that this money was being applied to the purchase of paid-up insurance only in accordance with the provisions of the policy's Paid-Up Additions Rider[3] and did not reflect any payments made on the base policy itself (Gonda Deposition Ex. 10). [4]

Contrary to Plaintiff's expert's report, MetLife did complete the replacement notification process. By letter dated April 2, 1992, MetLife informed Prudential that it

---

[3] A "Paid-Up Additions Rider" gives the policy owner a contractual right to purchase additional paid-up permanent life insurance that has cash value, loan value, and is eligible for dividends. These cash values can be borrowed against to help fund retirement, education, or other needs and can also be used to help reduce future out-of-pocket premium payments.

[4] The substance of the letter states:

Thank you for your payment to the Paid-Up Additions Rider.

We received your rider payment of $1618.82 on April 27, 1992, and in accordance with the provisions of the Paid Up Additions Rider, we have applied your payment to purchase $5,444.00 of Paid-Up Insurance.

Please note that this acknowledges payment to your Paid-Up Additions Rider only. It does not reflect any payments made on your base policy which may have been included in your total payment.

Each year, shortly after the policy anniversary, you will receive a statement with detailed information concerning the status of your rider.

If you have any questions about this policy were any other insurance needs, please contact your Metropolitan representative at the office listed above.

had received an application from Plaintiff that indicated it was a possible replacement for and in force policy issued by Prudential. The content of the letter conformed to applicable Pennsylvania replacement regulations in effect at the time of the transaction.

3. Based upon the documents and evidence I have reviewed, it is my opinion that Plaintiff was provided with adequate information and knew or should have known the amount and duration of his premium payment obligations on his 1992 MetLife whole life policy.

Plaintiff's Complaint alleges that the costs of his 1992 MetLife policy were misrepresented and that he was provided with misleading illustrations in connection with the purchase of the policy. Plaintiff alleges that William Freidt told him that his 1992 MetLife policy would cost $50 per month, or $600 per year, and that he would only have to pay premiums for 10 years. Nothing Plaintiff has produced in writing, however, supports his claim that William Freidt or MetLife offered him a whole life policy at a cost of $50 per month.

Plaintiff produced two "Whole Life Plus" illustrations from his files. In his deposition testimony, he was asked if he had ever seen those documents before and he replied: "I'm not sure." When asked if these documents were documents that might have been provided to him by Mr. Freidt, he stated "Could have been. I don't know." (Gonda Deposition pp. 18-19; Ex.1, 2). It should be noted, however, that both of those exhibits were dated 4/30/92. Therefore, neither of them could have formed the basis for any premium payment expectation at the time that Plaintiff made application for his 1992 MetLife policy on March 25, 1992.[5] In addition, each illustration reflects an initial assumed net payment of $1,801 -- far in excess of Plaintiff's claimed $50 per month (or $600 per year).

A third partial illustration, which did not come from Plaintiff's files, was also shown to Plaintiff in his deposition. That illustration was titled: Accelerated Payment Plan Illustration with Annual Dividends Used To Buy Paid-Up Additional Insurance. When asked if he recalled seeing any type of documents like this in any of his meetings with Mr. Freidt, Plaintiff responded: "I don't think so." (Gonda Deposition p. 28; Ex.4). Even if he had, that illustration also does not support his claim.[6] In fact, none of the

---

[5] At the bottom of the each page of both illustrations its states: "This illustration is to be used in connection with the attached Metropolitan Life Insurance Company proposal showing details, guarantees and assumptions for WLP. All yields, interest rates and tax brackets are assumed an order for illustrative purposes only." Exhibit 1 illustrates net payments in of $1801 per year for 40 years. Exhibit 2 also illustrates net payments in of $1801 per year, but for 10 years.

[6] That Exhibit is dated 3/23/92. It illustrates an annualized cash outlay per year of $1800 for 13 years at non-smoker premium rates, with a total premium excluding riders of $1200.80, payable for lifetime. The annualized cash outlay column is footnoted. The footnote states: "The cash outlay illustrated shows the results if the current dividend scale continues without change. Dividends are not guaranteed and may increase or decrease in the future. If future dividends decrease it is possible that the cash value of additional insurance may not be sufficient in some future years to pay the full current premium and some

illustrations support Plaintiff's claim that he was offered a $64,667 whole life policy at a cost of $600 per year for only 10 years.

Plaintiff also alleges that Mr. Freidt verbally misrepresented that he would have to pay premiums of $600 per year for only 10 years. In his deposition testimony, he claims that this is supported by the premiums listed in his policy (Gonda Deposition p. 56).

MetLife issued policy number 95 207 015 A on April 27, 1992 with the face amount of $64,667 and a monthly premium of $110.35. The last page of the policy indicates that was delivered and countersigned by Mr. Freidt on 5/2/92.

It should be noted at the outset that at the time Plaintiff made application to MetLife in 1992, he had owned one or more Prudential whole life policies for approximately 20 years. The basic format of the Prudential whole life policy he produced from his files is similar to the format of the MetLife policy -- the cover page states the "right to cancel" and contract data, schedule of premiums and table of values are set forth in the next few succeeding pages. In addition, having owned whole life policies for twenty years and paying premiums throughout that time period, Plaintiff should have been well familiar with the requirement of whole life policies to make regular, timely premium payments.

The MetLife policy delivered to Plaintiff clearly discloses the amount and frequency of the premium payment required and duration of necessary payments, but even a cursory look at the first several pages would have shown Plaintiff that the policy he received was not the one he claims he was offered.

The cover page of his MetLife policy reads:

### Metropolitan Life Insurance Company

Metropolitan Life Insurance Co. will pay the amount of insurance and provide the other benefits of this policy according to its provisions.

| | |
|---|---|
| Insured | RONALD M. GONDA |
| Face amount of insurance | $64,667   AS OF APRIL 27, 1992 |
| Policy Number | 925 207 015 A |
| Plan | **Whole Life** |

cash outlay may be required." It further states: "Dividends based on January 1992 scale that uses current interest, mortality and expense rates. Illustrative figures are not guarantees or estimates for the future."

**Whole Life Policy**

Life insurance payable when the insured dies.
Premiums payable for a stated period.
Annual dividends.

At the bottom of the policy's cover page, it states:

**20-Day Right To Examine Policy** -- Please read this policy. You may return the policy to Metropolitan or to the sales representative for whom you bought it within 20 days from the day you receive it. If you return it within the 20-day period, the policy will be void from the beginning. We will refund any premium paid.

See Table of Contents on back cover.

Page 3 of the 1992 MetLife policy contains the Premium Schedule. The Premium Schedule clearly states that premiums are due on the date of the policy and every 1-month after that date (check-o-matic) and indicates a total life insurance premium of $110.35 payable for 62 years. Therefore the Premium Schedule in the policy is clearly inconsistent with Plaintiff's claims that he understood his policy would cost $50 per month and that he would be required to pay premiums for only 10 years.

The Table of Values on page 4 lists values applicable to a policy without paid-up additions, dividend accumulations or policy loan. The Table of Values indicates that the cash value is guaranteed to be $22,116.11 at Mr. Gonda's age 60 and $28,518 at age 65.[7]

The balance of the pages of the policy contain specific information about terms and features applicable to "Understanding this Policy" including the provisions on page 5 with respect to payment of dividends; page 6 regarding premium payment, grace period and the effect of non-payment of premiums; and the general provisions on page 9 with respect to the policy and any riders being the entire contract, and expressly stating that no sales representative has the authority to change or waive any provisions of the policy. The terms of the Paid-Up Additional Insurance Rider are also attached to the policy.

In his deposition, Plaintiff claims that the time he is policy was delivered, he was asked for a blank check so that $50 month could be deducted from his checking account to pay premiums on his policy (Gonda Deposition p. 37). Nothing on the Request For Check-O-Matic Arrangement form, states the amount to be deducted. MetLife's practice upon receipt of a Request For Check -O-Matic Arrangement would be to send the policyholder a form letter welcoming them to the program and telling the policyholder, among other things, the date that the first check would be drawn against the

---

[7] This is also inconsistent with Plaintiffs testimony that his policy was supposed to have $64,000 or something like that when he was 65 so that he could use it for retirement (Gonda Deposition p. 22). Later in his deposition, when asked about the Premium Schedule's indicating " years payable" as 62, Plaintiff states: "It's part of my age when I want to retire. 62." (Gonda Deposition p. 57).

policyholder's account, and the date of each month that subsequent checks or debits would be drawn. At the top of the letter the policyholder's policy number and premium amount to be withdrawn each month would be indicated. Plaintiff did not produce such letter from his files. In addition, on the first page of Plaintiff's Application For Life Insurance for the 1992 MetLife policy, item 5 "Premium Payments" it indicates that the $50.00 to be paid with the application "is not at least equal to one check-o-matic premium."

Any illustration provided and any statement made with regard to potential premium for the policy would have been made prior to Plaintiff's application having been submitted and/or medical testing having been done. As discussed below, even if Plaintiff believed at the time he made his application to MetLife that he could purchase a whole life policy with a face amount of $64,667 at $50 per month payable for only 10 years, it would be unfair and unreasonable for him to expect that MetLife would still offer him the same policy, at the same rate, once medical tests revealed that he falsely stated on his MetLife life insurance application that he had quit smoking.

In making application for his 1992 policy, Plaintiff was required to respond to certain questions on the application, including question 9 regarding tobacco use. In response to the question about the last time he smoked/used tobacco, Plaintiff answered that he had quit smoking cigarettes in 1988 and never used the other listed tobacco products. As part of the application process, Plaintiff was also required to take a paramedical examination and to provide certain body fluid samples for medical testing. The top of the last page of the MetLife application sets forth an Agreement above where the proposed insured signs, it states: " I have read this application and agree that all statements and answers are true and complete to the best of my knowledge and belief."

By letter dated 5/6/92, Plaintiff received notification that MetLife determined through medical testing that his urine contained nicotine at levels comparable to those found in cigarette users. The letter states: "We are pleased offer you a policy. I think you should know that your premium rate was based on our examination findings." The letter urges Plaintiff to "take the time to read the enclosed statement." Although Plaintiff did not produce any enclosure from his files, MetLife's regular practice was to include a single page enclosure entitled "<u>Your Information Rights</u>." The enclosure details three important rights the recipient has. Plaintiff thereby had rights to: make a written request for certain information obtained by MetLife; receive specific reasons for MetLife's decision; and, most importantly, if the Plaintiff believed that any information in MetLife's files is wrong or incomplete, he could ask MetLife to correct or amend it. If MetLife did not agree with him, he could file a short statement of dispute. The enclosure ends with: "Please contact our sales representative or write to us if you have any further questions concerning your application or the rights outlined here."

Upon receipt of this notification from MetLife, Plaintiff had ample time within the 20-day "free look" period to ask questions and to review his policy. In his deposition, Plaintiff admits he understood the meaning of the "20-day right to examine" provision. When questioned, he answered: "It means you got 20 days to decide what you want it or

not." (Gonda Deposition, p. 55). Notably Plaintiff testified in his deposition that he did not contact Mr. Freidt or anyone else at MetLife to question the letter or seek additional information about his policy or premium costs (Gonda Deposition p. 60).

In addition to the policy itself, Plaintiff received other indications that the premium for his 1992 MetLife policy was not as he now claims, but he apparently chose to ignore the information. In accordance with MetLife's regular procedures, Plaintiff would have received certain additional documents reflecting the status of his policy and his premium payment obligations.

Mr. Gonda should have received an "Anniversary Statement" about the time of his policy anniversary on 4/27/93. That Anniversary Statement would list the current mode or frequency that premium payments were due and the amount of premium required. Mr. Gonda should also have received a separate PUAR Annual Statement detailing its value. Plaintiff did not produce a copy of either of these statements from his files.

Plaintiff did produce a copy of a Notice of Payment Due, indicating that a premium of $1219.87 was due by April 27, 1993. His deposition testimony indicates that this notice was one of a number of premium due notices that he received. Plaintiff apparently failed to make the required payment on time. MetLife records show that the 1992 policy lapsed in July 1993. It was MetLife's standard business practice to send out a lapse notice once the grace period for an overdue premium payment had run. Though he produced no copy of such a notice from his files, Plaintiff signed a request on June 18, 1993 to take funds from his Paid-Up Additions Rider and to pay a semi-annual premium of $659.29. MetLife records show that payment was processed in August 1993 and Plaintiff's policy was reinstated -- only to lapse again on January 3, 1994. Once again, although Plaintiff did not produce a document from his records, MetLife would have sent a lapse notice advising him that his premium payment was overdue and that his policy was due to lapse if payment was not made.

Plaintiff voluntarily chose to discontinue further payments on the 1992 MetLife policy shortly thereafter. On January 21, 1994, Plaintiff signed a cash surrender request form. In return for surrendering his 1992 policy, MetLife issued a check to Plaintiff in the amount of $671.91, dated January 28, 1994, representing the cash surrender value of his policy. In his deposition, Plaintiff testified he surrendered his 1992 policy because he could not afford to pay premiums of $1200(Gonda Deposition p. 50).

In sum, there is nothing in any of the illustrations, or for that matter any other documents produced by Plaintiff, to support his claim that he was told that the premium on his 1992 MetLife policy was $50 per month or that it would require him to make out-of-pocket premium payments for only 10 years. If anything, given the numerous documents that Plaintiff received which were inconsistent with his alleged understanding, it would have been unreasonable for Plaintiff not to inquire and verify that his understanding was correct. Further, Plaintiff did not make premium payments in accordance with any of the illustrations.

Moreover, it would be unreasonable for Plaintiff not to raise a question when he was being asked to pay additional premiums he now claims were not due, especially given the fact that Plaintiff's policy lapsed twice in 1993. Certainly when Plaintiff surrendered his policy stating in his deposition testimony that it was because he could not afford it, if he believed he did not owe the premium payments being requested, a reasonable person would have complained before surrendering the policy. Plaintiff did nothing. Plaintiff several times in his deposition testified that he did not have any discussions regarding the premiums on his policy with Mr. Freidt or anyone else at MetLife regarding the payment of his premiums in 1993; and, other than his initial telephone conversation and two meetings with Mr. Freidt and the meeting he had with the gentleman who brought him his surrender check, he had no other discussions with anyone at MetLife regarding the 1992 policy (Gonda deposition pp. 47, 60).

4. With respect to the life insurance transactions involved in this case, it is my opinion to a reasonable degree of certainty, that the actions of MetLife and its sales representatives did not fall below the standard of care expected of a licensed insurance agent and an insurance company in Pennsylvania at the time of the transaction. My opinion is based on the material I have reviewed in this case, my education, training and experience in the insurance industry and my review of applicable Pennsylvania Insurance Regulations.

5. With respect to the actions of William Freidt, based upon the material that I reviewed, it is my opinion that these sales representatives conducted their business with Mr. Gonda properly and that MetLife provided reasonable and appropriate training and supervision of him. Plaintiff has produced no evidence to show that MetLife was not providing appropriate supervision of his activities.

During the period in which Mr. Gonda purchased his policy, MetLife had a well-defined supervisory structure and a detailed program of supervision in place. This program included extensive training of both sales representatives and their supervisors. Each was provided with manuals of instruction that included guidance on regulatory requirements as well as legal and ethical considerations with regard to sales procedures and practices. The sales representative manual gave extensive written guidelines with respect to, among other things, duties of the sales representative, use of advertising and other printed matter, prospecting for new business, replacements, completion of applications, premium payments, policy delivery and policy changes. MetLife provided both its own extensive training and encouraged approved industry training.

A separate manual of instructions was provided for sales management that set forth their responsibilities and provided them with detailed instructions, procedures and forms for supervision of sales personnel with respect to, among other things, recruiting, field training, new business procedures such as review and testing of applications, delivery of policies, countersignatures and replacements. Sales management was

11

instructed to personally review and determine that the insurance applied for was appropriate to the circumstances and consistent with company guidelines.

In addition, MetLife had oversight systems in place. It had an internal auditing system in place to analyze and test business processes and procedures to ensure that adequate controls were in place and to detect potential abuses. Although Mr. Gonda never complained about his policy or the premium he was being charged, there was also a complaint-handling system that existed for the purposes of addressing and properly resolving policyholder complaints.

MetLife has continued to evolve its compliance and supervisory system by establishing an enhanced compliance program in February 1994. This program was fully communicated to all covered employees by December 31, 1994 and included the following five stated objectives:

1. Customer relationships will be based on a solid foundation of service, education and trust, customers will be able to easily secure answers to questions, let MetLife know about service problems, and get problems resolved.

2. All policies and procedures necessary to reasonably assure employee compliance with applicable laws, regulations and company policies will be clearly communicated to and understood by employees.

3. Employees will be able to easily secure answers to ethics and compliance questions and will be encouraged to report deficiencies without fear of retaliation.

4. Reporting relationships will be well delineated and responsibilities clearly assigned to facilitate and assure accountability for the thorough and timely handling of compliance issues.

5. Policies and procedures will be administered uniformly and compliance will be effectively monitored and audited, areas for improvement recognized, and corrective action plans fully implemented.

MetLife has also been a member of the Insurance Marketplace Standards Association ("IMSA") since 1998. Insurers who members of IMSA subscribe to the IMSA Code and commit to adhering to the six basic principles of ethical market conduct established by IMSA relating to the sale of individually-sold life and annuity products.

In any event, no purpose would be served by awarding punitive damages in this case. Any Market Conduct issues that might be raised by the conduct in this case have long since been addressed by the Commonwealth of Pennsylvania and other state Insurance Departments. MetLife has already paid fines and has already taken appropriate remedial action. In fact, for example, a 1998 State of Connecticut Insurance Department Report of Investigation found that MetLife complied with its 1994 Stipulation and Consent Order by implementing the Enhanced Ethics and Compliance Program.

Based upon the material I reviewed in this case, my education, training and experience in the insurance industry, it is my opinion that MetLife had reasonable and appropriate training and supervision of its sales representatives during the relevant time period. There should be no question that punitive damages are not appropriate in this case.

6. Based upon the material that I reviewed, it is my opinion with respect to the 1992 MetLife policy purchase transaction discussed above, Plaintiff has not suffered any economic, financial, or other compensable damages.

As discussed above, the policy Plaintiff purchased was appropriate to his circumstances at the time of purchase. The policy clearly set forth the policyholder's premium paying obligations -- both as to amount and duration. Moreover, Plaintiff received other written documents from MetLife before and during the 20-day "free look" period that made it unreasonable for him to rely on an inconsistent alleged oral representation about the amount and duration of his premium paying obligations for that policy. Plaintiff had several options to avoid or mitigate any damages. He should have reviewed the 1992 MetLife policy when he received it. If he had any questions he could have, and should have, inquired about the premium. If he was unsatisfied with the policy for any reason, he could have returned the 1992 MetLife policy during the "free look" period and received a full refund. He could have then replaced the 1992 MetLife policy and/or reinstated his Pruco UL policy. Further on, if he still wanted more life insurance, he could have used the cash surrender value of his 1992 MetLife policy to purchase a new life insurance policy. Plaintiff took none of these actions.

Plaintiffs' expert presented a report that purportedly supports the damages claimed in this case. As discussed more fully earlier in this report, Plaintiffs' experts' professional opinions lack reasonable factual or legal basis, or are contrary to deposition testimony. In my opinion, there are no monetary damages awardable in this case.

*/s/ Kenneth I. Daniels*
Kenneth I. Daniels

**KENNETH I. DANIELS**
**8375 Valley Tarn**
**Atlanta, Georgia 30350**
**(770) 804-0376**

## PROFESSIONAL EXPERIENCE

**Kenneth I. Daniels**                                      **November 1996 to Present**

Independent Consultant on Securities and Insurance Compliance

Overall services include development and review of supervisory, compliance and field examination systems, procedures and manuals for broker-dealers, investment advisers and variable insurance products. Litigation support services include case review and assessment, discovery and litigation consulting, and expert witness reports and testimony in court and arbitration cases. Appointed as Independent Consultant pursuant to SEC and State Securities Commission Settlement Orders to review broker-dealer/ investment adviser firm procedures and to recommend necessary changes. IMSA assessments and enhancements provided in conjunction with Groner & Associates.

**IFG Network Securities, Inc.**                          **April 2001 to October 2002**

Chief Compliance Officer

Overall responsibility for the Compliance program at a broker-dealer, investment adviser, insurance agency group of companies. Responsibilities included development, implementation and monitoring of systems and procedures to help ensure compliance with regulatory, industry and company rules and regulations. Review, interpret and communicate significant industry developments. Made recommendations to Senior Management regarding best practices, risk/liability and proposed solutions to compliance-related business issues. Supervised Compliance Department staff, involving oversight of internal compliance audits and regulatory examinations, advertising and sales literature review, registration& licensing, complaints, E&O claims, arbitrations and legal actions affecting the firm and its representatives, surveillance and monitoring of transactions. Participated in and make presentations at sales and training meetings. Developed and monitored Department budget. Represented the firm in Network-wide conferences and meetings.

**Prudential Insurance Company of America**              **February 1999 to November 2000**

Vice President, Operations & Control

Responsible for ensuring that Prudential's Southern Territory, its 22 Agencies, branch and detached offices operated consistently with laws, regulations and company policies, in a cost-effective and operationally efficient manner. Supervised the Territorial staff and Operations Control Managers in each agency who implement the Agency's compliance systems, expense planning and monitoring, and overall agency operations. Coordinated the annual planning process for the Territory and monitored progress toward goals of $3 million production and $35 million expense management.

**The Equitable Life Assurance Society**                  **August 1987 to November 1996**

Vice President and Counsel                                 August 1991 to November 1996

Responsible for advising Equitable's Divisional Senior Vice Presidents and Southern Region managers and agents on legal and compliance matters, including: hiring, terminations, agent contract issues, sales practices,

Exhibit A

Kenneth I. Daniels                                                                                    Page 2

customer and regulatory complaints, advertising and sales literature, outside business activities and the establishment of marketing relationships with banks, CPAs, and trade associations. Also served as a legal and compliance resource for Equitable's Agency Support Group, Advanced Markets Team and National Hiring Office. Primarily responsible for responding to and favorably resolving several major State insurance inquiries. Wrote Equitable's company-wide internal disciplinary action program and model sanction guidelines.

Vice President and Regional Compliance Director                        August 1987 to August 1991

Responsible for establishing and administering the compliance program for the Southern Region and its agencies, including examination of field offices, education and training, registration and licensing, and Review of field generated advertising and sales literature. Also responsible for resolution of regulatory inquiries, oversight of sales complaints and special investigations on behalf of the Regional President.

**U.S. Securities and Exchange Commission**                        **August 1974 to July 1987**

Special Counsel, Office of Insurance Products and                        April 1983 to July 1987
Legal Compliance, Division of Investment Management

Served as Enforcement Liaison to the Commission's Regional Offices and other Home Office operating Divisions providing guidance, legal interpretation and policy input on a broad range of issues arising out of compliance examinations, investigations and enforcement actions conducted pursuant to the Investment Company and Investment Adviser Acts. Regularly expressed the Division's views on these matters at open and closed Commission meetings.

Senior Counsel, Division of Enforcement                        June 1980 to April 1983

Prosecuted and supervised enforcement cases involving non-disclosures, material misrepresentations, market manipulations, options, proxy contests, tender offers, insider trading, investment company and adviser violations, fraudulent tax offerings and false and delinquent reports.

Assistant Chief Counsel, Division of Enforcement                        December 1978 to June 1980

Responsible for advising the Enforcement Division on legal, technical, interpretive and policy matters. Coordinated special projects and Division programs, prepared public statements and speeches for the Director in connection with professional conferences and appearances before Congressional Committees, and conducted a number of sensitive investigative matters.

Legal Assistant to Commissioner Irving M. Pollack                        June 1978 to September 1978

Reviewed and provided the Commissioner with independent judgment in all areas of the federal Securities laws, including: interpretive releases, proposed rules and regulations, enforcement recommendations, litigation, appellate issues, and settlement of actions before the Commission.

Attorney, Branch of Corporate Regulation, NYRO                        August 1974 to November 1978

Analyzed, investigated and prosecuted enforcement cases; assisted in appellate litigation. Represented the Commission at hearings in bankruptcy reorganization proceedings in the Northeast Region.

Kenneth I. Daniels                                                                                     Page 3


## EDUCATION

**Washington University School of Law**, St. Louis, Mo.          Juris Doctor
          Editor, <u>Washington University Law Quarterly</u>

**University of Rochester**, Rochester, N.Y.                              Bachelor of Arts, Psychology


## PROFESSIONAL DATA

Admitted to Practice:     New York State Courts; U.S. District Court, S.D.N.Y.;
                          U.S. Court of Appeals, Second Circuit; U.S. Supreme Court


Graduate of National Institute for Trial Advocacy 1979
Chartered Life Underwriter (CLU) 1990
Independent Assessor, Insurance Marketplace Standards Association (IMSA) (1997 – 2000)
Arbitrator, NASD Regulation   (1998 – present)
NASD Series 7, 24, 63 (1988-2004) and NASD Series 65 (1999-2004)
GA Life & Health, Variable Life, Variable Annuity, Property & Casualty licenses (1999-2005)


## PUBLICATIONS

Contributor to "Selling With Due Care – Issues That Shape The Life Insurance Business," **Life
Insurance Selling**, April 1998.

"When Bad Things Happen To Good Agents" and "Don't Be A Compliance Casualty," **Conclusions,**
a publication of the Atlanta Chapter of the American Society of CLU and ChFC;  May 1997 and May
1994, respectively.

"Financial Planning and Investment Advisors--A Guide Under the Federal and New Georgia
Provisions," **Atlanta Lawyer**, Summer 1989.

"Dismissal of Stockholder's Derivative Action as Res Judicata," 1973 **Washington University
Law Quarterly** 219.


## CASES IN WHICH I'VE TESTIFIED

Belli, et al v. Merrill Lynch, Pierce Fenner & Smith, et al., Circuit Court of Cook County Illinois; Case No. 91 L
18172

Smothers v. Merrill Lynch, Pierce Fenner & Smith, NASD Arbitration Case No. 95 -03814

Aiello v. Ferris Baker Watts, et al., NASD Arbitration Case No. 02 -- 07173

Sutton v. Merrill Lynch, Pierce Fenner & Smith, NASD Arbitration Case No. 03 - 03183

James v.  Intersecurities, et al., NASD Arbitration Case No. 02- 06274

Bise v. Merrill Lynch, Pierce Fenner & Smith, et al., NASD Arbitration Case No.03-02294

Jarrard v. Prudential Equity Group, Inc., NASD Arbitration Case No. 02-06055

Sims v. Washington Square Securities, Inc., et al., NASD Arbitration Case No. 03-08345

Wellman v. Charles Schwab & Co., Inc., et al., NASD Arbitration Case No. 03-05363

Kierce v. Connolly, NASD Arbitration Case No. 04-00078

Paul Bauer v. Metropolitan Life Insurance Company, et al., Court Of Common Pleas, Allegheny County, Pennsylvania, Civil Division, G. D. No. 95 - 15814

Freismuth v. Prudential Equity Group, Inc., NASD Arbitration Case No. 03-07779

Brainard v. American Skandia Life Assurance Corp. Case No. 1: 03-C.V.-1698
U.S. District Court, N. D. Ohio, Eastern Division

Adams, etal. v. McFadden, etal., NASD Arbitration Case No. 03-05687

# EXHIBIT 2

**EXHIBIT 2**

**Gonda v. Metropolitan Life Insurance Co. et al.**

**DEFENDANT METROPOLITAN LIFE INSURANCE COMPANY'S
PROPOSED LIST OF TRIAL EXHIBITS**

| No. | Date | Description |
|-----|------|-------------|
| ML-A | 04/27/92 | **Policy No. 925 207 015 A [RMG 000009-000031; MP 2157000001-2157000024]** |
| ML-B | 03/25/92 | Application for Policy No. 925 207 015 A [RMG 000027-000030; MP 2157000018-2157000023] |
| ML-C | 03/25/92 | Notice Regarding Replacement of Life Insurance and Annuities [MP 2157000139] |
| ML-D | 03/25/92 | Illustration for $64,667 Whole Life Policy [MP 2157000032-2157000033] |
| ML-E | 04/02/92 | Letter from Leonard Nicsky of MetLife to Prudential Insurance Co. re: replacement of Ronald Gonda's policy [MP 2157000030] |
| ML-F | 04/28/92 | Letter to Ronald Gonda from MetLife re: Paid-Up Additions Rider [RMG 000032] |
| ML-G | 04/30/92 | Illustrations prepared for Ronald Gonda [RMG 000004-000008] |
| ML-H | 05/01/92 | Request for Check-o-Matic Arrangement [MP 2157000101] |
| ML-I | 05/06/92 | Letter to Ronald Gonda from Don Roddy re: nicotine usage [MP 2157000036] |
| ML-J | 04/27/93 | Notice of Payment Due for Policy No. 925 207 015 A [RMG 000035-36] |
| ML-K | 06/18/93 | Service Request Form for Policy No. 925 207 015 A [MP 2157000080] |
| ML-L | 08/11/93 | Check from MetLife to Ronald Gonda [MP 2157000102] |
| ML-M | 01/21/94 | Service Request Form for Policy No. 925 207 015 A [MP 2157000025] |

| No. | Date | Description |
|-----|------|-------------|
| ML-N | 01/28/94 | Notice of Cash Surrender Payment for policy No. 925 207 015 A [RMG 000033-34] |
| ML-O | 01/26/94 | Check from MetLife to Ronald Gonda [MP 2157000103] |
| ML-P | 12/08/99 | Consumer Relations Screens for Policy No. 925 207 0015 A [MP 2157000104-215000136] |
| ML-Q | 12/08/99 | Updated Payment History Screens for Policy No. 925 207 0015 A [MP] |
| ML-R | 09/10/03 | Deposition of Ronald Gonda (with Exhibits) |
| ML-S | 10/17/03 | Deposition of William Gerald Friedt (with Exhibits) |
| ML-T | 04/00/81 | Accelerated Payment Plan brochure [M129770180954-M129770180956] |
| ML-U | 06/05/85 | Letter to Field Force re: Cash Value Transfers to Universal Life [MP925000124053-MP925000124054] |
| ML-V | 07/05/88 | Memorandum from Alan Knepper to the Field Force re: L-95 and the Competitive Edge [M069702430269-M069702430272] |
| ML-W | 07/02/90 | Letter to SEHO Managers and Supervisors re: UL waiver of premium load [M099730520433- M099730520434] |
| ML-X | 09/00/90 | Manual of Instructions for Account Representatives Clause 31 - Accel Pay Instructions for Notice Business Policies [MP9365005866; MP9365005939- MP9365005949] |
| ML-Y | 08/00/92 | Manual of Instructions for Account Representatives Clause 31 - Accel Pay Instructions (Excluding Survivorship Whole Life (SWL) and Flexible Whole Life (FWL)) [M129765770828; M129765770904-M129765770911] |
| ML-Z | 11/23/92 | Email from Cheryl Fager to All Sales Offices re: AP Eligibility Quotes [M109766910705] |
| ML-AA | 02/14/94 | Memorandum to the Field Force re: Accelerated Payment Plan (APP) Arrangement [M099755790010-M099755790011] |

2

| No. | Date | Description |
|---|---|---|
| ML-BB | 01/00/94 | MetLife Outlook: Special Edition No. 8<br>[M109759250024-M109759250027] |
| ML-CC | 03/25/94 | Memorandum to the Field Force re: "The ABC's of Dividends" Brochure<br>[M099730610246] |
| ML-DD | 02/00/94 | The ABC's of Dividends brochure<br>[M119712710286-M119712710293] |
| ML-EE | 10/26/94 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement<br>[MP925000086581-MP925000086585] |
| ML-FF | 11/14/94 | Memorandum to the Field Force re: MetLife's Accelerated Payment Arrangement Brochure (PL-1303)<br>[MP925000093602-MP92500093603] |
| ML-GG | 10/00/94 | MetLife's Accelerated Payment Arrangement brochure<br>[MP925000086023-MP925000086029] |
| ML-HH | 03/10/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications<br>[MP0004005643-MP0004005667] |
| ML-II | 03/27/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications<br>[MP925000157798-MP925000157800] |
| ML-JJ | 10/25/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications<br>[MP925000121158-MP925000121163] |
| ML-KK | 12/14/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications<br>[MP925000121244-MP925000121258] |
| ML-LL | 12/28/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications<br>[MP0004004957-MP0004004971] |
| ML-MM | 08/18/97 | Memorandum to the Field Force re: Accelerated Payment Arrangement (AP) Option Program<br>[MP925000108107-MP925000108116] |
| ML-NN | 03/00/97 | Answers to Your Questions About the Accelerated Payment Arrangement and Your MetLife Policy<br>[MP925000145315-MP925000145322] |

| No. | Date | Description |
|---|---|---|
| ML-OO | 10/26/94 | Memorandum to the Field Force re: Sales Illustrations – Explanation Pages<br><br>[M109758660043-M109758660044] |
| ML-PP | 01/12/95 | Memorandum to the Field Force re: Signature Requirement on Sales Illustrations<br>[M099749060082-MP099749060083] |
| ML-QQ | 04/28/95 | Memorandum to the Field Force re: Proposed NAIC Illustration Regulation<br>[M099730850091] |
| ML-RR | 12/08/95 | Memorandum to the Field Force re: Signature Requirements on Sales Illustrations<br>[M099720291871-M099720291874] |
| ML-SS | 06/30/97 | Memorandum to the Field Force re: Signature Requirement on<br>Illustrations Procedural Change<br>[MP925000074433-MP925000074436] |
| ML-TT | 05/00/86 | Branch/District Office Audit Program<br>[M049700141654-M049700141691] |
| ML-UU | 01/00/89 | Office of Consumer Relations manual<br>[MP0004025479-MP0004025521] |
| ML-VV | 09/00/91 | Audit Manual – An Administrative Guide to Auditing Department Policies and Procedures<br>[M049700142005-M049700142218] |
| ML-WW | 06/00/87 | Policy Guide for Business Conduct<br>[MP925000293708-MP925000293730] |
| ML-XX | 00/00/90 | Policy Guide for Business Conduct<br>[MP0004032321-MP0004032344] |
| ML-YY | 09/00/86 | Manual of Instructions for Sales Management - Clause 50-A - Responsibilities and Accountabilities of Branch Managers/District Sales Managers [MP925000004896-4917, MP92500004919-4932] |
| ML-ZZ | 04/03/80 | Memorandum to District Sales Management re: Form 228…Falsification of Company Records or Reports<br>[MP4011161601-MP4011161603] |
| ML-AAA | 11/00/82 | Audit Committee Charter<br>Memorandum from J. Creedon to All Metropolitan Officers Re: Auditing Statement of Policy |

4

| No. | Date | Description |
|---|---|---|
| ML-BBB | 12/22/83 | Memorandum from J.P. Maurer to District Sales Managers re:  Management Compensation Arrangements for the Year 1984<br>[MP0004006033-MP0004006038] |
| ML-CCC | 10/22/86 | Memorandum from Charles E. Lavezzoli to the Field Force re: Honesty, Integrity and Fair Play<br>[M109712990432] |
| ML-DDD | 10/16/90 | Memorandum from Harry P. Kamen to All Department Heads (MLI and MP&C) re:  Procedures for Dealing with Employee Misconduct<br>[MP925000060366-MP925000060367] |
| ML-EEE | 03/03/92 | Memorandum from Richard W. Abele re:  Employee Misconduct Procedures<br>[MP0004032888-MP0004032889] |
| ML-FFF | 12/14/92 | Memorandum from Richard N. Maurer to Regional Executives re: Honesty and Integrity - Our Basis for Doing Business<br>[MP925000069240-MP925000069241] |
| ML-GGG | 12/15/92 | Memorandum from Richard N. Maurer to Branch Managers and District Sales Management re:  Honesty and Integrity - Our Basis for Doing Business<br>[MP925000071488-MP925000071493] |
| ML-HHH | 12/16/92 | Memorandum from Richard N. Maurer to the Field Force re: Honesty and Integrity - Our Basis for Doing Business<br>[MP925000033100-MP925000033107] |
| ML-III | 12/22/92 | Memorandum from Harry P. Kamen to All Officers re: Misconduct<br>[MP925000299077-MP925000299078] |
| ML-JJJ | 04/00/93 | Audit of Sales Outlets<br>[M049700141555-M049700141577] |
| ML-KKK | 12/01/93 | Memorandum from Richard N. Maurer to the Field Force re: Ethical Business Conduct and Local Customer Service<br>[M019807570122] |
| ML-LLL | 01/14/94 | MetLife's Response to the PA Market Conduct Report<br>[MP0004033080-MP0004033127] |
| ML-MMM | 02/00/94 | MetLife Enhanced Compliance Program - February 1994<br>[MP925000059631-MP925000059676] |

5

| No. | Date | Description |
|---|---|---|
| ML-NNN | | Manual of Instructions for Account Representatives [M099740000032] |
| | 02/00/93 | Clause 1A - Honesty and Integrity - Our Basis for Doing Business [M099740000053- M099740000058] |
| | 07/00/94 | Clause 1B - Standards for Business Conduct [M099740000059- M099740000060] |
| ML-OOO | 01/03/94 | Memorandum to the Field Force re: Accelerated Payment Plan (APP) Arrangement, with attachment [M129759740061-M129759740062, M129779250354-M129779250356.001] |
| ML-PPP | 10/26/94 | Memorandum to the Field Force re: Sales Illustrations – Explanation Pages [M109758660043-M109758660044] |
| ML-QQQ | 12/26/94 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement [M129759740281-M129759740285] |
| ML-RRR | 10/16/95 | Memorandum to the Field Force re: Accelerated Payment (AP) Arrangement Customer Communications, with attachments [MP1298006674-MP1298006685] |
| ML-SSS | 03/04/94 | MetLife Enhanced Compliance Program Personal Insurance Workplan [M08971220028-M089712200092] |
| ML-TTT | 07/09/80 | Memorandum from V. Stanley Benfell to the Field Force re: Replacement of In Force Business [MP925000189379- MP925000189380] |

| No. | Date | Description |
|---|---|---|
| ML-UUU | 08/03/81 | Memorandum to District Sales Management and Branch Management re: Replacement Business Rules<br><br>[MP925000034478-MP925000034480] |
| ML-VVV | 12/05/83 | Memorandum from George B. Trotta to Branch Managers and District Sales Managers re: Universal Life – Replacement Activity<br>[MP925000142414] |
| ML-WWW | 02/15/85 | Memorandum to the Field:  Piggybacking and Replacement Business<br><br>[M119737720279-280] |
| ML-XXX | 11/25/85 | Memorandum from G. Trotta to Agency Vice Presidents, Regional Sales Managers, Branch Managers and District Sales Managers re: Piggybacking and Replacement Business<br><br>[MP925000034577] |
| ML-YYY | 01/00/86 | "Piggybacking / Replacement" Guided Conference Outline<br>[MP925000094761-MP925000094771] |
| ML-ZZZ | 10/22/86 | Memorandum to the Field:  Honesty, Integrity and Fair Play<br>[M109712990432] |
| ML-AAAA | 02/01/89 | Memorandum from Anthony C. Cannatella to the Field Force re: Replacement Business<br><br>[M109739390052-M109739390054] |
| ML-BBBB | 03/13/95 | Memorandum from A. Cannatella to the Field Force re: Policy Replacement Information Guide<br><br>[MP925000122539-2542] |
| ML-CCCC | 06/00/95 | Weighing The Options: Policy Replacement<br>[MP925000061759-MP925000061840] |
| ML-DDDD | 08/21/95 | Memorandum from Stephen G. Orluck to Sales Office Management re: Enhancements to the FIP Tracking Process<br><br>[MP925000122824] |
| ML-EEEE | 09/21/95 | Memorandum to the Field Force re: "Policy Replacement: Weighing The Options"<br><br>[MP925000190197-MP92500019201] |

| No. | Date | Description |
|---|---|---|
| ML-FFFF | 08/00/96 | Agent's Replacement Guide<br>[MP0004026810-MP0004026973] |
| ML-GGGG | 10/28/96 | Memorandum to the Field Force re:  New Training Module on Replacement<br>[MP925000262040-41] |
| ML-HHHH | 03/00/82 | Compensation Rules and Schedules - Clause 307 - Replacement Business Rules<br>[MP4011145995; MP4011146133-MP4011146142] |
| ML-IIII | 04/00/82 | Manual of Instructions for District Sales Management, Including Manual of Instructions for Agents - Clause 150 - New Business<br>[MP92500003921-3945, 3999-4000] |
| ML-JJJJ | 02/00/88 | Manual of Instructions for Sales Management - Clause 50A - Responsibilities and Accountabilities of Branch Managers/ District Sales Managers<br>[MP925000004897;  MP925000004919-MP925000004932] |
| ML-KKKK | 09/00/86,<br>07/00/88,<br>02/00/89 | Manual of Instructions for Sales Representatives - Clause 101 - New Business [M119769180465, M119769180540-563<br>M119769180449, M119769180454-464<br>M029845890085-100] |
| ML-LLLL | 08/00/92 | Manual of Instructions for Account Representatives - Clause 123 - Exchange of Life Insurance Policies Under Section 1035<br>[M099740000032, 243-256] |

| No. | Date | Description |
|-----|------|-------------|
| ML-MMMM | 05/00/88 | Manual of Instructions for Account Representatives - Clause 123 - Exchange of Life Insurance Policies Under Section 1035<br>[M029845890001-5246] |
| ML-NNNN | 06/22/84 | Memorandum from George B. Trotta to the Field Force re: Field-Prepared Sales Materials<br>[M109734450064] |
| ML-OOOO | 05/25/88 | Memorandum from Robert J. Crimmins to the Field Force re: Sales Materials - Use and Reproduction of Published Articles<br>[MP925000068549] |
| ML-PPPP | 11/05/90 | Memorandum from M. S. Peress to Director of Marketing, Regional Executives, Branch Managers and District Sales Managers in Eastern Zone re: Unauthorized Sales Materials, Including Pre-Approach Letters<br>[M019879360440] |
| ML-QQQQ | 11/27/92 | Memorandum from Steven G. Orluck to the Field Force re: Procedures for Requesting Approval of Locally Produced Sales Literature<br>[MP925000282268-MP925000282271] |
| ML-RRRR | 03/22/93 | Memorandum from Stephen G. Orluck to the Field Force re: Sales Literature for Use in Professional Markets<br>[MP925000071426] |
| ML-SSSS | 06/30/93 | Memorandum from Robert J. Crimmins to the Field Force re: Procedures for Approval of Locally Produced Sales Material and Use and Reproduction of Published Articles<br>[M119762060985- M119762060987] |
| ML-TTTT | 09/13/93 | Memorandum from Richard N. Maurer to Branch Managers and District Sales Managers re: Procedures for Approval of Locally Produced Sales Material and Use and Reproduction of Published Articles<br>[M109732480056- M109732480057] |
| ML-UUUU | 08/08/94 | Memorandum to the Field Force re: Procedures for the Approval of Locally Created Sales Material<br>[MP925000261461- MP925000261466] |
| ML-VVVV | 07/00/94 | Manual of Instructions for Account Representatives - Clause 100-S - Sales and Training Materials Approval Requirements<br>[M099740000032; M099740000140- M099740000142] |

9

| No. | Date | Description |
|---|---|---|
| ML-WWWW | 09/29/97 | Complaint in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla). [MP2364004494-4513] |
| ML-XXXX | 04/19/06 | Civil Docket in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla). [MP2364004533 – 4541] |
| ML-YYYY | 02/01/99 | Summary Judgment Order in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla). [MP2364004514 – 4526] |
| ML-ZZZZ | 01/11/00 | Opinion by Tenth Circuit affirming Order in James L. Rayl v. Metropolitan Life Insurance Company, D.C. No. 97-CV-505-H (N.D. Okla). [MP2364004529 – 4532] |
| ML-AAAAA | 04/04/05 | Testimony of Harry Kamen in Kintner v. Metropolitan Life Insurance Co., Civil Action No. 01-1725 (p. 129-163) [MP2364004456 – 493] |
| ML-BBBBB | 08/09/73 | Prudential Policy No. D80 263 288 [RMG 000041 – RMG 000085] |
| ML-CCCCC | 08/03/92 | Request for Policy or Contract data re: Policy No. 925 207 015 A. [MP 2157000086] |

10