# Ronald M. Gonda v. Metropolitan Life Insurance Company, et al.
## Civil Action No. 00-2286

### Hearsay Designations in Connection with Plaintiffs' Exhibits 95 and 107 (Videotape of MetLife APP Research-Four Focus Groups)

Although Metropolitan Life Insurance Company ("MetLife") and William Friedt, Jr. maintain the position that the entirety of Plaintiff's Exhibits 95 and 107 constitute inadmissible hearsay, and MetLife and Mr. Friedt do not waive their right to renew this objection to its admissibility at trial, MetLife and Mr. Friedt hereby designate the following excerpts from the videotape transcript as objectionable pursuant to the hearsay rules of the Federal Rules of Evidence.

| Page of Transcript | Designation Number | Reason for Hearsay Objection |
|---|---|---|
| 1 | 1 | Double Hearsay – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 1 | 2 | Double Hearsay – Representative's statement in the cited passage does not identify the speaker. Thus, the statements set forth in this passage are not subject to substantiation or cross examination. |
| 2 | 3 | Double Hearsay – Representative's statement in the cited passage does not identify the speaker. Thus, the statements set forth in this passage are not subject to substantiation or cross examination. |
| 2 | 4 | Double Hearsay – Representative's statement in the cited passage does not identify the speaker. Thus, the statements set forth in this passage are not subject to substantiation or cross examination. |
| 2 | 5 | Double Hearsay – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 2 | 6 | Double Hearsay – Refers to documents or information that are not in evidence and which cannot be authenticated. |
| 2-3 | 7 | Double Hearsay – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. |

|   |   |   |
|---|---|---|
|   |   | In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 3 | 8 | <u>Double Hearsay</u> – The representative's statements do not identify the underlying declarant, and the statements referred to in this passage cannot be substantiated and are not subject to cross examination. |
| 3 | 9 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 3 | 9A | <u>Double Hearsay</u> – Refers to correspondence or other documents or information that is not in evidence and which cannot be authenticated. |
| 3 | 10 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 3 | 11 | <u>Double Hearsay</u> – Representative's statements are general comments and do not represent an actual presentation that can be identified, substantiated and that would be subject to cross examination. |
| 4 | 12 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 4 | 13 | <u>Double Hearsay</u> – Speculative nature of comment cannot be substantiated and is not subject to cross examination. |
| 4 | 14 | <u>Double Hearsay</u> – Referring to statements by another representative that cannot be substantiated and are not subject to cross examination. |
| 4 | 15 | <u>Double Hearsay</u> – Statements by the representative, which themselves are not subject to cross examination, are citing comments or statements by other unidentified representatives whose statements are not subject to authentication or cross examination. |

| | | |
|---|---|---|
| 4 | 16 | <u>Double Hearsay</u> -- Statements by the representative are citing statements of other representatives which, themselves, cannot be substantiated and are not subject to cross examination. |
| 4 | 17 | <u>Double Hearsay</u>—Statements by unidentified customers of the unidentified representative. Neither of the statements made can be substantiated or are subject to cross examination. |
| 5 | 18 | <u>Hearsay</u> – General statement by a representative that is not subject to substantiation or cross examination. |
| 5 | 19 | <u>Double Hearsay</u>—Statements by unidentified representative referring to an unidentified "they" and includes statements that cannot be substantiated and are not subject to cross examination. |
| 5 | 20 | <u>Hearsay/Speculation</u> – This statement by an unidentified representative refers to what unidentified customers are thinking. |
| 5 | 21 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 5 | 22 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 5 | 23 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments and suggestions attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 6 | 24 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 6 | 25 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives |

| | | |
|---|---|---|
| | | cannot be identified and the context in which the statements are being made is unclear. |
| 6 | 27 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear.<br>Additionally, this excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 6 | 28 | <u>Double Hearsay</u> – This excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 6 | 29 | <u>Double Hearsay</u> – This excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 6 | 30 | <u>Double Hearsay</u> – This excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 7 | 31 | <u>Double Hearsay</u> – This entire excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 7 | 32 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear.<br>Additionally, the excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 7 | 33 | <u>Hearsay/Speculation</u> – Statement by representative of what unidentified customers are thinking cannot be substantiated and is not subject to cross examination. |
| 7 | 34 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 7 | 35 | <u>Hearsay</u>—The representative appears to be referring to a document that is not in evidence and which cannot be authenticated. |
| 8 | 36 | <u>Hearsay</u> – The representative(s) appear to be referring to a document that is not in evidence and which cannot be authenticated. |
| 8 | 37 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives |

| | | |
|---|---|---|
| | | cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 8 | 38 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 8 | 39 | <u>Double Hearsay</u> – Representatives referred to in this excerpt are not identified, and the comments attributed to the representatives cannot be substantiated and are not subject to cross examination. In addition, the statements contained in this passage are not an admission by the Company because, again, the representatives cannot be identified and the context in which the statements are being made is unclear. |
| 8 | 40 | <u>Hearsay</u> – This excerpt refers to a document that is not in evidence and which cannot be authenticated. |
| 9 | 41 | <u>Double Hearsay</u> – Unidentified representative is stating what an unidentified "Paul" said. The statements cannot be substantiated and are not subject to cross examination. |

ME1\5703676.1

METLIFE APP RESEARCH
FOUR FOCUS GROUPS
NEW YORK CITY
(September 25 and 26, 1996)

FEMALE COMMENTATOR: Four focus groups were conducted in New York City on September 25 and 26, 1996, for MetLife's APP accelerated payment research. Each session lasted approximately two hours. MetLife is working to develop materials designed to support and assist its account representatives in explaining the APP accelerated payment situation to policyholders who have been or will be affected by decreasing dividends. The materials being developed are designed to educate customers as to why dividends may fluctuate as a function of capital markets movements, interest rate cycles, dividend determination, etc. The ultimate objective of such materials are to help reps make a meaningful and informative presentation to customers, and then to help them choose wisely from the options available. The purpose of this market research project was to evaluate reps' reactions to these materials early in the development process and to gain insights into their handling of the APP situation to date, their expectations regarding anticipated customer reactions and their opinions as to how MetLife might offer support in this matter. The reps who participated in these discussions were deliberately selected on the basis of their experience, records of high production and large numbers of whole life customers with the APP option among their books of business. Most of the participants were in sales. A few were managers who had APP cases from former sales positions. Two of the groups were composed of Asian American reps, one Korean and a second a mix of Mandarin- and Cantonese-speaking reps. The detailed findings are as follows: First, reps were asked to reconstruct the way they typically would have explained several years ago the APP feature to customers at the time of sale. Response varied with some reps recalling having made very conservative explanations of the APP option as only a possibility. They remembered having emphasized that dividends were not guaranteed.

STUART: I did it two ways, actually. Basically, I showed an illustration showing the APP years, showed an illustration not showing the APP years. But I always did underline, or stress, dividends are not guaranteed. But today it seems like more people remember the APP illustrations than everything else.

MALE SALES REP 1: I usually present policy as a whole life and that you need to pay the premium all your life. But in certain way you can use the dividend and some cash values inside the policy to pay for itself. So, you don't have to pay premium yourself out of your pocket.

FEMALE COMMENTATOR: Other reps noted that their understanding of the APP feature and of the possible impact of interest rate fluctuations and reduced dividend scales on out-of-pocket premium payments had improved substantially over the past several years. Several reps reported that their training with regard to the APP feature had been sketchy and inadequate. Many had not been aware of a need to or encouraged to emphasize the uncertainty of continuing dividend scale levels.          /

MALE SALES REP 2: When I started in '88, when APP's looked great, and didn't explain them as properly as they should have been.

MALE SALES REP 3: If we're brutally honest, and I think every person in this room would agree with me, there was really no direction from the company in really explaining to the agents what dividends are, how they can develop, how they can change, what the different components of dividends are. Now we're all experts in dividends because we're getting hammered. But ten years ago that was not the case. All you got was you were told here's an illustration, go out and talk to a client and you say something like based on our current dividend scale, we're illustrating you'll be able to stop paying after seven or eight years.      2

That's all the company gave us. And the sales material, that's all our managers told us to do and there was really no clear direction. I'm not going to blame it on the company because we were in a different environment at that particular time. But I think what's happening is this lack of direction is coming back to haunt us now.

MALE SALES REP 4: I don't think the managers really understood. I will give them the benefit of ignorance rather than just pure greed or deception. But they, on the whole, gave us this great product, say, hey, go out. Five years. Anybody can pay for five years.

FEMALE COMMENTATOR: The APP situation appears to be of a particularly serious problem for the Chinese market. While some reps obviously tried to give their customers a clear understanding of the APP option, others candidly acknowledged having used this feature as a popular, powerful and effective marketing tool. Consequently, for some Chinese reps, the problem is small, but for most this issue is of major proportions, threatening to undermine credibility, the referral system and future sales opportunities.

FEMALE SALES REP 1: I would tell them actually the policy you have to pay all the way to '98 or '95. But the money that are accumulating in the policy, if they get into a certain number and cash value can provide all this dividend and guaranteed insurance rate can cover the premium, then you don't have to pay out from your pockets.

FEMALE SALES REP 2: Years ago -- before the meeting, we talked with Michi (ph) and (??), right? At the very beginning we don't have very well training to explain the illustration to the customer. And we only would get the license and begin to sell.

MALE SALES REP 5: I think they all understand the present economic condition. It's quite understandable if they just pay for additional one or two years. But next year, we have to -- through the computer, we just found out that actually they have to pay more, maybe three or four years, which is I don't know how to explain to my customers.

MALE SALES REP 6: In the Chinese market, APP is, I guess, the most disliked feature of a life insurance policy.

FEMALE COMMENTATOR: Discussion participants were asked to describe customer understanding, perceptions and expectations regarding the APP feature, regardless of their efforts to explain that future dividends were not guaranteed. They agreed that most customers clung stubbornly to the expectation that their premium payments would end after a specific number of years.

MALE SALES REP 7: You had to use the two illustrations that were always provided. Unfortunately, now that a lot of us are servicing inherited business that there appears only one illustration was ever provided to the clients. When you use the two illustrations, you show the individual that they -- you can circle the word none that was on the bottom. It didn't mean that their premiums stopped, but that, based upon Column B plus part of Column C, you would pay the premium due, or first column. That's how I explained it. If the dividends were greater, the number could shorten, because Column C, which was the total accumulated dividends, would be a larger amount -- would be larger. If the dividends were lower, Column C would be smaller and you may have to pay an extra year. Then you went back to the worst case scenario, being a full ledger statement which was attached on the back and said, well, this is -- if you want to develop a lot of cash value in your contract. You can pay all the way through. Most of them would lock in on the accelerated payment area.

MALE SALES REP 1: I believe the customers only remember the number 11 or 12 years. And they don't remember that they have to either lengthen or shorten the period of time.

FEMALE COMMENTATOR: Reps were asked to describe the specific impact this APP situation was having on themselves, other agents and their businesses. While the degree of affect varied widely, there was a consensus that the

<u>potential impact was quite serious.</u> They agreed that <u>the difficulties were being exacerbated by a number of factors, including industrywide negative publicity, uncertainty regarding what information former agents had given to inherited APP customers and the perceived lack of an appropriate response from corporate headquarters.</u>

STUART: But I mean now it's just that we have no credibility. And it's not your good clients. While your good clients will be upset with you, they probably won't buy from you a while, UL2 or something else. But the point being it's just -- we have no credibility.

MALE SALES REP 8: This is an industrywide problem, it's not a Metropolitan problem.

MALE SALES REP 3: I think a lot of the problems we're having with APP are a function of two issues. Number one, what New York Life just went through, which was highly publicized. Prudential went through it in a similar fashion. And what's happening is a lot of other insurance people and other financial people that are in our business, if they have a hold of one of our customers or clients, whatever you want to call them, they're telling you, oh, you have a whole life policy? Oh, you're getting screwed. <u>He told you it was going to be paid up in eight years? Guess what, it's not going to happen.</u>

MALE SALES REP 9: <u>I truly believed it was going to happen. I knew that there was a chance that they'd be off a year or two. But seven turned into 17 years. And we never got a satisfactory explanation from the company.</u>

MALE SALES REP 10: Especially that problem is very much difficult for us to explain to the customer.

FEMALE COMMENTATOR: For the Chinese reps, the repercussions were perceived to be particularly ominous, affecting professional trust and credibility, the referral system and future earning potential. Beyond the current APP situation, <u>some reps expressed concern that MetLife was also at jeopardy in related areas.</u>

FEMALE SALES REP 2: Our credibility was going down very much. The APP program start two years already, right? And then three years later they receive letters <u>saying they still have to pay more money.</u> I don't think we can have more business like this. I'm conference qualify every years and before I be council, but why I'm going down in business, business going down. Chinese market is different than American people. American people they like to pay the mortgage like 30 years, 50 years. And Chinese is no. Asian market is totally difference.

FEMALE SALES REP 3: It's going to be long-term over explanation, our referral will be a little bit less, our repeat sale will be a little bit less, yes. You have to anticipate. But I think by guaranteeing them in the future next year or so, I think it will regain the trust. And it's just that we have to build it all over again.

FEMALE SALES REP 2: Cutting dividends year by year. It's hurting us a lot.

MALE SALES REP 4: I'd say the APP is a lot less of a potential disaster than our Universal Life book of business.

FEMALE COMMENTATOR: <u>Reps described the actions that they were taking in response to decreasing dividends and customer reactions.</u> Some were actively taking measures to try to keep customers informed about and aware of the implications of dividend scale reductions. Others opted for a more passive, reactive approach.

STUART: I'm preparing people now as I put them on APP. <u>You're on APP now, you're accelerated. What's going to happen five or six or ten years from now when I say, I'm sorry, you've got to start paying again.</u>

SALES REP 2: I tell them, you know what interest rates have done, you've got money in the bank. Our money in the bank isn't any different than your

money in the bank. It's going to take a little longer. And I've been successful in putting fires out with that explanation.

FEMALE SALES REP 3: Next year when you get a statement, come again and we look it over, see how it works out. I think that can be anticipated.

STUART: I think the more we're involved with our clients, and I don't call my clients, which I probably should, the more contact we have through other products and mutual funds, annuities, whole life, the less problems we're going to have with those people. The more contacts --

FEMALE SALES REP 4: As Ken says, a relationship.

STUART: Sure. And that's it. If you have a relationship, you can overcome a lot.

FEMALE SALES REP 5: I like to emit the passive approach where you don't rock a sleeping whale. So, 90% of our clients unfortunately don't really remember what they bought ten years ago, and they're so accustomed to paying premiums. I admit I have some clients who are just not that financially sophisticated and get a bill and just pay it.

FEMALE COMMENTATOR: Discussion participants reported that they had experienced and were anticipating customer reactions that ranged from moderately disappointed to angry, unreasonable and irate. They expected the most furious responses from any customers who had, for whatever reason, bought the whole life policy solely or largely on the basis of the APP option. Many reps segmented customer reactions according to whether the policyholder was a client, a business relationship developed by the rep personally, or a customer, a policyholder inherited from another rep's book of business.

MALE SALES REP 9: People were sold the product strictly on APP. That was the focal point. The other pages of the illustration weren't addressed. There's going to be a major problem because those people are going to feel deceived, cheated, swindled.

MALE SALES REP 3: I'm having that problem basically with my inherited cases. With my good clients, even the ones who are disappointed, who've asked me, I've offered to do an in-force illustration. I can usually work with them to say, okay, this is the story, this is why.

MALE SALES REP 2: And when you rationally explain it. Take it if it was one of your own customers, they're less likely to hammer you. If it's inherited, you've got a problem, as you mentioned, because you don't know who they are and what was sold.

MALE SALES REP 10: From the customer point of view, they're very much disappointed when we explain you got to pay more premium. That's obviously because many (??) -- many an agent they say, this is -- especially in -- I don't know about the other market, but Korean market is - in the beginning, you know. The experienced rep they usually say, this is for ten years and after ten years you don't have to pay the premium. In the beginning, they would -- they did not actually say if this company's going to make sure your dividends going to pay off your premium. You got to pay another two or three more years. They never mention those kind of things. So, when it comes to the ten years or 11 years that certain year, many people are confused and say, When I saw this policy, my ex-agent told me at this certain year it ends and I didn't have to pay for it, but I ended up paying two or three more years.

FEMALE COMMENTATOR: Some reps perceived that widespread consumer misunderstanding regarding how capital markets work in general and how they impact dividend scales in particular is contributing to customers angry reactions. Other reps expect to experience some of the most negative reactions among APP customers who have already elected the option and stopped making out-of-pocket premium payments.

MALE SALES REP 9: A lot of people were bitterly disappointed the dividends went down by 20%, by 30%. That's not what we thought we had here. Metropolitan, right? That's an insurance company.

FEMALE SALES REP 6: Ten years ago we didn't stress the point that dividend does not guarantee. We do say it but we didn't stress the point and nobody believed that interest rate will come down. Eleven years ago everything was very high. Two years ago interest rate you only get 2% from a bank. All right, I use this to explain to the client when they came back. I say interest rate coming down, whatever, they understand but they don't want to understand. They say, MetLife's a big company. You'll find (??). You'll find it. You say you're the best company in United States. You have such a credibility. Why you going to cut? I don't care. You're supposed to make a lot of money. When selling mutual fund, you say do very well. How come you don't know how to do investment and give us a low dividend? That credibility is jeopardized.

MALE SALES REP 5: People understand that interest is a variable but they don't understand that dividend is variable.

FEMALE COMMENTATOR: Some reps noted their perceptions that consumer sophistication regarding the financial markets was growing, most notably impacting the expectations and attitudes of younger customers. A few reps were more optimistic, noting that keeping in touch with both customers and clients was perceived to create an atmosphere that would allow them to rationally and effectively inform these policyholders how the situation had arisen and what their options were.

MALE SALES REP 4: I think what's happening also in the industry the consumer is slowly but surely getting more and more sophisticated about investments. They are no longer afraid of the stock market. In fact, the baby boomers, as they migrate through time, are going to make investing in equities bigger and bigger and bigger.

STUART: I think the people in here, probably the President's Conference, Leaders Conference people don't have as much of a problem with their own clientele, but that doesn't help the younger people who sold it as a 25-year (??).

MALE SALES REP 11: Even my inherited clients I try and stay in contact with. It's not just something that's given to me and I just leave there. I always try and see those people so that I can get what the original agent said and try and stay on the basic track. If APP does come up, which it has in some of the past, again I just try and explain to them that dividends aren't guaranteed. I can't say what the previous agent said or did. I just tell them it's not a guarantee and obviously the interest rates affect what we do.

FEMALE COMMENTATOR: Reps were asked to specify what they would like MetLife to do to support the agency force and assist reps in helping their customers make wise decisions. Their suggestions took various forms, including improved public relations, customer communications and product positioning. Revise illustrations to enhance customer understanding of the impact of dividend fluctuations, and offer its clients direct recognition.

FEMALE SALES REP 5: I think we need to have some kind of goodwill campaign to get a client back, and not in a lawsuit environment, but more like even when you did that successful term conversion campaign and gave those vouchers. You gave a freebie and I think your term conversions shot up like crazy. I think that's a very successful campaign. I don't know of anybody that would disagree with me. Well, I think it's time to give these people a little freebie.

MALE SALES REP 8: Maybe Metropolitan ought to send a letter out to people every year telling them that the dividends that they get, that they've gotten that year, was so much but they're not guaranteed. Constantly remind the public that the dividend or the anticipated APP date may not occur because dividends are not guaranteed.

MALE SALES REP 3: I think we should develop a new in-force illustration that we should be able to run at policy year. Okay, if a contract is in force for seven years, the premium's $1,000 a year and there's, let's say for

argument's sake, $6,000 of accumulated dividends in the contract already, it should be able to illustrate taking from the current pool until all the money's exhausted and then to show premium reduction. Show what the client will pay out of pocket when there's no more dividend money to work with.

MALE SALES REP 8: There ought to be a two- or three-page illustration. This is what happens if we pay dividends. This is what happens if we don't pay dividends.

MALE SALES REP 3: I think one thing the company should look at possibly is look at direct recognition, like some of our competitors do.

MALE SALES REP 8: Definitely.

MALE SALES REP 3: Let's reward our clients who don't take policy loans.

FEMALE COMMENTATOR: Before discussion participants were exposed to any of the materials being developed by MetLife, they were asked what were, in their opinions, the critical issues and factors to be addressed in explaining to customers the variability of dividends and the uncertainty of the APP option. They cited MetLife's credibility, financial stability and industry leadership position, an explanation of how capital markets work and why interest rates fluctuate, an illustration of the various components determining dividends and a review of various options available to customers. 24

MALE SALES REP 11: The only way they can do it is explain how the markets react. If they put that in writing to these people that are looking for some type of response from the company and not think it was the agent misled them. I think that would be a little bit more appeasing to the people.

FEMALE SALES REP 6: Why the dividend comes down.

MALE SALES REP 3: I think there should be an explanation of the different components that create our dividends.

MALE SALES REP 8: Very simple.

MALE SALES REP 3: In simplified language that's easy to understand.

FEMALE COMMENTATOR: The majority of reps expressed approval of much of the contents of the early stage track book or presentation materials they reviewed. They responded favorably to the idea that using such materials would be rep driven, so that they could tailor a presentation to a particular customer's needs, interest and level of understanding. Here are some comments on the first four pages of the presentation materials. 25

FEMALE SALES REP 4: Is that a logical explanation to the customer?

MALE SALES REP 12: Very simple and good explanation, I think so, yes.

FEMALE SALES REP 4: What do you think about Roger's idea of putting the guaranteed elements right up front? 26

MALE SALES REP 12: Give them the positive.

FEMALE SALES REP 4: Absolutely.

MALE SALES REP 4: I use a lot the fact that MetLife handles the pensions or groups for almost 90 of the Fortune 100. If it's good enough for the Fortune 100, it's good enough for you. I push that big time. Forget about the ratings.

MALE SALES REP 3: Yeah, I don't want to hear about rates slipping.

MALE SALES REP 5: Over here we have $1.3 trillion. People don't know what that means. If we said we're number one as life insurance in force as of September '95.

FEMALE COMMENTATOR: Many reps noted that they already used the buying versus renting analogy when explaining to prospective customers the difference between whole life and term insurance. But a majority had difficulty in following the APP adjustable rate mortgage connection, stating that their customers would only be further confused. 27

FEMALE SALES REP 4: What do you think about this risk reward spectrum down at the bottom? 28

FEMALE SALES REP 5: They're not going to pick up on it. 29

MALE SALES REP 12: I don't understand what it means myself. 30

FEMALE SALES REP 6: What's bothering is these two cash things, I still don't understand. The left-hand side cash outlay is really big. And the right-hand side cash outlay is really small. And it's not true. For long term, the cash outlay for term is a lot.

FEMALE SALES REP 4: Can be a lot.

FEMALE SALES REP 6: Yeah, can be a lot, but this way look like you spend little money to buy here. I mean, I would say it's better, the little pocket, the little money only. This a lot of money buy whole life.

MALE SALES REP 1: This could give some impression that for term you can pay just a little bit for the life time, so --

FEMALE SALES REP 1: Just look at -- I'm not -- I lose my patience to read all this.

FEMALE SALES REP 4: All right, see a line on this page at this size?

FEMALE SALES REP 6: Yes, and it's confusing.

FEMALE SALES REP 4: Just as you can choose to limit your mortgage payments by using an adjustable rate mortgage --

MALE SALES REP 3: And how do you limit your mortgage payments other than, what, a lower payment? Is that what you're saying? I mean, I don't see the analogy between an adjustable rate mortgage and an APP arrangement.

FEMALE SALES REP 7: Maybe you tell client this accelerated payment arrangement. It's more risk. Nobody wants to buy insurance.

MALE SALES REP 2: My clients just don't relate to that. It's confusing. It's like what are you here to tell me about? What is adjustable rate mortgage? I may have to get into explaining what an adjustable rate mortgage is. They may not know what I'm talking about. They may be a 30-year fixed generation after generation. And if I'm trying to put an APP fire out, I don't want to complicate, confuse or dance around the issue. I want to hit it head on.

MALE SALES REP 13: If this is something that you really wanted to use more of a defensive for the people that are questioning those customers, I think you're adding more question by putting the question marks.

FEMALE SALES REP 5: Question marks?

FEMALE COMMENTATOR: Most reps shared the opinion that the presentation should be simplified and streamlined. They recommended emphasizing the connection between MetLife dividend scales and T-bond rates. A few objected to a lengthy discussion of capital markets and interest rates that would only exacerbate the customer's resentment.

MALE SALES REP 14: (??) look at the graph here. I think it's very easy to understand.

MALE SALES REP 8: It's true. Clear.

FEMALE SALES REP 1: I still like the -- I try to sell them the life insurance. With this picture, the client's probably think why I'm not invest money in equity? Why buy life insurance this time?

MALE SALES REP 9: This is the first page that you get to how it directly affects their policy.

STUART: I'd like to see even earlier on that Met has a responsibility.

MALE SALES REP 3: That's right.

COMMENTATOR: Reps generally agreed that the description of how dividends are determined would be particularly useful and effective.

STUART: You know people need -- deserve an explanation. We tell them this, but you know, something in writing would help. But we used to show this. I remember we used to show this to people. We used to have it in some of these books that we had. The components of a dividend.

FEMALE SALES REP 4: Is this a good lead in to the specific options?

FEMALE SALES REP 1: Yeah, I think this is already explained a lot. We really don't need the other prior pages, all those pages.

FEMALE SALES REP 4: Okay.

MALE SALES REP 8: A revelation. Great. Great.

31

32

33

34

35

FEMALE SALES REP 4: <u>Good to be able to show them this?</u>
MALE SALES REP 15: <u>Yup. It's the truth. Clear. Simple.</u>  36
MALE SALES REP 11: <u>Put these on the top pages.</u>
MALE SALES REP 8: <u>That should be the front page.</u>
MALE SALES REP 15: <u>Yeah.</u>
FEMALE COMMENTATOR: Most reps responded favorably to the array of options MetLife was proposing. Of the two pay-none options, wait and see elicited only modest interest. Many reps perceived that reducing the face amount of the policy would have <u>appeal for some of their customers, particularly when it was</u>  37
<u>explained that MetLife would be willing to guarantee no additional premium</u>
<u>payments for the APP customer who elected to take a 25% reduction in face value.</u>
MALE SALES REP 9: I think that's a legitimate option.
STUART: That's putting something on the table.
FEMALE COMMENTATOR: All of the pay-some options were moderately well received. <u>Among these, reps appeared to think their customers would be most</u>
<u>attracted to paying the difference between the premium and the dividend or</u>  38
<u>paying 25% of the premium. They were not so attracted to paying the premium for</u>
<u>X years or paying the premium once every four years.</u>
MALE SALES REP 4: This is straightforward.
FEMALE SALES REP 4: You've got to say this, right?
MALE SALES REP 4: Yeah, you've got to let them know what their options are.
FEMALE SALES REP 3: The options are very good because it gives the client the opportunity to select.
FEMALE COMMENTATOR: Reps were interested in having additional materials to use with the track book, perceiving a need to be able to customize presentations with information and projections relevant to the particular individual customer. Most discussion participants expressed <u>positive interest</u>
<u>in and appreciation for the fact that MetLife was working to develop meaningful</u>  39
<u>materials designed to help them explain to the APP customers how the current</u>
<u>situation has arisen and what their options are.</u>
FEMALE SALES REP 2: If the client needed. I can (??) something like this to the client, but not too complicated. Simplify it, like a three page, four page. Just clean it out, bring it to a customer, explain it to them and give it to them. Just you can keep it and make sure you understand it. And if you don't understand, call me up and I explain to you again.
MALE SALES REP 4: Just get a new version of that accelerated payment arrangement brochure that explains these options because we never had all these options before.
FEMALE SALES REP 4: Guarantees, all right?
STUART: I think how a dividend is composed. I think MetLife's responsibility is very important.
FEMALE SALES REP 4: And maybe move that up front.
STUART: Yeah, move that definitely.
MALE SALES REP 12: And then the interest rates that Met paid compared to the T-bills, was it?
FEMALE SALES REP 4: Yes. <u>Let's see, what page is that?</u>
STUART: <s>Maybe seven is strong.</s> <u>Maybe give the difference between a --</u>  40
FEMALE SAKES REO 4: <u>Seven and nine are strong.</u>
STUART: The term and the whole life, different types of insurance. Go back to basics.
MALE SALES REP 9: Once the problem shows up at your front door or with a phone call (??).
STUART: You're not going to be having a thousand people who are going to be questioning --

FEMALE SALES REP 4: Paul said that you've been through the process mentally yourself, and you know what you have to show them, what their options are?

MALE SALES REP 9: Sure. How about incorporating some features of the original illustration where the (invoice) --??

Master - EPNER 000085 [Duplicate tape: STADLER 5936]

Master - EPNER 000085 [Duplicate tape: STADLER 5936]

22