SWORN STATEMENT OF WILLIAM GERALD FRIEDT, JR.

- - -

Sheraton Inn-North
910 Sheraton Drive
Mars, Pennsylvania  16046

Saturday, July 23, 1994 - 9:16 a.m.

- - -

PRESENT:

RON PARRY, ESQ., of the law firm
of Arnzen, Parry & Wentz, P.S.C., 600 Greenup
Street, P.O. Box 472, Covington, Kentucky
41012-0472.

- - -

PAPPAS REPORTING SERVICE, INC.
Registered Professional Reporters
710 Fifth Avenue
Suite 1000
Pittsburgh, Pennsylvania  15219
(412) 566-2209
FAX (412) 566-1070
Listed:  Martindale-Hubbell

ORIGINAL
CONFIDENTIAL



2

```
 1                    I N D E X

 2   WITNESS          EXAMINATION BY          PAGE

 3   WILLIAM GERALD
     FRIEDT, JR.       Mr. Parry                3
 4
                        - - - \
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

3

1          WILLIAM GERALD FRIEDT, JR.

2    having been first duly sworn, testified and

3    said as follows:

4                    EXAMINATION

5    BY MR. PARRY:

6          Q       Would you state your full name,

7    please.

8          A       William Gerald Friedt, Jr.

9          Q       Can you spell your last name.

10         A       F-r-i-e-d-t.

11         Q       Is it okay if I call you Jerry?

12         A       Yes, please.

13         Q       Okay, Jerry.  My name is Ron

14   Parry, and I've just introduced myself to you.

15   I'm an attorney from Cincinnati, Ohio.  I'm

16   looking into some lawsuits in this area

17   relating to Metropolitan Life Insurance

18   Company, and that's why we've asked you to

19   come here today to ask you some questions

20   about the operation of the Butler office of

21   Metropolitan Life Insurance Company.  Do you

22   understand that?

23         A       Yes, I do.

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

MP2157000501

4

WILLIAM GERALD FRIEDT, JR.

1    Q        And let me ask you this, first

2    of all.  Has anybody promised you anything,

3    paid you any money, promised you any money to

4    get you to come here today to make this

5    statement?

6    A        No.

7    Q        Has anybody threatened you in

8    any way?  You're a pretty big guy.  You don't

9    look like you'd be threatened by much.  But

10   has anybody threatened you in any way to get

11   you to come here to make this statement?

12   A        No.

13   Q        So you've come here voluntarily,

14   and everything that you tell me is the

15   information you're volunteering to us; is that

16   right?

17   A        Correct.

18   Q        And you understand that the

19   court reporter has placed you under oath just

20   like you might be placed under oath in a court

21   of law if you testify; correct?

22   A        Yes, I do.

23   Q        Okay.  Can you give me, first

CONFIDENTIAL

5

WILLIAM GERALD FRIEDT, JR.

1   of all, your business address and your home

2   address at this time.

3       A       Home address is 133 Concord

4   Way, Cranberry Township, Pennsylvania  16066.

5   And what do you mean, "business"?

6       Q       Who do you work for now?

7       A       An explosive company.

8       Q       Okay.  And they're located here

9   in the Pittsburgh area?

10      A       Yeah.

11      Q       Okay.  Can you tell me the period

12  of time that you worked for Metropolitan Life

13  Insurance Company, from what year to what year?

14      A       Yeah.  July of 1989 until, oh,

15  September of '93.

16      Q       Okay.  About four years, then?

17      A       (Witness nods head.)

18      Q       How did you come to be employed.

19  by Metropolitan?  Did somebody recommend you

20  there, or did you see an ad in the paper?

21      A       No.  I had acquaintances,

22  friends, that worked there at the time.

23      Q       Okay.  Like who, for example?

CONFIDENTIAL

6

### WILLIAM GERALD FRIEDT, JR.

1        A        Well, Dan Weimer and Ron

2    Herrmann.  I knew both of those guys.

3        Q        Okay.  They worked in the

4    Butler branch?

5        A        Yes.

6        Q        And when you went to work for

7    Metropolitan, did you go to work in the Butler

8    branch, also?

9        A        Yes, I did.

10        Q        The four years that you worked

11    there, was it all spent in the Butler branch?

12        A        Yes, it was.

13        Q        Okay.  While you worked there,

14    was Craig Sabo the branch manager of that

15    office?

16        A        Uh-huh, when I started there,

17    he was.

18        Q        Okay.  You're aware, are you

19    not, that Craig Sabo was terminated by

20    Metropolitan in about June of '91?

21        A        Uh-huh.

22        Q        Tell me what you know about the

23    circumstances surrounding his termination.

7

WILLIAM GERALD FRIEDT, JR.

1    A        You're trying to make me remember

2    this.  Really, the most I know about the

3    situation, there was a -- the regional manager,

4    Gary Antonino, dismissed Craig and I believe

5    moved or transferred Rick and Randy to another

6    office.  Now, the situation surrounding that, I

7    know there was employee conflicts, problems,

8    things like that, that I guess was their

9    justification for termination.

10    Q        Okay.  Did you ever talk to

11    Gary Antonino about the reason why Craig was

12    terminated?

13    A        To Gary, no.

14    Q        Did you ever talk to Ron

15    Herrmann about the reason that Craig was

16    terminated?

17    A        No.

18    Q        Okay.  Were you asked to write

19    a letter relating to Craig Sabo's performance

20    there at the office?

21    A        Uh-huh.

22    Q        Who asked you to write the

23    letter?

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

8

WILLIAM GERALD FRIEDT, JR.

1       A       Mike George.

2       Q       And what was Mike George's role

3   at that time when he asked you to write the

4   letter?

5       A       I'd say training manager.  He

6   could have been a salesman, also -- or he was

7   a salesman.

8       Q       Did he work in the Butler

9   office?

10      A       No.

11      Q       Was he the training manager for

12  Western Pennsylvania?

13      A       For the Butler region, the

14  Pittsburgh region.

15      Q       Okay.  And what were the

16  circumstances under which he asked you that?

17  Did he come to Butler and have a meeting with

18  you or call you, or how was it?

19      A       No, I had a meeting at the

20  regional office with him on a Saturday

21  morning, and the reason I went to the meeting,

22  it was brought up to me that I should go to

23  the meeting because of a BMIT, it's a branch

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

9

WILLIAM GERALD FRIEDT, JR.

1   manager training, okay, for them putting me in

2   a branch manager position.  The meeting was

3   about that to a certain degree, but it was

4   also about writing this letter for him or for

5   the region about Craig Sabo.

6           Q       Was that after Craig had been

7   terminated?

8           A       No, it was before.

9           Q       Okay.  Did other people from

10  the Butler office go to that same meeting?

11          A       No.  This was individual, mine

12  was.

13          Q       Okay.  And did somebody at that

14  meeting tell you what they wanted you to put

15  in the letter?

16          A       We talked about what he was

17  looking for.  We talked about the things that

18  had happened with just the employee problems

19  and stuff like that.  He didn't exactly say

20  what to write in the letter, but, I mean, the

21  context was pretty well discussed.

22          Q       Okay.  Was there any discussion

23  with you about what might happen if you didn't

**CONFIDENTIAL**

10

WILLIAM GERALD FRIEDT, JR.

1   write the letter?

2        A       No, there really wasn't any

3   discussion about what would happen if I didn't

4   write the letter, but there was discussion

5   about what would happen if I did.

6        Q       And what would happen if you

7   did write the letter?

8        A       Well, like I said, with the

9   branch manager training, things like that, you

10  know, this is a new opportunity, career jump

11  and, you know, places to go, move up the

12  chain.

13       Q       So Mike George said something

14  to you, suggested to you or at least you got

15  the understanding that if you wrote this

16  letter about Craig Sabo that you would have a

17  chance for advancement at Metropolitan?

18       A       Yes.

19       Q       Okay.  And you said before

20  about you had discussions about employee

21  problems.  What kind of employee problems was

22  there with Craig Sabo and, I guess, some of

23  the other employees that you're referring to

CONFIDENTIAL

MP2157000509

11

WILLIAM GERALD FRIEDT, JR.

1    at the Butler office?

2        A        One of the main reasons I

3    believe they got rid of Craig was sexual

4    discrimination against a black woman who

5    worked in our office.

6        Q        That was April Watt?

7        A        That's correct.

8        Q        Okay. Did that actually occur?

9    Was there racial -- let's talk about racial

10   discrimination, first of all. Craig's white.

11   April Watt's black. Was there any racial

12   discrimination on his part that you ever saw?

13       A        In jest? You have to, I guess,

14   understand the situation. There were racial

15   slurs used, but not just by him, by everybody,

16   but it was made out as all fun intended. I

17   mean, no one ever got mad about it. No one

18   ever took it seriously. I mean, they would --

19   or back and forth.

20       Q        Okay.

21       A        It was never intended to

22   intimidate or --

23       Q        Let me ask you this. I've

**CONFIDENTIAL**

12

WILLIAM GERALD FRIEDT, JR.

1    talked to some people about April Watt.  She

2    apparently was a very outgoing, very humorous

3    kind of person.

4          A        Uh-huh.

5          Q        She liked to participate in

6    these kind of jokes and things like that;

7    didn't she?

8          A        Right.

9          Q        And wasn't there also maybe

10   some discussions, off-color jokes and things

11   like that that went back and forth --

12         A        Sure.

13         Q        -- between April and other

14   people in the office?

15         A        Sure.

16         Q        And you probably told some

17   off-color jokes to April and said some

18   off-color things to her from time to time.

19         A        I'm sure I've told jokes.

20         Q        Yeah.

21         A        Yeah.

22         Q        And did you hear other people

23   in the office telling her jokes --

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

MP2157000510

13

WILLIAM GERALD FRIEDT, JR.

1    A    Sure.

2    Q    -- and making remarks to her?

3    A    (Witness nods head.)

4    Q    And she never did, really,

5 complain about any of this; did she?

6    A    No, not at all, no.

7    Q    Okay.  How about sexual type of

8 jokes, sexual type of innuendo, things like

9 that?  Did that go back and forth?

10    A    Uh-huh.

11    Q    Between her and a lot of other

12 people in the office?

13    A    Uh-huh.

14    Q    Okay.  Did she ever express to

15 you any particular concern about anything that

16 Craig Sabo said to her?

17    A    No, no, not until it came to a

18 head, and then everything was modified or

19 magnified just to look a little larger than it

20 was.

21    Q    Okay.  Was there some

22 disagreement between Craig Sabo and April

23 Watt?

**CONFIDENTIAL**

MP2157000512

14

WILLIAM GERALD FRIEDT, JR.

1      A       Oh, of course there were, but

2   there were disagreements -- I mean, most of

3   them were self-caused.  He was the manager.

4   She was an employee.

5      Q       Okay.  Did those disagreements

6   have anything to do with her race or sexual

7   harassment, as far as you were able to

8   observe?

9      A       No, they weren't caused by

10  that.  It was work related, but, no, they

11  weren't.

12     Q       In other words, he would

13  criticize her maybe about the way she was

14  performing her job, she wasn't keeping up with

15  her paperwork, she wasn't --

16     A       Sure.

17     Q       I'm sure that there's more to

18  selling insurance than just meeting with

19  people.  You have to document things and so

20  forth?

21     A       Uh-huh.

22     Q       And she wasn't doing that

23  properly, and he would get on her from time to

CONFIDENTIAL

15

WILLIAM GERALD FRIEDT, JR.

1   time; is that right?

2       A       Uh-huh.   The same way he would

3   do with anybody else.

4       Q       Okay.   Do you believe that this

5   sexual harassment -- well, let me back up a

6   minute.   You're aware that April Watt sued

7   Metropolitan and Craig Sabo alleging racial

8   discrimination, alleging sexual harassment and

9   alleging that she was physically threatened by

10  Craig Sabo?   Are you aware of all that?

11      A       The first two.   The latter, no.

12      Q       Okay.   Do you believe that

13  that was all just made up as an excuse for

14  terminating Craig Sabo?

15      A       Like I said before, I think it

16  was modified or magnified to make it look

17  worse than it was, yeah.

18      Q       Did you ever see any of that?

19  In other words, did you ever see anything that

20  you would consider to be Craig Sabo sexually

21  harassing April Watt, did you ever see

22  anything that you believed to be racial

23  discrimination by Craig Sabo against April

CONFIDENTIAL

MP215700051.3

MP2157000514

16

WILLIAM GERALD FRIEDT, JR.

1   Watt or did you ever see him physically

2   threaten to hurt her or harm her in some way

3   if she didn't do something?

4         A        No, never physically harm her

5   or threaten her.  But like I said about the

6   racial discrimination, it was mostly in jest.

7   There was never anything intimidating or mean

8   about it.

9         Q        So when you had that meeting

10  there with Mike George, you said that was

11  before Craig was terminated?

12        A        Yeah.

13        Q        Approximately how long was it

14  before he was terminated?  A matter of a month

15  or --

16        A        Two weeks, three weeks.

17        Q        Okay.  And did you learn

18  whether or not other people who worked in the

19  office were also asked to write letters?

20        A        I knew some of them did or were

21  asked to, yeah.

22        Q        Did you have any discussions

23  with them at that time?  In other words, maybe

CONFIDENTIAL

MP2157000515

17

WILLIAM GERALD FRIEDT, JR.

1   you'd come back to that office in Butler a few

2   days later, after you have your meeting with

3   George.  Did you discuss with anybody else

4   whether they'd had similar meetings?

5        A        No, no.  But, I mean, you have

6   your coffee pot seminars where you sit around

7   and talk about what's going on.

8        Q        And do you have a copy of that

9   letter that you wrote?

10       A        No.

11       Q        Do you remember what was in it?

12       A        Very vaguely.  I wrote it on

13  the morning he wanted me to turn it in.  It

14  was real short.  It talked about -- I don't

15  know.  I can't remember.  To be quite honest

16  with you, I'd have to see it again.

17       Q        Well, do you remember generally

18  what it -- I mean, in the letter did you

19  accuse Craig Sabo of racial discrimination?

20       A        I said there were racial slurs

21  used.  I didn't say whether they were, like I

22  told you, out of jest or anything, but there

23  were racial slurs used, yeah.

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

18

WILLIAM GERALD FRIEDT, JR.

1    Q        Well, when you wrote the

2    letter, your belief was that if there were

3    racial slurs used they were just in jest, like

4    everybody did in the office?

5    A        You know, I wanted to write the

6    letter and get the thing over with.  It was --

7    Q        Well, let me ask you this.

8    Would you have written that letter had you not

9    been promised something by Mike George?

10   A        Well, it was that, and just

11   there were a few steps along the line that it

12   was made to seem exciting or, you know, the

13   power's going this way and you got to get on

14   if you ever want to go anywhere with this

15   company, things like that.

16   Q        In other words, there was kind

17   of a feud between Craig Sabo and other people

18   at Metropolitan; wasn't there?

19   A        Uh-huh.

20   Q        And the other people being Gary

21   Antonino and Mike George and Richard Antonino

22   and that group; correct?

23   A        Correct.

**CONFIDENTIAL**

WILLIAM GERALD FRIEDT, JR.

1     Q     And so you were told, basically,

2  "You have to help us get rid of Craig Sabo,

3  because we're going to be the people in power,

4  and he's not, and you better help us"?  That's

5  basically what you were told?

6     A     I guess you could put it that

7  way, yeah.

8     Q     What were you told to do with

9  this letter?

10     A     Write it and give it to Mike

11  George.  He's the one that asked me to write

12  it.

13     Q     Okay.  Did you write it that

14  same day that --

15     A     No, I wrote it -- it was

16  probably two to three weeks later.  It was on

17  the morning he wanted it.

18     Q     Okay.

19     A     I waited until the last minute

20  to write it.  I wrote it in the morning,

21  before I even went to the office.

22     Q     Handwritten?

23     A     Handwritten on legal paper.  It

CONFIDENTIAL

MP21570005l8

20

WILLIAM GERALD FRIEDT, JR.

1  was one page, one side, as far as I can

2  remember. I mean, it wasn't anything special.

3       Q       Okay. And you believe in there

4  you talked about racial slurs that you've said

5  were --

6       A       Sure.

7       Q       -- happened, but they were in

8  jest?

9       A       Uh-huh.

10       Q       Did you talk about any sexual

11  harassment in there?

12       A       No.

13       Q       Did you talk about Craig's job

14  performance, the way you believe that he was

15  performing his job as branch manager?

16       A       I might have touched on it, but

17  it was vague.

18       Q       Yeah. Did you have any

19  criticisms that you believe were valid

20  criticisms about the way he did his job as

21  branch manager?

22       A       I couldn't say. It's been so

23  long, I don't remember.

**CONFIDENTIAL**

21

WILLIAM GERALD FRIEDT, JR.

1        Q       Okay.  Was there any discussion

2    at that time about the fact that April was

3    going to file a lawsuit against Craig or

4    Metropolitan?

5        A       There was some discussion,

6    yeah.

7        Q       By whom?

8        A       By her.

9        Q       Okay.  And did she tell you why

10   she was thinking about that, or what did she

11   tell you about this upcoming lawsuit?

12       A       Personally, she never told me

13   anything.  It was me hearing it from other

14   people or --

15       Q       Okay.  And what did you hear

16   about the lawsuit?

17       A       That she was suing for racial

18   discrimination because he was -- what's a good

19   word for it?  Mental distress.

20       Q       Okay.  Do you know whether or

21   not anybody asked her to file that lawsuit?

22       A       No.

23       Q       You never heard anything about

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

22

WILLIAM GERALD FRIEDT, JR.

1    that?

2         A       Huh-uh.

3         Q       Did you ever hear that Gary

4    Antonino told her that she should file the

5    lawsuit?

6         A       I could say honestly that they

7    talked about it, yeah.

8         Q       Who talked about that?

9         A       April and Gary.

10        Q       When was that that they talked

11   about it?

12        A       I'd say before and after it

13   happened.

14        Q       Okay.  Before and after the

15   firing?

16        A       Uh-huh.

17        Q       We have the firing, and, of

18   course, the lawsuit came later.

19        A       Right.

20        Q       But you're saying that the

21   lawsuit was discussed between Gary and April

22   before the firing --

23        A       Sure.

**CONFIDENTIAL**

WILLIAM GERALD FRIEDT, JR.

1       Q      -- of Craig Sabo and after?

2       A      Uh-huh.

3       Q      Okay.  And did you overhear

4  that conversation?

5       A      No.

6              (Brief interruption.)

7  BY MR. PARRY:

8       Q      Okay.  I was asking you if you

9  personally overheard conversations between

10  Gary Antonino and April Watt about the

11  lawsuit.

12       A      Correct.  No, I never did.

13       Q      Okay.  But you heard something

14  about it from somebody else?

15       A      Sure.  I would hear April

16  talking about it.

17       Q      What was it she was saying?

18       A      I couldn't really say.

19       Q      Was she saying that Gary

20  Antonino wanted her to file a lawsuit against

21  Craig Sabo?

22       A      I could say that Gary Antonino

23  would help her file a lawsuit or assist her or

**CONFIDENTIAL**

MP215700 0 0522

24

WILLIAM GERALD FRIEDT, JR.

1   they talked and decided that was the correct

2   thing to do.

3           Q       Okay.  You know Joe Phillips;

4   don't you?

5           A       Uh-huh.

6           Q       He worked in the same office

7   with you there?

8           A       Right.

9           Q       We took his statement in here

10  yesterday, and he said that April told him

11  that she had a conversation or maybe more than

12  one conversation with Gary Antonino --

13          A       Okay.

14          Q       -- that he told her that she

15  should file a lawsuit against Craig Sabo and

16  that she should also make Metropolitan a party

17  in the lawsuit, sue Metropolitan also.

18                  Did you ever hear that, that

19  there was any discussion between Gary and

20  April about who to put in the lawsuit or how

21  she should file a lawsuit?

22          A       No.

23          Q       Okay.  Do you believe that

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

25

WILLIAM GERALD FRIEDT, JR.

1  everything that you wrote in your letter was

2  truthful?

3      A      It was truthful, yeah.  It was

4  completely truthful.  It could have been maybe

5  at the time somewhat vindictive or rehearsed.

6      Q      Were you upset at Craig Sabo at

7  the time?

8      A      No, actually, I wasn't.  It was

9  all real fast moving, confusing.  I was young,

10  new in the business.  It seemed like the thing

11  to do, you know, following the parade.

12      Q      You wanted to get ahead at that

13  time and just --

14      A      Well, not so much get ahead.

15  It was -- you know, I'm not really one to sit

16  on the fence, but sometimes you choose the

17  wrong side or whatever.

18      Q      After you wrote the letter,

19  what did you do with it?  Did you give it to

20  Mike George?

21      A      Uh-huh.

22      Q      Personally give it to him or

23  send it?

**CONFIDENTIAL**

26

WILLIAM GERALD FRIEDT, JR.

1    A        Yeah, I believe so, in the
2  morning at the office.

3    Q        Okay.  At the Butler office?

4    A        Uh-huh.

5    Q        He came there to get the
6  letter?

7    A        Well, that's, I believe, after
8  Craig had been dismissed and he was interior
9  branch manager or -- interior branch manager.

10    Q        Okay.  So he was actually
11  working in Butler at the time?

12    A        Correct.

13    Q        And did he look at the letter
14  and make any comment to you about the letter?

15    A        He made a comment after he read
16  it, yes, something to the effect that he
17  wasn't completely satisfied with what I wrote.

18    Q        "Is that the best you can do,"
19  is that what he said?

20    A        Something like that, yeah.

21    Q        And what did you tell him?

22    A        I said yes.

23    Q        Okay.

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

27

WILLIAM GERALD FRIEDT, JR.

1    A        See, I really didn't want to

2  write the letter, but I did it anyways.  I

3  regretted it ever since I did it.

4        Q     .  Why do you regret it?

5        A        Just because I shouldn't have

6  wrote it.  Like I said, following the parade,

7  being behind everybody.

8        Q        Do you feel like that your

9  letter was part of an effort on the part of

10  Gary Antonino and others to unjustly fire

11  Craig Sabo?

12        A        It was meant to fire him, yeah.

13  They were using that as some type of an

14  evidence or justification, sure.

15        Q        What do you believe is the real

16  reason why Gary Antonino and others who were

17  close to him wanted to get rid of Craig Sabo?

18        A        As far as I know, and this is

19  coming from a salesman who didn't really hear

20  anything except what possibly Rick would tell

21  me, was they just really didn't get along very

22  well, Craig and Gary.  I know they would argue

23  or fight, what have you, back and forth, but,

CONFIDENTIAL

28

WILLIAM GERALD FRIEDT, JR.

1   see, that was never evident to us.

2         Q        Did they have disagreements

3   about ethics, about the proper sales practices

4   to use and things like that?

5         A        I'm sure they did.

6         Q        How are you sure they did?  Did

7   you overhear that, or was that just kind of

8   common knowledge in the office?

9         A        Well, we had a few problems at

10  the Butler office with, oh, I guess the way

11  things were sold or --

12        Q        What kind of problems?

13        A        Oh, underwriting problems,

14  using money that you shouldn't use, things

15  like that.

16        Q        Churning?

17        A        Sure.

18        Q        Okay.  Did Craig try to

19  discourage churning?

20        A        For the most part.

21        Q        Did Gary Antonino try to

22  encourage churning?

23        A        Not to me, he didn't, but I

CONFIDENTIAL

MP215700052 7

29

WILLIAM GERALD FRIEDT, JR.

1   really never talked to him.

2        Q       Did Gary Antonino ever attempt

3   to send other agents into the Butler office

4   who weren't based there, such as Ron Schram or

5   Joel Sherman or Richard Antonino?  Did he ever

6   attempt to send them in there to that office

7   to work with you agents in that office to go

8   out and churn your customers?

9        A       While Craig was there or not?

10       Q       Yes.

11       A       I would say he might have

12   attempted to.  He never did, as far as I can

13   remember, while Craig was there.

14       Q       How about after Craig left?

15       A       There was no one who ever

16   worked from our office, but there were agents

17   who worked with the people in my office, yeah.

18       Q       And who were those agents?  The

19   people I mentioned?

20       A       Joel Sherman was one.

21       Q       Okay.

22       A       I think he was the only one who

23   really ever did any work.

CONFIDENTIAL

30

WILLIAM GERALD FRIEDT, JR.

1      Q      Did you ever hear the term
2   "juice" used?
3      A      Sure.
4      Q      What's juice in the context of
5   Metropolitan Life Insurance policyholders?
6      A      Juice is cash value.
7      Q      In existing policies?
8      A      Yeah.
9      Q      And did you ever hear the term
10  "working the juice"?
11     A      Yeah.  It's pretty --
12     Q      And you know what that means
13  when I say "working the juice"?
14     A      Uh-huh.
15     Q      And isn't it a fact that Joel
16  Sherman would work with agents in your office,
17  in the Butler office, and you'd go out and
18  work the juice with your customers?
19     A      Yes.
20     Q      Did he ever do that with you?
21     A      No, never did.
22     Q      Did he ever do it with Joe
23  Phillips?

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

31

WILLIAM GERALD FRIEDT, JR.

1    A       Yes.

2    Q       Who else did he work with when

3  he was working the juice?

4    A       Mainly Joe from my office.

5    Q       Okay.  How about Ron Schram?

6  Did he ever work with anybody in your office?

7    A       No.

8    Q       Richard Antonino?

9    A       No.

10    Q       Have you been interviewed by

11  attorneys for Metropolitan?

12    A       Huh-uh.

13    Q       Have you been interviewed by

14  the Insurance Commissioner's office?

15    A       No.

16    Q       Are you in any trouble with the

17  Insurance Commissioner's office?

18    A       No.

19    Q       Do you still have a license to

20  sell life insurance?

21    A       Uh-huh.

22    Q       You also know Rick Sabo; is

23  that right?

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

32

WILLIAM GERALD FRIEDT, JR.

1    A    Yes, I do.

2    Q    And Rick worked in the Butler

3 office with you?

4    A    Uh-huh.

5    Q    And then was Rick transferred

6 at some point in time?

7    A    Right after Craig was dismissed.

8    Q    Okay.  And where was he

9 transferred to?

10    A    I believe North Hills.

11    Q    Okay.  And did anybody ever

12 discuss with you the reasons for his transfer?

13    A    Personally, no, never told me

14 exactly why, but I'm sure it would have to do

15 with Craig being dismissed.  They're brothers,

16 and they moved him.

17    Q    Okay.  Why would they move him

18 because his brother was dismissed?  What would

19 be the reasoning behind that?

20    A    Oh, it seems pretty evident.

21 You get rid of your brother -- if you have a

22 brother and someone gets rid of him, whether

23 right or wrong, it's still going to annoy you

33

WILLIAM GERALD FRIEDT, JR.

1    or make you mad, aggravate.

2        Q      Did you ever talk to Mike

3    George about the reasons why Rick was moved?

4        A      No.

5        Q      Did you ever talk to Gary

6    Antonino about it?

7        A      No, I never really talked to

8    Gary about anything.

9        Q      Okay.  Do you know that Rick

10   was later terminated from Metropolitan?

11       A      Uh-huh.

12       Q      Do you know the circumstances

13   surrounding that?

14       A      No, I don't.

15       Q      Have you ever discussed that

16   with anybody, I mean, whether it was anybody

17   who knew about it or just discussions in the

18   office?

19       A      No.

20       Q      Scuttlebutt?

21       A      No.

22       Q      Do you believe that that had

23   anything to do with Craig's termination?

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

34

WILLIAM GERALD FRIEDT, JR.

1        A       No, I don't believe it did.

2        Q       Okay.  Have you ever discussed

3   with Rick Sabo anything that you knew about

4   his termination?

5        A       No, no.  I haven't really even

6   talked to Rick for the last -- well, he was

7   gone, what did you say, May -- June of '91?

8        Q       That's when Craig left.  I

9   think Rick was gone sometime after that.

10       A       Probably since then.

11       Q       Okay.  Are you aware of any

12  reasons that would justify Rick being

13  terminated?

14       A       No, no.  He was out of my

15  office.  Like I said, I don't really hear

16  much.

17       Q       Okay.  Have you talked to Craig

18  Sabo since '91?

19       A       No.

20       Q       You left Metropolitan in '93,

21  did you say?

22       A       Yes.

23       Q       Why did you leave there?

CONFIDENTIAL

35

WILLIAM GERALD FRIEDT, JR.

1      A        Tired of the career, didn't

2  really like the business anyways.

3      Q        There was a point in time when

4  there started to be a lot of bad publicity

5  about Metropolitan in the Pittsburgh area; is

6  that right?

7      A        Yeah.

8      Q        Was it after that that you

9  left?

10     A        It was almost right at the same

11 time or a little bit before.

12     Q        Okay.  Had you ever worked for

13 an insurance company before you went to work

14 for Metropolitan?

15     A        No.

16     Q        Did you go to any training

17 prior to becoming an agent for Metropolitan?

18     A        Prior to, no.

19     Q        How did you receive your training

20 in how to sell life insurance?

21     A        Metropolitan's few small

22 meetings, training in the office.

23     Q        Basically, you got your training

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

MP215700053

36

WILLIAM GERALD FRIEDT, JR.

1    in Butler, then?

2          A        Sure.

3          Q        You didn't go to Johnstown or

4    anywhere else to get training?

5          A        No, no.  I went to one meeting

6    when I was hired.  I believe it lasted a week.

7          Q        Okay.  And who was the person

8    who was primarily responsible for training

9    you?

10         A        (No response.)

11         Q        Did they send somebody in, like

12   Mike George, into the office to train you, or

13   did you just pick up things in the office?

14         A        In the office, no, it was all

15   hands on with your fellow employees.

16         Q        Okay.  As you were learning the

17   business, did you learn about churning?

18         A        Yeah.

19         Q        About using cash value in

20   existing policies to purchase new policies?

21         A        Uh-huh.

22         Q        Did you do that yourself?

23         A        Yeah.

CONFIDENTIAL

37

WILLIAM GERALD FRIEDT, JR.

1        Q        Churn customers?

2        A        I've rolled a policy before,

3 yes.

4        Q        Okay.  Was that something that

5 was done frequently by agents in that office

6 that you're aware of?

7        A        Frequently, I couldn't say for

8 sure.

9        Q        It was done fairly regularly,

10 if not frequently; was it not?

11       A      It was done.  As far as I know,

12 there's a proper way and improper way to do

13 it.  You know, there's replacement forms that

14 need to be signed, require full disclosure if

15 they know what they're doing and the reasons

16 why.  I would have no problem doing it myself

17 with my own life insurance as long as it's

18 done correctly and for the right reason.

19       Q      Okay.  If you were asked

20 whether or not in your view, based on

21 everything that you knew about the situation,

22 whether or not Craig Sabo was properly

23 terminated --

**CONFIDENTIAL**

38

WILLIAM GERALD FRIEDT, JR.

1      A      Uh-huh.

2      Q      -- your opinion would be that

3 he was not; is that correct?

4      A      Without knowing the whole

5 situation, I would say he was not.

6      Q      Okay.  And if you were asked

7 about whether Rick Sabo was terminated for the

8 right reasons or the wrong reasons, would you

9 have any knowledge about that?

10     A      No, I couldn't say anything

11 about that.  It was out of my line of fire.

12     Q      Do you know who else wrote

13 these letters similar to yours?

14     A      No.

15     Q      You are aware that there was

16 more than one person in that office who wrote

17 these letters?

18     A      Uh-huh.

19     Q      In April Watt's lawsuit that

20 she filed in court, here are some statements

21 that are made.  See, that's the lawsuit here,

22 April's (indicating).

23     A      Okay.

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

MP2157000537

39

WILLIAM GERALD FRIEDT, JR.

1    Q        U.S. District Court, Western

2  District of Pennsylvania, April Watt versus

3  Metropolitan and Steven Craig Sabo.

4    A        Okay.

5    Q        "During the course of her

6  employment, Ms. Watt was subjected to blatant

7  overt acts of sexual and racial discrimination

8  propounded by Defendant Sabo and others in the

9  office."

10          Now, your testimony on that

11  subject would be that just didn't happen; did

12  it?

13    A        It happened, but it was never,

14  like I said, intimidating or meant to

15  discriminate, put in your place or whatever

16  you'd like to say.  It was always made out of

17  jest.

18    Q        As a matter of fact, April was

19  pretty well liked by most of the people in the

20  office?

21    A        Sure, sure.  And she would

22  racially discriminate herself, too, actually.

23    Q        And anything that was said to

CONFIDENTIAL

40

WILLIAM GERALD FRIEDT, JR.

1    her of that nature, she took it in fun --

2          A       Uh-huh.

3          Q       -- and returned fire kind of in

4    fun; didn't she?

5          A       Sure.

6          Q       She would call you or others

7    maybe honkeys and things like that?

8          A       Absolutely.

9          Q       Okay.  It says, "These actions

10   consisted of derogatory statements being made

11   at meetings and in private conferences with

12   the Plaintiff."  It goes on to say, "Physical,

13   sexual assaults of the Plaintiff."  Did you

14   ever see any physical or sexual assaults of

15   her --

16         A       No.

17         Q       -- by Craig Sabo?

18         A       No.

19         Q       It says, "Criticisms of

20   Plaintiff based upon her race."  Did you ever

21   see any of that?

22         A       The same thing I said before.

23         Q       Just in jest?

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

41

WILLIAM GERALD FRIEDT, JR.

1      A      Uh-huh.  Yeah, the word

2  "nigger" was used, but it was not -- the same

3  way the word "honkey" would have been used.

4      Q      Just in jest?

5      A      Correct.

6      Q      Okay.  It says here, "She was

7  treated as an inferior person."  Is that

8  correct?

9      A      I would say no.

10      Q      It says, "These actions were

11  often accompanied by threats of physical and

12  financial harm."  Did that happen?

13      A      Not to my knowledge.

14      Q      Do you have any other facts that

15  you're aware of relating to the termination of

16  Craig Sabo or Rick Sabo that I haven't asked you

17  about already?

18      A      No, I don't.

19      Q      Okay.  Once again I'll ask you,

20  you've given this statement now.  Everything

21  that you've said was said voluntarily and you

22  weren't threatened in any way, you weren't

23  promised any money or anything else to come here

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

CONFIDENTIAL

42

WILLIAM GERALD FRIEDT, JR.

1    and give this statement; correct?

2            A        No, I was not.

3                MR. PARRY:  Okay.  Thank you

4    very much.

5                THE WITNESS:  You're welcome.

6                      - - -

7                (At 9:50 a.m., the statement

8    was concluded.)

9                      - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

PAPPAS REPORTING SERVICE, INC.
(412) 566-2209

**CONFIDENTIAL**

43

1  COMMONWEALTH OF PENNSYLVANIA        )
                                       )  SS:
2  COUNTY OF ALLEGHENY                 )

3        I, Janice G. Karl, Notary Public within
   and for the Commonwealth of Pennsylvania, do
4  hereby certify that before the taking of his
   statement, the said witness, WILLIAM GERALD
5  FRIEDT, JR., was by me first duly sworn to
   testify to the truth, the whole truth, and
6  nothing but the truth, and that the above
   statement was recorded in stenotype by me and
7  reduced to typewriting under my direction.

8        I further certify that the reading and
   signing of the transcript of his statement
9  were waived by the witness and by counsel for
   the respective parties and that the said
10 statement constitutes a true record of the
   testimony given by the said witness.

11

12       I further certify that I am not a
   relative or employee or attorney or counsel of
13 any of the parties, or a relative or employee
   of such attorney or counsel, or financially
14 interested directly or indirectly in this
   action.

15       I further certify that the said
   statement was taken before me at the time
16 and place specified in the notice.

17       IN WITNESS WHEREOF, I have hereunto
   set my hand and affixed my seal of office at
18 Pittsburgh, Pennsylvania, this __15th__ day of
   __August____, A.D., 1994.
19

20                          _Janice G. Karl_
21                          Janice G. Karl

22    ┌─────────────────────────────────┐
      │         Notarial Seal           │
      │  Janice G. Karl, Notary Public  │
      │  Pittsburgh, Allegheny County   │
      │ My Commission Expires June 24, 1996│
23    │ Member, Pennsylvania Association of Notaries│
      └─────────────────────────────────┘

PAPPAS REPORTING SERVICE, INC.
         (412) 566-2209

**CONFIDENTIAL**

LAWYER'S NOTES

| PAGE | LINE | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PAPPAS REPORTING SERVICE
(412) 566-2209

CONFIDENTIAL

MP2157000542