IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD M. GONDA, | : CIVIL ACTION NO. 00-2286 |
| Plaintiff, | : |
| | : |
| v. | : CHIEF JUDGE AMBROSE |
| | : |
| METROPOLITAN LIFE INSURANCE COMPANY AND WILLIAM GERALD FRIEDT, JR., | : |
| Defendants | : |

**METROPOLITAN LIFE INSURANCE COMPANY AND WILLIAM GERALD FRIEDT'S BRIEF IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE EVIDENCE REGARDING THE CONNECTICUT MARKET CONDUCT EXAMINATIONS OF METROPOLITAN LIFE INSURANCE COMPANY AND RELATED DOCUMENTS**

**PRELIMINARY STATEMENT**

Metropolitan Life Insurance Company ("MetLife") and William Gerald Friedt, Jr. bring this Motion in Limine to Exclude Evidence Regarding the Connecticut Market Conduct Report (the "Connecticut Report") and Related Documents. Plaintiff has identified the Connecticut Report as Plaintiffs Proposed Exhibit 57.[1]  Plaintiff further listed numerous items on his Exhibit List which relate to the Connecticut Report.[2]

The Connecticut Report should be excluded on three grounds. First, it is irrelevant (Rules 401 and 402). Second, even if relevant -- which it is not -- the Connecticut Report's probative value is outweighed by the risk of unfair prejudice (Rule 403). Finally, the Connecticut Report is inadmissible as classic hearsay (Rule 802).

---

[1] A copy of the Connecticut Report is attached to the Motion as Exhibit A.

[2] Plaintiff has identified a letter, dated December 19, 1997, from Daniel F. Harrigan, Program Manager, Market Conduct Division, State of Connecticut, to Harry P. Kamen as Exhibit 108. Exhibit No. 108 is attached to the

The Connecticut Report is irrelevant. Mr. Friedt, the sales representative in this case, is not mentioned in the Connecticut Report and did not participate in the investigations upon which the Connecticut Report is based, and thus had no opportunity to respond. Similarly, neither the Plaintiff nor the Plaintiff's policy is mentioned in the Connecticut Report or the related documents.

The Connecticut Report is not only irrelevant, but also inadmissible hearsay. The Connecticut Report is based on "hundreds of pages of testimony" from numerous unnamed policyholders and MetLife employees. See Ex A at 1. The Connecticut Report even published lengthy quotes of unnamed policyholders. See Ex A at 19 – 21. In order for evidence regarding the Connecticut Report to be admitted into evidence, Plaintiff must satisfy his burden of showing that the Connecticut Report fits within an exception to the hearsay rule. Plaintiff cannot meet that burden. The Connecticut Report is a product of one-sided investigations conducted without the safeguards of the adversarial process and thus lack the trustworthiness required to come within the official records exception to the hearsay rule. Furthermore, any probative value the Connecticut Report could have is outweighed by the overwhelming prejudicial impact on Defendants.

Plaintiff may try improperly to use the Connecticut Report as evidence of a trait or habit, though it is inadmissible for lack of relevance. The Connecticut Report was explicitly limited to life insurance sales practices in the Commonwealth of Connecticut. See Ex A at 4. Mr. Friedt is not mentioned in the Connecticut Report, namely because he has never conducted any business in Connecticut. In addition, neither Plaintiff nor Plaintiff's policy was referenced in the

---

Motion as Exhibit B. Plaintiff has identified the State of Connecticut Insurance Department Stipulation and Consent Order as Exhibit 109. Exhibit No. 109 is attached to the Motion as Exhibit C.

Connecticut Report. The Connecticut Report was issued "as a result of a joint investigation by the Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department." Id. The Connecticut Report contains numerous "findings" regarding issues that have nothing to do with the issues presented in this case. For example, the Connecticut Report addresses whether MetLife violated the 1994 Stipulation and Consent Order entered into by MetLife and the Connecticut Insurance Department,[3] whether MetLife's current compliance systems are sufficient to prevent churning and misrepresentation in the sale of life insurance, and MetLife's purported failure to report regulatory violations by MetLife sales representatives. Id. at 8-9. The findings on those issues are not relevant to this case.

Allowing evidence of these entirely irrelevant findings in the Connecticut Report will serve only to confuse and prejudice the jury. Further, while the Connecticut Report found that there was sufficient evidence to charge MetLife with violations of Connecticut statutes regarding its sales of "vanishing premium," Plaintiffs here are not bringing an action involving MetLife's purported violation of Connecticut statutes. Thus, any findings that MetLife violated such statutes are completely irrelevant.

Furthermore, the transactions at issue took place in Pennsylvania. The Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department have no jurisdiction to "investigate" transactions in Pennsylvania, nor did they do so. Accordingly, the Connecticut Report is entirely irrelevant to this case. Based on the information and arguments set forth above, any evidence regarding the Connecticut Report and the underlying investigations should be excluded.

---

[3] This Consent Order involved only allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815. See Ex A at 6 and Exhibit A to same.

Furthermore, Defendants were not afforded the due process in the Connecticut Report proceedings to which it is entitled in this Court proceeding. See 40 Pa. P.S. §323.4 (setting forth the procedures applicable to insurance department examinations). Specifically, Defendants were denied: (1) the benefit of a hearing before an impartial trier of fact, (2) the protections of appropriate evidentiary rules, and (3) the opportunity to take sworn testimony subject to cross-examination. There was no regard for evidentiary rules.

## BACKGROUND

### I. THE TRANSACTION AT ISSUE

Plaintiff's claims arise from the 1992 sale of a Whole Life insurance policy. Plaintiff alleges that in 1992, MetLife sales representative William Gerald Friedt, Jr. made misrepresentations at the sale of Policy No. 925 207 015 A (the "1992 policy"). Specifically, Plaintiff alleges that Mr. Friedt made misrepresentations regarding the replacement of an existing Pruco life insurance policy which was used to partially fund the 1992 policy, and that Mr. Friedt misrepresented that the 1992 policy would be fully funded by making monthly payments of $50.50 for ten years. Plaintiff also alleges that Mr. Friedt represented that the 1992 policy would accumulate a certain cash value and death benefit after forty years.

### II. THE CONNECTICUT REPORT

The Connecticut Report was issued on October 14, 1995 "as a result of a joint investigation by the Connecticut Attorney General's Office and the Market Conduct Division of the Connecticut Insurance Department." Ex A at 4. The Connecticut Report addresses issues such as whether MetLife violated the 1994 Stipulation and Consent Order, entered into by MetLife and the Connecticut Insurance Department in response to the Florida Market Conduct Report, whether MetLife's current compliance systems are sufficient to prevent churning and

misrepresentation in the sale of life insurance, and MetLife's purported failure to report regulatory violations by MetLife sales representatives. This Consent Order involved only allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815. See Ex A at 6 and Exhibit A to same. Moreover, the Connecticut Report was explicitly limited to life insurance sales practices in the Commonwealth of Connecticut. See Ex A at 4.

## ARGUMENT

**I.  THE INTRODUCTION OF THE CONNECTICUT REPORT IS IRRELEVANT, HIGHLY PREJUDICIAL, AND BEYOND THE SCOPE OF THE TRANSACTIONS AT ISSUE.**

**a. The Connecticut Report Should Be Excluded Because It Is Irrelevant and Has No "Nexus" to Plaintiff's Allegations.**

Plaintiff should not be permitted to alter the scope of this case with irrelevant documents and testimony. Federal Rule of Evidence 401 defines "relevant evidence" as evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Nothing in the Connecticut Report has any bearing on establishing what occurred regarding Plaintiff's purchase of the policy at issue. Neither Plaintiff nor Plaintiff's policy is mentioned in the Connecticut Report. In addition, the sales representative, Mr. Friedt, is not mentioned in the Connecticut Report. The Connecticut Report focuses on the Torrington, Connecticut MetLife office, which Mr. Friedt never worked at.

The Connecticut Report addresses issues such as whether MetLife violated the 1994 Stipulation and Consent Order entered into by MetLife and the Connecticut Insurance Department, whether MetLife's current compliance systems are sufficient to prevent churning and misrepresentation in the sale of life insurance, and MetLife's purported failure to report

regulatory violations by MetLife sales representatives.[4]  This Consent Order involved only allegations regarding misrepresentations that whole life insurance policies were sold as retirement or savings plans in violation of Conn. Gen. Stat. § 38a-815.  See Ex A at 6 and Exhibit A to same.  Plaintiff has not made any such allegations.

Furthermore, the transaction at issue took place in Pennsylvania.  The Connecticut Attorney General and the Market Conduct Division of the Connecticut Insurance Department have no jurisdiction to "investigate" transactions in Pennsylvania, nor did they do so.  The Connecticut Report focuses on determining whether MetLife violated the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38(a)-815, a statute which does not apply to sales that occur in Pennsylvania, such as the transactions at issue in this case.  Accordingly, the Connecticut Report is entirely irrelevant to this case.

To the extent that Plaintiff asserts that the Connecticut Report is evidence of a trait or habit, such evidence is inadmissible under Federal Rule of Evidence 406 if that trait or habit is not relevant to the claims or defenses at issue.  See Petrokehagias v. Sky Climber, Inc., 2000 WL 1469334 (E.D. Pa. 2000).  As previously noted, the purported sales practices at issue in the Connecticut Report are unrelated to the sale to Plaintiff, and therefore, cannot constitute admissible evidence of a trait or habit.

---

[4] In the instance that the Connecticut Report is not found to be irrelevant – which it is – and portions of the Connecticut Report are admitted into evidence, the portions of the Connecticut Report that refer to MetLife's compliance should be admitted.  The Stipulation and Consent Order obligated MetLife to adopt an enhanced compliance program to prevent abusive sales practices.  The Connecticut Report found that MetLife's "Enhanced Ethics and Compliance Program," which was discussed at length in the Connecticut Report, has been effective in reducing abuses.  As such, if evidence of the Stipulation and Consent Order is admitted, the Court should necessarily also admit evidence of MetLife's compliance.  Failure to do so would unduly prejudice MetLife.

### b. The Connecticut Report Should Be Excluded Because It Is Highly Prejudicial to MetLife.

Even if this Court were to determine that the Connecticut Report has relevant information to offer at trial -- which it does not -- pursuant to Federal Rule of Evidence 403, relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403; see also Ex. D Drummond, 11 Fed. R. Evid. Serv. at 1912-1913 (noting that Rule 403 "vests the court with discretion to exclude relevant evidence if its probative value is outweighed by the danger of unfair prejudice" and holding that the accident Connecticut Report at issue should be excluded because it "contain[ed] conclusions as to the cause of the accident [and thus] . . . creat[ed] the potential for the jury to be unduly prejudiced by the Connecticut Report and to adopt the conclusion of another tribunal as its own rather than making an independent determination based on the facts as presented").

The Connecticut Report discusses matters that are of no relevance to Plaintiff's claims and are highly prejudicial to MetLife. The investigation was conducted with the purpose of determining whether MetLife violated a Connecticut statute which does not apply in the instant matter. In addition, the stamp of governmental authority for the Connecticut Reports, whether appropriate or not, would most likely unfairly sway the jurors, improperly inviting them to determine the facts of this case based on allegations that have never been proved by any sort of hearing. Admission of the Connecticut Report would serve only to distract the jurors from the task at hand -- deciding whether or not Plaintiffs were defrauded and if so, whether the alleged fraud caused Plaintiffs any damages. The potential for distraction is particularly significant given that any similarity of the allegations in this case to the allegations address in the Connecticut Report is minimal at best.

Accordingly, based on the foregoing arguments, the Connecticut Report, and any information regarding the Connecticut Report, should be excluded.

## II. THE CONNECTICUT REPORT CONSTITUTES INADMISSIBLE HEARSAY.

The Connecticut Report is classic hearsay. The Connecticut Report is based on "hundreds of pages of testimony" of unnamed policyholders and MetLife employees. See Ex A at 1. The Connecticut Report even contains lengthy quotes from unnamed policyholders.[5] See Ex A at 19-21. Defendants have no opportunity to examine the anonymous witnesses whose testimony Plaintiff is attempting to transmit, word for word, into the courtroom through the Connecticut Report. In order for evidence regarding the Connecticut Reports to be admitted into evidence, Plaintiff must satisfy the burden of showing that the Connecticut Report fits within an exception to the hearsay rule. Plaintiff simply cannot meet that burden.

Plaintiff may claim that the Connecticut Report falls within the "official records" exception to the general hearsay rule. Federal Rule of Evidence 803(8)(c) provides that public records are, under certain circumstances, admissible as an exception to the general hearsay rules "unless [their] sources of information or other circumstances indicate lack of trustworthiness." Fed R. Evid. 803(8)(c) (emphasis added); see also Swietlowich v. Bucks County, 610 F.2d 1157, 1165 (3d Cir. 1979). Because the Connecticut Report fails to satisfy the requirement of trustworthiness, it constitutes inadmissible hearsay and should be excluded from evidence.

The Advisory Committee Notes to Rule 803(8) set forth four key indicia of trustworthiness: (1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when Connecticut Reports are prepared

---

[5] Assuming the Connecticut Report is not found to be hearsay -- which it is -- the quotes of unnamed policyholders should be excluded under F.R.E. 805, requiring each layer of hearsay to fit within an exception to the hearsay rule

with a view to possible litigation.  Fed. R. Evid. 803(8), Advisory Committee Notes.  The Supreme Court in Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 168 n.11 (1988), noted that "[t]his trustworthiness inquiry . . . was the [Advisory] Committee's primary safeguard against the admission of unreliable evidence, and it is important to note that it applies to all elements in the Connecticut Report.  Thus, a trial judge has the discretion, and indeed the obligation, to exclude an entire part or portions thereof . . . that she determines to be untrustworthy.  Moreover, safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice, provide the court with additional means of scrutinizing and, where appropriate, excluding evaluative Connecticut Reports or portions of them." Id. at 167-68.

      Two of these key indicia -- whether a hearing was held and possible motivational problems such as bias -- are clearly implicated in this case and compel the exclusion of the Connecticut Report and any other evidence or testimony regarding the Connecticut Report.  First, no hearings were ever held on the purported "findings" in the Connecticut Report.  Thus, the Connecticut Report's broad "conclusions" are without specific factual support and are based on nothing more than bare allegations and unsworn statements by policyholders reported second-hand by the examiners.  Because the actual claims of specific individual policyholders were never subjected to the scrutiny of adversarial proceeding, the Connecticut Report lacks the requisite level of trustworthiness needed to be admissible.  See, Ex. D Drummond v. Alia – The Royal Jordanian Airline Corp., 11 Fed. R. Evid. Serv. 1904, 1908-10 (W.D. Pa. 1982) (finding that an accident report prepared by the government of Qatar concerning an airline crash was untrustworthy because, among other reasons, "one can conclude that since there was no hearing

---

before being admissible.  Plaintiff can not satisfy the burden of showing that the quotes fit into an exception to the hearsay rule.

conducted, there were very few procedural safeguards to protect against the inclusion of hearsay and irrelevant evidence.  It is very possible that a large amount of hearsay and irrelevant evidence was included in the Connecticut Report.  This results in hearsay within hearsay and the admission of other inadmissible evidence, which serve to undercut the trustworthiness of the Connecticut Report"); Denny v. Hutchinson Sales Corp., 649 F.2d 816, 822 (10th Cir. 1981) (affirming exclusion of government report based on its "untrustworthiness" where Connecticut Report's findings resulted from ex parte investigation with no formal procedures and no opportunity to cross-examine witnesses); Hines v. Brandon Steel Decks, Inc., 886 F.2d 299, 303 (11th Cir. 1989) (citing cases in support of the "fact that no hearing was held in making [a] Connecticut Report affects its trustworthiness").  The findings in the Connecticut Report are based almost entirely on the hearsay statements of third parties and on a review of MetLife documents relating to insurance policies sold in Connecticut that have nothing to do with Plaintiff.  The Connecticut Report is not based on any transactions or purported sales practices actually observed by the examiners.

     The Connecticut Report contains numerous opinions expressed by the Connecticut Attorney General and the Market Conduct Division of the Connecticut Insurance Department on various aspects of MetLife's operations.  See Ex. A, the Connecticut Report, at 40-42 (relating "Findings" of the Connecticut Report).  The Connecticut Report concludes that MetLife has violated the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38(a)-815.  See Ex A at 2.  Defendants, however, will have no opportunity to cross-examine the authors of these opinions.  Accordingly, the Connecticut Report, and evidence regarding the Connecticut Report, should be excluded from the trial.  See Wilson v. Attaway, 757 F.2d 1227, 1245 (11th Cir.1985) (the Connecticut Report excluded because, among other reasons, it failed to afford possibility of cross-examination); Hines, 886 F.2d at 303-304 (inability to cross-examine investigator who

prepared the report is "a proper factor to take into consideration when deciding trustworthiness" of the report) (citations omitted).

The Connecticut Report is also rife with hearsay statements regarding interviews with unnamed policyholders. Hearsay statements of third parties do not become admissible simply because they appear in an official record. All such hearsay within hearsay is plainly inadmissible.

Because the Connecticut Report fails to satisfy the requisite indicia of trustworthiness, contains unauthorized expressions of opinions, and is rife with double hearsay, it fails to meet the hearsay exception for admissibility as a government Connecticut Report and, therefore, must be excluded from evidence.

Plaintiff may also erroneously contend that the Connecticut Report is admissible under Federal Rule of Civil Procedure 406 to show MetLife's routine practice. To the contrary, federal courts, including this Court, interpreting Rule 406 consistently hold that for evidence to be admitted as a corporation's routine practice, the conduct in question must be a "regular response to a specific situation."[6] Becker v. ARCO Chem. Co., 207 F.3d 176, 204 (3d Cir. 2000) (holding that evidence that a business had a tendency to use pretenses when firing employees was not admissible as habit evidence under Rule 406, because it was not the sort of semi-automatic, situation-specific evidence that the rule admits); Mobil Exploration and Producing U.S., Inc. v. Cajun Const. Services, Inc., 45 F.3d 96 (5th Cir. 1995) (To admit evidence as routine practice, there must be a sufficient pattern of conduct so that it is considered a uniform and regular response to a repeated situation); McCarrick v. New York City Off-Track Betting Corp., No. 91

---

[6] Moreover, it cannot be that the Report, concerning an insignificant number of transactions when compared with company wide sales practices, could be used to show routine.

11

Civ. 5626, 1995 WL 261516, at *5 (S.D.N.Y. May 3, 1995) ("[i]n order to be admissible under [Rule 406] . . . the conduct at issue must constitute a 'regular response to a repeated specific situation.'") (quoting <u>Thompson v. Boggs</u>, 33 F.3d 847, 854 (7th Cir.1994)).

  Moreover, Plaintiff's potential contention that the Federal Rule of Evidence 404(b) permits this type of evidence to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" is likewise without merit.  To show that improper bad acts evidence is admissible to show intent, this Court has held that "'the proponent must clearly articulate how that evidence fits into a chain of logical inferences, <u>no link of which may be the inference that the defendant has the propensity to commit the crime charged.</u>'"  <u>Becker</u>, 207 F.3d at 191 (3d Cir. 2000) (quoting <u>United States v. Morley</u>, 199 F.3d 129, 133 (3d Cir. 1999)) (emphasis added).  In <u>Becker</u>, the plaintiff initiated an action against his former employer under the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act, contending that his former employer discriminated against him on the basis of his age by terminating his employment.  <u>Id.</u> at 179.  The plaintiff sought to introduce evidence of his former employer's "manner" in which it had terminated another employee.  <u>Id.</u>  This Court ruled that such evidence is only admissible if the proponent can articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged.  Applying this test, the Court held that the evidence in question failed the test because the evidence of the employer's manner of terminating another of its employees was not relevant on the issue of whether it discriminated against the plaintiff <u>absent</u> the inference that the employer had a propensity to act in a certain way and that it acted in conformity with this prior conduct when it terminated the plaintiff.

  Similarly, Plaintiff cannot articulate how the Connecticut Report fits into a chain of logical inferences pointing towards MetLife's purported intent without involving the inference

that because MetLife allegedly acted a certain way in the past, it acted that way during sale of Plaintiffs' policies.  Thus, the Connecticut Report is inadmissible to establish MetLife's alleged intent.

Also at issue in Becker was whether the evidence regarding the employer's manner of terminating another employee was admissible as evidence of a common plan or scheme.  This Court stated that in order to admit Rule 404(b) evidence as reflecting a plan or scheme, the crimes must be part of a common or continuing scheme; the plan must encompass or include both crimes; and the crimes must be connected, mutually dependent and interlocking.  Moreover, both crimes must be steps toward the accomplishment of the same final goal.  Additionally, the Court noted that to be admissible under Rule 404(b), it is insufficient to show that each crime was "planned" in the same way.  Instead, there must be an overall scheme of which each of the crimes is but a part.  Id. at 197 (citation omitted).

The Court found in Becker that the evidence at issue was not admissible as proof of the defendants' plan based on these principles as there was no evidence presented that the two terminations were connected, mutually dependent or part of any larger goal of the former employer.  See also J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259 (3d Cir. 1994) (In order for prior bad act evidence to be admissible to establish a common plan, plaintiffs must show that the acts "are part of a single series of events'") (quoting Government of the Virgin Islands v. Pinney, 967 F.2d 912, 916 (3d Cir. 1992)).[7]  Here, Plaintiff

---

[7] In J & R Ice Cream, the plaintiff claimed that a franchisor had made misrepresentations concerning its expertise in site selection and the amount of maintenance charges applicable to the site selected for the plaintiff's franchise.  The plaintiff introduced evidence that the franchisor made misrepresentations to other prospective franchisees concerning the amount of revenue a typical franchise could produce.  The Third Circuit held that the introduction of that evidence was improper under Rule 404(b) because "the jury could have used the highly prejudicial, indeed almost inflammatory evidence to conclude that [the defendant] used misrepresentations in multiple aspects of its sales efforts."  31 F.3d at 1269.

13

has failed to show that the alleged acts of MetLife contained in the Connecticut Reports are part of a single series of events.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court exclude the Connecticut Market Conduct Report and any evidence regarding the Report from use at trial.

> Respectfully Submitted,
>
> s/ B. John Pendleton, Jr.
> B. John Pendleton, Jr.
> McCARTER & ENGLISH, LLP
> Four Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102
> (973) 622-4444
>
> Attorneys for Defendant
> Metropolitan Life Insurance Company and
> William Gerald Friedt, Jr.

Dated: June 19, 2006

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via electronic case filing system, on this 19th day of June 2006 on the following counsel of record:

> Kenneth R. Behrend, Esq.
> Behrend and Ernsberger, P.C.
> Union National Bank Building
> 306 Fourth Avenue, Suite 300
> Pittsburgh, PA  15222

                          __s/ B. John Pendleton, Jr._____