the legal department.  There is no evidence of any follow-up by the legal department.

## VI.   THE ESCALATION OF HOSTILITIES

The widespread awareness of the Urso problem continued to create friction between the sales force and the legal department. On February 24, 1993, Bruce Hemer wrote to Thomas McDermott, a vice president who reported directly to Mr. Maurer, and stated that:

> I'm not very enamored with selling life insurance as 'a savings plan with life insurance as a bonus'.  And this is the type of approach, as specified in the various sales materials, and presumably also in face-to-face presentations, which has been the problem with "nurses" matter.  But it also is rife, company-wide.

On May 14, 1993, an audit report of the Urso district was issued.    Distribution of the report was widespread, going to Maurer, the Senior Vice President in the New York Home Office, Goggans, Vice President and Officer in Charge of the Southern Territory, numerous vice presidents in New York, Richard Mandel, Associate  General  Counsel,  New  York,  and  other  company-wide representatives.  The audit was conducted as a result of the large number of "ten-day free look" refunds for the sales office.   The audit acknowledged awareness of outstanding litigation brought by two  former  sales  associates  of  the  office  (the  whistleblower litigation), a related investigation by the Florida Department, reviews by the legal department of sales literature utilized by the district, and investigations of consumer complaints by the legal department.

30

In order not to duplicate the efforts of other ongoing investigations within Met, the scope of the audit was modified and specifically excluded the sales presentation and sales literature being utilized by the district representatives to market their product to the public.

The auditors concluded that:

> The above control exposures combined with our knowledge of the status of other ongoing investigations indicate that [Urso] is not operating at an acceptable level of control.

Despite efforts at reconciliation between Urso and the legal department in October 1992 and again in April 1993, tensions continued to increase. Urso's superiors portrayed him as a martyr being persecuted by the legal department. In a letter dated June 22, 1993, Goggans wrote to Maurer comparing Urso to General George Patton. Goggans stated that Urso:

> . . . is in the field setting records every day, that others dare to dream, his people are well trained and focused, he shares his strategies with those willing to listen, he loves his work and company, and he strives to continue to improve performance with hard work, honesty and integrity![28]

Goggans complained that the attorneys were indecisive and the sales force should not be penalized as a result of their incompetence. In response, Mandel in the legal department threatened disciplinary action against Urso if the unauthorized sales materials did not cease. Goggans was incensed by Mandel's position and wrote to Mandel on July 2, 1993.[29] The sales management in Tampa

---

[28]  A copy of Goggins' letter to Maurer dated June 22, 1993, is included within the Appendix at Tab D-17.

[29]  A copy of Goggans' letter to Mandel dated July 2, 1993, is attached to this Appendix at Tab D-18.

31

approached Ted Athanassiades and asked him to mediate the hostilities. Athanassiades agreed to help and on July 12, 1993, Mandel wrote to Goggans, scheduling a meeting for July 15, 1993, in New York. Present at the meeting were Athanassiades, Mandel and Ira Freedman of the legal department, Goggans, James Higgins, Schneider and Urso of the Southern Territory, Edward J. Lynch (Crimmins' assistant), and Steve Orlock, of personal insurance.[29]

At the meeting, Urso claimed he was a victim of circumstances and was not a renegade manager. In an emotional presentation, he argued that his sales techniques did not differ from those prevalent throughout the Company and that he was being singled out for harassment by an incompetent legal department unable to effectively process requests to approve sales literature.

## VII. MET'S OSTRICH APPROACH TO THE PROBLEM

At the close of Urso's July 15th presentation, Mandel, in a gesture of conciliation, ripped up the notes he had prepared to rebut Urso's position and suggested instead, that all parties move forward and refrain from looking back. At the close of the meeting, Mandel took Urso to his office to prepare a new letter Urso could use to continue to sell his Plan.

The attitude of the personal insurance unit is reflected by a memo from Lynch to Crimmins dated July 20, 1993, reporting on the meeting. Lynch reported:

---

[29]   Bob Crimmins was not in New York on the date of the meeting.

32

> Most of the meeting was devoted to Rick Urso's description of the sometimes awkward approval process that took place for his sales materials, including, but not limited to, those which he ordered through the Company's normal channels that were subsequently challenged and then disapproved by the Law Department. Rick also explained the tremendous cost associated with confusing, contradicting and changing approval procedures.
>
> The bottom line is that Rick was clearly perceived as an innocent victim of circumstances - not some renegade manager who was insensitive to the use of only approved sales literature. Rick was obviously well prepared and made a very positive impression.

In the course of this investigation, Crimmins confirmed that the Lynch memo accurately reflected his assessment of both the meeting and the situation. The tenor of the meeting and lack of follow-up are typical of Met's management style, that of ignoring the problem in the hope it will disappear, like an ostrich burying its head in the sand. No consideration was given to the effect that Urso's practices had on policyholders or the possibility of sanctions against wrongdoers. Rather, Urso, the most successful salesman in the MetLife organization, received absolution; Met looked forward as usual.

Despite the widespread awareness of the problems associated with Urso's marketing techniques, and despite an audit report dated May 14, 1993, finding that Urso was not operating at an acceptable level of control, Met effectively viewed the situation as resolved as of July 15, 1993. Met focused only on Urso's profitability and remained unperturbed until the Florida Department filed its Notice and Order to Show Cause on August 27, 1993. Were it not for the kick delivered by this filing, Met would have taken no action in response to the Urso situation, would not have sanctioned anyone, and would not have made policyholders whole.

33

VIII. THE NOTICE AND ORDER TO SHOW CAUSE

Unknown to Met's management, an investigation by the Florida Department was in full gear. Sparked by a complaint by Urso agents to Florida Department field investigators during a routine investigation of Met's Tampa Regional Office, and by follow-up interviews and statements to the Department by Urso agents, Gallagher directed the Florida Department to bring a Notice and Order to Show Cause why Met's Certificate of Authority to do business in Florida should not be revoked or suspended.

When it arrived at Met's New York home office, the Notice and Order to Show Cause generated a flurry of activity. Met's senior management immediately sent a memo to all branch managers and district sales managers requiring them to certify their individual compliance with the Company's mandate of Company officer approval of sales literature.

On October 5, 1993, Commissioner Gallagher hand-delivered a letter to President Ted Athanassiades and Chairman Harry P. Kamen that stressed "how serious we at the Florida Department of Insurance view the situation and how important it is your response be honest and forthright."[21] The letter urged Met to agree to the Department's appointment of a disinterested third party to conduct a thorough investigation and issue a comprehensive report. Met initially agreed to the third party appointment but objected to Gallagher's choice of Thomas Tew for the role. Negotiations

_____

21/ A copy of Gallagher's letter to Met is attached to the Appendix at Tab D-19.

34

stalled and on October 12, 1993, Commissioner Gallagher and Florida Attorney General Bob Butterworth named Tew to head a joint agency investigation of Met's sales practice.  On October 13, 1993, Attorney General Butterworth named Tew a Special Assistant Attorney General for the State of Florida.[21/]

On October 6, 1993, a directive was sent to the Officers In Charge of the five territories requiring them to transmit to the New York home office all sales and training materials currently in use or intended to be used, and to execute a certification reflecting that this had been done.  This directive, an effective implementation of Met's existing policy, caused Met's personal insurance sales force to grind to a halt.  The flood of documents brought in by the October 6th recall overwhelmed the legal department and caused it to call in assistance from outside counsel.  The recalled documents were placed in room "8 Z," a cavernous open area on the 8th floor at Met's old Madison Avenue office.   Tables designated for each region overflowed with materials previously unapproved by the legal department.

IX.  THE INITIAL PLAN OF RESTITUTION - URSO POLICYHOLDERS

Faced with the Notice and Order to Show Cause and the growing adverse publicity which it generated, President Ted Athanassiades decided to act decisively in an attempt to quickly resolve the problem. He proposed that Met give all policyholders who purchased

_____

[21/]  A copy of the Attorney General's letter appointing Tew is attached to the Appendix at Tab D-20.

insurance from Urso's agency the choice of either receiving a refund of their premiums or applying their premiums toward the purchase of a Met annuity.[23] Chairman Kamen and Senior Executive Vice President Nagler concurred.

Met's initial public position was that the objectionable sales practices were limited to the Tampa, Florida office, an assertion that failed. Investigations by Tew, state regulators and the media quickly revealed that Urso's sales techniques, copied by numerous agents, merely reflected a marketing culture sanctioned by Met. Countless Met training documents reiterated the theme that insurance sells best when disguised as savings or retirement planning. Once this theme was uncovered during the course of the investigation, Met greatly expanded its restitution offer. Met proposed to extend various settlement options to a broad class of victims of Met's misleading sales practices. This class includes all persons who purchased policies from offices in which more than 15% of the sales were "even premium" purchases.[24] Further, refunds will be offered to all persons who purchased policies from an agent whose even premium sales accounted for more than 25% of his total sales. Refunds will also be offered to all persons who purchased policies from an office in which Met discovered tainted sales literature. Any person with a valid complaint will be

---

[23]  The form of letters transmitting this offer to the affected policy holders is included in the Appendix at Tab E.

[24]  "Even Premium" purchasers refers to that class of policy holders who paid "even" premium (i.e., $25 a month, $50 a month, etc.). Someone who purchases insurance in an odd face amount is focusing on the savings aspect of the plan rather than on the insurance aspect of a plan.

36

offeeed a refund if he or she is not included within the other
groups.  A detailed description of the Restitution Plan is included
in Section XIII below.

**X.    A FAILED COMPLIANCE PROGRAM**

> *I suppose the 'worst case scenario' is that,*
> *as long as there is a sales force, there will*
> *be unauthorized sales literature.  Memo from*
> *Bruce Hamer, Director of Consumer Affairs to*
> *Richard Maurer, Senior Vice President, Met,*
> *August 15, 1991.*

Met, like all insurance companies, exists because of the
efforts of its sales force.  Obviously, the high priority accorded
sales bestows status and recognition.

Over the years, Met developed thousands of pages of training
manuals, sales brochures, scripts, selling techniques and other
materials for new agents.  All agents were provided an Account
Representative Manual, a 200-page document which mentions that
printed advertising materials must be submitted to the Met home
office for approval prior to their use.[31]

Met assigned three lawyers, on a part-time basis, to review
all sales literature generated by some  22,000 sales agents in
approximately 1,000 sales offices.  These lawyers all performed
other functions in addition to reviewing literature.  No lawyer was
exclusively assigned the task of approving sales literature.

Met did not document its review process.  There was no central
record indicating whether a specific piece of sales literature was

---

[31]    A similar clause, albeit slightly more detailed, is found in the manuals
distributed to branch managers.

37

reviewed; when it was reviewed, by whom it was reviewed, or the conclusion that was reached and the communication of that conclusion. There was no method by which a salesperson could look at a document and determine whether or not it had received home office approval.

Between 1987 and 1993, few instances exist in which Met's policy of home office approval of sales literature was communicated to its national sales force. To the extent these policies were communicated, they were ignored with impunity.

With its limited resources, Met's New York home office legal department was overmatched in dealing with Urso and his supporters. In November 1992, the law department gave Urso a pre-approach letter not in violation of state law that he chose not to use.

The effectiveness of the home office legal department was undermined by the use of territorial counsel. Given the lack of manpower available in the home office, it is not surprising that the sales force utilized territorial counsel. While Met claims territorial counsel lacked approval authority, counsel's activities were not impeded.

Met's November 5, 1991 audit of Urso references Michele Ligon's comments in relation to sales literature. This audit report was distributed throughout Met, yet no one questioned Ligon's authority to discuss sales literature. On December 13, 1991, Gary Voith, Director of Marketing Services for the Southeastern Territory, wrote to Bruce Hemer, Director of Consumer Affairs in the New York home office, and included a letter

38

"reviewed by our territorial in-house compliance officer, L. Michele Ligon, J.D." While this sales letter was subsequently disapproved by the Met home office legal department, no one specifically advised that Ligon could not approve a piece of sales literature.

In a February 4, 1992, memorandum, Bruce Hemer addressed the issue of territorial level approvals and queried, "Is 'territorial-level' approval a helpful step in the total process, or is it the end of the total process?" The question apparently remained unanswered by Met until its decision in October 1993 to require compliance with its previously dormant policy of home office legal approval of all sales literature.

## XI.  AWARENESS OF THE PROBLEM

Virtually every area of Met knew or should have known of the emerging problem surrounding Urso.

### 1.  Auditing

As early as November 8, 1991, the auditing division had detailed uses of unauthorized sales literature in its audit of SEHO's district sales office. Auditing reports directly to a senior executive vice-president, Stuart Nagler, who reports to Kamen. However, Kamen was unaware of the audit department's alarming report.

Auditing also commented on Urso's monumental mass mailing budget. A 1990 audit revealed that Urso had spent more than $200,000 on mass mailings in the first ten months of 1990. Urso's

1991 budget of $492,378 increased to nearly $1 million in 1992, an amount ten times the amount authorized for any other Met sales office ($100,000 was authorized for only a few of the major Met sales offices). Still no questions were raised.

2.  Management

Robert Crimmins, head of Personal Insurance, knew of the unauthorized sales literature problem at least by March 1991. The matter was brought to his attention again in April 1992. The full scope of the problem was known by 1993, but Crimmins believed the situation was resolved at the July 15, 1993, meeting.

Similarly, Mark Moser sent a letter to Harry Kamen complaining of Urso's sales techniques. While Kamen states he did not see the letter, it is disturbing to think that no action was taken by Met in response to Moser's serious allegations.

3.  Legal

The legal department, fully aware of Urso's activities, engaged in a running battle with him from November 1992 until October 1993. Further, numerous allegations were made against Urso and his sales practices in the Florida whistleblower litigation which should have been communicated to, and acted upon, by the legal department.

It is difficult to conceive of a scenario whereby the knowledge of the Urso activities could have been more widespread than it was at Met. Despite this extensive knowledge within numerous areas of the Company, no effective action was taken until

40.

the Florida Department filed its Notice and Order to Show Cause on August 27, 1993.

## XII. THE HEART OF THE PROBLEM

The lack of a timely response to the Urso problem can be attributed to Met's marketing culture.  As stated in a memorandum dated February 24, 1993, from Bruce Hemer to Thomas McDermott, the problem of selling life insurance as a "savings plan" with life insurance as a "bonus" was "rife, company wide."  Urso was only remarkable because he effected a national single-product approach.

Prior to October 1993, Met's requirement for legal department approval of literature was not adequately communicated to its sales force.  The sales force was either unaware of or disregarded Met's requirement of home office legal approval of sales literature; no effective procedure existed for monitoring the sales force's compliance with corporate mandates.

The sales force took advantage of its position as generator of sales and profits for the Company and enjoyed a free hand in the marketing of products.  Met tacitly condoned nationwide efforts of its aggressive sales force to sell whole life policies disguised as savings or retirement plans.

## XIII. THE EXPANDED PLAN OF RESTITUTION

As a result of meetings with Tew and state insurance regulators, Met designed an expanded policyholder restitution program to address concerns raised in the investigation.

41

Under the expanded restitution program, Met will contact a broad group of approximately 60,000 policyholders, which should include all policyholders who received the solicitations in question. Met will offer each person contacted the opportunity, if he or she was misled in the purchase of a whole life policy, to claim a refund of all premiums paid plus interest or an annuity funded in that amount. Through this program, Met intends to meet the concerns of regulators and perhaps to resolve pending litigation, and most importantly to demonstrate its commitment to its customers' satisfaction.

### 1.    The Initial Offer To Policyholders

Met has already contacted policyholders of the Tampa office. All owners of in-force whole life policies purchased from that office from the beginning of 1988 through May 1993--18,000 policyholders located throughout the country--were offered a full refund of premiums paid plus interest, or an annuity funded in the same amount. Owners of policies that had lapsed were contacted and sent a check in the amount of premiums paid (less any amounts previously paid to the policyholder) plus interest.[2/]

### 2.    Identifying Additional Policyholders To Be Contacted

Recognizing that similar sales literature was used by other Met offices, Met has fashioned an expanded restitution offer to reach any policyholder who may have been misled by that literature

---

[2/]    The current restitution proposal would pick up post-May 1993 (through October 1993) policyholders of the Tampa office; and in the context of a possible class action settlement, all Tampa policyholders might once again be notified. No additional compensation would be offered to those Tampa office policyholders who have already received full refunds under the 1993 restitution program.

or related sales practices. Because Company records do not identify what sales literature was used in selling a particular policy, there is no way to positively identify policyholders who may have purchased policies from other Met offices based on challenged literature. Met has, therefore, identified a larger group that will, at a minimum, include those policyholders and to whom Met will extend a restitution proposal.

A.   Even Premium Policyholders

All the sales literature in question promoted saving for retirement or other purposes. The whole life policies sold have "even" premiums (ending in 5 or 0) and "odd" face amounts. Such "even premium" policies are in contrast to the great majority of whole life insurance policies which are sold principally for the death benefit and which tend to have an even face amount and an odd premium.

Scripts used in the Tampa sales office discuss monthly payments of $65, $75, $100, etc. to fund the retirement plan. Where the challenged literature was heavily used, approximately 84% of the whole life policies sold during the period 1990 to 1993 were even premium policies. For Met as a whole during the same period, approximately 7% of whole life policies sold were even premium. The percentage of even premium purchasers is also high in other offices where there is evidence of significant use of the challenged sales material. It is reasonable to conclude, therefore, that any policyholder misled into the purchase of a

43

whole life policy as a retirement or savings plan will, be with few exceptions, an even premium policyholder.

The restitution plan adopts several tests to determine which even premium policyholders should be contacted. Each of these tests incorporates over-inclusive standards, with the result that more than two-thirds of Met's even premium whole life policyholders during the relevant period will be contacted. In addition, Met has reviewed its central complaint files (including complaints forwarded by state regulators) to include policyholders, even premium or not, who purchased during the relevant period and who have complained about non-disclosure in connection with the sale of policies as retirement or savings plans.

### B.    The Relevant Offices and Agents

Anecdotal evidence suggests that where the challenged literature was used, typically it became a staple tool, at least for a while, of the agent using it. Accordingly, as a first test, Met reviewed the records of each of its agents and identified those who in any year from 1990 through October 1993 made even premium sales of whole life policies that amounted to 25% or more of that agent's total whole life sales for the year. If that test is met, even if there is no evidence of use of improper literature or improper sales techniques, all of the even premium policyholders who purchased their policies from that agent will receive notification of the restitution offer. The 25% threshold represents a statistically significant deviation from the mean for all agents that could indicate meaningful "plan" selling.

44

As a second test, Met reviewed the records of its approximately 1,000 sales offices to identify those where, in any year during the 1990-1993 period, even premium sales were 15% or more of the office's total of whole life sales for that year. That percentage, on an office-wide basis, could be indicative of a meaningful level of retirement or savings plan selling. Accordingly, all even premium whole life policyholders of all 15% or higher offices will also be notified of the restitution order.

Finally, Met surveyed its field sales offices for indications that any agent or office used any of the challenged literature to sell life insurance as a retirement or savings plan. Where the survey of literature reviewed found indications of use of challenged literature, the even premium whole life policyholders of the relevant agent or office, as appropriate, will receive notification of the restitution offer.

Met also undertook a review of its central files of policyholder complaints (including any complaints forwarded by state regulators) for those raising issues of non-disclosure in the sale of whole life policies as retirement or savings plans. Policyholders who made such complaints about sales in the relevant 1990-1993 period, and who have not already received refunds, will be included in the restitution group, whether or not they are even-premium policyholders.

C.    Exclusions From The Even Premium Class

Two small groups are carved out of the class of even premium policyholders to be notified, on the ground that they must have

45

known that they were buying life insurance. First, policyholders who converted their group or term life insurance to whole life are excluded. Policyholders who exchange one type of life insurance for another presumably are aware that they are acquiring life insurance.

Second, purchasers of policies with a face value of $1,000,000 or more are excluded. These policyholders are likely to be more financially sophisticated, are almost certain to investigate the nature of the product being purchased, and are likely to be required to take a full medical examination as a condition to obtaining the policy.

D.    Start And End Date For Group Receiving Notice

Met proposes to contact even premium policyholders who purchased their whole life policies on or after January 1, 1990 (whether or not those policies have since lapsed or been cancelled) and who fit the criteria described above.[21/]

Met proposes an end date for the group to be offered restitution by requiring purchase before November 1, 1993. By that date, Met effectively prohibited the use of unauthorized literature and begun the process of reviewing all existing field sales material. Additionally, publicity relating to the Tampa sales office had reinforced the importance of adequate disclosure of the products being sold.

---

21/   The number of even premium whole life policies issued by Met almost doubled between 1990 and 1991 (from approximately 13,000 to approximately 24,000 policies, or from roughly 4% to 6% of all whole life policies issued).

46

### E.    Size of the Class

The size of the class to be notified is approximately 60,000 policyholders (including lapsed policyholders), with premiums paid through December 1993 of more than $76 million.[11/]

### F.    Form And Method Of Notice

Each of the policyholders identified by this methodology will be sent a letter stating that he or she may have received sales literature in connection with the purchase of a whole life policy as a retirement or savings plan that did not make clear that the product being sold was a whole life policy.   The letter would include a form for making a claim for restitution if the policyholder believed he or she was misled in that purchase ("a claim form").   To make a claim, a policyholder (or lapsed policyholder) would have to submit a claim form within 45 days from the notice that (i) states that the policyholder was actually misled in connection with the purchase of the policy, (ii) describes the misrepresentation alleged and, if possible, identifies any misleading literature used and provides a copy of such literature if available, (iii) is signed and notarized, and (iv) releases Met from any claims in connection with the purchase of the policy.   Each appropriately completed claim would be honored.

---

[11/]    The figures set forth are company-wide figures and include policyholders from the Tampa sales office to whom notification of a restitution offer has already been given. Previously notified Tampa office policyholders account for approximately 18,000 policyholders and $24 million in premiums (including amounts already paid out) of the amounts set forth above.

47

. The 45-day window for refund claims is important to a fair resolution of this situation. The offer of a cash refund creates a risk (which Met has already seen realized in connection with its Tampa refund offer) that other insurers will use the offer as an opportunity for aggressive replacement activity. A 45-day offer period is adequate for policyholders to make an informed decision, but affords some protection to Met against inappropriate replacement activity.

Met is a defendant in a class action lawsuit filed in United States District Court for the Middle District of Florida. The complaint in that action alleges that the Tampa sales office and other Met sales offices misled purchasers of whole life insurance through the use of sales literature and other solicitations that did not disclose that the product involved was a whole life policy. The complaint is brought on behalf of a purported class consisting of all purchasers of Met whole life policies who purchased their policies as a result of the allegedly misleading sales literature and practices described in the complaint. Because of the almost complete overlap between the purported class and the group of policyholders to be contacted in connection with this restitution offer, Tew and the Company are exploring the possibility of combining settlement of the class action with its restitution offer.

If this proposal is combined with a class action settlement, then notice would be sent to the same group, informing them of the class action, the proposed settlement, and their ability to object

48

to the settlement or to opt out of the class (and, therefore, avoid being bound by the class action settlement).

### G.    The Form of Restitution

The restitution offer to the group defined above will provide whole life policyholders who were misled the option of (i) a cash refund totalling all premiums paid (less any outstanding loan amount or other withdrawal) plus interest at a blended rate determined by the annuity interest rate paid by the Company in each applicable year,[21] or (ii) reformation of the whole life contract into an annuity funded in that amount.

Any owner of a lapsed or cancelled policy in the class misled would be offered a refund in the amount of premiums paid (less any amount already paid out to the policyholder), plus interest calculated in the same manner as for in-force refunds.

The Company recognizes that the restitution offer will be made to and may be accepted by policyholders who were fully informed and understood that they were purchasing a whole life policy. At the same time, that over-inclusiveness ensures that virtually all affected policyholders are reached. If individual cases of misrepresentation are found that fall outside the group being notified, Met stands ready to offer restitution to those policyholders as well. This restitution program can be implemented logically only on a national scale.    For that reason, it is

---

[21]    Interest will be calculated based on the aggregate premium paid from period to period and the Met annuity interest rate in effect for such periods, so that the policyholder will be put in a position comparable to what would have been the case had an annuity been purchased.

particularly important to Met that a consensus be developed among affected regulators as to the appropriateness of the program.

## XIV. PROPOSED ENHANCED COMPLIANCE PROGRAM

As a result of the events described in this report, Met has embarked on a comprehensive review and strengthening of its compliance structures and programs across all business units and product lines throughout the Company. Met's Chairman of the Board and Chief Executive Officer, Harry P. Kamen, has stated that Met is committed to devoting whatever resources are necessary to achieve an effective ethics and compliance program that will protect its policyowners and detect and deter potential problems. Met's Enhanced Ethics and Compliance Program will be designed and implemented to meet the goals of effective training, education, communication, supervision, auditing, discipline, and accountability.

### 1. Accountability and Organization

The Enhanced Compliance Program creates new and expanded organizational structures to ensure that compliance programs are effectively developed, implemented, communicated and monitored.

The Corporate Ethics and Compliance Department, operating under the direction of the Chief Compliance Officer, will be responsible for developing, documenting, communicating and administering enhanced corporate compliance programs; approving each business unit's enhanced compliance program; monitoring

50

compliance throughout the Company; auditing Personal Insurance sales offices regarding compliance issues; and following up to ensure any deficiencies are timely corrected. The Chief Compliance Officer will report directly to the Chairman and Chief Executive Officer on compliance issues, will report significant compliance issues to the Business Standards Committed (described below), and will report periodically to the Audit Committee of the Board. Pursuant to its audit function, the Corporate Ethics and Compliance Department will conduct on-site compliance inspections of all sales offices at least annually and will conduct periodic compliance meetings with employees. The Corporate Ethics and Compliance Department will report compliance deficiencies to senior management and follow up to determine whether corrective actions have been implemented.

Each business unit within the Company (e.g., Personal Insurance, Group Insurance) will designate an Ethics and Compliance Officer ("ECO") who shall be at least a vice president and who will report both to the Company's Chief Compliance Officer and to the senior company officer responsible for that line of business. The Ethics and Compliance Officer and his or her staff will be accountable for overseeing the process of developing, documenting, communicating and administering compliance programs in that unit.

The Business Standards Committee, comprised of members of the Corporate Management office (the Company's top officers), will monitor and resolve significant control, audit and compliance issues. The Committee will receive and follow up on reports from

51

senior management, the Chief Compliance Officer, the Corporate Controller and the General Auditor.

The Corporate Customer Relations Department, which reports to the President and Chief Operating Officer, will be responsible for ensuring appropriate and timely responses to customer and regulatory complaints, developing systems to generate enhanced reports on complaints, detecting patterns or instances of noncompliance, and reporting any such patterns to the Chief Compliance Officer and senior management of the relevant business unit.

In addition to their existing responsibilities, the legal department and auditing department will be responsible for reporting compliance issues that come to their attention to the Corporate Ethics and Compliance Department.

2.  Personal Insurance Enhanced Compliance Program

Because Met's personal life insurance sales force operates under the supervision of the Personal Insurance Unit, the Company made the development and implementation of Personal Insurance ethics and compliance programs its highest priority.

Donald Stadler, an experienced vice president with a reputation for integrity, is the new Ethics and Compliance Officer for Personal Insurance. He will be assisted by a staff of 20-25 employees. Stadler and his staff will be responsible for overseeing the process of developing, documenting, monitoring and administering Personal Insurance's enhanced ethics and compliance

program and communicating it to sales management, sales representatives and other employees. The enhanced program will be communicated through distribution of documents and through territorial, regional and branch conferences and meetings; in addition, the enhanced program will be integrated into all Personal Insurance training courses. The program will be monitored to detect noncompliance and to assure appropriate and consistent disciplinary practices and timely reporting of compliance activities. Work has already begun to analyze the effectiveness of existing policies and procedures and to formulate enhanced policies and procedures to assure that ethics and compliance problems do not arise in the future.

In conjunction with the Corporate Ethics and Compliance Department and the legal department, Personal Insurance conducted sales practices training programs around the country during the past two months. Substantial work has also begun in the following areas:

A.   Sales Material

A unit ("Sales Marketing Unit") will be established in Personal Insurance responsible for the development or review of all standard sales material and for ensuring legal department approval of all such material. All members of the unit will attend a training course conducted by the legal department to ensure familiarity with applicable laws and regulations.

Company policy will discourage sales representatives from developing customized sales materials. No customized materials may generally be used unless they are approved by each of the following: branch manager, regional and/or territorial unit, Sales Marketing Unit and the legal department.

53

The longstanding requirement that all sales material and all product or company training material be reviewed and approved by the legal department will be reinforced and communicated frequently to all employees and sales representatives through education and training courses, periodic reminders and certifications.

All approved sales and training material will bear a legal department control number and will have an automatic expiration date, beyond which it cannot be used or printed without further Law Department approval.

After a brief transition period, no sales or training material may be printed, distributed, stored in a warehouse, or otherwise used unless it contains a current legal department control number.

In addition to maintaining an advertising file of all approved sales and training material, the legal department will maintain a record of all such material, including the control number, the name or a description of the material, the unit or person to whom approval was given, the date of approval, the name of the lawyer giving approval, and other information.

B.   Training:  Management

All personnel engaged in training must attend annual training sessions which place appropriate emphasis on ethics and compliance issues.

At least once annually, every person in sales management will attend a training session which places appropriate emphasis on ethics and compliance issues.

Every person in sales management will receive special training with respect to any enhanced policies and procedures which are implemented.

C.   Training:  Sales Representatives

All sales representatives are required to attend, at least annually, a continuing education course on ethics and compliance issues.

54

All training material and manuals will be reviewed and revised to ensure more effective communication of compliance policies and procedures.

All training material, regardless of the medium, must be reviewed and approved by the legal department prior to use.

D.    Promotion and Recognition

No person in sales or sales management will be promoted unless the person has a favorable compliance history, including review of any audit deficiencies, policyowner and regulatory complaints, litigation, and disciplinary actions.

Similarly, no person will receive official sales or sales management recognition (e.g., President's Conference or Managers' Hall of Fame) unless the person has a favorable compliance history.

E.    Recruiting

Personal Insurance will phase in a requirement of NASD licensing for all individual within their first year of employment. NASD licensing applications will be required prior to appointment.

F.    Monitoring

Every branch manager will conduct and document semi-annual reviews, for compliance purposes, of each sales representatives' sales methodology.

An enhanced computer information system has been developed to monitor sales activities and compliance at the sales representative, branch office and regional levels.

As noted above, the Corporate Ethics and Compliance Department will conduct annual on-site compliance audits of all branch offices. These audits will be in addition to, not replacements of, audits conducted by the Audit Department.

In the coming months, Personal Insurance will continue to identify and implement policies and procedures designed to improve the prevention and detection of non-compliance, the monitoring and auditing processes, ethics training, and discipline.

55

## XV.  ACKNOWLEDGMENT

I want to acknowledge the invaluable assistance of the staff of the Florida Department of Insurance (especially Daniel Y. Sumner, S. Marc Herskovitz and Kim Forester), the Florida Attorney General (especially Lester A. Garringer, Steven H. Parton and Amy Bardill) and the attorneys of Tew & Garcia-Pedrosa (especially Joseph L. Rebak) in the investigation into the sales practices of Metropolitan Life Insurance Company, and the contributions of Joseph L. Rebak, J.R. Rosskamp and Mary Ann Allen in the preparation of this Report. I would also like to acknowledge the lead role of the New York Department of Insurance in the development of the Expanded Plan of Restitution described in this Report.

This Report is respectfully submitted to Florida Insurance Commissioner Tom Gallagher and Florida Attorney General Robert A. Butterworth this 6th day of March, 1994.

THOMAS TEW

57

A



ORGANIZATIONAL CHART FOR THE SOUTHEASTERN TERRITORY
(Pre-April 1991)

Executive Vice President
Corporate Management Office

Robert Crimmins

Officer-In-Charge
Southeastern Territory

Rudy Michaud (1975 - July 1992)

Marketing Vice President
Jim Higgins (1989 - Present)

Regional Sales Manager
(Tampa Region)
William Latta (May 1987 - April 1991)

Rick Urso and Associates
Rick Urso (1983 - Present)

Marketing Director/
Director of Marketing Services
Gary Veith (March 1990 - July 1992)
Gordon Silva (May 1987 - March 1990)
William Latta (January 1984 - May 1987)

Advanced Underwriting Consultant
L. Michele Lipon
(1986 - October 1992)

Organizational Human
Resources Vice President
John Smith
(until July 1992)

Public and Consumer Affairs
Roy Bertke
(1980 - Present)



ORGANIZATIONAL CHART FOR THE SOUTHEASTERN TERRITORY
(April 1991 - July 1992)

**Executive Vice President**
Corporate Management Office

Robert Clemmns

**Senior Vice President**
Career Agency Operations

Richard Maurer

**Officer-in-Charge**
Southeastern Territory

Rudy Michaud (1975 - July 1992)

**Operations and Human Resources Vice President**
John Smith (until July 1992)

Public and Community Affairs
Roy Bartke (1980 - Present)

**Marketing Director/s**
Director of Marketing Services

Gary Voith
(March 1990 - July 1992)

Advanced Underwriting Consultant
L. Michelle Uren
(1986 - October 1992)

**Marketing Vice President**
Jim Higgins (1989 - Present) and
William Latta (April 1991 - July 1992)

**Regional Sales Manager**
Southeastern Region

Dennis Schneider (April 1991 - Present)

Rick Ureo and Associates
Rick Ureo (1983 - Present)



## ORGANIZATIONAL CHART FOR THE SOUTHERN TERRITORY
(July 1992 - Present)

Executive Vice President -
Corporate Management Office
**Robert Cimmins**

Senior Vice President
Conseco Agency Operations
**Richard Maurer**

Officer in Charge
Southeast Territory
**William Goggans (July 1992 - Present)**

Marketing Vice President
**Jim Hagins (1989 - Present)**

Conseco Securities Marketing
**Dennis Schneider (April 1991 - Present)**

Rick Uno and Associates
**Rick Uno (1983 - Present)**

Director of Marketing Services/
Trainer Resources
**Ed Trowbridge
(July 1992 - Present)**

Public and Consumer Affairs
**Roy Benike
(1980 - Present)**

Marketing Services Manager
**John Goutbaud
(July 1992 - Present)**

Advanced Underwriting Consultant
**L. Michelle Lyon
(1986 - October 1992)**

B-1

# Tax-Advantaged Bonus Plan

## A new concept in retirement planning for you . . . the business owner!



Today you're in charge of your business — someday you'll want to be in charge of your retirement.

What if you could create *just for yourself* a plan that would allow you to contribute as much as you want and provides you with a tax-free retirement benefit? And what if that plan were a deductible business expense with no out-of-pocket cost?

### A Bonus with a Distinct Advantage

This is one bonus you can give yourself and no one else! This is one plan that will give you those most important dollars for retirement and also make available cash for more immediate needs, such as family emergencies.

**ADVANTAGES THAT BENEFIT YOU —**
- No IRS approval required
- Exclusive — for *you* and *you alone*
- Practical — design the plan the way you want it
- Uncomplicated — save money on professional fees
- Affordable — set a plan budget for yourself
- Deductible — reduce your business taxes

**WHAT THIS PLAN CAN DO FOR YOU —**
**IT CAN PROVIDE:**
- *Tax-free* retirement benefits
- *Tax-free* survivor benefit
- *Tax-deferred* cash values
- Contributions uninterrupted by disability with Waiver of Premium
- Cash reserve for personal or business needs
- *Reimbursement for income taxes* payable on bonus *(optional)*





## How It Can Work for You

*Prepared For:* _____

| | |
|---|---|
| How much do you want to contribute? | $_____ Year/Month |
| Your current age? _____ | Your gender? _____ |
| Your tax bracket? _____ | Company tax bracket? _____ % |
| When do you want to retire? _____ | How many years of income do you want? _____ |

### FUNDING PHASE

| In Year | Guaranteed Cash Value | OPTION A | | OPTION B | |
|---|---|---|---|---|---|
| | | Cash Value¹ | Survivor Benefit | Cash Value¹ | Survivor Benefit |
| | | | | | |
| | | | | | |
| | | | | | |

## *What impact will your choice of Option A or B have on your retirement and survivor benefits?*

### RETIREMENT PHASE

| | OPTION A | OPTION B |
|---|---|---|
| Annual Tax-free Benefit at ___ | | |
| | | |
| Total Retirement Benefit to ___ | | |
| + Tax-free Survivor Benefit [Death at ___] | + | + |
| = Total Benefit | | |
| − Employer's Total After Tax Cost [___ X Bracket] | − | − |
| = Net Gain | | |

## *By taking Option B & paying $_____ in income taxes you gain $_____ in retirement and survivor benefits!*

¹ Cash Value based on illustrative values of MetLife's _____ (guaranteed face amount of $_____) and PUAR using current dividend schedule. Dividends are neither guarantees nor estimates for the future.
² Annual Tax-Free Benefit through policy loans and withdrawals. Loan rates are not guaranteed, and policy must be kept in force until death. If policy lapses prior to death, there may be income taxes payable.
Additional charge of Waiver of Premium rider is included.

Metropolitan Life Insurance Company, Home Office: New York, NY

B-2



# Tax-Advantaged Retirement Plan

*A new concept in retirement planning
for you and your profession!*



**ADVANTAGES THAT BENEFIT YOU —**

- **Affordable** — you decide how much you want to put away
- **Flexible** — you plan how much you need and when you will retire
- **Portable** — you take the plan with you wherever your work takes you
- **Uncomplicated** — you pay no professional fees and file no tax forms
- **Security** — you have retirement dollars you know will be there for you!

**WHAT THIS PLAN CAN DO FOR YOU —
IT CAN PROVIDE:**

- *Tax-free* retirement benefits
- *Tax-free* survivor benefit for your family
- *Tax-deferred* cash values
- Contributions uninterrupted by disability with Waiver of Premium
- Cash reserve for personal or business needs

What if you as a nurse could create *your own retirement plan* — that allows you to contribute as much as you want and to provide yourself *tax-free retirement benefits?*

## Retirement with a Distinct Advantage

This is a retirement plan you can create for *yourself!* This is one plan that can give you those important *dollars for retirement* and also make available cash for more immediate needs, such as family emergencies.



# For Nurses

**What contributing $100 a month now can mean for your retirement later!**



## An Example (Female Age 35 Retiring at 65)

### FUNDING PHASE

| In Year | Guaranteed Cash Value | Cash Value[1] | Survivor Benefit[1] |
|---------|----------------------|---------------|---------------------|
| 5 | $4,000 | $4,300 | $68,000 |
| 10 | $10,300 | $11,800 | $91,000 |
| 15 | $17,300 | $23,600 | $109,000 |
| 20 | $25,400 | $41,500 | $123,000 |
| 25 | $34,500 | $67,600 | $164,000 |
| 30 | $44,700 | $105,500 | $210,000 |

### RETIREMENT PHASE

| | |
|---|---|
| Annual Tax-free Benefit at 65 | $5,550 |
| Total Retirement Benefit to 85 | $111,000 |
| + Tax-free Survivor Benefit (Death at 85) | $208,000 |
| = Total Benefit[1] | $319,000 |
| − Total Premiums | $36,000 |
| = Net Gain | $283,000 |

## The more you contribute, the greater your benefits!

| Monthly Premium | Annual Benefit Age 65 | Total Benefit Ages 65–85 | Survivor Benefit Age 85 |
|-----------------|----------------------|--------------------------|-------------------------|
| $150 | $9,300 | $186,000 | $342,000 |
| $200 | $12,500 | $250,000 | $460,000 |

[1] *Cash value based on illustrative values of NetLife's Whole Life (Female 35, guaranteed face amount of $58,373) and PUAR using 1995 dividend schedule. Dividends are neither guarantees nor estimates of the future.*

[2] *Annual Tax-free Benefit through policy loans and withdrawals. Loan rates are not guaranteed, and policy must be kept in force until death. If policy lapses prior to death, there may be income taxes payable.*

*Additional charge if Waiver of Premium rider is included.*



# How It Can Work for You

**Prepared For:** _____

| How much do you want to contribute? | | |
|---|---|---|
| Your current age? _____ | Your gender? _____ | $_____ Year/Month |
| When do you plan to retire? _____ | | |
| How many years of income do you want? _____ | | |

## FUNDING PHASE

| In Year | Guaranteed Cash Value | Cash Value¹ | Survivor Benefit¹ |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## RETIREMENT PHASE

| | |
|---|---|
| Annual Tax-free Benefit at _____ | |
| | |
| Total Retirement Benefit to _____ | |
| + Tax-free Survivor Benefit (Death at _____ | |
| = Total Benefit² | + |
| − Your Contribution | |
| = Your Net Gain | − |

¹Cash Value based on illustrative values of MetLife's _____ (guaranteed face amount of $_____) and PEAR using current dividend schedule. Dividends are neither guaranteed nor estimates for the future.
²Annual Tax-free Benefit through policy loans and withdrawals. Loan rates are not guaranteed, and policy must be kept in force until death. If policy lapses prior to death, there may be income taxes payable.
Additional charge if Waiver of Premium rider is included.

Metropolitan Life Insurance Company, Home Office: New York, NY

C

Metropolitan Life Insurance Company
General Office
Headquarters Area, Suite 610
Street, SE 30348
Telephone: 404-454-5600 / Fax: 404-454-4640

 Metropolitan Life

Mr. R. Urso, District Sales Manager
733 SEHO District Sales Office

Re: Audit of
SEHO District Sales Office

Attached is a copy of the report on our audit and examination
of the SEHO District Sales Office. This review was completed
during the weeks of October 14 and October 31, 1991.

Please furnish Mr. D. Schneider, Regional Sales Manager of
the Tampa Region with your response regarding any corrective
action that has been or will be undertaken as a result of
this report. This response should be dated no later than
December 6, 1991.

A copy of your correspondence to Mr. Schneider is to be
forwarded to myself as well as the individuals listed on the
attached distribution list.

W. Donald Anderson, Manager
Auditing - Southeast Region

November 4, 1991

DISTRIBUTION LIST

cc  Mr. R. Michaud, Senior Vice-President and C.E.O.
    Southeastern Head Office

    Mr. F. Hauser, Senior Vice-President and Controller
    New York Home Office, Area 6-B

    Mr. J. Higgins, Vice-President, Marketing
    Southeastern Head Office

    Mr. D. Schneider, Regional Sales Manager
    Tampa, FL Region

    Mr. E. Reiter, Personal Insurance Controller
    New York Home Office, Area 5-O

    Mr. J. Welch, Vice-President and General Auditor
    New York Home Office, Area 6-H

    Mr. S. Manzar, Vice-President
    Auditing, New York Home Office, Area 6-H

    Mr. J. J. Gould, Assistant Vice-President
    Auditing, New York Home Office, Area 6-G

    Mr. A. Palietta, Assistant Vice-President
    Auditing, New York Home Office, Area 6-H

    Mr. J. Hughes, Senior Consultant
    P.I. Financial Mgt., New York Home Office, Area 5-O

    Mr. P. Petrie, Territorial Controller
    Southeastern Territory

    Mr. J. Leonardi, Personal Insurance Auditing
    New York Home Office, Area 6-H

METLIFE
AUDITING DEPARTMENT
-------------------------------------------------------------    XISETASR
                                                    NOVEMBER 8, 1991

AUDIT OF:

TSB SERO DISTRICT SALES OFFICE
TAMPA, FLORIDA

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY

## ENVIRONMENT

The SEKO District sales office, located in the Southeastern Head Office in Tampa, Florida, consists of 87 employees which includes 64 account representatives and four assistant sales managers.

Auditing congratulates the SEKO District for their past and present contribution to the overall benefit of MetLife. The sales office earned the Company's highest personal insurance award which was MetLife's 1990 Sales Office of the Year. In addition, the District, managed by Mr. Rick Urso, was the top office in Southeastern Territory in 1989 and 1990 and provided nearly one quarter billion dollars of new life insurance protection to more than 2,300 clients in 1990.

## PURPOSE AND SCOPE

The audit was conducted to determine whether the District is operating in compliance with approved MetLife procedures.

Our examination included a review of the following for the period between December 11, 1990 and October 11, 1991:

o  Accounting
o  Income - Disbursements/Expenses
o  Underwriting - Commissions/Compensation
o  Policies, Plans, Procedures & Regulatory Requirements
o  Personnel

## OPINION

It is our opinion that the accounting records are maintained in a satisfactory manner and the system of internal controls is adequate. However, there is one immediate concern regarding pre-approach letters which should be addressed by senior management to reduce the risk of negative publicity.

Observations noted during the audit, the results of which are summarized on the attached fact sheets, are shown below under the summary of audit findings.

## SUMMARY OF AUDIT FINDINGS

o  Unauthorized sales literature has been utilized which is contrary to Mr. Michaud's 1990/91 letters to the field and could result in additional State "Cease & Desist" orders and cessation of underwriting privileges.

o  Since 9/16/91, when Marketing restricted the number of pre-approach letters to 50 per representative, per week, 342,734 pre-approach letters have been mailed by the District in 11 business days.

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 1 -

° As of 10/14/91, Forms 659, Statement of Cash Account
(Trial Balance) and Bank Statement Reconciliations had not
been completed for the months of August and September
1991.

EXIT INTERVIEW

The audit observations were discussed in a meeting conducted
on October 21, 1991 with the following in attendance:

| AUDITING | SIMO DISTRICT |
|---|---|
| J. McDonald | R. Urso, District Sales Mgr. |
| A. Capropreso | A. Spicella, Office Manager |

The audit was completed by Mr. J. McDonald and the
undersigned.


A. Caropreso
Supervising Auditor

10/25/91

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 2 -

FACT SHEET

| 758 SENO District | Prep. By: A. Carrasco |
|---|---|
| Sales Office Name & Number | Appr. By: _____ _____ |
| | Date |

SUBJECT: Miscellaneous - Unauthorized Pre-Approach Letters

FINDINGS: Prior to the start of the audit as well as during the first week of the audit, unauthorized pre-approach sales letters were being mailed by Representatives in the SENO District. Following are examples of improper or misleading statements used in letters mailed subsequent to Mr. Michaux's guidelines as the field dated 9/25/91:

| UNAUTHORIZED WORDING | EXPLANATION |
|---|---|
| Nursing Representative Deposits | "Made up" title. Not an acceptable synonym for premium. |
| Retirement Saving Plan | Name of policy & its benefits must be specified. |
| Investment World | Insurance cannot be referred to as an investment. |

Another questionable term used but omitted from the approved version:

| Guaranteed | New version adds approved nurses. |
|---|---|

One group of letters mailed during the audit contained the signature of Christine McCarron, "Nursing Representative." Ms. McCarron is a former Account Representative who is now a Clerk in the SENO District.

A Cease and Desist order prohibiting the above type letter from use has been issued by the State of North Carolina and inquiries on the letters have been received from Insurance Departments in Virginia and Florida.

MANAGEMENT COMMENTS: Mr. Urso stated he was not aware that unauthorized letters were still in use and would make certain only approved letters would be mailed in the future. He has issued the following written statement to each Account Representative: "It has been brought to my attention that several versions of this letter have been going out. This is the only letter that has been approved & under no circumstances can any other letter be used without Company approval. If you have any other versions of this letter, please destroy immediately. Rick. (10-21-91)

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 3 -

FACT SHEET

| 758 SEHO District | Prep. By: A. Caropreso |
|---|---|
| Sales Office Name & Number | Appr. By: _____ '79. |
| | Date |

**SUBJECT:** Miscellaneous - Unauthorized Pre-Approach Letters

**MANAGEMENT COMMENTS (CONTINUED):** Mr. Urso indicated the letters containing Ms. McCarron's signature were "left over" from the date she was a representative. The signatures were simply "generic" since any replies were charged out to various representatives.

**CONCLUSIONS/RECOMMENDATIONS:** Continued use of the unapproved letters could lead to the eventual cessation of MetLife's privileges to underwrite insurance in the applicable states, according to Ms. L. Michelle Ligon, J.D., Advanced Sales & Consulting Services, Marketing.

Mr. Urso should comply with the terms of Mr. Michaud's guidelines on sales letters by closely supervising each "bulk mailing." The long term benefits to the District and to MetLife would undoubtedly offset any short term benefits achieved by utilizing unauthorized sales literature.

**CUSTOMER RESPONSE:**

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 4 -

FACT SHEET

| 755 SEHO District | Prep. By: A. Caropreso |
| Sales Office Name & Number | Appr. By: _____ 4/5/t |
| | Date |

**SUBJECT:** Disbursements - Bulk Mailing In Excess of The Number Approved by Marketing

**FINDINGS:** Marketing issued a letter to the field dated 9/18/91 limiting the number of pre-approach letters which could be mailed at Company expense to 50 each week, per representative.

From 9/18/91 thru 10/17/91, a period of 21 business days, there have been 383,794 pre-approach letters mailed out by Southeastern Head Office mail room personnel for the SEHO District which presently consists of 64 representatives.

**MANAGEMENT COMMENTS:** Both Mr. Urso and Ms. Spicella indicated they did not receive a copy of the letter limiting the number of pre-approach letters which could be mailed each week. The Territorial Office was contacted on 10/21/91 and Auditing was informed that the letter was mailed to all sales offices.

Mr. Urso also indicated that the Regional Office recently implied that the letter indicated "we need to wisely control our non-productive expenses" and the SEHO District was productive.

**CONCLUSIONS/RECOMMENDATIONS:** On 10/21/91, Mr. Urso was furnished with a copy of Marketing's letter dated 9/18/91.

If the SEHO District is exempt from the guidelines set forth by Marketing, they should be furnished with a letter of approval from the Marketing Vice President. Mr. Urso should be advised in writing of any restrictions to be observed regarding the maximum amount of bulk mailings allowed.

Since bulk-mailings include other expenses besides postage, such as two envelopes, paper, printing, Xerox, mail room processing and storage, Marketing should advise the District and the Purchase Payable Unit in the Southeastern Head Office whether they are exempt from normal guidelines.

**CUSTOMER RESPONSE:**

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 5 -

FACT SHEET

| | |
|---|---|
| 75B SEMO District | Prep. By: A. Caropreso |
| Sales Office Name & Number | Appr. By: _____ ''/ Date |

SUBJECT:  Control of Cash
- Statement of Cash Account (Trial Balance)
- Bank Statement Reconciliation (Form 669)

FINDINGS:  As of 10/14/91, Form 669, Statement of Cash Account (Trial Balance) and Bank Statement Reconciliations had not been completed for the months of August and September 1991.

MANAGEMENT COMMENTS:  Management concurs with the findings and will reconcile the cash accounts each month upon receipt of the bank statement.

CONCLUSIONS/RECOMMENDATIONS:  Per Form 1-M:  "A statement for the Manager's bank account will be received directly from the bank on a monthly basis.  Upon receipt of the bank statement, the SA/OM, or his/her substitute, is to promptly and fully complete Form 669 (i.e., both the statement of Cash Account and the Bank Statement Reconciliation portions)."

CUSTOMER RESPONSE:

METLIFE CONFIDENTIAL - FOR INTERNAL USE ONLY
- 4 -

**Metropolitan Life** AND AFFILIATED COMPANIES

SOUTHEASTERN HEAD OFFICE BRANCH
THE METROPOLITAN PLAZA
TAMPA, FL 33607
(813) 870-4650

*NOT RESTRICTED TO A PHYSICIAN*

## NURSES GUARANTEED RETIREMENT SAVINGS PLAN

Would you mind just giving us your name and date of birth
below in order that we may furnish you information about a
NEW RETIREMENT SAVINGS PLAN:

1. Currently earning high money market interest rates

2. The cash fund may be used for emergencies and
opportunities

3. Deposits may be made monthly as the budget allows

4. An optional disability benefit may also be included

5. Pays a guaranteed income at retirement

This is something new, one of the most widely discussed
retirement programs in the investment world today.

Sincerely

*Christine McCarron*

Christine McCarron
Nursing Representative

-----------------------------------------------------

NAME _____

ADDRESS _____ CITY _____

STATE _____ ZIP CODE _____

HOME PHONE _____ BUS PHONE _____

DATE OF BIRTH: MONTH _____ DAY _____ YEAR _____

This retirement program does not conflict with any other
retirement program, IRA, 401K, annuity (TSA), or hospital
retirement that you may have at the present time or acquire in
the future.

If you leave your present nursing position this retirement
program will stay with you to guarantee your retirement goals.

Metropolitan Life
and affiliated companies

METROPOLITAN INSURANCE COMPANY
Southeastern Head Office Branch
4123 Boyscout Boulevard
Tampa, FL 33607
(813) 879-8050

## NURSES INSURED RETIREMENT PLAN

One of the most widely discussed retirement savings plan is now available to ALL NURSES. This new Retirement Plan is designed to complement your existing benefits with 5 VERY IMPORTANT PRINCIPLES.

1. CONTROL — If you leave your present nursing position, this retirement program can stay with you to help you reach your retirement goals.

2. FLEXIBILITY — Accessibility of cash

3. TAX BENEFITS — Tax deferred accumulation.

4. SECURITY — Can be used to provide lifetime income.

5. DISABILITY — Your monthly contributions can continue to be deposited by Metropolitan should you become disabled.

This retirement program does not conflict with any other retirement program, IRA, 401K, Annuity, that you may have at the present time or acquire in the future.

Sincerely

John Wise
Nursing Representative.

Please complete the following, so that we may furnish you with information about this New Insured Retirement Plan.

NAME_____

ADDRESS_____  CITY_____

STATE_____  ZIP CODE_____

HOME PHONE_____  BUS PHONE_____

DATE OF BIRTH: MONTH_____  DAY_____  YEAR_____

Rudolph Michaud, CLU
Vice President
Southeastern Field Office

[ ] Metropolitan Life

September 25, 1991

To   the Field Force and Management Team
     Southeastern Territory

Re   Unauthorized Sales Literature

The Manuals of Instructions for Sales Management and Sales
Representatives are very explicit regarding clearance by the
home office of sales material originating in the field.

Metlife representatives have a wide range of professionally
developed, approved support material to choose from.
Nevertheless, it is recognized that sales situations do
sometimes arise where a variation may be deemed helpful or a
new approach to a prospect may be developed. A home office
review procedure, including legal review, has been
established to accommodate these situations. Any proposed
material must be legally approved prior to its use.

There have recently been some instances of unauthorized
letters being sent to prospects and/or clients that have
given rise to complaints directed to state Insurance
Departments and to the Corporate Management Office. In some
cases, letters have been mailed that are offensive or
unnecessarily threatening in style, as in "...urgent matter
concerning your policy..." or words to that effect.

Others are merely unprofessional, with grammatical errors
and misspellings. Still others are potentially misleading
or make reference to various benefits that are not available
in any one contract. These types of communications are
unacceptable and may result in disciplinary action being
taken against those responsible.

The attached procedures, excerpted in summary form from the
manuals, have been updated with the application of
Electronic Mail to expedite review for approval in the home
office. You should refer to the manuals for more complete
details concerning the process.

One of the most valuable assets you have in sales is the
personal image you project.  You start creating that image
with the big advantage of MetLife's name -- the quality
company in insurance and financial services.  Your customers
rely on that reputation.  It is extremely important that
each of you reinforce that image in all your communications.
It's essential to the Company's continued success...and
yours.

Please be guided accordingly.

Sincerely

Senior Vice-President

Attachment

PROCESSING REQUESTS FOR APPROVAL OF UNAUTHORIZED SALES LITERATURE

The following applies to all lines of insurance. These procedures
are meant to help management screen out inappropriate material or
to make necessary changes before submitting material for approval

- Branch Manager/District Sales Manager reviews the material
  for content to see if it offers a more effective approach
  than similar existing material. It should also be checked
  for visual impact, spelling and grammatical errors and the
  elimination of improper or misleading statements.

  The following are some examples of improper usage (but not
  an all-inclusive list):

NEW PLAN - Terms such as "a new program from MetLife" or
           "new mortgage reduction plan" cannot be used to
           describe an insurance policy. The name of the
           policy and its benefits must be specified.

LOW COST - Cannot be used when referring to premium payment.
           It is also not acceptable to say "save premium"
           or "better coverage" in reference to Metropolitan
           Property and Casualty Insurance Company products.

NET COST - Cash values above total premiums paid cannot
           be termed "return over cost" or "net cost".

SAVINGS - The terms "save" and "savings" cannot be
          used to imply that life insurance provides
          a savings medium comparable to a bank
          account.

DEPOSIT - Is not an acceptable synonym for premium.

INVESTMENT - Insurance cannot be referred to as an
             investment.

TAX-FREE - Should not be confused with "tax-deductible"
           contributions to a qualified retirement plan.
           A more acceptable term is "tax-deferred
           benefits."

URGENT - Or other terminology implying something is wrong
         with a client's policy should never be used when,
         in fact, a representative merely wants a telephone
         number or other piece of non-essential information.
         Always state clearly what the matter of concern is

TITLE - Only a qualified Registered Representative or
        Financial Planner may use these titles. Also,
        "made-up" titles such as Mortgage Protection
        Specialist, Nursing Representative, Small Group
        Representative, etc., are not to be substituted
        for Company approved titles.

When management has approved the material, it should be sent to the Marketing Vice-President or his designee in the territory, via Electronic Mail, on Form T12378. A brief description of the material and its intended use should accompany the transmission.

- If approved at the territorial level, the material will be re-transmitted to Marketing Communications in the Home Office (IO SVCS), attention Joycelyn Roberts. Marketing Communications will be responsible for obtaining all necessary approvals.

- The material may be approved for use as submitted or with revisions, or it may be disapproved for use. If approved, the territory will create a diskette and forward it to the sales office.

MetLife reserves the right to discontinue previously approved material at any time. Individuals who persist in using unauthorized material will be subject to disciplinary action, up to and including termination.

For more complete details concerning this process, please refer to the Company's Manuals of Instructions for Sales Management and Sales Representatives.

M2

D-1

**Metropolitan Life**
AND AFFILIATED COMPANIES

MARY TO GIVE YOU A BIT OF BACKGROUND AS TO FIRST OF ALL WHY WE
SENT YOU THE LETTER AND REALLY WHY WE'RE HAVING SUCH AN ABUNDANCE
OF INTEREST FROM THE (NURSES). IS AS I'M SURE YOU'RE PROBABLY
WELL AWARE, METROPOLITAN, LIKE OTHER LARGE, INSURANCE COMPANIES,
CERTAINLY HAS TAKEN CARE OF MOST OF THE RETIREMENT PLANNING FOR
THE (NURSES) FOR MANY, MANY YEARS.  AND THE FACT IS, THE TYPES OF
RETIREMENT PLANS THAT WE'VE ALWAYS MADE AVAILABLE WERE REALLY
BASICALLY THE SAME TYPE OF RETIREMENT PROGRAMS THAT EVERYONE WAS
MAKING AVAILABLE - YOUR BANKS AND OTHER LARGE INSURANCE COMPANIES
AND THAT WAS YOUR TYPICAL IRA, ANNUITY, TYPE ACCOUNT.  AND QUITE
FRANKLY, MARY   WE'VE DONE QUITE A GOOD JOB FOR THE (NURSES) WITH
THOSE ACCOUNTS AND WILL CONTINUE TO DO SO.  BUT THRU THE YEARS WE
HAVE SEEN A LOT OF CONCERN FROM A LOT OF THE (NURSES) WITH THOSE
RETIREMENT ACCOUNTS.  AND WHAT I MEAN BY CONCERNS IS THAT WE'VE
FOUND THAT A LOT OF (NURSES) EITHER WEREN'T SAVING THE AMOUNT
THAT THEY REALLY WANTED TO SAVE OR IN SOME CASES WEREN'T SAVING
AT ALL.  AND WE FOUND BY WORKING WITH THE (NURSES) AND THEM
EXPRESSING THEIR OPINIONS TO US THAT THE MAIN REASON WAS THE LACK
OF FLEXIBILITY IN THE IRA, ANNUITY, ACCOUNT.  AND WHAT I'M REALLY
TALKING ABOUT  MARY  WHEN I TALK ABOUT THE LACK OF FLEXIBILITY,
IS THE LACK OF AVAILABILITY OF CASH.  AS YOU KNOW WITH AN IRA,
ANNUITY, ACCOUNT CERTAINLY UNCLE SAM GIVES US THE OPPORTUNITY TO
TAX DEFER OUR MONEY THROUGH THE YEARS BUT BECAUSE OF THIS HE PUTS
SOME STRICT LIMITATIONS IN THE IRA ANNUITY ACCOUNT THAT STATE,
VERY SIMPLY - WE CAN NOT UTILIZE ANY OF OUR MONEY AT ALL BEFORE
THE AGE OF 59 1/2 AND IF WE DID SO WE'D BE PENALIZED PRETTY
SEVERELY

IN FACT I THINK A GOOD EXAMPLE OF THIS WOULD BE, LET'S SAY, WE
HAD A (NURSE) OUT THERE THAT HAD BEEN SAVING IN AN IRA ACCOUNT
FOR THE LAST FEW YEARS AND NOW HAS SAVED SO FAR, I DON'T KNOW,
LET'S SAY $20,000  AND NOW THIS (NURSE) HAS AN OPPORTUNITY TO
UTILIZE THOSE MONEYS FOR A NEED THAT'S COME UP.  WHAT DO I MEAN
BY THAT?  SHE HAS AN OPPORTUNITY SUCH AS A CHILD'S EDUCATION - A
BUSINESS OPPORTUNITY, AN EMERGENCY OR EVEN A REAL ESTATE
OPPORTUNITY.  IN OTHER WORDS  MARY  THE (NURSE) NOW HAS AN
OPPORTUNITY TO MAXIMIZE HER DOLLARS.  WELL FIRST OF ALL, IS THE
MONEY AVAILABLE?  CERTAINLY, IT'S COMPLETELY AVAILABLE.  THE FACT
IS THAT IF IT HAD BEEN WITH US, THE BANK OR ANY OTHER LARGE
INSURANCE COMPANY, THE MONEY WOULD BE COMPLETELY AVAILABLE BUT
NOW IS WHEN THE GOVERNMENT STEPS IN.  BECAUSE OF THE WAY THE
GOVERNMENT LAWS ARE SET UP, ANY DOLLARS TAKEN FROM THE IRA
ACCOUNT BEFORE THE AGE OF 59 1/2 WILL HAVE A 10% PENALTY IMPOSED
UPON IT AND IT'S CALLED THE GOVERNMENT EARLY WITHDRAWAL PENALTY
SO, YOU TAKE THE 10% MINUS THE $20,000 - $2000 WOULD BE THE
GOVERNMENT EARLY WITHDRAWAL PENALTY.  NOW IF THAT WERE THE ONLY
THING, IT PROBABLY WOULDN'T BE THAT BAD IF THE OPPORTUNITY WERE
GOOD ENOUGH.  THE FACT IS, THAT'S JUST THE FIRST STEP BECAUSE NOW

**Metropolitan Life**
AND AFFILIATED COMPANIES

WE HAVE THE TAX PENALTY.   BECAUSE THE $20,000 HAS BEEN TAX
SHELTERED THRU THE YEARS.  NOW WHEN WE GO TO UTILIZE THAT MONEY,
THE ENTIRE $20,000 IS NOW GOING TO BE TAXED AS ORDINARY INCOME.
AND THE WAY THE TAX LAWS ARE SET UP UNDER THE NEW TAX LAW THAT
BECAME EFFECTIVE IN JAN. 1987; THERE ARE JUST 2 TAX BRACKETS, A
15% AND 28% TAX BRACKET.   A SINGLE (NURSE) EARNING $17,850 OR
MORE IS IN THE MAXIMUM TAX BRACKET OF 28% AND A MARRIED (NURSES)
IS COMBINED INCOME WITH HER SPOUSE OF $29,750 OR MORE IS IN THE
MAXIMUM TAX BRACKET OF 28%.   AND EVEN IF A (NURSE) DIDN'T FIND
THEMSELVES IN THAT MAXIMUM TAX BRACKET, THAT $20,000 ALONE WOULD
PUT THEM IN IT BECAUSE THAT'S COUNTED AS ORDINARY INCOME ON TOP
OF THE MONEY THEY MADE.
SO, YOU TAKE THE $20,000 X 28% TAX PENALTY AND- 55,600 WOULD BE
THE TAX PENALTY. SO YOU ADD THE $2000 GOV'T EARLY WITHDRAWAL
PENALTY. ADD TO THAT THE $5600 TAX PENALTY -AND $7600 IS WHAT IT
ACTUALLY WOULD OF COST THIS (NURSE) TO UTILIZE HER $20,000.   THAT
VERY SIMPLY MARY IS WHY WE'VE FOUND AGAIN THAT ALOT OF THE
(NURSES) WERE NOT SAVING THIS MONEY THAT THEY REALLY WANTED TO
SAVE AND AGAIN, IN SOME CASES WEREN'T SAVING AT ALL.  THEY DIDN'T
LIKE THE IDEA OF BEING IN A RETIREMENT PROGRAM THAT HAD NO
FLEXIBILITY AT _ALL_ OF UTILIZING THEIR FUNDS SHOULD THE NEED
ARISE.

SO THE REASON FOR THE LETTER THAT WE SENT TO THE (NURSES) AND THE
REASON FOR THE TREMENDOUS INTEREST IN THE RETIREMENT PROGRAM IS
THAT NOW AS AN INSURANCE INDUSTRY, WHAT WE HAVE BEEN ABLE TO DO,
IS TO PUT TOGETHER THE TYPE OF RETIREMENT PROGRAM FOR THE
(NURSES) THAT WE KNOW, WITHOUT QUESTION, DOES DO ALL THE THINGS
THE (NURSES) HAVE LOOKED FOR IN A RETIREMENT PROGRAM.   #1 WHERE
THE (NURSES) NOW HAVE THE AVAILABILITY OF UTILIZING THEIR FUNDS
AS THEY GROW THRU THE YEARS WITHOUT THIS' GOV'T PENALTY, WITHOUT
THIS TAX PENALTY.   NOW, BE THAT AS IT MAY, IS IT DESIGNED AS A
SHORT TERM SAVINGS?  CERTAINLY NOT. I MEAN THAT'S REALLY WHAT THE
BANKS ARE FOR.  FOR PEOPLE WHO ARE LOOKING FOR SHORT TERM
SAVINGS.  WHAT THIS ACCOUNT DOES THOUGH, IS GIVE YOU THE
OPPORTUNITY TO SAVE FOR RETIREMENT.  BUT AS YOU'RE SAVING FOR
RETIREMENT AND YOUR DOLLARS GROW IN THE ACCOUNT, WHERE NOW YOU DO
HAVE THE AVAILABILITY AND FLEXABILITY TO UTILIZE THOSE FUNDS
WHEN OPPORTUNITIES AND NEEDS COME UP THRU THE YEARS.   THE 2ND
BENEFIT AND THIS WE'VE SEEN WITHOUT QUESTION IS THE MOST
IMPORTANT TO THE (NURSES), I GUESS, BECAUSE YOU'RE AROUND IT ALL
THE TIME AND THAT'S WHERE NOW THE RETIREMENT PROGRAM IS PROTECTED
AND GUARANTEED WITH A DISABILITY BENEFIT.  WHAT I'M REALLY
SAYING  MARY  IS THAT - SAY FOR INSTANCE  3 YEARS AGO YOU .
DECIDED TO SAVE FOR RETIREMENT. IN THE BANK AND LET'S JUST SAY
YOU DECIDED TO SAVE - I DON'T KNOW - LET'S SAY $100 A MONTH AND
FOR THAT THREE YEARS MONTH AFTER MONTH AFTER MONTH, YOU WERE -

2

**Metropolitan Life**
AND AFFILIATED COMPANIES

SAVING THAT 10¢ A MONTH SYSTEMATICALLY EVERY SINGLE MONTH. WITH THE INTENTION OF SAVING FOR RETIREMENT AND NOW ALL OF A SUDDEN YOU BECOME DISABLED. WELL, IF THIS SITUATION WERE TO OCCUR IN MOST CASES YOUR RETIREMENT PLANS WOULD BE BROUGHT TO A STOP. YOU WOULDN'T BE ABLE TO CONTRIBUTE ANYMORE TO YOUR RETIREMENT ACCOUNT BECAUSE EVEN IF YOU WERE RECEIVING DISABILITY BENEFITS AND SOCIAL SECURITY BENEFITS AT WORK, YOU WOULD NEVER RECEIVE WHAT YOU WERE USED TO MAKING. THE FACT IS THOSE DOLLARS WOULD HAVE TO GO TO NECESSITIES AND LETS FACE IT, WHEN YOU'RE DEALING WITH RETIREMENT YOU'RE DEALING WITH A LUXURY. YOU WOULDN'T BE ABLE TO CONTRIBUTE ANYMORE.

SO NOW, WHAT WE'VE BEEN ABLE TO DO AS AN INSURANCE INDUSTRY, IS PUT TOGETHER THE TYPE OF PROGRAM THAT NOT ONLY GIVES YOU, AGAIN, THE AVAILABILITY OF FUNDS, BUT NOW, WHERE YOUR RETIREMENT IS COMPLETELY GUARANTEED SHOULD YOU BECOME DISABLED. WHAT I'M REALLY SAYING IS IF YOUR UNABLE TO SAVE FOR RETIREMENT BECAUSE OF A DISABILITY, METROPOLITAN WILL NOW SAVE FOR YOU. NOW, AS FAR AS THE DEFINITION OF DISABILITY, IT'S NOT LIKE SOCIAL SECURITY WHERE AS YOU KNOW FROM BEING A NURSE TO RECEIVE SOCIAL SECURITY BENEFITS, A PERSON WOULD HAVE TO BE HALF DEAD AND IN A WHEELCHAIR

WITH THIS ACCOUNT, WE'RE REALLY USING THE SAME LAWS WE'VE ALWAYS USED IN FACT WITH OUR OLD INSURANCE ACCOUNTS FROM 80 YEARS AGO, THAT VERY SIMPLY WERE SET UP TO SAY - IF YOU'RE UNABLE TO FULFILL GAINFULL EMPLOYMENT, WHETHER IT BE A MENTAL OR PHYSICAL DISABILITY, YOU WOULD NEED A LETTER FROM YOUR DOCTOR STATING THAT-- AFFECT. WHAT WE WOULD ASK YOU TO DO AT THAT TIME IS TO PLEASE KEEP YOUR DEPOSITS GOING AS YOU'VE BEEN DOING. LET'S USE AN EXAMPLE OF $100 A MONTH. AT THAT POINT, METROPOLITAN WILL REIMBURSE TO YOU THAT LAST 6 MONTHS IN A CHECK AND IN THIS CASE WOULD BE $600 AND THEN AND THERE AFTER KEEP SAVING THAT $100 A MONTH FOR YOU EITHER UNTIL AGE 65 OR UNTIL YOUR DISABILITY CEASES. CERTAINLY NOT PAST AGE 65 SINCE THAT IS NORMAL RETIREMENT AGE. THE BEAUTY IS, AS METROPOLITAN IS SAVING THE MONEY FOR YOU FOR RETIREMENT, IT'S AS IF YOU WERE SAVING IT YOURSELF. YOU STILL HAVE THE SAME BENEFITS AND AVAILABILITY TO UTILIZE YOUR MONEY AS IF YOU WERE SAVING THE MONEY YOURSELF.

NOW HOW WE ARE ABLE TO PUT THIS ACCOUNT TOGETHER IS REALLY QUITE SIMPLE TO EXPLAIN. IN FACT THE EASIEST WAY TO EXPLAIN IT, IS THAT' IT'S VERY SIMILAR TO A MONEY MARKET ACCOUNT AT THE BANK. THE DIFFERENCE IS BECAUSE A MONEY MARKET ACCOUNT AT THE BANK IS DESIGNED FOR SHORT TERM SAVINGS AND THIS ACCOUNT IS DESIGNED AS A FUNDING VEHICLE FOR RETIREMENT. THERE'S BASICALLY 3 MAJOR DIFFERENCES THAT THIS ACCOUNT HAS OVER THE BANK. THE FIRST DIFFERENCE IS THE RATE OF RETURN. AS YOU KNOW THE AVERAGE MONEY MARKET AT THE BANK IS PAYING ANYWHERE FROM 5 1/2% TO 6%

3

Metropolitan Life Insurance Company   Metropolitan Tower Life Insurance Company
Metropolitan Insurance and Annuity Company   Metlife Securities Inc
Metro Tower - New York NY
Metropolitan Property and Casualty Insurance Company
Metro Center Warwick RI

**Metropolitan Life**
AND AFFILIATED COMPANIES

INTEREST. WELL, MONEY MARKETS ARE DESIGNED TO GIVE YOU A RATE OF RETURN BASED SOLELY ON AN INTEREST RATE. WHEN SOMETHING IS BASED ON A RATE OF RETURN BASED ON INTEREST THEN THAT ACCOUNT IS DESIGNED FOR SHORT TERM SAVINGS. THIS ACCOUNT BECAUSE OF THE FACT THAT IT'S USED AS A FUNDING VEHICLE FOR RETIREMENT. IS NOT DESIGNED TO GIVE YOU A RATE OF RETURN BASED SOLELY ON AN INTEREST RATE. IT'S DESIGNED TO GIVE YOU A RATE OF RETURN BASED ON GROWTH THRU THE YEARS IN THE FORM OF GUARANTEED, THAT'S THE KEY HERE, GUARANTEED CASH VALUES PLUS DIVIDENDS. AS YOU SAVE IN THIS ACCOUNT YOU WILL RECEIVE A GUARANTEED CASH VALUE OF 6 1/2 % PLUS DIVIDENDS AND ONE THING METROPOLITAN CAN SAY ABOUT THEIR DIVIDENDS IS THAT NOT ONLY HAVE WE ALWAYS PAID THE DIVIDEND THAT WE'RE SHOWN, BUT IN EVERY SINGLE CASE, PAID MORE. THE REASON FOR THIS IS THAT METROPOLITAN IS VERY, VERY CONSERVATIVE IN THE WAY WE SHOW OUR DIVIDENDS AND THAT EVEN GOES BACK TO THE DEPRESSION DAYS WHEN PEOPLE ACTUALLY LOST MONEY IN THE BANK. NOT ONLY DID METROPOLITAN HAVE THE MONIES THE PEOPLE SAVED BUT IN EVERY SINGLE CASE, STILL PAID THE DIVIDENDS. THE END RESULT, WHAT THE ACCOUNT IS DESIGNED TO DO IS PROVIDE COMPLETE SAFETY AND AT THE SAME TIME WE ARE NOW ABLE TO MAXIMIZE YOUR RETURN BECAUSE IT IS DESIGNED THE WAY RETIREMENT IS SUPPOSED TO BE, -- GROWTH THROUGH THE YEARS IN THE FORM OF GUARANTEES. GUARANTEED CASH VALUES.

NOW, THE SECOND MAJOR DIFFERENCE IS THAT THIS ACCOUNT IS COMPLETELY TAX SHELTERED. BECAUSE THIS RETIREMENT ACCOUNT PROVIDES AN INSURANCE BENEFIT TO PROTECT IT, WE CAN NOW TAKE ADVANTAGE OF THE TAX LAWS OF INSURANCE WHERE BY IN THE MONEY MARKET ACCOUNT AS YOUR MONEY IS GROWING THROUGH THE YEARS YOU ARE GOING TO PAY TAXES. WITH THIS ACCOUNT, NOT ONLY ARE YOU ABLE TO IMPROVE YOUR YIELD BECAUSE IT IS BASED ON. AGAIN, GROWTH THROUGH THE YEARS IN THE FORM OF GUARANTEED CASH VALUES PLUS DIVIDENDS BUT NOW YOU ARE GOING TO BE IN THE SITUATION WHERE THEY ARE GOING TO GROW TAX SHELTERED, AND THE THIRD BENEFIT AND THIS AGAIN WE FEEL IS SO VERY, VERY IMPORTANT TO THE (NURSES) AND THAT AGAIN IS THE DISABILITY BENEFIT WITH THIS ACCOUNT. SHOULD YOU BE UNABLE TO SAVE BECAUSE OF A DISABILITY, METROPOLITAN WILL NOW SAVE THE MONEY FOR YOU. WHERE BY AS LONG AS THIS ACCOUNT IS USED FOR IT'S PURPOSE - A FUNDING VEHICLE FOR RETIREMENT, IT NOW DOES. AGAIN WHAT THE (NURSES) HAVE ALWAYS WANTED IN A RETIREMENT ACCOUNT AND REALLY WHAT THE LETTER WAS ALL ABOUT.

THE CONCEPT WILL PROVIDE FOR YOUR NUMBER 1 SYSTEMATIC SAVINGS. LET'S FACE IT, WE ALL WORK VERY HARD FOR A DOLLAR. WHAT THIS ACCOUNT DOES IT MAKES US AND THAT'S THE KEY WORD HERE - MAKES US SYSTEMATICALLY SAVE A SMALL PORTION OF THOSE DOLLARS FOR OUR FUTURE.

4

**Metropolitan Life**
AND AFFILIATED COMPANIES

AGAIN, NOT ONLY DOES THE ACCOUNT GROW TAX DEFERRED BY WHERE THE MONEY CAN BE UTILIZED TAX FREE. AGAIN, THE KEY TO THE ACCOUNT IS THE FLEXIBILITY, OF KNOWING THAT BECAUSE THIS ACCOUNT IS USED AS A FUNDING VEHICLE FOR RETIREMENT, IT'S GOING TO GIVE YOU A RATE OF RETURN BASED ON GROWTH THROUGH THE YEARS IN THE FORM OF GUARANTEED CASH VALUES WHERE YOU NOW CAN MAXIMIZE YOUR RETURN AND THE FLEXIBILITY OF KNOWING THAT YOU NOW HAVE THE AVAILABILITY OF CASH TO UTILIZE SHOULD OPPORTUNITIES AND NEEDS ARISE THROUGH THE YEARS AND THE FLEXIBILITY OF HAVING THE ENTIRE ACCOUNT PROTECTED AND GUARANTEED WITH THE DISABILITY BENEFIT.

NOW, THE EASIEST WAY TO PROBABLY EXPLAIN THE TAX SHELTERED FEATURE WOULD BE TO COMPARE IT TO AN INVESTMENT THAT WE ARE ALL VERY FAMILIAR WITH.- A REGULAR MONEY MARKET AT THE BANK. IN FACT, I THINK USA TODAY PROBABLY EXPLAINS BEST WHAT I AM GOING TO SHOW YOU. USA TODAY SAYS THAT INSURANCE COMPANIES ESCAPED THE AX. WHAT THEY ARE TALKING ABOUT WHEN THEY SAY ESCAPED THE AX IS TAX REFORM. IT GOES TO SAY THAT THE NEW TAX LAW TOOK AN AX TO SOME TAX DEFERRED INVESTMENTS BY SPARED THE INSURANCE INDUSTRY GIVING IT ADDED APPEAL AS A LONG TERM INVESTMENT WHICH OF COURSE RETIREMENT IS. IT GOES ON TO SAY THAT INSURANCE IS ONE OF THE GREAT BENEFICIARIES OF THE TAX BILL. LET ME SHOW YOU EXACTLY WHAT THEY MEAN BY THAT.

AS YOU KNOW IF YOU HAVE MONEY SAVED IN A MONEY MARKET AT THE BANK, THE INTEREST THAT IS EARNED, WHETHER YOU TAKE THE MONEY OR NOT, YOU ARE GOING TO PAY TAXES AS ORDINARY INCOME AND AGAIN, WE KNOW THE AVERAGE PERSON IS GOING TO BE IN A 28% TAX BRACKET.

SAY HERE WE HAD A (NURSE) THAT WAS SAVING A $100 A MONTH IN THE BANK FOR RETIREMENT AND WE ARE GOING TO ASSUME THE CURRENT MONEY MARKET RATE IS 5 1/2% I DON'T WANT TO USE HYPOTHETICAL'S. I MEAN SOME PEOPLE WILL USE HYPTHETICAL RATES OF 10 OR 12 AND THESE ... CRAZY FIGURES. LET'S TALK WHAT THINGS ARE NOW - CURRENT. IF THINGS CHANGE, THEY CHANGE, BUT I THINK THE BEST WAY IS TO BE CONSERVATIVE WHEN WE SHOW THESE THINGS. IF A PERSON WAS SAVING A $100 A MONTH IN THE BANK, AT THE BANK'S CURRENT MONEY MARKET RATE, WE KNOW THAT PERSON IS IN A 28% TAX BRACKET. WHAT WOULD . HAPPEN IS THAT THE FIRST YEAR THIS PERSON WOULD EARN $31. FROM THAT $31 THEY EARNED THEY WOULD LOSE $9 TO TAXES. THE PERSON WOULD END UP WITH $1,222 AT THE END OF THE FIRST YEAR. THE SECOND YEAR, THE (NURSE) WOULD EARN AN ADDITIONAL $100. FROM THAT $100, 28% TAKEN WOULD BE $28 LOST TO TAXES. THE RESULT AT THE END OF THE SECOND YEAR OF MONEYS IN YOUR POCKET WOULD BE $2,494.

5

Metropolitan Life Insurance Company, New York, N.Y. | Metropolitan Tower Life
Metropolitan Insurance and Annuity Company | Metropolitan Tower, One Madison Ave.
Metropolitan Property and Casualty Insurance Company
Metropolitan Life, Newark, NJ

**Metropolitan Life** AND AFFILIATED COMPANIES

NOW. LET'S ASSUME THIS (NURSE) FOR THIS EXAMPLE WAS A 35 YEAR OLD. NOW, IT REALLY DOESN'T MATTER IF THE (NURSE) WERE A 35 YEAR OLD OR A 20 YEAR OLD OR A 55 YEAR OLD. THE LONGER THE MONEY WOULD BE IN THE BANK, THE MORE INTEREST IT WOULD EARN. IF THIS (NURSE) WERE A 35 YEAR OLD AND WE WENT ALL THE WAY TO RETIREMENT AGE OF 65, THIS (NURSE) WOULD HAVE $69,000 THAT THE ACCOUNT HAS GROWN TO. THAT IS THE MAGIC OF COMPOUND INTEREST.

NOW, TO SHOW YOU WHAT I MEAN AS FAR AS IF INTEREST RATES CHANGED. SAY THE BANK IS IN THE SITUATION WHERE THE RATE OF RETURN IN THE BANK AS FAR AS INTEREST WAS 8%. NOW WE KNOW NO BANK IS PAYING EVEN CLOSE TO 8% BUT TO SHOW YOU THE IMPACT OF THE TAX SHELTERED FEATURE OF THIS ACCOUNT AND THE IMPACT OF HAVING AN ACCOUNT THAT IS DESIGNED FOR GROWTH THRU THE YEARS WITH GUARANTEES - IF THE BANK ACCCOUNT WERE PAYING 8%, THAT $69,000 WOULD NOW BE $97,000.

NOW WE USE THE SAME $100 A MONTH DEPOSIT, THIS TIME IN THE (NURSES) INSURED SAVINGS ACCCOUNT THAT IS PROTECTED WITH THE DISABILITY BENEFIT. NOW FIRST OF ALL FROM DAY ONE BECAUSE THIS ACCCOUNT HAS AN INSURANCE BENEFIT TO PROTECT IT AS YOU SEE HERE, THERE ARE NO TAXES PAID THRU THE YEARS AND BECAUSE THIS ACCOUNT IS NOT DESIGNED TO HAVE A RATE OF RETURN BASED SOLELY ON INTEREST RATES BUT BECAUSE IT'S FOR RETIREMENT THRU GROWTH, THE ACCOUNT BASED ON OUR CURRENT, BASED ON TODAYS LOW ACCCOUNTS GROW TO $116,000.

IN OTHER WORDS, $116,000 FOR THE SAME DEPOSITS THAT WOULD GIVE YOU $69,000. WELL ONE THING, THERE IS ONLY THREE WAYS BASICALLY THAT ANYONE CAN SAVE FOR RETIREMENT. ONE WAY IS THRU AN IRA, ANNUITY TYPE ACCOUNT AND IN MOST CASES AGAIN WE FIND THAT THE (NURSES) DON'T LIKE THE LACK OF FLEXIBILITY IN THE IRA. THE OTHER WAY IS THE CREDIT UNION MONEY MARKET TYPE ACCOUNT, WHICH THIS IS. AND THE THIRD WAY IS THE (NURSES) INSURED SAVINGS ACCOUNT. WHERE AT THE SAME TIME THERE'S ONLY THREE WAYS TO SAVE FOR RETIREMENT THERE REALLY IS ONLY THREE THINGS THAT CAN HAPPEN TO ANY OF US AS WE SAVE FOR RETIREMENT. #1 WE LIVE AND IF WE LIVE WITH THIS ACCOUNT WE'RE ABLE TO MAXIMIZE OUR RETURN BECAUSE OF THE TAX SHELTERED FEATURE OF THE ACCOUNT AND BECAUSE OF THE GROWTH OF THE ACCOUNT. #2 IF YOU DIE. WELL, THE REASON WE'RE ABLE TO TAX SHELTER THE ACCOUNT IS BECAUSE WE'RE USING THE INSURANCE TAX LAWS WHICH MEANS WE HAVE THE INSURANCE BENEFIT. WELL, BECAUSE WE HAVE THE INSURANCE BENEFIT, IF YOU DIED, YOU HAVE AN INSURANCE BENEFIT TO PROTECT THE ACCOUNT, PLUS WHAT WE SAVED ALL TAX FREE WHERE HERE IN THE BANK - LET'S SAY IF YOU DIED IN THE 5TH YEAR, ALL YOU HAVE IS WHAT'S IN THE ACCOUNT. THE 3RD THING THAT COULD HAPPEN TO YOU IS YOU BECOME DISABLED. IF YOU'D

6

Metropolitan Life Insurance Company    Metropolitan Tower Life Insurance Company
Metropolitan Property and Casualty Insurance Company    MetLife Securities Inc.
Home Office: New York, NY
Metropolitan Property and Casualty Insurance Company

**Metropolitan Life**
AND AFFILIATED COMPANIES

BEEN SAVING IN A MONEY MARKET ACCOUNT FOR, LET'S SAY, SEVEN YEARS. WHAT HAPPENS IS ALL YOU WOULD HAVE IS WHAT'S IN YOUR MONEY MARKET ACCOUNT PLUS INTEREST. HERE IN THE ACCOUNT, NOW LET'S SAY YOU BECOME DISABLED. METROPOLITAN WILL KEEP SAVING THE MONEY FOR YOU AND GUARANTEE WHAT YOU SET OUT TO DO FOR RETIREMENT. THE BOTTOM LINE IS WHETHER YOU LIVE, WHETHER YOU DIE OR WHETHER YOU BECOME DISABLED -- YOU NOW HAVE A RETIREMENT ACCOUNT THAT WILL ALLOW YOU TO MAXIMIZE AND GUARANTEE YOUR RETIREMENT.

NOW, REMEMBER EARLIER I MENTIONED THAT THIS ACCOUNT IS NOT DESIGNED FOR SHORT TERM SAVINGS AND IF THAT'S WHAT A PERSON IS LOOKING FOR, THEN THAT'S REALLY WHAT BANKS ARE FOR. LET ME SHOW YOU EXACTLY WHAT I MEANT BY THAT. IF YOU NOTICE HERE IN THIS ACCOUNT IN THE FIRST YEAR YOU HAVE NO MONEY IN THE ACCOUNT. THE REASON FOR THAT IS THIS ACCOUNT IS NOT DESIGNED AS A SHORT TERM SAVINGS. IT'S DESIGNED AS A FUNDING VEHICLE FOR RETIREMENT. WHERE IT'S BECAUSE OF THIS THAT WE HAVE THESE BENEFITS THAT ALLOW THE ACCOUNT TO DO THIS. WHERE NOW FOR THE PURPOSE OF RETIREMENT YOU ARE ABLE TO MAXIMIZE YOUR RETURN.

THAT AGAIN IS WHY USA TODAY TALKS ABOUT THE NEW TAX LAW TAKING AN AX TO SOME TAX DEFERRED INVESTMENTS BUT GIVING THIS ACCOUNT ADDED APPEAL WHERE NOW IT'S ONE OF THE GREAT BENEFICIARIES OF THE TAX BILL. THAT IS WHY EVERYTHING WE TALK ABOUT IS TAX REFORM. TAX REFORM SPARING THE INSURANCE INDUSTRY.

WHERE AGAIN, NOT ONLY DO WE KEEP THE MOST IMPORTANT THING - A HIGH DEGREE OF SAFETY, BUT WHERE WE NOW HAVE AN ACCOUNT THAT WE CAN SAY -- THERE IS NO OTHER PRODUCT OR ACCOUNT AVAILABLE THAT WILL COMBINE THE FLEXIBILITY AND WHEN WE TALK FLEXIBILITY WE'RE TALKING AGAIN ABOUT THREE THINGS -- THE FLEXIBILITY OF HAVING AN ACCOUNT THAT'S NOT DESIGNED TO GIVE YOU A RETURN THAT'S BASED SOLELY ON AN INTEREST RATE BUT DESIGNED FOR THE PURPOSE OF RETIREMENT WITH GROWTH THRU THE YEARS WITH GUARANTEES.

THE NEXT THING OF FLEXIBILITY -- FLEXIBILITY OF AGAIN HAVING AN ACCOUNT THAT HAS THE AVAILABILITY OF FUNDS AS YOU BUILD IN THIS ACCOUNT. AS YOUR SAVING IN THIS ACCOUNT AGAIN, YOU NOW HAVE THE AVAILABILITY TO UTILIZE THE MONIES AND AGAIN THE MOST IMPORTANT THING -- THE FLEXIBILITY OF HAVING YOUR ACCOUNT COMPLETELY PROTECTED WITH A DISABILITY BENEFIT. IN FACT, WE CALL IT THE FLEXIBILITY OF DISABILITY. BEING IN A SITUATION WHERE AS YOU'RE SAVING FOR RETIREMENT, YOU HAVE THE FLEXIBILITY OF KNOWING THAT NOT ONLY, AGAIN, ARE YOU IN A SITUATION WHERE YOU HAVE AN ACCOUNT DESIGNED FOR GROWTH WITH GUARANTEES. NOT ONLY ARE YOU IN A SITUATION WHERE YOU HAVE AN ACCOUNT DESIGNED TO HAVE AVAILABILITY

7

Metropolitan Life Insurance Company   Metropolitan Property and Casualty Company
Metropolitan Insurance and Annuity Company   Metropolitan Sequence, Inc.
Home Office: New York, NY
Metropolitan Property and Casualty Insurance Company
Home Office: Warwick, RI

**Metropolitan Life**
AND AFFILIATED COMPANIES

WHERE YOU NOW HAVE CONTROL AND FLEXIBILITY BUT HAVE AN ACCOUNT THAT'S PROTECTED WITH A DISABILITY BENEFIT. TAX ADVANTAGES, AGAIN, USING INSURANCE TAX LAWS WHERE THE ACCOUNT IS GOING TO BE COMPLETELY SHELTERED THRU THE YEARS. THE BOTTOM LINE -- WHERE THE EARNINGS FROM THE POLICY CAN BE USED TO PAY FOR A COLLEGE EDUCATION OR RETIREMENT AND ALWAYS REMAIN FREE OF TAXES. THESE ARE JUST TWO EXAMPLES. THE BOTTOM LINE IS YOU HAVE AN ACCOUNT WHERE AGAIN -- I THINK FORBES REALLY CLOSES OUT AND TELLS THE STORY. FORBES TALKS ABOUT MANY TAX PAYERS ARE STILL STRUGGLING TO UNDERSTAND THE TAX IMPACT ON THEIR OWN TAX BILL. THEY GO ON TO SAY THE SWEEPING CHANGES HAVE SENT MANY INVESTORS BACK TO THE DRAWING BOARD LOOKING FOR WAYS TO PLAN FOR THEIR BIGGEST FINANCIAL NEEDS -- RETIREMENT AND THE EDUCATION OF THEIR CHILDREN. MANY OF THEM HAVE COME UP WITH THE SAME ANSWER -- INSURANCE. AGAIN, WHY? I THINK REALLY WALL STREET JOURNAL EXPLAINS IT THE BEST. IRA'S ARE SUDDENLY NOT AS ATTRACTIVE AS THE POLICIES WHICH ARE NOW AVAILABLE. BOTH STILL OFFER TAX FREE COMPOUND. IN OTHER WORDS, BOTH STILL BUILD TAX DEFERRED BUT THE INSURANCE PRODUCTS WILL NOT ALLOW TAX AND PENALTY FREE ACCESS TO EARNINGS. WHERE HERE YOU'RE PAYING ALL THE PENALTIES AND TAXES TO TAKE YOUR MONEY AND HERE YOU DON'T. IT GOES ON TO SAY WHILE IRA'S WILL REMAIN AS ILLIQUID AS EVER -- ILLIQUID MEANING YOU CAN'T UTILIZE THOSE MONIES WITHOUT THOSE PENALTIES -- YOU'RE STILL GOING TO HAVE MANDATORY WITHDRAWALS AT RETIREMENT WHICH WOULD STILL BE TAXED AS ORDINARY INCOME. WHERE NOW AGAIN, WITH THIS ACCOUNT AS WE MENTIONED HERE EARLIER, YOU NOW CAN UTILIZE YOUR MONEY COMPLETELY TAX FREE. THE BOTTOM LINE, AGAIN, THE ACCOUNT WILL NOW PROVIDE FOR THE (NURSES) COMPLETE SECURITY. BUT NOT ONLY COMPLETE SECURITY BUT HAVING AN ACCOUNT THAT AS THE CASH ACCUMULATION BUILDS THRU THE YEARS, THEY'RE GOING TO BUILD THRU THE YEARS IN THE FORM OF GUARANTEES WITH GROWTH THAT HAVE TAX ADVANTAGES AND NOW HAVE FLEXIBILITY OF AN ACCOUNT THAT NOT ONLY ALLOWED YOU CONTROL OF AVAILABILITY OF FUNDS BUT THE FLEXIBILITY OF KNOWING THAT THE ACCOUNT IS PROTECTED AGAIN, WITH A DISABILITY BENEFIT.

NOW, ARE WE THE ONLY INSURANCE COMPANY THAT'S APPROVED THIS ACCOUNT? CERTAINLY NOT. IN FACT, IF PRUDENTIAL WERE HERE TODAY OR JOHN HANCOCK OR NEW YORK LIFE -- CAN THEY PROVIDE YOU WITH THE EXACT SAME ACCOUNT? YES, THEY CAN. WOULD YOU MAKE A MISTAKE BY GOING WITH ONE OF THEM OVER US? I REALLY DON'T THINK SO. I THINK, YOU'LL FIND THAT AS LONG AS YOU ARE WITH A MAJOR INSURANCE COMPANY, WE'RE ALL GOING TO DO A VERY, VERY GOOD JOB FOR YOU. NOW, MAJOR IS IMPORTANT BECAUSE IT WOULD BE NICE TO KNOW THAT YOUR MONEY IS GOING TO BE ARROUND 30 YEARS FROM NOW.

8

**Metropolitan Life**
AND AFFILIATED COMPANIES

NOW, BECAUSE OF THIS, WHAT I WOULD LIKE TO DO IF I COULD TALK A
LITTLE ABOUT METROPOLITAN WITH YOU FOR A COUPLE OF MINUTES,
WOULD THAT BE ALRIGHT? WHAT THIS IS, IS AN ARTICLE PUT OUT BY
FORTUNE MAGAZINE JUNE OF EACH YEAR. AS YOU CAN SEE, THIS IS THE
LATEST ONE -- JUNE OF 1988. WHAT IT DOES IS RATE THE LARGEST
INS. COMPANY'S BY THEIR SIZE AND THEIR ASSETS. AS YOU CAN SEE
HERE PRUDENTIAL IS #1 IN SIZE AND METROPOLITAN IS #2 BUT NET
INVESTMENT INCOME IS A VERY, VERY IMPORTANT FEATURE BECAUSE WHAT
NET INVESTMENT INCOME IS -- IT SHOWS THE DOLLARS TAKEN IN AND THE
DOLLARS MADE BY A COMPANY. AS YOU CAN SEE HERE, METROPOLITAN IS
#1 IN NET INVESTMENT INCOME -- PRUDENTIAL IS #2. NOW, IS THAT
REALLY SAYING THAT WE'RE REALLY BETTER THAN PRUDENTIAL OR REALLY
ANYONE HERE? NO, IT'S NOT. BUT IT DOES PUT US IN THE POSITION
TO SAY SOMETHING THAT NOONE CAN SAY ANY THAT IS THE FACT THAT WE
ARE MAKING MORE MONEY FOR OUR POLICYHOLDERS THAN ANYONE ELSE. IN
FACT, THIS GOES TO SHOW THAT WE HAVE BEEN DOING THIS FOR THE LAST
SIX CONSECUTIVE YEARS. THE ONLY REASON I SHOW YOU THIS IS THE
FACT THAT IT SHOWS STABILITY AND SAFETY OF METROPOLITAN.

NOW, THIS IS PROBABLY THE MOSTT IMPORTANT THING THAT METROPOLITAN
HAS TO SAY. IT GOES ALL THE WAY BACK TO 1983. IT GOES ON TO SAY
THAT LAST YEAR METROPOLITAN LIFE SET AN INDUSTRY RECORD FOR
ATTRACTING NEW PENSION FUNDS. REALLY WHAT ARE PENSION FUNDS BUT
RETIREMENT MONEY SET UP BY LARGE CORPORATIONS. IT GOES TO SAY
THAT IN 1983, METROPOLITAN LIFE ATTRACTED OVER 3 BILLION OF NEW
FUNDS. THREE BILLION TO YOU OR I IS JUST A NUMBER. I THINK
YOU'LL SEE THAT THE NEXT SENTENCE REALLY SHOWS THE IMPACT OF
THAT. IT SAYS THAT'S THE MOST EVER INTRUSTED TO A PENSION ASSET
MANAGEMENT GROUP IN ANY SINGLE YEAR. IN OTHER WORDS, BY
METROPOLITAN ATTRACTING 3 BILLION DOLLARS IN 1983, IT WAS A MORE
MONEY INVESTED THAN ANYONE WHO HANDLES PENSIONS HAD INVESTED WITH
THEM. IN FACT, IT GOES TO SHOW HERE THAT IN THE 1ST SIX MONTHS
OF 1984, THAT RECORD WAS BROKEN AGAIN BY METROPOLITAN WITH AN
ADDITIONAL 3 1/4 BILLION DOLLARS. TO MAKE A LONG STORY SHORT,
1985, 1986, AND 1987 AND EACH YEAR AFTER THAT WE HAVE ACTUALLY
BROKEN INDUSTRY RECORDS FOR ATTRACTING NEW PENSION FUNDS. WHAT
THIS SHOWS IS THE CONFIDENCE THAT THE LARGE CORPORATION AND THEIR
EMPLOYEES HAVE IN METROPOLITAN'S ABILITY TO MAXIMIZE THEIR
RETIREMENT FUNDS OVER THE LONG HAUL. WHICH AGAIN IS WHAT
RETIREMENT IS. YOU ARE ALWAYS GOING TO HAVE SOMEONE COME IN AND
SAY -- I CAN DO THIS FOR YOU OR I CAN DO THAT FOR YOU OR I CAN DO
THIS FOR YOU. THE FACT IS, THAT WHEN YOU ARE DEALING WITH
RETIREMENT, YOU'RE REALLY WORRIED WHAT THEY CAN DO FOR ME WITH
THE PURPOSE OF THE ACCOUNT -- LONG TERM RETIREMENT. THE FACT IS,
THIS IS WHY SO MUCH MONEY IS INVESTED WITH US.

9

Metropolitan Life Insurance Company · Metropolitan Tower Life Insurance Company
Metropolitan Insurance and Annuity Company · MetLife Securities, Inc
Home Office: New York, NY
Metropolitan Property and Casualty Insurance Company
Home Office: Warwick, RI

**Metropolitan Life**
AND AFFILIATED COMPANIES

THE BOTOM LINE AGAIN IS WHERE IT WILL PROVIDE COMPLETE SECURITY,
THE CASH ACCUMULATIONS WILL HAVE TAX ADVANTAGES AND NOW AGAIN,
YOU'LL HAVE COMPLETE FLEXIBILITY IN A PROGRAM AS FAR AS KNOWING
THAT YOU HAVE COMPLETE CONTROL IN YOUR RETIREMENT ACCOUNT.

NOW, AS FAR AS THE DEPOSIT METHOD THAT WE'RE USING WITH THIS
ACCOUNT, WE'RE REALLY USING THE EXACT SAME DEPOSIT METHOD THAT
WE'VE ALWAYS USED IN OUR NORMAL IRA ACCOUNT. $2000 WAS THE
MAXIMUM THAT WAS ALLOWED TO BE SAVED IN THE ACCOUNT WHICH MEANT
YOU WERE SAVING $167.00 A MONTH. $1800 MEANT YOU WERE SAVING
$150.00 A MONTH. $1500 WAS $125 A MONTH AND WE WENT DOWN TO $900
A MONTH WHICH WAS $75 A MONTH.

THE DIFFERENCE WITH THIS ACCOUNT IS THAT THERE IS NO MAXIMUM AND
THE MINIMUM HAS BEEN SET AT $65 A MONTH. NOW ONE THING WE LIKE
TO SAY HERE (MARY) IS THE FACT THAT IF A (NURSE) IS THINKING OF
SAVING A CERTAIN AMOUNT FOR RETIREMENT. THEN, WITHOUT QUESTION,
THEY PROBABLY SHOULD SAVE A COUPLE OF NOTCHES LOWER THAN THEY
WERE THINKING OF AND THE REASON IS NOT ONLY SHOULD A (NURSE) BE
COMFORTABLE WITH THE RETIREMENT ACCOUNT ITSELF BUT VERY
COMFORTABLE WITH THE DEPOSITS THEY PUT IN TO THE ACCOUNT EACH AND
EVERY MONTH.

THE FACT IS, IF WE HAVE A (NURSE) AND ONCE IN A WHILE WE'LL HAVE
A (NURSE) COME UP AND SAY "I'VE BEEN SAVING $2000 IN AN IRA WHICH
MEANT I'VE BEEN SAVING $167 A MONTH - SO I FEEL COMFORTABLE
SAVING THAT IN THIS ACCOUNT."

WELL, IF THEIR VERY, VERY COMFORTABLE THE FACT IS, WE WOULD BE
GLAD TO OPEN AN ACCOUNT AT THAT AMOUNT BUT IN MOST CASES WE WOULD
STILL SUGGEST TO THAT (NURSE) THAT THEY START THE ACCOUNT WITH
MAYBE $125 A MONTH OR MAYBE $150 A MONTH. OR SOMETIMES WE WILL
HAVE A (NURSE) THAT IS THINKING OF SAVING $100 A MONTH. AGAIN,
IF THEY FEEL VERY COMFORTABLE SAVING THAT AMOUNT, IT IS UP TO
THEM. WE WOULD BE GLAD TO OPEN UP AN ACCOUNT FOR THEM WITH THAT
AMOUNT. BUT IN MOST CASES WE WOULD SUGGEST THAT THEY START THE
ACCOUNT WITH MAYBE $75 A MONTH OR EVEN THE BARE MINIMUM OF $65 A
MONTH. THE MAIN THING IS THAT WE WANT THE (NURSES) TO BE VERY,
VERY COMFORTABLE IN THEIR RETIREMENT ACCOUNT.

IN FACT, ONE THING WE DO ALOT DIFFERENT TODAY IS THE DELIVERY OF
THE RETIREMENT ACCOUNT. IT USED TO BE IN THE PAST THAT IF YOU
OPENED UP AN IRA WITH US OR THE BANK OR ANY OTHER RETIREMENT
ACCOUNT, WE WOULD GET IT APPROVED. WE WOULD BRING IT BY AND GO
OVER IT A LITTLE WITH YOU, YOU WOULD THROW IT IN YOUR SAFETY
DEPOSIT BOX AND REALLY IT WAS FORGOTTEN. YOU GET YOUR STATEMENT
ONCE A YEAR AND THAT WOULD BE ABOUT IT. WITH THIS RETIREMENT

10

Metropolitan Life Insurance Company, A Metropolitan Life Insurance Company
Metropolitan Insurance and Annuity Company, New York, NY
Home Office, New York, NY
Metropolitan Property and Casualty Insurance Company
Home Office, Warwick, RI

**Metropolitan Life**
AND AFFILIATED COMPANIES

ACCOUNT. BECAUSE OF IT'S FLEXIBILITY AND IT'S GUARANTEES, METROPOLITAN HAS A DELIVERY SET UP THAT IS COMPLETELY DIFFERENT.

WE REALLY HAVE 3 BASIC OBJECTIVES WHEN WE DELIVER THE RETIREMENT ACCOUNT TO YOU. #1 WE GO OVER AGAIN WITH YOU. WHY YOU TOOK THE RETIREMENT ACCOUNT, WHICH IS OBVIOUS -- FOR RETIREMENT BUT AGAIN, WE GO OVER WITH YOU, WHY RETIREMENT SAVINGS. #2 -- WHAT THE RETIREMENT ACCOUNT WILL DO FOR YOU. BUT THE MOST IMPORTANT THING IS WHAT YOU CAN DO WITH THE RETIREMENT ACCOUNT AS FAR AS THE FLEXIBILITY. FOR INSTANCE, IF YOU BECOME DISABLED OR IF YOU WANTED TO DO THIS OR WANTED TO DO THAT. THE MAIN THING AND WE FEEL IT'S VERY IMPORTANT, IS WHEN WE GET AN ACCOUNT APPROVED, WE SIT INFRONT OF YOU TO DELIVER THE RETIREMENT ACCOUNT AND IF THE (NURSE) IS NOT TOTALLY COMFORTABLE OF WAY THEY TOOK THE ACCOUNT, WHAT THE ACCOUNT COULD DO FOR THEM AND WHAT THEY COULD DO WITH THE RETIREMENT ACCOUNT -- THEN OUR ADVISE AT THAT TIME TO THE (NURSE) IS THAT WE WOULD RATHER THEY NOT EXCEPT THE RETIREMENT ACCOUNT. THE REASON IS, WE DO ALOT OF WORK WITH THE (NURSES) AND FOR THE (NURSES) AND WE KNOW THAT IF WE DO THE JOB RIGHT FORM THE BEGINNING. NOT ONLY WILL THE (NURSE) STAY WITH METROPOLITAN BUT LET ME TELL YOU, THRU OUT YOUR LIFETIME YOU ARE GOING TO WANT TO SAVE MORE AND MORE AND MORE. YOU WILL END UP LETTING METROPOLITAN TAKE CARE OF IT FOR YOU.

NOW, AGAIN, AS FAR AS THE DEPOSIT METHOD, WE LIKE TO START A (NURSE) WITH AN AMOUNT THAT IS VERY, VERY COMFORTABLE FOR THAT (NURSE). AGAIN, IN MOST CASES IF THAT (NURSE) IS THINKING OF AVING AN AMOUNT, WE WOULD RATHER NOT START AT THAT AMOUNT, WE WOULD RATHER START A LITTLE LOWER.

WHAT AMOUNT WERE YOU THINKING OF SAVING?

D-2

Candidates for Office of the Year
(Unless otherwise noted record is as of end of 1990)

| Territory | (1) Name of Office Manager | (2) Active Reps. 12/89 | (3) Active Reps. 12/90 | (4) New Agents | 1990 Qualifiers (5) P.C. | (6) Leaders | (7) Total MSC (000) | (8) Mgr's MSC | MSC Per Rep. (9) 1990 | (10) % of 1989 | (11) Net Yr. Lapse Rate | (12) Exp. Per $100.00 Total Comm. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Northeastern | 102 Cranston, RI Raymond Forrestal | 27 | 36 | 19 | 1 | 1 | 621 | 33 | 19,082 | 110 | 19.88 | 270 |
| Southeastern | F84 SDNO, FL Daniel URSO | 21 | 32 | 17 | 5 | 17 | 1,008 | 247 | 34,263 | 133 | 17.18 | 252 |
| Western | 937 Port of L.A., CA James Laurenza | 23 | 34 | 16 | 1 | 3 | 621 | 2,851 | 22,446 | 113 | 14.02 | 254 |
| Eastern | B87 City Hall, NY Stanley Eng | 22 | 31 | 10 | 10 | 7 | 2,165 | 0 | 44,598 | 91 | 3.83 | 242 |
| Central | 21A Dixieland, LA John Thompson | 19 | 19 | 6 | 0 | 6 | 467 | 0 | 23,904 | 101 | 12.31 | 236 |

# 1991 Sales Office of the Year

| Territory | Name of Office Manager | Active Reps 12/90 | Active Reps 12/91 | New Appts. | 1991 Qualifiers P.C. | 1991 Qualifiers Leaders | Total NSC (000) | NSC Per Rep 1991 | NSC Per Rep %of 1990 | 1st Yr. Lapse Rate | Exp. Per $100 Total Comm. | Avg. Face Amount Per Policy (000) | Average Annual Premium Per Policy | Average Annual Premium Per Policy |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MidAmerica | D75 Shreveport, LA William Foster | 21 | 23 | 12 | 1 | 4 | 519 | 22,703 | 108 | 7.79 | 263 | 130 | 2,236 | 17.53 |
| Northeastern | H7 Bayshore, NY Steven Day | 25 | 22 | 8 | 1 | 4 | 798 | 28,318 | 116 | 12.74 | 269 | 82 | 884 | 10.80 |
| Southeastern | *P06 SEHO, FL *P28 SEHO, FL Daniel R. Urso | 22 | 67 | 48 | 8 | 31 | 2,212 | 43,264 | 112 | 20.52 | 250 | 60 | 940 | 15.77 |
| Western | B46 Santa Rosa, CA Philip Fabian | 23 | 23 | 5 | 0 | 7 | 597 | 24,841 | 101 | 3.35 | 291 | 130 | 1,592 | 11.47 |

* The SEHO Branch became the SEHO District Office 10/7/91.

D-3

METROPOLITAN LIFE AND AFFILIATED COMPANIES

COMPENSATION RULES & SCHEDULES

For The Exclusive Use Of Field Representatives and Sales Support Personnel

Name _____

SCHEDULE I

COMMISSION RATES

Table 1 - PERSONAL LIFE INSURANCE POLICIES (excluding Universal Life Policies)

| Type of Policy/Contract | Commission Rates | | | Remarks |
|---|---|---|---|---|
| | FYC (1) | Renewal (2) | Service | |
| **A. WHOLE LIFE** | | | | |
| **1. WHOLE LIFE** (excluding Metromatic policies) | | | | |
| Term of Premium Payment | | | | |
| 30 years or more | 55.0% | | | |
| 25 through 29 years | 52.5 | | | |
| 20 through 24 years | 50.0 | 11.0% | None | |
| 18 and 19 years | 45.0 | | | |
| 14 through 17 years | 40.0 | | | |
| 10 through 13 years | 35.0 | | | |
| **2. LIFE PAID-UP AT 98(7)** | | | | |
| Term of Premium Payment | | | | |
| 20 years or more | 50.0% | 11.0% | None | Face Amounts Less Than $500,000 |
| 18 and 19 years | 45.0 | | | |
| 14 through 17 years | 40.0 | | | |
| 10 through 13 years | 35.0 | | | |
| Term of Premium Payment | | | | |
| 20 years or more | 45.0% | 11.0% | None | Face Amounts $500,000 and Over |
| 18 and 19 years | 45.0 | | | |
| 14 through 17 years | 40.0 | | | |
| 10 through 13 years | 35.0 | | | |
| Term of Premium Payment (Policies written eff. Jan. 1, 1992 and later) | | | | |
| 14 year + | 40.0% | 11.0% | None | All Face Amounts |
| 10 to 13 years | 35.0 | | | |
| **3. METLIFE ESTATE SAVER BASE POLICY** | 50.0% | 11.0% | None | |
| Supplemental Ins. Ben. (SIB) | 3.0 | None | None | |
| Supplemental Ins. Ben. Dump In | 3.0 | None | None | |
| Four-Year Estate Protection Rider | 3.0 | 3.0 | None | |

1-C (12-91)                                          -1.1-

SCHEDULE I (continued)

COMMISSION RATES

| Type of Policy/Contract | Condition | Commission Rates | | |
|---|---|---|---|---|
| | | FPC (3) | Renewal | Service |
| 2. FLEXIBLE RETIREMENT ANNUITIES (2) | Percent of Purchase Payment in Contract Year | | | |
| | Amount of Purchase Payment (4) | | | |
| Contract Ages First $3,000 | | | | |
| 15 through 50 | | 5.0% | 2.0% | 1.0% |
| 51 through 55 | | 4.0% | | |
| 56 through 60 | | 3.0% | | |
| 61 and Over | | 2.0% | | |
| Excess Over $3,000 | | | | |
| 15 through 50 | | 2.0% | 2.0% | 1.0% |
| 51 through 55 | | 2.0% | | |
| 56 through 60 | | 2.0% | | |
| 61 and Over | | 2.0% | | |

1-C (9-90)                                    -1.11-

D-4



# STATE BOARD OF INSURANCE

1110 SAN JACINTO                    AUSTIN, TEXAS 78701-1998                    (512) 463-6169

PAUL T. WROTENBERY, Chairman
RICHARD F. REYNOLDS, Member
JO ANN HOWARD, Member

A. W. POGUE, Commissioner
ERNEST A. EMERSON, Fire Marshal
NICHOLAS F. MURPHY, Chief Clerk

January 12, 1990

CRRR # P-835-788-364

Patrick J. Hunt, Manager
Personal Insurance Contracts Bureau
Metropolitan Life Insurance Company
One Madison Avenue
New York, NY 10010-3690

2|2|90

Re:  Advertising Material - Nurses Guaranteed Retirement Savings
     Plan - Agent Ed Moore

Dear Mr. Hunt:

The attached advertisement was forwarded to the Advertising Section
for our review to insure compliance with applicable portions of the
Texas Administrative Code, Part I, Title 28, Chapter 21, Subchapter
B, and other rules and regulations.

Following is a list of major violations noted and some additional
questions.

1.  Failure to identify the policy being sold violates Section
    21.104.(d) and (f).

2.  Use of the phrase "savings plan" violates Section
    21.114.(5)(F).

3.  In Item 5, reference to "savings" being "deposited" violates
    Section 21.114.(5)(G).

4.  Item 3 implies a current interest rate without reference to
    the guaranteed rate, a violation of Section 21.114.(4)(H).

5.  What are the form numbers of the policies now or previously
    promoted by the captioned advertising material?

6.  Who is responsible for developing the captioned advertising
    material?

7.  Did the company approve the use of the captioned
    advertising material?

8.  Does the company require the agency force to submit
    individually developed advertising material to the company
    for approval prior to use?

RECEIVED

NOV 20 1990

ADVERTISING

Patrick J. Hunt
Metropolitan Life I    rance Company
January 12, 1990
Page Number Two

Because of the violations noted above and the overall misleading
character of the captioned advertisement, Metropolitan Life Insurance
Company is requested to voluntarily discontinue any further use or
distribution of the advertisement in question.

Written assurance of voluntary compliance is requested pursuant to
Article 21.21, Section 22 of the Texas Insurance Code and is to be
received within ten days of receipt of this letter.

If the solicitation will continue the company is requested to revise the
material in question and submit for our review by February 2, 1990.
Additionally, all of the materials used in the solicitation are to be
submitted along with the revised advertisement.

If you have any questions I may be contacted at (512)475-1949.
Please address any correspondence to the undersigned, Mail Code
016-7, Advertising Section, P. O. Box 149091, Austin, Texas
78714-9091.

Sincerely,


F. J. Marek, CLU, Insurance Technician
Advertising
Mail Code 016-7

FJM\nh

Attachment

cc:  (File)


RECEIVED

NOV 20 1990

ADVERTISING



# STATE BOARD OF INSURANCE

1110 SAN JACINTO                    AUSTIN, TEXAS 78701-1998                    (512) 463-6169

PAUL T. WROTENBERY, Chairman
RICHARD F. REYNOLDS, Member
JO ANN HOWARD, Member

A. W. POGUE, Commissioner
ERNEST A. EMERSON, Fire Marshal
NICHOLAS MURPHY, Chief Clerk

March 20, 1990

CERTIFIED RETURN RECEIPT REQUESTED
P 128 368 686

Patrick J. Hunt, Manager
Personal Insurance Contracts Bureau
Metropolitan Life Insurance Company
One Madison Avenue
New York, NY  10010-3690

Re:  Advertising Materials - Nurses Guaranteed Retirement Savings
     Plan - Agent Ed Moore

     Our Letter Dated January 12, 1990

Dear Mr. Hunt:

You have failed to respond to our letter referenced above (a copy of
which is attached for your reference).

Article 1.24, of the Texas Insurance Code, requires you to promptly
provide us with a written response.  In accordance with Article 1.24,
we request a response be furnished to us no later than April 4, 1990.
Please address your response to the undersigned, Advertising Section,
Mail Code 018-7, P. O. Box 149091, Austin, Texas  78714-9091.

Thank you for your cooperation in resolving this matter.

Sincerely,

F. J. Marek, CLU, Insurance Technician
Advertising Section
Mail Code 018-7

FJM\and

Attachments

cc:  File

RECEIVED

NOV 20 1990

ADVERTISING



**≣¦€ Metropolitan Life**
AND AFFILIATED COMPANIES

METROPOLITAN INSURANCE COMPANY
Southeastern Head Office Branch
4100 Boyscout Boule  rd
Tampa, FL  33607
(813) 870-8050

**RECEIVED**

MDC  DEC  6 1989

STATE BOARD OF INSURANCE
AUSTIN, TEXAS

**RECEIVED**

NOV 2 8 1989

ADVERTISING

1/24/91

## NURSES GUARANTEED RETIREMENT SAVINGS PLAN

A New Nurses Guaranteed Retirement Savings Plan is now available to ALL NURSES IN THE DALLAS/FT WORTH AREA.  This new Retirement Savings Plan is designed to complement your existing benefits with 5 VERY IMPORTANT FEATURES:

1. CONTROL          - Unlike traditional retirement plans, if you should leave your present nursing position, you will not lose your retirement benefits.

2. FLEXIBILITY      - Availability of cash without penalty.

3. TAX BENEFITS     - High tax sheltered growth.

4. SECURITY         - Provides a guaranteed lifetime income.

5. DISABILITY       - Your monthly savings will continue to be deposited by Metropolitan should you become disabled.

The tax advantages, availability and guarantees make this NEW GUARANTEED RETIREMENT SAVINGS PLAN one of the most widely discussed in the investment world today.  Would you mind completing the form below in order that we may furnish you information on this New Retirement Savings Plan.

Sincerely

*Ed Moore*

Ed Moore
Nursing Representative

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

NAME_____

ADDRESS_____  CITY_____

STATE_____  ZIP CODE_____

HOME PHONE_____  BUS PHONE_____

DATE OF BIRTH: MONTH_____  DAY_____  YEAR_____

To:        William E. Latta
           Regional Sales Manager
           Tampa Regional Office

From:      Garry H. Voith
           Director
           Marketing Services

Date:      April 13, 1990

Subject:   Prohibited use of Direct Mail Letter


By copy of the attached correspondence, you are hereby notified
that further use of the referenced direct mail letter is
prohibited. Please make every effort to assure that all copies
of the mailing are destroyed by the branch.

Should you have need of assistance in exploring alternatives,
please feel free to contact our offices. We sincerely
appreciate your cooperation and support in addressing this
concern.


GHV/sas

cc:    L. Michelle Ligon


RECEIVED

NOV 2 0 1990

ADVERTISING

_Bill Lester_

Director of Marketing Services _Southeastern_
Branch/District Sales Manager _FN  SEHO_
                                                    District

Re   Unauthorized Sales Material

The attached material has been reviewed and it's use is:

☒ DISAPPROVED          Please take the immediate steps necessary
                       to assure that no copy of this item will be
                       retained in the Branch/District Office or
                       used by any Metropolitan representative.

                       Have the lower portion of this form completed
                       acknowledging that the necessary action has
                       been taken to prevent use of this material
                       and return this notification to the Director.
                       Market Development Services, Home Office,
                       Area 5-G within two weeks.

Special remarks _____

_____

Market Development Services, NYHO, Area 5-G

---------------------------------------------------------

Director of Marketing Services  _SEHO_          Territory

I have personally ordered that the use of the unauthorized sales
material be discontinued and that all existing copies of the material
be destroyed.

_____      _4-17-90_      _SEHO  F06_
Br./Dist. Sales Manager        Date        Br./Dist. No. and Name

## CONFIDENTIAL



RECEIVED
NOV 2 8 1989
ADVERTISING

**Metropolitan Life**

METROPOLITAN INSURANCE COMPANY
Southeastern Head Office Branch
4100 Boyscout Boulevard
Tampa, FL 33607
(813) 875-4050

RECEIVED

MBC DEC 6 1989

STATE BOARD OF INSURANCE
AUSTIN, TEXAS

### NURSES GUARANTEED RETIREMENT SAVINGS PLAN

A New Nurses Guaranteed Retirement Savings Plan is now available to ALL NURSES IN THE DALLAS/FT WORTH AREA. This new Retirement Savings Plan is designed to complement your existing benefits with 5 VERY IMPORTANT FEATURES:

1. **CONTROL** – Unlike traditional retirement plans, if you should leave your present nursing position, you will not lose your retirement benefits.

2. **FLEXIBILITY** – Availability of cash without penalty.

3. **TAX BENEFITS** – High tax sheltered growth.

4. **SECURITY** – Provides a guaranteed lifetime income.

5. **DISABILITY** – Your monthly savings will continue to be deposited by Metropolitan should you become disabled.

The tax advantages, availability and guarantees make this NEW GUARANTEED RETIREMENT SAVINGS PLAN one of the most widely discussed in the investment world today. Would you mind completing the form below in order that we may furnish you information on this New Retirement Savings Plan?

Sincerely

Ed Moore

Ed Moore
Nursing Representative

------------------------------------------------------

NAME_____

ADDRESS_____ CITY_____

STATE_____ ZIP CODE_____

HOME PHONE_____ BUS. PHONE_____

DATE OF BIRTH: MONTH_____ DAY_____ YEAR_____

Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010-3690
(212) 578-3691

Patrick J. Hunt
Director
Personal Insurance Compliance Bureau

**Metropolitan Life**
AND AFFILIATED COMPANIES
**RECEIVED**
DEC 20 1993

*Closed*
*11-30-90*
*PJM*

Mr. P. J. Marek, CLU
Insurance Technician
Mail Code 016-7
Texas State Board of Insurance
1110 San Jacinto
Austin, Texas 78701-1998

Re Advertising Material - Nurses Guaranteed Retirement
Savings Plan - Agent Ed Moore.

Dear Mr. Marek

Thank you for discussing the above mentioned sales material
with me on the phone a few days ago. Let me again apologize
for not responding a good deal sooner to your correspondence.

For your convenience, enclosed are copies of your January 12,
1990 and March 20, 1990 letters. Please be advised that after
receiving your first letter we were able to track down a copy
of the advertising material in question as well as its source.
On April 13, 1990, a letter (copy enclosed) was sent out by
the Director of Marketing Services in our Southeastern Head
Office informing the appropriate individuals that further use
of the material was prohibited and that all copies were to be
destroyed.

I trust that you will find this information satisfactory and
that you can now close this file. Thanks for your patience
and assistance.

Yours truly

Director

November 15, 1990

RECEIVED

NOV 20 1990

ADVERTISING

D-5

```
FROM: SEHO, FL F04 R42        MSG#: 90-01813131
TO  : SERE                    SENT: 08/24/90 11:03 AM    PRIORITY: 2
SUBJ: DAVE POWELL             FORWARDED BY: SEHO CONSUMER RELATIONS
```

GIANE SHAFFNER

IN REPLY TO THE COMPLAINT ON THE ABOVE, WE WILL DISCONTINUE THE LETTER
IN QUESTION.

THANK YOU

RICK URSO
BRANCH MANAGER

AUGUST 24, 1990