IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: METROPOLITAN LIFE INSURANCE CO. SALES PRACTICES LITIGATION | ) ) ) | MISC. DOCKET NO. 96-179 MDL NO. 1091 |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | JUDGE AMBROSE MAGISTRATE JUDGE BENSON |
| | ) | |
| Amodeo | C.A. No. 96-0759 | ) |
| Biggs | C.A. No. 96-0038 | ) |
| Caskey | C.A. No. 95-1426 | ) |
| Garrett | C.A. No. 96-0436 | ) |
| Oddi | C.A. No. 96-0051 | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The parties have submitted for approval a Settlement of this class action that is memorialized in a Stipulation of Settlement filed with the Court on August 18, 1999, with exhibits (Docket #515), as amended by the First Amendment to the Stipulation of Settlement filed with the Court on December 13, 1999 (Docket #714) (collectively, the "Settlement Agreement" or "Settlement"). For the reasons set forth below in its Findings of Fact and Conclusions of Law, the Court has determined that the Settlement, as amended, is fair, reasonable, and adequate and should therefore be approved. Contemporaneously, the Court has issued a Final Order Approving Class Action Settlement and a Final Judgment approving the Settlement and dismissing the Amended Consolidated Class Action Complaint (Docket #513, the "Amended Complaint") in this action with prejudice.

## I.   BACKGROUND

### 1.   THE PARTIES AND THEIR COUNSEL

1.      Plaintiffs Juanita I. Caskey. Joseph P. Garrett. Jr.. Arthur E. Leach and Michael A. Rankin are citizens and residents of the State of Florida. Plaintiffs Dennis W. Biggs. Sr.. Richard I.. Oddi and Harvey J. Williams are citizens and residents of the Commonwealth of Pennsylvania. Plaintiff Kristel M. Davis-Smith is a citizen and resident of the State of Ohio. Plaintiff Charles V. Amodeo is a citizen and resident of the State of Iowa. Plaintiff Ronald R. Hess is a citizen and resident of the State of California. Amended Complaint. Docket #513. ¶ 33.[1]

2.      The plaintiffs and the Class[2] are represented by the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and Specter Specter Evans & Manogue, P.C. ("Co-Lead Counsel"); Bonnett. Fairbourn, Friedman & Balint. P.C.; David W. Dunn Law Firm PLC; Hubbard & Biederman. LLP; Levin Fishbein Sedran & Berman: Lite DePalma Greenberg & Rivas. LLC; Gene Mesh & Associates; Savett Frutkin Podell & Ryan. P.C.; Schiffrin & Barroway. LLP; Spector & Roseman. P.C.; Malakoff Doyle & Finberg, P.C.; Martin. Drought & Torres. Inc.; Bragar Wexler Eagel & Morgenstern. LLP; Carlin & Vasvari. L.L.C.; Corinblit & Seltzer; Farrow. Bramson. Baskin & Plutzik. LLP; James. Hoyer. Newcomer. Forizs & Smiljanich. P.A.; Kincaid & Horton; Law Offices of Daniel Harris; Law Offices of George Donaldson: Law Offices of Tas Coroneos; Longley & Maxwell. L.L.P.; The

---

[1]      This Court dismissed all of Plaintiff Juanita I. Caskey's and Plaintiff Kristel M. Davis-Smith's claims in rulings pertaining to the original Consolidated Class Action Complaint. Their claims were realleged in the Amended Complaint solely to preserve their appellate rights concerning the prior dismissal rulings. Neither Plaintiff Caskey nor Plaintiff Davis-Smith have been proffered to represent the Class for purposes of the settlement at issue herein.

[2]      Capitalized terms in these Findings of Fact and Conclusions of Law have the meanings set forth in the Settlement Agreement. unless otherwise specified.

Lustigman Firm. P.C.; Murray & Murray Co., L.P.A.; Nick O'Malley Law Offices; Bruce A. Reznick

& Associates; Sachnoff & Weaver. Ltd.; Behrend & Ernsberger, P.C.; Law Offices of Herbert Hafif;

Stamell & Schager. LLP: and Phebus & Winkelmann. All are experienced plaintiffs' counsel with

expertise in insurance. consumer and class action litigation. *See* Joint Declaration of Melvyn I. Weiss.

Esq. and Howard A. Specter. Esq. (Docket #668, the "Weiss/Specter Decl.") ¶ 183.

  3.  Defendant Metropolitan Life Insurance Company is a mutual life insurance company

organized under the laws of the State of New York, with its principal place of business in New York.

Metropolitan Life Insurance Company is licensed in all fifty states to sell its insurance and financial

products. Defendant Metropolitan Insurance and Annuity Company, a wholly owned subsidiary of

Metropolitan Life Insurance Company. is a company organized under the laws of the State of

Delaware. with its principal place of business in New York.[3] Affidavit of Edmund G. Rakowski

(Docket #592, the "Rakowski Aff.") ¶ 2.

  4.  MetLife is represented by the law firms of Skadden, Arps, Slate, Meagher & Flom

LLP; McCarter & English. LLP; and Thorp Reed & Armstrong, LLP. All of these firms have

extensive experience in the defense of complex and class action litigation. MetLife also is represented

by experienced and able in-house counsel.

---

  [3]  Allegations were also made against MetLife's wholly owned subsidiary.
Metropolitan Tower Life Insurance Company, in the original Consolidated Class Complaint and
the Amended Complaint. and under the terms of the Settlement Agreement it is released from all
covered claims. as are Metropolitan Life Insurance Company and Metropolitan Insurance and
Annuity Company. The term "MetLife" as used herein includes Metropolitan Life Insurance
Company. Metropolitan Insurance and Annuity Company, and Metropolitan Tower Life Insurance
Company.

AO 72A

## 2.    PLAINTIFFS' ALLEGATIONS[4]

5.    **The "Churning" Allegations.** Plaintiffs allege that MetLife engaged in sales practices which "involve[d] all persons who purchased life insurance or annuity policies from MetLife that were financed by the depletion of nonforfeiture values from existing life insurance or annuity policies . . . ." Amended Complaint. ¶ 1. In particular. plaintiffs claim that MetLife "misrepresented the amount of out-of-pocket premium the replacement policy would require and concealed or omitted material information about the true nature. risks. and costs of the replacement transactions that were involved." *Id.* at ¶ 3. Plaintiffs define a "'replacement' policy [as] one which is financed by. inter alia. the use of equity. cash value. dividends. interest or premiums from an existing policy'." *Id.* at ¶ 62. Plaintiffs also assert that MetLife engaged in sales of "life insurance or annuity policies that were characterized and/or charged as new (i.e.. not replacement or something other than replacement) when. in fact. the later policies were replacements of the existing policies and should have been characterized and/or charged as such . . . ." *Id.* at 9.

6.    **The Vanishing Premium and Performance Allegations.** Plaintiffs allege that MetLife sold:

> life insurance policies that accumulate dividends and/or interest ("non-term policies") upon false and misleading policy illustrations and related documents that falsely represented the likelihood that future dividends and/or interest accrued on the policy would be sufficient to pay the entire premium of the policy after a specified amount of cash was paid out-of-pocket or from the non-forfeiture benefits of existing life insurance or annuity policies . . . .

---

[4]    The summary of plaintiffs' allegations in this Section B is not a finding on the merits of those allegations. For the purposes of class certification and addressing the fairness. reasonableness. and adequacy of the Settlement. the Court need not and is not determining the merits of plaintiffs' claims.

*Id.* ¶ 14. These allegations focus on alleged misrepresentations within policy illustrations and related documents which purportedly "deceptively described the likelihood that the policyholders' cash payments would end or 'vanish' after paying a certain amount of money." *Id.*

7.    **The "DAC Tax" Allegations.** Plaintiffs claim that MetLife improperly "passed along to [its] universal life policyholders with policies issued in or before 1992" MetLife's federal DAC tax liabilities by raising the cost of insurance charged under certain of its universal life policies, allegedly in violation of the terms of their MetLife policies. *Id.* ¶ 21. Plaintiffs also allege that for owners of MetLife's Single Premium Life Policy, this alleged practice violated (i) express promises in sales literature that Single Premium Life policyholders "would never incur any tax liability" and (ii) "a contractual guarantee that MetLife would never pay less than a 6% interest rate on their accumulated funds." *Id.* ¶ 23.

8.    **The Qualified Plan Allegations.** Plaintiffs assert that MetLife "utilized uniform sales presentations and related documents to market and sell" deferred annuities for the purpose of funding tax-qualified contributory retirement plans, such as Individual Retirement Accounts ("IRAs") and 401(k) plans. on the basis of a tax-deferral advantage that does not exist, because any investment in a qualified plan is already tax deferred. *Id.* ¶ 25. Plaintiffs further allege that MetLife "represented, through its uniform sales presentations and other documents, that deferred annuities were well suited for funding qualified plans." *Id.* ¶ 26.

9.    **The Investment Plan Allegations.** Plaintiffs allege that MetLife misrepresented to potential policyholders that its life insurance products were comparable to "investment or savings accounts. pension maximization or retirement plans, college tuition funding plans. mutual funds, or other types of investments or savings vehicles." *Id.* ¶ 28. Plaintiffs also allege that in connection with

5

these misrepresentations. MetLife concealed from policyholders that the true nature of these products was life insurance, misrepresented "the true rate of return under the policy, as well as its relative suitability with respect to other investment plan vehicles," and concealed the fact "that only part of the premiums paid – those not covering mortality expenses, administrative costs and commissions – would earn any investment return." *Id.*[5]

10.    The representative plaintiffs assert claims, among others, encompassing each of the types of allegations set forth above, as follows: Charles V. Amodeo asserts DAC Tax allegations (*id.*, ¶¶ 146-155); Dennis W. Biggs asserts Vanishing Premium and Performance allegations (*id.*, ¶¶ 156-161); Joseph P. Garrett asserts DAC Tax and Churning allegations (*id.*, ¶¶ 184-193); Richard L. Oddi asserts DAC Tax and Churning allegations (*id.*, ¶¶ 194-203); Harvey J. Williams asserts Vanishing Premium, Performance and Churning allegations (*id.*, ¶¶ 204-217); Arthur E. Leach asserts Churning and Qualified Plan allegations (*id.*, ¶¶ 218-231); Ronald Ray Hess asserts Churning allegations (*id.*, ¶¶ 232-243); and Michael A. Rankin asserts Investment Plan allegations (*id.*, ¶¶ 244-251).

11.    Although MetLife has agreed to settle the claims asserted in this Action, MetLife does not concede that it engaged in any wrongful conduct and denies all of plaintiffs' allegations. MetLife asserts that many of plaintiffs' claims result from economic conditions outside of MetLife's control.

---

[5]    MetLife already has resolved a significant portion of plaintiffs' Investment Plan claims as a result of the class action settlement approved in *Horton v. Metropolitan Life Insurance Co.*, Civ. No. 93-1849-CIV-T-23A (M.D. Fla.). To date, MetLife has paid over $70 million in restitution arising from *Horton*-type savings and retirement claims. *See* Defendants' Mem. of Law in Support of Class Action Settlement, Docket #588 at 18.

### 3.   PROCEDURAL HISTORY

12.    This Consolidated Class Action arose following the coordination of several individual and putative class action complaints filed in this Court and in other federal courts pursuant to a February 20. 1996 Transfer Order by the Judicial Panel on Multidistrict Litigation. On July 1, 1996, plaintiffs filed their Consolidated Class Action Complaint (Docket #26, "Consolidated Complaint").

13.    The Consolidated Class Action has encompassed at least 60 motions, with at least 173 supporting briefs and related submissions. 24 hearings or conferences before the Court. and at least 92 orders or recommendations from the Court.  The issues dealt with included substantive and procedural matters. as well as discovery disputes.  Some of the more significant matters presented to the Court are discussed below.

14.    On September 30. 1996, MetLife filed a motion to dismiss the Consolidated Complaint (Docket #53). After extensive briefing. on June 20, 1997, Magistrate Judge Kenneth J. Benson issued his Report and Recommendation. which recommended dismissing some, but not all, of the claims in the Consolidated Complaint (Docket #200). On August 12, 1997, this Court issued an order adopting the Report and Recommendation (Docket #238).

15.    MetLife also filed four separate Motions for Summary Judgment, seeking to dismiss all of the claims as to plaintiffs Amodeo. Biggs, Caskey and Oddi (Docket #s 216, 222. 219 and 225). Numerous briefs. exhibits. affidavits and declarations were submitted to the Court in connection with the summary judgment motions.  Magistrate Judge Benson issued four separate Reports and Recommendations as to the summary judgment motions on March 30, 1998, March 31. 1998 and April 13. 1998. Magistrate Judge Benson recommended: (i) denying summary judgment as to plaintiff Amodeo: (ii) denying summary judgment as to plaintiff Biggs; (iii) granting summary

7

AO 72A

judgment as to plaintiff Caskey; (iv) granting summary judgment as to plaintiff Oddi's breach of fiduciary duty and unjust enrichment claims and a portion of Counts 7, 8, and 9; and (v) denying summary judgment in all other respects (Docket #s 349, 350, 352 and 353). Plaintiffs' counsel and MetLife filed extensive objections to the Reports and Recommendations. By Memorandum Order dated May 12, 1998, this Court adopted and approved Magistrate Judge Benson's Report and Recommendation as to plaintiff Caskey and dismissed her claims (Docket #365). By Memorandum Orders dated June 17, 1998, this Court adopted and approved Magistrate Judge Benson's Reports and Recommendations as to plaintiffs Amodeo, Biggs and Oddi (Docket # 398).

16.    Since the filing of the Consolidated Complaint, the parties have conducted an extraordinary amount of discovery. For example, in the MDL litigation alone, MetLife has responded to over 212 individual requests for documents in six separate Requests for Production and 65 individual interrogatories in three sets of Interrogatories, while plaintiffs have responded to more than 400 individual Requests for Production and 400 individual interrogatories. In connection with plaintiffs' various Requests for Production, MetLife has either produced or made available for inspection over 8.8 million pages of documents and 18,164 pieces of multimedia materials, all of which have been reviewed by attorneys for MetLife and the plaintiffs (Docket # 556 at ¶¶ 57, 61, 63; Docket #588 at 19-20). Depositions have been taken of lead plaintiffs in the Consolidated Class Action Complaint and of MetLife representatives. Numerous experts also have been interviewed, retained and consulted by both plaintiffs and MetLife (Docket #588 at 20).

17.    MetLife also has responded to certain discovery requests in various state lawsuits which involve allegations similar to the allegations raised in the Consolidated Complaint. In addition, MetLife has participated in depositions of plaintiffs in those lawsuits.

8

4.  THE SETTLEMENT NEGOTIATIONS AND PRELIMINARY
    APPROVAL

18.  In October 1998, counsel for the parties began to conduct settlement discussions and informed the Court that negotiations had begun. From October 1998 to August 1999, MetLife's counsel and plaintiffs' Co-Lead Counsel negotiated extensively, often several times a week. The negotiations were contentious and it often appeared to the parties that a settlement might not be reached. *See* Weiss/Specter Decl. at ¶ 67. Throughout this process, the parties updated the Court on their progress.

19.  In the Spring of 1999, approximately 35,000 additional documents were produced by MetLife in further discovery, and in August 1999, depositions of several of MetLife's senior officers were taken *id.* at ¶ 64 . On August 3, 1999, the parties met with the Court to present an overview of the proposed Settlement, and provided the Court with a draft of the Stipulation of Settlement. On August 16, 1999, plaintiffs moved for leave to file the Amended Complaint (Docket #513). A copy of the Amended Complaint was submitted with the motion. The motion to amend was formally granted by the Court on September 8, 1999.

20.  On August 18, 1999, the parties executed the Stipulation of Settlement (Docket #515), and this Court preliminarily certified the class for purposes of settlement only and preliminarily approved the Settlement. *See* Docket #517, August 18, 1999 Order ¶ 1. The settlement was found to be "within the range of possible approval and, thus, preliminarily approved and sufficient to warrant sending notice to the Class." *Id.* ¶ 4. In addition, the Class Notice Package, the Publication Notice and the methodology of notice also were approved by this Court, *id.* ¶¶ 6-7, and the Fairness Hearing was scheduled for December 2, 1999. *Id* ¶ 5.

9

## 5.    THE SETTLEMENT CLASS

21.    The Settlement class is defined as all persons and entities who have or had an

ownership interest in any permanent life insurance policy or any deferred annuity issued by MetLife

in the United States during the period from January 1, 1982 through December 31, 1997 pursuant to

an individual sale. The class definition excludes (i) any present or former employee, director or sales

representative of MetLife, or his or her spouse; (ii) any insurance company that owns or owned a

policy or annuity pursuant to an absolute assignment effected as part of an Internal Revenue Code

§ 1035 exchange; and (iii) any person or entity who opts out of the proposed class with respect to a

particular policy or annuity. The class definition also excludes any persons or entities who have or

had an ownership interest in the following (unless and to the extent such persons or entities have an

ownership interest in another policy or annuity that is encompassed by the class definition):

- policies or annuities that were terminated due to the death of the insured or annuity owner or annuitant;

- policies or annuities that were issued by MetLife but not accepted or paid for, or were returned to MetLife as part of the exercise of a free look provision in the policy or annuity;

- policies or annuities that were rescinded: (a) as part of a reissue of a new policy or annuity; (b) because of a material misrepresentation on an application; or (c) where the policy or annuity was rescinded and the premiums or other monies paid were returned to the owner with interest, and the owner was represented by counsel at the time;

- policies that resulted in relief being awarded to their owner pursuant to the 1994 nationwide class action settlement of savings and retirement plan claims against MetLife in *Horton v. Metropolitan Life Ins. Co.*, Civ. No. 93-1849-CIV-T-23A (M.D. Fla.);

- policies or annuities that are the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing MetLife from any further liability;

10

- any deferred annuity issued in connection with the Transamerica HomeFirst Reverse Mortgage Program; and

- members of the class certified by order of the United States District Court for the Southern District of New York in *Dornberger v. Metropolitan Life Insurance Co.*, 182 F.R.D. 72 (S.D.N.Y. 1998).

## 6.    THE TERMS OF THE SETTLEMENT

### 1.    General Relief

22.    The Settlement Agreement provides for General Relief to be automatically provided to all policy owners in the class in the form of a free Settlement Death Benefit, and to all annuity owners in the class in the form of a free Accidental Death Benefit. The General Relief is to be provided to all Class Members. except those who elect Claim Evaluation with respect to a particular policy or annuity subject to the Settlement. No showing of any injury is necessary for Class Members to recover General Relief. and no forms need be returned in order to receive this benefit (Docket #515, amended by #714).

#### a.    The Settlement Death Benefit

23.    The Settlement Death Benefit ("SDB") provides death benefit coverage separate and apart from any insurance coverage the Class Members may have, and has a total value to the Class of at least $770 million. based on comparable insurance rates on the open market. *See* Declaration of Terry M. Long (Docket #648. the "Long Decl.") at ¶ 21. The amount and duration of the death benefit is based on the type and face amount of the policy that makes the owner a member of the class. the age of the insured under that policy, whether the policy is in force or terminated and. if terminated. the date of termination. The duration of the SDB ranges from one year to 59 months: the amount of death benefit ranges from 2.5% to 16% of the policy face amount. SDB coverage will commence as

11

of the implementation date of the Settlement Agreement, which as stated therein, is to be no more than 30 days after the date on which the Final Order and Judgment of the Court approving the Settlement Agreement would become final, after any appeals have been exhausted.

### b.    The Accidental Death Benefit

24.    The Accidental Death Benefit ("ADB") provides accidental death benefit coverage for a duration of three years to all eligible annuity owners and has a total value to the Class of at least $8 million, based on comparable insurance rates on the open market. *See* Long Decl. at ¶ 26. The amount of ADB awarded to a particular class member depends upon the account value of the annuity which makes the owner a member of the class, and ranges from $1,500 to $5,500.

25.    The SDB and ADB amounts and durations have been calculated initially based on the assumption that all Class Members would receive General Relief. After all claims in the Claim Review Process component of Claim Evaluation have been evaluated and scored by the Claim Evaluator, as discussed below, the Settlement provides that the applicable SDB and ADB amounts will be adjusted to reflect the percentage of Class Members who actually will receive the General Relief.

### 2.    Claim Evaluation

26.    The Claim Evaluation procedures have been designed to address the claims of Class Members who believe that they have been misled or injured in some manner by the conduct of MetLife or any of its current or former employees, sales representatives, or brokers. Class Members who elect Claim Evaluation will have the opportunity to receive relief that, depending on the nature and strength of their claim, is intended to fulfill the benefit of their claimed bargain or to compensate

12

them for any alleged misrepresentations made to them relating to their policies and in certain circum-
stances, to their annuities subject to the Settlement. Class Members were required to elect Claim
Evaluation by returning the Election Form included in the Class Notice Package so that it would be
received no later than November 2. 1999. The parties have agreed, however, to accept any Claim
Evaluation Election Form received on or before December 3, 1999.

27.    Under the Claim Evaluation procedures. MetLife is required to submit certain
information and documents to the Claim Evaluator, regardless of whether the information and
materials are favorable or unfavorable to MetLife. Class Members who elect Claim Evaluation and
MetLife may submit any information and documents they believe are appropriate for the Claim
Evaluator's review.

28.    The Settlement provides for three separate procedures in Claim Evaluation: (i) the
Claim Review Process; (ii) the Part VIII ADR Process; and (iii) the Part IX Arbitration Process. The
parties anticipate that the vast majority of claims submitted for Claim Evaluation will be evaluated
within the context of the Claim Review Process procedures described below. The Part IX Arbitration
Process will be used to resolve allegations relating to the sale of deferred annuities into Qualified
Plans. The Part VIII ADR Process will be used to resolve claims not subject to any of the Claim
Review Process claim categories or the Part IX Arbitration Process, claims that are not released in the
Settlement, and claims relating to or arising out of the servicing or administration of a policy or
annuity that are unknown or unknowable as of the date for electing Claim Evaluation."

---

As part of the First Amendment to the Stipulation of Settlement, filed on December
13, 1999 (Docket #714), the parties have agreed that the Part VIII ADR Process will be utilized for
claims (other than servicing and administration claims) that independently arise from acts, facts or
(continued...)

### a.     The Claim Review Process

29.     The Claim Review Process will be administered by a Claim Evaluator chosen solely by Co-lead Counsel for Plaintiffs. After the settlement is implemented, claim forms will be forwarded to all Class Members who elected Claim Evaluation. Relief in the Claim Review Process will be based on objective scoring and relief criteria, subject to the discretion of the Claim Evaluator. The Claim Evaluator will be able to determine the relief to be given to a claimant by consulting a table of values for each scoring category. or by applying simple formulas, depending upon the type of policy and claim. the documentation submitted by the claimant, the information in the customer file to be submitted by MetLife. and any other information submitted to the Claim Evaluator. The Claim Evaluator's decision as to the relief to be awarded for a particular claim is final and is not subject to review. except in very limited circumstances.[7] The parties anticipate that the Claim Evaluator will be able to resolve claims within 150 days of receipt of the Claim File assembled by MetLife, as set forth in the Settlement Agreement.

---

[7](...continued)
circumstances arising after the end of the Class Period only upon the mutual agreement of MetLife and the Class Member asserting such claim.

:     Certain objectors. including Robin and Ronald Gill, have argued that the lack of appeal procedures is unfair. For the following reasons, the Court does not agree. It is more advantageous to Class Members to have an expedited claim review process with, in most circumstances. review only by a Claim Evaluator chosen by Co-Lead Counsel for Plaintiffs. than it is to have the defendant score the plaintiffs' claims, subject to appeal to a neutral arbitrator. The prospect of obtaining quicker relief decisions, through an equitable process controlled by Co-Lead Counsel. weighs heavily in favor of approval of the Claim Evaluation procedures as established by the parties. In addition. dispute resolution procedures similar to those here have been repeatedly approved (and encouraged) by the courts.

14

AO 72A
Rev 8 82.

30.    There are five claim categories included in the Claim Review Process: Replacement Claims. Accelerated Payment or Vanishing Premium Claims, Performance Claims. Savings and Retirement Claims. and Other Marketing Claims. Each of these claim categories is fully defined in the Settlement Agreement and in the Class Notice.

31.    The total value of relief awards available to Class Members in the Claim Review Process is $690 million. Relief awards in the Claim Review Process are to be derived from (i) a $300 million CRP Cash/Credit Relief Fund. with relief payable to in-force policies or annuities as policy or annuity credits or adjustments. and to terminated policies or annuities in cash: and (ii) a CRP Death Benefit Relief Fund. with relief provided in the form of insurance or death benefits to certain claimants. The benefits to be provided from the CRP Death Benefit Relief Fund will have an aggregate value to policy owners of $390 million. based on comparable insurance rates on the open market. See Long Decl. at ¶ 57.

32.    The parties' actuarial experts have determined that the CRP Cash/Credit Relief Fund and CRP Death Benefit Relief Fund amounts should be more than adequate to cover all reasonable scenarios of anticipated claims in the Claim Review Process. See Long Decl. at ¶¶ 66-69: Declaration of Steven G. Hildenbrand (Docket #649. the "Hildenbrand Decl.") at ¶ 40. To ensure that each fund is fully utilized. after the Claim Evaluator has scored all the claims in the Claim Review Process. the Claim Evaluator will make any necessary proportionate adjustments in the relief to be awarded to claimants between the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund. pursuant to formulas provided in the Settlement Agreement. If the total relief to be awarded by the Claim Evaluator is less than the total of the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund. any remaining amount will be redistributed proportionately to all Class Members. whether or

15

not they elect Claim Evaluation, as an enhancement to their otherwise applicable settlement benefits. On the other hand, if the total relief to be awarded by the Claim Evaluator is more than the total of the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund, all claimants will receive a proportionate reduction in their relief awards, pursuant to the formula provided in the Settlement Agreement.

33.     The CRP Total Fund was calculated based on the amount of relief necessary if a full 5% of the class ultimately filed claims in Claim Evaluation. As of November 9, 1999 approximately 3.7% of the class had elected Claim Evaluation. *See* Supplemental Affidavit of Jeffrey D. Dahl (Docket #703, the "Dahl Supp. Aff.") at ¶ 11. Given this percentage, both parties' actuarial experts have concluded, based on the experience of other comparable settlements and the likely distribution of CRP claims, that the CRP Total Fund will be more than sufficient to cover all awards set by the Claim Evaluator, without any need for a reduction in CRP awards. Moreover, rather than a reduction, it is likely that all Class Members will receive an increase in their applicable relief based on the "spillover" of excess funds from the CRP Total Fund. Hildenbrand Decl. at ¶ 40; Long Decl. at ¶ 68.[8]

34.     The Settlement establishes detailed objective criteria governing the award of relief by the Claim Evaluator for each category of claims he will decide. *See* Stipulation of Settlement, Ex. A., § II. The relief criteria for each category of claims assure that like claims are awarded comparable

_____

[8]     The Court has been informed that from November 9, 1999 through the extended deadline of December 3, 1999, 11,673 additional Claim Evaluation election forms were received and processed. *See* Second Supplemental Affidavit of Jeffrey D. Dahl dated December 16, 1999, Docket #715. Because the total percentage of Class Members who elected Claim Evaluation (approximately 3.9%) is still substantially less than the 5% of the class on which the CRP Total Fund was calculated, the addition of all election forms received through December 3, 1999 will have no significant impact on the sufficiency of the CRP Total Fund.

16

relief by the Claim Evaluator. The parties' actuarial experts have prepared detailed relief tables to govern Accelerated Payment and Performance claims. These tables make the Claim Evaluator's task simple and uniform. Moreover, the Claim Evaluator has been provided the discretion to take numerous general equitable principles and other mitigating factors into account in assigning a score to a particular claim, *id.* § II.C.3., and also has the discretion to increase or decrease the relief that would be awarded to any claimant, group of claimants, or all claimants, as appropriate. *Id.* § II.D.2. The objective and easily quantifiable criteria to be applied by the Claim Evaluator are clearly stated in the Settlement, and are appropriately summarized in the Class Notice Package. *See* Point III *infra.*

      **b.**    **The Part VIII ADR Process**

    35.    Part VIII ADR claims first will be reviewed by a three-member MetLife review team, which will make an offer of relief to the claimant based on criteria set forth in the Settlement Agreement. If the claimant is not satisfied with the offer, he or she may elect to have the claim arbitrated. An arbitrator will be appointed by Co-Lead Counsel for Plaintiffs from a list of arbitrators compiled by an independent organization and approved by the parties. The arbitrator's decision will be final, except in very limited circumstances.

    36.    If a Part VIII claim is filed within one year from the date the Settlement Agreement is implemented and is otherwise timely, MetLife has agreed to pay an enhancement of 20% of any award. This enhancement shall be added to the award and will be paid directly to the class member. The purpose of this enhancement is to provide an offset against the fees and expenses of an attorney representing a class member in the Part VIII ADR Process.

    37.    In certain circumstances involving theft or forgery by a MetLife employee and/or sales representative, the applicable Part VIII award to a claimant may be trebled. As with awards of relief

in the Part IX Arbitration Process, any relief awarded to claimants in the Part VIII ADR Process will be paid by MetLife separately from awards of Claim Review Process relief.

### c.    The Part IX Arbitration Process

38.    The Part IX Arbitration Process will be used to decide claims, if any, that MetLife allegedly improperly marketed and sold deferred annuities to fund a tax-qualified plan on the basis of a tax-deferral advantage that does not exist because an investment in a qualified plan is already tax deferred. These claims first will be evaluated by MetLife. MetLife will have 60 days to make an offer of relief to the claimant. If the claimant is dissatisfied with the offer, he or she may elect to have the claim arbitrated in accordance with the procedures in the Settlement Agreement. The arbitrator will be appointed by Co-Lead Counsel for Plaintiffs from a list of arbitrators compiled by an independent organization and approved by the parties. The arbitrator's decision will be final, except in very limited circumstances.

39.    For Part IX Arbitration claims, claimants will receive the services of a "Claimant Representative," who will be an attorney selected by Co-Lead Counsel for Plaintiffs and paid by MetLife, to assist the claimant in evaluating any offer of relief from MetLife and to pursue any claim through the arbitration process. Any relief awarded to claimants in the Part IX Arbitration Process will be paid by MetLife separately from awards of Claim Review Process relief.

### 3.    The Deferred Acquisition Cost Tax Relief

40.    The Settlement also provides for Deferred Acquisition Cost ("DAC") Tax Relief to be automatically provided to all Class Members who own or owned a qualifying policy. DAC Tax Relief will be provided in addition to the applicable General Relief or Claim Evaluation relief. DAC Tax Relief is provided in the form of free additional death benefits, with a value of $40.3 million, in an

18

amount and term that varies depending upon the age of the policyholder, the policy face amount and whether the policy is in force or terminated. and if terminated. the year of termination.

41.    In addition. as part of the Settlement. MetLife has agreed that, no later than 30 days after the Settlement Agreement is implemented or March 31. 2000, whichever is earlier. MetLife will not include costs associated with the DAC tax as part of the cost of insurance charge or other charge or expense on those policies identified in the Settlement Agreement.  To the extent costs associated with the DAC tax are currently included in the cost of insurance charges for such policies. MetLife will adjust the cost of insurance charges to eliminate all DAC tax related costs.

## 7.    THE VALUE OF THE SETTLEMENT RELIEF TO THE CLASS AND THE COST OF THE RELIEF TO METLIFE

42.    The Proposed Settlement has a total value to Class Members of at least $1.645 billion. excluding the relief to be paid by MetLife for claims brought in Part VIII and Part IX of Claim Evaluation. and excluding any attorneys' fees that ultimately may be awarded (which MetLife has agreed to pay in addition to the other settlement relief). *See* Long Decl. at ¶ 12; Hildenbrand Decl. at ¶ 43.  Of this amount. the total value of the General Relief to Class Members is at least $778 million. with $770 million attributed to the SDB and $8 million to the ADB.  This valuation was set by calculating comparable term insurance rates derived from policies currently available in the marketplace. *See* Long Decl. at ¶¶ 20. 25." The total value of the Claim Review Process Relief funds

---

⁴    The actual face amount of the death benefit coverage of the Settlement Death Benefits and Accidental Death Benefits indicated on the Benefit Vouchers distributed to Class Members is approximately $38.4 billion ($35.4 billion for the SDB and $3 billion for the ADB). *See* Hildenbrand Decl. at ¶¶ 7. 16.

is $690 million; the total value of the DAC Tax SDB relief is $40.3 million; and the total value of the future DAC Tax relief is $137 million. Long Decl. ¶ 12.

43.    The cost to MetLife of providing the General Relief when discounted using 4.6% interest equals $300 million, based on MetLife's own mortality experience for the SDB and the 1996 Accidental Death Benefits Mortality Table for the ADB. This figure represents the anticipated cost of the expected benefits to be payable to Class Members under the General Relief. Hildenbrand Decl. at ¶¶ 13, 18.    Because this anticipated cost to MetLife has been discounted for present value, the actual cost to MetLife of the expected benefits to be provided in General Relief is greater than $320 million. *Id.* The total expected cost of the Settlement to MetLife is approximately $902.5 million -- excluding Part VIII relief, Part IX relief, and attorneys' fees -- of which $300 million is attributed to the General Relief, $450 million to Claim Evaluation, $15.5 million to the DAC Tax SDB relief, and $137 million to the cost of insurance revenue foregone as part of the future DAC Tax relief. *Id.* at ¶¶ 13, 18, 23, 27, 29; Long Decl. at ¶ 13.    Moreover, these cost figures do not take into account attorneys' fees and expenses, other substantial administrative costs, or any relief awarded to Class Members for Part VIII and Part IX claims, which are uncapped.[10]

---

[10]    The fact that the cost of the Proposed Settlement to MetLife is somewhat less than its actual value to Class Members does not diminish the adequacy or substantial scale of the settlement benefits being offered to Class Members. As stated in *Duhaime v. John Hancock Mutual Life Insurance Co.*, 177 F.R.D. 54, 71 (D. Ma. 1997), "the value of a settlement should not be measured by its cost to the defendant, but by its benefit to the class. . . . What is important is the nature of relief offered to the class." *See also Prudential Life Ins. Co.*, 962 F. Supp. at 557 ("The value of the relief to the Class, which may be substantial, is what matters."). In this case, whether one looks at the cost to the Company or the value provided to Class Members, the Proposed Settlement has substantial benefits to the class and the overall relief is more than adequate for the Court to approve the Settlement Agreement.

20

AO 72A
Rev 8/82

44.    Moreover, under the Stipulation of Settlement (Docket #515), MetLife has specifically agreed that it will not "utilize any extraordinary or exceptional accounting or actuarial principles to recapture from Policy and Annuity owners the costs of, or deprive Class Members of, the benefits provided in this Settlement Agreement." Stipulation of Settlement at III.D. As a result, MetLife cannot recoup from its customers the costs of the Proposed Settlement.

## 8.    THE RELEASE

45.    In exchange for the benefits provided by the Settlement, the Settlement Agreement contains a release that generally bars Class Members from asserting in any other lawsuit or proceeding any of the claims that have been or could have been asserted in this action. The release and any exclusions therefrom was set forth in full in the Stipulation of Settlement (pp. 59-67), was reprinted in Appendix A to the individual notice mailed to Class Members, and is included in the Court's Final Order.

## 9.    THE RESPONSE OF STATE REGULATORS

46.    On August 18, 1999, the same day that the Court conditionally certified the class, tentatively approved the Settlement and authorized the dissemination of the class notice, MetLife forwarded a letter to every state Commissioner or Superintendent of Insurance announcing the Settlement and enclosing a summary of the settlement terms. On August 25, 1999, a copy of the class notice package was mailed to every State Commissioner or Superintendent of Insurance. Declaration of Sheldon L. Cohen, Docket #609 at ¶ 2. No state insurance regulators have objected to the Settlement. See id. ¶ 2.

47.    Regulators and/or attorneys general in several states independently initiated outreach programs and public service announcements directed to the current and former MetLife policyholders

AO 72A
Rev. 8/82

in their states. In particular, beginning on or about September 24, 1999, Rust Consulting mailed a brochure to all Massachusetts Class Members on behalf of the Massachusetts Attorney General's office, describing the Settlement and the decisions that Class Members were to make before the applicable deadlines. In addition, the Massachusetts Attorney General's office established a toll-free hotline for Massachusetts Class Members to call with questions about the Settlement and sponsored various public service announcements concerning the settlement. *Id.* ¶¶ 3-4.

48.    Similarly, beginning on October 13, 1999 and October 15, 1999, respectively, Rust Consulting mailed letters on behalf of the Insurance Commissioners in Florida and Washington to all MetLife Class Members in their respective states providing information about the Settlement and reminding Class Members of the decisions they were to make before the applicable deadlines (Docket #590 at ¶¶ 35-36). Each of these states also established a toll-free telephone hotline for Class Members to call with questions about the Settlement (Docket #609 at ¶¶ 3-5).

## 10.    THE FAIRNESS HEARING

49.    The Court held a hearing regarding the fairness, adequacy and reasonableness of the Settlement on December 2, 1999.

50.    The parties filed extensive memoranda, declarations, affidavits and reports with the Court prior to the Fairness Hearing. These submissions included numerous declarations and affidavits from fact and expert witnesses, as follows:

a.    Plaintiffs submitted the following declarations and affidavits: Declaration of Terry M. Long (Vice President and Principal of Lewis & Ellis, Inc.)(Docket #648); Affidavit of John E. Sexton (Dean of the New York University School of Law)(Docket #557); Joint Declaration of Melvyn I. Weiss and Howard A. Specter (founders of Milberg Weiss Bershad Hynes & Lerach, LLP

22

and Specter Specter Evans & Manogue, P.C. respectively)(Docket #556); Affidavit of David J. Manogue (Shareholder of Specter Specter Evans & Manogue, P.C.)(Docket #s 559 and 560); Supplemental Affidavit of David J. Manogue, Esq. (Docket #669); Joint Reply Declaration of Co-Lead Counsel (Docket #668); Affidavit of Kirk E. Chapman, Esq. (Associate, Milberg Weiss Bershad Hynes & Lerach, LLP)(Docket #558); Reply Affidavit of Kirk E. Chapman, Esq. (Docket #671); Declaration of Edward M. Fitzgerald, Esq. (Attorney, Bonnett, Fairbourn, Friedman & Balint, PC) (Docket #666); Declaration of Mindy A. Tessler, Esq. (Attorney)(Docket #670); and Declaration of Jeffrey R. Messinger (Attorney, Milberg Weiss Bershad Hynes & Lerach, LLP)(Docket #665).

        b.      Defendants submitted the following declarations and affidavits: Declaration of Stephen G. Hildenbrand (Principal of PricewaterhouseCoopers LLP)(Docket #s 649 and 672); Supplemental Declaration of Stephen G. Hildenbrand (Docket #688); Affidavit of Kenneth D. Merin (former New Jersey Commissioner of Insurance)(Docket #s 653 and 673); Affidavit of Felipe Botero (Assistant Vice-President in the Information Technologies ("IT") Department of MetLife)(Docket #650); Declaration of Sheldon L. Cohen (Vice President in the Government and Industrial Relations Department of MetLife) (Docket #609, the "Cohen Decl."); Affidavit of Mark D. Yochum (Professor and Director of Legal Research and Writing, Duquesne University Law School)(Docket #652); Affidavit of Jeffrey D. Dahl (Senior Vice President and National Director of Claims Administration at Rust Consulting, Inc.)(Docket #590); Supplemental Affidavit of Jeffrey D. Dahl (Docket #703); and Declaration of Sheila L. Birnbaum (Partner, Skadden Arps Slate Meagher & Flom LLP)(Docket #663). The Court also received in evidence a videotape prepared by Rust Consulting concerning the Notice mailing and the telephone banks (marked as Court Exhibit 1).

AO 72A

51.   The parties' submissions also responded to the approximately 201 objections filed by Class Members or their counsel regarding the Settlement.

52.   Plaintiffs' and defendants' counsel were heard in support of the Settlement at the December 2 hearing.  Objector Robin Gill, appearing *pro se*, and objector John J. Pentz, by his counsel David Miller, Esq., were heard in opposition to the Settlement at the December 2 hearing. Other objectors who appeared at the December 2 hearing either withdrew their objections or expressed no dissatisfaction with the Notice or the terms of the Settlement.[11]

## 11.   MODIFICATIONS TO THE SETTLEMENT

53.   In order to resolve the objections raised by several Class Members, and in response to discussions with the Massachusetts Attorney General and the Florida and New Jersey Insurance Commissioners, the parties have agreed to certain enhancements to the Settlement, as set forth more fully in the First Amendment to Stipulation of Settlement filed on December 13, 1999 (Docket #714), including the following: (a) any Class Member who receives a UL Death Benefit in Claim Evaluation and surrenders his or her UL policy within one year of the Implementation Date will receive in cash 90% of the cost to the Company of providing that UL Death Benefit; (b) the Claim Designation "Score

---

[11]   Six *pro se* objectors who simply misunderstood the terms of the Settlement have withdrawn their objections – Alba R. Albornoz, Morris Carmen, Linda M. DeCeunick, Robert F. Martini, Myron Schwartz, and Millie Stapleton. *See* Messinger Decl., Docket #665 at ¶¶ 3-4. In addition, the following objections and in certain cases, motions to intervene, filed by attorneys -- including Mr. Miller -- have been withdrawn, by a formal withdrawal and/or a representation made to the Court at or before the Fairness Hearing: R. Beatty/R. Kaufman/K. Shapiro (Behrend & Ernsberger, P.C.); L. Bolda *et al.* (Feldstein, Grinberg, Stein & McKee); G. Daihl (Bishop & Wilson); R. Husman (Phebus & Winklemann); A. Martin *et al.* (Thompson Hutsler Law Firm); J. Rabouin/D. Murray (Stamell & Schager, LLP); M. Repp *et al.* (Andra Todd Dreyfus, P.A. and Johnson, Blakely *et al.*); J. Pentz, Jr. (David Miller, Esq.); and J. Rodriguez *et al.* (Law Office of Herbert Hafif). Stephen Sabo also withdrew his objections at the Fairness Hearing.

of 0" has been eliminated: (c) Part VIII has been modified to provide that claims arising out of events occurring after the end of the class period (other than servicing and administration claims) shall be subject to Part VIII arbitration only upon the mutual consent of the parties: (d) MetLife will provide to the Claim Evaluator a list of Producers who have had on average more than one sales practice complaint for each year of their employment with the Company: (e) the DAC Tax relief will be implemented no later than March 31, 2000, even if the Settlement Implementation Date is later: (f) the definition of "Replacement" has been revised to clarify that it includes claims relating to the redirection of premium payments: (g) the Claim Evaluation Claim Form will contain language relating to the redirection of premium payments and the disclosure of Paid-Up Additions Rider ("PUAR") load charges: (h) the scoring for terminated policies in the Accelerated Payment Claim category has been revised: (i) the scoring and relief criteria in the Claim Review Process with respect to certain types of claims will require the Claim Evaluator to award certain automatic minimum scores and awards when particular evidence is presented: (j) it has been clarified that claims relating to PUAR load charges are specifically included in Claim Evaluation as either Performance or Savings and Retirement Claims and awarded appropriate relief: (k) certain Accelerated Payment claimants will have the ability to reinstate their policies under certain circumstances: (l) the deadline for the receipt of claim evaluation election forms has been extended to December 3, 1999. These modifications add to the benefits provided to Class Members under the original Settlement Agreement, which were described in the Notice to the Class. Thus, additional notice to the Class of these modifications is unnecessary. *See Harris v. Graddick*, 615 F. Supp. 239, 244 (M.D. Ala. 1985) (declining to require additional notice to class members of amendment to proposed settlement where "the interests of the plaintiff class [were] in no way impaired by the amendment").

## II.    JURISDICTION

54.    **Subject Matter Jurisdiction.** The existence of federal question jurisdiction as to the federal securities law claims alleged in plaintiffs' Amended Complaint authorizes the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claims. Section 1367 codifies "principles of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case.'" *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164-65 (1997) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)) (alteration in original). *See also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 305-06 (3d Cir. 1998) ("*Prudential II*"), *cert. denied*, 119 S. Ct. 890 (1999).[12]

55.    **Personal Jurisdiction.** This Court has personal jurisdiction over the named plaintiffs, who are parties to this class action law suit and have agreed to serve as representatives for the class. In addition, the Court has personal jurisdiction over Class Members because (as discussed below) proper notice has been provided to them and they have been given a chance to opt out or to be heard. *See Prudential II*, 148 F.3d at 306. *See also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12

---

[12]    The Court is aware that the plaintiffs also have alleged diversity jurisdiction pursuant to 28 U.S.C. § 1332 and that there is a split among the Courts of Appeals as to whether supplemental jurisdiction under 28 U.S.C. § 1367 may be used to avoid the need for each class member to satisfy the amount in controversy requirement. *See Meritcare Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 220-22 (3rd Cir. 1999) (discussing disagreement among the Courts of Appeals). However, because federal question jurisdiction exists in this case, the Court need not reach the issue of diversity jurisdiction.

(1985).

56.     The Court therefore finds that all Class Members who did not request exclusion from the Class by the applicable deadlines are subject to this Court's personal jurisdiction. *See Shutts*, 472 U.S. at 812-13.

## III.     NOTICE OF THE SETTLEMENT

57.     In its August 18, 1999 Order, the Court approved the Class Notice Package, the Publication Notice and the notice methodology set forth in the Settlement Agreement. The Court found that the Class Notice Package, together with the Publication Notice, was the "best practicable notice" and was "reasonably calculated, under the circumstances, to apprize Class Members of the pendency of the Action and of their right to object to or exclude themselves from the proposed settlement," and met all the applicable requirements of law, including but not limited to Federal Rule of Civil Procedure 23(c) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. August 18, 1999 Order, Docket #517, ¶ 7. Based on the findings set forth below, the Court affirms these conclusions.

58.     Between August 30, 1999 and October 2, 1999, a total of 6,278,709 copies of the Class Notice Package were mailed by first class mail to Class Members at their last-known addresses. Affidavit of Jeffrey Dahl (the "Dahl Aff.") ¶¶ 19-20. The mailing was accomplished by Rust Consulting, Inc. of Minneapolis, Minnesota ("Rust Consulting"), the third party administrator retained by MetLife with the approval of the Court. In addition, 139 sample Class Notice Packages were mailed to attorneys believed to represent Class Members in sales practices litigation pending against MetLife throughout the United States. *Id.* ¶ 21.

59.     Between October 18, 1999 and October 22, 1999, Class Notice Packages were mailed

27