to an additional 2,212 Class Members who had not been originally included in the database of Class Members assembled by MetLife. These Class Notice Packages contained an insert, approved by the Court, informing the Class Members that the Court had extended their deadline to request exclusion from the class, to elect Claim Evaluation and to object to the settlement to November 22, 1999. This extension applied only to those Class Members to whom Class Notice Packages were mailed after October 2, 1999. *Id.* ¶ 32.

60.    In total, as of October 22, 1999, Rust Consulting had mailed or caused to be mailed 6,280,921 Class Notice Packages to Class Members, at an estimated printing, assembling and mailing cost of approximately $8,500,000, paid by MetLife. *Id.* ¶ 33.

61.    Rust Consulting remailed all notice packages that were returned with a forwarding address, and attempted to locate updated addresses for those Class Members whose addresses had not been researched prior to the commencement of the class notice mailing. *Id.* ¶¶ 25-26.

62.    Under Rule 23, notice of a proposed settlement must be "reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Handschu v. Special Servs. Div.*, 787 F.2d 828, 832-33 (2d Cir. 1986) (quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)). In determining the adequacy of notice to the class, the court must analyze the sufficiency of the notice's (i) mode of dissemination, and (ii) content. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 526 (D.N.J. 1997) ("*Prudential I*"), *aff'd*, 148 F.3d 283 (3d Cir. 1998).

63.    The Class Notice Package included: (1) a cover letter from James Benson, President of Individual Business at MetLife; (2) the Notice of Class Action, Settlement and Fairness Hearing, which includes cross-references to frequently asked questions about the Settlement; (3) a Fact Sheet

28

on General Relief. Claim Evaluation and DAC Tax Relief. which describes in detail the various relief options available under the Settlement: (4) a Statement of Eligibility, containing basic information about the specific policy or annuity subject to the Settlement: (5) a Benefit Voucher evidencing the estimated benefits that will be provided automatically to all Class Members who do not choose Claim Evaluation; (6) a Claim Evaluation Election Form for Class Members to elect the Claim Evaluation process: and (7) a Designation Form for Class Members to change the payee and/or measuring life for the death benefits as provided under the Settlement. Dahl Aff. ¶ 7. The Benefit Voucher. Statement of Eligibility. Election Form and Designation Form were customized for each policy or annuity in the database that is subject to the Settlement. *Id.* ¶ 16.

64.    The Class Notice Package in this case is substantially similar to the notice package considered and approved by the Court of Appeals for this Circuit in *Prudential*, as well as in numerous other insurance sales practices settlements around the country. *See. e.g.. John Hancock*, 177 F.R.D. at 61-62. In *Prudential*, the Court of Appeals found that "the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented." *Prudential II*, 148 F.3d at 306. Similarly, the dissemination of the notice in this case – by first class mail. to Class Members at their last known address – more than satisfies the requirement established by Rule 23(c) of "individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2): *see. e.g.. In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 178-79 (5th Cir. 1979).

65.    The content of the Class Notice Package as previously approved by the Court easily survives the scrutiny of the objectors. Rule 23(e) notice is "designed only to be a summary of the litigation and the settlement." 2 *Newberg* § 8.32. at 8-109: *see also Grunin v. International House of*

*Pancakes*, 513 F.2d 114, 122 (8th Cir. 1974) ("Class members are not expected to rely upon the notices as a complete source of settlement information."), *cert. denied*, 423 U.S. 864 (1975). Under Rule 23(e), a notice of a proposed settlement is adequate if it informs Class Members (i) of the nature of the pending litigation, (ii) of the general terms of the settlement, (iii) that complete information is available from the court files, and (iv) that any class member may appear and be heard at the fairness hearing. *Prudential I*, 962 F. Supp. at 527 (citing 2 Newberg § 8.32, at 8-103)).

66.    The Class Notice Package, as approved by the Court in its August 18, 1999 Order, indisputably satisfies each of these requirements, and also provides substantial additional information of assistance to Class Members, in as plain and concise a manner as possible for such a complex settlement.

67.    On October 1, 1999, the Publication Notice was published in the national editions of *The New York Times* and *the Wall Street Journal*, in *USA Today*, *The Pittsburgh Post-Gazette* and in the newspaper with the highest circulation in each of the 50 states and in the District of Columbia and Puerto Rico. Dahl Aff. ¶¶ 37-38. In addition, the Publication Notice was posted on MetLife's and Co-Lead Counsel's internet websites (Representation by counsel for Class Plaintiffs at the Fairness Hearing).

68.    The Publication Notice included, among other things, (i) the case caption; (ii) a description of the Settlement Class; (iii) a brief description of the proposed Settlement; (iv) identification of counsel for the Class; (v) the date and time of the Fairness Hearing; (vi) information about appearing at the Fairness Hearing; (vii) information about and the deadline for filing objections to the Settlement; (viii) information about and the deadline for filing requests for exclusion; (ix) the consequences of requesting exclusion; (x) the consequences of remaining in the Settlement Class; (xi)

30

a description of MetLife's responsibility for plaintiffs' attorneys' fees and expenses; (xii) a description of the preliminary injunction issued by the Court; and (xiii) the procedure for obtaining additional information. including a toll-free telephone number regarding how they could obtain an individual Class Notice Package.

69.    The Court finds that the Publication Notice is a clear and comprehensive summary of the proposed Settlement that gave the Class Members detailed and accurate information about the lawsuit, the terms of the Settlement and the options available to Class Members.

70.    At the parties' direction. Rust Consulting also established The MetLife Class Action Information Center, including among other things. a toll-free telephone bank to respond to Class Member inquiries.  The toll-free number was prominently displayed on each page of the Class Notice Package. and included in the Publication Notice. and on MetLife's and Co-Lead Counsel's websites. Rust Consulting staffed the toll-free telephone bank with specially trained personnel to respond to particular questions from Class Members concerning the litigation. the Settlement, and the various forms of relief available. Dahl Aff. ¶¶ 40-59. Rust Consulting personnel, together with MetLife and its counsel and Co-Lead Counsel. trained the more than one thousand telephone representatives hired by Rust Consulting to use a telephone script of approximately 250 questions and answers that was carefully prepared by counsel for both parties to answer questions from Class Members. *Id.* ¶¶ 44-52. Services also were provided for callers speaking Spanish or many other languages. *Id.* ¶¶ 46. 58-59. In addition. a separate TDD/TYY line was established for the hearing impaired. *Id.* ¶ 9.

71.    Beginning August 30. 1999. Rust Consulting telephone representatives working in several shifts were available from 7:00 a.m. to 7:00 p.m. Central Time to respond to inquiries from Class Members and others through the toll-free number. As of the close of business on November 9.

1999, the telephone bank had responded to 566,370 calls from Class Members and MetLife sales representatives. Dahl Supp. Aff. ¶ 8. Class Counsel were also available to answer calls to the telephone bank, and as of November 15, 1999 had responded to approximately 75,000 calls. Reply Affidavit of Kirk E. Chapman. Docket #671 at ¶ 4.

72.    Various objections have been made as to the adequacy of the disclosures in the Class Notice Package, and the timing of the deadlines for electing Claim Evaluation, requesting exclusion from the class and filing objections. Some objectors argue that the Class Notice Package is on the one hand too complicated and confusing for the typical class member, while others claim that it omits additional facts and analyses that are alleged to be necessary in order for Class Members to make an informed decision as to how to proceed. These conflicting positions demonstrate that the Class Notice Package strikes a proper balance and provides sufficient information in as clear and concise a manner as possible given the nature of the proposed settlement. *See Prudential I*, 962 F. Supp. at 532 (stating that "there must be a careful balance between arriving at an appropriate Class Notice length and ensuring sufficient information" and finding that the *Prudential* Class Notice "struck an appropriate balance between brevity and descriptiveness").

73.    Objector Pentz, who withdrew his objections after the Fairness Hearing, claimed that the Notice is "confusing, convoluted and cluttered," and contains "an 'information overload' that has the effect, if not the design, of discouraging attempts to decipher it." Pentz Objections. Docket #570 at 3-4. The Court does not agree. The Class Notice Package provides all necessary information to Class Members -- without burdening them with unnecessary and cumbersome details -- which is more than sufficient to alert Class Members to the nature and pendency of the action and the proposed settlement, and to allow Class Members to make an informed decision as to whether to opt out, object

32

to the proposed Settlement or elect claim evaluation. The Court notes in this regard that several experts have opined that the Class Notice Package is clear and comprehensive and adequately conveys the necessary information in as user-friendly a manner as possible given the complexities of the proposed Settlement.[13]

74.    Objections regarding any alleged confusion and lack of clarity of the Notice are easily answered by the fact that every page of the Notice provides the toll-free number for the MetLife Class Action Information Center established by Rust Consulting to respond to calls from Class Members who did not understand the Notice or had any questions about how to proceed. This service was free to Class Members and, as described above, the telephone operators were carefully trained to follow a detailed script prepared by counsel for both parties and to access information about each class member's policy or annuity from the database provided to Rust Consulting by MetLife. In addition, plaintiffs' counsel was available to talk to any class member who wanted to speak to an attorney, at no cost to the class member.

75.    Mr. Pentz's suggestion that all relevant information about the settlement be made available on the internet is impractical, and not nearly as effective as the establishment of the Class Action Information Center to answer questions of Class Members. The Court finds that, as in the *Prudential* settlement, this Settlement "establishes an unparalleled outreach program to ensure that

---

[13]    Mr. Merin has concluded that the Notice "compares favorably with the kind of notice typically provided in connection with insurance sales practices class action litigation or regulatory settlements." Merin Aff., Docket #673 at ¶ 10. Similarly, Prof. Yochum has stated that the Notice is "as clear and readable as possible," Docket #652 at ¶ 14, and that the Notice "frequently, repetitively and successfully use[s] language summarizing the critical content for the Class Member. These summaries have the useful effect of guiding the reader through the package and reinforcing critical information." ¶ 14(b). The Court has reviewed the Affidavit of Josiah Fisk submitted by counsel for Objector Pentz and has not found it to be persuasive.

AO 72A

class members are adequately informed about the Proposed Settlement." *Prudential I.* 962 F. Supp. at 492.

76.    The Court further finds that Class Members were provided an adequate period of time to review their materials and make the necessary decisions as to how to proceed. The deadline in the Notice for receiving election forms, opt out requests or objections was November 2, 1999. Those few Class Members who received notice less than thirty days prior to the original November 2, 1999 deadline were given a further extension of time to respond, until November 22, 1999. The parties have agreed, however, to accept as timely any opt out requests or objections received by November 9, 1999, and any election forms received by December 3, 1999. In addition, the parties have agreed to extend all other deadlines applicable under the Settlement for seven days. Moreover, the Claim Evaluator has the discretion to accept election forms received after December 3, 1999.

77.    Based upon a review of the individual and publication notice materials and the affidavits submitted concerning these materials, the notice methodology and dissemination, and the operation of the MetLife Class Action Information Center, the Court concludes that the best practicable notice was given to the Class in this case and that the notice (i) was reasonably calculated, under the circumstances, to apprize Class Members of the pendency of the Action and of their right to object to or exclude themselves from the proposed settlement, (ii) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to receive notice, and (iii) meets all applicable requirements of law, including but not limited to, Federal Rule of Civil Procedure 23(c) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## IV.    CLASS CERTIFICATION

78.    In its August 18, 1999 Order, the Court preliminarily certified the Class for settlement

34

purposes. Plaintiffs argue that final certification of this action for settlement purposes is both appropriate and warranted. The Court makes the following findings in support of its decision to grant final certification of the Class for settlement purposes, which are intended to supplement and finalize the certification findings made by this Court in its August 18, 1999 Order.

79.     In order to certify this settlement class, the Court must find that the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a) – numerosity, commonality, typicality and adequacy of representation – and, in addition, is maintainable under Rule 23(b)(3). The Rule 23(b)(3) requirements are that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

80.     In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 618 (1997), the Supreme Court expressly acknowledged that cases may be certified for settlement purposes only. In doing so, the Supreme Court stated that the "dominant concern" on which a court should focus in deciding whether to certify a class is "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 621. The Court further held that, when the question of certification is raised in connection with a class action settlement, "settlement is relevant to a class certification." *id.* at 619, and must be considered as "a factor in the calculus." *Id.* at 622.

81.     **Numerosity.** There is no question that the class proposed in this case -- the owners of more than seven million life insurance policies and annuities issued by MetLife from January 1, 1982 through December 31, 1997 -- meets the numerosity requirement. *See, e.g., Welch v. Board of Directors of Wildwood Golf Club*, 146 F.R.D. 131 (W.D. Pa. 1993) (the Third Circuit has generally held that numerosity requirement is met if proposed class exceeds 100 members); *cf. Prudential II*,

35

148 F.3d at 309.

82.    **Commonality.** The commonality requirement is satisfied "if the named plaintiffs share at least one question of fact or law in common with the grievances of the prospective class." *Baby Neal v. Carey*, 43 F.3d 48, 56 (3d Cir. 1994). *See also Prudential II*, 148 F.3d at 310. Because this requirement may be satisfied by the presence of a single common issue, it is "easily met." *Prudential II*, 148 F.3d at 310; *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992).

83.    In this case, the Amended Complaint (¶ 258) alleges over seventeen factual and legal issues common to the Class regarding MetLife's practices and course of conduct in the design and sale of its insurance policies and annuities. The commonality requirement is thus satisfied. *See Prudential I*, 962 F. Supp. at 511 ("[w]here many purchasers allegedly have been defrauded over time by similar misrepresentations, or by a common scheme to which alleged nondisclosures related, courts have found that the purchasers have a common interest in determining whether the defendant's course of conduct is actionable"), *aff'd in relevant part*, 148 F.3d 283 (3d Cir. 1998), *cert. denied*, 119 S. Ct. 890 (1999).

84.    **Typicality.** Typicality is satisfied when the named plaintiff's claims "'arise[] from the same . . . practice or course of conduct'" as those of the class generally, and the claims are based "'on the same legal theory.'" *Baby Neal*, 43 F.3d at 58 (citation omitted). Even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.* The "threshold for establishing typicality is low." *Seidman v. American Mobile Sys., Inc.*, 157 F.R.D. 354, 360 (E.D. Pa. 1994).

85.    The typicality requirement is satisfied in this case because the named plaintiffs allege claims that arise from the same alleged course of conduct that purportedly harmed all Class Members

36

and are based on the same or substantially similar legal theories, including securities fraud, negligence, common law fraud, breach of contract, negligent misrepresentation, unjust enrichment and unilateral and mutual mistake. *See Prudential I*, 962 F. Supp. at 518 (typicality requirement met in case alleging replacement, vanishing premium and investment plan claims, because defendant's alleged scheme to defraud was "prominent guiding thread through all of the plaintiffs' claims"). *Duhaime*, 177 F.R.D. at 63 (typicality requirement met where "named plaintiffs were subjected to the same deceptive sales techniques allegedly used by [defendant] against other class members").

86.    **Adequacy of Representation.** Rule 23(a)'s adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625 (citations omitted). According to the Court of Appeals for this Circuit, "adequate representation depends on two factors (a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Hoxworth*, 980 F.2d at 923 (quoting *Weiss*, 745 F.2d at 811; internal quotation marks omitted); *see also Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011 (1975). In this case, both of these requirements are clearly met.

87.    There are no conflicts of interest or other antagonisms between the proposed representative plaintiffs Amodeo, Biggs, Garrett, Oddi, Williams, Hess, Leach and Rankin and other Class Members that would impair the representative plaintiffs' incentive to prosecute vigorously all aspects of the claims against MetLife. All policy and annuity owners who believe they were deceived have the same shared interest and incentive in establishing the alleged fraud and to maximize the overall recovery. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("so long as all class members are united in asserting a common right, such as achieving the maximum

37

possible recovery for the class. the class interests are not antagonistic for representation purposes")
(citation omitted).

88.    In addition. it is clear that the settlement benefits the Class and does not involve any
sacrifice of the interests of some Class Members for those of others. No conflict exists between Class
Members in this litigation such as the conflict identified by the Supreme Court in *Amchem* between
currently injured class members. whose interest was in generous immediate payments, and "exposure-
only" class members. whose interest was in ensuring an ample fund for future claims. *See Amchem*.
512 U.S. at 612. In the present case. all the Class Members are presently identifiable and were sent
proper notice.  Each Class Member here has or had a policy or annuity, had knowledge of the
circumstances of his or her purchase. and the administration or servicing of his or her policy or
annuity. and was able to easily obtain information to evaluate any claims he or she might have.
Accordingly. unlike the exposure-only class members in *Amchem*, each Class Member in this case was
able to make an informed decision as to whether to participate in the Settlement and as to the options
available under the Settlement.

89.    Plaintiffs' counsel have provided fair and vigorous representation for the Class.
Melvyn I. Weiss of Co-Lead Counsel Milberg Weiss Bershad Hynes & Lerach LLP and Howard A.
Specter of Co-Lead Counsel Specter Specter Evans & Manogue, P.C. are class action attorneys
experienced in the litigation and settlement of large, nationwide class actions. *See, e.g.. Duhamie.* i77
F.R.D. at 63: *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 835-36 (W.D. Pa. 1995). Co-Lead
Counsel and the other firms representing the Class in this case are clearly qualified to conduct this
action. In addition. plaintiffs' counsel have vigorously conducted this litigation in the more than four
years since it began. Only after plaintiffs' counsel had completed truly extensive discovery. including

38

the review of more than 8 million documents produced by MetLife, and defended the representative plaintiffs' claims against a series of dispositive motions, including motions for summary judgment, did the parties begin any settlement negotiations. The settlement negotiations in this case were long, protracted, and hard fought, taking nearly ten months to complete and nearly breaking down on several occasion. It was only after plaintiffs' counsel satisfied themselves that they had procured the best possible settlement for the Class that an agreement was reached. *See* Weiss/Specter Decl., at section III.C.2. The Class thus had more than adequate legal representation.

90. **Predominance of Common Questions.** The predominance requirement in Rule 23(b)(3) focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem*, 521 U.S. at 623. Rule 23(b)(3) "requires a *predominance* of common questions, not a *unanimity* of them." *Hanrahan v. Britt*, 174 F.R.D. 356, 365 (E.D. Pa. 1997) (emphasis added; citation omitted). This requirement is thus "not defeated by slight differences in class members' positions" *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975), *cert. denied*, 429 U.S. 816 (1976); *accord Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987); *Prudential I*, 962 F. Supp. at 510-11; *Elkins v. Equitable Life Ins. Co. of Iowa*, No. CivA96-296-Civ-T-178, 1998 WL 133741, at *15 (M.D. Fla. Jan. 27, 1998).

91. The predominance inquiry tests whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 594. Even a few common issues may satisfy the predominance requirement if resolution of those issues "will so advance the litigation that they may fairly be said to predominate." *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir.), *cert. denied*, 479 U.S. 852 (1986). The "presence of individual questions does not per se rule out a finding of predominance." *Prudential II*, 148 F.3d at 315. In *Prudential II*, which involved insurance

39

sales practices claims similar to claims alleged on behalf of the Class by the representative plaintiffs here. the Court of Appeals affirmed the district court's finding of predominance. stating that the *Prudential* case fell into the category of cases alleging consumer or securities fraud in which the "predominance test is readily met." *Prudential II*, 148 F.3d at 314.

92.    As noted above. in their Amended Complaint (¶ 258), plaintiffs allege over seventeen factual and legal issues common to the Class. These allegations include the issues of whether MetLife failed to disclose material information relating to replacement, the nature of the policy, policy dividends, interest credits and values, whether MetLife breached its policy or annuity contracts or violated applicable regulations or statutes by the uniform practices alleged; whether MetLife developed a common scheme for fraudulently inducing Class Members to purchase life insurance or annuities, and whether MetLife implemented any such scheme by training sales representatives to use uniformly deceptive sales or other techniques and by providing sales representatives with uniformly deceptive materials and policy illustrations to be used with prospective or existing policy or annuity holders. Resolution of these issues will clearly "so advance the litigation that they may fairly be said to predominate." *In re School Asbestos Litig.*, 789 F.2d at 1010; *accord Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188. 1197 (6th Cir. 1988).

93.    The Court recognizes that differing state laws might have applied to certain of plaintiffs' claims had this case been tried. Of course, plaintiffs' claims under federal law involve a common body of law. Even as to state law claims, however, the possible existence of such variations does not defeat a finding of predominance. In *Prudential II*, the Court of Appeals held that any variations in state law did not defeat the district court's finding that common issues predominated over individual ones because the potential variations "could be overcome at trial by grouping similar state

40

laws together and applying them as a unit." *Prudential II.* 148 F.3d at 315.

94.    Finally, the Court notes that, to the extent any variations in state law would suggest that the case might not be readily manageable as a class action, that is an issue that the Supreme Court has specifically stated a court need *not* consider in determining whether a class should be certified for settlement purposes. *Amchem.* 521 U.S. at 620.

95.    The Court therefore finds that common issues of law and fact predominate.

96.    **Superiority.** Matters pertinent to a finding of superiority include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

97.    **Interests of Individual Members** – The interest of Class Members in conducting separate lawsuits does not require denial of class certification when a large number of Class Members' claims would be so small that Class Members would be deterred from bringing actions on their own. *See, e.g., Duhaime,* 177 F.R.D. at 64; *Prudential I,* 962 F. Supp. at 523. As the Supreme Court recently emphasized:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem,* 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir.

41

AO 72A
Rev 8 82)

1997)). In addition, because Class Members who wished to pursue their own lawsuits could have requested exclusion, no Class Member was precluded from conducting a separate lawsuit if he or she so desired. Moreover, the interest of Class Members in pursuing their individual claims is actually advanced by the Settlement proposed in this case, because the Settlement itself provides an efficient and cost-free means for Class Members to present individual claims and obtain individualized determinations as to whether their claims merit relief and, if so, at what level.

98.    **Pending Proceedings.** Many of the pending class actions are consolidated before this Court and support certification of the settlement Class. Of the related class actions against MetLife pending in other courts, only four of those cases actually have certified classes: *Cope v. Metropolitan Life Insurance Co.,* 696 N.E.2d 1001 (Ohio 1998); *Holt v. Metropolitan Life Insurance Co.,* 474 S.E.2d 196 (W. Va. 1996); *Green v. Metropolitan Life Insurance Co.,* No., 969547 (Cal. Super. Ct.); and *Rodriguez v. Metropolitan Life Insurance Co.,* No. 235846 (Cal. Super. Ct.). The plaintiffs in *Cope, Holt,* and *Green* did not oppose the Settlement in this case. The plaintiffs in *Rodriguez* have withdrawn their objections to the Settlement. The number of individual lawsuits pending against MetLife relating to the sales practices at issue in this case is very small in comparison to the large number of Class Members who will benefit from this Settlement. Nonetheless, the number of individual actions is great enough in absolute terms to create a significant strain on the courts. These factors weigh heavily in favor of granting class certification. *See Prudential I,* 962 F. Supp. at 523-24; *Prudential II,* 148 F.2d at 316.

99.    **Concentration of Litigation in This Forum.** Because this case will be settled (not tried), the desirability of concentrating the litigation in a particular forum is consistent with certification. Moreover, judicial efficiency is served by the concentration of this litigation in one

42

forum. This Court is an appropriate forum for the resolution of policy and annuity owner claims against MetLife. The MDL Panel centralized all related federal actions in this Court for pre-trial purposes. Given the consolidation of sales practices litigation against MetLife in this Court, it is clear that this Court is a desirable forum for this Class Settlement.

100.    **Manageability.** Given the Supreme Court's holding that a court certifying a settlement class need not decide whether or not a class action would be manageable at trial, *Amchem*, 521 U.S. at 620, this Court need not consider the issue of manageability. It is nevertheless worth noting that the proposed Settlement resolves any manageability problems that would have been present by creating a mechanism for reviewing the individual claims of Class Members. The Settlement Agreement thus permits what may be a sizable number of Class Members to achieve individual relief without burdening the judicial system and thus "result[s] in a large saving of judicial resources." *See Margaret Hall Found., Inc. v. Atlantic Fin. Management, Inc.*, No. 82-2534-T, 1987 U.S. Dist. LEXIS 7528, at *15 (D. Mass. July 30, 1987).

101.    Based on the above, the Court grants final certification of the settlement class in this case under Fed. R. Civ. P. 23(b)(3).

## V.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

102.    Fed. R. Civ. P. 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court." This rule has been interpreted to require a court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." 2 H. Newberg & A. Conte, *Newberg on Class Actions* § 11.41, at 11-88 to 11-89 (3d ed. 1992). A court

43

"cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995).

103.    The Court of Appeals for this Circuit has adopted a nine-factor test to assist district courts in determining whether a proposed class action settlement is fair, reasonable and adequate under Rule 23(e). These factors are: (i) the complexity and duration of the litigation; (ii) the reaction of the class to the settlement; (iii) the stage of the proceedings at which the settlement was negotiated; (iv) the risks plaintiffs face in establishing liability; (v) the risks plaintiffs face in establishing damages; (vi) the risks of maintaining a class action; (vii) the ability of the defendants to withstand a greater judgment; (viii) the reasonableness of the settlement in light of the best possible recovery; and (ix) the reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975); *accord, e.g., General Motors*, 55 F.3d at 785.

104.    Analysis of these factors "requires this Court to conduct both 'a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation' and 'a procedural inquiry into the negotiation process.'" *Prudential I*, 962 F. Supp. at 534 (quoting *General Motors*, 55 F.3d at 796). In addition, this Court can take into account the compromise inherent in the settlement process, in which plaintiffs and MetLife each made substantial concessions in order to reach a fair settlement that provides the maximum benefits to both parties in light of the considerable risks in pursuing this action to a trial. *See General Motors*, 55 F.3d at 806 ("after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution"). As stated in *Prudential I*, "in assessing the fairness of a proposed settlement, the Court should be careful not to substitute its image of an ideal settlement for the compromising parties' views . . . ." 962 F. Supp. at 534.

44

105.  This Court recognizes that it can establish a "range of reasonableness" for the settlement and should "guard against demanding too large a settlement based on its view of the merits of the litigation." *Id.; see also In re Novacare Sec. Litig.*, Civil Action No. 94-5808, 1995 U.S. Dist. LEXIS 15049, at *19 (E.D. Pa. Oct. 13, 1995) (a settlement "must be fair, adequate, and reasonable but not necessarily identical with the results that might be reached at trial"). In short, "the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." *Prudential I*, 962 F. Supp. at 534.[14]

106.  The Court also acknowledges that there is a presumption that the settlement is fair, reasonable and adequate when, as in this case, it is the product of arms-length negotiations conducted by experienced and highly capable counsel who are fully familiar with all aspects of class action litigation. *General Motors*, 55 F.3d at 785. *See also Ratner v. Bennett*, No. 92-4701, 1996 U.S. Dist. LEXIS 6259, at *12 (E.D. Pa. May 8, 1996); *Haas v. Pittsburgh Nat'l Bank*, 495 F. Supp. 815, 818 (W.D. Pa. 1980) (denying plaintiffs' motion to reform settlement agreement, reasoning that settlement provisions "resulted from good faith and arms length negotiations between experienced counsel").

---

[14]    As a result, objections as to the particular type of relief provided or the desire of certain Class Members for an alternative form of General Relief, such as a straight cash payment, a policy or annuity credit, reduced cost of insurance charges or an amount of reduced paid-up insurance are unfounded. The Court finds that the fact that different or perhaps even more generous settlement terms can be proposed in a hypothetical context affords no basis to reject a settlement achieved through arduous, arms-length negotiations between the parties that is both fair and adequate in its proposed relief. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 806 (3d Cir.), *cert. denied*, 116 S. Ct. 88 (1995); *see also Prudential I*, 962 F. Supp. at 534-35 (under Rule 23(e) a court "'may only approve or disapprove the settlement as presented. It may not rewrite the settlement as requested by numerous objectors.'") (quoting *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993)).

45

This Court finds that the terms of the settlement were negotiated at arms-length over a ten-month period by highly experienced class action counsel on both sides, following several years of voluminous, hard fought and probing discovery and motion practice, and that both sides had a full appreciation of the risks of continuing this action to trial.[15]

107.    Thus, the Court "should be slow to substitute its own judgment for that of experienced counsel who . . . have arrived at a settlement after extensive litigation and a careful assessment of the risks and potential rewards involved in a full trial and appeal." *Walsh v. Great Atl. & Pac. Tea Co.,* 96 F.R.D. 632, 642-43 (D.N.J.), *aff'd,* 726 F.2d 956 (3d Cir. 1983).

108.    After thorough consideration of the arguments of Co-Lead Counsel for the Class and counsel for MetLife, as well as the arguments asserted in the objections before the Court, both in written submissions and orally at the Fairness Hearing on December 2, 1999, this Court concludes that the proposed settlement amply satisfies each of the *Girsh* factors, and is entirely fair, reasonable and adequate to Class Members.

109.    **The Complexity and Duration of the Litigation.** The Court finds that further litigation of this case without a settlement would be lengthy, complex and highly expensive for both parties. In *Prudential II,* a case involving similar allegations of fraud, misrepresentation and breach

---

[15]    The extensive discovery conducted by plaintiffs led to the assertion of additional as well as broader claims in the Amended Complaint. Certain objectors argued that the assertion of expanded claims at the time of settlement is improper. This objection was unfounded. In *Prudential II,* the Court of Appeals for this Circuit allowed the inclusion of even unpled claims in the class settlement, because it "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.'" *Prudential II,* 148 F.3d at 326 n.82 (citation omitted); *see also Weinberger v. Kendrick,* 698 F.2d 61, 77 (2d Cir. 1982) ("there is no rigid rule against the addition of new claims shortly before submission of a proposed settlement provided that proper notice and opportunity for opting out are afforded") (citing cases).

46

of contract in connection with the sale of insurance products, the Court of Appeals found that "the trial of th[at] class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect of such a massive undertaking clearly counsels in favor of settlement." *Prudential II*, 148 F.3d at 318. *See also Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588 (3d Cir. ) (affirming approval of settlement in light of plaintiffs' "risks of establishing liability and damages" and "the complexity of the case"), *cert. denied*, 120 S. Ct. 178 (U.S. 1999); *Eichenholtz v. Brennan*, 52 F.3d 478, 488-89 (3d Cir. 1995) (finding that complexity, probable duration of suit and expense supported approval of partial settlement).

110.    Given the indisputable legal and factual complexity of this case, a trial on the merits would be complicated, tremendously expensive and lengthy. The proposed settlement, by comparison, will provide Class Members with automatic and immediate relief for those not electing Claim Evaluation, as well as a simple and expedient Claim Evaluation process designed to compensate claimants for their alleged harm, all without the expense and substantial delay of further litigation. As such, "the anticipated complexity, costs, and time necessary to try this case greatly substantiate the fairness of the settlement." *Prudential I*, 962 F. Supp. at 536.

111.    **The Reaction of the Class to the Settlement.** It is appropriate for the Court to evaluate the number of requests for exclusion and objections as a general barometer of Class Members' reaction to the proposed settlement. *See Prudential II*, 148 F.3d at 318. Based on this analysis, it is clear that there has been minimal opposition to the proposed settlement.

112.    The Court notes that of the approximately 7.3 million policies and annuities covered by the proposed settlement (which includes over 6.2 million Class Members), as of November 9, 1999, the MetLife Class Action Information Center had received requests for exclusion from the owners of

47

only 24,363 policies and annuities. *See* Dahl Supp. Aff. Docket #703. at ¶ 11. This represents (approximately) only one-third of one percent of the total number of policies and annuities in the class. The Court further notes that a number of the policy or annuity owners who excluded themselves from the class did so not because they thought the settlement was unfair or inadequate, but because they did not feel that they were misled and did not want to participate in any action against MetLife. *See* Birnbaum Decl. at Exhibit B.

113.    The Court's docket reflects that there were approximately 200 objections to the proposed settlement filed by individuals *pro se* or represented by counsel.    This represents substantially less than one-hundredth of one percent of the total number of Class Members covered by the proposed settlement (0.003 %). Thus. the number of Class Members who have disapproved of the proposed settlement or requested exclusion from the class is truly insignificant.

114.    Moreover. it is significant that not one objection to the proposed settlement was filed by any state insurance regulator. all of whom were immediately notified of the terms of the proposed settlement by MetLife. *See* Cohen Decl. at ¶ 2. This overwhelmingly favorable reaction of Class Members and regulators strongly suggests that the proposed settlement should be approved. *See Prudential II.* 148 F.3d at 318. *See also Bell Atlantic Corp. v. Bolger.* 2 F.3d 1304, 1313-14 n.15 (3d Cir. 1993) (small proportion of objectors constituted tacit consent to settlement); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115. 118-19 (3d Cir. 1990) (29 objections in 281 member class "strongly favors settlement"); *Shlensky v. Dorsey.* 574 F.2d 131. 148 (3d Cir. 1978) (upholding settlement where the "overwhelming majority of . . . shareholders have not objected to the settlement").

115.    In addition. a large number of the putative "objections" submitted by individual Class Members (approximately 35) address complaints as to alleged misrepresentations of MetLife sales

representatives relating to their particular policy or annuity, and have nothing to do with the fairness of the proposed settlement itself. The specific complaints of these objectors can be addressed in Claim Evaluation.

116.    **The Stage of the Proceedings at Which the Settlement was Negotiated.** The Court of Appeals for this Circuit requires district courts to consider "the degree of case development that class counsel have accomplished prior to settlement" to insure that "counsel had an adequate appreciation of the merits of the case before negotiating." *General Motors*, 55 F.3d at 813. Indeed, "[t]he Court must ensure that the case did not settle in the absence of sustained effort by class representatives sufficient to protect the interests of the class." *Prudential I*, 962 F. Supp. at 534 (citing *General Motors*, 55 F.3d at 806). In order to make this determination, the Court has considered the extent and adequacy of discovery conducted by the parties prior to reaching the proposed settlement. *See Prudential II*, 148 F.3d at 319 ("To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."); *see also Lazy Oil Co. v. Witco*, No. 94-110, 1997 U.S. Dist. LEXIS 21397, at *53 (W.D. Pa. Dec. 31, 1997) ("Since the Settlement was reached after the completion of extensive discovery, Plaintiffs' counsel were fully aware of the strengths and weaknesses of their case and could make an informed decision as to the fairness and reasonableness of the Settlement."), *aff'd*, 166 F.3d 581 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 178 (1999).

117.    Over four years of intensive discovery and substantial motion practice took place before the parties entered into the settlement negotiations that resulted in the proposed settlement submitted to this Court. As discussed above, during discovery, over 8.8 million pages of documents and over 18,000 pieces of multimedia materials were produced by MetLife and reviewed by counsel for the

49

AO 72A

parties (Docket #588 at 19-20). Depositions of the named class plaintiffs in the Consolidated Class Action Complaint, as well as several high level MetLife employees have been taken, on the issues of, among other things, product marketing, training of sales representatives, dividend and interest-crediting calculations, and customer complaints. In addition, numerous transcripts from depositions of other MetLife employees in related lawsuits have been made available to plaintiffs' counsel for review (Docket #588 at note 5). Moreover, MetLife made a motion to dismiss and several motions for summary judgment. These motions involved dozens of submissions by each party over a several month period and resulted in some claims being sustained while others were dismissed. As a result, this Court concludes that by the time settlement negotiations began, "the parties had reached a stage in the proceedings where they adequately understood the merits of the putative class action and could fairly, safely, and appropriately decide to settle the action." *Prudential I*, 962 F. Supp. at 538 (citing *Walsh*, 96 F.R.D. at 654); *see also General Motors*, 55 F. 3d at 813.

118.  **Plaintiffs Face Considerable Risks in Establishing Liability.**  The Court must balance the risks of establishing liability against the benefits afforded to the members of the class, and the immediacy and certainty of a substantial recovery against the risks of continuing litigation. *Girsh*, 521 F.2d at 157. The Court notes a number of the potential legal and factual obstacles that plaintiffs would have faced if this litigation had proceeded to a trial on the merits, including (i) statute of limitations defenses as to many of the claims, (ii) the need to prove reasonable reliance in the face of language in the plaintiffs' policies and illustrations that may contradict the alleged misrepresentations, (iii) the applicability of the parol evidence rule to plaintiffs' breach of contract claims, (iv) the asserted lack of fiduciary duty as a matter of law in most states, and (v) the contention that an unjust enrichment claim fails because valid written contracts bind the parties. *See* Defendants' Mem. of Law,

50

in Support of Class Action Settlement. Docket #588 at 54-70.[16]

119.    Indeed, Co-Lead Counsel describe a number of additional arguments that MetLife would undoubtedly make at trial, and that pose risks for plaintiffs, such as (i) that the illustrations provided to Class Members by MetLife complied with then-existing state insurance laws and regulations, (ii) that MetLife's actuarial evidence demonstrates that it believed its dividend scales and interest-crediting rates to be sustainable, (iii) that MetLife's replacement monitoring systems were among the most advanced in the industry, and (iv) that Class Members could not have reasonably failed to understand that they were buying life insurance in light of the physical examinations they underwent as well as documentary disclosure. *See* Weiss/Specter Decl. ¶ 140.

120.    As a result of the proposed settlement, none of these potential obstacles to plaintiffs' success on the merits, nor many others, will be litigated, which argues in favor of the settlement's approval.

121.    **Plaintiffs Face Considerable Risk in Establishing Damages.** Even if plaintiffs were to succeed in establishing liability, risks still remain in proving damages and the causal link between MetLife's improper conduct and such damages.

122.    Compounding these risks is the need to rely on accounting, economic and actuarial

---

[16]    The Court notes that MetLife has successfully defended itself in sales practices litigation throughout the country, and has won many cases on dispositive motions based on the Company's significant defenses to plaintiffs' allegations. For examples of recent rulings in favor of MetLife from different jurisdictions, *see Maples v. MetLife Gen. Ins. Agency, Inc.*, Index No. 603960/98 (New York County Sup. Ct. Sept. 13, 1999) (dismissing claims for, *inter alia*, lack of reasonable reliance); *McCall v. Metropolitan Life Ins. Co.*, Civ. No. 509-1996 (Pa. C. P. Ct. Venango County. Sept. 1, 1999) (dismissing fiduciary duty, breach of contract and bad faith claims); *Schulz v. Metropolitan Life Ins. Co.*, No. H-99-1180 (S.D. Tex. Aug. 19, 1999) (dismissing claims as time barred); *LaPoint v. Metropolitan Life Ins. Co.*, No. 99-1271 (W.D. La. Aug. 25, 1999) (same).

51

experts at trial in order to establish damages, as well as the complex issues of liability described above. As noted by the district court in *Prudential I*, "a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And divergent expert testimony leads inevitably to a battle of the experts." *Prudential I*, 962 F. Supp. at 539 (citing *United States v. 412.93 Acres of Land*, 455 F.2d 1242, 1247 (3d Cir. 1972)). Settlement of this litigation eliminates any risk of a jury determination that the Class Members are entitled to little or no recovery.

123.    **The Risks of Attempting to Maintain a Class Action Through Trial.** If the settlement were not approved and plaintiffs were to attempt to litigate their claims, plaintiffs would face the risk that this Court would not certify a litigation class, or that any certified class would ultimately be decertified because of manageability or other concerns in maintaining a class action. *Prudential I*, 962 F. Supp. at 540. *See also Link v. Mercedes-Benz of N. Am., Inc.*, 550 F.2d 860, 864 (3d Cir. 1977) ("[T]he district court is free to decertify the class for a proper reason, and unmanageability would be such a circumstance.") (citing 3B Moore's Federal Practice ¶ 23.01[11-4], ¶ 23.65; 7B Charles Alan Wright et al., Federal Prac. & Proc. § 1785 (2d ed. 1986)).

124.    In approving this class settlement, the Court need not evaluate the manageability of litigating the claims of a nationwide class. *See Amchem*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."). However, it is clear that if the claims at issue were litigated as a class action, MetLife no doubt would argue that intractable problems of manageability might arise, which could mandate the denial of class certification. *See, e.g., In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 223-25 (W.D. Mich. 1998) (citing manageability concerns in denying class certification of insurance sales

52

practices claims).

125.    Thus, the possibility that class certification would be denied, or that any class would ultimately be decertified if this case were to be litigated to trial, weighs in favor of approving the proposed settlement, with its certain outcome. *Prudential I*, 962 F. Supp. at 540 ("[T]he risks of decertification weigh in favor of approving the [p]roposed Settlement.").

126.    **The Ability of the Defendants to Withstand a Greater Judgment.**  The total economic relief to be conferred upon the class is conservatively valued at over $1.6 billion, exclusive of the unlimited relief available through Part VIII and Part IX of Claim Evaluation and exclusive of attorneys' fees. At the same time, the cost of the proposed settlement to MetLife exceeds $900 million. It is fair to assume that a greater judgment could have a direct impact upon MetLife's credit ratings and the dividends it pays on participating policies. Thus, a greater judgment could result in policyholders, both Class Members and non-class members, suffering reductions in their policy dividends and reductions in future cash values, which reductions would be magnified by the compounding effect on future cash values. The detrimental impact that a larger judgment could have on MetLife and its policyholders weighs in favor of the Settlement Agreement. *See Prudential II,* 148 F.3d at 322. In addition, this factor is of minor significance when one considers that the Settlement gives Class Members the opportunity to recover full compensatory relief without responsibility to pay attorneys' fees. This fact, combined with the rarity of an award of punitive damages in cases of this sort, shows that this factor does not present a meaningful concern in the context of this Settlement.

127.    **The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation.**  The benefits of the proposed settlement having a value of at least $1.645 billion to Class Members and the legal and factual difficulties that plaintiffs would face if the

53

case were to continue to be litigated have already been described in detail. In discussing these factors, the court noted in *Prudential I* that "[t]o estimate the best possible recovery for plaintiffs in the aggregate would be exceedingly speculative, and unnecessary here." *Prudential I*, 962 F. Supp. at 540. Rather, the Court has considered that individual class member relief under the Settlement Agreement will be more expedient, and of a greater amount, than might be achieved at trial. *See Prudential II*, 148 F.3d at 322 ("In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'") (quoting *General Motors*, 55 F.3d at 806).

128.    The same analysis and conclusion apply here as in *Prudential*. It is clear that an individual's recovery under the proposed settlement exceeds the value of the best possible recovery at trial discounted by the risks of litigation. Under the Settlement Agreement, all Class Members are entitled to General Relief without any need to prove any injury. Moreover, each injured class member who elects Claim Evaluation will have an opportunity to receive complete relief corresponding to the strength of his or her claim, and, in certain cases, additional relief, all without any cost to Class Members in pursuing these claims.

129.    As in *Prudential*, a score of 3 is designed to give full rescissionary or compensatory relief. Even for a score of 2, which generally receives 50% of the award that would be available for a score of 3, the lack of any litigation costs or fees demonstrates that this award is equal to the value of what a successful plaintiff would likely obtain after trial. *Prudential I*, 962 F. Supp. at 541.

130.    Furthermore, a claimant in the Claim Evaluation process would not be subject to certain defenses, such as statute of limitations and the parol evidence rule, which MetLife has waived

54

for purposes of the settlement only. The prospects of relief at trial, however, would be uncertain given the significant obstacles to establishing liability noted above. In addition, final resolution through trial, even if successful, would take many years, unlike the ability to receive prompt relief provided by this settlement. Accordingly, as in *Prudential*, "the creative mix" of MetLife's Claim Evaluation options along with the General Relief "creates a settlement that benefits class members greatly more than litigation would." *See Prudential I*, 962 F. Supp. at 541.

131.    For all the foregoing reasons, the Court finds that final certification of the class for settlement purposes is warranted and appropriate and that the Settlement, as amended, is fair, reasonable and adequate and should therefore be approved.


DONETTA W. AMBROSE
UNITED STATES DISTRICT JUDGE

December _28_, 1999

cc:    Liaison counsel of record

55