# REPORT OF
# MARKET CONDUCT EXAMINATION
## OF THE

### METROPOLITAN LIFE
### INSURANCE COMPANY
### New York, New York

AS OF

December 27, 1993

## COMMONWEALTH OF PENNSYLVANIA



# INSURANCE DEPARTMENT
# MARKET CONDUCT DIVISION
### Issued: February 11, 1994

M9371

M129779220004

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.



COMMONWEALTH OF PENNSYLVANIA
INSURANCE DEPARTMENT
HARRISBURG

THE COMMISSIONER

March 30, 1994

SUBJECT:    Pennsylvania Insurance Department
            Market Conduct Examination Report
            Metropolitan Life Insurance Company

TO:         All Commissioners, Superintendents and Directors
            State Insurance Departments

FROM:       Cynthia M. Maleski      *Cynthia M. Maleski*
            Insurance Commissioner

On behalf of the Pennsylvania Insurance Department I am
pleased to enclose a report of market conduct on Metropolitan Life
Insurance Company.  The report details unlawful insurance practices
involving policy churning, use of illustrations, retirement
planning and unapproved contract usage.  As a result, Met Life has
been ordered to pay a $1.5 million civil penalty, make refunds,
restore policyholders to prior coverages, obtain form approvals,
change operating policies and procedures and terminate sales
representatives.

The market conduct examination also prompted
Pennsylvania Governor Robert P. Casey and I to propose legislative
reforms which will cap agent commissions on replacement
transactions, regulate the structure and use of sales
illustrations, require insurers to maintain records and make
reports on sales transactions, and regulate financial planning
activities by agents and brokers.  These reforms were announced on
March 11, 1994.

Pennsylvania is pleased to share the results of its
recent work on the Met Life problem.  If you would like copies of
our legislation please contact my office.



- M9371

M129779220005

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

METROPOLITAN LIFE INSURANCE COMPANY

TABLE OF CONTENTS

ORDER

| | | |
|------|-------------------------------|-----|
| I. | Introduction | 1 |
| II. | Scope of Examination | 4 |
| III. | Company History | 6 |
| IV. | Pennsylvania Operations | 7 |
| V. | Background | 8 |
| VI. | Consumer Commplaints | 12 |
| VII. | Replacement Activity | 15 |
| VIII. | Sales and Advertising | 59 |
| IX. | Retirement Plan Promotions | 85 |
| X. | Forms Filing and Approval | 155 |
| XI. | MetLife Corporate Interviews | 161 |
| XII. | Recommendations | 164 |
| XIII. | Company Response | 166 |

M9371

M129779220006

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

BEFORE THE INSURANCE COMMISSIONER
OF THE
COMMONWEALTH OF PENNSYLVANIA

ORDER

AND NOW, this 17th day of April, 1993, in accordance with Section 905(c) of the Pennsylvania Insurance Department Act, Act of May 17, 1921, P.L. 789 as amended, 40 P.S. §323.5, I hereby designate Thomas S. Buzby, Deputy Insurance Commissioner, to consider and review all documents relating to the market conduct examination of any company and person who is the subject of a market conduct examination and to have all powers set forth in said statute including the power to enter an Order based on the review of said documents. This designation of authority shall continue in effect until otherwise terminated by a later Order of the Insurance Commissioner.

Cynthia M. Maleski
Insurance Commissioner

B0317-4

M9371

CONFIDENTIAL

Notice: Producers and Use Subject to Case Management and Protective Order in MDL No. 1091, United States Dist. Ct.

M12977922007

Metropolitan Life Insurance Company
Market Conduct Examination as of the
close of business on December 27, 1993.

Docket No.
MC94-02-11

### ORDER

A market conduct examination of Metropolitan Life
Insurance Company's ("Referred to herein as Respondent")
Pennsylvania business was conducted in accordance with
Article IX of the Insurance Department Act, 40 P.S. 323.1
et seq, for the period January 1, 1990 through December
31, 1992. The market conduct Examination Report disclosed
exceptions to acceptable company operations and practices.
Based on the documentation and information submitted by
the Respondent, the Department is satisfied that the
Respondent has taken corrective measures pursuant to the
recommendations of the Examination Report.

It is hereby ordered as follows:

1.  The attached Examination Report will be adopted
and filed as an official record of this Department.  All
findings and conclusions resulting from the review of the
examination Report and related documents are contained in
the attached Examination Report.

2.  Respondent shall comply with Pennsylvania statutes
and regulations.

M9371

M129779220008

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

3. Respondent shall comply with all recommendations contained in the attached Report.

4. Respondent shall notify and offer restitution, consistent with the Examination Report's Recommendations to all policyholders determined to be covered by the Examination reporting period. Proof of such restitution offered and an accounting of acceptances and declinations shall be provided to the Department. Respondent shall implement the restitution plans referenced in the Report within sixty (60) days from the date of execution of this Order.

5. Respondent shall ensure similarly situated policyholders outside of the Examination reporting period who come forward are accorded restitution consistent with the Report's Recommendations.

6. Respondent shall pay one million five hundred thousand dollars ($1,500,000) to the Commonwealth of Pennsylvania in settlement of all exceptions identified in the Report. Payment of this matter shall be made by check payable to the Commonwealth of Pennsylvania. Payment should be directed to Sharon L. Harbert, Administrative Assistant, Bureau of Enforcement, 1321 Strawberry Square, Harrisburg, PA 17120. Payment must be made no later than thirty (30) days after the date of this Order.

M9371

M129779220009

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

7.  Respondent shall file affidavits executed by each of its directors stating under oath that they have received a copy of the adopted Report and related orders within thirty (30) days of the date of this Order.

The Department, pursuant to Section 905(b)(1) of the Insurance Department Act, will continue to hold the content of the Examination Report as private and confidential information for a period of thirty (30) days from the date of this Order.

BY:    Insurance Department
       Commonwealth of Pennsylvania

_____ / February 11, 1994
Thomas E. Buffy, Deputy Insurance Commissioner
Office of Consumer Services and Enforcement

M9371

M129779220010

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

## I.  INTRODUCTION

Pursuant to the Insurance Commissioner's authority
under Sections 903 and 904 of the Insurance Department
Act, the market conduct examination was announced by the
Insurance Department on July 22, 1993.  The examination
commenced on August 18, 1993 and continued through
December 27, 1993.  In accordance with insurance statutes,
no information or commentary concerning the examination
has been disclosed or made public from the time the
examination was announced and the examination report was
accepted by the insurer and became a public document.

The market conduct examination report generally notes
only those items to which exception is taken.  An
exception is any instance that does not comply with a
statute or regulation.  Exceptions contained in the report
may result in imposition of penalties.  Practices,
procedures, or files which were reviewed by the Department
are not necessarily referred to in this report if no
improprieties were indicated.

Through the course of the examination, the Department
provided Company officials with status memoranda
correlating specific policy numbers with citations to each
section of law violated.  Additional information was
requested, and interviews were conducted, to clarify or

- 1 -

- M9371

M129779220011

Notice: Production and Use Subject to Case Management and Protective
Order in MDL No. 1091, United States Dist. Ct.

document apparent exceptions.  An exit conference was
conducted with Company officials to discuss the alleged
exceptions identified during the examination and to
provide written summaries.

The courtesy and cooperation extended by the officers
and employees of the Company during the course of this
examination is hereby acknowledged.

- 2 -

M9371

M129779220012

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

The undersigned participated in this examination and preparation of this report.


Chester A. Derk Jr.; AIE, HIA
Market Conduct Division Chief


Victor DiCicco
Market Conduct Examiner


Agnes W. Donahoo, CBIW
Market Conduct Examiner


Ralph W. Burnham
Market Conduct Examiner


Lawrence C. Gould
Market Conduct Examiner


Robert A. Cak
Market Conduct Examiner


Rodney E. Curry
Market Conduct Examiner


Robert A. Downie
Market Conduct Examiner

- 3 -

M9371

M129779220013

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct."

## II.  SCOPE OF EXAMINATION

A targeted market conduct examination has been performed on Metropolitan Life Insurance Company, hereinafter referred to as "MetLife", at their Johnstown, Pennsylvania office and through interviews conducted with various consumers, insurance agents and MetLife employees located principally within a six (6) county Western Pennsylvania Region, and a Report thereon is submitted as follows:

The examination covered the period January 1, 1990 through December 31, 1992, unless otherwise noted.  The purpose of the examination was to review MetLife's management, marketing and sales practices and procedures in Western Pennsylvania.  Western Pennsylvania was defined as the counties of Armstrong, Allegheny, Beaver, Butler, Westmoreland, and Washington.  However, some areas of review were expanded beyond Western Pennsylvania when initial findings indicated the activity appeared to occur throughout Pennsylvania.

In order to obtain a thorough perspective on MetLife's marketing practices, the examination was conducted in three (3) phases:

- 4 -

M9371

M129779220014

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

(1) MetLife's Johnstown, Pennsylvania office was
    visited by examiners to review copies of
    requested applications and consumer complaint
    files, as well as securing additional data
    relative to the examination.

(2) Interviews were conducted with various consumers,
    agents and MetLife employees in Western
    Pennsylvania concerning MetLife marketing
    practices and procedures.

(3) Interviews were conducted with principal MetLife
    corporate officials having management or
    supervisory responsibility for the insurer's
    marketing and sales operations.

The examination included, but was not limited to, the
following areas of MetLife operations:
- Sales and Advertising
- Consumer Complaints
- Replacement
- Forms Filing and Approval

- 5 -

M9371

M129779220015

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

### III.  COMPANY HISTORY

Metropolitan Life Insurance Company was incorporated under the laws of New York, and commenced business in Pennsylvania under a Certificate of Authority issued in January 1869.

Metropolitan Life Insurance Company is the second largest life insurance company in the United States. MetLife's origins can be traced to the National Union Life and Limb Insurance Company, a firm originally chartered in 1863.  In 1865, the company changed its name to National Life and Travelers' Insurance Company, and underwent two reorganizations within a period of two years, in 1866 splitting its life and casualty lines into separate companies, National Life Insurance Company and National Travelers' Insurance Company.  On March 24, 1868, National Travelers' Insurance Company was reorganized as Metropolitan Life Insurance Company.

In January 1915, Metropolitan transformed from a stock company to a mutual company, in effect becoming owned by its policyholders.  MetLife's Certificate of Authority was amended as of January 30, 1990 by adding Separate Account (Variable Life) authority.

- 6 -

MILLER CONFIDENTIAL I

M9371

M129779220016

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

## IV.   PENNSYLVANIA OPERATIONS

Metropolitan Life Insurance Company's Certificate of Authority to write business in the Commonwealth of Pennsylvania was last issued on April 1, 1993.

MetLife's major lines of Pennsylvania business (premium volume), as of their 1992 annual statement consist of, Life Insurance $360,780,453, Annuities $48,321,061, and Group Insurance $11,231,782.

MetLife's market approach is handled primarily through a captive agency system.  As of August 6, 1993, MetLife had 3,170 licensed agents in Pennsylvania.

MetLife is licensed in the District of Columbia and all states.  MetLife is also licensed in all provinces of Canada, Puerto Rico and the U.S. Virgin Islands.

- 7 -

MIDWEST
CONFIDENTIAL

M9371

M129779220017

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. CL.

## V.  BACKGROUND

In March 1993, a former sales representative of
MetLife provided the Enforcement Bureau of this Department
with information alleging that Gary P. Antonino, MetLife
Regional Vice President in the Pittsburgh, Pennsylvania
area was causing and condoning marketing efforts which
obtained the replacement of existing MetLife policies of
insurance and annuities through misrepresentation.  It was
also alleged that MetLife representatives were engaging in
the deceptive marketing of insurance as retirement and
savings plans.  A field investigation was commenced to
review the allegations.

The Unfair Insurance Practices Act, No. 205, Section
5(a)(1)(vi), defines "Unfair Methods of Competition" and
"Unfair or Deceptive Acts or Practices" as "... Making,
publishing, issuing or circulating any estimate,
illustration, circular, statement, sales presentation,
omission comparison which:" "... Is a misrepresentation
for the purpose of inducing or tending to induce the
lapse, forfeiture, exchange, conversion or surrender of
any insurance policy".

Further, Section 637 of The Insurance Department Act
states "No agent or solicitor of any insurance company,
association, or exchange, and no insurance broker, shall

~ 8 ~

M9371

M129779220018

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

issue, circulate or use, or cause or permit to be issued, circulate or used, any written or oral statement or circular misrepresenting the terms of any policy issued or to be issued by such company, association, or exchange, or make an estimate, with intent to deceive, of the future dividends payable under such policy."

Replacement is defined under Pennsylvania insurance regulations as a transaction in which new life insurance or a new annuity is to be purchased, and it is known or should be known to the proposing agent, broker, or proposing insurer if there is no agent, that by reason of the transaction, existing life insurance or an annuity has been or is to be one of the following:

- Lapsed, forfeited, surrendered, assigned to replacing insurer or otherwise terminated.
- Converted to reduced paid-up insurance, continued as extended term insurance or otherwise reduced in value by the use of non-forfeiture benefits, dividend cash values or other policy cash values.
- Amended so as to effect either a reduction in benefits or in the term for which coverage would otherwise remain in force or for which benefits would be paid.
- Reissued with a reduction in cash value.
- Pledged as collateral or subjected to borrowing, whether in a single loan or under a schedule of

- 9 -

M9371

M129779220019

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

borrowing over a period of time for amounts in the
aggregate exceeding 25% of the loan value set forth in
the policy.

When an insurer engages in the replacement of its own
insurance policies and annuities, both the agent and the
insurer have a clear understanding of replacement
activity. This would be particularly so, in instances
where the same agent has solicited both policies.

The Insurance Department's initial inquiry was met by
the counter allegation of Gary P. Antonino, MetLife
Regional Vice President that the complaints were
groundless and were caused by the actions of unscrupulous
competitors and disgruntled former MetLife sales
representatives. However, as the investigation
progressed, more information about the allegations was
uncovered or brought to the Department's attention and
several other states announced investigations of
wrongdoing in their jurisdictions.

Subsequently, a series of televised investigative
reports were aired by a local Pittsburgh television
station, portraying the allegations and prompting a number
of consumers to come forward and recount their
unsatisfactory insurance transactions with MetLife sales
representatives.

- 10 -

M9371

M129779220020

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

The rapid evolution of the case, the increase in allegations and the prospect of the allegations reaching beyond the Western Pennsylvania geographic area caused the Department to elevate its inquiry to a targeted market conduct examination.

MDL 1091

CONFIDENTIAL

- 11 -

M9371

M129779220021

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct."

## VI.  CONSUMER COMPLAINTS

The Unfair Insurance Practices Act, No. 205, Section 5(a)(11), requires a complete record of all complaints received be maintained for four (4) years. This record shall indicate the total number of complaints, their classification by line of insurance, the nature of each complaint, the disposition of these complaints and the time it took to process each complaint.

MetLife was requested to provide their consumer complaint data for 1990, 1991 and 1992, for a six (6) county Western Pennsylvania Region. A review was made of this data in order to identify and assess the nature of the complaints. A synopsis of this data is as follows:

1990 Complaint Total = 354
1990 Applications = 18,
                                Replacement      - 125
                                Misrepresentation - 144
                                                    269

1991 Complaint total = 385
1991 Applications = 5,085
                                Replacement      - 170
                                Misrepresentation - 142
                                                    312

1992 Complaint Total = 331
1992 Applications = 11,351
                                Replacement      - 130
                                Misrepresentation - 111
                                                    241

(All figures are total universe, as reflected on computer runs generated by Metropolitan Life Insurance Company for a six (6) county Western Pennsylvania Region)

Based upon the above data, a ratio analysis was made and the results are as follows:

- 12 -

M9371

M129779220022

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

```
1990 - Replacement complaints received  - 125
       Total complaints received        -  354
                                           35.31%

       Misrepresentation complaints     - 144
       Total complaints received        -  354
                                           40.67%

       Replacement & Misrepresentation  - 269
       Total complaints received        -  354
                                           75.98%

1991 - Replacement complaints received  - 170
       Total complaints received        -  385
                                           44.15%

       Misrepresentation complaints     - 142
       Total complaints received        -  385
                                           36.88%

       Replacement & Misrepresentation  - 312
       Total complaints received        -  385
                                           81.03%

1992 - Replacement complaints received  - 130
       Total complaints received        -  331
                                           39.27%

       Misrepresentation complaints     - 111
       Total complaints received        -  331
                                           33.53%

       Replacement & Misrepresentation  - 241
       Total complaints received        -  331
                                           72.80%
```

(All figures are total universe, as reflected on computer
runs generated by Metropolitan Life Insurance Company for
a six (6) county Western Pennsylvania Region)

The ratio analysis above illustrates that replacement
and alleged misrepresentation accounted for the majority
of complaints against MetLife in Western Pennsylvania.

An analysis of gross consumer complaints received by
the various offices of the Pennsylvania Insurance

- 13 -

M9371

M129779220023

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

Department involving MetLife had a corroborating effect on
the data provided by MetLife.  Taken together, the data
from both sources suggested that MetLife complaint
activity is distributed throughout Pennsylvania.

The Unfair Insurance Practices Act, No. 205, Section
5(a)(1)(vi), defines "Unfair Methods of Competition" and
"Unfair or Deceptive Acts or Practices" as "...  Making,
publishing, issuing or circulating any estimate,
illustration, circular, statement, sales presentation,
omission comparison which:" "... is a misrepresentation
for the purpose of inducing or tending to induce the
lapse, forfeiture, exchange, conversion or surrender of
any insurance policy".

Further, Section 637 of The Insurance Department Act
states "No agent or solicitor of any insurance company,
association, or exchange, and no insurance broker, shall
issue circulate, or use, or cause or permit to be issued,
circulated or used any written or oral statement or
circular misrepresenting the terms of any policy issued or
to be issued by such company, association, or exchange, or
make an estimate, with intent to deceive, of the future
dividends payable under such policy."

- 14 -

M9371

M129779220024

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. CL.

## VII.  REPLACEMENT ACTIVITY

### - METLIFE POLICIES AND PROCEDURES -

MetLife recognizes that the replacement of existing
life insurance and annuities is generally to the
disadvantage of consumers, and that only a low level
creation of new business through the use of cash values in
existing MetLife policies of insurance and annuities
should be allowed.  MetLife has established written
procedures and controls which were intended to limit
internal replacement and funding of new business to
fifteen percent (15%) of total new business.

MetLife distributes to its operational, administrative
support and marketing staff, various written documents
setting forth the policies and procedures of the company.
Each member of its sales force is provided with a "Manual
of Instructions for Account Representatives," setting
forth the rules and practices under which MetLife
representatives are to conduct the business of insurance.

Contained within the manual is a definition of
replacement, stating "Replacement occurs when a life
insurance policy is either completely surrendered or
allowed to lapse, is changed and the premium is reduced,
or is depleted by a loan, and a new policy on the same
insured is written within a specified period."  This

- 15 -

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

definition of replacement does not address replacement caused through the taking of dividend cash values from existing policies to fund new policies, and does not address replacement transactions involving annuities.

Also, contained within the manual is MetLife's position as regards "Replacement Insurance and Piggybacking".

- "Replacements must be 1035 Exchanges, where applicable, and this should be disclosed on the application for the new policy."
- "All state-required replacement forms must be completed."
- "When a replacement occurs, first-year commission payments are based on the new policy premium minus the old policy premium."
- "The impact of the policy replacement and appropriate alternatives should be fully explained to policyholders."
- "This should not be a systematic selling approach."
- "The policyholder should be informed of all ramifications."
- "We will take appropriate disciplinary action against all MetLife personnel involved in these situations. Depending on the facts of each individual situation, disciplinary action may include warnings, retraining or termination of employment."

- 16 -

M9371

M129779220026

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

Written instructions to MetLife's sales force state "... the replacement of existing life or health insurance or annuities, in this or any other company, is generally to the disadvantage of the policyowner, and Company representatives are, of course, forbidden to solicit insurance for replacement of existing insurance in all cases where it is unlawful and, even if lawful, where it is contrary to the best interests of the policyowner."

MetLife outlines for its representatives the potential disadvantages of replacement, and instructs that "In all cases involving replacement of life insurance, the replacement questions in the application must be answered in the affirmative" and "Metropolitan's rules concerning replacement are formulated to make available full and clear information on which an applicant for insurance can make a decision in his or her own best interest, to reduce the opportunity for misrepresentation and incomplete comparisons in replacement situations, and to preclude unfair methods of competition and unfair practices."

While defining "Piggybacking" as the use of existing premium/policy values to finance new business, MetLife instructs its sales force that "an important objective of the Company is to maintain a low level of "piggybacking" activity." Furthermore, "It is Metropolitan's position that this practice generally is not in the best interests

- 17 -

M9371

M129779220027

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

of our policyowners, our Field Representatives or the Company."

In justifying this position, MetLife cautions their sales force that "Piggybacking techniques usually do not produce quality business. Further, the Company increases the amount of life insurance business on the books but receives little or no new funds while incurring increased sales and administrative expenses associated with the issue of new business." It was further stated, "New policies financed by existing equity are generally sold to people who cannot afford them, frequently resulting in early lapse, leaving the policyholder with little or no insurance."

Having stated a philosophy generally opposing replacement of insurance and piggybacking, MetLife implemented corresponding internal control procedures. The MetLife sales representative's manual sets forth the following:

MetLife explains to their sales force the "Financed by In force Policies (FIP) System," a system designed to "help identify those situations where as a method of selling, a Field Representative uses existing policy values in a systematic fashion to finance new business."

- 18 -

M9371

M129779220028

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

- The FIP ratio is a measurement of the number of new Personal Life Insurance (PLI) policies placed during the preceding twelve (12) months that were apparently financed by the use of equity or premium from an existing policy, compared to the total number of new PLI policies placed.

- MetLife bases the matching of policies through its monitoring of transactions in the same household involving "a cash surrender or loan, or a dividend withdrawal exceeding $100.00 from an existing policy to pay a new policy."

- For policies issued prior to January 1, 1988 a match occurs when an existing policy shows a loan, dividend withdrawal or cash surrender to a new policy within that period six (6) months before or six (6) months after the new policy's issue date.

- While MetLife had not instructed its agent force that the use of dividends constituted a replacement activity, the FIP system was designed to detect the taking of dividend cash values. MetLife's instructions did not address the use of funds from annuities as FIP match transactions.

- For PLI policies issued during the examination period detection of replacement activity through the FIP system should have been made by MetLife when dividends or loans were taken from an existing policy to pay for a new policy six (6) months before or six (6) months

- 19 -

M9371

M129779220029

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

after issue of the new policy; and when surrender was
made of the existing policy to pay the new policy six
(6) months before or twelve (12) months after the
issue of the new policy.  It did not appear
replacement would have been detected had issued PLI
policies been funded through the surrender of
annuities.

- MetLife warns their sales force that "Representatives
who utilize piggybacking techniques as a method of
selling or deliberately use techniques to avoid a
match under the FIP reporting system will be subject
to disciplinary action, which may include
termination."

The MetLife manager's manual sets forth the following:
- "An important part of your managerial responsibility
is to control 'piggybacking,' i.e., the use of
existing premium/policy values to finance new
business.  In recognition of this responsibility,
significant weight is given to the office's Financed
by In Force Policies (FIP) ratio in determining
additional income you might earn under the Annual
Profitability Compensation Arrangement."

- "Therefore, each month you should review the policy
transactions included on the FIP Detailed Report and
discuss the transactions with the representative to be
certain that he or she fully understands the Company's

- 20 -

M9371

M129779220030

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

position on piggybacking.  In addition, you should
also review new applications, and if you find that the
present policy values are being used to finance the
new policy, you may interview the policyholder before
submitting the application.  In this way you can
ascertain that the policyholder understands the
implications of the proposed transaction."

- "Also, you should be alert to certain techniques that
may be employed to circumvent the present FIP matching
system. These include changes to a "cheaper" plan of
insurance, or reducing the face amount, thereby
generating a change allowance that can support the new
policy; the deliberate use of the Automatic Premium
Loan Option; use of different or "bogus" addresses, or
delaying transactions over the six-month matching
period."

- "Generally, documentation of a representative's
"piggybacking" activity would require a letter from
the policyholder indicating that the representative
had recommended using existing policy values/premium
to finance new business.  Any recommendation to
terminate a field representative should be processed
through the regional office, and the Law Department
should be consulted."

- MetLife managers were to be provided FIP reports on a
monthly basis for each representative. Also, a
summary report on each representative for the calendar

- 21 -

M9371

M129779220031

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

year (January through December), and a report for each
representative focusing on the past twelve (12) months
of activity, regardless of office assignment, was to
be provided to MetLife managers.

The Replacement Business Rules of MetLife provide
that "a new Personal Life Insurance policy or Annuity
contract will be considered to be a replacement policy"
if a premium-paying Personal Life Insurance policy (other
than Industrial) or Annuity Contract, previously issued on
the same life, (i) lapses, (ii) is surrendered for the
cash value, or (iii) the annualized premium is reduced by
policy change, within six months before or six months
after the date the new application is written."

MetLife's complaint handling manual specifically
states that, as regards misrepresentation and replacement
cases:

"... occasionally a policyholder will complain to the
Company that the terms of the policy deliberately were
misrepresented, or not clearly or fully explained at
the time of sale.  These complaints will, at times,
include situations where cash, loan or dividend values
of existing insurance have been utilized to pay
premiums on a new policy without full comprehension on
the part of the policyholder of the nature of the
transaction."

- 22 -

M9371

M129779220032

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

- "... misrepresentation occurs when a Company
representative provides incorrect, false or misleading
information which was a material factor in the
insured's decision to purchase the contract, and upon
which the insured has relied to his/her detriment.
This includes actions taken by a representative on
behalf of a policyholder without the policyholder's
knowledge, or deception by the representative in
his/her handling of a transaction."

- "... replacement is any transaction involving the
purchase of new insurance in which, as part of the
transaction, one or more of the following conditions
occur:

  - The lapse or cash surrender of an existing
  insurance.

  - The substantial borrowing against the loan value
  of existing insurance whether as a single loan or
  under a schedule of borrowing over a period of
  time.

  - The conversion of an existing policy to one of its
  non-forfeiture provisions.

  - The conversion of existing insurance which reduces
  the amount of protection or results in a lower
  cash value plan."

In view of MetLife's above positions, clearly stated
in both the sales representative's and sales manager's

- 23 -

M9371

M129779220033

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

manuals, MetLife had established procedures intended to
monitor and control the replacement of PLI policies.
However, such procedures did not monitor replacement
involving use of annuities.

In order to determine the MetLife sales force's
understanding of replacement and piggybacking, interviews
of MetLife's managers and sales representatives were
conducted. The following results were noted as reflected
on the Field Force Interviews Chart.    (See page 26)

- One hundred percent (100%) of those interviewed
  believed they were allowed by MetLife to produce
  up to fifteen percent (15%) of their new business
  through use of cash values in existing MetLife
  policies of insurance.
- One hundred percent (100%) believed that the surrender
  of an existing policy to pay a new policy constituted
  replacement.
- Seventy-three percent (73%) believed the taking of
  dividends from an existing policy to pay a new policy
  does not constitute replacement.
- Twenty seven percent (27%) believed the taking of a
  loan against an existing policy to pay a new policy
  does not constitute replacement.
- Ninety-five percent (95%) were aware of, and
  understood, the purpose of the FIP Reporting System.

- 24 -

M9371

M129779220034

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

- One hundred percent (100%) believed first year commission on new policies was reduced by MetLife when existing insurance was surrendered to pay for a new policy.

- Thirty-six percent (36%) admitted awareness of MetLife sales force practices in delaying surrender of existing insurance to generate higher first year commissions, or having engaged in such practices.

- It was first determined from members of MetLife's sales force that the FIP System monitoring was allegedly suspended by MetLife during the period 1989 to 1990 in the Pittsburgh Region in order to assess the impact upon agent productivity.

Subsequent interview of Robert J. Crimmins, Executive Vice President Personal Insurance, MetLife, confirmed that the MetLife sales force in four (4) regional areas, including Pittsburgh, had been allowed to use existing policy dividends without restriction in the creation of new business from 1989 through 1990. The modification of MetLife's controls as to FIP monitoring had not extended to transactions involving the taking of loans or surrender of existing policy cash values.

- 25 -

M9371

M129779220035

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

**Field Force Interviews**
**93 – M02 – 008**

Subject: Internal Replacement of Insurance & Marketing Plans

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Replacement re Last Application** | Y | N | N | N | | N | N | N | N | Y | | N | N | N | N | N | | N | 27% |
| Dividend Use is Replacement | Y | Y | Y | N | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 73% |
| Loan Use is Replacement | Y | Y | Y | | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 100% |
| Surrender is Replacement | Y | Y | Y | | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 100% |
| **PFP Controls** | | | | | | | | | | | | | | | | | | | |
| Understands Match Rate | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 95% |
| Aware of Office Match Rate | Y | N | N | Y | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 77% |
| Aware of Personal Match Rate | N | N | N | Y | | Y | Y | N | Y | Y | | N | N | N | N | N | | Y | 77% |
| **Aware of RWB Rule** | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | Y | Y | Y | Y | | Y | 100% |
| Admits Circumventing RWB | N | N | N | Y | | N | N | Y | N | Y | | N | N | N | N | N | | N | 36% |
| **Retirement & Savings Plans** | | | | | | | | | | | | | | | | | | | |
| Received 50/50 Plan Instruction | Y | Y | N | Y | | Y | N | Y | Y | Y | | Y | N | Y | Y | Y | | Y | 100% |
| Instructed to Market Deceptively | N | N | N | Y | | N | N | Y | N | Y | | N | N | N | N | N | | N | 23% |
| Marketed 50/50 Plan | N | Y | Y | N | | Y | N | Y | Y | Y | | Y | N | Y | Y | N | | Y | 41% |
| Marketed Deceptively | N | N | N | N | | N | N | N | N | N | | N | N | N | N | N | | N | 100% |

Remarks:    Replacement questions were posed in the context of the individual's understanding of replacement from the perspective of the company when creating new policies from cash values combined in existing policies of insurance and annuities.

Note: Individual responses to questions regarding the 50/50 Plan showed that training was generally perceived as having the emphasis on presentation of the 50/50 Plan as a retirement/savings plan and not insurance.

– 26 –

CONFIDENTIAL

MDL

M9371

M129779220036

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

In order to test the above observations for internally funded policies, a sampling was made of one hundred seventeen (117) applications by questionnaire, resulting in fifty-five (55) consumer responses. Applications of consumers responding showed fifty-two (52) instances of replacement denial. The following results were noted as illustrated in the charts appearing on pages 29 - 31.

- In twenty-seven (27) instances (52%), replacement by surrender of existing policies was proposed by MetLife agents and agreed to by insured's at the time of application.

- In fifteen (15) instances (29%) replacement by the taking of "dividends" from existing policies was proposed and agreed to at the time of application.

- In ten (10) instances (19%), either (1) no agreement was made to purchase, although an application was submitted, (2) no policy was delivered, although a policy had been issued, or (3) the consumer was confused about funds being taken from existing policies.

Review of policy transactions reflected use of the term "dividends" by the MetLife representatives, and consumers, was generic. In those policies paying annual dividends, a non-guaranteed benefit, dividends could be: (1) taken as a cash payment to the policyholder, (2) left to accumulate in the policy with interest, (3) applied to

- 27 -

M9371

M129779220037

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

reduce the annual premium due on the policy, or (4)
applied to purchase paid up additional insurance within
the policy.

In the majority of existing policies from which
"dividends" had been used to fund new policies of
insurance, the cash values involved in the replacement
activity were from the surrender of paid up additional
insurance. Therefore, use of such "dividends" constituted
a reduction in the death benefit and cash value of
existing insurance.



- 28 -

M9371

M129779220038

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

1602 CWS Responses
90-MR2-008

Subject: Solicitation... representations impacting on lapse, surrender or (forfeiture of existing)... insurance and annuities.

Page 1

REDACTED
CONFIDENTIAL
POLICYHOLDER
INFORMATION

| Complaint number | Date | Policy | App'd Form | Prior Understanding of Dividends/Premiums | Replacement | Solicitation Method | Remarks |
|---|---|---|---|---|---|---|---|
| 7.21 | ▓ 5/5/92 | ▓ | N | Dividends only | Y | 5 | No policy in house |
| 3.16 | ▓ 5/5/92 | ▓ | N | Div & Surrender | Y | 2 | Pay new @ $15 / mos |
| 7.20 | ▓ 8/19/92 | ▓ | N | Surrender | Y | 2 | Loans/new @ $45/mos |
| 2.20 | ▓ 2/25/92 | ▓ | N | Surrender | N | 2 | $20/mos |
| 7.6 | ▓ 8/25/92 | ▓ | N | Surrender | Y | 5 | Letter by rep. |
| 8.8 | ▓ 1/21/92 | ▓ | N | Dividends only | Y | Unk | $427/yr, add'l plcy. |
| 7.23 | ▓ | ▓ | N | No use of old values | Y | 0 | $400 – 10 yrs |
| 2.15 | ▓ | ▓ | N | Dividends only | Y | 2 | Illinois PH/Mail & Phone |
| 3.24 | ▓ 07/22/92 | ▓ | N | Surrender | Y | Unk | Canceled by local office |
| 3.16 | ▓ 02/17/92 | ▓ | N | Surrender | Y | 2 | $300/yr |
| 6.2 | ▓ 02/24/92 | ▓ | N | Surrender | Y | 2 | $45/qtr |
| 7.24 | ▓ 11/25/90 | ▓ | N | Surrender | Y | 0 | Same premium as old |
| 7.8 | ▓ 04/07/92 | ▓ | N | Dividends only (Unknown) | Unk | Unk | Obtained "annuity?" |
| 6.10 | ▓ 12/03/92 | Y | N | Dividends only | Y | Unk | Bad Address. |
| 6.25 | ▓ 2/5/92 | ▓ | N | Unknown | Y | Unk | Non–delivery/False Simil |
| 7.14 | ▓ 11/21/90/91 | ▓ | N | Dividends only | Y | 2.5 | Bad Address |
| 1.14 | ▓ 1/27/92 | ▓ | N | Surrender | Y | 3 | Unauth loans |
| 2.23 | ▓ 2/12/92 | ▓ | N | Unknown | Y | 2 | $250/yr |
| 3.11 | ▓ 1/28/91 | ▓ | N | Split policy / UL | Y | 2.3 | No delivery/lapsed |
| 4.21 | ▓ 10/17/91 | ▓ | N | Surrender | Y | 2 | No delivery/unauth loan |
| 1.8 | ▓ 12/3/92 | ▓ | N | Surrender | Y | 2 | $25 / mos |
| 1.18 | ▓ 6/5/92 | ▓ | N | Dividends only | Y | 2.5 | Believes canceled |

Solicitation: 1) To purchase additional rider or add—on to existing policy.
2) To obtain a new policy with greater death benefit, at a cost the same or slightly greater than the cost of the insurance being replaced.
3) Special offer — a) Excess Profits b) Savings by Company due to reduced administrative costs c) Free Insurance.
4) Offset or reduce tax effects.
5) Promise of a paid—up policy with no additional out—of—pocket expense.
6) Promise of a paid—up policy at some future time, with no out—of—pocket expense.

– 29 –

M9371

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. CL"

M129779220039

1992 CWS Responses
93-MO2-006

Subject to protective ... regulations impacting on lapse, surrender or forfeiture of existing policies of insurance and annuities.

Page 2

REDACTED CONFIDENTIAL POLICYHOLDER INFORMATION

| Consumer | Policy Number | Appl Date | Repl Appl PH | Repl PH Info | Appl'd Form | PH's Understanding of Old Policy Use | Replacement Denied | Solicitation Method | Remarks |
|---|---|---|---|---|---|---|---|---|---|
| 1.2 | | 9/2/92 | N | N | N | Surrender | Y | 2 | $35 mos.$26K PU 5 yrs |
| 2.18 | | 11/0/92 | N | | N | Denies purchase | Y | N/A | Believes reversed |
| 2.6 | | 5/11/92 | N | N | N | Did not purchase | Y | 5 | Believes cancelled |
| 3.20 | | 9/23/92 | N | N | N | Surrender | Y | 2 | $350/yr |
| 7.17 | | 3/4/92 | N | N | N | Surrender | Y | 2 | $338.60/yr |
| 3.22 | | 1/0/91 | N | N | N | Confused | Y | Unk | Cano new/lost old |
| 4.22 | | 9/0/92 | N | N | N | Surrender | Y | 2 | Policy not delivered |
| 4.22 | | 9/17/92 | N | N | N | Surrender | Y | 2 | $540.75/yr |
| 1.12 | | 9/10/92 | N | N | N | No agreement to buy | Y | 2 | No delivery |
| 1.1 | | 1/8/91 | N | N | N | No agreement to buy | Y | 2 | No delivery |
| 3.3 | | 9/30/92 | N | N | N | Surrender | Y | 2 | Policy declined |
| 6.2 | | 11/3/92 | N | N | N | Surrender | Y | 2 | Being reversed |
| 1.5 | | 2/3/92 | N | N | N | Dividends only | Y | 2 | $200.00 /yr |
| 6.11 | | 9/23/92 | N | N | N | Dividends only | Y | 5 | Retirement |
| 1.9 | | 4/0/92 | N | N | Y | Dividends only | Y | 0 | Reissued? M3 |
| 3.8 | | 1/25/92 | N | N | N | Surrender | Y | 0 | Annuity/Retirement |
| 2.2 | | 6/1/92 | N | N | N | Dividends only | Y | 4,6 | Executive Retirement Plan |
| 2.2 | | 5/22/92 | N | N | N | Dividends only | Y | 4,6 | Executive Retirement Plan |
| 2.4 | | 1/22/92 | N | N | N | Not Certain | Y | 5 | Additional cash payment |
| 3.4 | | 3/2/92 | N | N | N | Surrender | Y | 2 | $60 /mos |
| 1.23 | | 8/15/92 | N | N | N | Surrender | Y | 0 | $453.00 /yr |
| 5.20 | | 4/15/92 | N | N | Y | Surrender | Y | 2 | Title3) Repl/Reused |

Solicitation: 1) To purchase additional rider or add-on to existing policy.
2) To obtain a new policy with greater death benefit, at a cost the same or slightly greater than the cost of the insurance being replaced.
3) Special other — a) Excess Profits  b) Savings by Company due to reduced administrative costs  c) Free insurance.
4) Offset of reduced tax effects.
5) Promise of a paid-up policy with no additional out-of-pocket expense.
6) Promise of a paid-up policy at some future time, with no out-of-pocket expense.

- 30 -

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1061, United States Dist. Ct.

REDACTED
CONFIDENTIAL
POLICYHOLDER
INFORMATION

1992 CWS Responses
00–M02–006

Subject: Solicitations and representations impacting on lapse, surrender or forfeiture of existing policies of insurance and annuities.

Page 3

| Complaint | Date | | | Type | Replacement | Solicitation Method | Remarks |
|---|---|---|---|---|---|---|---|
| 2.16 | 6/4/92 | N | N | Surrender | Y | 0 | Loan / then lapse |
| 3.5 | 12/4/92 | N | N | Dividends only | Y | 0 | Purchase by father |
| 2.1 | 7/28/92 | N | N | Dividends only | Y | 5 | For son by husband's pol |
| 1.15 | 6/17/92 | N | N | Surrender | Y | 2.30 | $113./mos |
| 1.11 | 6/15/92 | N | N | Switch funds over* | Y | 2.4 | Total family $66.90/mos |
| 1.11 | 6/15/92 | N | N | Switch funds over* | Y | 2.4 | See above |
| 1.25 | 6/10/92 | N | N | Surrender | Y | 2 | $570/yr. |
| 5.4 | 1/24/92 | N | N | Surrender | Y | 2 | $25.00/mos |
| 7.9 | 3/14/90 | N | N | Dividends only | Y | 4 | Lapsed |
| 3.9 | 6/12/92 | N | N | Div. & Surrender | Y | 2.5 | Paid—up(?) |
| 4.9 | 2/5/92 | N | N | Surrender | Y | 2 | Lapsed |

Solicitation: 1) To purchase additional rider or add—on to existing policy.
2) To obtain a new policy with greater death benefit, at a cost the same or slightly greater than the cost of the insurance being replaced.
3) Special offer — a) Excess Profits  b) Savings by Company due to reduced administrative costs  c) Free Insurance.
4) Other or reduce tax effects.
5) Promise of a paid—up policy with no additional out—of—pocket expense.
6) Promise of a paid—up policy at some future time, with no out—of—pocket expense.

– 31 –

M12977922041

M9371

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

In view of the high rate of replacement denial on
applications involving replacement activity at the time of
application, a review was made of the one hundred
seventeen (117) applications in relation to the producing
MetLife office.  The following results were noted as
illustrated in the chart on page 33.

- Eighty-eight percent (88%) denied replacement on the
  application, when in fact it was clear FIP funding had
  occurred.
- The practice of denying replacement on applications
  utilizing FIP funding, was identified in all offices
  within the sample.

- 32 -

M9371

M129779220042

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

| Market Conduct Examination 96-M02-008 Metropolitan Life Insurance Company | CWS92 Sample, Replacement Denied, By Office Dividend Use & Delayed Surrender | | October 4, 1993 |
|---|---|---|---|
| Office | FIP | Replacement Denied on Application | |
| L76 | Beaver Valley | 8 | 7 |
| L66 | Center | 3 | 2 |
| 26A | Charters | 14 | 7 |
| 483 | East Hills | 7 | 6 |
| 44B | Enterprise | 18 | 17 |
| A16 | Greensburg | 4 | 4 |
| 14B | North Allegheny | 8 | 8 |
| L05 | New Kensington | 6 | 6 |
| L15 | Penn Hills | 3 | 3 |
| O32 | Pittsburgh South | 15 | 14 |
| J25 | Squirrel Hills | 17 | 17 |
| Other | | 11 | 9 |
| | Total Cases: | 117 | 106    (90%) |



1992 CWS Sample
Denial of Replacement

MetLife Offices
☒ FIP    ☒ Replacement Denied

Note: The 1992 CWS Sample depicts policies shown by the Company as being Funded by In-force Policies (FIP). Of the 2,801 FIP representing 22.08% of total 1992 applications written, 192 applications had replacement questions responded to as "NO" by 148 (78%) applicants and 151 (79%) of agents.

Field examination, through mailed questionnaire to 117 of 192 applicants (61% of reviewed applications), provided a response by 65 applicants. Of those responding whose applications showed no replacement (65), 27 individuals had understood at time of application that they were to surrender their existing policies, 15 individuals had understood at time of application that they were to use only dividends from existing policies, and 10 individuals had not agreed to purchase or were confused as to their transactions. Denial of replacement on application was concluded to result from: 1) Concealment of intended total replacement — 62%, 2) Improper response as to replacement (dividend use) — 23%, and 3) Overall improper completion of application replacement questions — 61%.

- 33 -

M9371

M129779220043

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. CL."

MetLife was requested to provide application and
replacement information for policies issued during 1990,
1991 and 1992, within a six (6) county Western
Pennsylvania Region in order to assess the level of
replacement activity.  A synopsis of the data received is
as follows:

Total applications received during 1990  -  18,921

Total applications received during 1991  -  15,085

Total applications received during 1992  -  11,351

1990 Applications funded internally  -  3,491

1991 Applications funded internally  -  2,313

1992 Applications funded internally  -  2,501

(All figures are total universe, and reflected on computer
runs generated by Metropolitan Life Insurance Company for
a six (6) county Western Pennsylvania Region)

A ratio analysis was made on data received concerning
the replacement activity during the experience period.
Based upon results of the analysis, a pattern of activity
is apparent in which a high volume of replacement activity
took place, generating a substantial complaint volume (see
page 12).  Results of the analysis are as follows:

1990 - Internally funded replacements  -  3,491
       Total applications written      -  18,921
                                           18.45%

- 34 -

M9371

M129779220044

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

```
1991 - Internally funded replacements  -    2,313
       Total applications written       -   15,085
                                            15.33%

1992 - Internally funded replacements  -    2,501
       Total applications written       -   11,351
                                            22.03%
```

(All figures are total universe, as reflected on computer
runs generated by Metropolitan Life Insurance Company for
a six (6) county Western Pennsylvania Region)

Routine audits were directed and performed by MetLife
audit program areas outside the marketing area.
Corrective action in response to audit reports appeared to
be the responsibility of the audited office's manager and
the Region Vice President. Special audits were performed
by the auditing program area at the request of MetLife
management at any level.

MetLife was requested to provide all FIP reports and
audit reports for MetLife offices within the six (6)
county Western Pennsylvania Region, to assess the
effectiveness of MetLife management's use of internal
controls.

Of thirteen (13) audit reports provided, examination
showed:

- A May 1990 audit of the North Hills office of
  MetLife's Pittsburgh Region showed that 85% of one
  hundred nineteen (119) consumer complaints had been
  caused by major misrepresentation and identified the

- 35 -

MDL CONFIDENTIAL

M9371

M129779220045

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

deceptive promise of paid-up policies, lack of
disclosure and replacement as areas of concern. Audit
response showed the issues were blamed on past office
manager Michael J. Boris and the audit was closed upon
assurances by the new manager Theodore N. Stavrakis
and Regional Vice President Gary P. Antonino, that
MetLife sales representatives would be properly
supervised.

- An August 1990 audit of the Enterprise office of that
region showed that although sales representative J.
Joel Sherman had a 76.1% FIP ratio, thirty-nine (39)
policyholders contacted fully understood their
transactions. The audit was closed by Regional Vice
President, Gary P. Antonino, with no further action.

- A November 1990 audit of the North Allegheny office of
Michael J. Boris showed that the office manager was
not performing required reviews of Consolidated
Warrant System (CWS) reports. CWS reports depict
payments made from existing policies to new policies.
The audit was closed upon assurances from Office
Manager, Michael J. Boris and Regional Vice President,
Gary P. Antonino that such reviews would occur. In
October 1992 a special audit was made again at the
North Allegheny Office, which identified Richard
Hughey, Burton Merchant, Timothy Schram, George
Nassif, and Ronald Schram as having FIP ratios of
33.6% to 37.5%, 37% of CWS Reports were not available

- 36 -

MEL LIFE HIGHLY CONFIDENTIAL

M9371

M129779220046

Nonce: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

for confirmation of manager review, and that sales
representatives had apparently been concealing
replacement to generate higher commissions. This
audit was closed upon assurances from Regional Vice
President, Gary P. Antonino and audited office manager
Office Manager, Michael J. Boris that compliance and
supervision of sales representatives would be made.

- An August 1993 audit report for the Squirrel Hill
office of that region showed seven (7) sales
representatives: Kenneth Spangler, Pete LaBrasca,
Frederick Newstrom, Gilbert Johnson, Stephen Barey,
Elbert Maxwell and James Spangler had FIP ratios
ranging from 30.3% to 51.1% The audit was closed
upon assurances from Office Manager, Gregory Zigray
and Regional Vice President, Gary P. Antonino that
monitoring and supervision of sales representatives
would be made.

- FIP reports were observed to have been provided on a
monthly basis to MetLife managers at the local office,
regional office, and territorial office levels.

- FIP reports received covered the December 1990 to
September 1993 period. (see pages 40 - 42)

- Average monthly FIP ratios at the regional level, for
all offices, exceeded 15% from December 1990 through
February 1993 and ranged from a low of 16.1% to a high
of 27.9%. It was noted the averaged ratios declined
steadily from December 1990 to present.

- 37 -

M9371

M129779220047

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.

- Excessive FIP ratios were noted for MetLife offices not identified by audit reports.

## - FINDINGS AND CONCLUSIONS -

From analysis of MetLife consumer complaints, audit reports and FIP reports, it was clear management failed to utilize or integrate available internal control mechanisms to detect and control improper replacement activity.

- The impact of improper replacement activity upon complaint data, i.e. increased complaints, would not be expected to occur until such time as new policies failed to perform as solicited. Thus current complaints would not be expected to accurately mirror improper replacement activity as indicated by FIP ratios contemporary to complaints.

- MetLife complaint ratios, due to Replacement and Misrepresentation, of 78.96%, 81.03% and 72.80% in years 1990, 1991 and 1992 (see page 13) should have been cause for MetLife management to have examined those issues and to have scrutinized current audit and FIP reports.

- Access of MetLife corporate management to those reporting vehicles indicates corporate management's awareness of replacement and misrepresentation as practices existing within the marketing strategy.

- Other than audit reports, no MetLife corporate directives specifically identified replacement and

- 38 -

M9371

M129779220048

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."