NEW YORK

PREPARED FOR JOHN G. NOTAXREIMBURSEMENT    BY STEVEN KOHLER
PLAN:  LIFE PAID UP AT 98

|  | CLASSIFICATION | AGE | AMOUNT OF INSURANCE |
|---|---|---|---|
| INSURED: | STANDARD  SMOKER | 40 | $443,254 |

PREMIUM MODE: ANNUAL

| | ANNUAL PREMIUM | YRS PAYABLE |
|---|---|---|
| BASIC POLICY | $7,099.99 | 58 |
| PAID-UP ADDITIONS RIDER | $2,900.01 | 25 |

ANNUAL DIVIDENDS USED TO BUY PAID-UP ADDITIONS INSURANCE

| END OF POLICY YEAR | ANNUALIZED NET OUTLAY* | PREMIUM APPLIED | AMOUNT WITHDRAWN | TOTAL ANNUAL DIVIDEND | GUARANTEED CASH VALUE | ILLUSTRATIVE CASH VALUE## | ILLUSTRATIVE DEATH BENEFIT# |
|---|---|---|---|---|---|---|---|
| 1 | 10,000 | 10,000 | NONE | NONE | 2,845 | 2,845 | 472,955 |
| 2 | 10,000 | 10,000 | NONE | 890 | 5,244 | 7,134 | 486,031 |
| 3 | 10,000 | 10,000 | NONE | 1,201 | 13,441 | 15,609 | 500,036 |
| 4 | 10,000 | 10,000 | NONE | 1,471 | 23,049 | 24,973 | 515,156 |
| 5 | 10,000 | 10,000 | NONE | 1,998 | 34,289 | 38,544 | 531,550 |
| 6 | 10,000 | 10,000 | NONE | 2,501 | 42,532 | 51,834 | 549,442 |
| 7 | 10,000 | 10,000 | NONE | 2,875 | 52,490 | 65,396 | 573,370 |
| 8 | 10,000 | 10,000 | NONE | 3,264 | 63,575 | 80,477 | 588,334 |
| 9 | 10,000 | 10,000 | NONE | 3,703 | 73,936 | 94,397 | 609,455 |
| 10 | 10,000 | 10,000 | NONE | 4,168 | 88,528 | 114,043 | 631,790 |
| 11 | 10,000 | 10,000 | NONE | 4,704 | 97,670 | 132,830 | 655,516 |
| 12 | 10,000 | 10,000 | NONE | 5,275 | 111,838 | 153,339 | 680,693 |
| 13 | 10,000 | 10,000 | NONE | 5,906 | 121,838 | 175,260 | 707,452 |
| 14 | 10,000 | 10,000 | NONE | 134,759 | 134,759 | 199,199 | 735,879 |
| AGE 55 | 10,000 | 10,000 | NONE | 7,254 | 147,778 | 224,883 | 766,314 |
| 16 | 10,000 | 10,000 | NONE | 8,029 | 161,359 | 252,968 | 798,248 |
| 17 | 10,000 | 10,000 | NONE | 9,014 | 175,503 | 283,689 | 832,491 |
| 18 | 10,000 | 10,000 | NONE | 9,975 | 189,751 | 316,841 | 868,913 |
| 19 | 10,000 | 10,000 | NONE | 11,015 | 204,567 | 353,166 | 907,664 |
| AGE 60 | 10,000 | 10,000 | NONE | 12,169 | 219,951 | 392,996 | 948,932 |
| 21 | 10,000 | 10,000 | NONE | 13,428 | 234,845 | 434,793 | 996,325 |
| 22 | 10,000 | 10,000 | NONE | 14,343 | 247,772 | 479,339 | 1,051,023 |
| 23 | 10,000 | 10,000 | NONE | 15,242 | 261,586 | 527,283 | 1,107,134 |
| 24 | 10,000 | 10,000 | NONE | 16,137 | 275,940 | 579,291 | 1,166,800 |
| AGE 65 | 10,000 | 10,000 | NONE | 17,032 | 290,367 | 635,137 | 1,230,184 |

* BASE PLAN PREMIUM, RIDER PREMIUM AND ANY LOAN REPAYMENT LESS WITHDRAWALS AND LOANS. ANNUALIZED PREMIUM EQUALS THE MODAL PREMIUM TIMES NUMBER OF PREMIUM PAYING PERIODS FOR YEAR (MAY INCLUDE LOAN INTEREST PAYMENT IF OUTSTANDING LOAN EXCEEDS ILLUSTRATIVE CASH VALUE).

a WITHDRAWALS ARE MADE FROM PUAR DIVIDENDS FIRST, PUAR CASH VALUE SECOND, AND BASE POLICY DIVIDENDS LAST.

- POLICY LOANS 3* ... '- "N ADJUSTABLE LOAN INTEREST RATE OF 8.75%. ACTUAL RATE MAY DIFFER AND IS SUBJECT TO CHANGE EACH POLICY ANNIVERSARY. : AN REPAYMENTS(-) MADE FROM POLICY WITHDRAWALS ONLY

-- ILLUSTRATION ASSUMES LOAN INTEREST IS ADDED TO THE EXISTING LOAN EACH YEAR. IF OUTSTANDING LOAN EXCEEDS ILLUSTRATIVE CASH VALUE, LOAN INTEREST PAYMENTS WILL BE PAID BY POLICYHOLDER AND REFLECTED IN ANNUALIZED NET OUTLAY.

## GUARANTEED CASH VALUE AND CASH VALUE OF ADDITIONAL INSURANCE.

# INCLUDES BASIC INSURANCE, ADDITIONAL INSURANCE, AND ANY RIDER INSURANCE. REFLECTS ANY OUTSTANDING LOAN AND LOAN INTEREST.

DIVIDENDS BASED ON JAN. 1992 SCALE THAT USES CURRENT INTEREST, MORTALITY AND EXPENSE RATES.  ILLUSTRATIVE FIGURES ARE NOT GUARANTEES OR ESTIMATES FOR THE FUTURE.

EXPLANATORY NOTES FORM 667 AND FORM 663 MUST BE ENCLOSED    PAGE  6

METROPOLITAN LIFE INSURANCE COMPANY    7/23/92

- 154 -    M9371

NOTICE: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

M129779220164

## X.  FORMS FILING AND APPROVAL

Throughout the course of the examination, it was noted MetLife policies viewed in consumer homes, policy copies sent into the Department in response to mail surveys, and specimen policies provided by MetLife's Johnstown office differed from the corresponding MetLife policy forms which were approved by, and on file with, the Department.

Whole Life Policy (7-87) and Life to 95 (57-87): Form approval was granted by the Department for both policy forms on June 2, 1987.  Departmental approval was granted to MetLife for replacement of policy pages seven (7) and eight (8) for both forms on June 12, 1991.  The approved replacement pages provided consumers notice that: "You may ask us to pay premiums with a combination of yearly dividends, the cash value to any paid-up additions and/or any dividend accumulations.  As long as these values are great enough, out-of-pocket premiums need not be paid to keep your policy in force."  All policy forms 57-87 and 7-87 encountered during the examination, issued subsequent to June 12, 1991, contained the earlier pages which had been replaced with the pages approved June 12, 1991.

Upon subsequent review by MetLife, it was reported to the Department a total of seventy thousand five hundred

- 155 -

M9371

M129779220165

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

fifty-seven (70,557) incorrect Whole Life Policy (7-87) forms and ten thousand three hundred eighty-one (10,381 Life to 95 (57-87) policy forms had been issued to Pennsylvania consumers. As a result, these two (2) unapproved policy versions were issued to a total of eighty thousand nine hundred thirty-eight (80,938) consumers subsequent to June 12, 1991

Survivorship Whole Life Policy (2J-90 PA): Form approval was granted by the Department for this policy form on October 23, 1990. MetLife had initially submitted a generic policy form 2J-90 which was disapproved by the Department. Resubmission was made in the form of 2J-90 PA, which included revisions to pages one (1) and nine (9), from what was originally filed under form 2J-90, concerning Supplemental Insurance Benefit and Split Policy Option. Based upon the revisions, policy form 2J-90 PA was then approved. However, all Survivorship Whole Life policies (2J-90 PA) noted during the examination contained the original page one (1) contained in policy 2J-90 which was not approved for use in Pennsylvania.

Upon subsequent review by MetLife, it was reported to the Department a total of three hundred eighty-three (383) unapproved versions of Survivorship Whole Life policy 2J-90 PA, containing the unapproved language on page one

- 156 -

M129779220166

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

(1), had been issued to Pennsylvania consumers subsequent
to October 23, 1990.

Flexible Premium Life Insurance Policy (7UL-90):
Form approval was granted by the Department for this
policy form on August 23, 1990. The initial MetLife
submission was disapproved. Among the points of
disapproval was the use of disclosure language on the
Policy Specification page stating "The Planned Premium
shown below may need to be increased to keep this policy
and coverage in force. The Department required
additional disclosure language "Even if coverage
continues, the amount payable on the final date of policy
may have little or no value.", be added to the disclosure
language submitted on the Specification Page in order to
be considered for approval. MetLife subsequently
submitted an amended Policy Specification page with the
requested disclosure language, and Departmental approval
was granted August 23, 1990.

All Flexible Premium Life Policies (7UL-90) noted
during the examination contained the limited, unapproved,
disclosure language on the Policy Specification page and
lacked the disclosure language required to obtain approval
of the policy. This is of serious concern to the
Department since it was noted throughout the examination
the Flexible Premium Life Policy (9UL-90) was the primary
policy sold using the "free insurance" and "paid-up

- 157 -

M129779220167

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct.

insurance" solicitations. The absence of the required
disclosure notice to policyholders, denied consumers full
and fair disclosure concerning future premium payments and
policy value. The lack of proper disclosure was found to
be particularly serious in terms of damage to consumers in
view of the manner in which the policies were solicited
and sold.

Upon subsequent review by MetLife, it was reported to
the Department a total of twenty nine thousand eight
hundred forty-two (29,842) Flexible Premium Life Policies
(7UL-90) were issued to Pennsylvania consumers with
unapproved and incomplete disclosure language.

Multifunded Flexible Premium Life Policy (7.6FM-90):
Both unisex and sex distinct versions of this policy were
granted Departmental approval on November 6, 1990. It was
noted throughout the examination policy form 7.6FM-90, as
actually issued to consumers, contained additional
unapproved policy language on pages 1, 3, 3.1, and 5.

Upon subsequent review by MetLife, it was reported to
the Department a total of six thousand five hundred
forty-two (6,542) unapproved versions of the Multifunded
Flexible Premium Life Policy (76.FM-90) were issued to
Pennsylvania consumers subsequent to November 6, 1990.

- 158 -

M129779220168

M9373

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. CL?

Throughout the course of the examination, all policy forms noted in consumer homes, as well as duplicate policies provided by MetLife, at the Department's request, contained non-guaranteed illustrated value tables bound in with the policy pages. Since only guaranteed value tables are permitted to be included in a bound policy, each policy containing the non-guaranteed illustrated value tables constitutes an unapproved version of the policy.

Upon subsequent review by MetLife, it was reported to the Department a total of three hundred eighteen thousand eight hundred forty-two (318,842) policies were issued to Pennsylvania consumers containing unapproved non-guaranteed illustrated value tables. According to MetLife, this occurred with all life and annuity policies issued from the Johnstown, Pennsylvania office since 1988.

– FINDINGS AND CONCLUSIONS –

In summation of the above findings, a total of four hundred thirty-six thousand five hundred forty-seven (436,547) unapproved policy forms were issued to Pennsylvania consumers. Section 354 of the Insurance Company Law (40 P.S.477b) specifically states it shall be unlawful for any insurance company doing business in the Commonwealth of Pennsylvania to issue, sell, or dispose of any policy or contract covering life insurance or annuities until the forms have been submitted to and

– 159 –

M129779220169

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

formally approved by the Insurance Commissioner.

It should be noted that during the course of the examination MetLife cooperated fully in providing the Insurance Department with all requested documents and beginning inquiries into the various consumer complaints which surfaced during the examination in order to determine necessary corrective action required to make damaged consumers whole.



– 160 –

M129779220170

v9373

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

## XI. METLIFE CORPORATE INTERVIEWS

As the final phase of the examination, interviews were conducted with principal MetLife corporate officials having management or supervisory responsibilities for marketing and sales operations:

- Robert J. Crimmins, Executive Vice President, Personal Insurance
- Richard N. Maurer, Senior Vice President, Career Agency Operations
- Vincent G. Vitiello, Vice President, Marketing, Mideastern Territory
- Gary P. Antonino, Vice President, Pittsburgh Regional Agency

Two (2) other MetLife corporate officials were also contacted by the Insurance Department for interview:

- Charles M. Kavitsky, Vice President, Mideastern Territory. (Declined interview without legal counsel)
- Nudrak S. Parkin, Vice President, Northeastern Territory. (Failed to respond to Insurance Department requests for interview)

During the examination, MetLife caused the termination, or accepted the resignation or retirement, of several MetLife managers and sales representatives associated with their Western Pennsylvania sales force:

- 161 -

M129779220171

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

- Richard N. Maurer, Senior Vice President. Career
  Agency Operations.  (In charge of Territorial
  Marketing)
- Charles M. Kavitsky, Vice President and Officer In
  Charge, Mideastern Territory.  (Responsible for
  marketing activities within Pennsylvania Regional
  Offices)
- Mwafak S. Peress, Vice President and Officer In
  Charge, Northeastern Territory.  (Responsible for
  marketing activities of Regional Office areas within
  Pennsylvania)
- Gary P. Antonino, Vice President and Sales Manager,
  Pittsburgh Regional Agency  (Responsible for
  marketing activities of District and Branch offices in
  Western Pennsylvania)
- Michael J. Bokie, Manager, North Allegheny Branch.
  (Former District Manager, North Hills District)
- Theodore Stavrakis, Manager, Enterprise Branch and
  North Hills Branch.
- Mike George, Manager, Washington Branch.
- Ronald Schram, Senior Sales Representative.
- J. Joel Sharman, Senior Sales Representative.
- Richard Antonino, Senior Sales Representative.

- 162 -

M129779220172

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

MetLife further indicated they intend to cooperate fully with the Insurance Department in any subsequent enforcement actions which may be undertaken against individual licensees.

- 163 -

M129779220173

M2371

Notice: "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

## XII.   RECOMMENDATIONS

1.  MetLife must develop and implement procedures to ensure that only forms properly filed and approved, as required by Section 354 of The Insurance Company Law, are used in Pennsylvania.

2.  MetLife shall develop a plan to identify and notify Pennsylvania policyholders, whether active or inactive, who purchased life insurance during the period January 1, 1990 through December 31, 1993, funded in whole or in part, by values taken from other MetLife insurance policies or annuity contracts.

    (a)  Those policyholders who might have been misled or deceived in the purchase of a replacement policy during the period described above shall be surveyed and asked if they were misled or deceived, and any affirmative response in either of these regards shall cause MetLife to take appropriate steps to restore the policyholder to his or her prior policy(ies).

    (b)  All other policyholders who purchased replacement policies during the period described above shall be surveyed and asked if they were misled or deceived. If the policyholder responds affirmatively in a sworn writing stating with specificity the nature of the misrepresentation or deception, MetLife shall take appropriate steps to restore the policyholder to his or her prior policy(ies).

3.  MetLife shall implement corrective measures in order to make whole all policyholders identified as having incurred an expense load charge on a new policy funded in whole or in part from another MetLife insurance or annuity policy, which would not have occurred had the replacement activity been fully disclosed.

4.  MetLife shall offer to refund policyholders solicited through specialized retirement marketing programs such as Nurses, Teachers, Cosmetologists, Small Business Owners and 50/50 applicants.  Refund letters must be reviewed and approved by the Insurance Department.

5.  MetLife must report to the Insurance Department the results of all surveys and restorative or corrective actions taken.  Specific dollar amounts of restitution must be documented and reported to the Insurance Department.

- 164 -

M129779220174

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

6.  MetLife must explain in detail how this level of improper activity occurred without Corporate action being taken sooner, and identify all procedures to be developed and implemented to ensure such activity is properly monitored and controlled by Corporate officials.

7.  MetLife must develop and issue written procedures to their agency force clearly stating MetLife's positions on replacement and piggybacking marketing practices.

8.  MetLife must reaffirm and enforce its requirement for MetLife approval of all advertising material used by MetLife sales representatives during the sale or solicitation of insurance or annuity policies.

9.  MetLife must develop and implement written procedures and guidelines to enable proper monitoring of agent activity in order to identify problem agents.

10. MetLife shall take necessary corrective action, including termination where there is evidence of violation of insurance law or regulation, and report those actions to the Insurance Department.

- 165 -

M129779220175

M9373

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

XIII.   COMPANY RESPONSE



- 166 -

M129779220176

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091  United States Dist. Ct.

One Madison Avenue, New York, NY 10010-3690

Lawrence A. Vranka
Vice-President
P.I. Consulting & Claims Services

☼ MetLife®

January 14, 1994

**BY TELECOPY**

Dennis C. Shoop, Director
Bureau of Enforcement
Pennsylvania Insurance Department
Strawberry Square
Harrisburg, PA  17120

Dear Mr. Shoop:

I am writing in response to your proposed Report of Examination of Metropolitan Life Insurance Company ("MetLife") covering the period from January 1, 1990 through December 31, 1992 as of the close of business on December 27, 1993 (the "Report"). We have reviewed the Report and are looking forward to working with you to resolve the issues identified in the Report.

I have attached a section by section analysis setting forth the specific revisions we would like to have made to the text of the Report. The attachment does not address the recommendations made in the Report because we would prefer to present our thoughts on the recommendations at our next meeting.

After you have had a chance to review the attached, we would like to meet with you to discuss our suggested changes to the text of the Report and to the recommendations.

Very truly yours,

*[signature]*

Lawrence A. Vranka

M129779220177

Metropolitan Life Insurance Company

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

## SECTION BY SECTION ANALYSIS

### V.  BACKGROUND

Page 9, first full paragraph: We ask that you insert "defined under Pennsylvania insurance regulations as" after the second word of the first sentence.

Page 10, before first full paragraph: We ask that you insert language similar to the following: "It should be noted that the Pennsylvania insurance regulations regarding replacement of life insurance and annuities generally exempt from their coverage transactions in which the replacing life insurance policy or annuity and the existing life insurance policy or annuity are issued by the same insurer. Replacement is not in and of itself prohibited in Pennsylvania, but rather is prohibited where misrepresentation occurs."

Page 10, first full paragraph: We do not believe that the following is necessarily true: "when an insurer engages in the replacement of its own insurance policies and annuities, both the agent and the insurer have a clear understanding of replacement activity." While an individual agent may have a "clear understanding" of replacement activity in any given transaction, it does not follow that the insurer will have the same level of knowledge. Therefore, we ask that you delete this paragraph.

Page 10, second full paragraph: Because other state investigations of MetLife's alleged wrongdoing have not focused on replacement activity, we ask that you delete the following language in the last sentence of this paragraph: "and several other states announced investigations of similar allegations of wrongdoing in their jurisdictions." While we are aware that the West Virginia Insurance Department investigated replacement activity within the state of West Virginia a couple of years ago, to the best of our knowledge, that investigation is now closed. We are not aware of any other state that has announced an investigation of MetLife relating to replacement activity.

### VI.  CONSUMER COMPLAINTS

Page 12: We ask that in your summary of consumer complaint data, you juxtapose the total number of consumer complaints with the total number of policies sold in the Western Pennsylvania Region.

M129779220178

M9377

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

JAN 14 '94 16:28 FROM                    TO 917177E31259      PAGE.223.267

**Page 12, second full paragraph:** The second sentence of this paragraph reads: "review was made of this [consumer complaint] data in order to identify and assess the marketing practices utilized." We do not believe this consumer complaint data necessarily identifies the types of marketing practices used by MetLife agents--consumer complaints are not always valid, and, even if they are, the complaints nevertheless present a biased viewpoint, and the conduct complained of may not rise to the level of a "marketing practice." We ask that you substitute the words "nature of the complaints" for "marketing practices utilized."

**Page 13, first full paragraph:** We ask that you insert "alleged" before misrepresentation.

**Page 13, last paragraph carried over to Page 14:** We ask that you delete this paragraph.

## VII.   REPLACEMENT ACTIVITY

It is our impression the Department has acknowledged that MetLife has established mechanisms to monitor replacement activity, particularly MetLife's use of the TIF ratio, which are better than those of most other insurance companies. Therefore, we ask that this observation be noted at the start of both your discussion of MetLife's internal control procedures beginning on page 35 and your findings and conclusions on page 38.

**Page 21, first line:** We ask that you delete "it should have been clear that."

**Pages 29-31, Chart:** The eighth column in the chart on pages 29 through 31 is titled "Replacement Concealed." We believe that, taken out of context, this title could be read to mean that replacement was concealed from the policyholder. We ask that the title of this column be changed to read: "Repl Question Answered No."

**Page 32, last paragraph:** In addition to the two results you note from the review of the 117 applications, we ask that you note that, despite the replacement denial, as the notes to the chart on page 33 indicate, 42/52 (80.77%) of the applicants understood at the time of application that they were to surrender their existing policies or to use the dividends from their existing policies. Furthermore, we would like your first result (88% of the applications improperly contained replacement denials) to be qualified by: (1) your earlier finding that 73% of the sales representatives surveyed did not believe that the taking of dividends from an existing policy to fund a new policy constituted replacement, and (2) the fact that internal

-2-

M129779220179

I-

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct."

JAN 14 '94 16:25 FROM                    TO 917177831259        PAGE.004/007

replacements are exempt from the Pennsylvania replacement regulations.

**Page 38, Findings and Conclusions:** We ask that you delete the conclusion that "it was clear management failed to utilize or integrate available replacement activity." As the charts on pages 40 through 42 indicate, and as the Report notes on page 37, FIP rates at the regional level did decline from December, 1990 to the present. This decline provides some evidence that management responded to directives to ensure compliance with internal policies. By 1992, regional average FIP rates were consistently below 15%. Additionally, we note that the 15% FIP rate was not a mandate, and that management could expect a certain level of replacement activity to occur.

We also ask that you delete the conclusion that management's access to certain reporting vehicles indicates corporate "awareness" of improper replacement activity and misrepresentation. As you know, consumer complaints of perceived misrepresentation may or may not be valid, and high FIP rates are not necessarily indicative of improper replacement activity. In fact, on page 36, the Report acknowledges that one audit revealed that, despite the much higher than average FIP rate of one sales representative, all of the policyholders contacted during the audit had a thorough understanding of their transactions.

Finally, we do not believe that Richard N. Maurer's December 16, 1992 letter to the field force indicates an awareness of any improper practices in the field generally, or in the Western Pennsylvania Region specifically, but simply reflects MetLife's decision to reinforce the education of its field force on the issue of ethics. We ask that you delete the point on page 58 concerning Mr. Maurer's letter.

**Page 58, Findings and Conclusions:** We ask that you change the first sentence to read "The observed pattern of deceptive solicitations and concealed replacements by MetLife sales representatives appears to have been for the purpose of increasing their commissions."

## VII.  SALES AND ADVERTISING

Our concern about this section of the Report is that it creates the impression that the use of illustrations in a sales presentation is inherently misleading. It is our view that illustrations are not in and of themselves misleading, but rather can be misleading to the extent they are used improperly by sales representatives at the point of sale. We are concerned that this section may be used to be a challenge to the use of illustrations which is an accepted, industry-wide practice. We are uncertain

-3-

M129779220180

M9371

Notice: "Production and Use Subject to Case Management and Procedure Orders in MDL No. 1091, United States Dist. Ct."

JAN 14 '94 16:29  FROM                        TO 917127763:253        PAGE.005/007

of the Department's position on this issue and ask that the
Report clarify this issue.

     Page 60, second full paragraph: We ask that you insert
"potential" before "effect" in the first sentence. Similarly, we
ask that you replace "may have" for "has" in the last sentence.

## IX.   RETIREMENT PLAN PROMOTIONS

     Page 85, first and fourth sentences: Because this part
of the Report focuses on sales material, we ask that you
substitute the words "sales material" for the words "marketing
plans."

     Page 85, last sentence: We ask that you substitute the
words "sales materials" for the words "marketing practices and
procedures."

     Page 87, last paragraph: We ask that you add the
following language after the word "however" in the second line of
this paragraph: "Departmental sources indicated that." We also
ask that you delete the word "corporate" from the third line of
this paragraph. MetLife uses the term "corporate officer" to
describe officers in the Home Office, rather than officers in the
field, such as Messrs. Krivitsky and Aquilino.

     Page 91, third to last sentence: We ask that you
change the words "solicitation methods" to "sales material." We
also ask that you delete the word "routinely."

     Page 95, last paragraph, first sentence: We ask that
you delete the words:  "which had been approved by MetLife."

     Page 95, last paragraph, second sentence: We ask that
you delete the words:  "upon approval by a marketing division of
MetLife," and substitute the words:  "after having been developed
by MetLife's Personal Insurance Advanced Markets unit."

     Page 97, second to last sentence: We ask that you
replace the words "were designed to preclude" with "did not
contain."

     Page 97, last sentence: We ask that you replace the
words "schemes and practices occurred throughout Pennsylvania"
with "practices have been identified in other regions of
Pennsylvania."

                              -4-

                                              M129779220181

                                              M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct.

## X: FORMS FILING AND APPROVAL

**Page 155, second full paragraph:** We ask that the Report include an explanation of the circumstances under which MetLife sought approval for the replacement pages of the Whole Life Policy and Life to 95 and the reasons why the revised versions were not used in Pennsylvania. Thus, we ask that you add an explanation incorporating the following facts: In 1991 MetLife submitted the replacement pages for approval in all 50 states, under the self-imposed condition that unless all 50 states approved the replacement pages, the revised versions would not be used in any state. When MetLife failed to get approval from all 50 states, it continued to use in Pennsylvania the 1987 approved forms. Although MetLife arguably should have withdrawn its approval request for the replacement pages and resubmitted the 1987 version for reapproval, without explanation of the facts, the Report tends to suggest that MetLife acted deceptively.

**Page 156, first full paragraph:** We ask that you note that the only difference between the original page 1 of the Survivorship Whole Life Policy and the revised page 1 was that the former failed to contain the words "Supplemental Insurance available. Exchange of Policy if certain changes made in Internal Revenue Code. (See Policy Exit Option]."

**Page 157, last paragraph:** We ask that you note that the reason the Flexible Premium Life Policies failed to contain the appropriate disclosure language simply was due to clerical oversight. In 1990, when MetLife phased in the use of the laser printer to replace the system of packaging separate pre-printed pages to create a policy, the disclosure language accidentally was not input into the computer.

We also ask that you delete all but the first sentence of the paragraph which starts on page 157 and continues on page 158. We believe that the disclosure language inadvertently omitted from the policy—"Even if coverage continues, the amount payable on the final date of policy may have little or no value" —relates to the cash accumulation aspect of the policy, whereas the "free" or "paid-up" insurance solicitation method referenced in the Report relates to the face amount of the insurance coverage. The Report does not indicate that the "free" or "paid-

---

¹    It is not clear to us that under 40 P.S. § 477b the approval of the revised pages automatically renders the 1987 approved forms "unapproved." However, we recognize that Pennsylvania insurance regulations require an insurer to inform the Department when an "approved form or filing becomes obsolete and is no longer issued . . . ." 31 Pa. Code § 89.16(b).

-5-

M129779220182

Notice: Production and Use Subject to Case Management and Protective Order . . . MDL . . .

M9371

up" insurance solicitation method was accompanied by any
misrepresentation as to prospective policy cash values.

### XI.  METLIFE CORPORATE INTERVIEWS

**Page 163**:  Please note that MetLife also accepted the
resignation of Mike George, Manager, Washington Branch, during
the time period covered by the Department's examination.

-6-

M129779220183

M9371

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct."

JAN 27 '94 15:00  FROM

One Madison Avenue, New York, NY 10010-3690

TO 917:77831255    PAGE.021/285

Lawrence A. Vranka
Vice-President
P.I. Consulting & Claims Services

**MetLife**

**BY TELECOPY**

Mr. Dennis Shoop
Pennsylvania Department of Insurance
1326 Strawberry Square, 13th Floor
Harrisburg, Pennsylvania  17120

Re:  Targeted Market Conduct Examination

Dear Mr. Shoop:

As you know, we would like to have the discussion of the various pieces of Tax Advantaged Bonus Plan ("TAB") literature deleted from the report of your examination.  We have, however, prepared a rebuttal on the TAB literature in the event that the discussion stays in the report.  I have attached a copy of that rebuttal for your information.

Very truly yours,

Lawrence A. Vranka

January 27, 1994

M129779220184

Metropolitan Life Insurance Company                        M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

JAN 27 '94 15:01  FROM                    TO 917177831059          PAGE.002/005

The Tax-Advantaged Bonus Plan ("TAB") sales
approach, which was used in Pennsylvania as well as in other
states, is designed for small businesses.  Under the TAB
concept, the employer (typically a closely held C
corporation) sets up a "Tax-Advantaged Bonus Plan" that will
pay an employee (typically the corporation's principal
shareholder) a bonus that is used to purchase cash-value
life insurance with a Paid-Up Additional Insurance Rider
("PUAR").

The bonus is ordinarily a tax-deductible business
expense for the employer and taxable income for the
employee; the individual employee's tax rate will, however,
be lower than the corporate employer's.  In addition, the
employee has the option of using policy cash values to reim-
burse himself or herself for the tax liability resulting
from the bonus.  The policy provides a tax-free death bene-
fit and builds tax-deferred cash value that the employee can
use to supplement retirement income or for other purposes.

MetLife's marketing approach makes clear that the
product involved is life insurance.  The employee must fill
out a standard life insurance application, and the employer
must supply a letter authorizing payment for the policy.
The market to which TAB is targeted is generally
sophisticated, and business owners approached by MetLife
sales representatives frequently consult their accountants
or attorneys before setting up a TAB plan.

The original TAB sales material consisted of a
marketing kit containing a sales representatives' guide, a
small leave-behind brochure, a larger point-of-sale bro-
chure, an illustration software guide, a variety of forms
and one or two cartoons.  The kit was developed by MetLife's
Personal Insurance Advanced Markets unit.

The sales approaches suggested in the sales repre-
sentatives' guide, which is reproduced at pages 121 to 134
of the Department's report, make clear that the product is
life insurance and emphasize death benefits as well as accu-
mulation features.  For example, on the first page (at page
121), in explaining how the plan works the guide states that
the bonus is used "to purchase either Whole Life, L95 or L98

M129779220185

M93??

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct."

with PUAR."  The guide proposes two "prospecting letters" (at pages 130 and 131 of the report); one begins "Everybody wants retirement benefits and life insurance. . . ," and the other is very general and directed toward a meeting to discuss "retirement benefits and financial security. . . ."

The small brochure reproduced at pages 112 and 113 of the report, which is designed to be used as a mailer or a leave-behind piece, is also very general and makes clear that the product being discussed provides "life insurance benefits" in addition to "retirement income" and "an emergency fund."

The point-of-sale brochure included in the kit, which appears at pages 114 to 116 of the report, also could leave no doubt that the product being sold is life insurance.  It states that TAB "is a simple way to provide extra retirement income and life insurance protection to business owners and their selected employees."  In a section titled "How Does It Work?," the brochure explains that "The employee applies for a MetLife insurance policy with the Paid-Up Additions Rider."  The brochure discusses both the "death benefit" and the "cash value" of the insurance policy and explains its tax consequences.

A different point-of-sale brochure (the "summary TAB brochure"), which is reprinted at pages 117 to 120 of the report, was developed by Personal Insurance Advanced Markets in the fall of 1993 and first became available in January 1993.  It never received the approvals required by MetLife's procedures.

The summary TAB brochure, like the point-of-sale brochure in the kit, was intended for use in face-to-face selling and therefore would have been used in a context which made it apparent that a bonus plan was being set up to fund the purchase of life insurance.  The concept is complicated enough that a complete presentation would be required prior to any sale.  The brochure, which was provided to the sales representatives for one dollar per copy, is not for direct-mail marketing or general marketing approach purposes.[1]

---

1.    Similarly, telemarketers did not use "sales solicitation scripts" but only placed calls to arrange appointments for sales representatives to make complete pre-
(continued...)

M129779220186

2

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct."

Like the other TAB materials, the summary TAB brochure does not indicate that the illustrative numbers shown are "precise earning values." On the contrary, it explains in a footnote that cash values are "based on illustrative values of MetLife's Life at 98 (Male 45), guaranteed face amount of $512,626) and PUAR using 1993 dividend schedule" and that "[d]ividends are neither guaranteed nor estimates for the future." The brochure lists guaranteed cash values in addition to illustrative cash values. The brochure accurately describes the attributes of the life insurance product being sold. The brochure talks about "survivor benefit[s]" and "cash value[s]," and in discussing the "Annual Tax-Free Benefit" during retirement, it indicates that these benefits are obtained through policy loans and withdrawals. Policy in force until death."

It is inaccurate to state (at page 95 of the report) that the summary TAB brochure "had been approved by MetLife" or had received "approval by a marketing division of MetLife." Advanced Markets Unit was not authorized to approve sales literature, nor was it a part of MetLife's regular sales literature approval process. Under MetLife's procedures, sales literature could not be distributed until the company's Compliance Bureau had secured approval from reviewers in the Law Department, the Personal Insurance Consulting Services unit, and in appropriate circumstances, other units such as the Tax Department. The Advanced Markets staff, however, presented the summary TAB brochure directly to individuals in the Tax Department and Consulting Services without going through the Compliance Bureau or submitting the brochure to the Law Department.

When MetLife's Law Department discovered in the spring of 1993 that the summary TAB brochure had been distributed without proper approvals, MetLife's warehouse in Edison, New Jersey was directed to cease deliveries of the summary TAB brochure and destroy extra copies.

---

1. (...continued)

sentations. The TAB concept is far too complicated to sell over the telephone. The script reproduced at pages 105 to 107 of the report -- which was never approved by MetLife -- also mentions death benefits, indicating that the product being sold was life insurance.

M129779220187

3

M937

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct."

### Tax-Advantaged Retirement Plan for Nurses

The Tax-Advantaged Retirement Plan for Nurses brochure (the "nurses' retirement brochure"), which is reproduced at pages 108 to 111 of the Department's report, was created by Advanced Markets using the summary TAB brochure as a template. Although it is factually similar to the summary TAB brochure, the underlying sales concept is different.

Like the summary TAB brochure, the nurses' retirement brochure was intended to be used as a point-of-sale piece accompanied by a complete sales presentation in which the use of whole life insurance cash values to supplement retirement income would be explained. It does not suggest that the policyholder will realize any "precise earning values," but discloses in footnotes that dividends are "neither guarantees nor estimates for the future." It indicates guaranteed as well as illustrative values and explains in a footnote that illustrative values are based on "MetLife's Whole Life (Female 35, guaranteed face amount of $58,278) and PUAR using 1993 dividend schedule." The footnotes also disclose that tax-free benefits are obtained through policy loans and withdrawals and that "Loan rates are not guaranteed, and policy must be kept in force until death. If policy lapses prior to death, there may be income taxes payable."

As with the summary TAB brochure, Advanced Markets improperly bypassed Law Department review. It is therefore inaccurate to state that the brochure was "approved by MetLife" or by "a marketing division of MetLife." Distribution of the nurses' retirement brochure was immediately halted when the Law Department discovered its existence in April 1993. Fewer than 2,000 copies of the brochure had been distributed to sales representatives at the time.

M129779220188

4

49327

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct."



COMMONWEALTH OF PENNSYLVANIA
INSURANCE DEPARTMENT
STRAWBERRY SQUARE
HARRISBURG, PA 17120

EXECUTIVE OFFICES

February 14, 1994

CERTIFIED MAIL

Metropolitan Life Insurance Company
Attn: Harry P. Kamen, Chairman and CEO
One Madison Avenue
New York, NY 10010-3690

     RE: Report of Market Conduct Examination of
         Metropolitan Life

Dear Mr. Kamen:

     Under cover of this letter the Department is enclosing revised pages 164-165 of the Market Conduct Examination Report. Kindly substitute these pages in place of pages 164-165 presently contained in the Report. The pages were revised as a result of textual changes to clarify recommendation number 2 on page 164 as requested by Met Life on February 14, 1994. We have agreed to the revision due to the exigencies presented by Friday's blizzard and the fact that your company's fax containing the alternative language was received by the Department on that day. The Department's Order issued February 11, 1994 pursuant to Section 905(c) is not altered by this substitution.

     Since we have agreed to the revision, and pursuant to our meeting at the Department this morning with Met Life representatives, including Larry Vranka and outside counsel, Michael L. Browne, it is our understanding that Met Life has agreed not to contest the Examination Report and therefore will not request any hearing on this matter.

     Further enclosed for attachment to the Report is a copy of comments received by the Department this afternoon from Met Life. In consideration of the resolution of this issue and as a courtesy in this matter, we agree that these comments will be attached to the final report.

               Very truly yours,

               Thomas S. Buzby
               Deputy Insurance Commissioner
               Consumer Services & Enforcement

TSB:ALW:sr

cc: Dennis C. Shoop, Director
    Bureau of Enforcement
    Lawrence A. Vranka, Vice President
    Michael L. Browne, Esquire
Enclosures
R0214-2

M129779220189

M93??

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct.

Metropolitan Life Insurance Company
One Madison Avenue, New York, NY 10010-3690

**MetLife**

Lawrence A. Vranka
Vice-President
P.I. Consulting & Claims Services

February 14, 1994

Dennis C. Shoop, Director
Bureau of Enforcement
Pennsylvania Insurance Department
Strawberry Square
Harrisburg, PA  17120

Dear Mr. Shoop:

     In accordance with our discussions today, enclosed is
the Response of Metropolitan Life Insurance Company to the Report
of Examination, which the Department will include in and make part
of its Report of Examination.

     I look forward to working with you to implement the
recommendations of the Report.

                                   Sincerely,

                                   Lawrence A. Vranka
                                   Vice-President

LAV/bbc
Enclosure

CONFIDENTIAL
MDL101091

M129779220190

M9371

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct."

### RESPONSE OF METROPOLITAN LIFE
### INSURANCE COMPANY TO REPORT OF EXAMINATION

Metropolitan Life Insurance Company ("MetLife" or the "Company")
hereby submits the following response to the Pennsylvania
Insurance Department's (the "Department") proposed Report of
Examination of Metropolitan Life Insurance Company covering the
period January 1, 1990 through December 31, 1992.[1]

As set forth more fully below, MetLife objects to many of the
Report's conclusions which are insufficiently supported and not
justified by the findings.[2]   MetLife strongly disputes the
unsubstantiated conclusion reached by the Pennsylvania Department
that there was any corporate MetLife awareness of wrongdoing by
the field force.

The Department's Examination focused on replacement transactions,
alleged misrepresentations in sales and advertising, and forms
filing and approval.  MetLife objects to findings and conclusions
in each of these areas.

---

[1]   MetLife submitted proposed revisions to the text of a
preliminary Report under cover of a letter dated January 14, 1994-
some of the revisions were incorporated into the Final Report.  A
true and correct copy of the proposed revisions and the
accompanying cover letter are attached to this response as Exhibit
A and are hereby made a part of the response.

[2]   Because the Department has not provided MetLife with detailed
information regarding the interviews it conducted with MetLife
policyholders or personnel, MetLife cannot directly respond to a
number of specific findings set forth in the Report.   M129779220191

M9371

Notice: Production and Use Subject to CMO Protective and Privacy
Orders in MDL No. 1091 United States Dist. CT

1.    REPLACEMENT ACTIVITY

Findings and Conclusions

The Report's principal finding regarding replacement activity was
that "management failed to utilize or integrate available internal
control mechanisms to detect and control improper replacement
activity." (Report at 38). The Report concluded that the high
proportion of customer complaints based on replacement activity
"should have been cause for MetLife management to have examined
those issues and to have scrutinized current audit and FIP
reports." (Report at 38). The Report further concluded that
"Access of MetLife corporate management to those reporting
vehicles indicated corporate management's awareness of replacement
and misrepresentation as practices existing with the marketing
strategy," (Report at 38), and further concluded that a letter
entitled Honesty and Integrity Our Basis For Doing Business, by
Richard Maurer, Senior Vice President, directed to the field
force "indicate[ed] an awareness and concern of corporate MetLife
as to the practices of the field force." (Report at 38). MetLife
requests that these conclusions be deleted from the Report.

Response

It is important to note from the outset that, while replacement
transactions were a primary focus of the Report of Examination,
replacement per se is not prohibited by any Pennsylvania statute
or regulation. Moreover, the Pennsylvania replacement regulations
specifically exempt internal replacement transactions from their

-2-

M129779220192

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091, United States Dist. Ct.

coverage. PA Code §§ 81.3(4), 81.3(5). The Report fails to note that all of the replacement transactions it discusses involved internal replacements–that is, replacements of MetLife policies with other MetLife policies–which are exempt from the Pennsylvania replacement regulations and hence do not involve any violation of those regulations. Notwithstanding the fact that replacement is not prohibited in Pennsylvania, and as the Report accurately reports, MetLife has developed extensive policies and procedures designed to discourage replacement, recognizing that replacement may, in some circumstances, not be in the best interests of policyholders and generally is not in the best interests of MetLife. In fact, the Pennsylvania Insurance Department has acknowledged that the mechanisms established by MetLife to monitor replacement activity are more extensive than those of most other insurance companies.[3]

Contrary to the Report's finding that Management failed to utilize internal control mechanisms to detect and control improper replacement activity, MetLife had targeted its six county western

_____

[3] The Report does criticize MetLife for failing to define replacement in its Manual for Account Representatives to include the taking of dividends from existing life insurance policies to fund new policies. (Report at 15, 16). However, the use of dividends to fund new polices is included with the definition of "Piggybacking" which appears in MetLife's manual for Account Representatives. "Piggybacking"–the use of existing policy values to fund new policies–is also discouraged by MetLife, and the electronic monitoring system referenced in the Report, MetLife's Financed by Inforce Policies ("FIP") System, does detect the use of dividends to fund new business and includes policies funded through the use of dividends in the reports generated by the FIP System.

M129779220193

-3-

M9373

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

Pennsylvania region-the Pittsburgh Region-for its own internal investigation _prior_ to the commencement of the Department's Examination. The investigation was triggered precisely because MetLife's internal monitoring system indicated a high volume of policyholder complaints in the Pittsburgh Region.

MetLife's internal investigation revealed that certain account representatives and local management were violating MetLife's policies and procedures, primarily as they related to replacement. Among other things, it was determined that some of the agents were circumventing MetLife's rewritten business rules by concealing from the Company that they were engaging in replacement transactions. MetLife has voluntarily made restitution in the majority of situations identified by the Company wherein circumvention of the rewritten business rules resulted in the assessment of any unnecessary load charge on one or more payments

M129779220194

-4-

Notice: Production and Use Subject to CMO M... ... ... ...
Orders in MDL No. 1091 United States Dist. Ct.