made into a policy; additionally, MetLife has expressed its willingness to work with the Department to develop a plan of restoration which will provide an opportunity for Pennsylvania policyholders who have been misled in the context of replacement transactions to revert to their prior policies.

The data presented in the Report revealing that by February 1993 regional FIP ratios had dropped approximately to or below MetLife's 15% guideline is further evidence that MetLife utilized internal control mechanisms to reduce replacement activity. (<u>See</u> pages 40-42). Indeed as the Report notes, "averaged [monthly FIP] ratios declined steadily from December 1990 to present." (Report at 37).

Significantly, MetLife's goal of limiting the sale of new policies that are financed by in force policies to 15% is not a regulatory mandate, but merely a self-imposed internal guideline. Departure from this self-imposed guideline does not, without more, support the inference that improper replacement transactions have occurred. Indeed, as noted by the Report, one MetLife audit of a sales representative with a FIP rate of 76.1% revealed that all of the policyholders contacted during the audit had a full understanding of their transactions. (Report at 36). Thus, it is clear that there is no necessary relation between high FIP ratios and improper replacement activity.

M129779220195

-5-

M9937

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

It bears repeating that replacement is not _per se_ improper or violative of any state regulation and can be in the best interests of the policyholder. For example, a universal life policy may be an attractive alternative for a whole life policyholder when financial circumstances change, _e.g._, there may be a need for the flexibility of coverage and premiums provided by a universal life policy which is not available under a traditional whole life policy. Alternatively, the decline in interest rates in the past few years may prompt a policyholder to replace an interest sensitive universal life policy with a whole life policy or a multifunded universal life products. Or, there may be a need for additional insurance coverage in any form, and existing policy or annuity values, whether accumulated dividend or other cash values, may appropriately be used as the funds to buy that insurance.

MetLife strenuously objects to the Report's conclusion that corporate management's access to complaint ratio data and FIP ratio data indicates "corporate management's awareness of replacement and misrepresentation as practices existing within the marketing strategy." (Report at 38). MetLife unequivocally denies that there was any awareness at the corporate management level of any systematic marketing strategies involving misrepresentation in replacement sales and requests that this conclusion be deleted from the Report. As previously noted, high FIP ratios cannot be equated with improper replacement activity. While the consumer complaint level in the Pittsburgh Region was an

M129779220196

-6-

M937-

Notice: Production and Use Subject to Case MULTI... and ...
Orders in MDL No. 1091, United States Dist. Ct.

indicator of potential problems, an indicator which triggered MetLife s own investigation. MetLife had no awareness of improper replacement activity or misrepresentation until that investigation was underway. At that time, remedial measures were implemented. As noted in the Report, it must also be borne in mind that individual sales representatives were found to have engaged in various efforts to circumvent the rewritten business rules and conceal replacement transactions from the Company. Any conclusions regarding MetLife's corporate awareness of replacement activity are severely undercut by this finding.

The Report states that Richard N. Maurer's December 16, 1992 letter to the field force indicated an awareness of improper practices in the field. (Report at 38.) This conclusion is unwarranted, and MetLife requests that it be deleted from the Report. MetLife had always been and will always be concerned with ensuring that its field force maintains the highest standards of integrity. Mr. Maurer's letter reflected MetLife's efforts to reinforce the education of its field force on issues of ethics. To cite a letter requiring compliance with corporate policy as evidence of corporate complicity would undercut all future efforts at compliance.

One final aspect of the Report's discussion of replacement activity merits a response. The Report discusses at length the failure of account representatives to respond affirmatively, in the internal replacement context, to MetLife's standard life

M129779220197

-7-

Notice: Production and Use Subject to Case Management/Protective Orders in MDL No. 1091, United States Dist. Ct.

M9371

insurance application question inquiring whether the transaction involves replacement. The Report notes that account representatives had answered this question negatively on 88% of the applications reviewed by the Department even though existing policy values were in fact being used to fund the new policy.[5] (Report at 32). The Report implicitly equates the account representatives' failure to answer this question affirmatively with misrepresentation to the policyholder. In other words, the Report without basis suggests that, where the representative has failed to answer the question affirmatively, the policyholder has been misled. This is demonstrably incorrect and rebutted by the Report's own finding. The Department's survey of policyholders whose applications revealed replacement denials demonstrated that at least 42 out of 52 of the responding applicants, or 80.77%, understood at the time of application that they were to surrender their existing policies or to use dividends from existing policies to fund their new policies. (Report at 27, 33). Thus, there is no necessary relation between a negative response to the replacement question on the application and any misunderstanding by the replacing policyholder.

Furthermore, MetLife has put the replacement question on its application so that its underwriting department can ensure that

---

[5]   The high negative response rate to the replacement questions could be attributable to the fact that 73% of the sales representatives surveyed by the Department did not believe that using dividends from an existing policy to fund a new policy constituted replacement. (Report at 24).

-8-

M129779220198

M9371

Notice: Produced and Use Subject to Case Management and Protective Order in MDL No. 1091, United States Dist. Ct.

the proper replacement notices are utilized in connection with the
sale.  Because Pennsylvania exempts internal replacement from
their statutory notice requirements, there is no need for the
replacement question to be answered at all in the context of an
internal replacement in Pennsylvania.[6]

Therefore, while the discussion of the replacement question has
some prominence in the Report, in fact, a negative answer to that
question has no impact on the policyholder in the context of an
internal replacement and has no bearing on misrepresentation.
Accordingly, MetLife requests that the Department delete any and
all discussion of replacement denial that is not specifically
associated with account representative misconduct.

2.  SALES AND ADVERTISING

The Report concludes, in effect, that illustrating a policy's
performance based on current interest rate is per se misleading.
Actually, the Report states as follows:  "Use of this type of
illustration, depicting future performance based only upon
'current interest' rates, by MetLife sales representatives has the
effect of misleading consumers."  (Report at 60).  Even if
illustrations depicting only current rates were misleading, which
is certainly not necessarily the case, none of the authorized

---

[6]  An affirmative response is unnecessary for MetLife's internal
monitoring purposes.  The FIP System will pick up a transaction as
a replacement and will include the transaction in the account
representatives' FIP ratio, whether or not the replacement
question is answered affirmatively.

M129779220199

-9-

M93⁻1

Orders in MDL No. 1091, United States Dist. Ct.⁻

illustrations included in the Report, depict future performance based <u>only</u> upon current interest rates; all authorized MetLife illustrations included in the Report include guaranteed rates. The Report further states: "Stating future performance based upon anything other than guaranteed rates, has the effect of implying a guarantee." (Report at 60). This statement is without any foundation whatsoever. In standard MetLife illustrations, the current illustrated rates are juxtaposed with clearly identified guaranteed rates. Under these circumstances, it is implausible to assert that the current illustrated rates would be interpreted as guaranteed rates. Additionally, the notes to the illustration explain that the illustrated interest rates and/or dividend rates are not guaranteed. For the foregoing reasons, MetLife requests that the second complete paragraph on page 60 of the Report be deleted.

The Report also criticizes MetLife's standard illustrations for failure to include disclosures as to withdrawal and expense charges and failure to show policy performance at a greater variety of interest rates.[7] (Report at 60). This is not a legitimate criticism. A sales illustration serves a limited function and does not purport to set forth all of a policy's terms and conditions. With respect to the universal life policies for

---

[7]  The Pennsylvania Department is obviously aware that the NAIC is working to standardize illustrations, and the assumptions on which they are based, on an industry-wide basis. Such standardization will enable illustrations to be used as a more effective comparison of products sold by different companies. MetLife strongly supports the NAIC's effort.

M129779220200

-10-

Orders in MDL No. 1091, United States Dist. Ct.

which it is possible to unbundle the various costs and expenses, the Report is simply wrong in asserting that MetLife illustrations do not refer to the policy's costs and expenses. For example, the notes to MetLife's current universal life illustration itemize the costs and expenses factored into the illustrated values as follows:

> An expense charge of 4% will be deducted from each planned or unscheduled premium payment. The remaining 96% of the premium goes into the Cash Value that is credited with interest daily and from which monthly deductions are made to cover the cost of the policy's benefits . . . . During the first 15 years, (and 15 years after any increase in the Specified Face Amount) a surrender charge is deducted from the Cash Value.[8]

For whole life products, it is not feasible to parcel out the various costs and expenses from the policyholder's premium and accordingly, MetLife's illustrations do not attempt to do so. MetLife requests deletion of the first full sentence on page 60 of the Report.

## 3.    RETIREMENT PLAN PROMOTIONS

The Report discusses certain sales materials which were designed to market whole life insurance as a "savings" or cash accumulation vehicle. (See, e.g., Report at 85-154). There can be no question that the cash accumulation fund of a whole life policy can serve

---

[8]  The universal life illustrations included in the Report at pages 63-64 and 67 are incomplete and do not include the explanatory notes which are attached to this response as Exhibit B.

M129779220201

-11-

M9371

Notice: Production and Use subject to [illegible] Orders in MDL No. 1091 United States Dist. Ct.

as a vehicle to build savings, and insurance companies industry-wide market whole life insurance emphasizing the product's cash accumulation feature. However, MetLife has never condoned marketing practices designed to obfuscate the insurance feature of the whole life policy.

Despite suggestions in the Report to the contrary (see, e.g., Report at 95), none of the specific sales literature criticized in the Report received the Home Office Law Department approval required by MetLife for all sales material prior to use in the field. MetLife policy is clear that the printing or distribution by sales persons of advertisements of any kind whatsoever, except those currently issued or authorized by the Company, must not be undertaken without the permission of the Home Office and that only materials that have been approved by the Law Department may be used in connection with sales solicitations. MetLife has admitted publicly in recent months that is has uncovered instances of the use of unauthorized and inappropriately authorized sales literature, and the Company has moved strongly to stop all use of such literature.

Although the Report notes that some unapproved field literature does not use the word insurance, there is no evidence in the Report that the presentation of the product at the point of sale was inappropriate or that any policyholders were misled. Additionally, the policyholders were required to complete an application for a whole life insurance policy, in some cases, were

M129779220202

-12-

M9371

Notice: Production and Use Subject to Case ...
Orders in MDL No. 1091 United States Dist. Ct.

required to undergo medical examinations, and would have been
provided with an illustration with the name of the product clearly
identified.

In the event that any Pennsylvania policyholders have been misled
by MetLife's account representatives through the use of
unauthorized sales materials, MetLife is formulating a plan to
offer restitution to these policyholders, consistent with what the
Company understands will be the Pennsylvania Department's
recommendations; and MetLife is enhancing its compliance and
control procedures to ensure that all sales literature used by our
field force has the necessary Law Department approval.

**Tax Advantaged Bonus Plan and Tax Advantaged Retirement Plan for
Nurses**

The Report comments specifically on two pieces of sales literature
used by the MetLife Home Office, the Tax-Advantaged Bonus Plan
("TAB") literature and a Tax-Advantaged Retirement Plan for Nurses
brochure. Neither piece of literature was approved, as required,
by the Law Department. Additionally, each has disclosure of the
product offered (even if not the full extent of disclosure Law
Departmental review would have produced).

The TAB sales approach was designed for small businesses, and
contrary to the Report's finding, the insurance aspect of TAB is
clear from the sales literature included in the Report. Under the
TAB concept, the employer sets up a "Tax-Advantaged Bonus Plan"

M129779220203

-13-

M9371

Notice: Produced and NG subject to the Protective
Orders in MDL No. 1091, United States Dist. Ct.

that will pay an employee (typically the corporation's principal shareholder) a bonus that is used to purchase cash-value life insurance.

MetLife's marketing approach makes clear that the product involved is life insurance. The employee must fill out a standard life insurance application, and the employee must supply a letter authorizing payment for the policy. The market to which TAB is targeted is generally sophisticated, and business owners approached by MetLife sales representatives frequently consult their accountants or attorneys before setting up a TAB plan.

The sales approach suggested in the sales representatives' guide, which is reproduced at pages 121 to 119 of the Report, makes clear that the product is life insurance and emphasizes death benefits as well as accumulation features. On the first page (at page 121 of the Report), in explaining how the plan works, the guide states that the bonus is used to purchase either Whole Life, L95 or L98 with PUAR." The guide proposes two "prospecting letters" (at page 130 and 131 of the Report); one beings "Everybody wants retirement benefits and life insurance. . . ," and the other is very general and directed toward a meeting to discuss "retirement benefits and financial security. . . ."

The small brochure reproduced at pages 112 and 113 of the report, which is designed to be used as a mailer or a leave-behind piece, is also very general and makes clear that the product being

M129779220204

-14-

discussed provides "life insurance benefits" in addition to
"retirement income" and "an emergency fund."

The point-of-sale brochure included in the kit, which appears at
pages 114 to 116 of the report, also could leave no doubt that the
product being sold is life insurance.  It states that TAB "is a
simple way to provide extra retirement income and life insurance
protection to business owners and their selected employees."  In a
section titled "How Does It Work?" the brochure explains that "The
employee applies for a MetLife insurance policy with the Paid-Up
Additions Rider."  The brochure discusses both the "death benefit"
and the "cash value" of the insurance policy and explains its tax
consequences.

A different point-of-sale brochure (the "summary TAB brochure"),
which is reprinted at pages 117 to 120 of the Report, was
developed by Personal Insurance Advanced Markets in the fall of
1992 and first became available in January 1993.  It did not
receive the Law Department approval required by MetLife's
procedures.

The summary TAB brochure, like the point-of-sale brochure in the
kit, was intended for use in face-to-face selling and therefore
would have been used in a context which made it apparent that a
bonus plan was being set up to fund the purchase of life
insurance.  The concept is complicated enough that a complete
presentation would be required prior to any sale.  The brochure,

-15-

M129779220205

M9371

Notice: Production and Use Subject to Court Protective Order and Protective
Order in MDL No. 1091, United States Dist. Ct.

which was provided to the sales representatives for one dollar per copy, is not for direct-mail marketing or general marketing approach purposes.[9]

Like the other TAB materials, the summary TAB brochure does not indicate that the illustrative numbers shown are "precise earning values." On the contrary, it explains in a footnote that cash values are "based on illustrative values of MetLife's Life at 98 (Male 45, guaranteed face amount of $312,626) and PUAR using 1992 dividend schedule" and that "[d]ividends are neither guarantees nor estimates for the future." The brochure lists guaranteed cash values in addition to illustrative cash values. The brochure accurately describes the attributes of the life insurance product being sold. The brochure talks about "survivor benefit[s]" and "cash value[s]," and in discussing the "Annual Tax-Free Benefit" during retirement, it indicates that these benefits are obtained "through policy loans and withdrawals." Policy in force until death.

When MetLife's Law Department discovered in the spring of 1993 that the summary TAB brochure had been distributed without proper approvals, MetLife's warehouse in Edison, New Jersey was directed

---

9  Similarly, telemarketers did not use "sales solicitations scripts" but only placed calls to arrange appointments for sales representatives to make complete presentations. The TAB concept is too complicated to sell over the telephone. The script reproduced at pages 105 to 107 of the report-which was never approved by MetLife-also mentions death benefits, indicating that the product being sold was life insurance.

M129779220206

-16-

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

to cease deliveries of the summary TAB brochure and destroy extra copies.

The Tax-Advantaged Retirement Plan for Nurses (the "nurses' retirement brochure"), which is reproduced at pages 108 to 111 of the Report, was created by Advanced Markets using the summary TAB brochure as a template. Although it is factually similar to the summary TAB brochure, the underlying sales concept is different.

Like the summary TAB brochure, the nurses' retirement brochure was intended to be used as a point-of-sale piece accompanied by a complete sales presentation in which the use of whole life insurance cash values to supplement retirement income would be explained. It does not suggest that the policyholder will realize any "precise earning values," but discloses in footnotes that dividends are "neither guaranteed nor estimates for the future." It indicates guaranteed as well as illustrative values and explains in a footnote that illustrative rates are based on "MetLife's Whole Life (Female 35, guaranteed face amount of $50,279) and PUAR using 1993 dividend schedule." The footnotes also disclose that tax-free benefits are obtained through policy loans and withdrawals and that "Loan rates are not guaranteed, and policy must be kept in force until death. If policy lapses prior to death, there may be income taxes payable."

As with the summary TAB brochure, the Home Office marketing group that developed the brochure improperly bypassed Law Department

-17-

M129779220207

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

review.  It is therefore inaccurate to state that the brochure was
"approved by MetLife" or by "a marketing division of MetLife."
(Report at 95).  Distribution of the nurses' retirement brochure
was immediately halted when the Law Department discovered its
existence in April 1993.  Fewer than 2,000 copies of the brochure
had been distributed to sales representatives at the time.
Accordingly, MetLife requests that the following language be
omitted from the discussion of the TAB literature at the bottom of
page 95 of the Report: "which has been approved by MetLife" and
"upon approval of a marketing division of MetLife."

4.    FORMS FILING AND APPROVAL

Whole Life Policy (7-87) and Life to 95 (57-87)

The Report concludes that unapproved versions of policy forms 7-87
and 57-87 were issued in Pennsylvania (Report at 155, 156).
However, the policy forms that were issued were approved by the
Department in 1987.  In 1991 MetLife submitted replacement pages
for approval in all 50 states, under the self-imposed condition
that, unless all 50 states approved the replacement pages, the
revised versions would not be approved in any state.  When MetLife
failed to get approval from all 50 states, it continued to use in
Pennsylvania the forms that had been approved in 1987.


Survivorship Whole Life Policy (2-90PA)

The Report notes that MetLife's Survivorship Whole Life Policy was
issued in Pennsylvania with certain language missing from the
form.  (Report at 156.)  In fact, the only language missing from

                              -18-

M129779220208

                                            ⁻M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct.

the form as issued was the following: "Supplemental Insurance Available. Exchange of Policy if certain changes made in Internal Revenue Code. (See Policy Split Option)." The omission of this language was simply the result of clerical oversight.

## Flexible Premium Life Insurance Policy (7UL-90)

The Report cites certain language that was omitted from policy form 7UL-90 "Even if coverage continues, the amount payable on the final date of the policy may have little or no value." (Report at 157.) While the Report implies that the omission from policy form 7UL-90 was intentional and somehow related to the "free" or "paid-up" insurance solicitation method described earlier in the Report, such a conclusion is not supported by the facts.[10] This language was omitted simply because of a clerical oversight. In 1990, when MetLife phased in the use of a laser printer to replace the system of packaging separate pre-printed pages to create a policy, the missing language was inadvertently not input into the computer system.

The disclosure language which does appear on the Policy Specification page—"The Planned Premium shown below may need to be increased to keep this policy and coverage in force"—clearly

---

[10] The language which was omitted from the policy form when the transition was made to laser printing relates to the policy's cash value upon surrender and not to whether the policy's death benefit is "free" or "paid-up." The Report does not identify any point of sale misrepresentations as to cash value, further undercutting the Department's suggestion that this omission was anything more than an accident.

M129779220209

-19-

M9371

Notice: Production and Use Subject to Case Management and Protective
C...

informs the policyholder that the policy may not be paid up even with payment of the Planned Premium.

## Illustrated Value Tables

Finally, the Report notes that "non-guaranteed illustrated value tables" were bound in the policies reviewed by the Department. (Report at 159). It is MetLife's general practice to include an illustration with the policy when it is delivered. This illustration projects the policy's anticipated performance at both guaranteed and current interest or dividend rates. Our investigation of the Report's findings relating to these illustrations revealed that well-intentioned clerks in our Johnstown Administrative Office mistakenly decided to bind the illustrations with the policies. The Report cites no evidence that any policyholder was misled or confused by this practice.

## PENALTY

(It is MetLife's understanding from discussions with the Insurance Department) that the Department's Order will contain a fine of $1,500,000. The Company will not contest this penalty, because it is not in the Company's best interest to wage protracted and contested administrative and legal proceedings against the Department and it is the Company's firm desire to bring this matter to a quick resolution. Nevertheless, the Company strongly believes that the fine to be assessed is totally out of proportion with the violations alleged, none of which involve willful intent to harm Pennsylvania residents. In fact, many of the problems

M129779220210

-20-

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

cited involve clerical errors or oversights and, as indicated earlier, the Company believes that much of the activity relating to replacement activity was not even prohibited by any Pennsylvania statute or regulation.

CONCLUSION

Because MetLife's foremost concern is the best interests of its policyholders, MetLife has already addressed a number of the issues identified in the Report through its own investigations. Additionally, MetLife has made substantial headway in complying with the proposed recommendations in the Report. MetLife is committed to continuing to cooperate with the Pennsylvania Insurance Department in an effort to resolve any issues covered in the report.

Dated: February 14, 1994

METROPOLITAN LIFE INSURANCE COMPANY

By: _____
Lawrence A. Vranka
Vice-President

M129779220211

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.



EXHIBIT A

M129779220212

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

Lawrence A. Vranka
Vice-President
P I Consulting & Claims Services

**⟨ MetLife**

January 14, 1994

BY TELECOPY

Dennis C. Shoop, Director
Bureau of Enforcement
Pennsylvania Insurance Department
Strawberry Square
Harrisburg, PA 17120

Dear Mr. Shoop:

I am writing in response to your proposed Report of Examination
of Metropolitan Life Insurance Company ("MetLife") covering the
period from January 1, 1990 through December 31, 1992 as of the
close of business on December 27, 1993 (the "Report"). We have
reviewed the Report and are looking forward to working with you
to resolve the issues identified in the Report.

I have attached a section by section analysis setting forth the
specific revisions we would like to make made to the text of the
Report. The attachment does not address the recommendations made
in the Report because we would prefer to present our thoughts on
the recommendations at our next meeting.

After you have had a chance to review the attached, we would like
to meet with you to discuss our suggested changes to the text of
the Report and to the recommendations.

Very truly yours,

Lawrence A. Vranka

M129779220213

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No, 1091, United States Dist. Ct.

M129779220214

SECTION BY SECTION ANALYSIS

## V.    BACKGROUND

**Page 9, first full paragraph:**  We ask that you insert
"defined under Pennsylvania insurance regulations as" after the
second word of the first sentence.

**Page 10, before first full paragraph:**  We ask that you
insert language similar to the following:  "It should be noted
that the Pennsylvania insurance regulations regarding replacement
of life insurance and annuities generally exempt from their
coverage transactions in which the replacing life insurance
policy or annuity and the existing life insurance policy or
annuity are issued by the same insurer.  Replacement is not in
and of itself prohibited in Pennsylvania, but rather is
prohibited where misrepresentation occurs."

**Page 10, first full paragraph:**  We do not believe that
the following is necessarily true:  "when an insurer engages in
the replacement of its own insurance policies and annuities, both
the agent and the insurer have a clear understanding of
replacement activity."  While an individual agent may have a
"clear understanding" of replacement activity in any given
transaction, it does not follow that the insurer will have the
same level of knowledge.  Therefore, we ask that you delete this
paragraph.

**Page 10, second full paragraph:**  Because other state
investigations of MetLife's alleged wrongdoing have not focused
on replacement activity, we ask that you delete the following
language in the last sentence of this paragraph:  "and several
other states announced investigations of similar allegations of
wrongdoing in their jurisdictions."  While we are aware that the
West Virginia Insurance Department investigated replacement
activity within the state of West Virginia a couple of years ago,
to the best of our knowledge, that investigation is now closed.
We are not aware of any other state that has announced an
investigation of MetLife relating to replacement activity.

## VI.    CONSUMER COMPLAINTS

**Page 12:**  We ask that in your summary of consumer
complaint data, you juxtapose the total number of consumer
complaints with the total number of policies sold in the Western
Pennsylvania Region.

M129779220214

M9371

Notice: "Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct."

**Page 12, second full paragraph:** The second sentence of this paragraph reads: "review was made of this [consumer complaint] data in order to identify and assess the marketing practices utilized." We do not believe this consumer complaint data necessarily identifies the types of marketing practices used by MetLife agents--consumer complaints are not always valid, and, even if they are, the complaints nevertheless present a biased viewpoint, and the conduct complained of may not rise to the level of a "marketing practice." We ask that you substitute the words "nature of the complaints" for "marketing practices utilized."

**Page 13, first full paragraph:** We ask that you insert "alleged" before misrepresentation.

**Page 13, last paragraph carried over to Page 14:** We ask that you delete this paragraph.

## VII. REPLACEMENT ACTIVITY

It is our impression the Department has acknowledged that MetLife has established mechanisms to monitor replacement activity, particularly MetLife's use of the FIP ratio, which are better than those of most other insurance companies. Therefore, we ask that this observation be noted at the start of both your discussion of MetLife's internal control procedures beginning on page 15 and your findings and conclusions on page 38.

**Page 24, first line:** We ask that you delete "it should have been clear that"

**Pages 29-31, chart:** The eighth column in the chart on pages 29 through 31 is titled "Replacement Concealed." We believe that, taken out of context, this title could be read to mean that replacements was concealed from the policyholder. We ask that the title of this column be changed to read: "Repl Question Answered No."

**Page 32, last paragraph:** In addition to the two results you note from the review of the 117 applications, we ask that you note that, despite the replacement denial, as the notes to the chart on page 33 indicate, 42/52 (80.77%) of the applicants understood at the time of application that they were to surrender their existing policies or to use the dividends from their existing policies. Furthermore, we would like your first result (68% of the applications improperly contained replacement denials) to be qualified by: (1) your earlier finding that 73% of the sales representatives surveyed did not believe that the taking of dividends from an existing policy to fund a new policy constituted replacement, and (2) the fact that internal

-2-

M129779220215

U9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.

replacements are exempt from the Pennsylvania replacement
regulations.

Page 38, Findings and Conclusions: We ask that you
delete the conclusion that "it was clear management failed to
utilize or integrate available replacement activity." As the
charts on pages 40 through 42 indicate, and as the Report notes
on page 37, FIP rates at the regional level did decline from
December, 1990 to the present. This decline provides some
evidence that management responded to directives to ensure
compliance with internal policies. By 1993, regional average FIP
rates were consistently below 15%. Additionally, we note that
the 15% FIP rate was not a mandate, and that management could
expect a certain level of replacement activity to occur.

We also ask that you delete the conclusion that
management's access to certain reporting vehicles indicates
corporate "awareness" of improper replacement activity and
misrepresentation. As you know, consumer complaints of perceived
misrepresentation may or may not be valid, and high FIP rates are
not necessarily indicative of improper replacement activity. In
fact, on page 36, the Report acknowledges that one audit revealed
that, despite the much higher than average FIP rate of one sales
representative, all of the policyholders contacted during the
audit had a thorough understanding of their transactions.

Finally, we do not believe that Richard N. Maurer's
December 16, 1992 letter to the field force indicates an
awareness of any improper practices in the field generally, or in
the Western Pennsylvania Region specifically, but simply reflects
MetLife's decision to reinforce the education of its field force
on the issue of ethics. We ask that you delete the point on page
39 concerning Mr. Maurer's letter.

Page 58, Findings and Conclusions: We ask that you
change the first sentence to read "The observed pattern of
deceptive solicitations and concealed replacements by MetLife
sales representatives appears to have been for the purpose of
increasing their commissions."

## VII.  SALES AND ADVERTISING

Our concern about this section of the Report is that it
creates the impression that the use of illustrations in a sales
presentation is inherently misleading.  It is our view that
illustrations are not in and of themselves misleading, but rather
can be misleading to the extent they are used improperly by sales
representatives at the point of sale.  We are concerned that this
section may be read to be a challenge to the use of illustrations
which is an accepted, industry-wide practice.  We are uncertain

-3-

M129779220216

M9373

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. Ct."

of the Department's position on this issue and ask that the
Report clarify this issue.

Page 60, second full paragraph: We ask that you insert
"potential" before "effect" in the first sentence. Similarly, we
ask that you replace "may have" for "has" in the last sentence.

## IX.   RETIREMENT PLAN PROMOTIONS

Page 85, first and fourth sentences: Because this part
of the Report focuses on sales material, we ask that you
substitute the words "sales material" for the words "marketing
plans."

Page 85, last sentence: We ask that you substitute the
words "sales materials" for the words "marketing practices and
procedures."

Page 67, last paragraph: We ask that you add the
following language after the word "however" in the second line of
this paragraph: "Departmental sources indicated that." We also
ask that you delete the word "corporate" from the third line of
this paragraph. MetLife uses the term "corporate officer" to
describe officers in the Home Office, rather than officers in the
field, such as Messrs. Kavitsky and Antonino.

Page 91, third to last sentence: We ask that you
change the words "solicitation methods" to "sales material." We
also ask that you delete the word "routinely."

Page 95, last paragraph, first sentence: We ask that
you delete the words: "which had been approved by MetLife."

Page 95, last paragraph, second sentence: We ask that
you delete the words: "upon approval by a marketing division of
MetLife," and substitute the words: "after having been developed
by MetLife's Personal Insurance Advanced Markets unit."

Page 97, second to last sentence: We ask that you
replace the words "were designed to preclude" with "did not
contain."

Page 97, last sentence: We ask that you replace the
words "schemes and practices occurred throughout Pennsylvania"
with "practices have been identified in other regions of
Pennsylvania."

-4-

M129779220217

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091 United States Dist. CL"

## X.  FORMS FILING AND APPROVAL

Page 155, second full paragraph: We ask that the Report include an explanation of the circumstances under which MetLife sought approval for the replacement pages of the Whole Life Policy and Life to 95 and the reasons why the revised versions were not used in Pennsylvania. Thus, we ask that you add an explanation incorporating the following facts: In 1991, MetLife submitted the replacement pages for approval in all 50 states, under the self-imposed condition that unless all 50 states approved the replacement pages, the revised versions would not be used in any state. When MetLife failed to get approval from all 50 states, it continued to use in Pennsylvania the 1987 approved forms. Although MetLife arguably should have withdrawn its approval request for the replacement pages and resubmitted the 1987 version for reapproval,[1] without explanation of the facts, the Report tends to suggest that MetLife acted deceptively.

Page 156, first full paragraph: We ask that you note that the only difference between the original page 1 of the Survivorship Whole Life Policy and the revised page 1 was that the former failed to contain the words "Supplemental Insurance available.  Exchange of Policy if certain changes made in Internal Revenue Code.  (See Policy Split Option)."

Page 157, last paragraph: We ask that you note that the reason the Flexible Premium Life policies failed to contain the appropriate disclosure language simply was due to clerical oversight.  In 1990, when MetLife changed to the use of the laser printer to replace the system of packaging separate pre-printed pages to create a policy, the disclosure language accidentally was not input into the computer.

We also ask that you delete all but the first sentence of the paragraph which starts on page 157 and continues on page 158.  We believe that the disclosure language inadvertently omitted from the policy—"Even if coverage continues, the amount payable on the final date of policy may have little or no value"—relates to the cash accumulation aspect of the policy, whereas the "free" or "paid-up" insurance solicitation method referenced in the Report relates to the face amount of the insurance coverage.  The Report does not indicate that the "free" or "paid-

---

[1]    It is not clear to us that under 40 P.S. § 477b the approval of the revised pages automatically renders the 1987 approved forms "unapproved."  However, we recognize that Pennsylvania insurance regulations require an insurer to inform the Department when an "approved form or filing becomes obsolete and is no longer issued . . . ."  31 Pa. Code § 89.16(b).

-5-

M129779220218

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

up" insurance solicitation method was accompanied by any misrepresentation as to prospective policy cash values.

## XI.  METLIFE CORPORATE INTERVIEWS

Page 163:  Please note that MetLife also accepted the resignation of Mike George, Manager, Washington Branch, during the time period covered by the Department's examination.



-6-

M129779220219

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091  United States Dist. Ct.



EXHIBIT

M129779220220

M9371

Notice: Production and Use Subject to Case Management and Protective
Orders in MDL No. 1091. United States Dist. Ct.”

## EXPLANATORY NOTES

**Flexible-Premium Life** is a versatile nonparticipating insurance policy that can be adjusted to meet changing life-styles and can build a sizable cash accumulation.

**Premium Payments** may be paid at any time and in any amount subject to the limitations stated in the policy. You may skip planned premium payments or change their frequency and amount if the Cash Value is large enough to keep your policy from lapsing. Federal maximum premium limits have been established to ensure that the policy's death benefit is treated as life insurance under the current federal tax law. You should be aware that adjustments may be made.

### Death Benefit Options

Option
1.      The specified face amount of insurance
2.      The specified face amount of insurance plus the Cash Value on the date of death.

A minimum death benefit will be payable under either option. The minimum is a percentage of the Cash Value ranging from 250% at ages 40 and younger to 100% at age 95. After the second policy year you may change the death benefit option.

The specified face amount of insurance may also be changed after the policy has been inforce for 2 years (subject to a minimum increase of $5,000, minimum policy size requirements and any other limits set by the company). An increase in the death benefit is subject to evidence of insurability, and a charge of $5 per $1000 of the increase which will be deducted from the Cash Value.

An expense charge of 4% will be deducted from each planned or unscheduled premium payment. The remaining 96% of the premium goes into the Cash Value that is credited with interest daily and from which monthly deductions are made to cover the cost of the policy's benefits. (Certain proceeds from an existing Metropolitan insurance policy that are transferred to a Flexible-Premium Life insurance policy may not be subject to the 4% expense charge). Interest at the guaranteed rate of 4% per year will be credited to the first $1000 in the Cash Value. On amounts in excess of $1000 in the Cash Value, interest will be credited at the currently declared rate. During the first 15 years, (and 15 years after any increase in the specified Face Amount) a surrender charge is deducted from the cash value. The balance remaining is the **Cash Surrender Value**.

The **Monthly Deductions** is the sum of the following:
1. The cost of term insurance provided on the primary insured.
2. The cost of any additional benefits provided by riders.
3. **First Year:**
   For all policies there will be a monthly charge equal to:
      $15.00 per month at issue ages 50 and older and
      $10.00 per month at issue ages 18-49 and
      $0.00 per month at issue ages 0-17

M129779220221

   Plus $.25 per $1000 of specified face amount.


FORM 603 UL

METROPOLITAN LIFE INSURANCE COMPANY

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

Renewal Years:

For policies with a specified face amount of less than $100,000, there will be a $4.00 monthly administration charge for each month after the first policy year.

For policies with a specified face amount of $100,000 through $249,999, there will be a $2.00 monthly administrative charge for each month after the first policy year.

For policies with a specified face amount of $250,000 or more, there will be no monthly administrative charge after the first policy year.

At any time the policy may be surrendered for its current Cash Surrender Value. The cash surrender value will equal the cash value less the applicable surrender charge and any outstanding loans and loan interest.

A partial cash withdrawal may be made at any time subject to a minimum withdrawal of $250. Also a partial withdrawal will not be permitted if the resulting cash surrender value is less than two monthly deductions based on the cost of term insurance for the month following the withdrawal. Partial cash withdrawals will reduce the Cash Value and if Death Benefit Option A is in effect, will also reduce the specified face amount or insurance by the amount of the withdrawal. A cash withdrawal that will result in a specified face amount that is less than the minimum will not be permitted.

The policy loan provision provides for a policy loan interest rate of 8%. A loan will affect the interest rate credited to loaned amounts that are the excess of the first $1000 in the Cash Value.

The Interest-Adjusted Indexes provide a means for evaluating the comparative cost of the policy under stated assumptions. They can be useful in comparing Universal Life coverages only if the same premium and death benefit are assumed for each plan being compared — a lower index is better than a higher one. In computing the indexes, an assumed rate of interest is applied in averaging the premiums paid and benefits available over a stated period of time, taking into account the time value of money.

At attained age 18, the holder of a juvenile policy can request to have his or her class upgraded to an adult preferred or standard nonsmoker.

Intermediate values are illustrated based on current mortality rates and charges and the rate of interest chosen by the client.

This proposal is not a contract nor an offer to contract. For full details ask to see a specimen contract.

Any application for insurance will be subject to Metropolitan's underwriting rules.

M129779220222

FORM 603 UL

METROPOLITAN LIFE INSURANCE COMPANY

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

The following are <u>Additional Benefits</u> in rider form that may be included in your policy. For full details ask to see a specimen contract.

<u>Disability Waiver Benefit</u> (Form 72W-89) provides that if you become totally disabled as described in the rider, before age 60 and your disability lasts for at least six months, the monthly deductions will be waived while totally disabled. In addition, the monthly deductions for the first 6 months of disability will be reversed. If total disability continues to age 65, all future monthly deductions will be waived as they fall due.

<u>Accidental Death Benefit</u> (Form 72A-89) provides additional insurance, usually equal to the specified face amount (subject to company maximum). If you die from the accident.. An amount equal to twice the A.D.B. amount is paid if the accident occurred.while you were a fare-paying passenger in a licensed public conveyance being operated by a common carrier for passenger service.

<u>Spouse Term Insurance Rider</u> (Form 71ST-89) provides term insurance payable if your spouse dies prior to the expiration of coverage (generally the spouse's age 65). If you die while the rider is in force, a supplementary paid-up term insurance policy will be issued on your spouse.

<u>Children's Term Insurance Rider</u> (Form 71CT-89) provides term insurance on each child, payable if a child dies prior to the expiration of his or her individual coverage (generally at age 25). If you die while this rider is in force, a supplementary paid-up term insurance policy will be issued on each covered child.



M129779220223

FORM 603 UL

METROPOLITAN LIFE INSURANCE COMPANY

M9371

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091 United States Dist. Ct.