IN THE COMMONWEALTH COURT OF PENNSYLVANIA

J. JOEL SHERMAN,  :
        Petitioner  :
                 :
    v.               : No. 309 M.D. 1994
                 : HEARD: August 10, 1994
CYNTHIA MALESKI, Insurance  :
Commissioner of the Pennsylvania:
Insurance Department and the  :
PENNSYLVANIA INSURANCE  :
DEPARTMENT,  :
        Respondents :

BEFORE:  HONORABLE ROCHELLE S. FRIEDMAN, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY JUDGE FRIEDMAN     FILED: August 30, 1994

       Jeffrey Joel Sherman (Sherman) has filed an Application for Special Relief in the Nature of a Preliminary Injunction in our original jurisdiction against Cynthia M. Maleski, Insurance Commissioner (Commissioner), and the Pennsylvania Insurance Department (Department).

       Sherman is an insurance agent licensed by the Department to do business in Pennsylvania. From March of 1982 until October of 1993, Sherman wrote insurance policies for Metropolitan Life Insurance Company (MetLife) and was a top salesperson for that company.

       On August 18, 1993, the Department initiated a market conduct examination of MetLife pursuant to Article IX of The

Insurance Department Act of 1921 (Insurance Department Act).[1] The scope of the Department's examination of MetLife included, *inter alia*, "Agent Activities" and "Agent Sales Practices." (*See* Comm. Exh. No. 1 at 43 & 59.)

As the Department proceeded with its examination, MetLife began to dismiss sales representatives and management personnel in the geographical areas under investigation. (N.T. at 135.) Sherman became aware of the examination through his clients who had been contacted by the Department for purposes of the examination. (N.T. at 134.) MetLife fired Sherman on October 27, 1993. (N.T. at 135-36, 148.) Subsequently, Sherman met with the Department to offer his cooperation, but the Department concluded its investigation on December 27, 1993 without Sherman's involvement. (N.T. at 76-77, 127, 137.) Thereafter, Sherman obtained employment as a sales representative for Jefferson-Pilot Life Insurance Company (Jefferson-Pilot) and Sun Life of Canada (Sun Life).

In a letter dated January 26, 1994, the Department officially notified Sherman that he was the subject of an

---

[1] Article IX of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, *as amended*, 40 P.S. §§323.1-323.8.

On April 17, 1993, the Commissioner issued an order pursuant to section 905(c) of the Insurance Department Act, 40 P.S. §323.5(c), making Thomas S. Buzby, Deputy Insurance Commissioner, her designee "to fully consider and review the report [of the market conduct examiners], together with any written submissions or rebuttals and any relevant portions of the examiner's workpapers, and enter an order."

-2-

enforcement investigation. (Sherman Exh. S.) The letter stated that the Department's examination of MetLife indicated that Sherman had violated sections of Pennsylvania's Insurance Regulations, the Insurance Department Act, and the Unfair Insurance Practices Act (UIPA).[2] (Id.)

On February 11, 1994, the Department formally issued a Market Conduct Examination Report (Report), containing the Department's findings and conclusions, and an order adopting the Report as an official record of the Department.[3] With respect to "Agent Activities," the Report mentioned Sherman by name and concluded that he and others had misled clients with "deceptive

---

[2] Act of July 22, 1974, P.L. 589, 40 P.S. §§1171.1-1171.15.

[3] As the Commissioner's designee, Thomas S. Buzby issued the order on February 11, 1994, stating in part:

> 1. The attached Examination Report will be adopted and filed as an official record of this Department. All findings and conclusions resulting from the review of the [E]xamination Report and related documents are contained in the attached Examination Report.

(Comm. Exh. No. 1, Order of Thomas S. Buzby.) Pursuant to section 905(d)(1) of Article IX, the order constituted a "final administrative decision." Section 905(d)(1) states in pertinent part:

> (d)(1) All orders ... shall be accompanied by findings and conclusions resulting from the commissioner's consideration and review of the examination report.... Any such order shall be considered a final administrative decision and may be appealed to the commissioner....

40 P.S. §323.5(d)(1).

-3-

solicitations and concealed replacements."[4] (Comm. Exh. No. 1 at 58.) The Report also mentioned Sherman in its evaluation of MetLife's "Agent Sales Practices," concluding that he and others were guilty of misrepresentation in violation of section 5(a)(1)(vi) of the UIPA, 40 P.S. §1171.5, and section 637 of the Insurance Department Act, 40 P.S. §277.[5] After the issuance of the Report, Sun Life and Jefferson-Pilot informed Sherman that his sales records would have to be reviewed by his supervisors at those companies for compliance with insurance laws and regulations. (Sherman Exh. N & O.)

On March 4, 1994, Governor Casey and the Commissioner announced that the Department had fined MetLife $1.5 million for, inter alia, misleading sales practices. The Governor issued a press release that same day, quoting the Commissioner as follows: "[t]he evidence of MetLife agents' rampant misrepresentation to the public ... is indisputable." (Sherman Exh. C at 3)(emphasis added).

---

[4] The Report states that "[r]eplacement solicitations were such as to cause policyholders, directly or indirectly, to believe that by using their existing policy values to purchase new insurance they were to receive paid-up policies, free coverage, or increased coverage at little or no additional cost." (Comm. Exh. No. 1 at 58.)

[5] The Report stated that MetLife's agents, including Sherman, had made misrepresentations by "utilizing sales illustrations based upon non-guaranteed projected values, and in many cases reinforcing the sales illustration values with cover letters containing misleading statements concerning the insurance policy being sold." (Comm. Exh. No. 1 at 71-72.)

-4-

On March 10, 1994, Applicant Insight, Ltd. telephoned Ralph W. Burnham, Market Conduct Examiner, on behalf of its client, Sun Life, inquiring into the investigation of Sherman. Burnham had received similar telephone requests previously and had declined to comment. On this date, however, Burnham, in response to a hypothetical question about an agent who delayed policy replacements to earn higher commissions, stated that such activity constituted embezzlement. (N.T. at 74-75.) Applicant Insight, Ltd. then noted on its report that the Department was investigating Sherman for embezzlement. (Sherman Exh. K.)

On June 29, 1994, the Department filed an Order to Show Cause (Order) why the Department should not revoke Sherman's license.[6] (Comm. Exh. 2.) The Order alleged, based upon incidents described in the Report, that Sherman had violated the Commonwealth's laws and regulations pertaining to misrepresentation and unfair or deceptive practices.[7] (Comm. Exh. 2 at 32-34.) The Order also informed Sherman that he should respond within thirty days and that, if he did, the Department would hold a formal administrative hearing on the matter. (Comm. Exh. 2 at 35.)

In a June 30, 1994 press release, the Department announced that Sherman had been accused "of engaging in a pattern

---

[6] We note that such orders are published in the Pennsylvania Bulletin.

[7] Contrary to the Applicant Insight, Ltd. report, the Order did not contain an allegation of embezzlement.

-5-

of numerous and continuous unfair and deceptive practices, evidencing total disregard for [his] clients' interests, and sacrificing [his] clients' financial and emotional well-being for [his] own financial gain." (Sherman Exh. F at 1.) Thereupon, the New York Times reported that Sherman had been mentioned by name in a "scathing report" issued earlier in the year about the sales practices of some agents at MetLife. (Sherman Exh. Q.) The Wall Street Journal also printed an article referring to the alleged deceptive sales practices of certain MetLife agents, including Sherman. (Sherman Exh. R.) As a result of the Order and the resulting publicity, Sun Life and Jefferson-Pilot suspended Sherman pending satisfactory resolution of the matter. (Sherman Exh. L & P.)

On July 18, 1994, Sherman filed the present Application for Special Relief in the Nature of a Preliminary Injunction,[8] requesting that this court issue a preliminary injunction staying any Departmental action on the Order until this court has decided the merits of his Petition for Review in the Nature of a Complaint for Injunctive Relief (Complaint). In his Complaint, Sherman alleged that the Department violated his right to procedural due

---

[8] At the same time, Sherman filed a Petition for Review in the Nature of a Complaint for Injunctive Relief and a Motion for Expedited Consideration of the Application for Special Relief in the Nature of a Preliminary Injunction. This court issued an order on July 21, 1994 granting the Motion for Expedited Consideration and fixing the hearing for July 28, 1994. However, on July 28, 1994, the parties presented a Joint Motion to Continue the hearing, which was granted.

-6-

process by precluding the possibility of defending himself before a fair and impartial tribunal. In particular, Sherman alleged that the Commissioner, by issuance of the Report and by her public comments, had prejudged his guilt with respect to the incidents described in the Order.

On August 8, 1994, the Department filed a Motion to Quash Subpoenas, alleging that (1) certain documents requested by Sherman are not subject to subpoena under 40 P.S. §323.5(f); (2) certain records are privileged as attorney work products and attorney-client communications; and (3) the request itself is overbroad, burdensome and vexatious.[9]

On August 10, 1994, a hearing was held before this court on Sherman's request for a preliminary injunction and the Department's Motion to Quash Subpoenas.[10] On that same day, the Commissioner appointed William S. Taylor, Deputy Insurance Commissioner, to be the adjudicative officer in the license revocation proceedings against Sherman.

---

[9] The critical issues involved in the motion appear to have been resolved between the parties. We note that no argument was made to this court upon which we might base an adjudication of this matter.

[10] Sherman testified on his own behalf and presented the testimony of Thomas S. Buzby, Deputy Insurance Commissioner, and Ralph W. Burnham, Market Conduct Examiner.

-7-

I. Preliminary Injunction

A preliminary injunction shall be granted if: (1) it is necessary to prevent immediate and irreparable harm which could not be compensated by damages; (2) greater injury would result by refusing the injunction than by granting it; and (3) the injunction properly restores parties to their status as it existed prior to the alleged wrongful conduct. The court must also be convinced that the right to a preliminary injunction is clear and that general equity jurisdiction is warranted. Valley Center, Inc. for Mental Health v. Parkhouse, 62 Pa. Commonwealth Ct. 453, 437 A.2d 74 (1981).

A. Immediate and Irreparable Harm

Sherman contends that (1) he is in immediate danger of losing his license and therein the right to earn a living, (2) his business reputation has been irreparably harmed by issuance of the Report and the Commissioner's public comments, (3) his business reputation will be irreparably harmed by the revocation of his license, and (4) such harm could not be compensated by damages. The Department, however, maintains that Sherman has not suffered immediate and irreparable harm but, instead, has merely suffered from adverse publicity,[11] the loss of ability to write new

---

[11] The Department cites Pye v. Insurance Department, 29 Pa. Commonwealth Ct. 545, 372 A.2d 33 (1977), aff'd, 479 Pa. 146, 387 A.2d 877 (1978), where we stated that adverse publicity is a risk encountered by all parties to legal proceedings and is not alone sufficient to invoke the remedy of injunction. However, adverse publicity is not the only factor to be considered in this case; we
(continued...)

-8-

insurance policies[12] and the <u>possible</u> loss of his license. We agree with Sherman.

Although the Department argues that the loss of Sherman's license is not immediate, but merely speculative, we believe that the conclusions of the Report, in conjunction with the order adopting the Report as an official Department record, constitute a <u>final administrative decision</u> of the Department under 40 P.S. §323.5(d)(1),[13] and the Commissioner's statement that the evidence of rampant agent misrepresentation is "indisputable" demonstrates that Sherman is in immediate danger of losing his license due to prejudgment by the Commissioner. Moreover, we believe that the revocation of Sherman's license would irreparably harm his reputation and his ability to earn a living. Furthermore, such harm cannot be compensated by damages because it would be impossible to calculate the amount of lost income resulting from the revocation of Sherman's license.

---

[11](...continued) must also take into account Sherman's allegation of prejudgment by the Commissioner, an element that was not present in <u>Pye</u>.

[12] Notably, the Department's brief lacks any authority to support its statement that the loss of ability to write insurance policies does not constitute immediate and irreparable harm.

[13] We note that section 905(d)(1) of Article IX of the Insurance Department Act, 40 P.S. §323.5(d)(1), allows for a "company" to appeal an order to the Commissioner. However, Sherman is not a "company" as defined by section 902 of Article IX of the Insurance Department Act, 40 P.S. §323.2; thus, the statute does not give Sherman the right to appeal the findings and conclusions contained in the Report which pertain to him.

-9-

### B. Greater Injury Will Occur

Sherman maintains that greater injury will result from denying his request for a preliminary injunction than from granting it. Sherman contends that he will lose his license and, thus, the right to earn a living, whereas the Department will suffer no harm by waiting for this court to decide the merits of Sherman's complaint. Because Sun Life and Jefferson-Pilot have suspended any policy-writing activity by Sherman pending resolution of this matter, we agree with Sherman that greater harm will result from denying the preliminary injunction than from our granting it.

### C. Restore Parties to Status Quo

Sherman argues that the grant of the preliminary injunction will restore the parties to the status quo existing at the time of the alleged wrongdoing. Here, Sherman maintains that the Department's wrongful action was issuance of the Order and that a stay of the administrative proceedings would restore the parties to the status quo existing prior to the issuance of the Order.

We disagree with Sherman's contention that issuance of the Order constitutes the Department's wrongful action. An order to show cause is the Department's statutory means of initiating due process for a party against whom charges have been raised: it gives notice that particular allegations have been made by the agency against the party, and it offers an opportunity for the party to defend against the allegations before a fair and impartial

-10-

tribunal. We agree with Sherman that he cannot get a hearing before a fair and impartial tribunal; however, the reason for this is not because the Department issued its Order but, rather, because of the impermissible inclusion of Sherman's name in the Department's Report[14] and the Commissioner's subsequent public remarks. These wrongful actions deprive Sherman of an opportunity to be heard before a fair and impartial tribunal because they constitute prejudgment.

Thus, to return the parties to their status prior to the wrongful actions would require that we place the parties in the circumstances existing prior to the issuance of the Report. However, because Sherman failed to request that Sherman's name be removed from the Report, which would place him in the position he was in prior to the Department's harmful action, and because

---

[14] Mr. Buzby, in response to questions from the court, testified as follows:

> THE COURT: Mr. Buzby, if the report said everything it said except for naming the agents who have ... allegedly violated the law, would it be as efficacious a report? In other words, could you still have your order without ever naming those agents ...?
>
> THE WITNESS: I would have to answer your question in the affirmative, Your Honor, and to point out to you in other reports that we have issued ... we have illustrated the same types of sales activities ... without attaching names....

(N.T. at 109-10.)

Sherman failed to request a general prayer for relief in equity, we cannot grant the relief sought here.[15]

Although this issue is dispositive of Sherman's request for a preliminary injunction, we believe that the remaining questions warrant discussion at this time because of their importance to the adjudication of Sherman's Complaint. Thus, for the sake of judicial economy, we will address whether Sherman is likely to prevail on the merits of his Complaint and whether this court lacks equity jurisdiction because Sherman failed to exhaust administrative remedies.

### D. Clear Right to Relief

In determining whether a petitioner has a clear right to a preliminary injunction, this court must determine whether, when the issues are finally resolved, petitioner will prevail on the merits. AFSCME, AFL-CIO v. Commonwealth, 77 Pa. Commonwealth Ct. 37, 465 A.2d 62 (1983).

---

[15] See Standard Pennsylvania Practice 2d §79:150 (1983) (footnotes omitted) (emphasis added), which states in pertinent part:

> The decree in an action in equity must conform to the pleadings ... and must be consistent with the relief prayed for in the complaint .... In this regard, the equity decree should not exceed the relief prayed for in the complaint ... although, under a general prayer for relief in equity, the court ... may enter any agreeable relief, even though not specifically requested in the prayers.

-12-

### 1. Procedural Due Process

#### a. Deprivation of a Protected Property Interest

Because Sherman asserts a procedural due process violation, we must initially establish a right to due process in this case. In order for due process protections to apply, a person must have a substantial property interest. In Lyness v. State Bd. of Medicine, 529 Pa. 535, 605 A.2d 1204 (1992), our Supreme Court stated that such property rights include the right of an individual to pursue a livelihood or profession. Moreover, in Stone and Edwards Ins. Agency v. Department of Insurance, ___ Pa. Commonwealth Ct. ___, 636 A.2d 293 (1994), we recognized that an existing license to transact business cannot be revoked or suspended without the requisite process. Thus, Sherman has a constitutionally protected property interest in his existing license, which is threatened by the Department's Order.[16]

#### b. Fair and Impartial Tribunal

"[T]he basic elements of procedural due process are adequate notice, opportunity to be heard, and the chance to defend

---

[16] Furthermore, in R v. Department of Public Welfare, ___ Pa. ___, ___, 636 A.2d 142, 149 (1994), our Supreme Court stated:

> [I]n Pennsylvania, reputation is an interest that is recognized and protected by our highest state law: our Constitution. Sections 1 and 11 of Article I make explicit reference to "reputation," providing the basis for this Court to regard it as a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal protection.

-13-

oneself before a fair and impartial tribunal having jurisdiction of the case." Lyness, 529 Pa. at 542, 605 A.2d at 1207 (quoting Commonwealth v. Thompson, 444 Pa. 314, 316, 281 A.2d 856, 858 (1971)). Sherman does not dispute that the Department has provided adequate notice and an opportunity to be heard with respect to the Order; rather, Sherman questions that he will have the chance to defend himself before a fair and impartial tribunal.

### (1) Prejudgment

Sherman maintains that the findings and conclusions of the Report, which in conjunction with Buzby's order constitute a final adjudication of the Department, and the Commissioner's public comments regarding the "indisputable" evidence demonstrate that the Commissioner has prejudged his guilt with respect to the incidents described in the Order. The Department contends that the Commissioner bears no personal antagonism towards Sherman, but if she did, the Commissioner has avoided even the appearance of bias by delegating her power to someone else.

In Lyness, our Supreme Court stated that "a mere possibility of bias under Pennsylvania law is sufficient to raise the red flag of protection offered by the procedural guaranty of due process" and that actual bias was not the watchword in

-14-

ferreting out violations of due process under the Pennsylvania Constitution. Lyness, 529 Pa. at 544, 605 A.2d at 1208.[17]

Here, Sherman has shown that the Department, pursuant to the authority of the Commissioner under Article IX of the Insurance Department Act, performed a market conduct examination of MetLife and issued its Report. The Report, which named Sherman and concluded that he had violated sections of Pennsylvania's insurance laws and regulations, became a final administrative decision of the Department. The Department, then, through the power vested in the Commissioner, decided against Sherman without according him notice or an opportunity to defend himself before a fair and impartial tribunal. Thereafter, the Commissioner publicly condemned the rampant misrepresentation of the agents, stating that the evidence against them was "indisputable." We believe that the Report and the Commissioner's statement, taken together, indicate that the

---

[17] The Department relies on older cases, including a withdrawn opinion and a reversed decision, and contends that Sherman must prove actual bias or personal antagonism by the Commissioner towards Sherman. See Reilly v. SEPTA, 507 Pa. 204, 489 A.2d 1291 (1985); In re Appeal of Blystone, 144 Pa. Commonwealth Ct. 27, 600 A.2d 672 (1991), appeal denied, 534 Pa. 641, 626 A.2d 1159 (1993); Pennsylvania Publications, Inc. v. Pennsylvania Public Utility Commission, 152 Pa. Superior Ct. 279, 32 A.2d 40 (1943), rev'd, 349 Pa. 184, 36 A.2d 777 (1944); and Subscribers of Erie v. Insurance Dep't, (No. 2266 C.D. 1990, opinion withdrawn Oct. 11, 1991).

Moreover, we believe that those cases cited by the Department that have any weight are readily distinguishable from the case before us here. Unlike this case, Reilly was a recusal case concerning a judge who allegedly felt animosity towards an attorney, not a party. Blystone involved a commissioner who had expressed personal bias against a party before he was commissioner, not while serving as commissioner.

-15-

Commissioner has prejudged Sherman. We do not believe that the Commissioner, as the ultimate adjudicator, can now accord Sherman his constitutional right to a fair and impartial tribunal with respect to the matters contained in both the Report and the Order.

### (2) Delegation of Authority

The Department argues that the Commissioner has avoided any appearance of bias by appointing William Taylor as a neutral and detached party to preside over Sherman's license revocation hearing. Sherman, however, contends that the Commissioner is unable to delegate her ultimate adjudicatory power. We agree with Sherman.

The Department's argument fails to recognize that the prescribed statutory scheme clearly dictates that the Commissioner shall have final authority in all phases of the proceedings. As the language of the statute indicates, the duties required by the statutory scheme begin and end with the Commissioner.[18] Although

---

[18] Section 1171.7 of the UIPA states:

> The Commissioner may examine and investigate the affairs of every person engaged in the business of insurance in this state in order to determine whether such person has been or is engaged in any unfair method of competition or in any unfair or deceptive act or practice prohibited by this act.

40 P.S. §1171.7 (emphasis added). Section 1171.8 of the UIPA states:
> (a) If, as a result of investigation, the Commissioner has good cause to believe that
> (continued...)

-16-

[18](...continued)
> any person is violating any provision of this act, the <u>Commissioner</u> shall send notice of the violation by certified mail to the person believed to be in violation. The notice shall state the time and place for hearing which shall not be less than thirty days from the date of such notice.
>
> (b) At the time and place fixed for the hearing in the notice, the person shall have an opportunity to be heard and to show cause why an order should not be made by the <u>commissioner</u> [sic] to cease and desist from acts constituting a violation of this act and why administrative penalties should not be assessed.
>
> (c) Upon good cause shown, the <u>Commissioner</u> shall permit any person to intervene, appear and be heard at the hearing, either in person or by counsel.
>
> (d) The <u>Commissioner</u> may administer oaths, examine and cross-examine witnesses, receive oral and documentary evidence and subpoena witnesses, compel their attendance and require the production of books, papers, records or other documents which he deems relevant to the hearing. The <u>Commissioner</u> shall cause a record of all evidence and all proceedings at the hearing to be kept.
>
> (e) Following the hearing, the <u>Commissioner</u> shall issue a written order resolving the factual issues presented at the hearing and stating what remedial action, if any, is required of the person charged....

40 P.S. §1171.8 (emphasis added). Furthermore section 1171.9 of the UIPA states:

> Upon a determination by hearing that this act has been violated, the <u>Commissioner</u> may issue an order requiring the person to cease and desist from engaging in such a violation or, if such violation is a method of competition, act or practice defined in section 5 of this act, the <u>Commissioner</u> may suspend or revoke

(continued...)

-17-

Taylor may conduct the hearing at the Commissioner's request and may advise the Commissioner regarding the appropriate adjudication, the Commissioner retains the ultimate decision making power.[19]

### E. General Equity Jurisdiction Warranted

The Department argues that general equity jurisdiction is not warranted here because Sherman has failed to exhaust available administrative remedies.

---

[18](...continued)
the person's license.

40 P.S. §1171.9 (emphasis added).

[19] 1 Pa. Code §35.187, entitled "Authority delegated to presiding officers," states in pertinent part:

> Presiding officers designated by the agency head to preside at hearings shall have the authority ....
>
> (7) To dispose of procedural matters *but not* ... to dispose of motions made during hearings to dismiss proceedings or other motions which involve *final determination* of proceedings.

1 Pa. Code §35.187(7) (emphasis added). Moreover, 31 Pa. Code §56.2(a), which supersedes 1 Pa. Code Part II pertaining to proposed reports, states in pertinent part:

> (a) At the conclusion of an administrative hearing, if submission of briefs is waived by participants with the consent of the presiding officer or the Insurance Commissioner sitting as such or after submission of briefs, the matter will be adjudicated by the *Commissioner*.

31 Pa. Code §56.2(a) (emphasis added).

-18-

Our Supreme Court has long recognized the general rule requiring a petitioner to exhaust all available administrative remedies before seeking judicial redress for an alleged wrongdoing by a government agency. Feingold v. Bell of Pennsylvania, 477 Pa. 1, 383 A.2d 791 (1977). As recently stated in Terminato v. Pennsylvania National Insurance Co., ___ Pa. ___, ___ A.2d ___, 1994 Pa. LEXIS 332 *12 (Pa. Aug. 4, 1994), "[w]here the Legislature provides a statutory remedy that is mandatory and exclusive, the general rule is that a court is without power to act." However,

> [a]s with all legal rules, the exhaustion of administrative remedies rule is neither inflexible nor absolute, and this Court has established exceptions to the rule. Thus, a court may exercise jurisdiction where the administrative remedy is inadequate.

Feingold, 477 Pa. at 7, 383 A.2d at 793. "The mere existence of a remedy does not dispose of the question of its adequacy." Id. at 7, 383 A.2d at 794. The available statutory remedy must be able to provide the relief requested for the alleged injury sustained. Terminato, ___ Pa. at ___, ___ A.2d at ___, 1994 Pa. LEXIS 332 at *15. "If the statute [providing the remedy] does not apply to a controversy, it obviously is not intended to be any remedy, much less an exclusive remedy." Id.

In this case, the available administrative remedy is not adequate because the Department simply cannot provide Sherman with a fair and impartial tribunal with respect to the Order. Sherman alleges that the Commissioner has prejudged him; the relevant statutes and regulations do not permit the Commissioner to delegate

-19-

her ultimate authority to adjudicate this matter. Because neither the statute nor the regulations address this particular problem, they have not provided _any_ remedy for Sherman, much less an exclusive remedy.

## II. Conclusion

Because Sherman failed to make a _general_ prayer for equitable relief, we are constrained to consider the relief requested. We conclude that Sherman's request for a stay pending review of his Complaint by this court does not place the parties in the status quo existing prior to the Department's issuance of the Report and the attendant publicity. Accordingly, Sherman's request for preliminary injunction is denied.

ROCHELLE S. FRIEDMAN, JUDGE