# An Opinion in the Case of Gonda

## v. MetLife et al.

**United States District Court**
**Western District of Pennsylvania**

Robert Boyd Carter, CLU, ChFC
Louisville, Kentucky
May 10, 2006

## Introduction and Statement of Facts:

I was first approached about this case in April, 2006, by the firm of Behrend & Ernsberger, representing the Plaintiff, Ronald M. Gonda. I formulated my opinion after reading the Complaint and attached exhibits; the Plaintiff's Pre-Trial Report and all attachments; the Opinion of the U.S. Court of Appeals for the Third Circuit dated 11-17-05; the deposition of Ronald M. Gonda taken 9-10-2003 and attached exhibits; the deposition of the Defendant, William G. Friedt taken 10-17-2003; the deposition of William G. Friedt in another case taken 7-23-1994 (and included in the exhibits for the deposition in this case); expert opinions submitted by Michael J. Dupay in the Eck, Hazen, Kintner Kressovich and Mohney cases; the Pennsylvania Market Conduct Examination of MetLife dated 2-11-1994; and the Connecticut Market Conduct Examination of MetLife dated 10-14-1998; documents and depositions in other cases in which I have submitted expert opinions or testified, or both; and several authoritative texts. A copy of my CV is attached.

The Plaintiff, Ronald M. Gonda, was a 38-year-old single man with no dependents in March, 1992, when he was approached by the Defendant, William G. Friedt, who was then an Agent for MetLife. Mr. Gonda owned two individual life insurance policies at that time—A $10,000 Whole Life policy from Prudential Life and a $50,000 Universal Life policy from Pruco Life (a Prudential subsidiary). His premiums for these two policies were $26.36 and $49.50 a month, respectively.

Mr. Gonda was a mold fitter for an industrial company with a high school education and no particular financial background. He owned no annuities, bonds, CDs, stocks or other securities. His only individually-owned financial products were the two life policies. Indeed, he was uncertain about those. For example, he could not give a very precise definition of the Whole Life policy.

> Q: Is it a whole life insurance policy?
>
> A: I think so.
>
> Q: Do you now what a whole life insurance policy is?
>
> A: No. (Gonda deposition, P. 12:2-6).
>
> Q: From the time that you purchased the policy until you were 38, did you pay all the premiums?
>
> A: Yes.
>
> Q: Do you recall whether it was whole life or term?
>
> A: I'm not sure.
>
> Q: Do you know if that policy paid you any dividends?
>
> A: I don't think so. I'm not sure. (Gonda deposition, P. 14:3-12).

Indeed, when pressed, Mr. Gonda could not define "dividend", a critical value of his Prudential policy and a key selling point of the MetLife policy in this case.

> Q: ...do you know what the term dividend means?
>
> A: No. What does it mean? (Gonda deposition, P. 23: 5-7).

2

Although Mr. Gonda was confused about his existing insurance, Defendant Friedt offered him a new MetLife Whole Life policy that would be "paid up" in 10 years, for a premium of just $50.00 a month, plus the cash value of Mr. Gonda's existing $50,000 Pruco Universal Life policy (which had a premium of $49.50 a month).

> Q: What did you talk about? *(At this appointment with Agent Friedt.)*
>
> A: He said about the policy being paid up inside of ten years.
>
> Q: Did you discuss how it would be paid up in ten years?
>
> A: Like 50 bucks a month.
>
> Q: So you discussed that if you paid premiums of $50 a month, the policy would be paid up after ten years?
>
> A: Yeah.
>
> Q: Did you discuss with Mr. Friedt how premiums would be paid after ten years?
>
> A: Policy would be done after ten years, paid up. It was like a retirement thing. The policy, it was like he sold it back so I got $1800 out of it *(referring to surrendering the Pruco policy.)*. He said the *(new MetLife policy)* policy is paid up for three years, and I only have seven years to go and it will be paid up. (Gonda deposition, P. 21: 15-25 and P. 22: 2-8).

In fact, Mr. Friedt showed Mr. Gonda an illustration for a new $64,667 Whole Life policy with a stated monthly premium of $110.35 and an annual Paid Up Additions Rider assuming another $600.00 would be paid in to enhance values.

However, this sophisticated scenario was contained in a "Whole Life Plus" illustration prepared by Agent Friedt that was titled: "Illustration of Values of the Funding of a Retirement Plan". This illustration displayed a "Net Payment" of $1801 a year for just 10 years and a "hypothetical taxable alternative" of 8.33% to equal the projected cash value accumulation of $318,537 at Mr. Gonda's Age 65 **(but assuming that the full $1801 annual premium was in fact paid each year for 27 years.)**

This dubious illustration was reinforced by another titled "50/50 Personal Savings Plan" which compared the proposed Whole Life policy favorably to both CDs and IRAs (neither of which Mr. Gonda owned.) Among the advantages for the Whole Life policy on this "50/50 Plan" illustration was statement # 1: "disability feature--yes" (meaning the Waiver of Premium benefit available as an option with Whole Life policies.)

It is clear Mr. Gonda did not understand any of this.

> Q: When you say it was supposed to be a retirement kind of thing, what kind of retirement kind of thing was it supposed to be?
>
> A: I was supposed to get like--when I was 65 I could use it for retirement. It was supposed to be $64,000 or something like that. Leave it there or take it out when I retire. (Gonda deposition, P. 22: 9-15).

Agent Friedt persuaded Mr. Gonda to replace his existing $50,000 Pruco policy with the illustrated MetLife "Whole Life Plus" plan. (The older $10,000 Prudential policy was left undisturbed.)

3

Q: What did you (sic) tell him about that policy? (The $50,000 Pruco policy.)

A: He told me it wasn't a very good policy. It was sort of shaky because it was like stocks and bonds. He said this policy was better (indicating). (In original).

Q: He said the Pruco policy was related to stocks and bonds?

A: Yes.

Q: How did he tell you this policy, this, meaning the MetLife policy, was better than the Pruco?

A: This would be paid up in ten years. (Gonda deposition, P. 24: 2-14).

At that initial appointment Agent Friedt completed an application for a Met Life Whole Life policy for $64,667 with an annual unscheduled Paid Up Additions Rider for $600, **but without Waiver of Premium--the #1 feature of the so-called "50/50 Personal Savings Plan."**

Furthermore, Agent Friedt indicated correctly on the application that the sale of the new MetLife policy involved a replacement of the existing Pruco policy–**but he neglected to complete the additional forms required in replacement sales in Pennsylvania.** This additional paperwork, which is not onerous, consists of Notifications to the applicant (Ronald M. Gonda) and the company whose policy is being replaced (Pruco) that a replacement may be in process. It is designed to caution the applicant that a replacement may not be in his best interests and to alert the company being replaced so that it can make its best efforts to conserve its business. Consequently, Agent Friedt violated the Pennsylvania Insurance Code by not making a proper Notification.

Following this first appointment, Agent Friedt returned with MetLife policy #925 207 015A for $64,667 and with a $110.35 a month premium and a $600 Paid Up Additions Rider (but no Waiver of Premium) and with the annual premium payable for 62 years, or until Mr. Gonda would be Age 100. The cash surrender value of Mr. Gonda's Pruco policy ($1618.82) was rolled into the MetLife policy to help offset the premium gap--the difference between the $50.00 a month Mr. Gonda would pay and the actual standard premium of $110.35 a month; the balance, if any, would be paid into the Paid Up Additions Rider.

Q: The second meeting with Mr. Friedt, what did you discuss during that second meeting?

A: He brought the Pruco thing back and said I got $1800, and he invested it into this so I wouldn't have to pay taxes. My policy was paid up for three years.

Q: When you say he brought the Pruco thing back, what did he bring back to you? The Pruco policy?

A: He told me he sold it back, got $1800 for it and my policy was paid for three years. Then he asked me for a blank check so he could deduct the $50 a month out of my checking account. (Gonda deposition, P. 37: 6-20).

Of course, this shaky financial arrangement could not continue--Mr. Gonda's $50-a-month payment was insufficient to pay the required $110.35 premium for more than a year or so, even with the rollover of cash value from the Pruco policy. Soon, Mr. Gonda began to get lapse notices from MetLife.

4

Q: You said they kept requesting more premiums and more premiums and you couldn't afford that. Did you receive notices from the company regarding premium payments?

A: Yeah. That's when--they wanted like 1200 bucks or something.
(Gonda deposition, P. 50:22-25 and P. 51: 2-4).

Eventually, Mr. Gonda submitted a cash surrender form for the MetLife policy, dated 1-21-94, just 21 months after the policy had been issued, and received approximately $600 (the cash value of the Paid Up Additions Rider).

Q: Do you have any recollection of how you received this document?

A: I think the guy came to my house and paid, gave me 600 bucks or something for the policy. I could not afford the *(sic)* pay the premiums. He kept sending me bills for $1200. It was only supposed to be 50 bucks a month. (Gonda deposition, P. 50: 4-10).

Although he received an approximate $600 refund, Mr. Gonda had spent much more at that time--$50 a month for 21 months, or $1050, plus the $1618.82 in the Pruco cash value. His experience with MetLife cost him more than $2000 in direct loss.

Mr. Friedt was not around to witness this unhappy conclusion; he had already left the company.

Q: When you say a guy came to your house, was that Mr. Friedt?

A: No. He don't work there no more.

Q: How did you find out that he didn't work there no more?

A: Guy told me.

5

## The Policies in the Case:

The policy Agent Friedt sold Mr. Gonda was a Whole Life policy, characterized by a fixed premium payable until Age 100. The policy would have earned three Non-forfeiture Values, one of which is called Cash Surrender. Mr. Gonda's policy also had a Paid Up Additions Rider, a device to allow additional unscheduled premiums (in this case $600 a year) to purchase two of these Non-forfeiture Values—Cash Surrender value (commonly called cash value) and Paid-Up Additions (increases in the face amount).

This Paid Up Additions Rider is the source of the $600 "refund" Mr. Gonda received when he surrendered the MetLife policy.

The MetLife policy was participating, meaning that it shared in the divisible surplus of the Company—its distributable profits. Policy dividends, however, cannot be guaranteed, and economic factors caused MetLife's dividends to decline significantly and steadily after Mr. Gonda's policy was issued.

Furthermore, MetLife changed its form of corporate ownership in 2000 from a mutual company owned by its policyowners, such as Mr. Gonda, to a stock company owned by its shareholders. From then on policyowners would take second-place to shareholders in the competition for profits and decreasing policy dividends.

Thus, the 10-year "paid up" scenario promulgated by Agent Friedt would have never developed, if Mr. Gonda had decided to continue the policy by paying the additional premiums required.

Indeed, Mr. Gonda's policy would not have become "paid up" in 10 years under any scenario. A Whole Life policy is only truly Paid Up when no more premiums are payable—at Age 100.

What Mr. Friedt was proposing—with his "Illustration of the Values of the Funding of a Retirement Plan" and "50/50 Personal Savings Plan"—was a variation on the "vanishing premium" scheme.

So-called "vanishing premium" is a device to use anticipated high dividends, plus internal transfers of policy values and money, to make the apparent cash outlay into a Whole Life policy seem to be zero. (In this case the "Net Payment" of $1801 would become $0.) One major text calls the concept of "vanishing premium" an "erroneous" term and warns that it is "potentially misleading". (Black & Skipper, Life & Health Insurance, 13th Edition, P. 94.) (During this period, MetLife called its "vanishing premium" scheme "Accelerated Premium Plan", or APP.)

Another prominent authority cautions: "There is no guarantee that the so-called vanishing premiums will actually vanish, or, if they do vanish, that they will never reappear." (Beam, ed., Fundamentals of Insurance for Financial Planning, P. 193.)

The policy Agent Friedt replaced was a Universal Life policy, characterized by a flexible premium and an adjustable death benefit. Instead of receiving a dividend, it earned a guaranteed minimum interest rate and a current rate, if higher.

The Pruco Universal Life policy also would have allowed Mr. Gonda to adjust his $49.50-a-month premium upward or downward, if necessary. Unlike the policy which replaced it, the Pruco policy was never underfunded and would not have lapsed if Mr. Gonda had continued to pay the same $49.50 a month. It would have continued to earn interest at the guaranteed rate, at least.

## Agent Friedt's Deviations from the Standard of Care:

Section 637 of the Insurance Protection Act of the Commonwealth of Pennsylvania states:

> "No agent or solicitor of any insurance company, association or exchange, and no insurance broker, shall issue, circulate or use, or cause or permit to be issued, circulated or used, any written or oral statement or circular misrepresenting the terms of any policy issued or to be issued by such company, association or exchange, or make an estimate, with intent to deceive, of the future dividends under such policy."

The intent of these legal requirements is that every insurance sale be made by an honest and forthright agent to an informed and willing consumer and that every sale meet the needs of the consumer rather than the needs of the agent or the insurance company.

Yet this clearly did not happen in this case;   Agent Friedt violated his legal and ethical mandate at least seven ways in his sale to Ronald M. Gonda.

First, Agent Friedt sold Mr. Gonda a policy he did not need nor understand and which he could not afford. As a result, Mr. Gonda lost his affordable and serviceable Pruco policy and sustained a direct cash loss in the sale and eventual and inevitable surrender.

Second, Mr. Friedt failed to complete the required Notification in his replacement sale, denying Pruco an fair opportunity to inform its policyowner that the replacement would not be in his best interests.

Third, Mr. Friedt inexplicably failed to include the Waiver of Premium benefit in the policy that was issued, despite using the feature as a strong selling point for his "50/50 Personal Savings Plan" scheme. Fortunately, Mr. Gonda did not become disabled during his time as a MetLife policyowner.

Fourth, Mr. Friedt utilized improper illustrations to sell his product to Mr. Gonda—the "Illustration of Values of the Funding of a Retirement Plan" and the "50/50 Personal Savings Plan." Not only were both fanciful in their assumptions, but both falsely promoted a Whole Life insurance policy as a "retirement plan".

Indeed, in his deposition in this case Mr. Friedt continued to assert that the Whole Life policy was some kind of "investment" rather than what it clearly is--a life insurance policy.

> Q: So this *(the 50/50 Personal Savings Plan illustration)* is meant to show how this product will out perform a CD, basically?
>
> A: It is meant to show how this product performed.  This would also have been used in conjunction with a regular illustration.
>
> Q: What do you mean by a regular illustration?
>
> A: One that is not compared to other investments.  (Friedt deposition, 10-17-2003, P. 31:6-14.)

Fifth, Mr. Friedt proposed a "vanishing premium" scheme that was so severally underfunded it could not possibly have succeeded.  And Mr. Gonda paid the price for that scheme when he was forced to surrender the MetLife policy at a loss.

7

Furthermore, Mr. Friedt was quite aware what he was doing.

Q: Mr. Friedt, did you ever hear the term "vanishing premium" before?

A: Yes.

Q: What does it mean to you.

A: It is a term referred to putting your policy on an accelerated payment.
(Friedt deposition, 10-17-2003, P. 43: 20-25.)

Q: I asked you what vanishing premium meant. You said putting it in an accelerated payment. Are these two things the same or is there something different about accelerated payment?

A: I don't think there is anything different. (Friedt deposition, 10-17-2003, P. 44: 7-11.)

Sixth, Mr. Friedt failed to service his beleaguered policyowner properly, so that the dimensions of Mr. Gonda's severe underfunding were not apparent to him until he had no choice but to surrender the policy. However, twelve years later, Mr. Friedt seemed unconcerned about his failure to service his customers.

Q: ...is that *(the vanishing premium scheme)* something you used at MetLife?

A: I was never there long enough to have the availability to put a policy on vanishing premium or accelerated payment.

Q: What do you mean by that?

A: I was only there for four years so none of my policy holders would have been eligible.

Q: But when you sold a policy, you didn't known you were going to be there for four years, so did you ever sell and policies where you told then they could use accelerated payment?

A: It was an option, yes. (Friedt deposition, 10-17-2003, P. 44: 13-24.)

Finally, Mr. Friedt appears to have been motivated to make this unfortunate sale primarily by his needs—for a commission. He would have received $1324.20 in first-year commissions on his sale to Mr. Gonda, or 55.0% of the $110.35-a-month premium paid over a 12-month period. Mr. Friedt's gain nearly equaled Mr. Gonda's loss.

8

## **MetLife's Complicity:**

At all times throughout this dubious sale to Ronald M. Gonda, William G. Friedt was an Agent for MetLife. He was also a captive agent, meaning one who could only represent a single company--in effect, an employee. MetLife was responsible at all times for his supervision and his actions.

MetLife's supervision of Agent Friedt was exceedingly poor.

William G. Friedt was the subject of at least four documented consumer complaints in his short career with MetLife. Yet, astoundingly, he seems to have been unaware.

>Q: So this complaint was never brought to your attention?

>A: No. (Friedt deposition, 10-17-2003, P. 14:22-24.)

Further, during this period he was identified in company documents for having a "FIP" ratio that exceeded company standards, yet he was never disciplined. (FIP means Financed by In-Force Policies and refers to the practice of cannibalizing existing MetLife policies to finance new policies--and new commissions.) Agent Friedt's FIP ratio exceeded 25.0%; the maximum Company allowance was just 15.0%.

MetLife's failure to enforce its own rules was cited as a significant management failure in the 1998 Market Conduct Examination conducted by the State of Connecticut.

> "The fact that the company had defined acceptable ratios for replacement activity and financed policies, and had applied those standards during internal audits appears to indicate that MetLife was aware its sales force was potentially engaging in improper sales practices. When improper sales were identified, the audit reports rarely recommended contacting the consumers involved to determine whether their interests had been properly protected." (P. 22.)

The identical failure was noted in the 1994 Market Conduct Examination conducted by the Commonwealth of Pennsylvania.

> "From analysis of MetLife consumer complaints, audit reports and FIP reports, it was clear management failed to utilize or integrate available internal control mechanisms to detect and control improper replacement activity. (P. 38.)

Certainly, no one did anything to control the improper replacement of Ronald M. Gonda's Pruco policy.

Agent Friedt's transgressions were not his fault entirely. Not only was he inadequately supervised, but he had been inadequately trained, too.

>Q: How did you receive your training in how to sell life insurance?

>A: Metropolitan's few small meetings, training in the office.
>(Friedt deposition, 7-23-1994, P. 35:19-22.)

One thing Agent Friedt did learn was "churning", or improper replacement for purposes of getting commissions.

9

> Q: Okay. As you were learning the business, did you learn about churning?
>
> A: Yeah.
>
> Q: About using cash value in existing policies to purchase new policies?
>
> A: Uh-huh.
>
> Q: Did you do that yourself?
>
> A: Yeah. (Friedt deposition, 7-23-1994, P. 36: 16-23.)
>
> Q: Is this still true? *(referring to the questions and responses above.)* Do you have any different answers to these questions?
>
> A: I learned about churning. I know what churning was, about using cash values in existing policies to purchase new ones. I came across people who have replaced their policies, yes. (Friedt deposition, 10-17-2003, P. 10: 12-17.)

MetLife's inability to control churning was one of the findings in the Connecticut Market Conduct Examination conducted in 1998.

> **"There is ample evidence that MetLife agents engaged in churning in Connecticut and that MetLife's management knew or should have known that it was occuring."** (Emphasis added.) (P. 40.)

Of course, Agent Friedt did not simply churn away Ronald Gonda's Pruco policy, he utilized improper illustrations to do so. One was the "50/50 Personal Savings Plan".

> Q: Did you sell any policies using the 50/50 sales strategy?
>
> A: Yes. (Friedt deposition, 10-17-2003, P. 17: 8-10.)

But the Pennsylvania Market Conduct Examination noted that MetLife permitted its agents to use the "50/50 Plan" deceptively.

> "Portions of the track book, pre-approach letters, and telephone scripts presented the 50/50 Plan as an investment or savings vehicle rather than an insurance policy." (P. 85.)

And this deception was part of a broader scheme to promote life insurance policies as "retirement" plans or "investments"--exactly what Agent Friedt did.

> **"These marketing plans had the capacity to mislead consumers into purchasing life insurance under the false presumption they were purchasing a retirement plan."** (Emphasis added.) (P. 85.)

Furthermore, Agent Friedt was also allowed to employ another misleading and deceptive illustration in addition to the "50'50 Plan"--the "Illustration of Values of the funding of a Retirement Plan."

10

Although, by his admission, it was not a "regular" MetLife "vanishing premium" illustration, it was produced at his MetLife office using MetLife's facilities.

> Q: Is this something that is familiar to you as far as something that looks like an illustration you would have produced?
>
> A: I would have used the office computer to print this illustration, yes.
> (Friedt deposition, 10-17-2003, P. 27: 7-11.)

Both Pennsylvania, in 1994, and Connecticut, in 1998, criticized MetLife for promulgating misleading and deceptive illustrations.

> "Stating future performance, based upon anything other than guaranteed rates, has the effect of implying a guarantee." (Pennsylvania, P. 60.)

> "Misrepresentations of vanishing premium policies are difficult to prove. It is often a case of the policyholder's word against the company's. **Nevertheless, the cases are too numerous and too consistent to disregard the claims of policyholders. It is also difficult to disregard policy illustrations prepared by the company which show prominently in the first column of the first page that no cash outlay is needed after a few years.**"
> (Emphasis added.) (Connecticut, P. 40.)

The "retirement" illustration Agent Friedt used to sell the Whole Life policy to Ronald Gonda showed the premium vanishing after just 10 years. But the only thing that vanished was Mr. Gonda's $50,000 Pruco policy and its cash value.

By his own admission, William Friedt used these improper illustration and sales schemes--and no one at MetLife ever told him not to do so.

> Q: Did anybody at MetLife ever tell you not to use the 50/50 sales method?
>
> A: No.
>
> Q: Did anyone at MetLife tell you not to churn?
>
> A: No, I don't think so. (Friedt deposition, 10-17-2003, P. 47: 6-11.)

As Michael J. Dupay has chronicled in a series of trenchant opinions in the Eck, Hazen, Kintner, Kressovich and Mohney cases, MetLife embodied a "corporate culture" that encouraged the evasion of rules and regulations--including strictly defined Company rules--and which isolated and ostracized whistleblowers and those seeking to curtail flagrantly anti-consumer activities.

Mr. Dupay demonstrated in detail that MetLife engaged in these odious practices beginning in 1979 and ignored several internal warnings that legal retribution would ensue. MetLife was a "recidivist" throughout this period, with no apparent interest in reforming itself or protecting its policyowners from its agents. These compelling opinions and their extensive documentation are incorporated by reference into this opinion.

Indeed, the Pennsylvania and Connecticut Market Conduct examinations confirm Mr. Dupay's analysis. They reached striking similar conclusions--and they were conducted four full years apart. The $1.5 million fine MetLife paid to the Commonwealth of Pennsylvania did not seem to dissuade the Company from committing the same improper activities four years later in another state.

11

As the Commonwealth of Pennsylvania concluded:

> "The observed pattern of deceptive solicitations and concealed replacements by MetLife sales representatives appears to have been for the purpose of increasing their commissions. Replacement solicitations were such as to cause policyholders, directly or indirectly, to believe that by using their existing policy values to purchase new insurance they were to receive paid-up policies, free coverage, or increased coverage at little or no additional cost." (P. 58.)

## Professional Opinion:

It is my professional opinion, to a reasonable degree of certainty, that Ronald M. Gonda was damaged by the actions of MetLife and its Agent, William G. Friedt.

Mr. Gonda was sold a product he did not need, nor understand, and which he could not afford.

He was sold a product in a deceptive and misleading manner, and without important consumer protections, such as the replacement Notification and the Waiver of Premium.

He was persuaded to surrender a useful and functioning policy that met his needs and that he could afford in order to finance a "vanishing premium" scheme that was destined to fail--and which was itself disguised to appear to be a "retirement" plan.

He lost the $1618.82 in cash value he had earned through his Pruco policy.

He lost the $50,000 Pruco death benefit and the larger amount that replaced it when he realized that the MetLife policy was not what he had been promised.

He has been forced to wait 14 years for just compensation.

He has incurred continuing costs in his claim for just restitution.

It is my professional opinion, to a reasonable degree of certainty, that the Plaintiff, Ronald M. Gonda, is due reasonable compensation from the Defendant MetLife and its Agent, William G. Friedt, because MetLife actively participated in the deceptions perpetrated by Agent Friedt and failed to control his damaging actions.

Mr. Gonda forcefully stated his own case.

   Q: Could you tell me what it is, in your own words, that you think has been misrepresented to you with respect to the policy you purchased from MetLife?

   A: It was only supposed to be $50 a month and paid up in ten years. Now they started sending me all these bills. I was--I was under the understanding. That's how he explained it. They took the check from my checkbook for $50 a month. If it was supposed to be more than $50 a month, why wouldn't they tell me and the check would be there for more than 50 a month?
   (Gonda deposition, P. 71: 21-25 and P. 72: 2-9.)

   Q: Could you tell me, in your own words, how you think you have been damaged by MetLife?

   A: I lost my life insurance that was worth $50,000. I don't have no insurance now like that.
   (Gonda deposition, P. 72: 25 and P. 73: 2-6.)

13

### Damages:

First, Ronald M. Gonda should receive the Pruco cash value he lost in the transaction, plus reasonable interest since then. That $1618.82 at 6.0% interest for 14 years would now be worth $3660.00.

Second, Ronald M. Gonda should receive the $50,000 death benefit he lost in the transaction. Since the policy is gone, he should receive the cash equivalent, or $50,000.00.

**The total of these two amounts—$3660.00 and $50,000.00—equals $53,660.00 in damages to reflect the "benefit of the bargain" owed to Ronald M. Gonda.**

**In addition the Plaintiff should also receive reasonable compensation for his court costs and attorney's fee, post-judgement interest and any punitive damages the court should award.**

Respectfully submitted,

Robert Boyd Carter, CLU, ChFC

130 Dorsey Station Road
Louisville, KY 40223
1-502-290-1630