IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

NANCY ECK,

              Plaintiff

      vs.

METROPOLITAN LIFE
INSURANCE COMPANY,
et al.,

              Defendants

CIVIL DIVISION

NO. GD95-017150

ISSUE NO. _____

OPINION AND ORDER OF COURT

HONORABLE R. STANTON WETTICK, JR.

Counsel for Plaintiff:

Kenneth R. Behrend, Esquire
306 Fourth Avenue
300 Union National Bank Building
Pittsburgh, PA 15222

Counsel for Defendants:

Kimberly A. Brown, Esquire
301 Grant Street
14th Floor One Oxford Centre
Pittsburgh, PA 15219

B. John Pendleton, Jr., Esquire
Four Gateway Center
100 Mulberry Street
Newark, NJ 07102

Exhibit 2

## OPINION AND ORDER OF COURT

WETTICK, A.J.

Plaintiff's and defendants' motions for post-trial relief are the subject of this Opinion and Order of Court.

This lawsuit is one of more than two hundred pending lawsuits in which persons who purchased MetLife insurance policies have raised claims based on MetLife's sales practices. I have assumed responsibility for managing the litigation and I presided at this trial. However, most of the other trials will be conducted by other members of this court.

I have made a series of pretrial rulings which have limited the claims that a plaintiff may pursue. Also, I advised the parties that the other judges will be using the jury instructions for fraudulent misrepresentation claims that I used in this case. The parties' objections to these jury instructions raised in this case will become part of the subsequent litigation if a party in another case states that it is raising the objections to the jury instructions that were raised in *Eck v. MetLife.*[1]

This lawsuit arises out of a sale of a $15,000 whole life insurance policy dated March 16, 1992. The policy provides that it will be fully paid if the insured makes monthly payments of $35.80 for fifty-two years. The fifty-two year period is apparently based on the policy's guaranteed interest rate of 4% per year. If dividends exceed the guaranteed rate of 4%, the insured may apply the excess dividends toward the payment of premiums (which means that the policy will be fully paid at an earlier time).

---

[1] A party may raise additional objections that were not addressed in *Eck.*

1

MetLife agents had access to illustrations showing the number of years in which payments would need to be made based on current interest, mortality, and expense rates. The illustration for this transaction showed that the monthly dividends would need to be paid only for twelve years based on these current rates.[2]

The illustration contains the following language.

```
**  THE CASH OUTLAY ILLUSTRATED SHOWS THE RESULTS IF THE CURRENT DIVIDEND SCALE
    CONTINUES WITHOUT CHANGE.  DIVIDENDS ARE NOT GUARANTEED AND MAY INCREASE OR
    DECREASE IN THE FUTURE.  IF FUTURE DIVIDENDS DECREASE, IT IS POSSIBLE THAT
    THE CASH VALUE OF ADDITIONAL INSURANCE MAY NOT BE SUFFICIENT IN SOME
    FUTURE YEARS TO PAY THE FULL CURRENT PREMIUM AND SOME CASH OUTLAY MAY BE
    REQUIRED.  IF PREMIUMS ARE MODAL, ANNUALIZED PREMIUM EQUALS THE MODAL
    PREMIUM TIMES NUMBER OF PAY PERIODS FOR YEAR.
DIVIDENDS BASED ON JAN. 1992 SCALE THAT USES CURRENT INTEREST, MORTALITY AND
EXPENSE RATES.  ILLUSTRATIVE MONTHLY INCOME BASED ON APRIL 1992 SETTLEMENT
OPTION RATES.  ILLUSTRATIVE FIGURES ARE NOT GUARANTEES OR ESTIMATES FOR THE
FUTURE.
```

At trial, plaintiff testified that the MetLife agent who sold her the policy told her that the policy would be fully paid after ten years. He used an illustration to support his statement.[3] However, she was never shown or given any page of the illustration which said that the figures are not guaranteed. Also, she did not read the policy when it was delivered.

The MetLife agent, on the other hand, testified that he never told any customer that the rates in an illustration were guaranteed. To the contrary, he always explained that the illustration is based on current rates and that if dividends fall, more payments will be needed. He also testified that he would have given the plaintiff the entire illustration, including pages containing the language that illustrative figures are not guaranteed.

The jury returned a verdict in defendants' favor on plaintiff's fraudulent misrepresentation claim. In a nonjury proceeding, I entered a decision in favor of

---

[2]According to plaintiff's counsel, the illustration is based on an interest rate of 9.45% that had been paid in the previous year. (Plaintiff's 9/1/05 Offer of Proof at 4 ¶9.)

[3]The illustration shows payments for twelve years.

plaintiff because the evidence, using a preponderance of the evidence standard, established violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. §201-1 *et seq.* ("Consumer Protection Law").

## PLAINTIFF'S MOTION FOR POST-TRIAL RELIEF

Plaintiff's motion for post-trial relief raises the following grounds: (1) dissatisfaction with evidentiary rulings, which plaintiff asserts that I made, regarding MetLife's "corporate practices"; (2) objections to my jury instructions covering fraudulent misrepresentation and reliance; (3) objections to the amount of damages I awarded under the Consumer Protection Law claims; and (4) objections to the amount of counsel fees I awarded.

The fourth ground (the counsel fee award) is addressed at pages 2-4 of my September 13, 2005 Decision and Award.

## GROUND ONE

In paragraph 2 of plaintiff's motion for post-trial relief, plaintiff states:

> 2.  The trial court has made evidentiary rulings (that apply to all 212 cases), precluding plaintiff from submitting relevant and material evidence in support of proving plaintiff's claims for fraudulent misrepresentation and violations of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) that would establish: (1) motive, intent; common plan, scheme or design of defendants; and lack or absence of mistake of the plaintiff; and (2) supports or refutes the credibility of the parties.

The statement that I made evidentiary rulings as to testimony related to MetLife practices, applicable to each of the pending MetLife insurance practices litigation, is not correct. I addressed this same issue in an October 21, 2005 Memorandum and Order of

3

Court addressing plaintiff's motion for post-trial relief in *Pfeifer v. Metropolitan Life Insurance Co.*, GD95-017731, slip op. at 2 (C.P. Allegheny October 21, 2005):

> Plaintiff may be suggesting that he was not required to attempt to offer expert testimony because there is deemed to be a ruling, applicable in every case, that such testimony can never be introduced. This position is without merit for two reasons.

> First, various rulings that I have made have narrowed the claims that the plaintiff may raise at trial, but none have changed the rules governing the trial of these claims. In the trial of these claims, the same rules apply that apply to the trial of any case. Issues regarding the admissibility of evidence and the jury instructions are waived if not raised in the individual case. (This does not mean that the judges who are trying these cases will not make the same rulings that were made in prior cases.) (Footnote omitted.)

> Second, the only time that I made any ruling regarding the testimony that plaintiff describes in Grounds 2 and 3 was in the *Eck v. Metropolitan Life Insurance Co.*, GD95-17150, proceedings. The rulings were not "global" evidentiary rulings—they were very case-specific.

Prior to the *Eck* trial, plaintiff submitted a five-page offer of proof regarding the testimony of a proposed witness. The offer of proof was addressed at a September 1, 2005 conference at which a court reporter was present. At page 6 of the September 1, 2005 Transcript, plaintiff's counsel stated:

> Your honor, if we have a stipulation that if the client or the customer was told that this policy will be paid in ten years, that in and of itself constitutes fraud and we don't need that witness. (T. 6)

MetLife agreed that the jury would know—either through an instruction by the court or testimony offered by MetLife—that if the agent made the statement that the policy would be fully paid if monthly payments were made for ten years, the statement

4

was false. Therefore, plaintiff would not call this witness because the witness was not needed.[4]

During the trial, plaintiff's counsel made an offer of proof of rebuttal evidence. He sought to offer testimony of MetLife agents that they were trained to sell policies with APP Illustrations as paid-up policies (T. 321). He also sought to offer testimony that many agents did not explain that the dividends were variable and that out-of-pocket premium payments, as set forth on the illustration, may be greater than this amount (T. 322). He sought to offer this evidence on the ground that it would assist the jury in deciding the credibility of the testimony of plaintiff and the defendant insurance agent.

I asked plaintiff's counsel whether he had evidence that anyone had trained the agent who sold the policy to plaintiff to engage in the practices described in the offer of proof or whether he had proof that this particular agent would have attended any training sessions which directed or encouraged agents to engage in the practices described in the offer of proof. Plaintiff did not have any such evidence. For this reason, I ruled the evidence concerning the manner in which some agents were trained was not admissible in this case (T. 319-323).

I also ruled that plaintiff could not introduce testimony that other agents sold insurance policies by using the illustrative figures as guarantees.[5] This testimony would

---

[4]Plaintiff sought to introduce the evidence described in the offer of proof to show that MetLife knew that any representations, based on MetLife illustrations, as to when the policy would be fully paid were false. This evidence described in the offer of proof was not needed once MetLife stipulated that any representation that an agent made, as to when a policy would be fully paid, that differed from the terms of the policy was a fraudulent misrepresentation.

[5]When an agent testifies, as Mr. Slomers testified, that he or she always follows a specific procedure, it is very possible that the plaintiff will be permitted to introduce testimony from other witnesses that the agent did not do so in other transactions. However, plaintiff did not have any witnesses available to offer such testimony in this case (T. 325).

not support a finding that the defendant insurance agent used illustrative figures as guarantees.

Pa.R.E. No. 406 governs evidence of the habit of a person or the routine practice of an organization. The comment to this rule states that concepts of habit or routine practice denote conduct that occurs with fixed regularity in repeated specific situations. This rule permits testimony of uniform practices. According to the comment, a habit is a person's regular practice of meeting a particular kind of situation with a specific type of conduct.

In this case, plaintiff had no evidence that the defendant agent had been instructed (or encouraged) to sell insurance by misrepresenting the terms of the policy. Furthermore, plaintiff did not propose to offer testimony that it was the routine practice of the defendant agent to sell insurance by misrepresenting the terms of the policy. Proof that other agents engaged in these practices does not support a finding that this was the routine practice of the defendant agent. Also, plaintiff was not offering testimony that it was the practice of almost every agent in almost every transaction to misrepresent the terms of the policy.[6]

<u>GROUND TWO</u>

I will next consider plaintiff's objections to my instruction governing fraud. This instruction to the jury reads as follows:

---

[6]In order to eliminate any confusion as to a party's offer of proof with respect to the alleged practices of MetLife and its agents, in all future cases the witnesses that a party seeks to call, as to this issue, are required to be present or shall have given their testimony in a deposition for use at trial. If there is a question as to whether a witness may testify, the trial judge may elect to hear the testimony of the witness outside the presence of the jury before making a ruling.

## INSTRUCTION—FRAUD

A person who makes a fraudulent misrepresentation of material fact to another person is responsible for all harm resulting from that other person's reliance on the fraudulent misrepresentation. In order for the plaintiff to recover against the defendants, you must find by clear and convincing evidence that (1) the defendants made a misrepresentation to the plaintiff, (2) the misrepresentation made by the defendants to the plaintiff was fraudulent, (3) the misrepresentation was of a material fact, (4) the defendants intended that the plaintiff rely on the defendants' misrepresentation, (5) the plaintiff relied on the defendants' misrepresentation, (6) the reliance was justifiable, and (7) plaintiff's reliance on the defendants' misrepresentation was a factual cause of the harm suffered by the plaintiff.

A misrepresentation is fraudulent when the person making the misrepresentation knows that it is untrue or does not believe it is true or is indifferent as to whether it is true.

A fact is material if it is one that would be of importance to a reasonable person in determining a choice of action. A material fact need not be the sole or even a substantial factor in inducing or influencing a reasonable person's decision. A fact is also material if the maker of the misrepresentation knows that the person to whom it is made is likely to regard it as important even though a reasonable person would not regard it as important.

Reliance means a person would not have acted as he or she did unless he or she considered the misrepresentation to be true. To be justifiable, the reliance on the misrepresentation must be reasonable.

In determining whether there is justifiable reliance in a noncommercial insurance transaction, you are instructed that an insured is not necessarily required to read the insurance policy at the time it is delivered. Instead, you must consider the positions of the parties, their expertise and experience, and the circumstances of the transaction. If you find that, under the circumstances of the transaction that is the subject of this litigation, a reasonable person with the plaintiff's background and experience would rely on the agent's description of the material terms of the insurance policy, there is justifiable reliance even though the plaintiff did not read the policy when it was delivered.

On the other hand, if the plaintiff's background and experience, the relationship of the parties, and the circumstances of the transaction make it unreasonable for the plaintiff not to have read the policy when it

was delivered, you must find that the plaintiff did not justifiably rely on the material misrepresentation of the agent.

In summary, policyholders are not always required to read their insurance policies.  To the contrary, an insured may, indeed, rely on the representations of his or her insurance agent unless, under the circumstances, it is unreasonable for that insured not to read the policy when it is delivered.[7]

(Vol. II T. 13-16.)

Both MetLife and plaintiff object to the portion of this instruction discussing justifiable reliance.  It is the position of MetLife that I should begin the paragraph with a sentence stating that a plaintiff cannot recover if he or she blindly relies on the misrepresentation, the falsity of which would be patent or obvious if he or she used the opportunity to make a cursory examination or investigation.  Plaintiff, on the other hand, contends that I should modify my instruction to include a statement that the policyholder may expect the policy to include what the agent said unless something else occurs so that the policyholder now has a reason to doubt the agent (T. 343, 350, 354).

Both positions are inconsistent with the Superior Court's discussion of the reasonable reliance requirement in *Toy v. Metropolitan Life Insurance Co.*, 863 A.2d 1 (Pa. Super. 2004), and *Drelles v. Manufacturers Life Insurance Co.*, 881 A.2d 822 (Pa. Super. 2005).

In *Toy*, the plaintiff testified that she purchased what she believed to be a retirement plan (50/50 savings plan) with life insurance as an added benefit and received, instead, only a whole life policy.  Upon receipt of the policy, she had ten days

---

[7]In other cases, this instruction will be modified if a plaintiff claims that a reading of the policy will not reveal the misrepresentation that took place.  In this case, plaintiff testified that she knew the agent's representations were false as soon as she looked at the policy (T. 68, 80).

in which to cancel the transaction.  She did not do so.  I denied her claim under the Consumer Protection Law on the ground that she failed to establish justifiable reliance on the agent's misrepresentations.  I ruled that a cursory examination of the cover page of the policy would have alerted the plaintiff to a potential discrepancy between the agent's representations and the actual substance of her purchase.  The Pennsylvania Superior Court reversed.  The Superior Court ruled that it is for a jury to determine whether the plaintiff's failure to conduct a cursory examination of the information contained on the cover page of the life insurance policy prevented the plaintiff from demonstrating her justifiable reliance on the agent's oral representations.

In *Drelles*, the plaintiffs contended that they relied on representations of the agent as to the number of payments the plaintiffs would need to make to keep the insurance policies in effect until the death of the plaintiffs.  I ruled that as a matter of law, the plaintiffs' reliance was not reasonable because the plaintiff-husband was a sophisticated investor with a lengthy work history as an investment analyst and financial market forecaster responsible for developing investment strategies for institutions and individuals.  The Superior Court reversed.  The *Drelles* opinion contained the following discussion:

> This Court has held that an insurance agent's expertise in the field of life insurance vests his or her representations with authority and tends "to induce the insured to believe that reading the policy would be superfluous." *Rempel*, 323 A.2d at 197.  *Accord Pressley*, 817 A.2d at 1140-41.  Establishing a requirement that an insured is responsible for ascertaining the contents of a life insurance policy would virtually eliminate the possibility of establishing a *prima facie* case of negligent misrepresentation by creating an "insoluble dilemma." *Rempel*, 323 A.2d at 197.

> If the insured failed to read the policy he would lose because he could not establish justifiable reliance; but, if he did read the policy he could not show that he in fact relied upon the representations of the agent

9

with regard to its contents. We therefore hold that whether or not justifiable reliance has been established is a question of fact for the jury, to depend, inter alia, on the relative position of the parties, their expertise and experience.

*Id. See Rempel*, 471 Pa. at 412, 370 A.2d at 369 (stating that policyholder has no duty to read policy unless circumstances make it unreasonable not to read it). *Compare Matcon Diamond, Inc. v. Penn National Insurance Company*, 815 A.2d 1109, 1115 (Pa.Super.2003) (holding that even in commercial context, liability carrier cannot avoid coverage by issuing policy with terms that vary from provisions sought by insured).

\* \* \*

In view of the trust placed in insurance agents, it is "not unreasonable" for consumers "to rely upon the representations of the expert rather than on the contents of the insurance policy itself, or to pass when the time comes to read the policy." *Id.* (internal quotation omitted). Ultimately, policyholders have no duty to read the policy and are entitled to rely upon agent's representations unless the circumstances of the case make it "unreasonable" for them not to read the policy. *Id.* at 12-13.

As in *Toy*, we hold that Appellants' receipt of the policies alone was insufficient to establish, as a matter of law, that they did not rely on Sherman's representations. Due to the complicated nature of insurance transactions, we cannot conclude that Appellants' alleged trust in Sherman was so unreasonable that, as a matter of law, they cannot demonstrate justifiable reliance as required by the UTPCPL. The right to rely upon a representation is generally held to be a question of fact. *Toy*, 863 A.2d at 12. Furthermore, the issue of justifiable reliance cannot be resolved without considering the relationship of the parties involved and the nature of the transaction. *Id.* It is up to a jury to determine whether Appellants justifiably relied upon Sherman's representations to the extent necessary to support their UTPCPL claims.

881 A.2d at 840-41.

Plaintiff's proposed instruction—that the policyholder may expect the policy to include what the agent said it would include unless something else occurs so that the policyholder now has a reason to doubt the agent—is inconsistent with the statement in *Drelles* that "policyholders have no duty to read the policy and are entitled to rely upon

the agent's representations unless the circumstances of the case make it 'unreasonable' for them not to read the policy." *Id.* at 841.

The following paragraph of the jury instruction is based on this language within *Drelles*:

> In summary, policyholders are not always required to read their insurance policies. To the contrary, an insured may, indeed, rely on the representations of his or her insurance agent unless, under the circumstances, it is unreasonable for that insured not to read the policy when it is delivered.

For these reasons, I denied plaintiff's request that my instruction include a statement that the insured may rely on the agent's description of the policy unless something else occurs.

Plaintiff also contends that I erred because the jury should have been instructed that the insured was entitled to the coverage which the agent described unless the insurance company advised the insured that the policy is different from what the agent described. Plaintiff cites *Pressley v. Traveler's Property Casualty Corp.*, 817 A.2d 1131 (Pa. Super. 2003), to support this proposed instruction.

*Pressley*, unlike the present case, did not involve allegations of fraudulent conduct. In Pressley, the insurance agent admitted that he promised to add the insured's mother to the insurance policy and that under appropriate circumstances he was authorized to do so. In that instance, the promise of the insurance agent becomes part of the insurance contract.

Under settled law, the language of a writing is significant. In commercial transactions, a writing containing an integration clause trumps a fraudulent misrepresentation claim. *1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.*,

11

NO: GD95-017150

653 A.2d 663 (Pa. Super. 1995).  In a consumer transaction, the writing controls unless a party can establish by clear and convincing evidence that he or she reasonably relied on a fraudulent misrepresentation.  *Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. 2002).

There is no language in *Pressley* suggesting that the Court was devising a new rule of law.  Thus, the *Pressley* opinion applies to the fact situation in which an agent with authority to add a person to the policy fails to do so; in other words, it involves coverage that should have been provided.  Where the claim is, instead, a misrepresentation as to the terms of the policy, the case law described in the above paragraph applies.[8]

Plaintiff also contends that this court erred by not instructing the jury that defendants had the obligation to show that the insured understood the material terms and conditions of the policy.  According to plaintiff, a company that uses boilerplate language that is not  likely to be understood in consumer transactions is obligated to demonstrate that the consumer understood what the contract said (T. 355-357).  Plaintiff states that this is not based on a claim that the insurance agent is a fiduciary; instead, it is based on a reasonable expectation doctrine applicable to form contracts using boilerplate language.

There is no case law which supports this position.  See *Ihnat v. Pover*, 146 P.L.J. 299, 303-310 (1998), where I ruled that an insurance company has no duty to explain the terms and conditions of the policy; its obligations are covered by contract law (the

---

[8]If *Pressley* governed alleged misrepresentation claims made by an agent, the *Toy* and *Drelles* opinions would not use the standard that policyholders are entitled to rely upon the agent's representations unless the circumstances of the case make it unreasonable for them not to read the policy.

language of the agreement controls but any ambiguities are construed against the insurance company) and tort law (i.e., fraud and negligent misrepresentation causes of action).

## GROUND THREE

Paragraphs 3 and 4 of plaintiff's motion for post-trial relief addressed the damage award:

> 3.  The trial court's rulings improperly limit the plaintiffs' damages (in all 212 cases) to the out-of-pocket loss instead of benefit-of-the-bargain damages for the fraudulent misrepresentation claims as well as under the UTPCPL.

> 4.  Pursuant to the trial court's ruling under the UTPCPL limiting the damages to out-of-pocket loss, the award of damages improperly limited the damages to thirty-six monthly payments and did not return all of the money paid into the policy. MetLife should not be permitted to retain any of the money paid into the policy that was sold using unfair and deceptive business practices.

Plaintiff made monthly payments of $35.80 from March 1992 until she surrendered the policy on January 21, 1997. At that time, she received $773.17.

In my September 13, 2005 Decision, I found that by the end of the third year after plaintiff purchased the policy, she had sufficient information regarding the fraud and her options to make an informed decision as to how she wished to proceed.[9]

I awarded her the first thirty-six monthly payments of $35.80 with interest from the dates of payment at the prime rate, less the cash surrender payment that she would have received at the end of the three-year anniversary. I awarded interest at the prime

---

[9]Plaintiff testified that she read the policy in 1994 and understood that payments were due for fifty-two years (T. 111-114). She filed her lawsuit on October 25, 1995.

rate on this amount to the date of trial. On the basis of expert reports of John S. Moyse, I determined the actual damages to be $2,500.00.

I awarded three times actual damages ($7,500.00) and reasonable attorney fees and costs related to the lawsuit ($13,800.00).

Plaintiff's statement that I have ruled that a plaintiff's damages in all the MetLife insurance practices litigation are limited to out-of-pocket losses is incorrect. I have not made any rulings governing any case other than this case.

Plaintiff contends that I erred in not awarding plaintiff the amount that plaintiff describes as the benefit of the bargain: "Ms. Eck sought recovery of benefit of the bargain damages of $11,377.23 consisting of the $15,000 in life insurance she was supposed to receive minus the $3,622.77 of premiums that Plaintiff did not make upon learning that the policy would not perform as represented." (Brief in Support of Plaintiff's Motion for Post Trial Relief at 24.)

Plaintiff is not entitled to a damage award of $11,377.23 for two reasons:

First, she surrendered the policy in the fifth year of a policy that would be fully paid in ten years according to plaintiff. A plaintiff who rescinds a transaction cannot later seek recovery of the benefit of the bargain.[10]

Plaintiff's reliance on *Metz v. Quaker Highlands, Inc.*, 714 A.2d 447 (Pa. Super. 1998) and *Agliori v. Metropolitan Life Insurance Co.*, 879 A.2d 315 (Pa. Super. 2005), for the proposition that a party who rescinds a transaction may also recover benefit of

---

[10]MetLife contends that benefit of the bargain damages can never be awarded. It refers to the statements in *Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257 (Pa. Super. 1983), and other cases that under Pennsylvania law in an action based on fraud the measure of damages is actual loss and not the benefit of the bargain. It also refers to the language of §9.2 that the court will award "actual damages sustained." In this case, I need not address the issue of whether a plaintiff who continued to make payments due under an insurance policy may recover damages based on the benefit of the bargain (assuming that these damages would exceed actual losses).

the bargain damages is misplaced. In *Metz*, the Court awarded only monetary damages that placed the plaintiffs in the position they would have occupied if they had not entered into the transaction (for example, these damages included the increases in housing costs, construction costs, and interest rates from the date of purchase to the date of rescission). In *Aglion*, the Court ruled that a plaintiff who had received the benefit of the bargain may elect to give up the bargain and to, instead, receive rescission damages.

Second, the award which plaintiff seeks would give plaintiff significantly more damages than would be awarded under any benefit of the bargain theory. Under any benefit of the bargain theory, plaintiff would owe interest on the payments that she did not make and on the money she received when she cancelled the policy. Also, and most important, the $15,000 would not be payable until plaintiff died. Consequently, while the payments with interest would be due at this time, the $15,000 would not be payable until her death.[11]

Plaintiff also contends that I erred in not refunding payments that plaintiff made in the fourth and fifth years of the policy. I did not order MetLife to refund these payments because plaintiff was receiving the benefit of the life insurance after she had learned of the actual terms of the policy. Furthermore, my award of triple damages took into account that I was awarding damages only for the initial three years.

---

[11]There is no expert testimony to support any "benefit of the bargain award" other than the award of $11,377.23 which plaintiff seeks. Plaintiff's expert does not offer any opinion setting forth the value at the time of trial of a policy that would pay $15,000 at the time of plaintiff's death. Plaintiff does not offer expert testimony, assuming such testimony can be offered, of the difference between the value of a $15,000 policy payable upon the insured's death that would be fully paid through monthly payments of $35.80 for twelve years and the value of a $15,000 policy payable upon the death of the insured that <u>could</u>, depending upon dividend rates, require monthly payments of $35.80 for as many as fifty-two years (or for as few as twelve years if dividend rates did not drop).

Plaintiff also contends that I erred in not permitting evidence of damages to be introduced at trial because harm is an element of a fraudulent misrepresentation claim and must be proven. This issue was never raised at trial. Prior to trial, the parties agreed that the court would be deciding the amount of damages and no objection was made to the jury instruction that plaintiff must prove harm to prove her fraud claim. If the issue had been raised, I would have added an instruction addressing this issue.

## DEFENDANTS' MOTION FOR POST-TRIAL RELIEF

Defendants raise the following six grounds:

## GROUND A—THE COURT'S RULING IS AGAINST THE WEIGHT OF THE EVIDENCE

I found that it was more likely than not that the MetLife insurance agent had guaranteed that the policy would be fully paid in twelve years. I made this finding because I found plaintiff to be more credible than Mr. Slomers and because the transaction involved the use of illustrations showing full payment within twelve years.

If the standard of proof was clear and convincing evidence, I would have dismissed all claims under the Consumer Protection Law. Plaintiff did not establish fraud under a clear and convincing testimony standard because plaintiff's testimony contains some inconsistencies and because of comments of her husband regarding the transaction.

## GROUND B—THE BURDEN OF PROOF FOR UTPCPL CLAIMS IS CLEAR AND CONVINCING

As I previously said, in entering an award in plaintiff's favor under the Consumer Protection Law, I found that plaintiff had proven her claim by a preponderance of the

evidence (but not by clear and convincing evidence). Defendants contend that I erred in using a preponderance of the evidence standard. This issue has never been decided by the Pennsylvania appellate courts.[12]

Section 201-9.2 ("§9.2") of the Consumer Protection Law provides for private actions. It reads as follows:

> § 201-9.2.   Private actions
>
> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.
>
> (b) Any permanent injunction, judgment or order of the court made under section 4 of this act shall be prima facie evidence in an action brought under section 9.2 of this act that the defendant used or employed acts or practices declared unlawful by section 3 of this act.

The question of whether the burden of proof for claims brought as private actions is a preponderance of the evidence or clear and convincing evidence is a question of legislative intent. Whenever legislation involves only economic and property interests, the case law indicates that it is presumed that the Legislature intended for a statutory claim to be governed by the preponderance of the evidence standard of proof unless statutory language indicates that a more demanding standard of proof shall be applied.

---

[12]On two occasions, the Superior Court has stated that in order to recover on a claim of fraud under the Consumer Protection Law, the plaintiff must prove the six elements governing a fraud claim "by clear and convincing evidence." See *Feeney v. Disston Manor Personal Care Home, Inc.*, 849 A.2d 590, 597 (Pa. Super. 2004); *Debbs v. Chrysler Corp.*, 810 A.2d 137, 155 (Pa. Super. 2002). However, in both cases, it did not matter whether the burden of proof was clear and convincing evidence or the lesser standard of preponderance of the evidence.

In *Feeney*, the Superior Court affirmed the trial court's grant of summary judgment for the defendant on the plaintiff's Consumer Protection Law claim because there was nothing to suggest that the defendants engaged in any fraudulent conduct intending to mislead the plaintiff. In *Debbs*, the Superior Court ordered the trial court to decertify the class because the trial court erred when it concluded that the commonality requirement was met.

See *Sutliff v. Sutliff*, 543 A.2d 534, 538 (Pa. 1988). There is no language in §9.2 or any other provision of the Consumer Protection Law which suggests that private actions brought pursuant to §9.2 should be governed by a more demanding standard of proof than proof by a preponderance of the evidence.

Furthermore, established case law holds that the purpose of the Consumer Protection Law is to protect the public from fraud and unfair or deceptive business practices, and it is to be liberally construed in order to effectuate its purposes. *Wallace v. Pastore*, 742 A.2d 1090, 1093 (Pa. Super. 1999); *Keller v. Volkswagen of America, Inc.*, 733 A.2d 642, 646 (Pa. Super. 1999). The Legislature would not have intended for legislation, enacted to provide broader protections to consumers than those provided by tort law, to be governed by a standard of proof which is higher than the standard usually applied to remedial legislation.

The Consumer Protection Law is one of many laws protecting consumers which permit private actions. Section 7311(a) of the Real Estate Seller Disclosure Law, 68 Pa.C.S. §7301, *et seq.*, provides that a person who willfully or negligently violates or fails to perform any duty described by any provision of this chapter shall be liable in the amount of actual damages suffered by the buyer as a result of a violation of this chapter.[13]

Section 7138(a) of the Odometer Disclosure Act, 75 Pa.C.S. §7131-7139, provides that a person who, with the intent to defraud, violates any requirement imposed under this subchapter shall be liable in an amount equal to three times the amount of

---

[13]Section 7311(a) provides that it shall not be construed so as to restrict or expand the authority of a court to impose punitive damages or apply other remedies applicable under other provisions of the law.

actual damages sustained or $3,000, whichever is greater, together with costs and reasonable attorney fees.[14]

Section 1204 of the Goods and Services Installment Sales Act, 69 P.S. §2204, provides that where a person willfully violates any provision of this Act in connection with the imposition, computation, or disclosures of or relating to time price differential or service charge on a consolidated total of two or more contracts, the buyer may recover an amount equal to three times the total of the time price differentials or service charges and any delinquency, collection, extension, deferral, or refinancing charges imposed, contracted for, or received on all contracts included in the consolidated total and the seller shall be barred from the recovery of any such charges.

Section 13 of the Mobile Home Park Rights Act, 68 P.S. §398.13, provides that any mobile home park owner, operator, or resident aggrieved by a violation of their rights under this Act may institute a private cause of action to recover damages, or for triple damages when so provided in this Act, or for restitution in an appropriate court of initial jurisdiction within the Commonwealth. Section 9 of this Act provides that the failure to refund fees as provided by the Act shall entitle the tenant to recover triple the amount plus court costs and reasonable attorney fees.

Section 11 of the Utility Service Tenants Rights Act, 68 P.S. §399.11, provides that a landlord, ratepayer, or agent or employee thereof, who threatens or takes reprisals against a tenant because the tenant exercised his or her rights under sections of the Act governing rights of tenants to continue service and to withhold rent, shall be liable for damages which shall be two months' rent or the actual damages sustained by

---

[14]Section 7137 of the Act provides that a violation constitutes an unfair method of competition and unfair and deceptive act or practice within the meaning of §2(4) of the Consumer Protection Law.

the tenant, whichever is greater, together with the costs of suit and reasonable attorney fees.

Section 11 of the Credit Services Act, 73 P.S. §2191, provides that a buyer or borrower injured by a violation of the Act or by a credit service organization's or loan broker's breach of contract subject to this Act may bring an action for recovery of damages. A judgment shall be entered for actual damages, but in no case less than the amount paid by the buyer or borrower to the credit services organization or loan broker, plus reasonable counsel fees and costs. An award, if the trial court deems it proper, may be entered for punitive damages.

There is no case law which suggests that the Legislature intended for private actions, brought pursuant to any of these other laws protecting consumers, to be governed by more demanding proof than a preponderance of the evidence. I have not been offered any reason why the Legislature would have intended for only Consumer Protection Law claims to be governed by a higher standard.[15]

The following laws have provisions stating that a violation of this law shall be a violation of the Consumer Protection Law: Automobile Lemon Law (73 P.S. §1961); New Motor Vehicle Damage Disclosure Act (73 P.S. §1970.8); Health Club Act (73 P.S. §2175(a)); Credit Services Act (73 P.S. §2190(a)); Plain Language Consumer Contract Act (73 P.S. §2207(b)); Telemarketer Registration Act (73 P.S. §2246(a)); Unsolicited

---

[15]Section 4 of the Consumer Protection Law, 73 P.S. §201-4, provides that the Attorney General or a District Attorney may bring an action for injunctive relief against any person using or about to use any method or practice declared by §3 of the Act to be unlawful. Nothing in the Consumer Protection Law suggests that this action to restrain the use of these prohibitive acts is governed by a higher standard than a preponderance of the evidence. A claim that only private actions are governed by a higher standard of proof is inconsistent with subsection (b) of §9.2 governing private actions, which provides that any permanent injunction, judgment, or order of court made under §4 shall be *prima facie* evidence in an action brought under §9.2(a) that the defendant used or employed acts or practices declared unlawful by §3 of the Act.

Telecommunication Advertisement Act (73 P.S. §2250.5(a)); and Fair Credit Extension Uniformity Act (73 P.S. §2270.5(a)). The practices which these laws mandate in some instances and prohibit in other instances are not codifications of common law causes of action. They provide protections that the common law does not provide. None of these laws contains language which suggests that any lawsuits based on these laws shall be governed by a standard of proof greater than a preponderance of the evidence. Furthermore, since the goal of these laws is to provide increased protection to consumers, it is unlikely that the Legislature would have used the remedial provisions of the Consumer Protection Law to enforce these laws if it had intended for private actions under the Consumer Protection Law to be governed by a higher standard of proof of clear and convincing evidence.

Private actions brought under §9.2 may be based on any of twenty-one unfair practices described in §201-2(4) of the Consumer Protection Law.[16] It is unclear whether it is the position of defendants that the standard of clear and convincing evidence applies to all claims brought under the Consumer Protection Law, that this standard applies only to claims based on fraud-based practices, or that this standard applies only to claims based on the catchall provision of §201-2(4)(xxi). I will address each of these contentions that MetLife may be raising.

I find no merit to the contention that private actions based on any of the twenty-one unfair practices are governed by a standard of clear and convincing evidence. For example, §201-2(4)(xiv) provides that it is a deceptive practice to fail to comply with the terms of any written guarantee or a warranty for the purchase of goods or services;

---

[16]They also may be based on violations of other consumer protection legislation and violations of Attorney General regulations promulgated pursuant to §201-3.1 of the Consumer Protection Law.

subsection (xvi) provides that it is a deceptive act to make repairs, improvements, or replacements on tangible, real or personal property, of a nature or quality inferior to or below the standard of that agreed to in writing; §201-2(4)(xviii) provides that it is a deceptive act to use a contract form or any other document related to a consumer transaction which contains a confessed judgment clause that waives the consumer's right to assert a legal defense to an action; and subsection (xx) provides that it is an unfair trade practice to fail to inform the purchaser of a new motor vehicle that any rust proofing offered by the dealer is optional and that the new motor vehicle has been rust proofed by the manufacturer.  If the list of unfair practices included only these and similar practices, there would be no basis for asserting that the Legislature intended for a private action based on these practices to be governed by a higher standard of proof than the standard of proof required in any other legislation providing remedies to a person.  Furthermore, there is no explanation as to why the Legislature would have intended to impose a higher standard of proof for claims based on these practices simply because these practices are part of a list which includes fraud-based practices.

I next consider the contention that a standard of clear and convincing evidence should be applied whenever a court characterizes a claim as fraud-based.  As I previously discussed, there is no language in the Consumer Protection Law, in other consumer protection acts, in any legislative history, or in any Pennsylvania appellate court case law which supports this construction of the Consumer Protection Law.  While judicially created tort law may, in setting a standard of proof, distinguish between fraud-based claims and other claims, this is not a distinction that legislators are likely to make. Consequently, a court should not assume that the Legislature intended to make such a distinction where there is no language in the legislation suggesting such a distinction.

NO. GD95-017150

I believe that if the Consumer Protection Law did not include the catchall provision, courts, without discussion, would be applying a preponderance of the evidence standard to all private actions. A claim that the Legislature, by including the catchall provision, intended to change the burden of proof for all fraud-related conduct gives undue weight to the catchall provision. There appear to be few instances in which conduct coming within the catchall provision would not also come within one or more of the unfair practices described in §201-2(4)(i)-(xx). Thus, the tail would be wagging the dog if a fraud standard of proof governed all unfair trade practices because of the presence of the catchall provision.

I next consider the contention that, at the very least, a standard of clear and convincing evidence applies to claims based on the catchall provision ((xxi–"[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding"). In this case, plaintiff claims that MetLife misrepresented that the policy would be fully paid at the end of ten years. There is no explanation as to why the Legislature would have intended for this claim, if brought under the catchall provision, to be governed by a standard of clear and convincing evidence, but if brought pursuant to §201-2(4)(v) ("[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have") to be governed by a lesser standard of proof.

A ruling that private actions based on consumer protection legislation should be governed by a preponderance of the evidence standard of proof is consistent with most appellate court case law in other jurisdictions. See, e.g., *Dunlap v. Jimmy GMC of Tucson, Inc.*, 666 P.2d 83 (Ariz. Ct. App. 1983) (a private action brought under the Consumer Fraud Act is governed by a preponderance of the evidence standard of proof;

23

this is consistent with the policy that consumer protection statutes are remedial in nature and must be liberally construed in favor of consumers); *Cuculich v. Thomson Consumer Electronics, Inc.*, 739 N.E.2d 934 (Ill. App. Ct. 2000) (the plaintiffs were required to prove a claim under the Consumer Fraud Act only by a preponderance of the evidence; the Consumer Fraud Act does not specifically require a greater standard of proof and the Act is intended to provide broader protection to consumers than common law fraud claims); *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901 (N.D. 1986) (an action brought under false advertising and consumer fraud statutes based on allegations of fraudulent conduct must be proven only by a preponderance of the evidence).  But see *Osbourne v. Capital City Mortgage Corp.*, 727 A.2d 322 (D.C.1999) (misrepresentation claims under the Consumer Protection Procedures Act must be proven by clear and convincing evidence because statutes in derogation of the common law are to be strictly construed); *Deer Creek Construction Company, Inc. v. Peterson*, 412 So.2d 1169 (Miss. 1982) (court upheld dismissal of statutory fraud claims stating, without discussion, that there was no fraud proven by clear and convincing evidence).

Federal law also supports the use of a preponderance of the evidence standard for fraud-based consumer law legislation.  The Consumer Protection Law is based on federal consumer protection legislation, including the Federal Trade Commission Act which declares unfair methods of competition and unfair or deceptive acts or practices to be unlawful.  15 U.S.C. §45(a)(1).  Consequently, Pennsylvania courts may look to decisions under this Act for guidance and interpretation. *Commonwealth v. Monumental Properties, Inc.*, 329 A.2d 812, 817 (Pa. 1974); *Pirozzi v. Penske Olds-Cadillac-GMC*, 605 A.2d 373, 376 (Pa. Super. 1992).  The Court of Appeals for the 11th Circuit (*Federal Trade Commission v. Tashman*, 318 F.3d 1273, 1280 (11th Cir. 2003)) applied a

24

preponderance of the evidence standard for claims brought under the Federal Trade Commission Act.  Also see *Federal Trade Commission v. Five-Star Auto Club, Inc.*, 97 F.Supp.2d 502, 526 (S.D.N.Y. 2000).

In *Herman & MacLean v. Huddleston*, 103 S.Ct. 683 (1983), the Court of Appeals, relying primarily on the traditional use of a higher burden of proof in civil fraud actions, had ruled that a fraud action under §10(b) of the Securities Act is governed by a clear and convincing evidence standard of proof.  The United States Supreme Court reversed.  It ruled that the interests of defendants in a securities case do not differ qualitatively from the interests of defendants sued for violations of other federal statutes such as antitrust or civil rights laws, for which proof by a preponderance of the evidence suffices. *Id.* at 690-92.

## GROUND C—PLAINTIFF'S DAMAGES SHOULD NOT HAVE BEEN TRIPLED

I found that MetLife's insurance agent purposely and knowingly misrepresented the terms of the insurance policy that he sold to plaintiff.  In awarding triple damages, I took into account that the actual damages I was awarding simply restored plaintiff to the status quo.  My award of enhanced damages is consistent with the case law.

The intent and purpose of the Consumer Protection Law is to curb and discourage future fraudulent behavior in consumer-type cases.  If I had simply ordered MetLife to repay what is owed the consumer under a fraudulently induced contract, the deterrence value of the statute would be weakened.  See *Agliori v. Metropolitan Life Insurance Co., supra*, at 321-22.

In *Skurnowicz v. Lucci*, 798 A.2d 788, 796-97 (Pa. Super. 2002), the Superior Court reversed the trial court's ruling that an award of triple damages would not be

appropriate in the absence of a finding that the defendant's conduct was reckless. The Court stated that this was an incorrect legal standard; where fraudulent behavior has already been established, the act requires no further showing of recklessness.

In *Metz v. Quaker Highlands, Inc.*, *supra*, the plaintiffs entered into a contract with the defendant to purchase land to build a home. Prior to the closing, the plaintiffs discovered that the defendants had misrepresented the depth of the backfill. The plaintiffs did not proceed with the closing. Instead, they filed a lawsuit seeking rescission and damages for fraudulent misrepresentation. The trial court rescinded the contract and awarded actual damages (which it tripled). As I discussed at pages 14-15 of this Opinion, these damages were awarded to restore the plaintiffs to the position they would have occupied if they had not entered into the transaction. On appeal, the defendants argued that once rescission of a sales contract occurred, the plaintiffs could no longer pursue their claims for triple the amount of these damages. The Superior Court rejected that argument stating, "to allow the rescission merely of the sales agreement without imposing a corresponding penalty for fraudulent behavior in consumer-type cases would do violence to the intent and purpose of the law (UTPCPL) enacted specifically by the Legislature to curb and discourage such future behavior." *Id.* at 450 (citation omitted).

## GROUND D–THE INTEREST RATE AWARDED TO PLAINTIFF IS EXCESSIVE

Defendants contend that plaintiff is not entitled to prejudgment interest. They cite *Skurnowicz v. Lucci, supra*, 798 A.2d at 797, which upheld the refusal of the trial court to award prejudgment interest on the damage award. The Superior Court said that the plaintiffs were not entitled to prejudgment interest because they were successful solely

on tort theories of liability; only a plaintiff who succeeds on a contract claim is entitled to prejudgment interest.

In *Skumowicz*, the trial court did not rescind the contract and it awarded only consequential damages which the plaintiffs incurred as a direct and proximate result of the defendants' fraud. In that situation, under traditional tort concepts, this award is viewed as fully compensating the plaintiffs for their injuries.

In the present case in which I am rescinding the transaction, plaintiffs cannot be made whole without an award of interest on the money that they would have had available to them if they had not entered into the transaction.

Defendants also contend that I erred in awarding interest at the prime rate because the average person would not have achieved this rate of return. No one can know what the plaintiffs would have done with the money they paid to MetLife. They may have put it in a savings account that paid less than prime rate. They may have placed it in a stock index which may have had a rate of return that was either more or less than the prime rate of interest, or they may have used the money for trips that they would not otherwise have taken. I chose the prime rate because this is probably a rate of return that MetLife achieved and that plaintiff might have achieved.

## GROUND E–THE AWARD OF ATTORNEYS' FEES TO PLAINTIFF FOR HER UTPCPL CLAIMS SHOULD NOT HAVE BEEN PERMITTED, OR ALTERNATIVELY, SHOULD BE FAR LOWER THAN THE AMOUNT AWARDED

Initially, 73 P.S. §201-9.2 provided that the court may in its discretion award up to three times the actual damages sustained and "may provide such additional relief as it deems necessary or proper." An amendment to §201-9.2, which became effective on February 2, 1997, provided that a court may award reasonable attorney fees.

I awarded counsel fees only for legal work performed after February 2, 1997. In their motion for post-trial relief, defendants contend that no attorney fees may be awarded for legal work performed at any time in a lawsuit commenced prior to February 2, 1997. This position is inconsistent with a ruling of the Superior Court in *Agliori v. Metropolitan Life Insurance Co.*, *supra*, 879 A.2d at 322-23.

In that case, I had ruled that the plaintiffs were not entitled to seek attorney fees from the commencement of the action in 1995 through February 2, 1997. However, attorney fees may be awarded for legal work done after that date. The Superior Court stated that it agreed "with the trial court's interpretation of the statute and relevant case law, and thus affirm." *Id.* at 322.

My ruling in *Agliori* relied on a fifteen-page Opinion accompanying my November 24, 2003 Order of Court entered in *Ihnat v. Pover*, 152 P.L.J. 69 (2003), holding that the December 4, 1996 amendment to §9.2 should be applied to pending lawsuits as of its effective date. I said that this result is supported by a consistent line of appellate court case law which provides that legislation will be applied prospectively where this does not affect substantive rights or duties. Prospective application means that the new law will apply from its effective date into the future. Thus, in pending cases, a new remedy will be applied immediately, but not to what has taken place before the effective date of the new law. See *Gehris v. Commonwealth*, 369 A.2d 1271 (Pa. 1977); *Creighan v. City of Pittsburgh*, 132 A.2d 867 (Pa. 1957); *Cummings Lumber Co. v. Workers' Compensation Appeal Board*, 669 A.2d 1027 (Pa. Cmwlth. 1995); *Okkerse v. Prudential Property and Casualty Insurance Co.*, 625 A.2d 663 (Pa. Super. 1993); *Pope v. Pennsylvania Thresherman & Farmers Mutual Casualty Insurance Co.*, 107 A.2d 191 (Pa. Super. 1954).

The remaining issues as to the amount of the award are addressed in my September 13, 2005 Award and Decision.

## GROUND F—THE JURY INSTRUCTIONS AND VERDICT SLIP WERE IMPROPER

Even though the jury found in defendants' favor, I am addressing this ground because I anticipate that my rulings in this litigation will be appealed and on appeal the Superior Court may elect to issue an opinion that will minimize future appeals related to (i) jury trial instructions governing fraud, reliance, and the discovery rule and (ii) the verdict slip.

At pages 13-14 of their brief, defendants raise the following objection to my jury instruction governing fraud/reliance:

> After giving defendants the opportunity to present their objections, this Court ultimately adopted an instruction, which departed from the language of defendants' proposed jury instruction regarding fraud and the binding holding of the Superior Court in Toy v. Metropolitan Life Ins. Co., 863 A.2d 1, 12-13 (Pa. Super. 2004). Specifically this Court eliminated certain language from defendants' proposed instruction, as follows: "a plaintiff cannot recover if he or she blindly relies upon a misrepresentation the falsity of which would be patent or obvious if he or she used the opportunity to make a cursory examination or investigation." Defendants objected to the elimination of this language from the jury instruction, as it accurately reflects the controlling law regarding the obligation of a policyholder to use his senses and the fact that a policyholder is barred from recovery if he blindly relies upon a misrepresentation the falsity of which should have been patent or obvious under the circumstances.
>
> *   *   *
>
> The language proposed by defendants in their proposed revised jury instruction on fraud is a restatement of the language of the Toy opinion. Therefore, it is a clear and accurate statement of the controlling law, which this Court was bound to follow. Defendants were entitled to an instruction that clearly sets forth for the jury that plaintiff could not recover if she

29

blindly relies upon a misrepresentation the falsity of which should have been patent to her under the circumstances. The elimination of this language from the jury instructions prejudices defendants because without the additional language – borrowed directly from Toy – it suggests that a plaintiff can simply blindly rely on misrepresentations that would be patent or obvious if he or she conducted a "cursory examination" of the information available to him or her at the time of the sale.

I did not include the language that defendants proposed because it would suggest a duty on the part of the policyholder to at least conduct a cursory examination of the policy and other writings which MetLife furnished following the purchase of the policy.

I read *Toy* and *Drelles* to say that an insured may rely on the representations of his or her insurance agent unless the circumstances of the case make it unreasonable for the insured not to read the policy. An instruction that an insured may not rely on a representation the falsity of which would be obvious if the insured used the opportunity to make a cursory examination or investigation says the opposite—it permits an insured to rely on the representations of the insurance agent only where the misrepresentation cannot be discovered through a cursory examination or investigation.

Defendants also object to the following instruction regarding the discovery rule:

> By answering "yes" to Question 1, you will have decided that at the time the insurance policy was delivered, the plaintiff neither knew nor should have known of the insurance company's fraud. In this situation, the plaintiff had to sue within two years after the plaintiff acquired additional information that would cause a reasonably diligent person in the plaintiff's position to no longer rely on the insurance company's misrepresentations.
>
> The question you need to decide is when, as a result of events occurring after the insurance policy was delivered, it was no longer reasonable for the plaintiff to continue to rely on those representations of the defendants that were inconsistent with the provisions in the insurance policy. Once there was some reason to awake an inquiry

30

and direct diligence in the channel in which it would be successful, the two-year period begins to run.

Defendants contend that it is possible for a jury to find that the plaintiff had proven justifiable reliance for purposes of her fraudulent misrepresentation claim but not for purposes of invoking the doctrine of fraudulent concealment. I reject this argument because justifiable reliance for purposes of establishing a fraudulent misrepresentation claim must be established by clear and convincing testimony. Consequently, a finding of justifiable reliance establishes that the defendant is estopped from invoking the statute of limitations under the doctrine of fraudulent concealment (which needs to be established only under a preponderance of the evidence burden) until events after the sale of the policy create a reason for the plaintiff to no longer rely on the agent's misrepresentations.

Defendants contend that this court erred in not using a verdict slip that required the jury to determine whether plaintiff met each separate element of a fraudulent misrepresentation claim.

Before instructing the jury, I gave each juror a copy of the verdict slip which set forth each of the elements of a fraudulent misrepresentation claim. I then, twice, gave instructions that covered each element. Thus, the jury was in a position to decide whether to enter an award for plaintiff or for defendants. Furthermore, the use of this verdict slip permitted jurors to focus on the entire case.

For these reasons, I enter the following Order of Court:

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

NANCY ECK,

       Plaintiff

   vs.

METROPOLITAN LIFE
INSURANCE COMPANY,
et al.,

      Defendants

NO. GD95-017150

## ORDER OF COURT

On this _____9_____ day of February, 2006, it is hereby ORDERED that the Motions
for Post-Trial Relief of plaintiff and of defendants are denied.

BY THE COURT:

_____
WETTICK, A.J.