3

1

2              WILHELMENIA TAYLOR, having previously

3                   been sworn, continues testifying

4                   under oath as follows:

5

6   CONTINUED DIRECT EXAMINATION BY MR. BARTHOLOMAEI:

7         Q    Ms. Taylor, we're going to continue

8   your deposition which abruptly ended last week

9   because I wasn't feeling well and I apologize for

10  that again.  I wanted to continue with this

11  document which was previously marked as Taylor

12  Exhibit 1, which is the Proposed Strategy for the

13  Accelerated Payment Plan.

14              I wanted to ask you about a section

15  on page three.  Do you need a minute to review

16  this again?

17        A    No.  You can go ahead.

18        Q    This page, looks like it begins to

19  identify some problems.  There is a heading that

20  says:

21              "Problem #1:  Prospectus,

22  Policyholders and Account Reps Do Not Have a Clear

23  Understanding of the APP Arrangement".

24              What study was done to determine that

25  the prospects policyholders and Account Reps do

4

WILHELMENIA TAYLOR

2   not have a clear understanding as to the APP

3   Arrangement?

4               MS. TAYLOR:  Objection to form, lack

5           of foundation.

6       A       It's my recollection that a study was

7   not necessarily done at Metropolitan Life but we

8   received feedback from members who were working on

9   the APP mechanization process, customer service

10  people, marketing people, people in

11  communications, that they were getting certain

12  questions regarding the APP Arrangement which lead

13  them to believe there may have been some

14  situations where customers either did not remember

15  or did not understand.

16              And we had new representatives that

17  were joining the company and they weren't quite

18  clear sometimes on how the AP Arrangement worked.

19      Q       How were the representatives not

20  clear as to how the AP Arrangement worked?

21              MS. TAYLOR:  Objection to form.

22      A       It's my recollection most of the

23  questions that came in from the reps were

24  representatives who inherited existing customers

25  when they came and joined the company and they

7

WILHELMENIA TAYLOR

2  Talk About AP that was provided to

3  representatives.

4       Q      During what time period was this?

5       A      I'm not exactly sure about the time

6  period.  If we look at the documents I can show

7  you what they were.

8       Q      Was that in the '90s?

9       A      I believe it was the '90s, I can't

10  exactly be sure.

11       Q      When you were just talking about

12  feedback, you said feedback came in and questions

13  came in.  What does that exactly mean it came in?

14  Where did they come to?

15       A      We had 1-800 numbers at Met.

16  Customers would call the 1-800 number and ask

17  questions.  Representatives could call what they

18  then described as their head office, the

19  administrative that did the work that had to be

20  done on the policies.  Those were the typical ways

21  inquiries would come.

22       Q      How did that information come to you?

23       A      I was part of a group that was

24  working on the continued mechanization of the

25  accelerated paid process.

11

1               WILHELMENIA TAYLOR

2          the study find?

3               MS. TAYLOR:   The study couldn't find

4          anything either.   I don't think she

5          testified there was a study.

6               MR. BARTHOLOMAEI:   I'm referring to

7          Exhibit 1, the proposed strategy for the

8          Accelerated Payment Plan.

9               Q     The question was, what was it this

10   document found that policyholders did not have an

11   understanding of with respect to the Accelerated

12   Payment Plan?

13               MS. TAYLOR:   Objection as to form.

14          A     It's my recollection the members from

15   the customer service unit told a group that

16   customers were using the term "paid-up" when they

17   were calling to Request the Accelerated Payment

18   Arrangement.   They seemed to be confused that the

19   policy was paid-up versus being on the Accelerated

20   Payment Arrangement.

21          Q     What does paid-up mean?

22          A     Paid-up means there are no more

23   premiums required on the policy regardless if it's

24   out-of-pocket, paid by the funds in the policy.

25   There is no premiums required to keep the policy

12

1                    WILHELMENIA TAYLOR

2   in force.

3        Q    Was any investigation done as to if

4   customers had the belief as to their policies

5   being paid-up?

6             MS. TAYLOR:  Objection as to form.

7        A    I don't believe there was an

8   investigation.

9        Q    What was Metropolitan Life's

10  understanding of why customers were coming to form

11  the belief their policies were paid-up?

12            MS. TAYLOR:  Objection as to form.

13       A    I don't know what Met's belief was.

14  We were just dealing with the information we were

15  having.  Customers were using the term "paid-up"

16  in their request for the Accelerated Payment

17  Arrangement, but I don't believe Metropolitan Life

18  had a belief.

19       Q    Was any investigation done to

20  determine what information was being given to

21  policyholders or proposed insureds at the time of

22  sale that would lead them to believe their

23  policies would eventually become paid-up?

24            MS. TAYLOR:  Objection as to form.  I

25       just want to clarify that Ms. Taylor would

13

1              WILHELMENIA TAYLOR

2         not, for instance, know about necessarily

3         any kind of investigation or audit that was

4         done because she's not in the Auditing

5         Department and there could have been

6         something separate from the natural work

7         team that's in documents that she's unaware

8         of.

9              She can answer to the best of her

10        recollection.

11        A    I don't know about an investigation

12   being done.

13        Q    Let's talk about in this document.

14   On page three again there is a Solution section,

15   says:

16             "We need to better educate customers

17   and Account Representatives about the APP

18   concept."

19             Do you see that?

20        A    Yes.

21        Q    How was it determined that customers

22   needed to be educated about the APP concept?

23        A    Again it's going back to the

24   information that was coming from the members who

25   represented the customer service unit on the team

21

1                    WILHELMENIA TAYLOR

2    educating newly hired reps about the APP process."

3              Is that something actually produced

4    or created.

5         A      It's my recollection that the

6    Straight Talk about AP was the vehicle that was

7    used to, the Straight Talk about AP as well as the

8    consumer brochure, I believe those were the items

9    that were used to provide a representative with

10   more information about AP.  I don't believe it had

11   the words "training manual" on it.  I believe it

12   was those items.  That's what I recollect.

13        Q      On the same page, on page three in

14   the second paragraph under the Solution section.

15   The third sentence says:

16             "We should also consider

17   discontinuing the word "none" in the premium

18   outlay column on the illustration because it

19   fosters the idea the policy is paid-up."

20             Do you see that?

21        A      Yes.

22        Q      How is that determined that was

23   something that could be a solution to the problem

24   which is identified in the problem number one

25   section?

22

1                    WILHELMENIA TAYLOR

2            MS. TAYLOR:   Objection as to form.

3        A     From what I can remember, it wasn't

4    necessarily that it was.   It wasn't a

5    determination.   It was more of an opinion.

6            The illustration was being looked at

7    more or less under a microscope to basically say

8    we're hearing from the customer service reps that

9    customers are using the words "paid-up".

10           If you take a look at the

11   illustration piece by piece and if you looked at

12   it in its entirety, there should be no confusion.

13   But if you looked at it and looked at the words

14   "none," perhaps that's some of the reasons why the

15   customers are using the words "paid-up".

16           In order to try to eliminate that

17   mind set and make sure that it was clear to

18   customers that the policies weren't paid-up, it

19   was an opinion that perhaps if we did not include

20   the words "none" that the customers would be

21   looking at the illustration in a more totality

22   with a proper disclosure with respect to the

23   premium outlay rather than just the words "none".

24           We looked at every piece of the

25   illustration of the disclosure language, we looked

23

1          WILHELMENIA TAYLOR

2    at the premium at the lay column and said, okay,

3    perhaps that's why they are doing it, they are

4    looking at the premium outlay and not looking at

5    the disclosure language on the bottom.

6          Q    I'm not quite sure I understand.

7    What was it about the word "none" that came to

8    lead you to believe that customers were forming a

9    belief that the policies were paid-up?

10         A    The only way I can describe it, I

11    looked at the illustration, a group of us, the AP

12    natural work team, myself included.

13              When we looked at the illustration as

14    a whole, there appeared to us there should be no

15    confusion as to how the Accelerated Payment

16    arrangements work if the policy wasn't paid-up.

17    Since we were hearing fed-up customers were

18    calling up and using the term "paid-up," we

19    started looking at each piece of the illustration

20    and said perhaps this word might be causing some

21    confusion.

22         Q    Was there a proposed alternative of

23    using the word "none"?

24         A    No.  It was just an observation and

25    there was no alternative to "none".  It was just

CITTONE REPORTERS
(212)286-9222

24

1                    WILHELMENIA TAYLOR

2    an observation.

3         Q      It says here the word "none" fosters

4    the idea that the policy is paid-up.   Right?

5         A      Yes, that's what it says.

6         Q      How is it determined that the word

7    "none" fostered the idea the policy is paid-up?

8                 MS. TAYLOR:  Objection as to form.

9                 Asked and answered.

10        A      Again, if you looked at the

11   illustration in its entirety, there should have

12   been no confusion, at least the group didn't

13   belief there should be any confusion as to the how

14   the Accelerated Payment Arrangement work.

15               If you took that out of context and

16   just looked at the word, you might believe there

17   were no premiums due on the policy.

18        Q      When you say when the natural work

19   team was looking at the illustration, you thought

20   there should be no confusion about the

21   illustration, who were the members of the natural

22   work team?  We may have gone over this before.  Is

23   that something you can identify now?

24        A       There is a document, several

25   documents in there that listed the natural work

27

WILHELMENIA TAYLOR

1

2    believe it's in the documents, that there was

3    alternatives offered to the customer.  I'm not

4    sure about number, the D, I'm not sure about D.

5    The other ones sound familiar.

6          Q    A, B and C?

7          A    Yeah.

8          Q    Anything other than what's listed on

9    this document that was either implemented or

10   proposed to address what I just identified as

11   problem #2?

12         A    There was a long list of, there were

13   several options.  If you show me -- there was a

14   document in there, pretty large document I believe

15   that talks about alternatives, payment options for

16   the Accelerated Payment Arrangement.  I'm not sure

17   if they match up one-to-one.  We can go over them.

18   I think they're in the pile.

19         Q    Let's look at the next page.  This is

20   something I asked you about when we started the

21   deposition, whether there was a tracking system

22   for Accelerated Payment Plan policies.

23              I believe this section refers to a

24   proposal that it should be somehow indicated on

25   the application whether a policy was being sold

28

WILHELMENIA TAYLOR

1

2  using the Accelerated Payment Plan illustration;

3  is that right?

4              MS. TAYLOR:   Objection as to the term

5         "Accelerated Payment Plan" policies.

6       Q.    Do you see that under Solutions,

7       A     Right.   I just want to make sure, in

8  the original part of your question you mentioned

9  the word whether it was illustrated.   The concept

10  would have been used without using an

11  illustration, just discussing.

12            Could you repeat the question again?

13      Q     Was such a tracking system ever

14  implemented?

15      A     Not that I am aware of.

16      Q     What was the reason why a tracking

17  system was not implemented?

18      A     I don't know the reason why either.

19      Q     Did you receive any feedback as to

20  your solutions in this proposed strategy?   I'm

21  talking about the document in general now.

22      A     It's my recollection that, as part of

23  the natural work team, what we began doing was

24  focusing on the communications aspect, the ABC's

25  of Dividends, the Accelerated Payment brochure,

33

1                    WILHELMENIA TAYLOR

2    were saying.  I didn't see any documents that said

3    we had any information from the feedback from

4    customer service people.

5          Q     When you said your involvement in the

6    AP process ended, when was that?

7          A     I believe probably late 1994, early

8    1995.

9          Q     What happened at that time?

10         A     I left the department then, was

11   involved in the process end.  Basically assigned

12   other duties.

13         Q     Probably something I should have

14   asked you earlier.

15               Maybe at this time you can describe

16   your general background with respect to the

17   Accelerated Payment Plan or what you did at

18   Metropolitan Life that involved that?

19         A     I was a part of a group that was put

20   together I believe in late 1987, early 1988 to

21   mechanize the AP eligibility once a customer

22   requested it.

23               And I continued to stay involved in

24   the whole mechanization of the whole AP process at

25   Metropolitan Life until 1994 or so, early 1995.

34

WILHELMENIA TAYLOR

1

2    That process is documented in all the documents in

3    the reading I did before, preparing for this

4    deposition.

5              That's basically my involvement.

6         Q    What does mechanization mean?

7         A    As I used the term, it was a way of

8    determining if a policy was eligible to actually

9    use the Accelerated Payment Arrangement, what type

10   of communications would be sent to customers who

11   requested it who were operating on the

12   arrangement.  That whole process of producing

13   letters, statements, testing for eligibility.

14   That's what I call mechanization, where someone is

15   not handling it on a case by one case,

16   case-by-case basis.

17        Q     This proposed strategy document,

18   Exhibit 1, seems it goes a little bit further than

19   what you were talking before now.  Was that the

20   extent of your involvement, this mechanization

21   process, or were there other things you were

22   involved with?

23        A     As being part of the natural work

24   team, the natural work team, its involvement

25   included the mechanization, the communications.

37

1    WILHELMENIA TAYLOR

2         MR. BARTHOLOMAEI:   It's possible it's

3    not on the list.   I brought copies of this

4    document with me here today for that

5    reason.

6         MR. LABOVITZ:   Okay.

7    A    I don't know anything about an

8    investigation of this type.

9    Q    Was any feedback received from

10   customers like you described earlier, people who

11   called the 800 number, by whatever means it was

12   that Account Representatives have been telling

13   them their policy was paid-up, quote/unquote, when

14   the Accelerated Payment Plan took over?

15   A    The feedback I recall getting

16   especially on the AP natural work team was that

17   customers were using this term when describing

18   their request to be on AP.   I didn't hear about

19   representatives using this term.

20   Q    When you say customers were using the

21   term "paid-up", was any inquiry made from the

22   customers as to where they were getting that term

23   from?

24   A    I don't know.   I don't know what the

25   customer service reps actually asked them.   I know

38

WILHELMENIA TAYLOR

1

2 in our meetings they explained to them the policy

3 wasn't paid-up if they were asking for the

4 Accelerated Payment Arrangement.

5              Certain customers when called up

6 asked about that. When they were talking about

7 the Accelerated Payment Arrangement, customer

8 service reps explained how that arrangement worked

9 rather than paid-up.

10        Q      The term "paid-up", is that a term

11 used at Metropolitan Life?

12        A      It's a term they use in the entire

13 insurance industry. There are policies that can

14 become paid-up.

15        Q      What does paid-up mean?

16        MS. TAYLOR:  Objection as to form.

17 Asked and answered.

18        A      Paid-up means there are no premiums

19 due on the policy. The policy does not have any

20 premiums that must be paid because there are no

21 premiums due.

22        Q      On the Accelerated Payment Plan

23 illustration we talked about earlier there is a

24 column that says "none" as far as the premium

25 outlay column. Is that "none" referring to the

39

WILHELMENIA TAYLOR

1

2    fact at that point in premiums are due?

3         A    No.

4         Q    What does that refer to?

5         A    That's referring to the fact, with

6    respect to monies being paid out-of-pocket by the

7    customer, if dividends are sufficient, the

8    customer does not have to have a premium outlay

9    out-of-pocket.  Premiums are paid in another

10   fashion using the dividends.

11        Q    In those brochures we talked about

12   earlier, was it discussed that Account

13   Representatives should not use the term "paid-up",

14   rather when providing information to customers

15   with respect to their Accelerated Payment Plan

16   illustration?

17             MS. TAYLOR:  Do you have the

18        documents?  I think it would be helpful if

19        you showed them to her.

20             MR. BARTHOLOMAEI:  I don't think I

21        do.

22             MS. TAYLOR:  They were in the

23        documents you identified, the Straight Talk

24        and also the brochure.  She can give her

25        best recollection, but they are long

45

1                    WILHELMENIA TAYLOR

2          deposition and explained it depends on the

3          facts and circumstances, the issue date of

4          the policy, what activity -- I think we

5          went over this before.

6                 MR. BARTHOLOMAEI:   I remember and I

7          reviewed the transcript.  This is the point

8          we ended on last time.  I believe the last

9          question of the deposition was whether the

10         dividend scale ever went back up after 1992

11         in Metropolitan Life.

12         Q     I believe you said it had not?

13         A     I believe that's correct.

14                MS. TAYLOR:   Went back up from what

15         year, though?

16                MR. BARTHOLOMAEI:   Prior to 1992.

17                MS. TAYLOR:   Whether there is an

18         increase or decrease, you have to say

19         specifically.  You are saying did the scale

20         in effect in 1992, did it ever go above

21         that?

22                MR. BARTHOLOMAEI:   I understand what

23         you are saying.

24         Q     That Metropolitan Life never

25    increased its dividend scale after 1992?  Is that

46

1                    WILHELMENIA TAYLOR

2    right?

3          A      I believe that's correct.

4          Q      At some point did it become definite

5    that all policies sold prior to 1992 would not

6    perform as illustrated where an APP illustration

7    was used at the point of sale?

8                MR. LABOVITZ:  Object to the form.

9          A      I don't believe it became definite,

10   no.  I'm not an actuarial, I don't believe it

11   became definite all policies sold prior to 1992

12   would not perform.

13         Q      Were there any policies sold prior to

14   1992, the type of policy we've been talking about,

15   that would perform as illustrated?

16               MS. TAYLOR:  Objection as to form.

17         A      As illustrated you are saying?

18         Q      Right.

19         A      To the best of my recollection, yes.

20         Q      How is that possible?

21         A      The best example that I can give you

22   is if a policy was illustrated, let's say in the

23   early 1980s and the then current dividend scale

24   was used in the illustration and depending on what

25   the customer, if the customer did nothing else,

109

1          WILHELMENIA TAYLOR

2          A      I also don't recall an amount or a

3     study.

4          Q      The company give any consideration to

5     the amount it would cost to notify a whole class

6     or the entire universe of people who are on the AP

7     Arrangement?

8                 MS. TAYLOR:   Objection as to form.

9          A      I don't recall the amount of money

10    with respect to notifying people you just

11    described.

12         Q      On the second page, Mr. Rayl talks

13    about the dividend scale having been lowered in

14    1996.

15                Do you have any knowledge as to

16    whether the dividend scale was lowered in 1996?

17         A      Yes, I believe the dividend scale was

18    lowered in 1996.

19         Q      What about at this point in time --

20    we are now talking about the end of 1995,

21    beginning of 1996 -- was any further contact made

22    with policyholders like we talked about before

23    outside of the anniversary statements, billing

24    statements or suggestion that representatives

25    contact policyholders who were participants in the

144

1           WILHELMENIA TAYLOR

2           (RECORD IS READ)

3           MS. TAYLOR:  Also a compound

4      question.

5      A      I understand the last part, was there

6   a policy required.  My understanding, correct, a

7   use of sales illustration in an AP sales by a rep?

8   Is that what you are asking?

9      Q      Yes.

10      A      I don't recall a policy that said you

11   had to use a sales illustration if you were

12   discussing AP.  I don't know what a rep would do

13   or not do, but I don't recall a specific policy.

14      Q      Who was it at MetLife that approved

15   the reduction to the dividend scale in the early

16   '90s?

17      A      My understanding it was the Board of

18   Directors that approved the dividend scales.

19      Q      Is that the same for every year?

20      A      My understanding it was the Board of

21   Directors.

22      Q      What about interest rate reductions?

23           MS. TAYLOR:  Objection.  I think it's

24      beyond the scope of this deposition.  This

25      is an AP deposition and interest rates