# EXHIBIT A

(43.1)

MP401106954G

1

1    IN THE UNITED STATES DISTRICT COURT FOR THE
        NORTHERN DISTRICT OF OKLAHOMA
2
3    JAMES L. RAYL,          )
                             )
4        Plaintiff,   )
                             )
5        vs.          ) No. 97-CV-505 H(M)
                             )
6    METROPOLITAN LIFE       )
     INSURANCE CO., INC.,    )
7                            )
        Defendant.   )
8
9
10
11        VIDEO DEPOSITION OF JAMES L. RAYL,
12   taken on behalf of the defendant, pursuant to
13   notice and agreement as to time and place and the
14   Federal Rules of Civil Procedure, on Wednesday,
15   February 25, 1998, at the law offices of
16   Strecker & Associates, 1600 NationsBank Center,
17   15 W. Sixth Street, Tulsa Oklahoma, before me,
18   Maynard E. Peterson, RPR, RMR, Certified Shorthand
19   Reporter within and for the State of Oklahoma.
20
21
22
23
24                                            **CONFIDENTIAL**
25

        ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                        2
1        A p p e a r a n c e s:
2
3    For the Plaintiff:
4        J. BRIAN RAYL, Esquire
            Parker, Staggs & Associates, P.C.
5        Southern Ridge
            6506 South Lewis, Suite 220
6        Tulsa, OK 74136
7
8    For the Defendant:
9        J. STEPHEN POOR, Esquire
            Seyfarth, Shaw, Fairweather & Geraldson
10       55 East Monroe Street
            Chicago, ILL 60603
11           and
            KEVIN S. FINNEGAN
12           Assistant General Counsel
            MetLife
13       One Madison Avenue
            New York, NY 10010-3690
14
15
16
17
18
19
20
21
22
23
24
25
        ESQUIRE CORPORATE SERVICES

                                            Page    1

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

3

```
1        I N D E X
2        WITNESS                     Page
3   JAMES L. RAYL
4      Direct Examination by Mr. Poor      6
5        EXHIBITS                    Page
6   Deposition Exhibit No. 1           65
7   Deposition Exhibit No. 2           69
8   Deposition Exhibit No. 3           80
9   Deposition Exhibit No. 4           80, 121
10  Deposition Exhibit No. 5        87, 88, 91, 95
11  Deposition Exhibit No. 6          87, 90, 91
12  Deposition Exhibit No. 7          121, 122
13  Deposition Exhibit No. 8           138
14  Deposition Exhibit No. 9           145
15  Deposition Exhibit No. 10          147
16  Deposition Exhibit No. 11          155
17  Deposition Exhibit No. 12        165, 166
18  Deposition Exhibit No. 13        165, 167
19  Deposition Exhibit No. 14          165
20  Deposition Exhibit No. 15          165
21  Deposition Exhibit No. 16        165, 170
22  Deposition Exhibit No. 17        165, 171
23  Deposition Exhibit No. 18          165
24  Deposition Exhibit No. 19        165, 172
25  Deposition Exhibit No. 20        165, 173
```

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100,NORCROSS,GA 888-486-4044

4

**CONFIDENTIAL**

```
1   Exhibit Index (Cont'd)             Page
2   Deposition Exhibit No. 21        165, 173
3   Deposition Exhibit No. 22        165, 173
4   Deposition Exhibit No. 23        165, 174
5   Deposition Exhibit No. 24        165, 174
6   Deposition Exhibit No. 25        165, 174
7   Deposition Exhibit No. 26        185, 186
8   Deposition Exhibit No. 27        185, 198
9   Deposition Exhibit No. 28          187
10  Deposition Exhibit No. 29          199
11  Deposition Exhibit No. 30          212
12  Deposition Exhibit No. 31        218, 219
13  Deposition Exhibit No. 32        218, 219
14  Deposition Exhibit No. 33          220
15  Deposition Exhibit No. 34          221
16  Deposition Exhibit No. 35        232, 233
17  Deposition Exhibit No. 36        232, 233
18  Deposition Exhibit No. 37        255, 257
19  Deposition Exhibit No. 38        255, 258
20  Deposition Exhibit No. 39        255, 258
21  Deposition Exhibit No. 40          255
22  Deposition Exhibit No. 41          255
23  Deposition Exhibit No. 42          255
24  Deposition Exhibit No. 43        255, 257
25  Deposition Exhibit No. 44        256, 257
```

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100,NORCROSS,GA 888-486-4044

5

```
1   Exhibit Index (Cont'd)             Page
2   Deposition Exhibit No. 45      258, 311, 312
3   Deposition Exhibit No. 46          261
4   Deposition Exhibit No. 47        270, 274
5   Deposition Exhibit No. 48          270
6   Deposition Exhibit No. 49          270
7   Deposition Exhibit No. 50          270
8   Deposition Exhibit No. 51          273
9   Deposition Exhibit No. 52          297
10  Deposition Exhibit No. 53        297, 298
11  Deposition Exhibit No. 54        297, 299
12
```

MP401106954B

```
13
14
15
16
17
18
19        MR. POOR:  This is a discovery deposition
20   taken in the case of James L. Rayl vs. Metropolitan
21   Life Insurance Company, currently pending in the
22   United States District Court for the Northern
23   District of Oklahoma, taken pursuant to the Federal
24   Rules of Civil Procedure, notice and agreement of
25   the parties as to time and place.
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        6
1         JAMES L. RAYL,
2    being produced, sworn and examined on behalf of the
3    defendant, deposeth and saith as follows:
4         DIRECT EXAMINATION
5    BY MR. POOR:
6      Q.  Good morning, Mr. Rayl.
7      A.  Good morning.
8      Q.  Okay.  Would you please state your name,
9    sir, spell your last name for the record.
10     A.  James Lee Rayl, R-a-y-l.
11     Q.  And you are the plaintiff in this case,
12   correct, Mr. Rayl?
13     A.  Yes.
14     Q.  Have you ever been deposed before, sir?
15     A.  No.
16     Q.  Have you ever testified in any type of
17   formal court or administrative proceeding?
18     A.  No.
19     Q.  Take just a moment, let me just take a
20   moment, Mr. Rayl, and describe to you the ground
21   rules that I have --
22     A.  Okay.
23     Q.  -- for a deposition.  I am sure you have
24   been briefed on what to expect.  But a deposition
25   is my opportunity to ask you questions about your
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                        7
1    background, continue with MetLife, the facts and
2    allegations that you have surrounding the Complaint
3    that you filed against MetLife.
4      A.  (Affirmative head nod).
5      Q.  It is not my intention to be confusing or
6    tricky or misleading or in any way to attempt to
7    deceive you, but if for any reason you don't
8    understand any question I ask, don't hear it, or
9    are confused by it or for any reason want me to
10   repeat the question, rephrase it, if you will tell
11   me, I will be happy to do so.
12     A.  Good.
13     Q.  Okay?
14     A.  (Affirmative head nod).
15     Q.  If you answer the question, I am going to
16   work on the assumption that you have heard it and
17   understood it and are answering the question that
18   is being asked.  Fair enough?
19     A.  Fair.
20     Q.  From time to time witnesses will tend to
21   give nonverbal answers, shakes of heads or
22   perhaps --
23     A.  Yes.
24     Q.  -- an "uh-huh," I will correct you.  It is
25   not meant to be in any way offensive to you, but
          ESQUIRE CORPORATE SERVICES
```

CONFIDENTIAL

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

8

1  simply the court reporter needs --
2      A.  I understand.
3      Q.  -- to have a verbal answer.
4         And the way this process works, Mr. Rayl,
5  it is also useful if you allow me to finish my
6  question and then you give the answer.  It is very
7  difficult for the court reporter to report two
8  people talking at the same time.
9      A.  Okay.
10     Q.  Okay?  It's an informal process, if you
11 need a break, want to confer with your attorney,
12 you should feel free to do so.  I will ask if there
13 is a pending question to answer the question before
14 we take a break, but --
15     A.  Okay.
16     Q.  -- at any time.
17     A.  (Affirmative head nod).
18     Q.  Okay?
19     A.  Sure.
20     Q.  Are you on any medication today, sir?
21     A.  Yes.
22     Q.  What medication is that?
23     A.  I take Zestril 5 milligrams once a day,
24 Mevacor 40 milligrams once a day and Lopressor 50
25 milligrams twice a day.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

9

1      Q.  What is Zestril prescribed for?
2      A.  It has to do with my heart condition, but
3  I can't really tell you exactly.  I was on a number
4  of drugs before my last surgery and they have
5  reduced the regimen to this, and they are different
6  drugs.
7      Q.  All designed for your heart condition?
8      A.  The Mevacor is for cholesterol; the other
9  two are for my heart.
10     Q.  Do these drugs, at least, to your
11 knowledge, in any way interfere with your ability
12 to hear and understand a question and --
13     A.  No, they do not.
14     Q.  Do they in any way interfere with your
15 recollection or your ability to answer questions?
16     A.  No, they do not.
17     Q.  Other than conferences with your attorney,
18 have you spoken with or done anything to prepare
19 for the deposition today?
20     A.  No.
21     Q.  And I am excluding any conversations or
22 things you have seen with him today.
23     A.  No, I have not.
24     Q.  Other than documents you may have reviewed
25 with your counsel or shown to you by counsel, have

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

10

1  you looked at any documents to prepare for today?
2      A.  The documents that we forwarded as part of
3  the document production, I did review.
4      Q.  Okay.  What is your address, sir?
5      A.  1824 South Gardenia Avenue, and that's
6  G-a-r-d-e-n-i-a, Broken Arrow, Oklahoma 74012.
7      Q.  Is that a private home or --
8      A.  Yes.
9      Q.  -- an apartment?
10     A.  A private home.
11     Q.  Did you own or rent the home?
12     A.  I own.

**CONFIDENTIAL**

Page   4

13   Q.  How long have you resided at that address?
14   A.  Approximately eight-and-a-half years.
15   Q.  Your social security number is
16   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?
17   A.  Yes.
18   Q.  Are you currently married, sir?
19   A.  No.
20   Q.  You were married at one time to Bonnie
21   Beatrice Rayl?
22   A.  Yes.
23   Q.  Married in 1964?
24   A.  Yes.
25   Q.  Okay.  You are divorced, correct?
           ESQUIRE CORPORATE SERVICES
     6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                           11
1    A.  Yes.
2    Q.  And when was that divorce final?
3    A.  I believe it was 1988.
4    Q.  The process, I assume, had gone on for
5    some time?
6    A.  The best part of a year.
7    Q.  Okay.  You have two children?
8    A.  Yes.
9    Q.  Okay.  James Brian, who is with you today
10   as your attorney?
11   A.  Yes.
12   Q.  He's your son, obviously.  And Cynthia
13   Renee is your daughter?
14   A.  Yes.
15   Q.  Okay.  What are the ages of your children?
16   A.  29 and 27.
17   Q.  Which is which?
18   A.  Brian 29 and Cindy is 27.
19   Q.  Do either of your children reside with you
20   or rely upon you for support?
21   A.  No.
22   Q.  And your date of birth?
23   A.  May 13th, 1942.
24   Q.  If you could, please, sir, could you
25   briefly describe your educational background.
           ESQUIRE CORPORATE SERVICES
     6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                           12
1    A.  I finished high school in 1960, attended
2    the College of Steubenville, which was my home
3    town, attending night school.  I did not get a
4    formal degree from college.  I have attended
5    various classes, seminars and opportunities that
6    have presented themselves over the years, but I do
7    not have a degree.
8    Q.  "Steubenville" would be what?
9    A.  Ohio.
10   Q.  Ohio?
11   A.  Yes.
12   Q.  You attended courses at the College of
13   Steubenville from --
14   A.  Graduating from high school into
15   Steubenville.
16   Q.  Okay.  Until when?
17   A.  1961, January.
18   Q.  Okay.  Since then, and I think you
19   answered this, and I am sorry I didn't catch it,
20   have you taken any other formal courses designed to
21   lead to a degree conferred by a college or
22   university?
23   A.  No.
24   Q.  You have taken some training in education
25   courses?
           ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

13

1    A.  Continuing education, specialized
2 management courses, things like that.
3    Q.  Some of them have even been offered
4 through MetLife or reimbursed by MetLife?
5    A.  Yes.
6    Q.  You first went to work for MetLife in
7 1962?
8    A.  Yes, April 9th.
9    Q.  Prior to going to work for MetLife, what
10 kind of employment history did you have?
11   A.  When I graduated from high school, I
12 worked at a department store just as a retail clerk
13 in Ohio.  I left there to move to Washington, D.C.,
14 where I lived with my brother.  And I was employed
15 by Columbia Federal Savings & Loan as a teller
16 prior to joining MetLife.
17   Q.  What job did you first hold with MetLife?
18   A.  I was what was classified as a field
19 auditor.
20   Q.  You stayed in the field of auditing area
21 for a number of years, correct?
22   A.  About ten years, yes.
23   Q.  Ten.  Until the early Seventies?
24   A.  Until I came to Tulsa in January of 1973.
25   Q.  During the period you were in field

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

14

1 auditing, where were you located?
2    A.  I was originally working out of
3 Washington, D.C., probably for four or five years;
4 I don't remember exactly.  Then I was relocated to
5 Cleveland, Ohio, and I worked out of Cleveland.  I
6 traveled a lot and -- prior to coming to Tulsa.
7    Q.  What did you do generally in the field of
8 auditing area?
9    A.  The job started out as auditing individual
10 sales representatives of the company.  I ultimately
11 moved on to what was called a regional or a
12 supervisor at that time, where I supervised the
13 full auditing of our sales offices.
14   Q.  What did that auditing consist of?  When
15 you say "auditing of sales offices," what is that?
16   A.  Primarily, at that time -- the job has
17 changed over the years, but primarily at that time
18 it was -- instead of auditing or being responsible
19 for an individual representative, I had to go in
20 and review the accounts of all the representatives
21 in the office.  And it was primarily to determine
22 whether or not they were taking funds from the
23 company.  You occasionally got into other
24 irregularities, but it was primarily monetary
25 auditing.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

15

1    Q.  When you moved to Tulsa in January of
2 1973, what did you move to Tulsa to do?
3    A.  I was manager of what was called cash
4 control and accounting at that time.  It was
5 primarily the check-writing operation.
6    Q.  Let's just briefly run through your career
7 with Met, and get it in some chunks of time here
8 and then we can come back and go over it.
9    A.  Okay.
10   Q.  You stayed in that function about how
11 long?
12   A.  I would almost -- I am somewhat poor at

CONFIDENTIAL

J11069551

13  remembering those things, it is spelled out in my
14  application, which you have that document.
15    Q.  I won't hold you to the dates, --
16    A.  Okay.
17    Q.  -- just give us a general --
18    A.  The cash control and accounting division,
19  when it started, had about 11 people.  It then
20  assumed responsibility for transferring our premium
21  payments from our sales offices, where the
22  processing of premium payments from our sales
23  offices to our service center, where it grew to
24  approximately a hundred-plus employees, probably
25  about four years.  So that would put it somewhere

1  around '77, I guess, I was promoted to a position
2  of divisional manager, which meant I had the
3  responsibility for other managers in the building.
4  I was, in essence, reported directly to the vice
5  president and held that job, oh, probably three or
6  four years, I'm not sure exactly, until the
7  position was eliminated, at which time I accepted a
8  demotion and became manager of the Human Resources
9  operation.
10       While in Human Resources, I had
11  responsibility and some of this overlapped, I can't
12  give you the exact times, I had responsibility for
13  the financial control area, which was all the
14  budget and expense activity for the service center
15  as well as the field operations.
16       I also was responsible for managing our
17  personal health insurance and employee benefit plan
18  division for part of that time.
19       Then -- and I should -- it is probably
20  relevant to go back and say that at one point while
21  I was divisional manager, working directly with the
22  senior vice president as, in essence, a project
23  assignment, we initiated MetLife's first call
24  center operation.
25    Q.  We will come back to that.

**CONFIDENTIAL**

1    A.  Okay, that's fine.
2    Q.  I am really just interested --
3    A.  Okay.
4    Q.  -- in the chain of job titles.
5    A.  Okay.
6    Q.  Then we can come back and cover --
7    A.  Fine.
8    Q.  -- the evolution of those jobs and what
9  you did in far more detail.
10    A.  Okay.
11    Q.  I am just trying to get the skeleton, --
12    A.  Sure.
13    Q.  -- we can come back and put the skin on
14  it.
15    A.  In 1986, I was asked by senior vice
16  president Frank Lynch to go back and -- or, in
17  essence, assume managerial responsibility for the
18  Teleservicing operation for individual business.
19  There were some other reorganization-type things
20  going on, and I held that position until August
21  22nd of 1996.
22    Q.  And you are currently employed by MetLife,
23  correct?
24    A.  Yes.
25    Q.  What is your current job title?

MP4011069552

18
1    A.   Director of Planning, Development &
2  In-Force Management.
3    Q.   And you have been employed consistently by
4  MetLife from 1962 up to today?
5    A.   Yes.  Other than the period when I did not
6  have a formal position.
7    Q.   But you continued on the payroll --
8    A.   Yes.
9    Q.   -- and then you get paid?
10    A.   Yes.
11    Q.   You have not worked for any other
12  companies during this --
13    A.   No.
14    Q.   -- 1962 to the present?
15    A.   Right.
16    Q.   All right.  When you moved to Tulsa in
17  January of 1973, you became manager of cash control
18  and accounting?
19    A.   (Affirmative head nod).
20          MR. POOR:  Why don't we take a short
21  break.
22          THE WITNESS:  Sure.
23             (Brief recess.)
24          MR. POOR:  Would you please read back my
25  question.
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
19
1      (The last question and answer were read by the
2  reporter.)
3    Q.   (BY MR. POOR)  The answer is "yes."
4  Okay.  And you held that position until you became
5  divisional manager?
6    A.   Yes.
7    Q.   What did you do as manager of cash control
8  and accounting?  Let's start at the beginning
9  before the processing of premium payments was
10  transferred in.
11    A.   The initial position when I came out here
12  was a very small unit.  It was responsible for
13  writing and controlling all the disbursement and
14  checks for policy transactions, such as cash
15  surrenders, loans, dividend withdrawals, death
16  claims.
17    Q.   So this function was the function that
18  actually got a piece of paper to the policyholder,
19  the check to the policyholder?
20    A.   The check, yes.
21    Q.   Was there any other similar function of
22  that elsewhere in MetLife or is this where that --
23  is it centralized in Tulsa?
24    A.   No.  When we came out here in '73, it was
25  a part of a company's decentralization program, and
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
20
1  there were a number of similar offices all assigned
2  a specific geographic part of the country.  And we
3  did it for that geographic part of the country.
4    Q.   For the region covered by Tulsa at that
5  time?
6    A.   Yes.
7    Q.   During this period when you were manager
8  of cash control and accounting, as you have already
9  told me, there came a time when the processing of
10  premium payments function was transferred into your
11  unit --
12    A.   Yes.

CONFIDENTIAL

13   Q.  – or moved into your unit?
14   A.  Yes.
15   Q.  What was that function?
16   A.  Basically, prior to that function, our
17  premium payment or the policyholders mailed premium
18  payments to their local sales office, and we had
19  somewhere around I think probably 1200 sales
20  offices, and it was centralized in each of the
21  service center locations.
22       So that payment processing function with
23  the checks and the deposits and all of that was
24  moved into the service center and that's what I had
25  responsibility for, the transition and then the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

21

1  ongoing management.
2    Q.  Were there other service centers around
3  the country doing similar kinds of functions?
4    A.  Yes.
5    Q.  This is another responsibility you had for
6  the Tulsa region?  Was this also a regional based,
7  geographic based?
8    A.  At that time they were referred to as
9  "territories," but yes.
10   Q.  You held that position until you were
11  promoted to the divisional manager position?
12   A.  Yes.
13   Q.  What functions did you supervise as
14  divisional manager?
15   A.  It's a little bit hard to describe.  I
16  reported directly to what was then known as the
17  operations vice president, and I did various and
18  sundry project management types of things at
19  various times, specific divisions and those
20  managers reported to me.  But it was – and also at
21  that time I did specific projects and handled
22  things for our officer in charge.  It was just a
23  general support management function.
24   Q.  The operations VP, let's start from the
25  initiation of your – you moved into that

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

22

1  position –
2    A.  Yes.
3    Q.  – and reported to whom?
4    A.  Will Hartshorn.
5    Q.  Did you have any direct reports to you?
6    A.  At various times, I did, yes.
7    Q.  At the beginning?
8    A.  Throughout – throughout – to be honest,
9  I just really don't remember a lot of it, other
10  than the fact that at various times I would be
11  asked to look over specific functions and have them
12  report to me.
13       I had the Human Resources reporting to
14  me.  I had other divisions reporting to me off and
15  on, depending upon what the need; in other words,
16  where there was a need for closer direct
17  supervision or management of the operation or of
18  that particular function or activity, then I was
19  generally the one that was assigned that task.
20   Q.  You then moved into the manager of Human
21  Resources position about 1983?
22   A.  Yes.  It is somewhere in that
23  neighborhood; I would have to –
24   Q.  And that was a result of the elimination
25  of the divisional manager position, correct?

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011069554

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

23

1    A.   Yes.
2    Q.   How were you informed that the divisional
3  manager position was being eliminated?
4    A.   I don't recall specifically, it was after
5  a period of disability with my first surgery that I
6  actually came back to work and found out that my
7  official position title had changed to manager of
8  special projects or something like that.
9    Q.   And then from there you transitioned to
10  manager of Human Resources?
11    A.   Yes.
12    Q.   Did you become aware that the divisional
13  manager layer was eliminated throughout MetLife?
14    A.   Yes.
15    Q.   You indicated that shortly before this you
16  had been out on a period of disability.
17    A.   Yes.
18    Q.   For what condition?
19    A.   Triple bypass.
20    Q.   This was your first triple bypass?
21    A.   Yes.
22    Q.   When did you have that surgery?
23    A.   I think it was October 1982, but I would
24  really have to confirm that with the medical —
25    Q.   That's all right.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

24

1    A.   I mean it is documented in some of that
2  stuff you have got.
3    Q.   And then you were out for a period of
4  disability recuperating from the surgery, —
5    A.   Yes.
6    Q.   — the bypass?
7    A.   (Affirmative head nod).
8    Q.   When you became manager of the Human
9  Resources function, to whom did you report?
10    A.   There was a new operations officer brought
11  in, Mr. Hartshorn had been assigned a different
12  level of responsibility, and it was Dennis
13  McAuliffe.
14    Q.   Let me understand the organization of the
15  Tulsa facility now.  At that point in time, at the
16  point in time that you were the manager of Human
17  Resources, you reported to Mr. McAuliffe, who held
18  what position?
19    A.   I do not know what the official title was,
20  but, in essence, he took over responsibility for
21  all the then existing operations with the exclusion
22  of the Teleservicing and Telemarketing operation.
23    Q.   Okay.
24    A.   But all the normal divisions reported to
25  Dennis.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

25

1    Q.   Generally, what were those divisions?
2    A.   They would have been policyholder
3  services, at the time I think there was claims;
4  there may have been — there was personal health
5  insurance and employee benefit plans, and the
6  organization has undergone so many changes, I mean
7  the basic functions are there, but —
8    Q.   Then Teleservicing was somewhere else, or
9  not physically, but reporting somewhere else?
10    A.   Reporting to Mr. Hartshorn.
11    Q.   And Mr. McAuliffe — I didn't quite
12  understand your answer.  Did he report also to Mr.

13  Hartshorn?
14      A.  No, he reported directly to our officer in
15  charge at that time.
16      Q.  And who was that?
17      A.  That was Robert J. Crimmins.
18      Q.  Was Mr. Crimmins physically located in
19  Tulsa at that time?
20      A.  I believe so.  And we went through so many
21  officers in charge and their tenures.  He reported
22  to -- he reported to Mr. Crimmins at that time, but
23  I believe then we also had other ones come in, and
24  I am not sure exactly when, for example, Mr.
25  Crimmins left Tulsa.
            ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          26
1       Q.  But there was a period of time where Mr.
2   Crimmins was physically located in Tulsa?
3       A.  Oh, yes.  He was located there for
4   approximately four -- four to five years, I
5   believe.
6       Q.  As manager of Human Resources, what
7   positions did you have reporting to you?
8       A.  The only -- the only divisions, and they
9   didn't actually report to me, I was also
10  responsible for the day-to-day management at
11  various times of the personal health insurance,
12  employee benefit plans and also the financial
13  management function or financial control function.
14      Q.  As manager of Human Resources, did you
15  have people reporting to you?
16      A.  Yes, I did.
17      Q.  What kinds of people -- when I said who is
18  reporting to you --
19      A.  Oh, okay.
20      Q.  -- what I meant was, not necessarily the
21  names of the human beings, but the kinds of jobs,
22  personal clerk or benefit specialist or whatever
23  you might have reporting to you.
24      A.  Okay.  We had -- primarily at that time we
25  had two specialists that basically were responsible

CONFIDENTIAL

            ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          27
1   for all the important activities relative to the
2   administering company policies, dealing with the
3   necessary EEOC reporting, all that sort of thing,
4   compensation, compensation planning.  We also had
5   benefits administration, and I -- there were, like,
6   five or six people in there at the time.  I'm not
7   sure of the number.
8       Q.  And your group provided the Human
9   Resources support for the Tulsa facility?
10      A.  Yes.
11      Q.  Including Teleservices, even though that
12  reported elsewhere?
13      A.  Yes.
14      Q.  During the period you were in Human
15  Resources, which is now about a three-year -- '83
16  to approximately '86, approximately, --
17      A.  (Affirmative head nod).
18      Q.  -- what was the size of the Teleservicing
19  function in Tulsa?  Approximately.
20      A.  It was a combination of what was called
21  Teleservicing and Telemarketing, and I'm guessing,
22  I think it was like 25 or 30 people.
23      Q.  Was Mr. Hartshorn the direct manager or
24  was there actually a manager of that function?
25      A.  There was a manager of that function.
            ESQUIRE CORPORATE SERVICES

MP401106955 6

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

28

1    Q.   Who was the manager during that time
2  period?
3    A.   Barbara Gardner.
4    Q.   You had indicated in response to a prior
5  question that you played a role in the creation of
6  the Teleservicing --
7    A.   Yes.
8    Q.   -- function.  When did that function first
9  come to exist in the Tulsa facility?
10    A.   I believe it was around October of 1982.
11    Q.   So this was shortly before your movement
12  into Human Resources while you were still
13  divisional manager?
14    A.   Yes.
15    Q.   Okay.
16    A.   It -- okay.  It may have gone live like in
17  October 1982, we actually started on it at the
18  beginning and then developing the thing somewhere
19  earlier in the year.
20    Q.   Okay.  So it was during 1982?
21    A.   Yes.
22    Q.   Okay.  You say "we" did the planning, who
23  is the team?
24    A.   Basically, it was the brain child of
25  Robert J. Crimmins.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

29

1    Q.   Who was the officer in charge at that
2  time?
3    A.   Yes.
4    Q.   What was his direction or what was it he
5  wanted to create at the Tulsa facility as it
6  related to -- I am just focusing on Teleservicing
7  at this point.
8         Let me ask it a different way.  What was
9  his direction to the team at Tulsa in terms of what
10  he wanted to see created?
11    A.   He wanted to see a world class customer
12  service organization or operation that could also
13  capitalize on the marketing potential of providing
14  that level of service.
15    Q.   Was there a group of people assigned the
16  responsibility of planning, developing, putting
17  this type of Teleservicing organization in place?
18    A.   I was the primary person, and I selected
19  all the people that were a part of the original
20  operation.
21    Q.   Who was involved in the planning of the --
22  I'm not talking about the section of the people
23  actually answering the phones or supervising the
24  people answering the phones, but in terms of the
25  group of people responsible for planning what the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

30

1  organization would look like, the functions would
2  be, et cetera.  Who was involved in that, in
3  addition to yourself?
4    A.   Okay.  Probably everyone was involved.  I
5  mean I was taking primary direction from Mr.
6  Crimmins, but I believe that it was a collaborative
7  effort of the entire management team in the office.
8    Q.   Who was on the management team at that
9  time?
10    A.   Oh, boy.
11    Q.   As you can recall, that had a role in
12  planning the Teleservicing function?

**CONFIDENTIAL**

13  A.  The segment was headed up -- the managers
14  at that time, some of them would have been Lucian
15  Rizzo, Don Lyons, James Ruede.  And it's just hard
16  for me to recall at the various times who was there
17  without checking some information.
18  Q.  Where was Ms. Gardner in the organization
19  prior to responsibility for the Teleservices and
20  Telemarketing?
21  A.  She was in Human Resources, as I remember.
22  Q.  Okay.
23  A.  She was also in the position I vacated,
24  what was then became known as financial electronic
25  services at some period too, but --

31

1  Q.  But at the time she was in the Human
2  Resources position?
3  A.  That's my recollection, yes.
4  Q.  Okay.  How did it come about that you
5  became manager of Human Resources in this 1993 time
6  period?
7  A.  1983?
8  Q.  I mean 1983 time period.
9  A.  It was important that I have a formal
10  job.  The one I had was, as I indicated, was
11  temporary and not a formal position, and I had to
12  have a formal job, and I requested to Mr. Crimmins
13  that that is the position I would like to have.
14  Q.  Had that position been previously held by
15  Ms. Gardner?
16  A.  Yes.
17  Q.  And she then moved over to become the
18  manager of Teleservices?
19  A.  Yes.
20  Q.  Okay.  As manager of Human Resources and
21  Ms. Gardner as manager of Teleservices, were you
22  roughly peers?
23  A.  On paper, it would look that way, yes, but
24  it was kind of a different organization at the
25  time.

**CONFIDENTIAL**

32

1  Q.  Why was it -- and I assume you had
2  conversations with Mr. Crimmins about where you
3  were going to fall in the organization with the
4  elimination of the divisional manager position and
5  what job you were going to have, et cetera.
6  A.  Yes.
7  Q.  Why was it that you wanted in the Human
8  Resources position as opposed to the Teleservices
9  area?
10  A.  Because Mr. Hartshorn was being placed in
11  charge of Teleservices at that time and I decided I
12  would rather not report to him.
13  Q.  Why is that?
14  A.  At the time I felt a little betrayed.
15  Q.  By Mr. Hartshorn?
16  A.  Hartshorn.
17  Q.  And can you please describe to me why,
18  what had happened to make you feel that way?
19  A.  I saw the potential elimination of my
20  position.
21  Q.  Now, the divisional manager position --
22  A.  Yes.
23  Q.  -- we are talking about.
24  A.  And I just had a lot of difficulty
25  accepting that he did not give me warning and tell

XP401109555B

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

33

1   me up front that it had been eliminated and my job,
2   official job title had changed.
3       Q.   At the time were you aware that the
4   divisional manager position was being eliminated
5   throughout MetLife?
6       A.   There was another position, another --
7   it's a little complicated, but in most of the other
8   offices, they did not have a divisional manager
9   position. They had two assistant vice-presidents,
10  one was operations, one was services.
11          The intent was that all of the individuals
12  in those positions or the majority of them felt
13  that it should be a full vice president. And,
14  basically, the deal or whatever that was struck was
15  we will make them full vice president positions if
16  there is only one officer position in the office.
17  So in the other offices, instead of losing a
18  divisional manager, they were losing one of their
19  assistant vice-presidential positions.
20      Q.   But there were these positions at this
21  level being eliminated throughout --
22      A.   Yes.
23      Q.   -- the offices; this was not just Tulsa.
24      A.   Right.
25      Q.   It was not just you.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

34

**CONFIDENTIAL**

1       A.   Right. I did not -- yes.
2       Q.   And I take it the problem you had with Mr.
3   Hartshorn didn't relate to that more global
4   decision, but to the way he had handled it in
5   communicating or more properly failing to
6   communicate to you?
7       A.   Yes. Mr. Hartshorn, and in hindsight, he
8   was still one of the best people I ever worked for,
9   typically was very honest and up front with me and
10  we had an excellent working relationship. And, as
11  I said, there was a time when I was coming back
12  from my surgery and I did have just a sense of
13  betrayal at the time and confronting the fact that
14  I was going to have to to take a demotion, I would
15  have taken it much better if he had just been
16  honest with me and up front, but in hindsight, I
17  recognize that that was just a difficult thing for
18  him to do.
19      Q.   Did you explain these feelings to Mr.
20  Crimmins, as the reason why you did not want to go
21  to the Teleservicing?
22      A.   Yes, I believe I did.
23      Q.   Okay. Did Mr. Hartshorn report to Mr.
24  Crimmins?
25      A.   Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

35

1       Q.   In the function of Human Resources, you
2   reported to Mr. McAuliffe?
3       A.   Yes.
4       Q.   Who, in turn, reported to Mr. Crimmins?
5       A.   Yes.
6       Q.   And so Ms. Gardner was moved over to be
7   the manager in Teleservicing, and you took over the
8   position of manager of Human Resources?
9       A.   Yes.
10      Q.   Until 1986, when you left the manager of
11  Human Resources position and moved over to
12  Teleservicing?

Page   14

J11069559

13   A. Yes. I had -- I believe -- I would have
14 to go back and check the records, but I actually
15 had responsibility for both of them for some short
16 period of time, as I recall.
17   Q. Shortly before --
18   A. Before I just became manager of
19 Teleservices, yes.
20   Q. Where did Ms. Gardner go?
21   A. A good question. I'm not sure where she
22 went immediately following the Teleservices
23 position, and I guess it was a couple of years
24 later, whenever, that Mr. McAuliffe left Tulsa and
25 she became the operations officer.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

36

1   Q. And you moved over to manage the
2 Teleservicing function, you still reported to Mr.
3 McAuliffe?
4   A. Yes.
5   Q. Okay. Mr. Hartshorn was now out of the
6 picture in terms of having responsibility for
7 Teleservices?
8   A. At the time I took over Teleservices, as I
9 indicated, there was a -- it was involved in a
10 reorganization. And part of that organization at
11 that time was assumed by our office in Florida.
12 I'm not -- I'm not sure of the exact events, but
13 Mr. Hartshorn left our office, went to work in the
14 pensions department.
15   Q. Who talked to you about the possibility of
16 you moving over to Teleservices?
17   A. My recollection is that it was prompted as
18 a result of a meeting with Frank Lynch, when he
19 visited our office. And, as I recall, I had been
20 told that he was interested in having me assume
21 responsibility for Teleservices.
22   Q. What position did Mr. Lynch hold at that
23 time?
24   A. I'm not sure what the official title was,
25 but he was, I believe, the senior officer within

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

37

1 individual life insurance or personal insurance as
2 it was known at that time, responsible for the
3 operations of its service centers, or head offices,
4 as it was known at that time.
5   Q. Okay. This is in the 1985-86 --
6   A. '86.
7   Q. 1986.
8   A. As I recall, it was 1986.
9   Q. Okay. And at that point in time you
10 reported to Mr. McAuliffe, who reported to Mr.
11 Crimmins?
12   A. My hesitation is that I'm not sure exactly
13 when Mr. Crimmins left Tulsa and when Dennis might
14 have reported to another officer in charge out
15 there.
16   Q. Okay. But you still reported to Mr.
17 McAuliffe?
18   A. Yes.
19   Q. He, in turn, reported to the officer in
20 charge, --
21   A. Yes.
22   Q. -- who was either Mr. Crimmins or someone
23 else?
24   A. Yes.
25   Q. And Mr. Lynch was above the officer in

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

38

1  charge? I'm trying to understand the hierarchy.
2      A.  Yes.  Organizationally, and I don't know
3  how the organization chart would have been defined
4  at that time, the officer in charge was responsible
5  for all activities of the office, including the
6  marketing side of the field organization.
7          Mr. Lynch had responsibility for the
8  administrative operations, not only within those
9  offices, as I recall, the position has changed a
10  number of times, but also some of the support
11  functions at the time, again, as I recall.  He's
12  been in and out of that position a couple of times.
13      Q.  Okay.  But at the time -- I am now focused
14  on the time of this meeting where you had the
15  conversation --
16      A.  Okay.
17      Q.  -- with him.
18      A.  Yes.
19      Q.  At that point in time, at least within --
20  "ILI" refers to "individual life insurance"?
21      A.  Yes.
22      Q.  Okay.  Within that line of business, Mr.
23  Lynch was -- he was from New York --
24      A.  Yes.
25      Q.  -- or at least from the headquarters?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

39

1      A.  (Affirmative head nod).
2      Q.  And had pretty senior responsibilities
3  for, at least, part of the Tulsa operations?
4      A.  I don't know how you would define the
5  reporting relationships of the offices, but, in
6  essence, Dennis or the operations officer had some
7  accountability to Mr. Lynch on administrative
8  operations, but they also were directly accountable
9  to the officer in charge.
10      Q.  Okay.  What had occasioned Mr. Lynch to
11  have this trip meeting, I assume the event you are
12  talking about is a personal discussion or meeting
13  with him in Tulsa.
14      A.  The meeting was a general meeting that I
15  think was part of his regular -- regular agenda of
16  meetings, and it was just discussed at that time.
17  I really don't remember exactly how it all
18  transpired.  My recollection is that he indicated
19  he would like me to become involved and at the time
20  management got me involved and he was out there,
21  and we talked about it, and I could be getting the
22  meetings mixed up, but we did a presentation.  But
23  it was part of his regular visits to the office, as
24  far as I remember.
25      Q.  Prior to this general meeting that he

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

40

1  held, you were aware that he was coming out?
2      A.  Yes.
3      Q.  And I am trying to understand, I am trying
4  to understand what you are telling me.  Prior to
5  him coming out, you received some form of
6  information that Mr. Lynch was interested in
7  hearing from you or having you become involved with
8  Teleservicing?
9      A.  That's my recollection, but it's not very
10  clear to me at all the exact chain of events at
11  that time.
12      Q.  Okay.  Do you have any recollection of

MP401169562

13 from whom or how you came to have that belief?

14     A.  I assumed that it was as a result of

15 conversations I would have had with Dennis,

16 that's -- that's -- he would have been the one to

17 tell me that.

18     Q.  You don't have a specific recollection --

19     A.  No.

20     Q.  -- of that, but that would seem to be how

21 it would come about?

22     A.  There may be something in all the

23 documentation that I have provided that would

24 trigger a more concise memory, but --

25     Q.  Okay.  Now, at that point in time, you

        ESQUIRE CORPORATE SERVICES

 6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

              41

1 were providing Human Resource support to the

2 Teleservicing area?

3     A.  Yes.

4     MR. RAYL:  Excuse me, Mr. Poor, could we

5 take a short recess at your next convenience,

6 stopping point?

7     MR. POOR:  We can do it now, if you would

8 like, sure.

9     MR. RAYL:  Yes, sure.

10         (Brief recess.)

11     Q.  (BY MR. POOR)  Focusing on this time

12 period shortly before this general meeting you are

13 referring to with Mr. Lynch, were you aware of any

14 dissatisfaction or issues relating to Ms. Gardner's

15 performance as manager of the Teleservicing area?

16     A.  Not -- not specifically.  There -- no,

17 there were issues associated with the

18 reorganization and the marketing part of it, but,

19 you know, I don't remember.

20     Q.  Was there a general reorganization or

21 reshuffling of the deck over on that piece of any

22 business going on generally?

23     A.  At the time Ms. Gardner had it, there was

24 a lot of focus on the Telemarketing aspect of the

25 operation, and that was the piece that was being

        ESQUIRE CORPORATE SERVICES

 6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

              42

1 reorganized and moved to Florida.  And, in essence,

2 it was taken away or moved out of the call center,

3 and --

4     Q.  You were aware of that prior to the

5 meeting with Mr. Lynch?

6     A.  Oh, yes.

7     Q.  Okay.  And what was being left in Tulsa

8 was the Teleservicing --

9     A.  Yes.

10     Q.  -- piece?  All right.  The general, when

11 you say "general meeting with Mr. Lynch," a meeting

12 with whom?

13     A.  My recollection is that he typically came

14 out and met with the entire management team of the

15 office.

16     Q.  And that is your general recollection of

17 this particular meeting?

18     A.  Yes.

19     Q.  Okay.  I assume there were a number of

20 topics covered in that meeting other than

21 Telemarketing/Teleservices.

22     A.  Yes, I assume so.

23     Q.  Would these typically be full-day

24 meetings, half day, hour?

25     A.  I really don't remember.  There's been so

        ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
43

1   many differences over the years in those —
2   typically, it's my recollection would be they were
3   a day.
4       Q.   What do you recall about this meeting as
5   it related to Teleservicing/Telesales?
6       A.   The only thing I remember, and this
7   meeting, I guess, would have taken place after I
8   had some responsibility.  The only meeting I
9   remember is one where we did do a presentation to
10  Mr. Lynch, and we had prepared some material for
11  him on the Teleservicing and the directions and
12  steps we were trying to take.
13      Q.   Who is "we"?
14      A.   The Teleservicing organization, the people
15  that worked there.
16      Q.   Who actually did the presentation?
17      A.   I don't remember.
18      Q.   I mean did you do it personally or —
19      A.   I assume I did, but I really don't — I
20  don't remember.
21      Q.   Okay.  Was Ms. Gardner at this time
22  involved in the Teleservicing/Telemarketing?
23      A.   Not at the time of this meeting.
24      Q.   Okay.  So your assumption of at least some
25  responsibilities for Teleservicing had happened
            ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
44

1   prior to this meeting?
2       A.   Yes.
3       Q.   Okay.  And then the Teleservicing team put
4   on a presentation for Mr. Lynch about goals,
5   aspirations, where that function was going to go?
6       A.   We prepared a presentation.  We prepared
7   material.  I do not remember the specific
8   presentation with respect to what necessarily was
9   discussed or done at that meeting, other than the
10  fact that we had prepared material for him.
11      Q.   Okay.  At that time you were also still
12  manager of Human Resources?
13      A.   That's my recollection.
14      Q.   Okay.  Following that meeting, what
15  happened with regard to the transfer of your
16  responsibilities out of Human Resources into
17  Teleservicing?
18      A.   I'm — I don't even remember what the
19  chain of events at that time, except that I did
20  ultimately become totally responsible or solely
21  responsible for Teleservices.
22      Q.   And someone else took on the Human
23  Resource function?
24      A.   Yes.
25      Q.   At the time you became manager of
            ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
45

1   Teleservices, whatever your precise title was at
2   the time, to whom did you report?
3       A.   Dennis McAuliffe.
4       Q.   What was the size of the — Can we refer
5   to it as "call center"?
6       A.   Yes, that's fine.
7       Q.   All right.  What was the size of the call
8   center at that time?
9       A.   It was somewhere between 12 and 15
10  customer service representatives, and the total
11  staff was probably 20.
12      Q.   With the total staff including supervisors

**CONFIDENTIAL**

13  and perhaps some administrative
14  assistants/secretaries type, clerical types?
15      A.  Yes.
16      Q.  Okay.  What was the basic function of the
17  call center at that point in time?  What did the
18  CSRs do?
19      A.  They answered all types of questions from
20  individual life insurance policyholders relating to
21  their policies, service they wanted provided, that
22  sort of thing.  And we sent out appropriate forms
23  which -- when there was a transaction, they wanted
24  to do.
25      Q.  Okay.  This was an inbound call center?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

46

1       A.  Yes.
2       Q.  Were there particular product lines that
3   you were responsible for?  Or was it a territory
4   or --
5       A.  It started out geographically, very slow.
6   It took it several years before it became
7   nationwide, or we ended up taking half of the
8   country.
9       Q.  All right.  I am focusing on when you took
10  it over in 1986?
11      A.  Okay.  It was limited to this territory.
12      Q.  Okay.  But for all MetLife product lines?
13      A.  No, only individual life insurance.
14      Q.  Okay.  So it started out for ILI for the
15  Tulsa --
16      A.  Yes.
17      Q.  -- territory?
18      A.  Yes.
19      Q.  Region, whatever it was called at the
20  time.  Okay.  Were there other call centers
21  elsewhere in the country, either for other product
22  lines or other territories?
23      A.  By 1986, I'm not sure.  There may have
24  been some that were evolving in the group side.
25  There were no others within personal insurance or

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

47

1   individual life insurance.
2       Q.  So at this point in time, the call center
3   was a service provided predominantly to
4   policyholders, customers of the Tulsa Region?
5       A.  Yes.
6       Q.  I would like to talk a little bit about
7   the evolution of the call center and the functions
8   of it, because I know it grew over this ten years,
9   this '86 to '96 period.
10          As of '96, when you ceased having
11  responsibilities for the call center, approximately
12  how many people worked in the call center?
13      A.  Over 200.
14      Q.  And what were the customer service
15  representatives, supervisors, clerical staff?
16      A.  Telecommunications, training, staff
17  support, resource.
18      Q.  Okay.  What services were being provided
19  to policyholders by the Tulsa office.
20      A.  Okay.
21      Q.  I am now focused in 1996.
22      A.  Okay.
23      Q.  Then we will talk about how it got from
24  one spot to the other.
25      A.  In 1996, the individual business call

ESQUIRE CORPORATE SERVICES

MP401106956A

48

1  centers had gone beyond assuming responsibility
2  just for individual life insurance. We also had
3  assumed responsibility for what was known as the
4  corporate 800 number, which was being promoted as
5  the single number any customer could call when they
6  really didn't know where or how to reach the
7  appropriate area within MetLife.
8      Q.   Let's focus on the end of '95 for a
9  moment, because I know there was some consolidation
10 of call centers going on in '96.
11         Prior to that consolidation of call
12 centers, --
13     A.   Yes.
14     Q.   -- what other call centers were there in
15 MetLife?
16     A.   There was property and casualty; there was
17 dental; there was disability; there was vision
18 care; there was -- and part of the organization
19 called MetSource. There was annuities, group
20 annuities, and there were basically 22 call centers
21 identified during Phase 2 of MetLife Express.
22     Q.   Okay. And those calls centers grew up
23 predominantly around various product lines?
24     A.   Yes.
25     Q.   And the 22 were varying sizes?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

49

1      A.   Yes.
2      Q.   Some very small, --
3      A.   Yes.
4      Q.   -- some relatively large?
5      A.   (Affirmative head nod).
6      Q.   Okay. What other call centers were there
7  in individual business?
8      A.   The other call center was in Warwick,
9  Rhode Island. And between the Warwick and the
10 Tulsa sites, we handled the entire United States
11 for individual life insurance and corporate 800.
12     Q.   Okay. With regard to calls that came in
13 on the corporate 800 number with questions other
14 than individual life products, --
15     A.   Yes.
16     Q.   -- someone called in for a disability
17 policy, for example, --
18     A.   Yes.
19     Q.   -- and assuming it wasn't just a simple
20 request to be sent information or something, was
21 the function of the CSR to then get that person to
22 the call center with responsibility for that
23 particular product line?
24     A.   That was one of the functions, yes. There
25 were a number of initiatives that the company was

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

50

1  undertaking and they would use the corporate 800
2  number to support a wide range of special
3  projects. One of them was our life advice
4  program. So it was a very wide range of calls.
5      Q.   Okay. But as to the calls that would, for
6  example, stick with disability.
7      A.   Sure.
8      Q.   There was at that time a specific call
9  center for the disability --
10     A.   Yes.
11     Q.   -- product line? That if I had known the
12 right number as a policyholder, that's the number I

**CONFIDENTIAL**

13  should call.
14     A.  Yes.
15     Q.  One of the functions of the CSR in your
16  area was if the call came to them to get routed, if
17  that was the issue --
18     A.  Yes.
19     Q.  -- to that particular call center.
20     A.  (Affirmative head nod).
21     Q.  Okay.  How long had the Warwick facility
22  been in existence or when did it first come into
23  existence?
24     A.  I believe it was around 1988.
25     Q.  Okay.  From 1986 until 1988, the first

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
51

1  couple of years that you had responsibility for the
2  call center in Tulsa, did your responsibilities
3  remain the individual business piece in the Tulsa
4  territory?
5     A.  Yes.
6     Q.  Okay.  And then Warwick came into
7  existence in approximately 1988 to do what?
8     A.  There were many discussions during that
9  period of time as to the future of the call
10  centers, what their role was to be with an
11  individual insurance.  There were moves where some
12  people wanted to consider establishing a call
13  center in each of our offices, but, basically, it
14  was agreed that the company needed to go with more
15  than one and the strategy at that time was to at
16  least start a second one in the Northeast.
17     Q.  And Warwick performed similar functions
18  for the territory out of Warwick?
19     A.  Yes.
20     Q.  Okay.  So then for a while, policyholders
21  in the Tulsa territory and policyholders in the
22  Warwick, the Northeast, had call centers but with
23  no call center specifically covering --
24     A.  Yes.
25     Q.  -- other areas of the country?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
52

1     A.  Yes.
2     Q.  Okay.  That then changed at some point?
3     A.  Yes.
4     Q.  Do you recall, approximately, when that
5  changed?  I mean, let me rephrase it.
6        I know that during this time period other
7  product lines are growing, --
8     A.  Right.
9     Q.  -- call centers.  I am now focusing on the
10  ILI, the individual business piece.
11     A.  The entire history is probably in that
12  folder that covered the advancement of
13  Teleservices.
14     Q.  All right.  We will come to that specific
15  document.
16     A.  It was a slow, agonizing process to expand
17  it nationwide, and -- but it was through the early
18  Nineties.
19     Q.  Okay.  Were there at any point other call
20  centers handling the ILI individual business other
21  than Warwick and Tulsa up through this '95 time
22  period?
23     A.  No.
24     Q.  Okay.  We are back up to 1986.  I
25  understand your reporting relationships, I want to

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401106956

Page   21

53

1 understand how they changed. I think you told me
2 when you moved over to the customer service or into
3 the call center, you continued to reported to Mr.
4 McAuliffe.
5    A.  Yes.
6    Q.  Mr. Hartshorn had moved over to the
7 pension area.
8    A.  Yes.
9    Q.  How long did you continue to report to Mr.
10 McAuliffe?
11    A.  I don't remember specifically.  It was
12 not -- it was until Barbara Gardner became our
13 operations officer.
14    Q.  Okay.  And then you began reporting to Ms.
15 Gardner?
16    A.  Yes.
17    Q.  How long did you continue to report to Ms.
18 Gardner?
19    A.  Until the call center became a part of
20 business services group, which was probably around
21 April 1996 or early 1996.
22    Q.  Okay.  How did you become aware that Ms.
23 Gardner was becoming your supervisor?
24    A.  When it was announced that she would be
25 the replacement for Dennis.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

54

1    Q.  Where did Mr. McAuliffe go?
2    A.  He went back to the home office.
3    Q.  Were you aware he was moving back to the
4 home office?
5    A.  I don't remember the exact circumstances
6 as to what transpired when he was losing his
7 position in Tulsa.
8    Q.  Okay.  Is it your recollection that at the
9 time it was announced that Ms. Gardner was assuming
10 the operations officer position, is it your
11 recollection that that was the first time you heard
12 that Mr. McAuliffe was leaving or had you known
13 sometime before then?
14    A.  No, as I -- no, we knew he was leaving and
15 I am just trying to remember whether we posted for
16 the position or not.  I don't remember, but we knew
17 he was being replaced.
18    Q.  Did you talk to anyone about you being
19 considered for that position?
20    A.  I'm sure I did, but I don't specifically
21 remember.  Like I said, I can't remember whether
22 there was a posting process when that occurred or
23 not, but I certainly considered myself a candidate.
24    Q.  Do you recall being interviewed for the
25 position?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

55

1    A.  Not specifically.
2    Q.  Do you know who made the decision, the
3 selection decision, for the replacement for Mr.
4 McAuliffe?
5    A.  I believe it was David G. Martin.
6    Q.  What was his position?
7    A.  He was the officer in charge.
8    Q.  Okay.  Do you recall having any
9 conversations with Mr. Martin about your interest
10 in the job or your candidacy for the job, however
11 you care to describe it?
12    A.  I don't remember the specific -- any

CONFIDENTIAL

13 specific discussions that I had, no.
14    Q.   But do you recall there being discussions?
15    A.   I can't honestly say I do.
16    Q.   Okay.  Prior to the announcement that Ms.
17 Gardner was assuming this position, did you have
18 any conversations with her about her candidacy or
19 her consideration for the position?
20    A.   I know we had one discussion on the
21 subject, but I really don't -- I don't remember the
22 nature of the content of the discussion.  I just
23 remember that we did discuss it one day.  I believe
24 she came to my office, but I don't remember.
25    Q.   Do you have any recollection other than

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
56

1 her just coming to your office on this topic about
2 anything that was said or done in that
3 conversation?
4    A.   Nothing that I would -- nothing that I
5 would want to say with any degree of certainty, no.
6    Q.   Do you recall her asking you for your
7 support in the event of her appointment to that
8 position?
9    A.   I don't specifically recall that; no, I
10 don't specifically recall that.
11    Q.   Did Mr. Martin or anyone else ask you
12 about Ms. Gardner's candidacy for that position?
13    A.   No.
14    Q.   Okay.
15    A.   Not that I remember.
16    Q.   What was your reaction to the appointment
17 of Ms. Gardner for that position?
18    A.   My reaction was surprise and not surprise.
19    Q.   Well, take them one at a time.  Why were
20 you surprised?
21    A.   Because there were a number of
22 longer-service, more experienced managers who could
23 have been considered for the position.
24    Q.   I assume including yourself.
25    A.   Including myself.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
57

1    Q.   And do you have any reason to believe
2 those people were not considered?
3    A.   No.
4    Q.   Okay.  Certainly they were not selected?
5    A.   Right.
6    Q.   Putting aside yourself, did you believe
7 that there were other candidates in the Tulsa
8 facility more qualified for the position than Ms.
9 Gardner?
10    A.   Yes.
11    Q.   Who are those people?
12    A.   I would have believed that Don Lyons would
13 have been a reasonable candidate for the job.
14    Q.   What was Mr. Lyons' position in the
15 company at that time?
16    A.   I'm not sure.  He had a number -- I don't
17 remember.
18    Q.   He was relatively at your peer level?
19    A.   He was a peer, yes.
20    Q.   Someone you --
21    A.   Yes.
22    Q.   What was it about Mr. Lyons that you are
23 aware of about his background or skills or
24 experiences that you felt made him better qualified
25 than Ms. Gardner?

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

Page   23

MP40110569888

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

58

1   A.  He has a very good mind.  He's certainly
2  lived through the creation of the building and
3  understood the work and the work flow issues and
4  things like that.  But by the same token, he had
5  his strengths and weaknesses like we all do.
6   Q.  Ms. Gardner had her strengths and
7  weaknesses?
8   A.  Yes.
9   Q.  You have your strengths and weaknesses?
10   A.  Yes.
11   Q.  You also say you were not surprised.  And
12  why were you not surprised?
13   A.  Barbara, and this is in no way meant as a
14  criticism, because it is clearly what the company
15  has become and what it rewards, but she -- she
16  understood the politics and knew how to use the
17  politics for advancement, as many people do.
18   Q.  Now, focusing on that particular point in
19  time, when she becomes --
20   A.  Yes.
21   Q.  -- when the announcement is made, I know
22  we are not quite sure when that was, when you say
23  she understood the politics and knew how to use it
24  for advancement, what are you referring to?  And
25  now, again, I am putting you back in the time frame

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

59

1  at that time.  We will cover subsequent events down
2  the road.
3   A.  It was probably to provide -- I don't
4  think I can answer that with any specificity.
5  There's just a lot of things there.  I mean --
6  well, --
7   Q.  Give me an example of what you are talking
8  about, that would have happened by that point in
9  time?
10   A.  Okay.  One example would be that you
11  consistently say the right thing at the right times
12  to provide people with what they would prefer to
13  hear or --
14   Q.  Can you give me an example of something
15  involving Ms. Gardner that would have happened
16  where you felt that --
17   A.  No, I mean I don't know that there is
18  anything specific.  It is just a difference in
19  management styles, that's all.
20   Q.  What was the difference in management -- I
21  assume when you say "difference in management
22  styles," meaning a difference in your management
23  style.
24   A.  Yes.
25   Q.  What was the difference in management

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

60

1  styles that you saw between you and Ms. Gardner?
2  Describe what you mean by that statement for me.
3   A.  My management style was to consistently
4  say what I thought when an issue was in either the
5  company's interest or the customer's interest.  And
6  I had a very defined feeling as to right and wrong,
7  and I -- I would not hesitate to voice an unpopular
8  opinion.
9   Q.  And contrast that with Ms. Gardner.
10   A.  It just wasn't her personality style to --
11  she didn't -- well, those things weren't the big
12  issues with her.  They were with me.

Page   24

13   Q.   What things?
14   A.   Voicing an opinion, for example, when you
15 know it's contrary to the general feeling or
16 atmosphere.
17   Q.   How often did you have an opportunity to
18 work with Ms. Gardner in the context where you
19 would observe this particular management style?
20 Again, I am now talking about on or before her
21 appointment as your boss.
22   A.   There's no specific; she worked there from
23 whatever date she worked there and every manager
24 had a different management style.
25   Q.   Okay.  Prior to her becoming the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

61

1 operations officer, you had not worked for her?
2   A.   No.
3   Q.   Okay.  Had she ever worked for you?
4   A.   Yes.
5   Q.   Okay.  What period of time?
6   A.   She was -- actually, I was partially
7 responsible for hiring her when I was in Human
8 Resources.
9   Q.   Okay.
10   A.   I believe I was in Human -- no, I believe
11 I was -- no, I was not in Human Resources, I was
12 divisional manager.
13   Q.   So you were a part of the team that hired
14 her?
15   A.   Yes.
16   Q.   Into what position?
17   A.   I believe it was our finance and
18 electronics services at that time, but I'm not
19 sure.
20   Q.   Okay.  When she came on board, did you
21 then have any supervisory responsibility over her?
22   A.   If I did, I don't specifically remember
23 it.  I may have for some brief period of time, but
24 I don't remember.
25   Q.   Okay.  And then throughout the years there

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

62

1 would be management meetings or --
2   A.   Yes.
3   Q.   -- Tulsa meetings where you and she would
4 participate in the same kind of meeting?
5   A.   Yes.
6   Q.   Okay.  Did you express to anyone in the
7 MetLife hierarchy any dissatisfaction or concerns
8 over the placement of Ms. Gardner into this officer
9 position?
10   A.   I don't recall saying anything to anyone
11 at that time about her getting the position, but
12 it's -- but I may have.
13   Q.   Okay.  Did anyone ever discuss with you
14 why Ms. Gardner was selected for that position as
15 opposed to you?
16   A.   Not to my recollection.
17   Q.   Okay.  Do you know anyone else who was
18 involved in that decisionmaking process other than
19 Mr. Martin?
20   A.   No.
21   Q.   Okay.  How long had Mr. Martin been the
22 officer in charge at that point in time?
23   A.   I don't remember.
24   Q.   Okay.  Had he come through the Tulsa
25 organization or did he come elsewhere from the

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401106957D

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

63

1 company?
2    A.  He came from elsewhere.
3    Q.  Okay.  Now, at the time you started
4 reporting to Ms. Gardner, let's see if I can
5 understand the reporting structure, she would have
6 reported to Mr. Martin?
7    A.  Yes, she did at that time, yes.
8    Q.  He was OIC?
9    A.  Yes.
10    Q.  She was the operations officer, --
11    A.  Officer.
12    Q.  -- whatever?
13    A.  Yes.
14    Q.  And then you, in turn, reported to Ms.
15 Gardner?
16    A.  Yes.
17    Q.  Okay.  She had others reporting to her as
18 well, I presume.
19    A.  Yes.
20    Q.  Did she have the entire Tulsa facility
21 reporting to her?
22    A.  Yes.
23    Q.  Do you have a recollection of the size of
24 call center at this point in time?
25    A.  No.  The growth was slow, but I don't

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

64

1 remember.
2    Q.  During the years that you reported to Ms.
3 Gardner, did you find her to be supportive of what
4 you wanted to do in the call center?
5    A.  Most of the time.
6    Q.  And then there are occasions when she
7 disagreed, I assume, with what you wanted to do.
8    A.  We have had our ups and downs, yes.
9    Q.  What kind of day-to-day interaction did
10 you have with Ms. Gardner as it related -- I am not
11 talking about passing in the hall and saying
12 "hello," I am talking about on a business --
13    A.  In general, there wasn't a lot of day to
14 day; I mean it was -- it was either contact
15 through -- for a specific purpose or a managers'
16 meeting or some other formal occasion.  I mean --
17    Q.  Were there regularly-scheduled management
18 meetings, --
19    A.  Yes.
20    Q.  -- staff meetings?
21    A.  (Affirmative head nod).
22    Q.  How often would you have managers'
23 meetings?
24    A.  I really can't say in the beginning; in
25 the later years, it was weekly.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

65

1    Q.  Did the call center remain an inbound call
2 center during the period of time you supervised it?
3    A.  Yes.  It still is.
4    (A certain document was marked Deposition
5 Exhibit 1 for identification by the reporter.)
6    Q.  (BY MR. POOR)  I am handing you what has
7 been marked as Deposition Exhibit No. 1, Mr. Rayl.
8    A.  Uh-huh.
9    Q.  Take a second to look at it and tell me
10 when you have had an opportunity to do that.  I
11 have some questions about the substance of the
12 document, but predominantly I am going to try to

**CONFIDENTIAL**

11069571

MP401106957Z

13  use it to try to get some context in terms of time,
14  in terms of reporting to Ms. Gardner and the call
15  center operations.
16      A.  Okay.
17      Q.  Okay.  This is a letter, I take it, the
18  last three pages are a letter you wrote to a fellow
19  named Len Miller.
20      A.  Yes.
21      Q.  And you forwarded a copy to -- it says
22  "To: Barbara," I assume that's Ms. Gardner.
23      A.  Right.
24      Q.  And you dated it October 10, 1989?
25      A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

66

1      Q.  Do you recall, do you recognize this memo?
2      A.  I recognize it, yes.
3      Q.  Okay.  I assume by October 10th of 1989,
4  Ms. Gardner was now your --
5      A.  Yes.
6      Q.  -- supervisor?
7      A.  (Affirmative head nod).
8      Q.  Okay.  Does this help you in any way
9  recollect about when she became the operations
10  officer?
11      A.  No, other than I would -- I mean it seems
12  that it could have easily have been for the last
13  nine to ten years, so '88 wouldn't surprise me.
14      Q.  Okay.  So somewhere a couple years after
15  you took over the call center?
16      A.  Yes.
17      Q.  Okay.  Who was Len Miller?
18      A.  Len Miller was, and I do not remember
19  at -- Teleservicing has been through a tremendous
20  evolution and maze of reporting relationships.  Len
21  was primarily in charge of our electronic systems,
22  but during part of that time Teleservicing actually
23  had a reporting relationship with him in addition
24  to the one we had locally.
25          And at this particular point in time, I

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

67

1  don't know, other than he was involved from a
2  systems perspective.
3      Q.  He was a MetLife employee?
4      A.  Yes, vice president, assistant vice
5  president, I think is what I said, vice president.
6      Q.  And the letter related to certain
7  remarks.  I am now looking at the second line.
8      A.  Uh-huh.
9      Q.  It says, "Barbara" -- meaning Barbara
10  Gardner, I presume.
11      A.  (Affirmative head nod).
12      Q.  "spoke with me about my remarks during the
13  conference call that was held with Bob McDowall
14  Telecommunications and IBM/ROLM."  Do you recall
15  that particular event?
16      A.  No.
17          MR. RAYL:  Object to the relevancy of
18  that, but go ahead and answer it.
19      A.  I don't recall the specific event.  I
20  mean -- but we provided the document, but -- no, I
21  don't recall the specific event or what I said at
22  that time, but there was a high -- I experienced a
23  high level of frustration throughout the early
24  years of Teleservices.
25      Q.  Okay.

ESQUIRE CORPORATE SERVICES

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

68

1    A.  Len was an especially frustrating person.
2    Q.  Okay.  Staying at this point in time now,
3 in the 1988-1989 time period, I think you said
4 Warwick was started up in the '88 time period.
5    A.  I believe so, yes.
6    Q.  What was your relationship with or were
7 your responsibilities with regard to the startup
8 and the early phases of the Warwick operation?
9    A.  Other than initially providing them
10 support and then working with Kathy Schoos, who was
11 in charge of it in Warwick, on a number of common
12 issues, I mean I had no direct responsibility, but
13 the two of us spent the best part of our life
14 trying to advance Teleservices at that time.
15    Q.  She was your counterpart --
16    A.  Yes.
17    Q.  -- in Warwick?
18    A.  (Affirmative head nod).
19    Q.  And to whom did she report during this
20 time period?  This '88-'89 time period.
21    A.  I believe it was John Abela, who was
22 Barbara's counterpart.
23    Q.  Okay.  During the '88 to '90 time period,
24 the period we are talking about, did you share --
25 I'm not quite sure what you were telling me, did

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

69

**CONFIDENTIAL**

1 you share calls with Warwick or were you simply
2 sharing knowledge and --
3    A.  Knowledge and information and support,
4 yes.
5    Q.  Were they also getting 800 numbers, calls,
6 or was that still going to Tulsa?
7    A.  No.  They started up and they were taking
8 the 800 number calls from their territory and their
9 part of the country.
10    Q.  Okay.  So their operation mirrored yours,
11 but just for a different part of the company?
12    A.  Yes.
13    Q.  Would there be occasions -- we talked
14 about there being occasions where your CSRs would
15 route the calls perhaps to a specific property, the
16 P&C folks or a particular product line.
17    A.  Yes.  The corporate 800 number did not
18 happen in that time frame.
19    Q.  The corporate 800 number was later?
20    A.  Yes.
21    (A certain document was marked Deposition
22 Exhibit 2 for identification by the reporter.)
23    Q.  (BY MR. POOR)  Mr. Rayl, I am handing you
24 what has been marked as Deposition Exhibit No. 2.
25 I ask you to take a look at that document and tell

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

70

1 me whether you recognize it?
2    A.  I recognize it as probably one of the
3 reviews I received, yes.
4    Q.  Okay.  The second page, bottom left-hand
5 corner, do you recognize that as being your
6 signature?
7    A.  Yes, I do.
8    Q.  Okay.  And it will appear you signed this
9 document February 4th, 1991?
10    A.  Yes.
11    Q.  Okay.  During the course of your
12 employment with MetLife, you would receive a

13 performance review typically on an annual basis?
14   A.  Typically, yes.
15   Q.  Okay.  Typically given to you by your
16 direct —
17   A.  Yes.
18   Q.  -- supervisor, correct?
19   A.  (Affirmative head nod).
20   Q.  And you, in turn, would do performance
21 reviews typically on an annual basis --
22   A.  Yes.
23   Q.  -- of people reporting to you, correct?
24   A.  Yes.
25   Q.  So we are starting with the 1990, but you

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

71

1 had performance reviews prior to 1990?
2   A.  Yes.
3   Q.  Okay.  This happens to be one, and in the
4 bottom right-hand corner of the second page, you
5 recognize that is Ms. Gardner's signature?
6   A.  Yes.
7   Q.  Now, I know the forms changed from time to
8 time over the course of the period.
9   A.  (Affirmative head nod).
10   Q.  But during the period of time you reported
11 to Ms. Gardner, was there a certain process she
12 followed in terms of going through annual review
13 with you?
14   A.  I can't really say it was a process; it
15 was done differently in different years.
16   Q.  Okay.  Well, let's talk about this one, —
17   A.  Sure.
18   Q.  — to the best you recall.  The
19 handwriting that is on this document, other than
20 your signature, do you recognize that as Ms.
21 Gardner's handwriting?
22   A.  Yes, it appears to be.
23   Q.  Okay.  Do you recall sitting down with her
24 and going over this review with her?
25   A.  This specific one?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

72

1   Q.  Yes.
2   A.  No, I don't.
3   Q.  Okay.  Do you recall getting it -- let me
4 ask you the flip side.
5       Is it your recollection you simply got
6 this in the mail?
7   A.  No, I would -- no, I would suspect that we
8 sat down, I just don't remember.
9   Q.  You don't recall one way or the other?
10   A.  No, no.
11   Q.  Do you have any recollection as of the
12 year end 1990 what the size of the Teleservices
13 area was?
14   A.  I can't say with any certainty.  At that
15 point, I assume it to have been in the neighborhood
16 of 40 to 50, but that could be wrong.
17   Q.  Looking at the first page, "Overview of
18 Responsibilities," the first line, she's written —
19 and it would appear that this section is the key
20 responsibilities for 1990.  The first one is
21 "Expand Teleservices throughout 1990" and then
22 there's "(GLHO & SEHO)."
23   A.  Uh-huh.
24   Q.  Do you know what those acronyms stand for?
25   A.  Great Lakes Head Office and Southeastern

ESQUIRE CORPORATE SERVICES

MP401106957A

73

1  Head Office. In other words, that would have been
2  two other territories that we would have been
3  expanding into.
4      Q.  Okay. So at this point in time you are
5  now gaining geographic scope for the call center?
6      A.  Trying to.
7      Q.  I understand that's one of your goals is
8  to expand.
9      A.  (Affirmative head nod).
10     Q.  And that required expanding people and
11  getting enough staff to handle calls, et cetera,
12  correct?
13     A.  Yes.
14     Q.  Among others.
15     A.  It's going to take days, if you want to go
16  through that whole process.
17     Q.  I can assure you I don't want to go
18  through the whole process.
19     A.  Okay.
20     Q.  The Great Lakes and the Southeast, were
21  those the first geographic areas you started adding
22  to -- "you" meaning MetLife -- started adding to
23  the Tulsa call center?
24     A.  I can't honestly say whether it was or
25  not. Western could have been in there and I don't

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

74

1  remember the exact order in which we expanded.
2      Q.  Okay. The second line is "Continue strong
3  customer satisfaction indices"?
4      A.  Yes.
5      Q.  I assume "SATIS" is "satisfaction."
6      A.  (Affirmative head nod).
7      Q.  And what was that measure? What is being
8  referred to there?
9      A.  I can only assume that we had a number of
10  customer surveys in place over the years and that
11  they were in place at that time. I don't
12  specifically remember that, but that would have
13  been the only real indices that I would think that
14  she could refer to.
15     Q.  The third responsibility being listed is
16  "Review expenditure levels for Teleservices and
17  reduce staff/line ratios." Now, I am talking about
18  responsibilities for the prior year.
19     A.  Yes.
20     Q.  Do you recall what that goal was as it
21  related to 1990?
22     A.  No, I can't specifically say, other than
23  the staffing was a struggle for most of the time in
24  Teleservices. The company would never make a
25  commitment to delivering service that way,

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

75

1  properly, anyway.
2      Q.  Or, at least, you disagreed with the
3  company's decision as to the staffing levels in the
4  Tulsa call center. Is that a fair statement?
5      A.  That's a fair statement.
6      Q.  Okay. Do you know what was meant here by
7  "staff/line ratios"?
8      A.  No, I don't. I mean -- other than it may
9  have been a roundabout way trying to say to get
10  more call efficiency, but I don't know what she
11  meant at this point.
12     Q.  Okay. Looking at page 2. The sections F

13  and G refer to "Development Needs" and "Development
14  Plan/Actions."
15      A.  Uh-huh.
16      Q.  Drawing your attention to the section
17  entitled "Development Needs," the first point here
18  is "Separate business issues from
19  personal/emotional and subjective review.  Jim can
20  tend to make things 'personal' concerns."
21  "personal" being in quotes.
22          Do you recall any conversation with Ms.
23  Gardner, either at this specific review or related
24  to this topic during this time period --
25      A.  Sure.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

76

1      Q.  -- on this particular issue?
2      A.  (Affirmative head nod).
3      Q.  What do you recall?
4      A.  I don't remember any specific
5  conversations, but you have got the evidence of my
6  personal concerns as to the way the company was
7  dealing with many issues associated with customer
8  service.  I was trying to live up to a mission and
9  a vision that was given to me by Robert Crimmins
10  and, as you have got in there, you have got the
11  documentation which outlines my concerns to him at
12  the time because of my continuing frustration with
13  the middle levels of the organization failing to
14  deal with the real issues.  But I did make some of
15  them personal.
16      Q.  Okay.  Now, we had talked earlier about
17  the differing management styles you and Ms. Gardner
18  had.
19      A.  Yes.
20      Q.  Did you view this as reflecting the
21  differing management styles that you and Ms.
22  Gardner had?
23      A.  It's -- yes, I reviewed -- I mean
24  that's -- and it's -- it clearly was a valid
25  developmental issue.  I mean I did over the years

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

77

1  learn to deal more effectively with many of those
2  issues and not make them quite as personal and go
3  strictly on the basis of the business need or the
4  business issue.  So, yes, it was a --
5      Q.  Now, the second topic is "Trust your
6  teammates."
7      A.  Uh-huh.
8      Q.  "Management associates at all levels will
9  work with you.  Share your agenda, ask for
10  support."
11          Do you have any recollection of what the
12  issues reflect in that developmental need were?
13      A.  Not specifically, no.
14      Q.  Okay.  Now, under the "Developmental
15  Plan," Section G, it talks about a review in the
16  CLD area.
17      A.  Yes.
18      Q.  What is the "CLD" area?
19      A.  I guess in '91 or thereabouts, in addition
20  to Teleservices, which I guess I had overlooked
21  before, I also assumed responsibility for what was
22  known as the cash loan dividend area.  Because it
23  was such an integral part of many of the customer
24  concerns coming through Teleservicing, it was
25  thought that some improvements might be attained if

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

78

1  I took responsibility for that area.
2      Q.   And who talked to you about taking on
3  responsibility on for that area?
4      A.   That was Barbara.
5      Q.   Okay.  What was the CLD area?
6      A.   It was part of the policyholder services
7  division.  It stands for "cash, loan and dividend.
8      Q.   What did they do?
9      A.   Oh, they processed all cash surrenders,
10  all loan transactions and all dividend
11  transactions.
12      Q.   And when you say this was an integral part
13  of customer concerns, people would call in saying
14  "can I take a loan, can I?" --
15      A.   Fifty percent, or thereabouts, of the
16  phone calls in general dealt with some aspect of a
17  cash loan dividend area.  Now, this doesn't mean
18  that they were the specific transactions, but in
19  terms of quoting values, asking questions about
20  their dividends, asking tax questions related to
21  these transactions.
22      Q.   And the numbers in the processing of those
23  issues was in the CLD area?
24      A.   Yes.
25      Q.   Okay.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

79

1      A.   And there was -- part of it was also to
2  move as much of those transactions to the telephone
3  to try and resolve them at that point, also.
4      Q.   And so the goal, I take it, you and

**CONFIDENTIAL**

5  Ms. Gardner had was by moving that function under
6  your supervision, there could be a closer
7  integration --
8      A.   Yes.
9      Q.   -- of those functions?  Did that
10  integration in fact happen?
11      A.   To a large degree, it did.  At the time we
12  took it, it was very small.  There -- as a result
13  of additional reorganizations, other offices were
14  closed.  At the time I took it, the cash loan
15  dividend area had about 30 to 35 people.  We took
16  work from other offices and it grew to about 120,
17  which I was managing in conjunction with the call
18  center.  And it was eventually split off as a
19  separate division somewhere around '94 or '95.
20      Q.   Did Warwick have the same type of
21  structure --
22      A.   Yes.
23      Q.   -- related to CLD?
24      A.   Yes.
25      Q.   Do you recall expressing any disagreement

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

80

1  over the review for your performance in 1990?
2      A.   I have expressed disagreement with a
3  number of my performance appraisals.  As far as any
4  on this one, no, I do not recall expressing any
5  particular disagreement.
6      Q.   Okay.
7          MR. POOR:  Take about a two-minute break,
8  washroom break.
9          THE WITNESS:  Great.
10          (Brief recess.)
11      (Certain documents were marked Deposition
12  Exhibits 3 and 4 for identification by the

13 reporter.)
14    Q.  (BY MR. POOR)  Okay.  Mr. Rayl, I have
15 handed you a group of documents, which have been
16 marked for purposes of identification as Deposition
17 Exhibit No. 3, and there are a variety of documents
18 relating to a situation surrounding an Esther
19 Davis.
20    A.  Yes.
21    Q.  Now, I would like to start by talking
22 about the first two pages of this group exhibit,
23 which is a memorandum dated June 3rd, 1992.
24    A.  Okay.
25    Q.  Prepared by you.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

81

1    A.  Yes.
2    Q.  And I have, in fact, accurately
3 characterized this.  This is a two-page memorandum.
4    A.  Yes.
5    Q.  Okay. What was it that caused you to draft
6 this particular memorandum, these two pages?
7          MR. RAYL:  I object to the relevance.
8          You can go ahead and answer.
9    A.  It was essentially as a result of being
10 challenged on a non-selection of Esther Davis for a
11 position in the call center for which there was the
12 overwhelming sentiment of the people doing the
13 interviewing and myself that she was not qualified
14 for the position.
15    Q.  (BY MR. POOR)  The incidences, as I can
16 tell by the documents, the incidences surrounding
17 Miss Davis occurred in 19 — essentially 1991 time
18 period.  It would appear.
19    A.  Yes.
20    Q.  Okay.
21    A.  We had a number of performance issues with
22 Miss Davis.
23    Q.  Right.  And she was apparently selected in
24 November-December of 1990, and you had performance
25 problems with her in 1991.  And then she was

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

82

1 repositioned in the July of '91 time period, as
2 best I can tell from the chronology.
3    A.  Okay.  I don't know without reading this
4 entire file again and refreshing my memory, but --
5    Q.  Okay. Well, and my question is this, this
6 is a memo now that you drafted about a year later,
7 June — at least it is dated June of 1992.  And my
8 question really is why in June of 1992, what
9 occasioned you to draft this particular memo in
10 June of 1992, a year, thereabouts, after these
11 events?
12    A.  Well, there was a period of time when Ms.
13 Gardner and I had a number of discussions or
14 situations or whatever, in essence, where things
15 were being challenged.  I would venture to say,
16 since I wanted it in my personnel file, that it was
17 in some way related to some criticism I received
18 from her, which during various periods of time she
19 was prone to interject herself into areas that
20 seemed to be a little extreme and inappropriate.
21 I --
22    Q.  What do you mean?  What do you mean by
23 that, she would inject herself into areas that, I
24 take it, you viewed as extreme?
25    A.  She would involve herself in the
ESQUIRE CORPORATE SERVICES

MP401106957B

83

1   day-to-day issues of Teleservices to a degree that
2   she was not doing in other areas. She was second
3   guessing some of the actions taken in that area to
4   the point where I at various times documented a
5   number of situations; I wrote to Vincent J.
6   Donnelly, who was a superior at times; I wrote to
7   Bob Crimmins, documenting that and outlining a
8   number of files an incidences; and at one point, I
9   would have to go through the files, I also had a
10  disagreement, and actually it was Mr. Lyons and
11  myself and occasioned Mr. Lynch to come out and
12  discuss that with us.
13      Q.  Okay.
14      A.  But it was just a bad period in history.
15      Q.  Well, what was it about this incident,
16  this Miss Davis incident, that Ms. Gardner did that
17  you felt was inappropriate?
18          MR. RAYL:  Again, I will object to this
19  line.
20          You may answer.
21      A.  I can't say specifically here, but what
22  was happening was that -- and I would assume that
23  at some point or other Miss Davis went and spoke
24  with Ms. Gardner. Ms. Gardner was prone at the
25  time to listen to an employee's side of an issue,

**CONFIDENTIAL**

84

1   make a decision and take an action without
2   considering the full circumstances or the other
3   side of the position and requiring me or attempting
4   to require me to take actions that I felt were not
5   in the interest of the company or the call center.
6       Q.  (BY MR. POOR)  And that has been in your
7   first -- not your first sentence, but in the first
8   paragraph here in your cover memo, you are talking
9   about the operations officer, Ms. Gardner, correct?
10      A.  Yes.
11      Q.  "...exercise" -- and these are your
12  words -- "an unreasonable degree of interference
13  and control over the employee selection process."
14      A.  Yes.
15      Q.  I assume that's in general what you are
16  talking about here.
17      A.  Typically, the only selection process that
18  the officer would become involved in is when it
19  dealt with a supervisory position or a management
20  position in the office, not when you are filling
21  the regular positions. And she interjected herself
22  into some of those issues at times.
23      Q.  And I take it Esther Davis must have been
24  one of them?
25      A.  Yes.

85

1   Q.  Okay. During this time period now, the
2   '90-'91 up to '92 time period, did you and Ms.
3   Gardner have discussions about that, your
4   perception that is what she was doing?
5       A.  I'm sure we did, but I don't recall the
6   specific discussions we might have had. I never
7   took actions behind somebody's back or whatever. I
8   pretty much said what I thought.
9       Q.  And there were times when Ms. Gardner, I
10  presume, disagreed with your position.
11      A.  Yes.
12      Q.  Okay. Do I infer correctly that Miss

13 Davis was one of those occasions?
14    A.  Yes.
15    Q.  Okay.  Now, on page 2 of this cover memo,
16 you talk about hand delivering "...all of this
17 documentation...to an Officer of the Company."
18    A.  Yes.
19    Q.  Who was that officer of the company?
20    A.  Vincent J. Donnelly.
21    Q.  Okay.  Now, what was his relationship to
22 Ms. Gardner at that point in time?
23    A.  I can't -- he's had a number of positions;
24 I do not know whether she was reporting directly to
25 him at the time or whether it was where

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

86

1 Teleservices had a specific reporting relationship
2 to him at the time.
3    Q.  Okay.  Do you recall specifically on the
4 initial selection of Esther Davis having
5 conversations with Ms. Gardner about placing her in
6 that position?
7    A.  I don't remember the specific discussion
8 or events other than what should be documented.
9    Q.  Okay.  Do you have any recollection of Ms.
10 Gardner -- I assume you did not want to select her
11 for the position in the first place.
12    A.  Again, I'm not sure, because you refreshed
13 my memory, I think we did wind up -- maybe we did
14 wind up being forced to put her in the position,
15 but, no, I would not have selected her for the
16 position.
17    Q.  Okay.
18    A.  Nor would actually the person who did the
19 interviewing of her.
20    Q.  And I guess what I am really trying to get
21 to is the core of the issue that you had with Ms.
22 Gardner's supervisory or management style on this
23 issue, and I gather that you felt she was injecting
24 herself in decisions that were more appropriately
25 made at the line --

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

87

1    A.  Yes.
2    Q.  -- level.  Do you have any recollection on
3 this or other issues on that topic what Ms.
4 Gardner's explanation to you was as to why she was
5 involved at that level of the decisionmaking
6 process?
7    A.  No, I don't recall what her logic or her
8 explanations were at the time.
9    Q.  Okay.
10    A.  But it was a situation we were able to
11 work through and eventually get past.
12    (Certain documents were marked Deposition
13 Exhibits 5 and 6 for identification by the
14 reporter.)
15    Q.  (BY MR. POOR)  Okay.  I have handed you a
16 couple of sets of documents Mr. Rayl, Deposition
17 Exhibit No. 5, what has been handed to you has been
18 marked as Deposition Exhibit No. 5, is a copy, I
19 believe, of your 1991 performance review; --
20    A.  Yes.
21    Q.  -- is that correct?
22    A.  Yes.
23    Q.  And a group Exhibit No. 6, has been marked
24 for purposes of identification as Deposition
25 Exhibit No. 6, are a number of documents produced

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

88

1  to us. You can note that --
2      A.  Right.
3      Q.  -- the PL Bates number, --
4      A.  Right.
5      Q.  -- the PL-00951 --
6      A.  Right.
7      Q.  -- relating predominantly to that
8  performance review. And let me start with what has
9  been marked as Deposition Exhibit No. 5, which is
10  your performance review for 1991.
11      A.  Uh-huh.
12      Q.  And in the bottom of the second page there
13  is a comment, "Written response will follow.  I
14  register my disagreement with this assessment."
15  And then that's your signature?
16      A.  Yes.
17      Q.  You wrote that comment and then signed it?
18      A.  Yes.
19      Q.  Okay. Now, the typed assessment or the
20  typed information on this form was not placed on
21  here by you, I take it.
22      A.  Right.
23      Q.  Either by Ms. Gardner herself or I presume
24  at her direction.
25      A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

89

1      Q.  Do you recall sitting down with Ms.
2  Gardner and going over this review?
3      A.  Vaguely.  I mean I remember --
4      Q.  You remembered that it happened?
5      A.  Yes.
6      Q.  But the precise content may not be --
7      A.  Yes.
8      Q.  All right. Your overall rating was
9  generally effective.
10      A.  Yes.
11      Q.  I see on the first page, right?
12          And then under "Development Needs," it
13  talks about employee relations.
14      A.  Uh-huh.
15      Q.  Okay. Do you recall any particular
16  conversation or input from Ms. Gardner in addition
17  to what's on this document about her perception of
18  your performance for 1991?
19      A.  No, other than I disagreed with her
20  perception.
21      Q.  Okay. We can obviously go through these
22  specific points --
23      A.  Sure.
24      Q.  -- that's written on this document, but
25  other than what's, you know, talking about

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

90

1  specifically what is written, do you recall
2  anything she said or any additional input she had
3  on these topics or others related to your
4  performance?
5      A.  I don't remember the conversation, no.
6      Q.  Okay. When you wrote the note on the
7  bottom of the second page, was that in her
8  presence?
9      A.  Yes.
10      Q.  Okay. And do you recall expressing
11  specific areas of disagreement with her at the
12  time, or was it left that you would respond more

13  fully later?
14      A.  I'm sure she went through it.  I took
15  exception to those things I would have taken
16  exception to, but I would -- but I wasn't going to
17  try and attempt to get into a debate of them at
18  that time.  I just decided, fine, I will respond to
19  her assessment, which I felt was grossly
20  inaccurate.
21      Q.  Okay.  Now, turning your attention to
22  Group Exhibit No. 6.
23      A.  Yes.
24      Q.  I don't see a date on your performance
25  review for 1991 and perhaps I just missed it or my

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

91

1  copy is bad.  Would it typically have been right
2  after the start of the -- I'm sorry, I am still on
3  Exhibit 5.
4      A.  Okay.  No, it could have been anywhere
5  from January to May typically before she really got
6  around to sitting down and having that discussion.
7      Q.  But sometime in the first quarter of '92?
8      A.  First quarter to first half would be the
9  area. --
10      Q.  Okay.
11      A.  -- but that's --
12      Q.  So the first piece of paper on Deposition
13  Exhibit No. 6, which is a letter to Vincent
14  Donnelly from you, dated November 18th of 1991,
15  would have been prior to getting the performance
16  review for 1991?
17      A.  If this was for 1991, yes, it would have
18  been.  If we followed the normal chain of events; I
19  can't really --
20      Q.  Okay.  What was the purpose of writing
21  this memo to Mr. Donnelly?
22      A.  I knew that Mr. Donnelly, one, most at
23  that time reported directly to Mr. Crimmins, and I
24  felt my only recourse in the company was to make
25  sure that there was some balance given, since

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

92

1  Barbara could have acted as spokesperson to a large
2  part of the organization, I wanted to make sure
3  that they heard some of the other issues.  And
4  Vince and Mr. Crimmins have been both extremely
5  supportive to me throughout my career.
6      Q.  The issue in this particular document
7  deals with the reevaluation of your position and
8  the movement from a manager to a director.
9      A.  That's part of it, yes.
10      Q.  Okay.  At least with regard to that
11  part. --
12      A.  Yes.
13      Q.  -- the issue dealt with getting the title,
14  I take it, you say "Kathy," I presume that's Kathy
15  Schoos, --
16      A.  Yes.
17      Q.  -- getting the title, but not getting any
18  promotional increase?
19      A.  Yes.
20      Q.  Okay.  Had you had conversations with Ms.
21  Gardner prior to writing this memo about that
22  issue?
23      A.  I don't know that for a fact, but that's
24  the only way I assume I would have found out I
25  wasn't getting the promotion -- or getting an

ESQUIRE CORPORATE SERVICES

Page   37

MF401106958Z

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

93

1  increase at all.
2     Q.  Okay.  You reference in your letter that
3  "I did not get any promotional increase" at the
4  time of the title change.  "I was told that I would
5  get it on my salary review date, which is next
6  month," meaning, I take it, essentially year end
7  '91.
8     A.  Right.
9     Q.  "I am now told that because of the
10  restrictions concerning midpoints, I will not get a
11  promotional or merit increase."
12     A.  Yes.
13     Q.  Do you recall who told you that?
14     A.  I can only assume it was Barbara, but I
15  don't -- I don't specifically remember.
16     Q.  Okay.  Now, was Mr. Donnelly in -- and I
17  wasn't quite sure what your answer -- where you
18  placed him in the chain above you at the time you
19  wrote this letter.
20     A.  I am not -- I am not totally sure what his
21  responsibilities were at that time, but at varying
22  times we did have a reporting relationship to him.
23  He had confidence in my abilities and so he was
24  someone I knew that I could at least make aware of
25  the situation and by making him aware of it, I was

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

94

1  also in effect making Mr. Crimmins aware of it.
2     Q.  Did you and Mr. Donnelly have any
3  particular conversation on this, as a response to
4  this memo, that you recall?
5     A.  Not that I recall, no.
6     Q.  Did you tell Ms. Gardner that you were
7  writing this memo to Mr. Donnelly?
8     A.  Probably not.
9     Q.  Okay.  And I take it from the "probably
10  not," you probably did not send her a copy of it?
11     A.  No.  If I did, I mean most of them I would
12  have been prone to put that I copied her, I mean I
13  did copy her on any number of ones that I did
14  write.
15     Q.  And you would show, if that were the case,
16  your typical practice would be to show --
17     A.  Yes.
18     Q.  -- the person being copied?
19     A.  But this was really a personal issue, and
20  I was -- one way to deal with it was to at least
21  let Vince know what was happening.
22     Q.  Okay.  Now, turn your attention to the
23  second page that's in this group of documents.
24     A.  Okay.
25     Q.  Which if that's in the same order that my

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

95

1  set is in, no guarantee of that, of course, should
2  be a memo or a letter from you to Frank Lynch?
3     A.  No.  There's a -- what I have is another
4  one to Donnelly in 1992.
5        (Handed to counsel)
6        There you go.
7     Q.  Let's try again.
8     A.  Okay.
9     Q.  Turn your attention to the second page,
10  which should be Bates numbered PL-00978.
11     A.  Right.
12     Q.  It is a letter you drafted to Frank Lynch?

CONFIDENTIAL

13    A.  And this was in response to this
14  developmental review, obviously, in May.
15    Q.  All right.  So this is a letter you
16  drafted to Mr. Lynch in response to what has been
17  marked as Deposition Exhibit No. 5.
18    A.  Yes.
19    Q.  Now, where was Mr. Lynch in the
20  hierarchical chain at this point in time?
21    A.  At that time, my recollection is that
22  Barbara reported to him, and he had responsibility
23  for the head offices at the time.
24    Q.  Okay.  And drawing your attention to page
25  8 of your letter, which is PL-00985, I notice you

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

96

1  copied Mr. Crimmins.
2    A.  Yes.
3    Q.  Okay.  And you signed and dated this May
4  31, 1992.  I assume that's approximately when you
5  drafted it.
6    A.  Sure, yes.
7    Q.  Okay.  Now, again did you tell Ms. Gardner
8  that you were communicating with Mr. Lynch on this
9  issue?
10    A.  I do not recall specifically communicating
11  that with her.  I mean like I said, we had our ups
12  and downs and this was obviously during a down
13  period.
14    Q.  I don't want to go through everything in
15  this letter, but there are some specific issues I
16  want to understand.  On the first page of the
17  letter to Mr. Lynch, in the second paragraph, you
18  note, "I view this rating" — referring now to the
19  generally effective rating — "as being in direct
20  retaliation for my prior memo to
21  Barbara...regarding my expression of concern for
22  the reduction of my STIC payment."
23    A.  Yes.
24    Q.  What are you referring to there?
25    A.  That was the name for the company's

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

97

1  incentive compensation program at the time.
2    Q.  Okay.  Tell me what had happened in that
3  respect, —
4    A.  I don't —
5    Q.  — the reduction of the STIC.
6    A.  Other than the fact that she was obviously
7  giving me even less than I generated, I don't
8  remember the specifics.
9    Q.  I take it that there had been some
10  reduction in your STIC was prior to, I take it, the
11  performance review that you got for 1991.
12    A.  I assumed that that was the payment that I
13  would have received, and I don't know this, but I
14  would have received in the first quarter or
15  thereabouts of 1992 for 1991.
16    Q.  Okay.  And you say you had a prior memo
17  to her, disagreeing, using my words now and not
18  yours, —
19    A.  Uh-huh.
20    Q.  — reduction of payment.  What were the
21  concerns you expressed to her about the reduction
22  of payment, other than obviously your disagreement?
23    A.  Without the memo, I don't —
24    Q.  You don't have any specific recollection?
25    A.  No.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401069584

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

98

1     Q.  Okay. And what was it that led you to
2 believe that the rating you got for the year 1991
3 was in -- quote -- direct retaliation -- close
4 quote -- for this prior memo?
5     A.  That would have just been my perception at
6 the time.
7     Q.  Was there something that she said or did
8 or --
9     A.  It wasn't any single thing. There were a
10 number of things or -- the best way to describe it
11 I guess is forces at work at that time that I felt
12 that it was just -- the entire situation and
13 environment that I was working under.
14     Q.  Well, you referred to later on in the same
15 paragraph, "the continued harassment, mental and
16 emotional abuse and periodic confrontations" --
17     A.  Yes.
18     Q.  -- the last five years with Ms. Gardner.
19 Obviously, you referred you had up periods and down
20 periods with Ms. Gardner. I presume from this memo
21 that so far we are all on a down period here.
22     A.  For the most part of it during then was; I
23 mean that was one of the things that she was --
24 during that period, unpredictably, you never knew
25 what to expect.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

99

1     Q.  What I am trying to understand and perhaps
2 if you could give me an example. I mean what was
3 she doing -- let me rephrase it.
4     We have talked, for example, about your
5 disagreement with her, tendency, at least your
6 perception that she had a tendency to involve
7 herself in decisions made at a level that should be
8 left to --
9     A.  Right.
10     Q.  -- you or your staff?
11     A.  Right.
12     Q.  We talked about that. One of the examples
13 was this Esther Davis --
14     A.  Yes.
15     Q.  -- situation. I know there were others,
16 but that was one.
17     A.  Yes.
18     Q.  You talk, though, in this memo about a
19 variety of --
20     A.  Yes.
21     Q.  -- pejorative terms, harassment, mental
22 and emotional abuse, these periodic
23 confrontations. Can you help me by giving me an
24 example of something that, to your mind, fell in
25 that category?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

100

1     A.  I'm -- other than the fact that I have
2 obviously commented on some of it in this memo,
3 some of it in this eight-page memo to Frank, those
4 specifics, to be honest, I, you know, that's
5 history and I don't remember the specifics at this
6 time; although, I'm sure it's well documented and
7 was expressed.
8     Q.  Well, let's move back to the Mr. Donnelly
9 letter --
10     A.  Okay.
11     Q.  -- which is the first page, --
12     A.  Right.

13    Q.  -- where you say that there is something
14  in here -- I am now asking questions --
15    A.  Well, --
16    Q.  -- about what Ms. Gardner did that was
17  harassment/ --
18    A.  Okay.
19    Q.  -- mental and emotional abuse --
20    A.  This specific memo to him doesn't relate
21  to some of those things.  There should be other
22  documents that do.
23    Q.  Okay.  That's fine.  I am just trying to
24  understand.
25    A.  Okay.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

101

1    Q.  Okay.  Well, you also indicate in this
2  letter in the next few pages that you felt she also
3  treated Mr. Lyons inappropriately.
4    A.  Yes.
5    Q.  I assume Mr. Lyons reported directly to
6  her as well.
7    A.  Yes.
8    Q.  Do you have a recollection of where he was
9  in the organization at that time?
10    A.  I believe policyholder services, but I'm
11  not sure.
12    Q.  Okay.
13    A.  Mr. Lyons, I believe, sent his own
14  documents to Frank.
15    Q.  Do you have any recollection of actions or
16  incidences involving Mr. Lyons that fall into this
17  category?
18    A.  No, I don't remember any specifics.
19    Q.  Turning to page 3 in the middle, the
20  paragraph starts "Barbara is a 'master
21  manipulator'..."
22    A.  Yes.
23    Q.  That paragraph, then it talks about her
24  trying to buy people's loyalty, manipulating
25  people.  And you give an example of a former

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

102

1  employee, Dick Moser, "Moser," --
2    A.  Yes.
3    Q.  -- something like that.  Either with
4  regard to specifically with the Moser situation, if
5  that's the best example you can give me or with
6  another example you can give me, can you try to
7  help me understand what you are talking about in
8  terms of this description of her conduct?
9    A.  Other than what I have said here, I
10  mean -- no, I could probably present any number of
11  people that could cite their own situations, but --
12    Q.  Well, I am more interested, and I know,
13  Mr. Rayl, you know what you are --
14    A.  Right.
15    Q.  -- talking about here, but you need to
16  understand I don't; I wasn't there.  So I need you
17  to help me, it would be helpful to me if you could
18  give me an example.  And you can talk about the
19  Dick Moser situation, if you care to?
20    A.  Yes, I don't even --
21    Q.  Give me an example of what she was doing
22  that led you to describe her as, you know, buying
23  people's loyalty or being a master manipulator.
24    A.  At this time Barbara's management style
25  was not such that if she wanted you to do something

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP401106986

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

103

1    specifically, that she would just tell you this is
2    what she wanted you to do.  She appeared at the
3    time to be dealing from her own agenda, and she
4    bestowed favor in the form of compensation or
5    whatever on people that were most prone to vocally
6    and actively support whatever it was that she
7    wanted to do.
8        Q.  Well, give me an example of when you said
9    she had her own agenda.  Give me an issue in which
10   that manifested itself.
11       A.  I don't know of any really off the top of
12   my head, particularly at this time here.  There
13   were -- well, I don't remember any.
14       Q.  I take it these would have been issues
15   that you and she disagreed on.
16       A.  It may have been a number of issues,
17   anywhere from -- relating to issues affecting the
18   customer service center, issues affecting -- or
19   customers, issues affecting the work environment,
20   any number of things.
21       Q.  But, as you sit here today, you can't give
22   me a specific example of any one of those things?
23       A.  Not -- you know, I tend -- I am a
24   reasonably sensitive and as obviously has been
25   stated, somewhat emotional person, to the extent

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

104

1    that I operate from a sense of passion.  I
2    supported the company, and I supported its
3    customers with passion, with caring for the right
4    and wrong.
5            I was not interested in political agendas;
6    I was generally focused, as I believe my letters to
7    Crimmins and those people support, on issues that I
8    felt were important to the company, the customer.
9            The company, as a whole, gets itself
10   involved in any number of actions, directions or
11   whatever, where certainly some of these issues are
12   not the primary concern.
13           So those might have been the kinds of
14   issues with which I disagreed.
15           In other words -- well, it's -- we could
16   spend all day talking about that.
17       Q.  Well, I don't want to spend all day
18   talking about it, but I also need to have a better
19   understanding of what you are talking about.
20           For example, we had talked earlier about
21   staffing levels.
22       A.  Yes.
23       Q.  And staffing levels are referred to in
24   your performance review for 1991.
25       A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

105

1        Q.  And, you know, growing a business and yet
2    what kind of resources is this company going to
3    develop to support that expansion.
4        A.  Yes.
5        Q.  And it seems clear from the documents you
6    turned over to us that you strongly disagreed with
7    that decision by the company in terms of the level
8    of resources they were devoting to the
9    Teleservicing area.  Is that a fair statement?
10       A.  But it was really a bigger issue than
11   that.  It really revolved around the company on the
12   one hand paying lip service to the concept of

**CONFIDENTIAL**

13 providing good customer service while they tie your
14 hands behind your back and then don't devote the
15 resources or the strategic issues, technology,
16 systems or whatever, to support that.
17       As a company, we still haven't decided
18 where, when and how customer service should be
19 delivered.
20    Q.  It's not an easy set of issues, is it?
21    A.  It seemed pretty easy during many of those
22 periods.  It certainly surfaced in MetLife Express,
23 although the fact -- but that's another whole set
24 of issues.  But it is pretty easy for any company
25 to make a certain level of commitment to its

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
106

1 customers.  MetLife pays a lot of lip service and
2 does not deliver it.
3    Q.  Well, one of the issues, and I understand
4 in your view it is a broader issue, but let's focus
5 on -- we are now talking in 1991, the staffing
6 levels and the amount of resources the company was
7 prepared to devote to the growth of the
8 Teleservicing area.
9       There were many areas of MetLife in terms
10 of its operations outside of Teleservicing area,
11 correct?
12    A.  Yes.
13    Q.  Okay.  There are thousands of employees
14 who work for MetLife, correct?
15    A.  Yes.
16    Q.  There are many functional areas of
17 MetLife, correct?
18    A.  Yes.
19    Q.  There are many areas within the company
20 that need to be supported and funded for the
21 overall success of the company, correct?
22    A.  Yes.
23    Q.  And Teleservicing certainly is one of
24 those, correct?
25    A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
107

1    Q.  And at some level of the corporation,
2 there has to be a business decision as to taking
3 all of those pieces together, the varying levels of
4 funding and support for those varied support
5 functions, correct?
6    A.  Yes.
7    Q.  Okay.  Now, you were in the Teleservicing
8 function in Tulsa, --
9    A.  Right.
10    Q.  -- correct?  And as you have described it,
11 that was your passion, correct?
12    A.  Yes.
13    Q.  And there were disagreements, differing
14 views on the amount of resources going to be
15 devoted to the Teleservicing, correct, over the
16 years?
17    A.  Yes.
18    Q.  Okay.  And from time to time you disagreed
19 with those decisions, correct?
20    A.  I disagree with those positions -- or
21 those decisions and my disagreement, one, while
22 there were other functional parts of the company,
23 it was individual life insurance that brought
24 MetLife to its knees because of its sales
25 practices.  It's individual insurance that could

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

M2401116958808

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

108

1   not —
2       Q.   Let me back up to the answer to my
3   question —
4       A.   Okay.
5       Q.   — here for a second.  Let's keep on track
6   here.  Somewhere over you there is some very basic
7   resource decisions being made, where the company
8   resources were going, correct?
9       A.   Yes.
10      Q.   Okay.  And you certainly had a belief that
11  that decision was not focusing enough resources on
12  the development of Teleservices, correct?
13      A.   When we were blocking thousands of phone
14  calls that we couldn't even answer —
15      Q.   I am simply asking whether you — I am
16  not trying to get into who was right or who was
17  wrong, Mr. Rayl.  You disagreed —
18      A.   Yes, —
19      Q.   — to the Teleservices?
20      A.   — I did.
21      Q.   And you viewed the Teleservicing area as
22  an extremely important function for MetLife,
23  correct?
24      A.   Yes.
25      Q.   Okay.  And I take it from your answers

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

109

1   that, you know, by virtue of the amount of
2   resources being developed in Teleservicing in this
3   area was also your perception that others somewhere
4   above you in the chain didn't view Teleservicing
5   with the same level of importance to the company's
6   mission that you did; is that fair?
7       A.   Correct.
8       Q.   Okay.  And you expressed that disagreement
9   on a —
10      A.   Repeatedly.
11      Q.   Repeatedly.  To Ms. Gardner, to others
12  within the organization, —
13      A.   Yes.
14      Q.   — correct?  Did it, looking at the
15  documents such as the one you wrote to Mr. —
16  what's the one Mr. Lynch, Mr. Lynch, that we were
17  talking about, and there are obviously others, —
18      A.   Right.
19      Q.   — to Mr. Crimmins, Mr. Donnelly, —
20      A.   Right.
21      Q.   — there were a variety of people within
22  the organization, many of whom are very critical of
23  your supervisor, Ms. Gardner.  Let's stick with
24  those.  Did it occur to you that writing those
25  memoranda, regardless of whether what you are

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

110

1   saying in there was right or wrong, and going
2   around Ms. Gardner to others above her in the
3   hierarchy, was not the way most managers handled
4   those issues within the organization?  I mean —
5       A.   Absolutely.  And that's why most companies
6   get in the condition they are in.  If I had been
7   interested in my advancement, that was suicide.
8       Q.   Okay.  Did anyone ever sit down with you
9   and say, "You know, Jim, you really ought to sit
10  down and work these issues through with Barbara;
11  writing these memos to Vince, or Frank, or Bob or
12  whatever isn't going to be effective in

13  accomplishing what you want to accomplish"?  I
14  don't mean -- I am not giving you precise quotes,
15  but you understand the kind of conversation --
16      A.  Yes.
17      Q.  -- I am talking about.
18      A.  And I think that occurred and Barbara and
19  I worked --
20      Q.  Okay.
21      A.  -- together the last few years.
22      Q.  With whom?  Who had that kind of
23  discussion, counseling, whatever you want to
24  describe it, with you?
25      A.  In a discussion I had with Frank Lynch, it

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

111

1  became apparent that nothing was going to be done.
2  By the same token, I think a discussion -- and this
3  is supposition on my part, but that Barbara reached
4  a point where she was at least willing to meet me
5  halfway, and from that point on we had an okay
6  working relationship.
7      Q.  Okay.  Let's move back to your letter to
8  Mr. Lynch so I can understand, particularly, page 4
9  is where I am now.
10      A.  Okay.
11      Q.  The paragraph that starts "One thing I did
12  decide..."
13      A.  Uh-huh.
14      Q.  I am taking this a little bit out of
15  context, this is in the context of your larger
16  discussion here about being taken out of the
17  divisional manager position. You say, "...and,
18  above all, 'The Man in the Glass'."
19      A.  Yes.
20      Q.  What is that?
21      A.  It's a poem.
22      Q.  I am not a particularly literary fellow,
23  Mr. Rayl.
24      A.  It's an excellent poem.
25      Q.  By whom?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

112

1      A.  I don't remember the name, but it
2  basically says that's the person you have to
3  satisfy.
4      Q.  If I could, you know, draw your attention
5  to page 5.
6      A.  Okay.
7      Q.  You have a number of bullet points here.
8      A.  Uh-huh.
9      Q.  Bullet Point No. 1 is "Attempts to
10  reposition me willingly/unwillingly."
11      A.  Yes.
12      Q.  What did you mean by that?
13      A.  I was approached by Barbara and -- at
14  various times where she would ask me to consider to
15  be repositioned, and in 1987 there was an attempt
16  where I felt they were trying to do that to me
17  against my will and I wrote to the president and
18  that action ceased.
19      Q.  What was happening in 1987?
20      A.  I don't remember the exact circumstances,
21  other than I clearly perceived an attempt to take
22  me out of Teleservices.
23      Q.  And this was slightly before Miss Gardner
24  took over the area?
25      A.  No, I believe she was -- I would have

ESQUIRE CORPORATE SERVICES

Page   45

6000 LIVE OAK PARKWAY.STE 100,NORCROSS,GA 888-486-4044

113

1  to -- my recollection is that Barbara was -- I
2  think she must -- I don't remember exactly.  I
3  thought she was there at that time with Mr.
4  Martin.
5      Q.   And why did you believe that they wanted
6  to reposition you in 1997, or at the time, what did
7  you believe?
8      A.   It was my perception at the time for
9  reasons I don't remember on that.
10     Q.   I take it you and Ms. Gardner had very
11  different management styles.  We have already
12  talked about that.
13     A.   Yes.
14     Q.   Is that your recollection of what was
15  going on or you just simply don't remember?
16     A.   My -- Well, no, I don't, I don't really
17  remember in the 1987 time frame what I was thinking
18  at that time.
19     Q.   Okay.
20     A.   There were later discussions, but -- but I
21  never felt as threatened, I guess, as I did at that
22  point.
23     Q.   Later discussions on repositioning you?
24     A.   Yes.
25     Q.   Okay.  And that's what you are referring
              ESQUIRE CORPORATE SERVICES
       6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

114

1  to in this letter?
2      A.   Yes.
3      Q.   Okay.  When you say "discussions or
4  reposition," what do you mean by that?
5      A.   That I was approached on a potential
6  position being created.  At one time, and I can not
7  remember the time frame, but she was going to
8  create a position, in essence, it was a -- she was
9  going to put some budget stuff and things that I
10  had done before into that position and wanted me to
11  accept that position and get out of Teleservices.
12     Q.   And you didn't agree to that?
13     A.   No, I didn't agree to do it.
14     Q.   And she didn't --
15     A.   Never.
16     Q.   -- do that by force?
17     A.   No, right.
18     Q.   Okay.  The next bullet point talks about
19  making your management job extremely difficult.
20     A.   Yes.
21     Q.   I think we talked a little bit about
22  this.  This refers to your prior testimony, again
23  we talked about Esther Davis --
24     A.   Yes.
25     Q.   -- as being an example of Ms. Gardner
              ESQUIRE CORPORATE SERVICES
       6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

115

1  being involved at entry level or -- I don't want to
2  say "low level," but lower level personnel
3  decisions.
4      A.   Yes.
5      Q.   That you felt should be left up to you
6  and/or your --
7      A.   Yes.
8      Q.   -- supervisory staff?
9      A.   (Affirmative head nod).
10     Q.   The next bullet point talks about
11  promoting unrest and dissatisfaction.
12     A.   Yes.

CONFIDENTIAL

13    Q.  To paraphrase it, it's a concern that, you
14  know, she encourages employees to come directly to
15  her as opposed to, I gather, working through you or
16  your supervisors.  And you give an example of the
17  non-performing employee resigned prior to the date
18  of the PSP.  Do you see that reference?
19    A.  Yes.
20    Q.  What is "PSP"?
21    A.  That's what was then the weekly, it is now
22  biweekly employees' incentive payment.  And
23  typically if they left they didn't get it.
24    Q.  And who was the employee you are referring
25  to?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 886-486-4044
116

1    A.  I don't remember.
2    Q.  What was the problem with the way this
3  particular situation was handled, that you recall?
4    A.  As what I have said there is that the
5  employee went to Barbara.  She had already
6  submitted a resignation, found out they were going
7  to miss getting their incentive payment and wanted
8  to extend their resignation date just long enough
9  to get the payment.  I had refused it, the
10  supervisor had refused it.  So they went to Barbara
11  and she was granted the extension.
12    Q.  Okay.  And you disagree with that?
13    A.  Yes.
14    Q.  Now, on page 6 you talk at the bottom of
15  the page, the last sentence is threatening you with
16  termination.
17    A.  Yes.
18    Q.  And under what circumstances -- and I
19  assume again we are still talking about Ms.
20  Gardner, correct?
21    A.  Yes.
22    Q.  And under what circumstances did she
23  threaten you with termination?
24    A.  I don't remember the specifics, but it was
25  in one conversation that she had with me.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 886-486-4044
117

1    Q.  Okay.  Obviously, she didn't terminate
2  you?
3    A.  No, she did not.
4    Q.  Okay.  In the bullet point above that, you
5  talk about "Frequent attempts to initiate and force
6  confrontational issues...."
7    A.  Uh-huh.
8    Q.  That's a "yes"?
9    A.  Yes.
10    Q.  Okay.  Do you recall any specific examples
11  you are referring to there?
12    A.  Not this far back, no, I don't.
13    Q.  Did Mr. Lynch respond to you as a result
14  of this letter?
15    A.  Yes, he -- I believe this is the one he
16  responded to.  He actually flew out to Tulsa and
17  met with both Mr. Lyons and myself to discuss our
18  issues.
19    Q.  Okay.  Did he meet with you together or
20  did he meet with you apart?
21    A.  I really don't remember.
22    Q.  Okay.  What do you recall about that
23  meeting?
24    A.  I recall having what I believe was
25  breakfast with him at the Warren Place Double Tree,

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP401106959Z

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

118

1   where he basically expressed sympathy and concern,
2   but said essentially like it or lump it, there is
3   nothing he can do about it. But the situation got
4   better following that discussion.
5        Q.   Did he give you any counsel, advice, in
6   terms of trying to work with Ms. Gardner?
7        A.   I'm sure he did. I don't recall it
8   specifically, but I'm sure he did.
9        Q.   Okay. You had known Mr. Lynch prior to --
10       A.   He was one of our officers in charge; in
11  fact, he was the first one.
12       Q.   And you had worked with him --
13       A.   Yes, I had.
14       Q.   -- over the years?
15       A.   (Affirmative head nod).
16       Q.   Did you consider Mr. Lynch to be a friend?
17       A.   I would have to say not a good friend, but
18  certainly a little bit more than just a strict
19  working relationship, yes.
20       Q.   In the course of this conversation, did he
21  provide you any advice in terms of, you know,
22  changes you ought to look at making in your
23  management style -- let me rephrase that.
24        You talked, for example, the two of you
25  began to meet halfway.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

119

1        A.   Right.
2        Q.   Okay. Obviously, that implies both of you
3   moving a little bit --
4        A.   Yes.
5        Q.   -- in terms of the way you dealt with one
6   another in your management styles.
7        A.   Yes.
8        Q.   Did Mr. Lynch in his conversations, in
9   this conversation with you, talk to you about, you
10  know, "Jim, maybe you ought to be a little more
11  flexible, maybe you ought to try to work with
12  Barbara" kind of counseling, words of that --
13       A.   I don't specifically recall that, but I
14  suspect that was the case.
15       Q.   And following this sort of set of
16  meetings, in fact, did you try to change your
17  management style, at least as it related to dealing
18  with Ms. Gardner to try to work in a little more
19  tandem with her?
20       A.   Yes, I would -- I can't specifically tell
21  you the time frame. I'm assuming it was sometime
22  shortly following this, but, at least, we got on --
23  reached some level of understanding and on most of
24  the issues dealt with each other effectively. I --
25  I continued to wage or to be an advocate for what I

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

120

1   believed to be the important company issues
2   associated with Teleservices, and I did a number of
3   things to promote that, but most of those were, at
4   least, with the acknowledgment, if not the outright
5   blessing and support of Barbara, but she in the
6   later years supported me well.
7        Q.   And even in, I presume, in the later years
8   there would come a time when you and she would
9   disagree over a business issue. But in those
10  situations, I take it you and she were able to
11  handle those -- recognize that there might have
12  been two different decisions?

CONFIDENTIAL

13    A.  Right. In other words, the difficulty
14  here was where she was directly involved in the
15  issues of Teleservicing and interjecting herself at
16  a level that I felt was inappropriate.
17        As far as disagreeing on a major business
18  issue or whatever, I mean there's lots of people I
19  disagree with, so that wasn't necessarily an issue
20  as long as she wasn't trying to make me do
21  something contrary to my fundamental values and
22  beliefs.
23    Q.  Such as this Esther Davis thing?
24    A.  Yes, right.
25    Q.  Such as, you know, making you select

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

121

1  people in the area --
2    A.  Right.
3    Q.  -- you didn't feel were qualified or --
4    A.  Right.
5    Q.  I understand.
6        MR. POOR:  It's a good time for a lunch
7  break.
8        (The noon recess was here had.)
9        AFTERNOON SESSION
10       Wednesday, February 25, 1998
11       (A certain document was marked Deposition
12  Exhibit 7 for identification by the reporter.)
13    Q.  (BY MR. POOR)  Take a look at that.
14    A.  Sure.
15    Q.  Mr. Rayl, I am going to hand you two sets
16  of documents, both sets revolve around your 1992
17  performance review?
18        Deposition Exhibit No. 4 starts out with a
19  memorandum you wrote to Sharolyn Nance, who I think
20  during a portion of this time period was the
21  manager of Human Resources.
22    A.  Yes.
23    Q.  Right?
24    A.  (Affirmative head nod).
25    Q.  With regard to your performance appraisal,

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

122

1  some documents you attached to that memo.
2        And Exhibit No. 7 has a cover memo to
3  Vince Donnelly with regard to your 1992 performance
4  review.  And it appears to me from the attachment
5  that you had attached the same set of documents to
6  the memo of events that you had sent to Sharolyn.
7  That's going to be my first question, is whether
8  this series of documents were, in fact, enclosed in
9  the memo to Vince.
10    A.  I assume they were.
11    Q.  Okay. They were Bates stamped
12  consecutively --
13    A.  Oh, okay.
14    Q.  -- in the documents you produced to us,
15  so --
16    A.  Yes, then that was part of my -- Then that
17  would have been part of my file that I would have
18  had to gather on that.
19    Q.  Okay. Again in 1992, you were still
20  reporting to Barbara Gardner, --
21    A.  Yes.
22    Q.  -- correct? And again you had differences
23  of opinion with Ms. Gardner as it related to her
24  evaluation of your performance. Is that a fair
25  characterization?

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

123

1    A.  Yes, I think the issue was also, if I
2  remember, this one was, I was told the evaluation
3  was one thing and then it was formally changed to
4  something else.
5    Q.  I think that was actually 1991.
6    A.  Okay, it could be.
7    Q.  You have got memoranda I could show you --
8    A.  Okay.  That's fine, I'll take your word
9  for it.
10    Q.  -- changing a B to a G, or a G to a V
11  or --
12    A.  Right.
13    Q.  -- something.  Why was it that again in
14  1992 you felt compelled to communicate directly
15  with Mr. Donnelly on this issue?
16    A.  I suppose to understand that fully, you
17  would have to understand the magnitude of what I
18  perceived as the management challenge I faced and
19  the accomplishments that were associated with
20  that.  So that's --
21    Q.  I think I am actually asking you a
22  different question, Mr. Rayl.  I understand, I
23  either understand or it is not really relevant for
24  me to understand, --
25    A.  Okay.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

124

1    Q.  -- the fact that you felt that your
2  accomplishments and the management challenges you
3  faced were undervalued by Ms. Gardner and that you
4  disagreed with her ranking --
5    A.  Right.
6    Q.  -- and you laid out in some detail the
7  areas in which you disagreed.  And I presume these
8  writings accurately reflect, at least as of the
9  time the issues you had with her ranking, correct?
10    A.  Yes.
11    Q.  I mean we could go through them --
12    A.  Right.
13    Q.  -- but unless you tell me differently, I
14  am going to work on the assumption that, for
15  example, in 1991, you wrote a very lengthy, what
16  appears to be a very thorough response to the
17  review, which I presume sets out as best you could
18  at the time the issues you had with her review.
19    A.  Yes.
20    Q.  Okay.  The same for 1992, you set out
21  some --
22    A.  Yes.
23    Q.  -- very thorough, complete, appears to me
24  criticism of her review.
25    A.  Yes.

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

125

1    Q.  And while we could go through in detail,
2  the documents speak for themselves.
3    A.  Okay.
4    Q.  So my question is actually a little bit
5  different, which is why involve Mr. Donnelly in
6  this process in 1992?
7    A.  Basically, I had no real recourse outside
8  of Ms. Gardner.  In other words, she was the one
9  solely responsible for the assessment and the
10  communications that went on, and I wanted the
11  company in some way, shape or form to have a formal
12  record of my position on it outside of the normal

13  chain of command for my own self-protection.
14      Q.  What do you mean by that.
15  "self-protection"?  What did you expect to happen?
16      A.  Pardon?
17      Q.  You say for your self-protection; I
18  don't --
19      A.  Because there were people in the company
20  at higher levels who seemed to carry a much higher
21  level of regard and respect for me at that time
22  than I felt Ms. Gardner did, and I did not want to
23  have to rely that she was presenting my performance
24  at one level without my answering to those people
25  and letting them know that I disagreed with that.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

126

1      Q.  Let me work with that for a minute, Mr.
2  Rayl.
3      A.  Sure.
4      Q.  I know you understand what you are telling
5  me, and I am, not having worked in that milieu, I
6  am not a hundred percent certain.  Some of the
7  people you are corresponding with, Bob Crimmins,
8  Vince Donnelly, et cetera, --
9      A.  Yes.
10     Q.  -- are very high in the MetLife
11  Organization, --
12     A.  Yes.
13     Q.  -- correct?  I mean we are now talking
14  home office, very senior members of management --
15     A.  Yes.
16     Q.  -- in MetLife.  Not the whole senior
17  management team, but certainly a part of it.
18     A.  Yes.
19     Q.  People you had worked with off and on for
20  most of your career, not worked with, or worked for
21  or at various --
22     A.  Right.
23     Q.  -- points of time with or certainly had
24  some relationship with for a long period of time,
25  also correct?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

127

1      A.  Yes.
2      Q.  Who I think you just told me had -- maybe
3  saying they are supporters of yours is perhaps
4  overstating it, but certainly to your perception,
5  anyway, felt you were doing a good job or you felt
6  you had a good relationship with.  Is that what you
7  are telling me?
8      A.  I'm telling you that it was also a form of
9  a reality check to the extent that I could trust
10  Bob Crimmins or I can trust Vince Donnelly that if
11  I was way off base or if they felt I was totally
12  wrong, that they would have immediately told me
13  that and -- so to the extent that, one, I wanted
14  them to know and, two, to the extent that if I -- I
15  wanted them to know if I am headed in a direction
16  here, if you feel that my actions, in terms of what
17  I was trying to do in my position for the company,
18  are inappropriate or not the direction you think
19  the company and I should be going, then tell me
20  that.  And they never did.  Or -- well, they never
21  did.
22     Q.  Okay.  Did any of those individuals -- let
23  me rephrase that.  You have already told me that in
24  a conversation or two with Frank Lynch --
25     A.  Yes.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MF401105956

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

128

1    Q.  -- that there were conversations,
2    counseling, discussions, whatever you want to
3    characterize it, about the need to -- not that you
4    were doing anything necessarily inappropriate,
5    substantively, but that in terms of your dealing
6    with your superior, that there needed to be
7    something done to sort of mend those fences because
8    she wasn't going away.
9    A.   There was one discussion.
10   Q.   Okay.  There was one discussion only?
11   A.   Yes.
12   Q.   Where to paraphrase what you have told me,
13   it was more a, you know, we need to work on our
14   respective styles so the two of you can coexist and
15   get along and move this operation forward.
16   A.   Yes.
17   Q.   Is that fair?
18   A.   Yes.
19   Q.   Okay.  Apart from that one conversation,
20   did Mr. Donnelly, or Mr. Lynch, or Mr. Crimmins or
21   any of these higher level folks that sort of fall
22   into this camp you were communicating with,
23   communicate to you that what you were doing on a
24   substantive basis in the call center was wrong or
25   you were off base or was not what ought to be done

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

129

1    for the company?
2    A.   Okay.  Are you asking me if they ever told
3    me that they felt what I was doing was wrong?
4    Q.   Yes.
5    A.   Not to my recollection.
6    Q.   Okay.  In other than perhaps the way in
7    which you were raising these issues, --
8    A.   Yes.
9    Q.   -- going around your superior, putting
10   aside the style or the way with which --
11   A.   Yes.
12   Q.   -- you were dealing with this, did any of
13   those individuals ever tell you that the fact that
14   you were raising these issues was a problem or
15   wrong or that you shouldn't be doing it?
16   A.   Neither Mr. Donnelly nor Mr. Crimmins, to
17   my recollection, ever told me that I should stop or
18   not do it.  As one of the memos to Bob indicates, I
19   really tried, when he became the executive vice
20   president, I tried very hard not to bother him
21   unless I felt it was an issue of critical
22   importance, and he never once reacted negatively to
23   my memos or input.
24   Q.   How about Mr. Lynch?
25   A.   No, not to my recollection.  I -- I don't

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

130

1    remember ever -- him ever telling me "no."  I
2    mean -- no, I don't remember him ever telling me
3    "no," I shouldn't do it.
4    Q.   Okay.  Did Ms. Gardner ever talk to you
5    about the fact that you were communicating
6    criticism of her directly to her bosses?
7    A.   I don't have any specific recollection of
8    that; Barbara and I had, you know, a number of
9    discussions or conversations over the years and we
10   were -- at least I was frank with her and sometimes
11   she was pretty frank with me, but I don't -- I
12   don't remember any specific discussion of that.

CONFIDENTIAL

13    Q.  Okay.  And to the extent you would have
14  provided her with copies of some of the documents
15  typically, I think I have asked you this before,
16  typically she would be shown on the document as
17  getting a copy, normally?
18    A.  Generally.  In some cases, I may have
19  asked that documents be put in my personnel file to
20  which she had access to if she wished to review
21  them.
22    Q.  Whether she reviewed them or not, --
23    A.  I don't know.
24    Q.  -- you don't know?  Okay.  Now, during
25  this time period, this 1992-1991 period, there were

131

1  some issues, I believe, with your staff in terms of
2  valid or not perceptions of the style of management
3  that was going on in that organization.
4      Do you have a recollection of that and of
5  Human Resources interviewing everyone?
6    A.  Yes, I do.
7    Q.  Okay.  What do you recall about how that
8  issue arose?  Again, we are talking I believe in
9  the spring of '92.
10    A.  I don't really remember all the
11  circumstances, other than it was where some of what
12  I would have termed the marginal performers and the
13  dissatisfied employees found they got a sympathetic
14  ear from Barbara and met with her, which caused her
15  to embark, in my words, at that time and again this
16  is all history which we have put behind us, but, in
17  my opinion, it was a witch-hunt, and she had
18  Sharolyn Nance interview all the employees to which
19  I wholeheartedly supported her efforts to do that,
20  because Sharolyn was generally objective, and I
21  believe her memo outlines that -- the real problem
22  was with a handful of disgruntled employees.
23    Q.  There is nothing wrong, I take it, from
24  your perception of Ms. Gardner's responsibility to
25  have the manager of Human Resources get involved

**CONFIDENTIAL**

132

1  and try to understand what was going on?
2    A.  No, there's -- there was nothing wrong,
3  other than the fact that at the time I felt I was
4  being singled out and it was just part of the whole
5  environment at that time, but, you know, that was
6  just a -- it's something we both, I think, put
7  behind us.
8    Q.  Well, during the period of time you were
9  manager of Human Resources, --
10    A.  Yes.
11    Q.  -- which was for about a thee-year
12  period, --
13    A.  Yes.
14    Q.  -- in the mid-Eighties, did you view it as
15  one of your responsibilities if employees came
16  forward to say "I'm being mistreated" or
17  "improperly treated by management," to look at it
18  objectively and try to understand what's going on
19  and try to resolve it, one way or the other?
20    A.  Absolutely, and -- but the responsibility
21  there was to not convict or accuse before I had the
22  facts and to go out and ascertain the facts and
23  find out what the management or supervisors did.
24  At that point I felt I was being convicted without
25  being able to even present my side of the issues or

MF4010569598

133

1 our side, because it was -- a lot of it involved
2 other people in the --
3    Q.  Your direct report?
4    A.  Yes.
5    Q.  But, in fact, Ms. Nance did, in fact, talk
6 to people --
7    A.  Yes.
8    Q.  -- investigated and come up with
9 conclusions?
10   A.  Yes.
11   Q.  So from the performance of her job, she
12 did it the way --
13   A.  I would have --
14   Q.  -- it should have been done?
15   A.  Yes.
16   Q.  The way you would have done it?
17   A.  Yes.
18   Q.  Okay.  And so I am trying to understand
19 why you felt you were being persecuted or
20 mistreated at the time.  I take it was not by Ms.
21 Nance you felt --
22   A.  No, no.
23   Q.  And let me ask you exclusively, it was
24 not -- it was also, I take it, not by the fact that
25 Ms. Nance was conducting this investigation?

134

1    A.  No.
2    Q.  I think you said you supported that.
3    A.  I welcomed it.
4    Q.  Okay.  Help me understand what the problem
5 was, then.
6    A.  The problem was that at that time Ms.
7 Gardner and I had a very poor working
8 relationship.  I think there was a low level of
9 trust on both sides.  I think my perception was she
10 would have loved at that particular point in time
11 to have gotten me out of the job, gotten me out of
12 the company, for that matter.
13       I think after we went through that period
14 and, particularly, as the call center and the
15 Teleservicing operation began to get acclaim and
16 notoriety, she realized that I was much more of an
17 asset.  I realized that she was much more of an
18 asset to the extent that if we would just support
19 each other, we could hopefully make more inroads
20 than we were there.
21       I mean it was just a bad period in
22 history.  Her and I did not see eye to eye for that
23 period of time.  I -- well --
24   Q.  On a whole bunch of issues, it would
25 appear.

135

1    A.  Yes.
2    Q.  Okay.  Did there come a point in time -- I
3 know, for example, by 1994 --
4    A.  Yes.
5    Q.  -- her evaluations of you were very
6 positive.
7    A.  Yes.
8    Q.  That she nominated you for certain
9 excellence awards, --
10   A.  Yes.
11   Q.  -- et cetera?
12   A.  (Affirmative head nod).

CONFIDENTIAL

13    Q.  So somewhere in this '93-'94 time period
14  you and she had a — I am not quite sure what the
15  term would be, but you somehow found a way to
16  accommodate one another, and I think, as you said,
17  work together to try to accomplish what maybe
18  neither of you completely wanted for the
19  organization, but it was a —
20    A.  Yes.
21    Q.  — common goal?
22    A.  Yes.
23    Q.  How did you do that?  I mean did you and
24  she have sort of a meeting, you know, where
25  everybody bared their soul or did it evolve over

136

1  time?  Tell me how that happened.
2    A.  My recollection is that if there has been
3  anyone who has ever been critical of my
4  performance, it's me.  I — while I can stand up —
5  I mean — well, my whole experience as a manager
6  has been an evolutionary process that has gotten me
7  to where I am today as a person.  And I think, like
8  I said, at one point when Teleservicing in Tulsa,
9  in particular, began to get notoriety and respect
10  in the company, which favorably or which reflected
11  favorably on Barbara, that she then, if you want to
12  say let up, eased up or whatever, and I at the same
13  time worked at really trying to understand, look,
14  you know — I mean this couldn't go on.
15          This was a bad period of time and I — it
16  was going to affect me very badly, just because it
17  was mentally and emotionally, and I have alluded to
18  that.  Something had to give.  She gave a little
19  bit, or maybe she gave a lot, and so did I.  I mean
20  once — once things started evolving with the
21  Teleservicing operation, we both recognized that we
22  needed to work together better.  But I don't recall
23  any specific sit-down or agreement.  I think it
24  just sort of evolved.
25    Q.  When you say you gave a little.  One of

**CONFIDENTIAL**

137

1  the observations Ms. Gardner had made to you I
2  believe was in the 1990 performance review, was the
3  need to take things less personally.
4    A.  Yes.
5    Q.  And I don't want to mischaracterize your
6  testimony, but to, you know, understand there could
7  be business differences that you might not agree
8  with but not —
9    A.  Yes.
10    Q.  — to personalize it so much.
11    A.  Yes.
12    Q.  Did you find that in 1993, '94, as you and
13  Ms. Gardner reached an accommodation, you were able
14  to do that more to — to still have disagreements,
15  but not take them personally?
16    A.  I think, if you really reviewed all of the
17  documents relative, I think, to what we were trying
18  to do in terms of advancing Teleservices and what
19  have you, over those period of years, you would see
20  that my whole approach and management style changed
21  with many people and many issues, to try and deal
22  more effectively with the business issues and set
23  my personality or personal issues aside, but win my
24  arguments solely on the basis of business issues.
25    Q.  And by doing that, I take it that was one

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

138

1 of the ways you were able to work more effectively
2 with Ms. Gardner.
3   A.  Yes.
4   Q.  Okay.
5      (A certain document was marked Deposition
6 Exhibit 8 for identification by the reporter.)
7      THE WITNESS:  Okay.
8   Q.  (BY MR. POOR)  Now, Mr. Rayl, I have
9 handed you what has been marked for purposes of
10 identification as Deposition Exhibit No. 8.  It is
11 a multipage document, for all I know, it is
12 multiple documents, that you produced to us with a
13 Bates numbers PL-02403 through PL-02419.
14   A.  Right.
15   Q.  Can you identify what this document is
16 and, perhaps, tell me what the Teleservicing
17 Strategic Planning Board is, was.
18   A.  This was a period of time when I think
19 Vincent Donnelly had responsibility for
20 Teleservices, in spite of the fact -- and again it
21 was somewhat of a -- I believe at the time -- in
22 other words, for a period of time John Abela and
23 Barbara Gardner reported to him directly, and a
24 period of time, to my recollection he just kind of
25 oversaw some of the Teleservices stuff, I'm not

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

139

1 sure exactly where it was at this point, but it may
2 have been when we all reported to Vince.
3      And there was a strategic planning board
4 which I believe was -- it was an extension of
5 meetings we formally held with the Wichita
6 programming staff, where it was more formalized, to
7 deal with the issues of advancing Teleservices in
8 the company.
9   Q.  Can you give me a time frame?  Many of
10 these documents are undated.
11   A.  Oh, boy --
12   Q.  What year are we talking about?  I'm
13 assuming in the '92-'93 time period, but -- one of
14 the documents is dated May 1 of '93.
15   A.  Well, that would have been somewhere in
16 there; I would have to go back and check.  There's
17 April 15th, '93, so it was in that time period, I
18 would guess --
19   Q.  Okay.
20   A.  -- in 1993.
21   Q.  Okay.  And this board included Mr.
22 Donnelly, who our best recollection at the time had
23 responsibility for the area.
24   A.  Yes.
25   Q.  Mr. Abela and Ms. Gardner, who were the

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

140

1 operations officers of Warwick --
2   A.  Yes.
3   Q.  -- and Tulsa.  Who was Mr. Major?  I know
4 it says "agency vice-president."
5   A.  Yes.  He was at one point the regional
6 manager or an agency vice president in Tulsa
7 responsible for some of our marketing operations.
8 I believe this was -- in fact, I'm pretty sure this
9 was after he left Tulsa and then was engaged in the
10 development of supporting some of the marketing
11 aspects of Teleservices, the sales, lead
12 generation.  We worked with him and his

13    organization to try to develop that.
14    Q.  Okay.  Marge Kelly was who?
15    A.  She was an assistant vice president and
16  the best thing I can tell you is that she was on
17  the electronic systems side; I don't remember what
18  her -- what her exact role was.  Bob McDowall may
19  have reported to her, but I'm not sure.
20    Q.  Who was Bob McDowall?
21    A.  He was the director of the Wichita
22  computer center, in the programming staff that
23  supported most of the development side of
24  Teleservices' applications.
25    Q.  Okay.  Lucia Chez was who?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

141

1    A.  Lucy was another person on the systems
2  side; she worked for -- I think she worked for
3  Marge at that time.  I think she had responsibility
4  for what was known as the client file at that time,
5  which was just an electronic system under
6  development and --
7    Q.  Database kind of information, --
8    A.  Yes.
9    Q.  -- kind of stuff?
10    A.  (Affirmative head nod).
11    Q.  And Tom McHale?
12    A.  Tom McHale was, in essence -- worked
13  directly for Vince; he was kind of a staff support
14  person or staff assistant.
15    Q.  And then Kathy was your counterpart in
16  Warwick?
17    A.  Yes.
18    Q.  So this was a Teleservice planning board
19  in the IB area?
20    A.  Yes.  This was one valiant attempt by Mr.
21  Donnelly to actually further the whole
22  Teleservicing issue within the company.
23    Q.  Okay.  And do I take it from the way you
24  phrased that that it didn't succeed to the level --
25    A.  No, it did not.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

142

1    Q.  -- certainly that you had hoped?  Why not?
2  Or what was it about it that you viewed as being
3  not as successful as you had hoped?  And it would
4  appear you are addressing a lot of different issues
5  here.
6    A.  Oh, boy.  It continued and right up on
7  through 1995-'96 to just get lost in all the
8  corporate issues and a lack of commitment from the
9  department from personal insurance to deal with
10  many of the customer service issues.
11    Q.  When you say "deal with many of the
12  customer service issues," let me make sure I
13  understand what we are talking about.  A number of
14  these things in here talk about or result in
15  needing to invest more money --
16    A.  Uh-huh.
17    Q.  -- in, you know, expanding the queue --
18    A.  Right.
19    Q.  -- or cutting down the call time, or
20  advertising the 800 number or --
21    A.  Yes.
22    Q.  -- you know, spending money to generate
23  sales leads, et cetera, et cetera.
24    A.  Yes.
25    Q.  And I take it one of the issues and we

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011069602

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
143

1  talked about this before, was whether or not
2  personal business or whatever unit of the company
3  the money came from was prepared to spend the money
4  to do some of these things.
5      A.  But I would prefer not to just couch it in
6  terms of money.  The department would not make a
7  fundamental decision as to how it wanted to deliver
8  customer service to its customers.
9      Q.  And who was -- you say "the department."
10  Who were the people we are talking about now?
11     A.  It would -- it would be all the senior
12  officers of personal insurance at that time.  You
13  had the systems issues; you had the marketing
14  organization; you had the administrative areas,
15  which, essentially, could not come to agreement on
16  those issues.
17      So I mean we are not a company where
18  typically one person at a senior level was capable
19  of just making a far reaching decision when there
20  was lots of disagreement underneath.  They don't do
21  it, so --
22     Q.  Okay.  Now, are you giving me your
23  perception on just from results or were you part of
24  these meetings at that level with the personal
25  business or in the marketing side?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
144

1      A.  I would say that over the years in dealing
2  with the various people associated with this effort
3  and attending various meetings with various
4  players, that is clearly my perception of the
5  situation, but I knew, for example, what some of
6  these issues were.  For example, with respect to
7  the concerns in the marketing organization, the
8  lack of support from the systems side, just -- it
9  was --
10     Q.  "Lack of support from the systems side"
11  meaning the hardware-software --
12     A.  Developing applications to support --
13  appropriate applications to support a Teleservicing
14  environment, because the basic commitment, if you
15  couldn't get the basic commitment to Teleservicing,
16  nobody is ever going to stick their neck out and
17  try and support long-range systems objectives.
18     Q.  Okay.  How long did this task force stay
19  in, planning board I guess is what it is referred
20  to, remain in existence?
21     A.  This planning board or whatever, the
22  Teleservicing thing, has taken on many different
23  forms over the years.  My best guess would be that
24  this one that was initiated by Vince was probably
25  in existence about a year or so, maybe longer,

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
145

1  but -- There were less formal meetings to address
2  these issues.
3      Q.  Okay.
4      (A certain document was marked Deposition
5  Exhibit 9 for identification by the reporter.)
6      Q.  (BY MR. POOR)  I am handing you what has
7  been marked for purposes of identification as
8  Deposition Exhibit 9, ask you to take a look at
9  that document, tell me if you know what it is.
10     A.  This was a document I think that I
11  prepared primarily at the request of Vince Donnelly
12  to put forward a, in essence, a strategic plan for

**CONFIDENTIAL**

13  Teleservices that could hopefully have been taken
14  forward and supported. And it was an outgrowth of
15  what -- with regard to here as the task force and
16  that's part of similar to this strategic planning
17  board, but --
18      Q.  So when it says "the Customer Services
19  Task Force," it is something similar to, I take
20  it --
21      A.  Yes.
22      Q.  -- to the planning?
23      A.  Yes. That would have involved Kathy
24  Schoos, the Warwick people, us, at least Bob
25  McDowall and his people, and it's -- I would

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

146

1  venture to say that Jim Major was still involved at
2  this point, but there would have been a variety of
3  players.
4      Q.  Okay. I mean I see a handwritten note on
5  here that is dated 9 -- September 17th of 1993.
6      A.  Yes.
7      Q.  Is that your recollection of about the
8  time period we are in now?
9      A.  Yes, I have no reason to think it would be
10  anything different than that.
11      Q.  Okay.
12      A.  And, obviously, from Barbara's note it was
13  a discussion with Vince, so he was still involved
14  at that time.
15      Q.  It says "Vince submitting to Bob for
16  Planning Board next week." "Bob" being Bob
17  Crimmins, probably?
18      A.  Yes. And probably for his planning board,
19  which --
20      Q.  Is it a planning board in the higher
21  level --
22      A.  Yes.
23      Q.  -- of the company or in a different
24  organization?
25      A.  No, a higher level of the company would

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

147

1  have been personal insurance.
2      Q.  Okay. What feedback did you get
3  personally with regard to some of the issues in
4  here as to what the company was going to do, what
5  they were going to support or what they weren't
6  going to support?
7      A.  To be honest, to this specific document, I
8  don't remember other than there was a period --
9  Vince was aggressively trying to further the cause,
10  but at some point following this he took on
11  different responsibilities. Frank Lynch came in as
12  the senior vice president of customer services and
13  just a lot of it never happened.
14      Q.  Okay.
15      (A certain document was marked Deposition
16  Exhibit 10 for identification by the reporter.)
17      Q.  (BY MR. POOR) I am handing you what has
18  been marked Deposition Exhibit 10 --
19      A.  Yes.
20      Q.  -- for the purposes of identification.
21  Ask you to take a look at that. I believe that to
22  be your annual performance review for 1994.
23      A.  Yes.
24      Q.  Okay. Signature in the bottom --
25      A.  Yes.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401069604

11069605

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
148

1    Q.  -- left-hand corner of the second page?
2    A.  Yes.
3    Q.  Barbara's next to yours.
4    A.  Yes.
5    Q.  And this one is a very positive
6  performance, correct?
7    A.  Yes, it is, one of my shining moments.
8    Q.  Okay.  And by this point you and Barbara
9  had, as we have talked before, been able to come to
10  an accommodation in terms of how to work together
11  and to move the organization forward, as best could
12  be done?
13    A.  Yes -- no -- yes.
14    Q.  And this is not one of the performance
15  issues you had particular criticisms of?
16    A.  No, I wasn't objecting to this one, no.
17    Q.  I didn't find long memos criticizing this
18  one.
19    A.  No.
20    Q.  Okay.  All right.  Now, it was around this
21  time, and "this time" being January of 1995 --
22    A.  Yes.
23    Q.  -- on this performance review, that
24  MetLife Express starting, --
25    A.  Yes.
        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
149

1    Q.  -- going on?
2    A.  Yes.
3    Q.  Prior to January of '95 -- and it was in
4  about this time period you were invited to join
5  MetLife Express?
6    A.  Yes.
7    Q.  Okay.  Who first approached you with the
8  possibility of participating in that process?
9    A.  The first notification or indication that
10  I had any possibility of being approached probably
11  occurred in December.  There was -- I was in Phase
12  2 of MetLife Express, there was a Phase 1, and that
13  was being conducted by people from MetLife and
14  Booz-Allen, and one of the principals from
15  Booz-Allen came out and looked at our call center
16  service, we sat down, we had a lengthy discussion
17  at which time we discussed the history and many of
18  the customer service issues and what have you, and
19  he personally indicated to me that at that time
20  that he would like to see me on MetLife Express.
21    Q.  Okay.  What was MetLife Express, your
22  understanding of it, in any event?
23    A.  MetLife --
24    Q.  At this time period, I am talking about,
25  Mr. Rayl, not when you ultimately got involved in
        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
150

1  New York.
2    A.  All I knew at that time was that --
3  that -- because I think John Jones explained it
4  that it was where the company was trying to do a
5  massive reengineering of its operations, and to
6  hopefully make it better.
7    Q.  Who is John Jones?
8    A.  He was the principal from Booz-Allen.
9    Q.  Okay.  He's the fellow you met with
10  sometime in '94?
11    A.  Yes.
12    Q.  Okay.  And your understanding of Phase 1

**CONFIDENTIAL**

13  was a fairly small group consultants, top
14  management, --
15      A.  Yes.
16      Q.  -- looking at some fundamentals of the
17  business?
18      A.  Yes.
19      Q.  And that there was going to be a Phase 2
20  involving a larger group --
21      A.  Yes.
22      Q.  -- of MetLife employees --
23      A.  Yes.
24      Q.  -- also looking at the business?
25      A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

151

1       Q.  At the time was it your understanding
2  there would be a Phase 3?
3       A.  I really began to understand that in Phase
4  2, yes.
5       Q.  Okay.  All right.  When were you first
6  approached about participating in Phase 2?  And I
7  know Mr. Jones said he would like to see it
8  evolve.
9       A.  No, my formal -- I was formally
10  approached, I would guess it was mid-January 1995.
11      Q.  Who approached you?
12      A.  William Friedewald.
13      Q.  Is this on a personal level or --

**CONFIDENTIAL**

14      A.  I received a phone call from him.
15      Q.  Okay.  And was this the first contact you
16  had had with anyone from MetLife about
17  participating?
18      A.  Yes, it was the first -- yes, to my
19  recollection, it was the first contact that I had.
20      Q.  Now, who was Mr. Friedewald at that time?
21      A.  He was actually the senior medical officer
22  of the company.
23      Q.  Did you know him?
24      A.  No, I did not.
25      Q.  Had you ever met him before you got the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

152

1  phone call from him?
2       A.  No, I had not.
3       Q.  So what does he say to you and what do you
4  say to him in this phone call?
5       A.  To the best of my recollection, he told me
6  that I had been nominated to serve on MetLife
7  Express, that it would require a commitment, that
8  it would require that I relocate to New York City
9  for a period of some months, and I'm not sure what
10  else, but that I should let him know, and there was
11  a relatively short time frame.  I don't recall the
12  exact circumstances, but I did have the opportunity
13  within just a few days to go to New York and sit
14  down with him and discuss it, and accept the
15  position.
16      Q.  At the time you got the phone call from
17  Mr. Friedewald, did you have any knowledge as to
18  what Phase 2 of MetLife Express was, what teams
19  were being set up, what functions were being looked
20  at in any detail?
21      A.  Not in any definitive sense, other than
22  the fact that I -- I mean I did know at the time
23  that Mr. Friedewald was in charge of a customer
24  service team, and that that was the area that they
25  were looking for, but I did not understand the

ESQUIRE CORPORATE SERVICES

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

153

1  scope and magnitude of what was happening at that
2  time, only -- only with respect to that issue.
3     Q.  Were there communications generally to
4  employees of MetLife about MetLife Express's
5  process, the goals of the company weren't doing
6  it, --
7     A.  Most of that started after -- after the
8  kickoff of Phase 2.
9     Q.  Okay.  So at that point in time, there had
10  not been a lot of internal --
11    A.  No.
12    Q.  -- publicity --
13    A.  No.
14    Q.  -- in employee relations on it?
15    A.  (Negative head shake).
16    Q.  Okay.  Had you known prior to Mr.
17  Friedewald calling you that you had been nominated
18  to participate in the customer service area?
19    A.  I don't think I did.  I don't specifically
20  remember.  It's not inconceivable that Barbara had
21  mentioned something to me that I was being
22  considered.  That almost seems like that may have
23  happened, but I don't specifically remember it.
24    Q.  Okay.  In this phone call from Mr.
25  Friedewald, what did he explain to you he would be

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

154

1  doing as part of -- and I know you knew it would be
2  the customer service piece, but what did he tell
3  you you would be doing or the team would be doing
4  or --
5     A.  I don't really remember much in the way of
6  specific details, other than I think I understood
7  that it was to examine how customer service was
8  delivered throughout the company.
9     Q.  Okay.  And then within a matter of a
10  couple days?
11    A.  Days, within a week, I think, as I --
12    Q.  I presume he invited you in this phone
13  conference, telephone --
14    A.  To let him know, yes.  I don't remember
15  exactly how it came about that I was going to New
16  York, but I did make arrangements to stop by and
17  visit him during that visit.
18    Q.  Okay.  And had a more detailed
19  conversation at that point about --
20    A.  Right.
21    Q.  -- what you would be doing?
22    A.  It wasn't terribly detailed at that point,
23  other than the fact that there -- I think some
24  preliminaries on the kickoff meeting and things
25  like that that -- I mean I accepted it pretty much

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

155

1  without fully understanding, but I -- what I was
2  getting into.
3     Q.  Okay.
4     (A certain document was marked Deposition
5  Exhibit 11 for identification by the reporter.)
6     Q.  (BY MR. POOR)  I am handing you what has
7  been marked as Deposition Exhibit No. 11, which is
8  a copy of a document produced to us marked
9  PL-00436, ask you to take a look at that and if you
10  could identify that document for me, please, sir.
11    A.  Since I did not know Bill, and when he
12  approached me, I wrote this letter to him to make

**CONFIDENTIAL**

13  sure that he understood what he was getting.
14    Q.  Okay.  Before or after you went to New
15  York?
16    A.  I believe this was before.
17    Q.  Okay.  Phone call, letter, New York?
18    A.  That's my recollection, yes.
19    Q.  Okay.  Now, in this letter you referred to
20  an enclosed document, third paragraph, "Some of my
21  more recent frustration and criticism was captured
22  in the enclosed document."
23    A.  Oh, okay, yes.  That was my document on
24  what I felt -- I produced that document which you
25  have in terms of —

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

156

1    Q.  That's lots of documents.  You are going
2  to have to be more specific than that, --
3    A.  No, I will.
4    Q.  — because it wasn't attached to this.
5    A.  Right.  It is the one regarding what I
6  felt MetLife had to do in terms of — I think it is
7  what systems and technology does it take to provide
8  world class customer service or whatever.  There
9  was an introductory memo in there in which I voiced
10  some of my frustrations over the years with
11  customer service issues, and then there was a whole
12  lot of recommendations as to what I felt the
13  company needed to do, and I had circulated that
14  document throughout the company.
15    Q.  Okay.  Well, perhaps, as we go through
16  these documents we will find it, since I know there
17  have been a number of documents you have written
18  that sort of fit that description.
19    A.  I actually thought maybe you even had a
20  bound copy of that one, but I'm not sure.
21    Q.  I don't think I got anything that was
22  bound.
23    A.  Okay.  Well, it was in a notebook thing,
24  but maybe not.  Maybe not.
25    Q.  Well, we will find it at some point.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

157

1    A.  Okay.
2    Q.  If when you see it, if you would please
3  relate it back to this letter for me --
4    A.  Sure.
5    Q.  — so I know what we are talking about.
6  Okay.  Now, --
7    A.  It has attached to it a cover letter that
8  I wrote to the president and a cover letter that I
9  also wrote to Mr. Crimmins in distributing the
10  document to them.
11    Q.  Okay.  And you attached that?
12    A.  Yes, I did.
13    Q.  Up to this point, you hadn't had any
14  contact with Mr. Friedewald?
15    A.  No, I had not.
16    Q.  And as chief medical director for MetLife,
17  I assume that you had no reason to believe he knew
18  who you were or — that's an overstatement,
19  certainly he knew who you were or he wouldn't have
20  called you, but in terms of what role you played in
21  the organization or any of the detail about your
22  history at MetLife, he was in a different area of
23  the company?
24    A.  He was in a totally different area, right.
25    Q.  Okay.  Did you and he discuss particularly

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

Page   63

MP4I1069608

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

158

1  the point you are making in this letter about being
2  an aggressive and outspoken critic on various
3  issues, having little tolerance for politics, et
4  cetera?
5      A.  There was a brief discussion of that when
6  I met with him in New York. I really don't
7  remember what he said, but he had indicated that,
8  yes, he had, in essence, heard of me by reputation
9  or whatever, which I assumed that perhaps he had
10  had a conversation with Crimmins or somebody of
11  that nature, which he didn't particularly take as
12  negative, or I didn't take it as negative, I should
13  say.
14      Q.  Did you and he have any specific
15  discussion about the kinds of issues you are
16  referring to in this letter or was that sort of
17  dealt with in your attachment?
18      A.  The attachment generally was outlining
19  some of my frustration on the company's failure to
20  address customer service issues, but it was with a
21  whole lot of recommendations. I don't recall
22  specifically discussing it at that time. Over the
23  course of Phase 2, he certainly heard a lot more
24  about my frustrations on some of those issues that
25  we felt the company was not addressing and he was

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

159

1  very supportive.
2      Q.  Okay.  One of your concerns in writing
3  this letter and talking to him was making sure he
4  understood he was getting somebody who had been
5  critical, who wasn't afraid to say what they
6  thought and be aggressive on the things that they
7  thought were right for this particular function.
8      A.  Yes, I wanted him to understand that if he
9  wanted somebody to rubber stamp or whatever -- some
10  process, I was not going to do that. I mean if
11  they came to the conclusions I could support them,
12  I would support them, and I did.
13      Q.  And if they came to the conclusions you
14  didn't support, --
15      A.  I -- and I wrote to him on a number of
16  those issues, too.
17      Q.  Okay.  Did you feel that he understood
18  that the point you were trying to make here through
19  the letter?
20      A.  Yes, -- it was an interesting experience.
21  I mean my first reaction was the senior medical
22  officer in customer service, but as he led that
23  team, it was interesting because he had none of the
24  other biases or none of the other history or none
25  of the other -- and he tended to look at things

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

160

1  reasonably, objectively, and when you had an
2  opinion, he would challenge it and support it.
3      Q.  How long did you work on Phase 2 of
4  MetLife Express?
5      A.  From the first part of February until June
6  of 1995, June 30th, I think it was --
7      Q.  Okay.  We will call it --
8      A.  -- since I left.
9      Q.  We will call it five months?
10      A.  Five months, yes.
11      Q.  Okay.  And that was taking place in New
12  York?

CONFIDENTIAL

11066609

13  A.  And traveling to various locations --
14  Q.  Okay.
15  A.  -- all over the company.
16  Q.  You did some site visits?
17  A.  Yes.
18  Q.  You went to Aurora, et cetera?
19  A.  (Affirmative head nod).
20  Q.  And there were a variety of teams, --
21  A.  Yes.
22  Q.  -- functional teams in MetLife Express?
23  A.  Yes.
24  Q.  You were on the customer service team?
25  A.  Yes.

             ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          161

1   Q.  How many people -- and that was led by Dr.
2  Friedewald?
3   A.  Yes.
4   Q.  How many people were on that team?
5   A.  I have the exact number someplace, it was
6  somewhere in the neighborhood of 20, I think, of
7  which about 13, 14 were Met employees; the rest
8  were Booz-Allen people, and I think that number
9  even grew to more than that by the end of it.
10   Q.  Okay.  But in terms of the Met employees,
11 what areas of the company did they come from?
12   A.  They came pretty much from all over.  We
13 had Tony Gallo who came from Property and
14 Casualty.  We had -- geez, I can't think of his
15 name, another guy that came from Group P&C, we had
16 Rich Anderson who came -- at that time he was in
17 Facilities & Services, but who had a strong
18 background in individual life insurance
19 administration.  We had Norma Rossi and Mary
20 LoSardo, who came out of a lot of the research
21 areas.  We had Polly Wittenberg, who came out of
22 the Consumer Relations area and held some other
23 positions around the company.
24       I think the other guys, there was Mark
25 George, I think was his name, came from Pensions.

             ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          162

1  Kathy Henkle, who came from Pensions, Human
2  Resources.  So there was quite a mix.
3   Q.  Okay.  And the process was, I presume, a
4  series of joint meetings, some specific
5  responsibilities assigned with some of you,
6  including you, went to the field, I presume there
7  were smaller projects, it was a deliberative
8  evolutionary process over this five months?
9   A.  Yes, there was an evolutionary process
10 which wound up in the customer service team being
11 broken up into sub-teams, and the only person I
12 failed to mention was Ralph Jeffrey.
13       And Ralph and I were the two Met
14 employees responsible for looking at the call
15 center operations around the company, with Gail
16 Benson from Booz-Allen.
17       And then the other teams looked at a
18 variety of things, billing, work flow and other
19 customer service-related processes.
20   Q.  So the customer service team was looking
21 at sort of all of those elements of Met that
22 interfaced with the policyholder, --
23   A.  Yes, --
24   Q.  -- customer?
25   A.  Yes.

             ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011069610

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

163

1    Q.  Not just the person on the end of the
2   phone but the person cutting the checks, --
3    A.  Yes.
4    Q.  -- and the people processing the
5   paperwork, --
6    A.  Yes.
7    Q.  -- and sort of all the back office stuff
8   that affected how customers perceived and handled
9   with MetLife?
10    A.  A good portion of it, yes.
11    Q.  Okay.  How quickly did it break up into
12   sub-teams?
13    A.  I would guess that was probably six weeks
14   to two months into the process.
15    Q.  Was the June 30th date a date set at the
16   beginning of the process?  I mean was that the date
17   you were shooting for or did it just happen to be
18   that's when you were done?
19    A.  Actually, there was a date prior to that
20   that if it was not set at the very beginning, it
21   was set fairly close; in other words, they had a
22   specific time frame Met made out or set out as to
23   when we would report findings to the CMO with the
24   final report, I believe that was due in June of
25   '95.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

164

1    Q.  Okay.  When you say you and Mr. Jeffrey
2   had the responsibility for the call center
3   organization, --
4    A.  Yes.
5    Q.  -- you are just evaluating it.  We are in
6   a point of time in history now where you got the 22
7   I believe is the number you gave me, call
8   centers, --
9    A.  Yes.
10    Q.  -- various product lines of a call center,
11   there is Warwick, there is Tulsa, --
12    A.  Right.
13    Q.  -- stuff scattered all over the place,
14   right?
15    A.  Yes.
16    Q.  Now, where did Mr. Jeffrey come from?
17    A.  He came from, to the best of my knowledge,
18   he was a vice-president in the group department and
19   as part of their quality organization.  I don't
20   know whether their organizational structure, so I don't
21   know whether that is called Human Resources or
22   something special.
23    Q.  Okay.  Had you worked with Mr. Jeffrey
24   before?
25    A.  No, I had not.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

165

1    Q.  Okay.  Just describe for me, please, the
2   process you and Mr. Jeffrey went through to gather
3   information and to make -- I assume your job was to
4   make recommendations back to the whole team in
5   terms of the call center organization.
6    A.  It wasn't quite so much to the team as
7   much as it was -- although each team reported back,
8   but everybody was kind of doing their own thing.
9        There was a process, it was led by
10   Booz-Allen, who attempted to a large degree to tell
11   us what we should -- what types of information we
12   should be looking for and what have you.  A major

**CONFIDENTIAL**

Page  66

13  portion of my time was spent on educating all the
14  team members on many of the call center issues,
15  so --
16      Q.  Okay.
17      A.  Getting them to ask the right questions.
18      Q.  Okay.
19          MR. POOR:  Why don't we take a break.
20          THE WITNESS:  Okay.
21              (Brief recess.)
22          (Certain documents were marked Deposition
23  Exhibits 12 through 25, inclusive, for
24  identification by the reporter.)
25      Q.  (BY MR. POOR)  Now, Mr. Rayl, I am going

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
166

1  to hand you what has been marked for purposes of
2  identification as Deposition Exhibit No. 12.
3      A.  Yes.
4      Q.  Tell me if you can identify that document.
5      A.  Yes.  This is the document that I prepared
6  in late 1994 as part of my, once again, effort to
7  get attention focused on what I believed to be the
8  customer service and the technology issues that the
9  company needed to address.
10      Q.  This is the document that you enclosed
11  with your letter to Mr. Friedewald?
12      A.  Yes, it is.
13      Q.  Did you and he ever go over this document?
14      A.  I don't recall specifically going through
15  that document with him.  We went over many of the
16  things in it as a part of the MetLife Express
17  effort, but --
18      Q.  Now, I put in front of you a stack of
19  documents here, --
20      A.  Yes.
21      Q.  -- all documents which were produced to us
22  I think relatively in the order in which they
23  actually were produced to us.
24      A.  Okay.
25      Q.  And what I would ask you to do is look at

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
167

1  those documents, if you could just tell me one by
2  one, identify for me what they are and they are all
3  in files that you had marked or your counsel had
4  marked as having something to do with MetLife
5  Express.
6      A.  Okay.
7      Q.  And what I would ask is -- I don't
8  necessarily need to go through the substance of the
9  documents themselves, but I would like to
10  understand what they are, you know, who played a
11  part in authoring them and where they fell in the
12  deliberative process of MetLife Express.
13      A.  This first document on institutional
14  customers, I wrote directly to Mr. Friedewald as
15  the team leader of the customer service team
16  because --
17      Q.  Tell me when you -- it is Deposition
18  Exhibit No. 13.
19      A.  Okay, 13, I think.  And it is June 7th,
20  1995.
21      Q.  So this is towards the end of the --
22      A.  It is towards the end and there were some
23  concerns being expressed by some of the CMO members
24  as to how the call centers might deal with their
25  institutional customers, and I was trying to

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401106961Z

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

168

1  document and educate Dr. Friedewald as to some of
2  the things that could be used to satisfy those
3  concerns.
4     Q.  Okay.
5     A.  The next one, --
6     Q.  Which is No. 14.
7     A.  -- which is No. 14, is another document
8  because of -- I did not feel that -- well, I felt
9  that the overall systems issues associated with all
10  of the customer service and across the organization
11  were being seriously underestimated as to their
12  significance and their cost by the so-called
13  information technology team that was the one
14  responsible for doing this, and I was trying to
15  educate Dr. Friedewald on what I saw some of those
16  issues were and what I saw, based on the
17  observations of the site visits we made and -- to
18  try and give him some idea as to what the
19  technology -- level of technology really was that
20  was out there.
21     Q.  When was this document prepared?
22     A.  This is April 19th, 1995.
23     Q.  It was sort of midway through the process?
24     A.  Yes.
25     Q.  Who was on the IT team?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

169

1     A.  It was led by -- I am not sure who it was
2  led by, there was a whole separate team.  They were
3  not part of the customer service team.  It was
4  another whole MetLife Express team that was
5  functioning independently from us.
6     Q.  Okay.  Now, No. 15, a series of documents
7  addressed to Mr. Friedewald by you, May 16th of
8  '95, with a bunch of attachments.
9     A.  Yes.  One of the critical issues that
10  consensus could not be agreed upon was again how
11  was individual business going to deliver service to
12  its customers and what role should the sales
13  offices play in that activity.  This was --
14     Q.  What do you mean by that?
15     A.  There has been in the company a culture
16  that makes -- that managing officers believe that
17  all customer service should be provided by the life
18  insurance representative or by the local sales
19  office.  The reality is the sales offices are
20  ill-equipped to do that.  There is such turnover
21  and now the reduction in the size of the sales
22  force, it isn't a practical option.
23        But the company has never taken a
24  position that Teleservicing or anything else should
25  be the primary source for customer service with

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

170

1  developing a system than to support any other
2  alternatives.
3        Part of what I did in MetLife Express was
4  to do an extensive analysis of sales office
5  transactions, also trying to illustrate that the
6  service delivered by our sales offices merely as a
7  matter of process was inferior to what could be
8  delivered through Teleservicing, and that it might
9  make more sense to define sales office role as
10  being that of sales support.
11        And then there is just a ton of documents
12  in here related to that.

**CONFIDENTIAL**

13    Q.   Okay.
14    A.   And other miscellaneous MetLife Express
15    documents that I authored or put together.
16    Q.   Okay.  Deposition Exhibit No. 16 is also a
17    MetLife Express document, Teleservicing Training
18    Sub-Team.
19    A.   Yes.
20    Q.   And this happens to be dated, would it
21    appear to me, January of '96.
22    A.   That's correct.  This is a Phase 3
23    document.
24    Q.   All right.
25    A.   I was formally charged in Phase 3 at

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

171

1    determining what the training needs or some kind of
2    a plan for the call centers as they did that.
3    There was myself and Elizabeth Marr were the
4    members of that team.  We went around and made a
5    number of site visits, and based on the information
6    that she provided and the information I gathered
7    myself, I authored this document as the final
8    report.
9    Q.   Okay.  Deposition Exhibit No. 17 is what?
10    A.   These are just various -- copies of the
11    various correspondence that I had to -- or that I
12    submitted.  In other words, --
13    Q.   In what part?
14    A.   Okay.  I think these are very much August
15    14th, 1996, August 9th, 1996, June '96.  This was
16    really -- May 29th.  This was in the latter days of
17    prior to the site leader selection and there was
18    still a Phase 3 MetLife Express team and there were
19    still -- most of these people that these are
20    addressed to were Booz-Allen people, but it was
21    information being requested or whatever having to
22    do with the transition, having to do with -- well,
23    mostly the transition and things related to the
24    expansion of the four call center sites.
25    Q.   No. 18.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

172

1    A.   This is all various documents produced as
2    a part of MetLife Express.  This happens to be part
3    of the work transition plan.  I would guess some of
4    these others may have been pulled out from
5    different dates, but this is in July 1st, 1996.
6    But these are things, in essence, prepared by
7    Booz-Allen as part of the formal reports on MetLife
8    Express.
9    Q.   Okay.  So most of those are not prepared
10    by you, --
11    A.   No.
12    Q.   -- they are prepared by Booz-Allen?
13    A.   No, virtually none of these are prepared
14    by me.
15    Q.   Okay.  Exhibit 19?
16    A.   Exhibit 19, there was a separate analysis
17    done, and this is part -- in fact, I would suspect
18    that this may be duplicated in here, yes.  There
19    was -- In assessing the -- this is
20    customer-related.  In assessing or attempting to
21    evaluate what the volume of the phone calls might
22    be that would be received by the call centers,
23    there was a whole issue of how many calls would
24    be -- were currently being received in the sales
25    offices related to customer service.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

173

1    This was a document that I produced as
2  part of an analysis; some of the information came
3  from some information gathered by Jim Major or a
4  survey that he did, but most of this was stuff that
5  I put together to try and estimate how many phone
6  calls were coming from the sales offices -- or the
7  sales offices were receiving.
8    Q.  Okay.  Exhibit 20 appears to be documents
9  relating to your visits to various sites, Aurora,
10  et cetera.
11    A.  Yes.  This was -- I ended up doing the
12  most extensive documentation on site visits, and
13  this was just a record of all of our site visits
14  during Phase 2.
15    Q.  Okay.  Exhibit 21 appears to be a document
16  you prepared for Mr. Jeffrey in January of '96.
17    A.  Yes.  This was a rather elaborate and
18  extensive document.  With the four call centers,
19  there would be need -- there was a need for a
20  telecommunications traffic management center.  And
21  this is a document I prepared with some information
22  and help from my telecommunications people on what
23  needed to be considered and what they needed to do
24  to set up that traffic management center.
25    Q.  Okay.  Exhibit 22?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

174

1    A.  This appears to be a wide assortment of
2  the letters and documents I wrote trying to advance
3  the customer service and call center issues.
4    Q.  All as part of MetLife Express?
5    A.  No, this had nothing to do with MetLife
6  Express.  June '95, that -- I sent Mr. Crimmins the
7  sales office information, here's March of 1996,
8  yes, these were for the most part independent of
9  MetLife Express.  Some of these go back to 1988.
10    Q.  Okay.  Then Exhibits 23, 24 and 25, they
11  appear to be some of the summary presentation
12  documents on MetLife Express as it relates to the
13  call center organization.
14    A.  Yes.  These two were done by Booz-Allen.
15  This is based on what I wrote and what I prepared
16  to the company's corporate management office --
17    Q.  Okay.
18    A.  -- at the conclusion of Phase 2.
19    Q.  All right.  Now, let's talk about some of
20  the basic conclusions as it relates to the call
21  center in terms of the reengineering and
22  restructuring.
23    One of the fundamental decisions of the
24  customer service team was consolidate the number of
25  calls, correct?

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

175

1    A.  Yes.
2    Q.  Going from 22-some-odd calls centers down
3  to four.
4    A.  Yes.
5    Q.  Okay.  And consolidating the
6  responsibilities that were going to be handled by
7  the call center organization in those four center,
8  correct?
9    A.  Yes.
10    Q.  Now, what is a virtual call center?  What
11  does that mean to you?
12    A.  A virtual call center is essentially that

13    you could have the four sites function from -- from
14    the customer as a single call center, that you
15    could capitalize on your resources in all of the
16    call centers to make certain that calls were pooled
17    and calls were answered in the most effective and
18    efficient manner possible.
19        Q.   And was that one of the conclusions of the
20    customer service team --
21        A.   Yes.
22        Q.   Is that what ought to be done?
23        A.   Yes, it was.
24        Q.   Okay. That was a change in the way the
25    call centers had operated up to that point,

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
176

1    correct?
2        A.   "Yes" and "no." Prior to MetLife Express,
3    individual insurance was already engaged in trying
4    to make their two call centers a virtual call
5    center. I had given presentations to Frank Lynch
6    in New York and his planning board on the need to
7    do that and the technology that was going to be
8    required to do that. But the intent was that
9    Warwick and Tulsa would function as its own virtual
10    call center.
11        Q.   And then you had all these others out
12    there that were operating rather autonomously?
13        A.   At that point, this was prior to MetLife
14    Express, yes.
15        Q.   And even prior to MetLife Express,
16    although Tulsa and Warwick shared responsibilities,
17    they still were fairly autonomous call centers,
18    correct?
19        A.   Yes.
20        Q.   Okay.
21        A.   We did transfer traffic back and forth on
22    occasion.
23        Q.   But a virtual call center means more than
24    just transferring traffic?
25        A.   Yes, it does.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
177

1        Q.   Okay. It means far more in terms of the
2    integration of the operations, both certainly to
3    the customer as well as internally, it means a
4    closer knit between the call centers?
5        A.   It is mostly a technology issue. I --
6    with respect to the management, if the proper
7    technological tools are put in place, it really
8    does not impact the direct day-to-day management
9    assuming your calls are forecasted right and the
10    technology is there. All it means is that to the
11    customer, if you can answer the call faster, even
12    though it may have been originally headed for
13    Tulsa, if it can be answered faster in Warwick, it
14    would go to Warwick and be answered.
15        Q.   So from your view, it was predominantly a
16    technological issue?
17        A.   With respect to the virtual aspect, yes.
18        Q.   That's what I am talking about.
19        A.   There are a whole host of
20    management-related issues, which should exist,
21    whether they are virtual or not. In other words,
22    in terms of your consistency of policies,
23    consistency of management, consistency with respect
24    to how customers are going to be treated, what
25    transactions you are going to do, but they are not

ESQUIRE CORPORATE SERVICES

MP4011069616

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

178

1 really a problem -- they become more of an issue
2 with the virtual call center, but there are issues,
3 whether it is virtual or not.
4    Q.  Okay.  The fundamental recommendation to
5 go to four sites or to consolidate down to a
6 smaller number, whether it was four, or five or
7 three, I take it, it was a recommendation you
8 supported?
9    A.  No, it wasn't.
10    Q.  Why not?
11    A.  When Ralph Jeffrey left -- there was
12 originally supposed to be five and then two weeks
13 prior to the formal announcement, one of them was
14 knocked out.  When Ralph Jeffrey left, I sent a
15 memo to Bill Friedewald telling him that I thought
16 four sites because of the mix and because of some
17 of the issues there, they were making very, very
18 difficult management challenges and that I
19 recommended to him that they really go to six, and
20 I gave him the sites and what I felt ought to be in
21 them.
22    Q.  Okay.  Let me understand the processes.
23 At the conclusion of Phase 2 --
24    A.  Yes.
25    Q.  -- of MetLife Express, --
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

179

1    A.  Yes.
2    Q.  -- summer of '95, --
3    A.  Yes.
4    Q.  -- there was a conclusion that the number
5 of call centers ought to be consolidated.
6    A.  Yes.
7    Q.  There ought to be fewer call centers.
8    A.  Yes.
9    Q.  That fundamental premise I take it you
10 agreed with.
11    A.  Yes, I did.
12    Q.  It shouldn't be 20- --
13    A.  No.
14    Q.  -- -some-odd any more.
15    A.  (Negative head shake).
16    Q.  Okay.  At that point in time, was there a
17 number set?
18    A.  There were numbers bandied about, I don't
19 know that it was set.  And allegedly Phase 3 I
20 think was to really hone in and determine what that
21 final number should be.
22    Q.  Okay.  What was the range that was
23 discussed as part of Phase 2?
24    A.  I don't really remember.
25    Q.  Okay.  What role did you play after Phase
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

180

1 2 in setting the number in which call centers were
2 going to stay?
3    A.  After Phase 2, when I participated in
4 Phase 3, I was -- I voiced my opinions on the
5 numbers, but I didn't much care as long as Tulsa
6 was one of them.
7    Q.  And it seemed clear to you from the
8 beginning Tulsa was going to be one of them?
9    A.  That, yes, it did.  But I did not take it
10 for granted in Phase 3.
11    Q.  Okay.  When was Mr. Jeffrey placed in
12 charge of the call center organization?

CONFIDENTIAL

13    A.  I'm guessing, somewhere February-March of
14  1996, I believe.
15    Q.  Okay.  Prior to Mr. Jeffrey taking over
16  the call center organization, how was the
17  organization structured as it related to the Tulsa
18  call center?
19    A.  The Tulsa call center was still at that
20  point reporting -- it was still personal insurance
21  and it was still theoretically reporting up through
22  Barbara and that part of the organization.
23    Q.  During your absence from the call center
24  in this five-month period, --
25    A.  Yes.
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
181
1    Q.  -- who had day-to-day responsibility for
2  the call center organization in Tulsa?
3    A.  Jerri McCraw.
4    Q.  She was one of your -- she was your No. 2
5  person?
6    A.  Yes, she was.
7    Q.  What involvement did you have in sort of
8  the day-to-day operations during that period, if
9  any?
10    A.  Practically none.  She was quite competent
11  to handle most of the day-to-day activities.  I
12  would get phone calls or be involved when there
13  were major higher level issues, or whatever, but
14  not the day-to-day management.
15    Q.  Okay.  When Mr. Jeffrey took over the call
16  center organizations, that parsed out the Tulsa
17  call center, among others, and now Tulsa call
18  center reported directly to him, correct?
19    A.  Yes.
20    Q.  How did you come to know that that was the
21  new structure, and how that happened?
22    A.  I don't recall specifically, other than it
23  was understood that as part of the customer service
24  organization, they would be split out.  That was --
25  that was -- well, and so I mean I knew it from that

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
182
1  perspective.
2    Q.  Was that organizational structure
3  something you agreed with or disagreed with?
4    A.  I agreed with it in part, but I did not
5  feel -- I felt if there was going to be a customer
6  service organization, it was going to call itself a
7  customer service organization, it should assume all
8  responsibility for customer service, including what
9  we now term the back office operations.
10    Q.  So if you are going to have the
11  organization, your feeling was it didn't go far
12  enough?
13    A.  Yes.
14    Q.  Didn't bring enough components into --
15    A.  Right.
16    Q.  -- the customer service organization.
17    A.  Right.
18    Q.  Okay.  Did you know Mr. Jeffrey other than
19  having worked with him in MetLife Express?
20    A.  No, I did not.
21    Q.  That was the first chance you had had to
22  work with him?
23    A.  Yes.
24    Q.  Okay.  The same with Dr. Friedewald?
25    A.  Yes.
ESQUIRE CORPORATE SERVICES

MP401069618

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

183

1  Q.  And Mr. Jeffrey reported to Dr.
2  Friedewald?
3  A.  Yes.
4  Q.  Okay.  Dr. Friedewald is now head of the
5  customer service organization?
6  A.  Yes.
7  Q.  Okay.  As part of this restructuring and
8  consolidation of call centers, when did the company
9  actually go to the four call centers?  I mean over
10  what period of time was that transition made?
11  A.  At least through the best part of 1997, I
12  believe; I'm not sure.  For some areas, I'm not
13  sure that it is totally complete.  Now, I think it
14  is, but I don't know.
15  Q.  Okay.  When did it start?
16  A.  It was starting probably in May of 1996,
17  maybe before.
18  Q.  Okay.  When did you first become aware
19  that they were going to reevaluate post and accept
20  candidates for what became the site leader position
21  in the call centers?
22  A.  I believe when I first became aware that,
23  in essence, my job was at risk was somewhere around
24  February of 1996, in one of the MetLife Express
25  meetings when the discussion began about posting

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

184

1  for site leaders, as to how they would resolve it
2  for some locations.
3  Q.  Who was part of that conversation?
4  A.  There was a whole Phase 3 team that was
5  part of it.  It was the Teleservice and Phase 3
6  team.
7  Q.  And what was the reason given for posting
8  and working at candidates for the site leader
9  position?
10  A.  I don't really remember what the specific
11  reasons were that were stated at the time, but the
12  company did have a dilemma in some locations, in
13  that they had more than one person in charge of
14  call center operations, in Utica, New York; for
15  example, in Warwick, Rhode Island, there were two
16  separate call centers and they were going to have
17  to have some process to make a selection at those
18  locations.
19  Q.  And you say that was the first time you
20  understood your job was at risk?
21  A.  Yes.
22  Q.  Okay.  And by that you mean what?
23  A.  Well, I'll put it this way.  In other
24  words, I thought -- my initial concern was whether
25  or not Tulsa survived, and I considered my job at

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

185

1  risk as to whether or not Tulsa survived.  Once
2  we -- it became reasonably apparent that Tulsa was
3  going to survive and then that I began to suspect
4  or know that I was going to have to go through a
5  posting process to maintain my job, it was about
6  that time.
7  Q.  Other positions in the Tulsa organization
8  were posted and candidates sought as well, correct?
9  A.  Yes.
10  Q.  It wasn't just the site leader position?
11  A.  Yes.
12  Q.  Okay.

13    (Certain documents were marked Deposition
14  Exhibits 26 and 27 for identification by the
15  reporter.)
16    Q.  (BY MR. POOR)  Mr. Rayl, I am handing you
17  two sets of documents.  Deposition Exhibit No. 26
18  a three-page document, Bates stamped 65, 66 and 67,
19  Deposition Exhibit No. 27 are Bates stamped 63
20  through 75, with the exclusion of the ones I have
21  just pulled out of there.
22    A.  Okay.
23    Q.  Could you please take a moment to look at
24  those.
25    A.  Okay.
      ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
      186
1    Q.  Okay. Take a look at Deposition Exhibit
2  No. 26 first, please.
3    A.  Uh-huh.
4    Q.  Will you identify those documents for me.
5    A.  This is one copy. I believe it is the same
6  posting notice that was actually posted in our
7  office for the site leader position.
8    Q.  Okay.  What was posted, the first page or
9  all three?
10    A.  Only the first page.  These came out of
11  MetLife Express documents.
12    Q.  Okay.  So 66 and 67 are iterations that
13  led to the final posting, —
14    A.  Yes.
15    Q.  – which is the page that has been marked
16  PL-00065?

**CONFIDENTIAL**

17    A.  Yes. Yes, this is not the exact copy that
18  was posted.  I have got it.  In fact, it should
19  have been in one of those other exhibits.
20    Q.  And it is this posting or one identical to
21  it to which you responded?
22    A.  Yes.
23    Q.  Okay.
24    A.  I assume this – I assume there's no
25  changes between this and the other one.
      ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
      187
1    Q.  All right.  Do you recall when it was
2  posted?
3    A.  I believe it was posted April 5th.
4    Q.  Okay.  You then, in turn, submitted a set
5  of materials applying for that position, correct?
6    A.  Yes, I did.
7    (A certain document was marked Deposition
8  Exhibit 28 for identification by the reporter.)
9    Q.  (BY MR. POOR)  I am handing you what has
10  been marked as Deposition Exhibit No. 28.  It's a
11  set of materials produced to us, Bates stamped
12  Plaintiffs 1 through Plaintiffs 35.
13    A.  Yes.
14    Q.  It was under the heading "Site Leader
15  Posting Notice Application and Related."
16    A.  Yes.
17    Q.  And it is a series of documents, and I
18  would like your help in walking through the
19  process.
20    A.  Okay.
21    Q.  The posting went up I think you said April
22  15th.
23    A.  April 5th.
24    Q.  April 5th.  You had known prior to April
25  5th, obviously, by virtue of your involvement with
      ESQUIRE CORPORATE SERVICES

MP4011069620

188

1  MetLife Express that it was going to be posted?
2      A.  Yes.
3      Q.  That was not a particular -- seeing the
4  posting didn't come as a particular shock to you?
5      A.  No, it did not.
6      Q.  What happened next in the process?  Did
7  you talk to someone?  Did you submit the
8  application?
9      A.  I submitted the application.  I did not
10  really talk with anyone, but submitted my
11  application to our local Human Resources
12  organization.
13      Q.  All right.  Now, I have these in the order
14  in which they were produced to us, Mr. Rayl, but
15  perhaps you can help me --
16      A.  Sure.
17      Q.  -- understand what I have here.
18      A.  Okay.
19      Q.  What is Bates stamped as 15 is the actual
20  posting?
21      A.  Yes.
22      Q.  Okay.  To which you are responding,
23  correct?
24      A.  Yes.
25      Q.  Okay.  And then Bates stamped 16 --

189

1      A.  Is the application.
2      Q.  That is the form you fill out?
3      A.  Yes.
4      Q.  That has your name and stuff on it.
5  Basically, it says "See attachments"?
6      A.  Yes.
7      Q.  Now, are the attachments what has been
8  Bates stamped 001 through -14?
9      A.  Yes.
10      Q.  Okay.  So to duplicate the package that
11  you originally submitted, it would be Bates stamped
12  16 then?
13      A.  On top of --
14      Q.  On top of 1 through 14?
15      A.  Yes.
16      Q.  Okay.  So this you hand to Tulsa Human
17  Resources?
18      A.  Yes.
19      Q.  And as part of this package, you have got
20  there's some correspondence back and forth between
21  Human Resources --
22      A.  Yes.
23      Q.  -- confirming that you got it and "did you
24  get it?"
25      A.  Right.

**CONFIDENTIAL**

190

1      Q.  "Yes, we got it."
2      A.  I took no chances.
3      Q.  Okay.  To make sure it got in.
4      A.  (Affirmative head nod).
5      Q.  All right.  What happened next in the
6  process?
7      A.  The next step was I was finally notified
8  that interviews would be conducted on April 30th.
9  I met and interviewed individually with Bill
10  Friedewald; the same day I met and interviewed with
11  Ralph Jeffrey and Jim Gemas.
12      Q.  Is that in New York or was it in Tulsa?

Page  76

13    A.  It was in New York.
14    Q.  Okay.  And Tulsa was the only place you
15  are interested in, correct?
16    A.  Yes.
17    Q.  Did you meet with the three of them
18  individually or separately?
19    A.  Mr. Gemas and Mr. Jeffrey were together
20  and I met with them, and I met with Mr. Friedewald
21  separately.
22    Q.  Who came first?
23    A.  Friedewald.
24    Q.  Okay.  How long, -- and that was just you
25  and Dr. Friedewald?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

191

1    A.  Yes.
2    Q.  How long did that interview last?
3    A.  My recollection is it was somewhere around
4  50 minutes to an hour.
5    Q.  Okay.  And in general, can you tell me
6  what you covered with Dr. Friedewald?
7    A.  Not at this specific time.  He had a very
8  set -- I mean a very definite set of questions that
9  we went through, and I answered those questions.
10    Q.  Did he have a script in front of him or
11  pieces of paper, --
12    A.  My--
13    Q.  -- or does it appear just to be right?
14    A.  No, I think he had some notes that he
15  worked from.  I mean I got the distinct sense that
16  I was being asked the same questions that everybody
17  else had been asked.
18    Q.  Did you know who was in the pool of people
19  being considered at that point in time?
20    A.  I knew some of the people in the pool.  It
21  is -- my recollection at that time was that he
22  indicated to me that there was something in the
23  neighborhood of 27 internal candidates and some
24  lesser number of external candidates.
25    Q.  Did he give you the numbers three or four?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

192

1    A.  That's what I think it was that he told
2  me, yes.
3    Q.  Okay.  So at that point you knew that
4  there were both internal and external candidates
5  being considered for the site leader positions?
6    A.  The note that was also part of this
7  package was a notification that our Human Resources
8  received that the company was going to go to an
9  outside search firm, I believe it is Plaintiff's
10  20, that indicated they had contracted with an
11  outside search firm.
12    Q.  And that's a memo, or an E mail or --
13    A.  Whatever --
14    Q.  -- whatever it is, dated April 4th of
15  1996?
16    A.  Yes.
17    Q.  The date is on the bottom.
18    A.  Yes.
19    Q.  Okay.  So you knew they were looking
20  outside as well even before you met with Dr.
21  Friedewald --
22    A.  Yes.
23    Q.  -- and the group in New York?
24    A.  (Affirmative head nod).
25    Q.  You didn't know who those candidates were,

ESQUIRE CORPORATE SERVICES

MP4011069622

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
193

1  the external candidates?
2      A.  No, I did not.
3      Q.  Okay.  In the course of your conversation
4  with Dr. Friedewald, did you talk about the issue
5  of going to external candidates, whether there was
6  a need why they were going to external candidates?
7      A.  I don't know whether I did or not.
8      Q.  Okay.  Was that an issue that had been
9  discussed in any of the MetLife Express meetings
10  which you attended?
11     A.  I'm sure that there -- I mean my
12  recollection is that there was some mention
13  somewhere along the way that that was at least
14  being considered.
15     Q.  Okay.  So seeing the indication in Human
16  Resources that they were looking for external
17  candidates wasn't a complete surprise --
18     A.  No.
19     Q.  -- to you?
20     A.  (Negative head shake).
21     Q.  Okay.  When it came up in MetLife Express,
22  at least, the mention of it, did you pose an
23  objection or raise concerns over the need to do
24  that at that time?
25     A.  I really don't remember whether I voiced

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
194

1  my opinion on that subject at that time or not.  I
2  mean with the abundance of internal candidates and
3  all the alleged steps the company was taking to
4  preserve employees as a result of the downsizing,
5  whatever you want to call it, the things that
6  happened as a result of MetLife Express, I didn't
7  agree with it.
8      Q.  But my question is -- I know you didn't
9  agree with it, --
10     A.  I don't know that I voiced my opinion at
11  that time, I mean I don't know.
12     Q.  Okay.  The customer service call center
13  organization was not the only area being affected
14  by MetLife Express, --
15     A.  No.
16     Q.  -- correct?
17     A.  Right.
18     Q.  And there were in all areas of the company
19  people changing jobs, consolidating jobs, moving
20  jobs --
21     A.  Yes.
22     Q.  -- losing jobs?
23     A.  Yes.
24     Q.  Sort of the whole range, correct?
25     A.  Yes.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
195

1      Q.  Do you have any other recollection as to
2  what you and Dr. Friedewald discussed during this
3  50 minute to an hour?
4      A.  Not at the moment.  My sense was it was a
5  pleasant conversation, and I actually felt
6  reasonably good when I finished that interview.
7      Q.  Okay.  You then went to talk to Mr.
8  Jeffrey --
9      A.  Yes.
10     Q.  -- and Mr. Gemas?
11     A.  Yes.
12     Q.  What position did Mr. Gemas hold?

13    A.  He was -- had some role in the business
14  services group, Human Resources organization.
15    Q.  He had the HR liaison role --
16    A.  Yes, I believe that --
17    Q.  -- into the customer service organization?
18    A.  Yes.
19    Q.  Okay.  How long did that interview last?
20    A.  I don't -- I don't really remember.  I
21  would guess it was in the same neighborhood of an
22  hour, but I'm not sure.
23    Q.  What do you recall being said during that
24  interview?
25    A.  Not a lot.  I mean Ralph and I discussed
         ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                    196
 1  some issues, but at this moment I don't really
 2  recall the specifics of that interview.
 3    Q.  Okay.  In the job vacancy notice which you
 4  have sitting in front of you, minus Bates Stamp No.
 5  15, --
 6    A.  Uh-huh.
 7    Q.  -- under "Qualifications," it talks about
 8  "Exhibits participatory management style in
 9  current position or has capacity to adapt to new
10  techniques."
11    A.  Yes.
12    Q.  In your interviews with Dr. Friedewald and
13  then with Mr. Jeffrey and Mr. Gemas, was there a
14  conversation as to what that meant or what they
15  were looking for in that respect?
16    A.  If there was, I don't recall it, but
17  certainly my management style with my subordinates
18  is participatory, and I think any number of them
19  would attest to that.
20    Q.  Had you ever been criticized by any of
21  your superiors for lacking participatory management
22  style?
23    A.  Yes, I had been criticized for that
24  because I think they were quick to make judgments
25  that the manner in which I dealt with them or in
         ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                    197
 1  some cases the peers, I was generally pretty
 2  forthright and strong in some of the way I dealt
 3  with them and so they perceived that to be an
 4  issue, but I don't think it's supported by the
 5  people that work for me.
 6    Q.  But there were some of your superiors who
 7  at least had that perception?
 8    A.  Yes, absolutely.
 9    Q.  Was that an issue discussed in your
10  interview process?
11    A.  Not to my recollection.
12    Q.  Okay.  Following your trip to New York,
13  what was the next step that happened?
14    A.  There were a series of conference calls,
15  there was a series of other information, the
16  transition was going on.  It was somewhat business
17  as usual until Mr. Jeffrey was terminated or lost
18  his position.
19    Q.  How did you become aware of Mr. Jeffrey
20  was no longer going to be in the call center
21  organization?
22    A.  It was a result of either an individual or
23  a conference call, I think it was a conference call
24  from Dr. Friedewald, announcing that Ralph was gone
25  and that he was setting up a temporary
         ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP401106924

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

198

1  organization.
2     Q.  Who participated in that conference call?
3     A.  Typically what they were doing was there
4  were conference calls with everyone who was an
5  active -- or -- well, active manager or site leader
6  of the sites that were surviving, which was Utica,
7  Dayton, Warwick and Tulsa.  And there were two call
8  center in Warwick, PC and personal insurance, and I
9  believe there were a couple of different ones in
10  Utica.
11     Q.  Just to close the loop, --
12     A.  Sure.
13     Q.  -- Deposition Exhibit 27, which is over on
14  your right hand --
15     A.  Yes.
16     Q.  -- are some of the job descriptions you
17  produced to us or job posting notices for some of
18  the other positions in the call center
19  organization, correct?
20     A.  Yes, yes.
21     Q.  Okay.  So as I think we covered before, it
22  wasn't just your position that was being posted and
23  applications taken for; it was a number of
24  positions within the organization?
25     A.  Right.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

199

1     Q.  Okay.
2     A.  The site leader was generally, except for
3  one other job, the highest level job.
4     Q.  Right.  And you all reported to Mr.
5  Jeffrey or whatever that -- and then given to Mr.
6  St. John?
7     A.  Yes.
8     Q.  Okay.
9        (A certain document was marked Deposition
10  Exhibit 29 for identification by the reporter.)
11     Q.  (BY MR. POOR)  I am handing you as group
12  exhibit, marked as Group Exhibit No. 29.
13     A.  Yes.
14     Q.  Are the documents produced to us relating
15  to this interim site coordinator?
16     A.  Yes.
17     Q.  That we have been discussing?
18     A.  Yes.
19     Q.  Okay.  And this is now, if you will note
20  what's been Bates stamped as Bates Stamp 22, an
21  announcement to Call Center Associates, dated June
22  3rd, 1996, from Dr. Friedewald announcing that he
23  was assuming responsibility for the call center
24  organization, Mr. Jeffrey was going elsewhere.
25     A.  Yes.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

200

1     Q.  Okay.  Is that about the time you had the
2  conference call?
3     A.  Yes, it is.  This was either received the
4  same day or within a day of that call.
5     Q.  Okay.  And then there are a series of
6  documents and, in fact, Dr. Friedewald, I assume,
7  prepared this some dated June 4th, some dated June
8  10th, setting forth what is repeatedly referred to
9  as the "temporary organization."
10     A.  Yes.
11     Q.  Okay.  And announcing the interim
12  coordinators?

13    A. Yes.
14    Q. Who were the interim coordinators other
15 than you?
16    A. That's on --
17    Q. It is on page 23 or Bates stamped 23, I
18 believe.
19    A. Okay. Ed O'Day, I believe, was one of
20 the -- I believe he was at that time in charge of
21 the property and casualty call center in Utica.
22 Rosie Swisher was in charge of the property and
23 casualty call center in Dayton.
24       Patty Lager was in charge of the group
25 P&C; Kathy Schoos, who was my counterpart on the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

201

1 ILI side had withdrawn her name from consideration
2 for the call center site leader, and there was
3 myself.
4    Q. Okay. Did you come to understand why Mr.
5 Jeffrey was no longer part of the call center
6 organization?
7    A. No, I never really heard the story as to
8 what happened. I do not know to this date what
9 transpired.
10    Q. Did it come as a surprise to you that Mr.
11 Jeffrey was moved out of the organization?
12    A. It came as quite a shock. He was one of
13 the few people that had been held accountable.
14    Q. What do you mean by that?
15    A. Typically, if -- it's a personal opinion,
16 it's my opinion that MetLife in many cases when
17 they have had officers or whatever who fail to
18 perform adequately, actually take them out of the
19 position. There have been very few done that I
20 know of in my 37 years.
21    Q. I take it you perceived that Mr. Jeffrey
22 was not performing adequately?
23    A. No. I think that that was their
24 assessment of that. I had my own opinions, but,
25 no, he certainly was not performing any worse than

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

202

1 any number of other people. It was just a
2 surprise. I --
3    Q. What was your opinion in terms of the job
4 Mr. Jeffrey was doing in this relatively short
5 period?
6    A. My opinion was that Phase 2 of MetLife
7 Express developed a real concept and understanding
8 of what customer service should be and what the
9 call centers should be. As things progressed down
10 the path, things that a high value was placed on in
11 Phase 2 were succumbing to just the organizational
12 issues and pressures and I felt like Mr. Jeffrey
13 had compromised quite a number of things that we
14 had gone on, but that was not unusual. I felt to
15 the extent that as long as Tulsa survived and as
16 long as I was leading it, I could make the best out
17 of it and --
18    Q. Give me an example of what you think Mr.
19 Jeffrey was compromising as a result of these
20 organizational pressures.
21    A. We still were not dealing with some of the
22 fundamental issues as to service delivery. In other
23 words, there was marketing resistance to really
24 putting out a forthright statement that says
25 Teleservicing will become the primary customer

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP401169629

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
203
1   service vehicle. He was shying away from some of
2   those battles, if you want to call it, but I don't
3   fault him for it; I mean --
4        Q.   Just hard battles to fight in an
5   organization.
6        A.   They are very hard -- I thought that
7   MetLife Express would open the door and make a lot
8   of them easier, but it became pretty much business
9   as usual after that.
10       Q.   Still a lot of turf wars being fought?
11       A.   Well, probably more than ever.
12       Q.   Okay.  And Mr. Jeffrey didn't survive?
13       A.   He did not survive.
14       Q.   Okay.  Did you have any conversation with
15   Dr. Friedewald about who was going to succeed Mr.
16   Jeffrey?
17       A.   No.  I was not interested in the position,
18   so my only concern was announce the Tulsa site
19   leader and we had been promised that and that was
20   my concern.  I wanted to go back to my little part
21   of the world and do what I could.
22       Q.   Did you know whether Dr. Friedewald was
23   looking at internal candidates, external
24   candidates?
25       A.   I think he mentioned that he was looking
                ESQUIRE CORPORATE SERVICES
       6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
204
1   externally at some point, but I don't remember when
2   that happened.
3        Q.   And Mr. Stan St. John was hired --
4        A.   Yes.
5        Q.   -- to replace Mr. Jeffrey?
6        A.   Yes.
7        Q.   When did you become aware Mr. St. John was
8   hired?
9        A.   There was an announcement from Dr.
10   Friedewald somewhere around mid-June that Mr. St.
11   John would be coming on board July 1st, I believe.
12       Q.   Did you learn that from Dr. Friedewald in
13   a teleconference or by memo?
14       A.   There was, you know, like an E-mail, but
15   he may have also told us that in a conference call;
16   I really don't remember.
17       Q.   Mr. St. John was new to the MetLife
18   organization, correct?
19       A.   Yes, he was.
20       Q.   He came from AT&T, I believe.
21       A.   Yes.
22       Q.   And prior to joining MetLife, he had had
23   no contact with you?
24       A.   No.
25       Q.   You didn't know him from Adam, I presume?
                ESQUIRE CORPORATE SERVICES
       6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
205
1        A.   No, I did not.
2        Q.   When is the first opportunity you had to
3   talk to or communicate with Mr. St. John about the
4   call center organization, what he was -- what his
5   vision or what he was trying to do with the call
6   center organization?
7        A.   The only significant conversation dealt
8   with -- he made a series of visits to the four call
9   centers.  It was left up to those interim site
10   leaders to set up the agenda and handle his visit.
11   I believe it was two days, I don't remember the
12   exact dates, but it was mid-July.  And we prepared

CONFIDENTIAL

Page  82

13    a presentation for him in which all of my key
14    associates participated, trying to really give him
15    background and understanding of the issues
16    associated with the individual business, the call
17    centers, some of what we learned in MetLife Express
18    and mostly it was an opportunity to present our
19    vision of what we thought it should be.
20        Q.    Prior to that visit, what dealings had you
21    had with Mr. St. John?
22        A.    I think the only dealings we had were via
23    conference calls and E-mails.
24        Q.    Did he hold video teleconferences?
25        A.    I don't specifically remember any video

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

206

1    teleconferences. I wouldn't rule it out, but most
2    of them were just via telephone.
3        Q.    And who would be on the conference calls?
4        A.    All the interim site leaders.
5        Q.    So then there would be the four of you, —
6        A.    Yes.
7        Q.    — plus Mr. St. John?
8        A.    Yes. And Bill Friedewald, usually.
9        Q.    Dr. Friedewald would usually be invited?
10        A.    Yes, I think so.
11        Q.    Okay. How long would these
12    teleconferences usually last?
13        A.    I don't really remember. I don't remember
14    them being exceptional in any — I mean, you know,
15    I don't remember them dragging on for hours like
16    some of them tend to do. I mean he's — he was
17    pretty much to the point and discussed what he
18    wanted to discuss.
19        Q.    What would typically be the issues
20    discussed during these conferences?
21        A.    Gee, there was any number of transition
22    issues that we were dealing with, from staffing to
23    the type of furniture that was being ordered;
24    that's another interesting story. I mean to the
25    extent that I managed to get them to change their

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

207

1    standard on the furniture and that sort of stuff
2    for the SCSs. But there were just — there was a
3    host of transition issues that were arising that we
4    were dealing with.
5        Q.    Just sort of the nuts and bolts of
6    administrative issues of getting functions into the
7    call centers and —
8        A.    Major, but nuts and bolts, yes.
9        Q.    I didn't mean to infer they were
10    insignificant, —
11        A.    Right, right.
12        Q.    — but they were the management
13    challenges —
14        A.    What are you doing, what are your hiring
15    plans, yes.
16        Q.    Okay. How many of those did you
17    participate in prior to Mr. St. John coming out to
18    Tulsa, if you recall?
19        A.    No, I don't really recall, but it was like
20    within a couple of weeks when he came out there,
21    so — I — it couldn't have been too many.
22        Q.    Okay. Now, what was the basic agenda for
23    Mr. St. John's visit into Tulsa? What did he do?
24        A.    I have given you —
25        Q.    Just tell me what you remember.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401106962B

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
208

1     A.   Well, we tried to outline virtually many
2   of the key issues that we saw confronting the call
3   center, one of them was, not the least of which the
4   telecommunications function that was -- was being
5   sought to be controlled by the IT organization.
6   There were issues associated with the corporate 800
7   number and there were a host of issues on the
8   personal insurance side.
9          There were training issues, I mean we
10  prepared and gave him a very broad overview of what
11  we perceived were the issues that he needed to know
12  about and in many cases he needed to be prepared to
13  address at some point as a part of his
14  responsibilities.
15    Q.   During his visit, how much time did you
16  have to spend with Mr. St. John on a one-on-one
17  basis? I know, for example, you picked him up at
18  the airport, which isn't all that far from MetLife
19  offices, but --
20    A.   There were two of us at the time, Jerri
21  McCraw and I both picked him up at the airport and
22  had dinner with him that night. I don't -- I don't
23  recall that he spent any significant amount of time
24  with me one on one. It was pretty much a group
25  thing. He addressed all the customer service
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
209

1   consultants and discussed his philosophy and his
2   vision a little bit, but he did not spend any
3   significant amount of time with me, and he
4   certainly did not conduct anything that represented
5   a discussion of my philosophies or my management
6   background or skills or any of that.
7     Q.   Do you have any knowledge as to what
8   information Mr. St. John had about you during the
9   period of time that he was supervising you in terms
10  of background or information?
11    A.   No, I have no idea. But I have no reason
12  to think it should be anything but positive.
13    Q.   Okay. Did he talk about his philosophy or
14  what he was looking for in his management team,
15  during either these conference calls or --
16    A.   There were issues discussed, yes, none of
17  which posed a particular problem for me. They were
18  pretty much the standard line with respect to what
19  the overall mission was that came out of MetLife
20  Express, and I mean I just -- there just wasn't
21  really a lot of time or involvement to develop any
22  issues with him.
23    Q.   Well, what did he describe in terms of his
24  philosophy of management or, you know, what he was
25  looking, the kind of philosophy he was looking for
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
210

1   his managers to have, whether they posed a problem
2   for you or not? I mean what were the words that he
3   said?
4     A.   I don't even remember.
5     Q.   Okay. Did you have any conversation with
6   Mr. St. John about the process he was going to go
7   through to finalize the appointments to the site
8   leader?
9     A.   We had one point prior to Mr. St. John,
10  we -- "we" being the other interim site leaders --
11  asked if we would have to be reinterviewed. And
12  Dr. Friedewald had told us "no, there would not be

**CONFIDENTIAL**

13  additional interviews conducted."
14      Mr. St. John, I believe, in one of his
15  conference calls alluded to the fact that he was
16  conducting interviews, did not know whether that
17  was external, did not know whether that was people
18  that were in the original pool that perhaps he did
19  not see on his tour of visits to the call centers,
20  so I did not really know, other than everybody was
21  getting pretty anxious over when they were going to
22  make the announcement.
23      Q.   How much interaction did you have with Mr.
24  St. John between the time he was hired and your
25  conversation with him on August 20th?

1      A.   I had a substantial amount of interaction
2  in written form.  I sent him several memos, lots of
3  E-mails, trying to address some of his concerns.
4  We did -- I did, you know, have conference calls
5  with him, but considering his relatively short
6  period of time, I had a pretty fair amount of
7  interaction.  I would say he got more things in
8  writing from me than he did from the other three
9  combined.
10     Q.   Okay.  Did Mr. St. John during this couple
11  of month period express any concerns that he had to
12  you directly about what was going on in Tulsa, what
13  was going on in terms of your management of Tulsa,
14  your performance prior to the August 21st session?
15     A.   No, he did not.  He made an offhand remark
16  one time in a conference call, which I addressed in
17  writing, but he never directly spoke to me or
18  challenged my abilities or my performance.
19     Q.   This is the project management remark --
20     A.   Yes.
21     Q.   -- on the CallPath?
22     A.   Yes, it is.
23     Q.   And this was in the conference call with
24  Laurie --
25     A.   Laura Sokolski.

1      Q.   Sokolski.
2      A.   Yes.
3      (A certain document was marked Deposition
4  Exhibit 30 for identification by the reporter.)
5      Q.   (BY MR. POOR)  I am handing you what has
6  been marked Deposition Exhibit No. 30 --
7      A.   Yes.
8      Q.   -- for the purposes of identification.
9  This is the memorandum you just alluded to,
10  together with the underlying attachment, the E-mail
11  back and forth about the problem --
12     A.   Yes.
13     Q.   -- migrating to the new switch?
14     A.   Yes.
15     Q.   Okay.  And you prepared this document?
16     A.   That was after --
17     Q.   Sometime after the --
18     A.   That's right.  Because I, in the event
19  that he was going to attempt at some later date to
20  use that for -- as justification for his action, I
21  wanted a formal document, documentation of the
22  really events that transpired.
23     Q.   When did this conversation occur?
24     A.   It would appear that it was somewhere in
25  the two weeks preceding my being dismissed or

CONFIDENTIAL

MP401106963O

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
213

1  whatever.
2    Q.  I am presuming it is less than that.  I
3  mean you referred to it --
4    A.  It may be, this other --
5    Q.  -- on August 16th PROFS message, --
6    A.  Yes.
7    Q.  -- and then you had a conversation with
8  him on the 21st.
9    A.  Yes, it could well be in there.  I don't
10  -- I don't know exactly.
11    Q.  Okay.
12    A.  It was right in there, but --
13    Q.  Okay.  When did you first learn that you
14  were not going to be appointed to the site leader
15  position?
16    A.  August 22nd.
17    Q.  And you got the phone call from Mr. St.
18  John?
19    A.  Yes.
20    Q.  Okay.  He called you?
21    A.  Yes, he did.
22    Q.  Okay.  And that was about a week or so
23  after he had previously indicated the announcement
24  would be made?
25    A.  Yes.
        ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
214

1    Q.  He said I can't remember, it was the 12th
2  or 15th, and this was now the 22nd?
3    A.  Right.
4    Q.  Okay.  And this was a phone call?
5    A.  Yes, it was.
6    Q.  Okay.  As best you can recall for me,                    **CONFIDENTIAL**
7  please, what did he say to you and what did you say
8  to him?
9    A.  That conversation is documented somewhere.
10    Q.  I know you have notes; I am asking for
11  your recollection as you sit here today.  I want to
12  know what you recall him saying to you and what you
13  recall saying to him.
14    A.  He discussed the fact that he felt I did
15  not speak up on the conference calls, and in which
16  case -- which I found it very frustrating; in other
17  words, to try and discuss some of the issues with
18  the other interim site coordinators on a conference
19  call, but --
20    Q.  Let me stop you for a minute, Mr. Rayl.
21    A.  Okay.
22    Q.  Because I -- well, come to sort of what
23  you think about all of this.
24    A.  All right, fine.
25    Q.  What I am really interested in is the
        ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
215

1  phone rings, you pick it up, and you say "hello,
2  Jim Rayl."
3    A.  Okay.
4    Q.  The voice on the other end says, "Hi Jim,
5  this is Stan."
6    A.  And something to the effect that he wanted
7  to let me know that I was not being selected as the
8  site leader; that he had issues with my management
9  style or whatever; that he felt I was too much of a
10  -- quote -- strategic thinker for the position and
11  that he was -- he felt for whatever reason that, as
12  I recall, I lacked team-building skills or

13  whatever.
14     Q.  What do you recall saying to him?
15     A.  I recall saying to him that I disagreed
16  with his assessment; that I think what I had
17  accomplished and what the call center – where it
18  was and how well it was performing was a pretty
19  profound statement as to how well or how effective
20  I was as a manager.
21        It seemed to me that, if anything,
22  Teleservicing needed some strategic thinking, if
23  there was anything lacking in the company, it was
24  strategic thinking, and that I recall that I said
25  I – I think I said I wish him luck.

216

1     Q.  When you were talking about the need for
2  strategic thinking, what did you mean by that term?
3     A.  I mean in that term somebody who will be
4  proactive as opposed to reactive in trying to get
5  call center customer company issues surfaced and
6  addressed.
7     Q.  Okay.  Did Mr. St. John explain to you
8  what he meant by that term?
9     A.  No, he did not.
10    Q.  Okay.  And it was during this conversation
11  that Mr. St. John expressed dissatisfaction with
12  how you handled the conference calls, I take it.
13    A.  Well, his comment was something to the
14  effect that he really thought I should speak up
15  more in the conference calls, and which I told him,
16  there was no absence of his getting my opinions and
17  input in writing, which I – he had a lot of.
18    Q.  Did Mr. St. John indicate to you that he
19  felt it was a problem that you didn't speak up in
20  the conference calls and then sent your thoughts in
21  writing?  Did he tie the two together?
22    A.  He may have.  He may have – I think he
23  may have made some comment to that effect; I don't
24  know.
25    Q.  Okay.  And it would be accurate, would it

217

1  not, that you did send – I think you already told
2  me this, you did send Mr. St. John a lot of
3  E-mails, memoranda, letters?
4     A.  Yes, most of which he either said he
5  appreciated, or thanked me for or whatever.
6     Q.  How long did this conversation last?
7     A.  Probably no more than five minutes.
8     Q.  To your knowledge, was anyone else on the
9  phone?
10    A.  Not to my knowledge.
11    Q.  Okay.  Did you record the conversation in
12  any way, other than perhaps taking down notes?
13    A.  No, I did not.
14    Q.  Okay.
15       MR. POOR:  Let me take a short break.
16       (Brief recess.)
17    Q.  (BY MR. POOR)  Following this conversation
18  with Mr. St. John on the 22nd, –
19    A.  Yes.
20    Q.  – what did you do then?  What was the
21  next thing that happened?
22    A.  I believe I sent an E-mail to Mr. St.
23  John, and I may have told him during the call, I
24  don't know, but I sent him an E-mail telling him
25  that inasmuch as I was not going to be a part of

CONFIDENTIAL

MP4011069632

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
218

1 the organization, I would depart as quickly as I
2 could. I was going to take two or three days to
3 get my things together and I then proceeded to take
4 vacation.
5     (Certain documents were marked Deposition
6 Exhibits 31 and 32 for identification by the
7 reporter.)
8     Q. (BY MR. POOR) I am handing you what has
9 been marked as Deposition Exhibit No. 31. Is
10 that --
11     A. Oh, okay.
12     Q. -- a copy of the E-mail?
13     A. Well, I said what I did --
14     Q. This is a typed-out version.
15     A. No, I must have faxed it as opposed to
16 being an E-mail, but yes, that is a copy of what I
17 sent to him, and it must not have been August --
18 August 22nd must have been the last day I was
19 there.
20     Q. I thought the conversation was on August
21 20th, to be honest with you.
22     A. That probably makes sense, and the 22nd
23 maybe was the last day I was there or something
24 like that.
25     Q. Okay. In the conversations, did Mr. St.
        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
219

1 John ask you to continue in the role as interim
2 site coordinator?
3     A. Yes, he did.
4     Q. Okay. And you responded with this --
5     A. Yes.
6     Q. -- what is Deposition Exhibit No. 31. And
7 you copied Dr. Friedewald?
8     A. Yes, I did.
9     Q. All right. Now, on, I believe, the same
10 day there is also an E-mail that you sent Mr. St.
11 John about a coordinator's conference call,
12 something --
13     A. Yes.
14     Q. I am handing you what has been marked as
15 Deposition Exhibit No. 32.
16     A. Yes.
17     Q. What was that issue?
18     A. Apparently, he left me a voice mail and
19 indicated there was the phone call that was to take
20 place of which I had no knowledge, but that I was
21 not going to participate after -- and I have
22 expressed here pretty much what I felt.
23     Q. Okay. And you copied Dr. Friedewald?
24     A. Yes, I did.
25     (A certain document was marked Deposition

**CONFIDENTIAL**

        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
220

1 Exhibit 33 for identification by the reporter.)
2     Q. (BY MR. POOR) Now, you mentioned earlier
3 that you had kept a record or made notes about your
4 conversation --
5     A. Yes.
6     Q. -- with Mr. St. John on the 20th.
7     A. Yes.
8     Q. I am handing you what has been marked as
9 Deposition Exhibit No. 33. Is that the record that
10 you were referring to previously?
11     A. Yes.
12     Q. And you prepared that on or about August

13  26th? At least that's the date --
14      A.  Yes, that would be the date I did it.
15      Q.  Did you have any further conversations
16  with Mr. St. John about his decision, why he made
17  the decision, why he hired Miss Hemenway?
18      A.  No, I did not.  It was obvious to me.
19      Q.  What was obvious to you?
20      A.  That he wanted someone else in the
21  position with whom he had worked, in spite of what
22  I had done and my accomplishments and my
23  contributions.
24      Q.  And that certainly seems to be what
25  happened here, he had worked with Miss Hemenway --
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                    221
1       A.  Yes.
2       Q.  -- at AT&T?
3       A.  (Affirmative head nod).
4       Q.  Did you form any belief as to why he
5   wanted someone like Miss Hemenway in the
6   organization?
7       A.  No, because I considered what he had done
8   to be an absolute violation of company policy.
9       Q.  Put aside what -- a violation of company
10  policy, we are going to talk about that in depth.
11  My question was did you form any opinion as to why
12  he would want Miss Hemenway in that position?
13      A.  No.
14      Q.  Okay.
15          (A certain document was marked Deposition
16  Exhibit 34 for identification by the reporter.)
17      Q.  (BY MR. POOR)  I am handing you what has
18  been marked Deposition Exhibit No. 34, Bates
19  stamped 48 through 50, --
20      A.  Uh-huh.
21      Q.  -- that's the announcement, is it not, of
22  the --
23      A.  Yes, it is.
24      Q.  -- call center?
25      A.  Yes, it is.
          ESQUIRE CORPORATE SERVICES
   6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                    222
1       Q.  And in Dayton, Miss Swisher became the
2   call center site leader?
3       A.  Right.
4       Q.  And she had been the interim site leader
5   in Dayton prior to that, --
6       A.  Yes.
7       Q.  -- correct?  The announcement of Miss
8   Hemenway in Tulsa.  In Utica, a Mario LaPolla --
9       A.  Yes.
10      Q.  -- came from MetraHealth?
11      A.  Yes.
12      Q.  Which at that time was not a MetLife
13  Company, correct?
14      A.  At that time, I'm not sure what MetLife's
15  affiliation was with MetraHealth.  I thought they
16  had an interest in it until it now became United
17  HealthCare, which I don't think we have an interest
18  in, but I don't know.
19      Q.  So at some point it was transitioned away
20  from MetLife into --
21      A.  Right, right.  And that was -- it was
22  transitioned away in the creation of MetraHealth.
23  But I thought MetLife still had an ownership
24  interest.
25      Q.  Okay.  Who had been the interim site
          ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

223

1 leader there?

2     A.   I believe that was Ed O'Day.

3     Q.   Okay.

4     A.   Who was appointed the implementation

5 director.

6     Q.   Implementation director.  And Mr. LaPolla

7 came from outside at least the prior call center

8 organization --

9     A.   Yes.

10    Q.   -- if not MetLife itself?

11    A.   Yes.

12    Q.   Okay.  And then Patty Lager had been

13 interim site leader in Warwick?

14    A.   Yes.

15    Q.   Okay.  Now, following that you packed up

16 and took vacation?

17    A.   Yes.

18    Q.   Okay.  When did you start your position as

19 director -- I'm sorry, I have now forgotten.

20    A.   It is the director of Planning,

21 Development & Inforce Management.

22    Q.   Inforce Management.

23    A.   That I am not sure when that job became

24 formalized.  I would say it was probably not until

25 the beginning of -- it was either late 1996 or

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

224

1 early 1997. The position did not exist, it was one

2 for which I had to post subsequent to my dismissal

3 from the call center operation, but approximately

4 two, two to two-and-a-half weeks after I departed

5 and was sitting at home, I received a call from

6 Barbara Gardner, who basically indicated that she

7 would like me to come into the office and work to

8 support her operation, even though I had no formal

9 position in the company.

10    Q.   Okay.  Now, how much vacation did you have

11 as of August 20th or 21st?

12    A.   I had at least 120 days at that time.

13    Q.   Okay.  So you left the position of interim

14 site coordinator?

15    A.   Right, right.

16    Q.   And went on vacation.

17    A.   Right.

18    Q.   And it was during the course of the time

19 while you were at home drawing vacation pay or I

20 guess it would just be the same salary, correct?

21    A.   Right.

22    Q.   You get a call from Ms. Gardner?

23    A.   Yes.

24    Q.   Okay.  Asking you to come in and perform

25 some special projects or something?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

225

1     A.   Yes.

2     Q.   Okay.  Now, at what point in this process

3 did the inforce management position, were those

4 discussions had with you?

5     A.   One of the discussions was originally held

6 with me somewhere around August 14th, when Rich

7 Anderson was visiting Tulsa and the individual

8 business organization or ILI was in the process of

9 trying to reorganize, partly because of having the

10 call center taken away, partly to achieve some

11 consistency with Warwick, and at that time Rich

12 spoke with me and indicated that this position was

13  going to be created and he wanted to know if I was
14  interested in it.
15      Q.  And at that time I think you told him you
16  would think about it.
17      A.  Yes.
18      Q.  Okay.  And then the next contact was a
19  couple weeks later when Barbara called you to come
20  in and do some special projects?
21      A.  Yes.
22      Q.  Which I take it you did.
23      A.  Yes.  I don't remember the exact time
24  frame in which that job wound up being formally
25  posted, and I applied for it.  I want to think it

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

226

1  was like October, but I don't remember for sure.
2      Q.  Okay.  And then you moved into what became
3  the director of inforce management position?
4      A.  Yes.
5      Q.  And what does that job entail?
6      A.  At -- there was a transition issue that
7  took place with respect to the procedural
8  development for the call center.  It was not
9  originally envisioned to encompass that activity,
10  and somewhere in all of that it was agreed that the
11  -- quote -- business unit would assume that
12  responsibility and it was included in that
13  organization.
14      Q.  What function is that?
15      A.  All the procedural development writing for
16  the customer service representatives in the call
17  center.  There was also a piece of the training
18  organization for individual business, was in that
19  organization.  There was the budget and expense
20  area was included in that organization, and that
21  was created, in essence, one-half of that
22  organization, with its own manager.
23          The other half of the organization was
24  what is known as the inforce management, which has
25  been kind of an evolving company project related to

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

227

1  maintaining our inforce business and conservation
2  and things like that, with its own manager.
3      Q.  Are there other directors of inforce
4  management in the company?
5      A.  I think there is one other in Warwick,
6  yes.
7      Q.  Okay.  To whom do you report?
8      A.  I did report to Barbara during that period
9  of time.  I now report to -- in December-January of
10  1997, Barbara became an agency vice president and
11  was moved to our marketing organization.  At that
12  time for a year, another director in the building
13  who had moved there from our Little Rock
14  organization and myself co-shared responsibility
15  for managing individual business there while they
16  went -- while they sought a replacement for
17  Barbara, and that was just resolved like November
18  of '97.
19      Q.  Okay.  Was that position posted?
20      A.  No, it was not.
21      Q.  That position reports to Mr. Anderson?
22      A.  Yes, it does.
23      Q.  Did you have any conversations with Mr.
24  Anderson about that position and who was going to
25  fill it, whether you would be considered?

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MF401069636

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

228

1    A.  I did have a conversation. I don't exactly
2  remember when, I mean it -- there probably is
3  documentation there as to when he advised me that I
4  would not be considered a candidate for that
5  position.
6    Q.  Did you ask him to consider you as a
7  candidate for the position?
8    A.  Yes. And I felt that it was highly
9  inappropriate that I wasn't considered for the
10  position.
11    Q.  And why was it inappropriate?
12    A.  Because it was a natural progression, my
13  peer, Kathy Schoos in Warwick, had moved on to that
14  position. I was the only person left in that
15  office that had been there since its creation in
16  1973. I had the knowledge; I had demonstrated
17  certainly the abilities and I was fully capable of
18  handling that job.
19    Q.  Did Mr. Anderson tell you why he was not
20  going to give you that position?
21    A.  I don't remember his specific response,
22  other than he wanted to take his time, and there
23  was a general move in the company or a shift in the
24  past year-and-a-half to bring in a lot of outside
25  people. So I assume that had part of it to do with

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

229

1  that, but --
2    Q.  In all areas, not just Tulsa?
3    A.  Well, mostly at the corporate level, yes.
4    Q.  Okay. And who got that position?
5    A.  Sharon Condello came here from Emeritus.
6    Q.  I'm sorry?
7    A.  She came here from Emeritus Life in
8  Nebraska.
9    Q.  And is that to whom you currently report?
10    A.  Yes, it is.
11    Q.  Now, during this '96-'97 time period, did
12  you ever cease being a MetLife employee?
13    A.  In -- from my perspective, I didn't have a
14  job; I did not have a formal job title, and I
15  considered -- I considered myself, one, to have
16  been dismissed from the position and, secondly,
17  what has happened is that even if they were going
18  to terminate me, they would have given me some
19  period of time to seek other employment, so I was
20  never certain what was going to happen, but from my
21  own state of mind, I had no job.
22    Q.  But you were not terminated as an employee
23  of MetLife?
24    A.  In the technical sense of the word, I was
25  not terminated.

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

230

1    Q.  Okay. You went through a period of time
2  where you did not have a job assignment, correct?
3    A.  I did not have a formal position within
4  the company, --
5    Q.  Okay.
6    A.  -- yes.
7    Q.  Until the inforce, director of inforce
8  manager --
9    A.  Yes.
10    Q.  -- position evolved?
11    A.  Yes.
12    Q.  What is the job of director of inforce

13   management?  What do you do?
14      A.  I manage those two areas that I just
15   mentioned to you.
16      Q.  "Conservation" being --
17      A.  It has been a wide variety of initiatives
18   dealing with efforts to stop replacement of our
19   business by other companies, to conserve assets by
20   calling customers who have indicated they wish to
21   cash surrender their life insurance policies or
22   annuities; it has just been a whole revolving
23   series of programs.
24      Q.  Do you have people reporting to you?
25      A.  Yes, I do.
              ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                         231
1       Q.  How many people report to you?
2       A.  I have two subordinate managers and I
3    think the number is probably somewhere around 45 to
4    50 people.
5       Q.  And those people process, are they
6    clerical types or are they --
7       A.  No.
8       Q.  -- professional types or are they --
9       A.  The inforce management consists of some
10   basic what, if you want to call it, clerical-type,
11   phone-type work, --
12      Q.  All right.
13      A.  -- but also a lot of analysts and staff

**CONFIDENTIAL**

14   and we are doing an awful lot of analysis relative
15   to the conservation replacement.  The procedural
16   development area is certainly analysts.  One of the
17   other areas that I failed to mention was, in
18   essence, something that we developed and which I
19   called technology support services, where we have,
20   on our own, embarked on some initiatives to enhance
21   the utilization of Lotus Notes and revamp our
22   entire procedural documentation process.
23      Q.  Okay.  Now, you received a performance
24   review in the inforce management from Mr. Anderson;
25   is that correct?
              ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE.100,NORCROSS,GA 888-486-4044
                         232
1       A.  That's correct.
2       Q.  Let me see if I can find it.
3           MR. POOR:  Why don't we go off the record
4    for a second.
5           (Certain documents were marked Deposition
6    Exhibits 35 and 36 for identification by the
7    reporter.)
8       Q.  (BY MR. POOR)  What was the review that
9    you received from Mr. Anderson for your 1997
10   performance?
11      A.  "Generally effective."
12      Q.  There are issues you had with it, I
13   presume.
14      A.  Yes, there was.
15      Q.  What were the issues you had with the
16   review?
17      A.  Primarily, that I felt Mr. Anderson was
18   reacting to feedback that he was probably receiving
19   from Mr. St. John, and the fact that during the
20   course of the year some of the problems that he
21   alluded to I felt were in part due to the failure
22   on his part to fill the job in the office.
23          He had provided very little direction or
24   support in the course of the year to us and the
25   fact that he was holding me accountable for pieces
              ESQUIRE CORPORATE SERVICES

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

233

1  of the organization that I had no responsibility
2  for.
3      Q.  I am handing you what has been marked as
4  Deposition Exhibit No. 35. Is that your response
5  to Mr. Anderson's performance review?
6      A.  Yes, it is.
7      Q.  Okay. And there is a reference in there
8  to the communication issue.
9      A.  Yes.
10     Q.  With Ms. Hornsby.
11     A.  Yes.
12     Q.  I am handing you what is marked Deposition
13  Exhibit 36, which are a series of E-mails. Do you
14  want to take a second and look at those?
15     A.  Yes.
16     Q.  As soon as your attorney finishes looking
17  at it just let me know.
18         MR. POOR:  Oh, are you set?
19         MR. RAYL:  (Affirmative head nod).
20         MR. POOR:  Okay.
21     Q.  (BY MR. POOR)  The exchange of
22  communications, your words in your performance
23  appraisal, and she discusses a valid developmental
24  issue. Is that the series --
25     A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

234

1      Q.  -- of E-mails we are talking about?
2      A.  Yes, it is.
3      Q.  And did you and Mr. Anderson go over, you
4  know, that particular issue, in the context of your
5  performance review?
6      A.  Yes, we did. I don't really think he
7  understood other than the fact that Miss Hemenway
8  chose to elevate it to Mr. St. John, who chose to
9  make an issue out of it with Rich and he never
10  attempted to discuss what the real situation was
11  here that led to the exchange of communications,
12  but my frustration showed in the communication, and
13  I was willing to accept responsibility for that,
14  because I found it is hardly justification for
15  lowering an performance evaluation for the entire
16  year considering some of the other accomplishments
17  that had been done.
18     Q.  Okay. But I take it that one of the
19  criticisms that Mr. Anderson had dealt with the way
20  in which you communicated with Ms. Hornsby, the
21  tone, the manner in which --
22     A.  He did not specifically single out the
23  tone of the communication. I don't think the issue
24  was with Miss Hornsby, at least, if it was, he
25  never mentioned that, he just mentioned in general

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

235

1  that this had, in essence, made Stan irate and that
2  he really approached it from that standpoint, that
3  it allegedly had upset some people.
4         But if Theresa had more of a problem with
5  it, she could have spoken to me directly as we are
6  in the same office, or her director, Jim Judd could
7  have spoken to me. I was trying to make a point
8  relative to the problem some of the people under
9  her management were creating and that she needed to
10  address.
11     Q.  And you agreed with Rich that the point
12  could have been made perhaps differently?

CONFIDENTIAL

13    A. Yes, I did.
14    Q. Okay. Other than the one sort of fleeting
15  conversation you have told me about with Rich
16  Anderson about not being considered for the vacated
17  Barbara Gardner position, did you have any other
18  conversations about what the process was, why you
19  were or were not going to be picked for the
20  position, why Miss Condello was or was not picked?
21    A. I don't know whether there was any further
22  discussion of it when Rich made the announcement or
23  not. I mean I did not like it, but I don't recall
24  having attempted to pursue it with Rich or with
25  within the company, I didn't see any point in that.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

236

1    Q. Okay.
2    A. As evidenced, I chose to pursue it with
3  the EEOC.
4    Q. And there was an operations manager
5  position posted –
6    A. Yes.
7    Q. -- during this time period in '97?
8    A. '96.
9    Q. Okay. Who had held that position?
10    A. It was a new position as was a new
11  regional director of Human Resources; the only
12  difference there was I couldn't get ahold of the
13  original posting notice for that. But I felt the
14  manner in which those were being administered were
15  not consistent with company policy, --
16    Q. Okay.
17    A. -- since I was excluded from being
18  considered.
19    Q. For either position?
20    A. For either position.
21    Q. With whom did you speak about – Both
22  positions were posted?
23    A. They were not posted openly; they were
24  posted within those organizations, even though they
25  were in the Tulsa office; they were not posted in

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

237

1  the Tulsa office, and made available to Tulsa
2  employees; they were only made available to people
3  in either the IT organization or the Human
4  Resources organization.
5    Q. Okay. The Tulsa office at one point in
6  time was all one organization.
7    A. Yes, it was.
8    Q. Now, it's multiple organizations in the
9  same building.
10    A. Yes, it is.
11    Q. So, for example, the Teleservicing area
12  goes in one – it's in one organization, Ms.
13  Gardner is in a different organization, you are in
14  a different organization.
15    A. Human Resources --
16    Q. Human Resources is in a different
17  organization, so it is much more bulkanized now
18  than it was a few years ago.
19    A. Yes.
20    Q. And how long did you report to Ms. Gardner
21  this '96-'97 time period?
22    A. Until just the end of '96, and the
23  beginning of '97, she took on her new position.
24    Q. Okay. So for a very limited period of
25  time?

ESQUIRE CORPORATE SERVICES

MP401106964O

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

238

1    A.  Yes, right.
2    Q.  And the operations manager and the
3  regional director?
4    A.  Human Resources director.
5    Q.  Human Resources, were posted within those
6  organizations?
7    A.  Yes.
8    Q.  And people outside of those organizations
9  were not allowed to apply for --
10    A.  Yes.
11    Q.  -- that position?
12    A.  (Affirmative head nod).
13    Q.  Not just Jim Rayl, but anyone outside --
14    A.  Right.
15    Q.  -- the organization?
16    A.  Right.
17    Q.  So in that respect, you were not singled
18  out for those positions just --
19    A.  No, I was not.
20    Q.  Okay.  And what particular policy,
21  practice, contract do you believe was violated by
22  that?
23    A.  By the general company policy that said
24  that any employee who would be impacted as a result
25  of MetLife Express would be considered for all

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

239

1  openings.  There's a variety of the company
2  documentation on the policy basically that says all
3  qualified candidates for a position should be
4  considered.
5        There was a special memo in the program
6  from Anne Hayden in June of 1996 that dealt
7  specifically with the MetLife Express, and the
8  displaced employees as a result of that that
9  outlined the type of consideration they were
10  supposed to receive.
11    Q.  Okay.  Now, your complaint in this matter
12  challenges, and let me make a list of the personnel
13  items --
14    A.  Sure.
15    Q.  -- at issue.  One is your failure to get
16  the site leader position in the '96 time period,
17  correct?
18    A.  Yes.
19    Q.  Okay.  One is that you have just told me
20  the failure to be able to be considered for the
21  operations manager and regional director.
22    A.  Yes.
23    Q.  In HR.  One is the failure to be given the
24  Ms. Gardner position, --
25    A.  Yes..

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

240

1    Q.  -- which was -- what was the title?  I'm
2  sorry, the title of that?
3    A.  Operations vice president or operations
4  officer would probably be more appropriate.
5    Q.  Okay.  In the '97 time period?
6    A.  Yes.
7    Q.  She left in --
8    A.  Yes.
9    Q.  -- at the end, --
10    A.  Right.
11    Q.  -- and Miss Condello --
12    A.  That's right.

13   Q.  -- came in '97.
14   A.  (Affirmative head nod).
15   Q.  Okay.  Anything else?
16   A.  With respect to just the positions, that's
17   the positions.  Yes, there's a number of other
18   aspects of the complaint.
19   Q.  We will go through the complaint --
20   A.  Okay, fine.
21   Q.  -- here.  I am now talking about
22   employment transactions, in terms of job movement,
23   lack of job movement, promotions, demotions, --
24   A.  Right.
25   Q.  -- discreet job actions  --

    ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                    241

1   A.  Okay.
2   Q.  -- as opposed to treatment.
3   A.  Right.
4   Q.  And we are going to come to the treatment
5   area in a minute.
6   A.  Okay.
7   Q.  Have I appropriately summarized the job
8   actions at issue in this case?
9   A.  Yes.
10   Q.  Okay.  And I also want to characterize
11   what the issues are as it related to these
12   particular job actions.
13       The operations manager, regional director
14   of HR position, that is an allegation that MetLife
15   violated its policies, procedures, it's in your
16   terms contract --
17   A.  Yes.
18   Q.  -- with you, among others?
19   A.  Yes.
20   Q.  Okay.  And the site leader position, I
21   know there are breach of contract allegations --
22   A.  Right.
23   Q.  -- with regard to all four of these
24   positions?
25   A.  Right.

                **CONFIDENTIAL**

    ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                    242

1   Q.  The operations manager and regional direct
2   I singled out --
3   A.  Yes.
4   Q.  -- because that is the issue with those
5   positions, correct?
6   A.  Right.
7   Q.  Let's talk about the site leader
8   position.  In Count 1 of your complaint you allege
9   that you were relieved of your duties because of
10   your actions by which you obtained the status of --
11   quote -- whistle blower -- close quote.  Are you
12   familiar with the allegation?
13   A.  Yes.
14   Q.  Okay.  I am going to do this a little
15   backwards than I normally would do it.  Let's put
16   aside the actions you took, we are going to cover
17   in a minute what you did, I know you have got
18   allegations about churning and AP --
19   A.  Yes.
20   Q.  -- and vanishing premiums.  We will get
21   into that here in a second.  What is it that leads
22   you to believe that whatever actions you took in
23   that respect played a role in the decision made to
24   not to give you this permanent site leader
25   position?

    ESQUIRE CORPORATE SERVICES

MF401106 9642

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

243

1    A.  It was my sense that my outspokenness on
2  those issues may have played a part and been a
3  reason why they did not want me in a position where
4  I would continue to have access and have -- and
5  be -- continue to be an advocate on those kinds of
6  issues because of the -- what you are exposed to in
7  the call center.
8    Q.  You had held the call center position for
9  about ten years?
10    A.  Yes.
11    Q.  And during that ten-year period, and again
12  we are going to go through this here in a bit, you
13  had been involved in those issues over that --
14    A.  Yes.
15    Q.  -- I mean not all of the ten-year period,
16  but certainly a substantial period, --
17    A.  Yes.
18    Q.  -- right?
19    A.  (Affirmative head nod).
20    Q.  In 1990 -- do you know who made the
21  decision not to appoint you as site leader?
22    A.  With certainty, no, I do not.
23    Q.  Okay.  Certainly, it's your belief that
24  Mr. St. John played a role?
25    A.  Yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

244

1    Q.  If not the final role, certainly a key
2  role in it?
3    A.  Yes.
4    Q.  And do you have a belief as to the role
5  played by Dr. Friedewald and/or Mr. Gemas?
6    A.  No.  I don't -- I don't know.  I mean
7  there was -- it goes beyond there, there was a
8  potential that Jack Moynihan played a role in
9  that.  It seemed as though employees from
10  individual business were systematically eliminated
11  throughout the company in some of their positions
12  for which they would have normally been logical
13  candidates.  But that's supposition and theory.
14    Q.  Okay.  From personal knowledge, you don't
15  know --
16    A.  From personal knowledge, no, I do not.
17    Q.  -- who was involved in the decision, other
18  than perhaps Mr. St. John?
19    A.  No, I do not.
20    Q.  Did Mr. St. John say anything to you in
21  any way, shape or form about any actions you had
22  taken on public policy issues?
23    A.  Since I considered the reasons he gave me
24  to be a total fabrication to begin with, I did
25  not -- he did not say anything and I did not

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

245

1  consider that to be a justifiable basis for the
2  decision.
3    Q.  I am not now asking you whether you agree
4  or disagree --
5    A.  Fine.
6    Q.  -- with the basis of the decision, Mr.
7  Rayl.
8    A.  Okay.
9    Q.  We will all work under the assumption that
10  you don't agree, okay?
11    A.  Right, okay.
12    Q.  My questions now are different.

13     A.   Okay.

14     Q.   Did Mr. St. John say -- I will work on the
15 assumption because you don't believe the reasons he
16 gave you, there must be something else at work.

17     A.   Fine.

18     Q.   Okay?  Is that a fair assumption?

19     A.   That's fair.

20     Q.   So you don't have to tell me that any
21 more, we will work on that assumption.

22          My questions now are a little different,
23 because what I am trying to find out is whether
24 anything affirmatively was done or said or
25 communicated to you that leads you to that belief

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

246

1 other than the fact that you didn't get the
2 position that you thought you should have gotten
3 and didn't agree with the reasons given to you.
4 Okay. Do you understand what I am asking you now?

5     A.   Okay. I think so. There was a -- there
6 was a situation where I was called to the New York
7 law department to discuss some of the material or
8 one memo in particular that I had written, and so
9 in trying to assess the situation, it seemed
10 logical to me that perhaps it played a role in
11 there somewhere, but, no, I don't know, nobody
12 specifically told me that.

13     Q.   Okay. When did that meeting occur?

14     A.   I believe it was in January of '96.

15     Q.   Okay. I would like to move back to Mr.
16 St. John --

17     A.   Okay.

18     Q.   -- for a moment, if I could. That meeting
19 occurred before Mr. St. John joined --

20     A.   Yes.

21     Q.   -- MetLife?

22     A.   (Affirmative head nod).

23     Q.   Okay. During your tenure with Mr. St.
24 John, albeit a short one, I take it he did not say
25 or do anything specifically on this issue of --

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

247

1 I'll use the term "public policy" for shorthand,
2 meaning your allegations in this case that you are
3 raising issues of churning and accelerated
4 premiums, vanishing premiums --

5     A.   Yes.

6     Q.   -- et cetera? Can we use that for
7 shorthand purposes?

8     A.   Yes.

9     Q.   Okay. I take it Mr. St. John did not say
10 anything to you one way or the other about public
11 policy issues you were raising; is that a fair
12 statement?

13     A.   That's a fair statement.

14     Q.   Okay. The same question for Dr.
15 Friedewald, during your dealings with him, is it
16 fair to say that during Met Express public policy
17 issues and how the company should respond to them
18 on the customer service side of it came up from
19 various points in time --

20     A.   Yes.

21     Q.   -- during that process?

22     A.   Yes.

23     Q.   By not just you, but by others on the team
24 as well?

25     A.   I was probably the primary spokesperson

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP401069644

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
248

1  because most of the other team members did not come
2  from an area where they would have really
3  experienced it, other than to the extent that the
4  impact, the publicity and what the company went
5  through, the tremendous impact that it had on the
6  company.
7      Q.  The allegations and the cases and the
8  publicity were not hidden from anybody, correct?
9      A.  No, they were not.
10     Q.  The people on the customer service team,
11  everyone knew this was a big issue --
12     A.  Yes.
13     Q.  -- the company had to deal with, correct?
14     A.  Yes.
15     Q.  During those meetings, did Dr. Friedewald
16  ever criticize you on the way you were raising
17  those issues or talking about those issues, did he
18  dissuade you from raising those issues?
19     A.  Not to my knowledge.
20     Q.  Okay.  Did he ever do or say anything that
21  led you to believe that he was unhappy with you for
22  having raised those issues or talked about those
23  issues as part of Met Express?
24     A.  Not that I remember.
25     Q.  Okay.  Did Dr. Friedewald during his Met

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
249

1  Express process and even subsequently during the
2  period of time you were in his organization ever
3  appear to be supportive of trying to get those
4  issues resolved and dealing with them in the
5  customer service organization?
6      A.  I did not -- I did not see him take any
7  measures or I do not recall him taking any measures
8  that I would term to be particularly supportive of
9  dealing with him, either.
10     Q.  Okay.  So it didn't appear he was neither
11  hostile nor enthusiastic on the issues, I mean one
12  way or the other?
13     A.  Right.
14     Q.  Okay.  Did Dr. Friedewald ever do or say
15  anything that leads you to the belief that your
16  advocacy on the public policy issue was a factor in
17  the decision not to put you in the site leader
18  position?
19     A.  No, I can't say that -- that, other than
20  the extent to which he offered me no reason, and so
21  I don't know what his motivations were or what
22  conversations he may have had.
23     Q.  Okay.  How about the same answer for Mr.
24  Gemas?
25     A.  Yes, he's -- he was a non-entity in the

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
250

1  whole process.
2      Q.  Okay.
3          MR. POOR:  This is a good time to break.
4          (Brief recess.)
5      Q.  (BY MR. POOR)  All right.  Now, Mr. Rayl,
6  is it -- although it is not specifically alleged in
7  the complaint, is it your contention that the
8  operations officer, failure to get the operations
9  officer, is it your contention that that decision
10  was also motivated by your role in advocating
11  public policy issues?
12     A.  It is my contention that that may be a

13  part of the decision.  It is my contention, also,
14  that it is related to the call center issue, also,
15  or a suspicion.
16    Q.  Was it related -- okay.
17    A.  Pardon?
18    Q.  There is a very specific allegation in the
19  complaint that you failed to get the call center
20  job --
21    A.  Right.
22    Q.  -- because of the public policy issue.
23    A.  Okay.
24    Q.  Okay?  And that's fine, we just talked
25  about that, we are going to cover some of the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
251

1  public policy documents here in a couple of
2  seconds.
3    A.  Okay.
4    Q.  What I am simply trying to understand, is
5  there a similar, and I will address it to your
6  attorney or to you or I don't really care, is there
7  a similar allegation with regard to the operations
8  officer position?  I just need to know whether I
9  need to cover it or not..
10    MR. RAYL:  Yes.  Yes, I think that it
11  could have been pled -- I don't know if I spelled
12  it out in the complaint right now.  I can't
13  recall.
14    MR. POOR:  It is not alleged in the
15  complaint.
16    MR. RAYL:  Okay.
17    MR. POOR:  And that's why I am asking the
18  question.
19    MR. RAYL:  Right now, no, I guess if I
20  didn't allege it in the complaint.
21    THE WITNESS:  Well, I mean it may or may
22  not play a part in that; it's a possibility, I
23  think, if you want to cover it, cover it.
24    Q.  (BY MR. POOR)  Okay.  Do you know who made
25  the decision to -- can we refer to this as the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
252

1  Gardner or Condello, to fill the Gardner position?
2    A.  My belief is that decision was not
3  totally in Mr. Anderson's hands.
4    Q.  What is the basis for that belief?
5    A.  Simply that there seems to be -- well,
6  partially because I don't know exactly how things
7  work at that level, but I have never perceived
8  where any individual would be able to make a
9  decision of that -- on something like that totally
10  on their own without having to get some approval or
11  have some discussion with somebody superior to
12  them, to a point an officer of the company.
13    Q.  But you don't know who might have been?
14    A.  No.
15    Q.  You have no idea who was involved in the
16  decision?
17    A.  No, I do not.
18    Q.  Did anyone ever say or do anything to you
19  that led you to believe that these public policy
20  issues played a role in the decision not to give
21  you the position?
22    A.  Only to the concern expressed by the law
23  department, which I assume was -- was known at the
24  senior levels of individual business, that it may
25  have played a part in it.

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

253

1    Q.  This is that meeting with the attorneys in
2  January of '96?
3    A.  Yes.
4    Q.  Okay.  We will hold on that.  Do you have
5  any basis, do you have any personal knowledge as to
6  whatever was communicated in that meeting was
7  communicated to anyone else in MetLife?
8    A.  The meeting was precipitated by a memo I
9  wrote to CMO members.  No, I do not have any
10  specific knowledge that --
11    Q.  It went beyond --
12    A.  No.
13    Q.  -- the legal organization?
14    A.  No.
15    Q.  Okay.  Now, one of your allegations is you
16  had a history, and I will quote here, "history of
17  reporting violations."
18    A.  Yes.
19    Q.  Including violations, churning and
20  accelerating premiums, vanishing premiums, which we
21  have sort of generically referred to as "public
22  policy."
23    A.  Yes.
24    Q.  I will now be more specific.  It's those
25  issues that we are now talking about in terms of

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

254

1  public policy, the accelerated payments, the --
2    A.  Yes.
3    Q.  -- vanishing premiums, the churning
4  allegations, correct?
5    A.  Yes.
6    Q.  And those are problems that obviously
7  there was general publicity with regard to issues
8  raised against MetLife and other insurance
9  companies by various lawsuits, insurance
10  commissioners, et cetera.  I assume it was brought
11  to your attention in that respect like every other
12  MetLife employee, but it was also, I take it,
13  brought to your attention to by customers who would
14  call in to the call center organization, raising
15  issues?
16    A.  My efforts started long before MetLife was
17  the subject of investigation and litigation on
18  those issues.
19    Q.  All right.  Now, I am going to mark a
20  number of documents here that you produced to us
21  not necessarily to go over them in any great
22  specificity, --
23    A.  Okay.
24    Q.  -- but for you to help me identify and
25  understand which ones you think fall in this

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

255

1  category.
2    A.  Sure.
3      (Certain documents were marked Deposition
4  Exhibits 37 through 43, inclusive, for
5  identification by the reporter.)
6      THE WITNESS:  Okay.
7    Q.  (BY MR. POOR)  What I am interested in,
8  tell me which groups reflect your history of
9  reporting violations in obtaining the status of
10  whistle blower, as alleged in Paragraph 43, so we
11  can talk about those without talking about the ones
12  that --

13    A.  Okay.
14    Q.  -- fall outside.
15    A.  No. 40 is outside.
16    Q.  Okay.  Let me set that up here.
17    A.  This is background, this is really
18  background information, not specifically the
19  documents.
20    Q.  Okay.  That's 42.  Okay.
21    A.  There is a whole collection missing on
22  complaints by --
23    Q.  Okay.
24    A.  All right.
25    Q.  I thought I had pulled all the ones you

        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                        256

1   had produced that had some label of --
2     A.  Well, if files were together, I have
3   actually got those files if you want to look at
4   them.
5         MR. RAYL:  Could this file over here have
6   any, Mr. Poor?
7         (Handed to counsel.)
8         MR. POOR:  Okay.
9         (A certain document was marked Deposition
10  Exhibit 44 for identification by the reporter.)
11    Q.  (BY MR. POOR)  I thought it was the same
12  file, to be honest with you, but --
13    A.  Well, wait a minute, they might be still
14  two separate files.  Yes, they are different.
15    Q.  Okay.
16    A.  41 is not, but there is a whole series of
17  files or two files dealing with complaints that are
18  not here.
19    Q.  Okay.
20    A.  Subject to policyholder complaints.
21    Q.  And this one which is just external,
22  labeled as simply "external newspaper articles," --
23    A.  Right.
24    Q.  -- and things?
25    A.  Right.

        ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                        257

1     Q.  I believe there is one more set of
2   documents around.  It should have been two files,
3   separate files, one would have been stuff I
4   specifically wrote and another one is all dealt
5   with policyholder complaints.
6     A.  I can give you the numbers if that would
7   help.
8     Q.  If you can give me the numbers, maybe I
9   can --
10    A.  Yes.  Oh, I don't believe it.
11        MR. POOR:  Why don't we go off the record
12  now.
13        THE WITNESS:  1377 -- no, wait a minute.
14  1414 to 1491 was the primary file related to
15  policyholder complaints.
16        (Discussion off the record.)
17    Q.  (BY MR. POOR)  Okay.  So the groups of
18  documents that reflect the allegations in Paragraph
19  33 about your advocacy of public policy issues are
20  Deposition Exhibit 44, which are Bates stamped
21  01193, Deposition Exhibit 43, Bates stamped 01377
22  to 01413, Deposition Exhibit 37, Bates stamped
23  01112 to 01153.
24    A.  Some of these are related documents, but
25  they are part of that.

        ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

Page   103

RP4011065648

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

258

1    Q.  Right.  Exhibit 39, 01154 through 01192 --
2    A.  38.
3    Q.  -- which is Exhibit 38, and what will be
4  marked when we make a copy as Deposition Exhibit
5  45, Bates stamped PL-01414 through -01491.
6    A.  Yes.
7    Q.  Okay.  Some of these are documents
8  authored by you; some of them are complaints bought
9  to your attention, for example, some are letters
10  from lawyers, some are --
11    A.  Right.
12    Q.  -- complaints from some individuals?
13    A.  Supporting the issue, yes.
14    Q.  Right.  For example, what is Exhibit 38.
15    A.  That was -- it was one of the few
16  documents that I submitted that really was not
17  written to a superior; it was a document I authored
18  illustrating how we were trying to have the CSRs,
19  at that time they were CSRs, deal with these issues
20  and the publicity related to the churning
21  allegations and some of those activities.
22    Q.  Okay.  And this went to CSRs, trainers and
23  resource assistants?
24    A.  Yes.
25    Q.  And you authored this document?

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

259

1    A.  Yes, I did.
2    Q.  Okay.  Now, on any of the documents
3  covered in these various deposition exhibits, did
4  you receive criticism, feedback that was critical?
5    A.  Not -- I'm trying to think -- other than,
6  for example, there's one situation in there where I
7  tried to explain the AP problem.  It went to
8  someone in marketing, who turned around and tried
9  to say it didn't exist, and I went back and proved
10  to one of his own branch managers was having a
11  problem.  I didn't receive direct criticism for
12  that, with the exception of being criticized, if
13  you will, by the law department for my persistence
14  in trying to draw attention to these issues.
15    Q.  And that's in this meeting?
16    A.  That's in the meeting, yes.
17    Q.  Okay.  We will come back, put aside that
18  meeting.
19    A.  Okay.
20    Q.  Is that meeting the only time that you
21  have viewed yourself as having been criticized over
22  raising these issues?
23    A.  I guess I don't know where to draw the
24  fine line between criticism and where people
25  clearly indicate they don't want to hear it any

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

260

1  more, but --
2    Q.  There's a very clear line in my mind, let
3  me explain to you what it is.  I understand that
4  sometimes you view this as falling on deaf ears.
5    A.  Yes.
6    Q.  You understand.
7    A.  (Affirmative head nod).
8    Q.  And sometimes you will have people say,
9  "You know, Jim, just go talk to somebody else, I
10  don't want to hear it any more."
11    A.  (Affirmative head nod).
12    Q.  Okay.  I'm more interested in anything

13  anyone did affirmatively to say to you, "it's a bad
14  thing that you are raising this, don't do this any
15  more, you are in trouble for" -- when I say
16  criticism, that's what I am talking about in that
17  line?
18     A.  No, I don't recall any specific criticism.
19     Q.  Okay. Now, which one of these documents
20  generated a meeting with lawyers?
21     A.  That one.
22     Q.  Now, you have handed me documents that
23  Bates stamped PL-01199 through -01202.
24     A.  Yes.
25     MR. POOR: Why don't we mark that
      ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
             261

1  separately just for the purposes --
2     THE WITNESS: Sure.
3     MR. RAYL: (Affirmative head nod).
4     MR. POOR: -- of keeping it straight.
5     Would you mark this as 46.
6     (A certain document was marked Deposition
7  Exhibit 46 for identification by the reporter.)
8     Q.  (BY MR. POOR) This is a memo you wrote to
9  Mr. Lynch in November of '95, expressing your
10  concern over the field release on AP arrangements?
11     A.  Yes.
12     Q.  Okay. What happened after you sent that
13  letter to Mr. Lynch?
14     A.  I did get a note from him, I believe
15  that's the one that he responded to, said it was of
16  interest, asked for some statistics, but it also
17  was copied to Mr. Tweddie, who was a CMO member,
18  but it was sometime -- I'm trying to keep my years
19  straight -- no, I guess it was relatively quickly,
20  December-January, somewhere in that time frame I
21  received a call from the law department and they
22  wanted to know when I would be in New York and that
23  they would like to discuss AP with me.
24     Q.  Okay. Who did you get the call from?
25     A.  It was either Mr. Finnegan or -- I believe
      ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
             262

1  it was Kevin Finnegan.
2     Q.  Who is an attorney in the law department?
3     A.  Yes.
4     Q.  Okay. And then you did have a meeting
5  with the lawyers in the law department?
6     A.  It met with Kevin Finnegan and Robert
7  Nostramo.
8     Q.  Okay. Between sending the letter and your
9  meeting, did you have any other communication with
10  Mr. Lynch or anyone else in the organization on
11  this issue other than perhaps asking for
12  statistics?
13     A.  Most of what I wrote on this issue started
14  in 1992. No, I don't --
15     Q.  I meant not on this issue, necessarily,
16  but specifically in response to this memo?
17     A.  No.
18     Q.  The next thing substantively really that
19  happened was the meeting with the attorneys?
20     A.  Yes, it was.
21     Q.  Okay.
22     MR. POOR: I am going to ask him about the
23  meeting with the attorneys for the purposes of the
24  deposition, Brian. Obviously, you know it's our
25  position that this is a privileged communication.
      ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP40110696950



6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
263
1  we need an agreement in order to save time, by
2  asking him I am not waiving our position.
3      MR. RAYL:  Correct.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
264
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



**REDACTED - ATTORNEY CLIENT**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
265
1
2
3
4
5
6
7
8
9
10
11
12





13
14
15
16
17
18
19
20
21
22
23
24
25

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
266



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
267



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**REDACTED - ATTORNEY CLIENT**

ESQUIRE CORPORATE SERVICES

MP4011069652

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
268



REDACTED - ATTORNEY CLIENT

110069653

```
25    Q.  Okay. Anything else, Mr. Rayl, that
```
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
269
```
 1    happened or that people said to you or wrote to you
 2    or communicated to you that, other than what we
 3    have covered, that leads you to the belief that
 4    your involvement in these public policy issues was
 5    a factor in these personnel decisions we have been
 6    talking about?
 7      A.  I think the fact that I have been so
 8    persistent on those issues with so many people over
 9    so much time, that -- that there is a strong
10    possibility that it's in there. I mean I think
11    that -- there's -- in other words, very few people
12    at the senior level of the company, and
13    particularly, when we have -- we had investigations
14    and everything going on, could dare tell me, "oh,
15    don't ever tell us there's a problem," nobody could
16    say that to me.
17      Q.  And nobody did?
18      A.  Nobody did.  So I mean nobody was going to
19    tell me to stop or whatever, but clearly they
20    didn't act on it, either.  So --
21      Q.  All right.  Have we now covered all of the
22    facts that leads you to believe that your public
23    policy actions affected these employment
24    decisions?  I don't mean to infer there's more; I
25    just want to make sure we have covered them.
```

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
270
```
 1      A.  Basically, I believe they could have been
 2    a consideration in the actions against me, yes.
 3      Q.  Okay. Now, your second allegation is that
 4    MetLife breached its contract with you in I guess
 5    all four of these jobs.
 6      A.  Yes.
 7      Q.  Okay.
 8      (Certain documents were marked Deposition
 9    Exhibits 47 through 50, inclusive, for
10    identification by the reporter.)
11      Q.  (BY MR. POOR)  Mr. Rayl, I have handed you
12    documents marked Deposition Exhibits 47 through 50.
```

13    A.   Yes.
14    Q.   And these are copies of the various
15    company handbooks and policies that relate to the
16    posting program that you produced to us, correct?
17    A.   Right.
18    Q.   Okay.  Now, with each of these, and I
19    apologize, I didn't write down the numbers on mine,
20    so if I get the numbers wrong, --
21    A.   That's fine.
22    Q.   The exhibit that is the Anne Hayden
23    memo, --
24    A.   Hayden is 47.
25    Q.   Okay.  That was sent to all MetLife
                ESQUIRE CORPORATE SERVICES
      6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                            271
1    employees?
2     A.   Yes.
3     Q.   Okay.  The other documents, the two
4    documents called Manager's Guide, --
5     A.   Yes.
6     Q.   -- are ones you received in your capacity
7    as a manager --
8     A.   Yes.
9     Q.   -- at MetLife?
10    A.   (Affirmative head nod).
11    Q.   Because you had to apply the job
12    posting --
13    A.   Yes.
14    Q.   -- procedure over the course of your
15    employment as well?
16    A.   Right.
17    Q.   And these sort of help guide you in how to
18    do that, correct?
19    A.   Yes.
20    Q.   That's what you used them for, anyway,
21    correct?
22    A.   Yes.
23    Q.   And the one is called "MetLife - Your
24    Employee Handbook"?
25    A.   Yes.
                ESQUIRE CORPORATE SERVICES
      6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                            272
1     Q.   Is the handbook given to all employees?
2     A.   Yes.
3     Q.   Now, tell me in what way, we can take
4    these position by position, --
5     A.   Okay.
6     Q.   -- let's start with the easiest one, the
7    operation manager and the regional director of
8    Human Resources.  Can we talk about those two
9    together?
10    A.   Yes.
11    Q.   Okay.  What is it about the policies that
12    was violated by the way MetLife handled that
13    posting or failure to post?
14    A.   Would you object if I -- in other words, I
15    have those -- the specific job posting issues and
16    the excerpts from these manuals documented in a
17    file which I gave you that went with my EEOC
18    complaint.
19    Q.   Okay.
20    A.   That I think spells them out a little more
21    clearly, but --
22    Q.   Okay.
23    A.   -- it might be easier to go through them
24    that way.
25    Q.   Sure.  Let me pull it out for you, Mr.
                ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP401069654

273

1    Rayl. That's fine with me.
2        (A certain document was marked Deposition
3    Exhibit 51 for identification by the reporter.)
4        Q.    (BY MR. POOR) I am handing you Deposition
5    Exhibit No. 51. Okay. And those are the materials
6    you submitted to or received from the EEOC,
7    correct?
8        A.    Yes. Okay. I have the MetLife job
9    posting program, program rules, guidelines, HR
10   policies.
11       Q.    Please give me the Bates number?
12       A.    The Bates number is 00390 through 00394.
13       Q.    All right. I got it. Okay.
14       A.    Okay. Basically, my complaint is based on
15   the statements in the policy I believed it
16   interpreted it and administered it. So if you want
17   to take some of these excerpts or go through that.
18       Q.    Well, let's focus specifically --
19       A.    Okay. Let me find the one that I feel.
20       Q.    -- on -- let's talk about the operations
21   manager an regional director of Human Resource
22   position, if I could. I think that's the --
23       A.    Okay. Just for the sake -- let me look
24   at --
25           It talks about the Anne Hayden memo, which

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

274

1    is your Exhibit 47, "Jobs will be posted in all
2    administrative offices within a region. Employees
3    whose positions are declared excess will post for
4    jobs in the same manner and at the same time as all
5    other employees." And it talks about the
6    applications. There is -- I am going to have to go
7    through some of these. I mean it was the general
8    company policy that they should seek the most
9    qualified candidate for every position that's
10   posted, was my primary concern or belief.
11       Q.    That's fine, I just want to understand
12   what provision --
13       A.    In other words, that there was -- there
14   was nothing that indicated that when particularly
15   there were offices affected by the MetLife Express
16   were those initiatives that when they posted the
17   positions in those offices, there would be any
18   limiting of the candidates.
19       Q.    Okay. So let me make sure I understand
20   this. With regard to those two jobs, were they
21   filled internally?
22       A.    One was and one was filled from another --
23   with a person from another location.
24       Q.    Okay. But both from current MetLife
25   employees?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

275

1        A.    Yes, yes.
2        Q.    Okay. And as I understand why you think
3    MetLife violated its policy was that there is
4    nothing in here that says posting could be limited
5    to people within a functional organization, so
6    there is nothing that says they can limit it. And
7    you believe, I take it, you were qualified for
8    those jobs.
9        A.    Yes. There's -- the company stated
10   promotion policy was in there and in every staffing
11   situation it is company policy to select the best
12   qualified candidate for the position. They can't

13    do that if they don't let them be considered.
14        Q.   Who got those two jobs?
15        A.   Carl Bogler, who was the incumbent HR
16    manager, got the position for HR and Maureen Ortiz
17    from Wichita got the IT operations manager's job.
18        Q.   And you believe you were better qualified
19    for the positions than those two individuals?
20        A.   Yes, I do.
21        Q.   What makes you better qualified for that
22    position than Mr. Bogler?
23        A.   Bogler, B-o-g-l-e-r.  I'm -- my experience
24    as an HR manager in the past and many of the things
25    I had done there was -- I was a very strong HR

                ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                            276

1    manager.
2        Q.   He was the incumbent --
3        A.   Yes.
4        Q.   -- in that position, so he had been
5    performing that job or a similar --
6        A.   Yes.
7        Q.   -- scope job.  And was it your perception
8    he was not doing well in that position?
9        A.   It was my perception that -- I should have
10    been at least allowed to post and be considered for
11    that job.
12        Q.   Okay.  Other than the fact that you had
13    held the manager HR position, thought you had done
14    well in that position, was there anything else that
15    leads you to believe that you were better
16    qualified --
17        A.   Yes.
18        Q.   -- for that job than Mr. Bogler?
19        A.   Yes.
20        Q.   What else?
21        A.   My level of performance versus his level
22    of performance, and I --
23        Q.   And how do you know his level of
24    performance?
25        A.   We are living with it.

                ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                            277

1        Q.   You need to be more specific than that.
2        A.   Well, I don't want to get into some of the
3    issues there, but there have been a number of HR
4    issues arise and we are currently engaged in an HR
5    situation with one of our employees that had he
6    handled it appropriately, it would not now be where
7    it is sitting.  I mean there's a -- that's another
8    whole --
9        Q.   Well, I am simply trying to understand --
10        A.   Okay.
11        Q.   -- your perception of what skills or
12    qualifications he lacked in that position that
13    makes you believe you are better qualified than he.
14        A.   Well, it really doesn't matter whether I
15    believe I am or not.  That's my personal opinion,
16    but the fact is I didn't even get an opportunity to
17    put that forward.
18        Q.   I understand, but stay with me because it
19    matters to me.  I am just simply trying to
20    understand, if you had been considered for the job,
21    I assume your position is you believe you should
22    have been selected over Mr. Bogler, or maybe I am
23    misunderstanding.
24        MR. RAYL:  I believe our complaint alleges
25    that they breach the contract simply by not letting

                ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011969956

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

278

1  him post, --
2        MR. POOR:  That's right.
3        MR. RAYL:  -- not giving him the job.
4        MR. POOR:  But then there is a whole set
5  of questions as well, is that so what, he wouldn't
6  have gotten the job or so what, he would have
7  gotten the job.  So I do think that next
8  question --
9        MR. RAYL:  Okay.
10       MR. POOR:  -- has a relationship to that.
11       MR. RAYL:  I have no objection to him
12 answering it, other than to the extent that it, you
13 know, calls for a legal conclusion.
14       MR. POOR:  Yes, I am not trying to get a
15 lot of detail; I just want to understand the
16 comparable --
17    Q.  (BY MR. POOR)  I just wanted to understand
18 if you had been considered, why do you think they
19 should have given it to you over Mr. Bogler.
20    A.  Because I think my track record and -- in
21 terms of what I did when I was an HR manager and my
22 accomplishments, my knowledge, my willingness to
23 deal with the difficult issues would have put me
24 ahead of him.
25    Q.  All right.  The same question for the

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

279

1  operations manager.  And I am sorry, I don't
2  remember the name of it person.
3     A.  It's Maureen Ortiz.
4     Q.  Maureen Ortiz?
5     A.  Yes.
6     Q.  This is over in the IT, --
7     A.  Right.
8     Q.  She came from the IT organization?
9     A.  Yes, she did, but in an unrelated area to
10 what she's doing now.
11    Q.  Okay.  What is it about her that leads you
12 to believe you are better or you that leads you to
13 believe you are better qualified than she is?
14    A.  Well, one in that she's managing an
15 operation that is -- she's not been in the
16 environment with respect to having to have an IT
17 organization supporting an administrative
18 operation; she was in a computer center in
19 operations.  What was prior a data communications
20 operation has reported to me in the past.  I have
21 managed it before.  I certainly know the
22 administrative and customer issues.  I mean there's
23 no question in my mind I could be effectively
24 managing that operation.
25    Q.  Okay.  Was there anyone else, to your

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

280

1  knowledge, outside of those functional
2  organizations allowed to apply for those jobs?
3     A.  Not to my knowledge.
4     Q.  Okay.  With regard to the -- I think we
5  have referred to it as the "Gardner position," the
6  officer --
7     A.  Right.
8     Q.  -- position.  That was not posted,
9  correct?
10    A.  That was not posted.
11    Q.  Is there an obligation to post that level
12 position?

Page  112

13    A.  No, there is not.
14    Q.  What is it about the way -- and maybe this
15 is not one of the allegations, was there something
16 about the way that vacancy was filled that you
17 believe violated the company's posting program or
18 policies?
19    A.  It would not be related to the posting
20 program, per se, since it was not posting.  I feel
21 that it was, as I guess I have alleged, a
22 discriminatory action for not -- for not
23 considering me for that position.
24    Q.  Right.  And I am going to get to the age
25 discrimination here in a second.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

281

1    A.  Okay.
2    Q.  But we are right now on the breach of
3 contract allegation, and maybe I have got this job
4 in the wrong category.
5    A.  No, I don't --
6        THE WITNESS:  Was there --
7    Q.  (BY MR. POOR)  There is no allegation on
8 that in this complaint?
9    A.  I don't think there is, no, that I --
10 okay.
11    Q.  I don't want to do this again, Mr. Rayl.
12    A.  Okay.
13    Q.  I am just trying to confirm that.
14    A.  That's okay.
15    Q.  Okay.  Now, let's back up to the --
16    A.  Okay.
17    Q.  -- filling of Ms. Hemenway, --
18    A.  Okay.
19    Q.  -- putting Ms. Hemenway in the position.
20    A.  Okay.
21    Q.  The -- and I think I understand your
22 position with regard to the posting.  It was that
23 the consideration of outside candidates for the
24 position should not have happened, period.
25    A.  No.

CONFIDENTIAL

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

282

1    Q.  No?
2    A.  My position on posting is not --
3    Q.  I will not put words in your mouth.
4    A.  Okay.
5    Q.  Tell me in what way MetLife violated its
6 -- quote -- contract -- close quote -- with you?
7    A.  One, that it had a posting program in
8 place and at the time the candidates went through
9 that process.  There were external candidates which
10 were considered, which the posting program itself
11 says you only do that when it appears that you
12 can't find a qualified candidate internally.
13        There was an abundance of internal
14 candidates, but my issue with that was the fact
15 that the posting process had been completed, the
16 interviews had been completed, and that was -- the
17 whole process was violated by the fact that another
18 outside candidate came in who was not part of the
19 original posting, was not part of the original
20 outside search, had nothing to do with that.
21        Mr. St. John had the option to repost the
22 position.  He did that on the traffic manager job.
23 He did not do that on the site leader job.
24    Q.  Where in the policies does it say that you
25 cannot add candidates later on in the process?  I

ESQUIRE CORPORATE SERVICES

MP401106965B

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

283

1 understand your position on the external
2 candidates, but my question is now a little bit
3 different. You say they violated the program by --
4     A. Because there was a beginning and an
5 ending date to the posting process.
6     Q. And where does it say that once the
7 posting process is -- okay. Where does it say
8 there is a beginning and ending, on the posting
9 itself?
10    A. Yes.
11    Q. Okay.
12    A. There is a date at which the applications
13 are supposed to be there.
14    Q. Okay. Whatever that date is. It was
15 posted on April 5th, let's assume it's --
16    A. It closed April 12th.
17    Q. Okay. It closed April 12th. So you had a
18 week to respond. Is it your position that only
19 external candidates that were found during that
20 week period could be considered for the job?
21    A. That, combined with the fact that Mr.
22 Friedewald indicated there would not be any
23 additional interviews; we would not be
24 reinterviewed for the position, which would
25 indicate that it was not being thrown open again.
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

284

1     Q. Put aside what Mr. Friedewald said for a
2 minute, because I am focusing now on --
3     A. Okay.
4     Q. -- you have alleged they breached these
5 policies which you contend are contracts. And you
6 have told me that you believe they did it by after
7 the closing of the posting period, finding other
8 external candidates. Is that a fair summary of
9 what you have told me?
10    A. Yes.
11    Q. Okay. Now, my question --
12    A. That's part of it, and the fact that --
13 but go ahead.
14    Q. That's the one I am focusing on for the
15 moment. And if you can please show me in the
16 policies where it says that, it would be a great
17 help to me.
18    A. I don't know that it completely says with
19 respect to the external candidates. The one thing
20 it does say is when you should go for an outside
21 candidate.
22    Q. I understand you believe there were
23 internal candidates and even someone they found
24 before April 12th that shouldn't have been
25 considered?
ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

285

1     A. Right.
2     Q. I understand that. But you have also said
3 that the subsequent finding of external candidates
4 --
5     A. I don't know that the posting procedures
6 significantly addressed the external candidates
7 since it should be exceptional situations where
8 they look at them, anyway, if, in fact, there was
9 going to be a new search, then there should have
10 been an obligation on the part of the company to
11 notify the internal candidates that that was taking
12 place.

**CONFIDENTIAL**

11069659

13   Q.  And where does it say that?
14   A.  It doesn't say that, other than the fact
15  that they shouldn't have been looking at external
16  candidates to begin with.
17   Q.  Okay.  It's your belief that that's the
18  way they should have handled it?
19      MR. RAYL:  If you don't know for a fact
20  that it doesn't say that, don't say then if it
21  doesn't say that.
22      THE WITNESS:  Okay.  All right.  I would
23  have to reread the entire policy.
24      MR. RAYL:  Yes.
25   A.  I don't know.
      ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

286

1   Q.  (BY MR. POOR)  Okay.  In what other way
2  did the company violate its policies by hiring Miss
3  Hemenway?
4   A.  She's a lesser qualified candidate.
5   Q.  Can you tell me what you know about her
6  background?
7   A.  I've seen her resume, which was part of
8  the production.  I know some of what has transpired
9  since she has been appointed.
10   Q.  Let me focus on what you knew as of the
11  time she came in and you went out of that job.
12   A.  There's no way that anyone was more
13  qualified to fill that job than me.
14   Q.  I understand that you could have been
15  somebody from on high, I understand that; I am not
16  talking about your -- you have got lots of
17  documents, we have talked about your
18  qualifications.
19   A.  Right.
20   Q.  That isn't my question.  My question is
21  what did you know about Miss Hemenway?
22   A.  I didn't know a thing about Miss Hemenway.
23   Q.  Okay.  And what you have learned
24  subsequently is either through documents produced
25  in this case or issues that have arisen in the call

CONFIDENTIAL

      ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

287

1  center --
2   A.  Yes.
3   Q.  -- since she came on?
4   A.  Yes.
5   Q.  Okay.  Have we now covered all the ways in
6  which you believe the company violated its policies
7  by hiring Miss Hemenway?
8   A.  I don't know that from a legal standpoint,
9  and I will leave that to my attorneys to decide in
10  going through these documents whether there are
11  other aspects of these that constitute some other
12  or different contractual obligation on the part of
13  the company.
14   Q.  But as you sit here today, we have covered
15  everything you believe happened?
16   A.  In general terms, yes.
17      There's evidence that the company did not
18  do some of the internal applicant tracking that
19  they were supposed to do, since they couldn't
20  produce the documents.  So, no, I don't know
21  what -- I don't know that we have covered all of
22  those issues.
23   Q.  Okay.  Any other ways in which the company
24  violated its contractual obligations to you, other
25  than these four positions that we talked about?
      ESQUIRE CORPORATE SERVICES

XP401069610

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

288

1  MR. RAYL: Leave that to me.
2  THE WITNESS: Okay.
3  A. I don't know.
4  Q. (BY MR. POOR) As you sit here today, we
5 have covered everything you can think of sitting
6 here today?
7  A. Sitting here today.
8  Q. Okay. Now, you also claimed that age was
9 a factor in the failure to select you as site
10 leader.
11  A. Yes.
12  Q. Okay. And I understand that Miss Hemenway
13 was younger than you.
14  A. Yes.
15  Q. Okay. And I also understand your position
16 that you are better qualified for the job than she?
17  A. Yes.
18  Q. Okay. We don't need to cover either of
19 those two points.
20  A. Okay.
21  Q. Is there anything else that leads you to
22 the belief that your age was a factor in the
23 decision not to select you for that position?
24  A. The active discrimination itself, I don't
25 know. I mean we are getting into what will

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

289

1 constitute a legal finding of age discrimination.
2 Did somebody tell me I was too old for the job?
3 No, nobody told me I was too old for the job.
4  Q. Did anybody tell you they wanted somebody
5 young in the job, or did anybody make any kind of
6 remarks that had an age bias as related to this job
7 selection?
8  A. No.
9  Q. Okay. I am not asking you for a legal
10 conclusion, --
11  A. Right.
12  Q. -- Mr. Rayl, the lawyers will fight about
13 that; I am asking you for what leads you to the
14 belief in your own mind that age was a factor. As
15 I said, I know the allegation that she was younger
16 and you were more qualified, and I am simply asking
17 if there is anything else. Because it is my job to
18 cover --
19  A. Right.
20  Q. -- everything I can.
21  A. (Affirmative head nod). No.
22  Q. Okay. Now, the positions of operation
23 manager and regional director of HR, I guess, are
24 at issue in the breach of contract, correct? Since
25 no one else was allowed to post, there is not an

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

290

1 age or retaliation allegation?
2  A. No.
3  Q. Is there an allegation of age
4 discrimination as it relates to the Gardner
5 position?
6  A. My own feeling is that when the
7 circumstances -- when the circumstances come out,
8 that's for a jury to decide as to whether age was a
9 factor or -- I don't know.
10  Q. I am not asking you for a conclusion; I am
11 just asking whether it is an issue in this case
12 that I need to cover. It is not alleged in the

CONFIDENTIAL

Page 116

13  complaint.
14        MR. RAYL:  It is not alleged in the
15  complaint and at this time we are not alleging it,
16  not intending on alleging it.
17        MR. POOR:  Then I don't have to cover it.
18        THE WITNESS:  Thanks.
19        MR. POOR:  Fair enough.
20     Q.  (BY MR. POOR)  Now, Mr. Rayl, one of the
21  statements you made earlier when we were talking
22  about the public policy retaliation —
23     A.  Uh-huh.
24     Q.  — claim, was that employees from
25  individual business were systematically

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
291

1  eliminated.  Do you recall telling me that?
2     A.  Yes.
3     Q.  Okay.  This was in the time frame of
4  the — this is in the '96-'97 time frame we are
5  talking about?
6     A.  Yes.
7     Q.  Okay.  Who are you talking about?
8     A.  I don't remember specifically except that
9  it seemed that a number of individual business
10  people who were in various parts of the — quote —
11  business services group organization or should have
12  been in there didn't wind up there.  They either
13  were moved elsewhere, didn't have a job or
14  whatever, that part of the organization seemed to
15  draw all of its people from other parts of the
16  company, in areas where having someone from
17  individual business would have been a clear asset
18  to what they were doing.  That's it.
19     Q.  So you were not involved in that
20  decisionmaking process, —
21     A.  No.
22     Q.  — I presume.
23     A.  (Negative head shake).
24     Q.  And you don't have any firsthand
25  knowledge —

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
292

1     A.  No.
2     Q.  — as to why the decision —
3     A.  It was an observation, that's all.
4     Q.  Okay.  What is it about that
5  observation — you raised it in the context in
6  saying on the public policy side.
7     A.  I don't know that it was on the public —
8  if it was being associated with the public policy,
9  I don't think that was the intent.
10     Q.  Tell me what the intent was.
11     A.  Other than it was just part of what was
12  happening in the BSG organization as the outgrowth
13  of MetLife Express, as the outgrowth of the
14  implementation of many of the MetLife Express
15  initiatives.
16     Q.  Okay.  Now, the remaining count of the
17  complaint that we haven't talked about is your
18  allegation that the conduct of Mr. St. John and
19  other employees in MetLife during 1996 constituted
20  intentional infliction of emotional stress.
21     A.  Yes.
22     Q.  Okay.  And can you please tell me what
23  conduct we are talking about here.  What did they
24  do?  You can list it for me, if we have covered it,
25  I don't want to cover the details again.

ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

MP4011069662

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

293

1    A.  No.  The conduct was that after my
2    extensive involvement in MetLife Express, after my
3    working relationship with Dr. Friedewald, after the
4    prolonged situation in the site leader selection,
5    the fact that I was given no indication whatsoever
6    at any time that there was anything lacking in my
7    qualifications or my consideration that Mr.
8    Friedewald -- or Dr. Friedewald was very aware of
9    my passion for what I was doing, my desire for that
10   position; Mr. St. John was allowed to come into the
11   company and for whatever reasons take an action
12   that, in my opinion, the consequences -- well, the
13   consequences clearly were to inflict that distress
14   on me and what I went through.
15       Q.  Why do you believe it was clearly designed
16   to inflict that type of distress on you?
17       A.  Because if, in fact, there was -- if, in
18   fact, the organization was going to allow Mr. St.
19   John to take that kind of an action against an
20   employee like myself after what I had done and what
21   I was contributing with no warning, with clear
22   knowledge that it was going to be personally
23   devastating to me, without the courtesy of someone
24   else giving me some clue that -- as to what might
25   happen and then to abruptly on a given day pick up

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

294

1    the phone and tell me that my job was being taken
2    away from me, that's an unconscionable and
3    intentional act, in my opinion.
4        Q.  What is it that they should have done
5    differently?
6        A.  The minute -- if, in fact, the
7    organization, Dr. Friedewald or anybody else, was
8    going to allow Stan St. John to select someone
9    else, knowing the consequences, then somebody
10   should have come out and had a personal
11   conversation with me and worked out a solution
12   where I came out of it unharmed, at least,
13   monetarily, careerwise, and everything else.
14       I had invested my entire past ten years,
15   my heart and my soul and they knew it, everybody
16   knew it.  And they knew what that would do to me.
17       Q.  Other employees lost longtime jobs with
18   MetLife, too, as part of MetLife Express; is that
19   true?
20       A.  They did not lose their --
21       Q.  Is that true?
22       A.  That's true.
23       Q.  In fact, there are individuals in MetLife
24   that lost their employment with MetLife, as part of
25   MetLife Express; correct?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044

295

1    A.  That's true.
2        Q.  There are interim site leaders not
3    selected as the permanent site leader, I can't
4    remember that person's name, but it was one of them
5    --
6        A.  Ed O'Day went on to become implementation
7    director.  He was given a position in the
8    organization.
9        Q.  He did not maintain his position as site
10   leader, correct?
11       A.  Correct.
12       Q.  Okay.  When you moved out of the interim

13 site coordinator, whatever the title was at the
14 time, --
15     A.  Yes.
16     Q.  -- was your pay cut?
17     A.  No, but --
18     Q.  Okay.  You continued to receive bimonthly
19 or monthly, whatever you receive, paychecks?
20     A.  The site leader position was posted at a
21 higher level than what I was --
22     Q.  Mr. Rayl, I am asking some very specific
23 questions.
24     A.  Okay.
25     Q.  Was your current rate of pay reduced?
          ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          296
1      A.  No, it was not.
2      Q.  Okay.  Did you continue to receive
3 paychecks during this period of time?
4      A.  Yes, I did, but I was on vacation.
5      Q.  Okay.  Did anyone else other than Mr. St.
6 John take acts against you that you believe were
7 designed to inflict emotional distress?
8      A.  Certainly, Mr. Friedewald or Dr.
9 Friedewald is implicated.
10     Q.  By at least allowing Mr. St. John --
11     A.  Right.
12     Q.  -- to find somebody else for the job?
13     A.  Right.
14     Q.  Okay.  Is there anyone else or anyone
15 other actions, failure to act that constitutes the
16 intentional infliction, in your judgment?
17     A.  I guess I am not necessarily prepared to
18 sit down here and go through everything that
19 transpired and say whether there were or were not
20 other things I considered acts of intentional
21 infliction.
22     Q.  Well, that's the allegation in this case,
23 Mr. Rayl.
24     A.  Well, that is the allegation.
25     Q.  I just want to know what they did.
          ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
                          297
1      A.  Well, there were -- well, the
2 circumstances and all of those things associated
3 with how that was handled constituted that count.
4 Whether or not I can sit here and recite everything
5 that I would classify in that category at this
6 particular minute, I don't know, but we have
7 covered the most of them.
8      Q.  Okay.  Is there anything you can recall
9 that we haven't covered?
10     A.  No.
11     Q.  Okay.
12         (Brief recess.)
13     (Certain documents were marked Deposition
14 Exhibits 52 through 54, inclusive, for
15 identification by the reporter.)
16     Q.  (BY MR. POOR)  Sir, you have been handed
17 three sets of documents, Deposition Exhibit No. 52
18 I believe is, is it not, a copy of a letter that
19 you wrote to Mr. Kamen?
20     A.  Yes, it is.
21     Q.  In 1996 after --
22     A.  Yes.
23     Q.  November of 1996.
24     A.  Yes.
25     Q.  Okay.  And then copied a whole bunch of
          ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
298

1  folks?
2      A.  Yes, I did.
3      Q.  Did you receive any response back from
4  this?
5      A.  None whatsoever.
6      Q.  From any of the individuals?
7      A.  None of them.
8      Q.  Okay.  Exhibit No. 53 are documents
9  produced to us, Bates stamped 02289, et cetera.
10  Could you just briefly tell me what that set of
11  documents is?  I don't mean the substance, --
12      A.  Yes, this --
13      Q.  -- I just want to understand --
14      A.  No, this was a collection of documents
15  supporting efforts we had made over the years
16  relative to trying to get the company to capitalize
17  on the call center from a marketing and sales lead
18  generation standpoint.
19      Q.  Okay.
20      A.  It goes back a number of years.
21      Q.  I see.  So the first document is one in
22  August you sent to Mr. St. John; the others are
23  just -- it is just a collection --
24      A.  It is just a collection.
25      Q.  These are not ones you sent to Mr. St.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
299

1  John?
2      A.  No.  Right, it is just a collection
3  illustrating our efforts to try and utilize the
4  call center for that.
5      Q.  I understand.  Okay.  The last document in
6  front of you which I have had marked is Deposition
7  Exhibit No. 54, are your answers to defendant's --
8      A.  Document production.
9          (Discussion off the record.)
10      Q.  (BY MR. POOR)  Now, Mr. Rayl, I am going
11  to go over with you a few of your answers to
12  defendant's interrogatories in this case.
13      A.  Yes.
14      Q.  You reviewed and signed these
15  interrogatories?
16      A.  Yes, I did.
17      Q.  Okay.  Interrogatory No. 3 asks for people
18  who you believe have knowledge of the facts --
19      A.  Yes.
20      Q.  -- in this case.  Now, many of the names we
21  have talked about, there is no need to cover them.
22          In response to the wrongful termination
23  count in, addition to Mr. Anderson, Ms. Gardner,
24  Mr. St. John and Dr. Friedewald, all of whom we are
25  painfully aware of who they are, you also list a

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044
300

1  Rose E. Wolf?
2      A.  Yes.
3      Q.  Who is Ms. Wolf?
4      A.  She was in the BSG Human Resources and was
5  a party, as I understand it, to the posting process
6  and -- with respect to how some of the call center
7  and the BSG organization handled some of its
8  postings.  And I would assume that she was involved
9  or my belief is that she was involved from that
10  standpoint at least with knowledge relative to the
11  outcome of the posting process, whether or not
12  there were issues associated with Miss Hemenway's

13  hiring, whether or not the Human Resources
14  organization there raised any concerns.
15      Q.  She's the person in corporate Human
16  Resources that your people would have worked with?
17      A.  That Stan St. John and the call center
18  would have worked with.
19      Q.  And you know that because -- how do you
20  know that?
21      A.  Because her name came up during the
22  process in some of the dialogue over the posting as
23  to who was handling it and that sort of thing.
24      Q.  You never talked to her directly?
25      A.  No, I did not.

              ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                         301
1       Q.  And you don't know for sure what her
2   involvement was?
3       A.  No, I do not know for sure.
4       Q.  Okay.  And in response to the breach of
5   contract claim, you list Miss Hayden.  Obviously,
6   she drafted --
7       A.  Right.
8       Q.  -- one of the policies.  Is there anything
9   else other than the pieces of paper we talked about
10  today?
11      A.  And -- no.  Well, other than her
12  responsibility in Human Resources for the
13  administration of company policy.
14      Q.  Okay.  You don't know that she was
15  directly involved in your case, --
16      A.  No.
17      Q.  -- your issue?
18      A.  No.
19      Q.  Okay.  Staying on the breach of contract,
20  you list James O'Connor?
21      A.  Yes.
22      Q.  As director of IT, and I gather at
23  Atlanta.
24      A.  Yes.  Mr. O'Connor was the one
25  responsible, as I know it, for the hiring of the

**CONFIDENTIAL**

              ESQUIRE CORPORATE SERVICES
  6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                         302
1   operations manager and that posting process within
2   the IT organization, and I felt he could have
3   explained or at least established that, and it was
4   a limited posting and whatever their logic and --
5       Q.  So the posting was in his organization?
6       A.  Yes, it was.
7       Q.  Dr. Wiseman is your primary care
8   physician?
9       A.  Yes, he is.
10      Q.  Okay.  We will come back to him for a
11  second.
12          You list a Pauline Wittenberg as
13  providing testimony relative to discussions in
14  Phase 2 of MetLife.
15      A.  She was a party to -- she was a member of
16  the customer service team during Phase 2.  There
17  were a number of comments made or conversations
18  about, well, we will do this in Tulsa and
19  referencing my -- my role, you know, that at least
20  conversations and discussions took place creating a
21  reasonable expectation for me that I would be the
22  site leader in Tulsa and the conversations that
23  took place in Phase 2 related to that.
24      Q.  Were related to complimentary of the job
25  being done by the Tulsa organization?

              ESQUIRE CORPORATE SERVICES

MF401106966

Case 2:00-cv-02286-DWA    Document 71-2    Filed 06/19/2006    Page 123 of 145

6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

303

1    A.  That and just simply as a matter of my
2  involvement on the customer service team and what I
3  was contributing to the call centers, and there was
4  discussion, at one point, about establishing the
5  traffic management center there and a lot of other
6  things, but --
7    Q.  Miss Wittenberg was on the team?
8    A.  Yes, she was.
9    Q.  Do you know what role she played in the
10  ultimate selection process?
11    A.  None, probably.
12    Q.  Kenneth Luna?
13    A.  Yes, Ken Luna would testify to -- he's in
14  the IT organization, on the telecommunications side
15  that clearly that Tulsa was a consistent leader in
16  utilizing technology in many of the things that we
17  were doing in the call center, and my knowledge of
18  those issues.
19    Q.  Okay.  And how long have you sought
20  treatment from Dr. Wiseman?
21    A.  I have been under a physician's care since
22  my original bypass back in 1982. Dr. Wiseman took
23  over my former PCP's practice when he left, and I
24  would guess it's been two-and-a-half, three years;
25  I'm not exactly sure when he took it over.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

304

1    Q.  And how many bypass operations have you
2  had?
3    A.  Oh, two. Two.
4    Q.  Okay. One in 1982 and then the other was
5  in '97?
6    A.  January 28th.
7    Q.  '97?
8    A.  '97.
9    Q.  Okay. Now, we have previously gone
10  through or we pulled out the set of documents
11  relating to EEOC, and what has been Bates stamped
12  and 00328, that's the charge of discrimination
13  filed in this case; is that correct?
14    A.  Yes.
15    Q.  That's your signature at the bottom
16  left-hand corner?
17    A.  Yes, it is.
18    Q.  And those are the allegations you made to
19  the EEOC?
20    A.  Yes. That was their interpretation of
21  my --
22    Q.  Understood.
23    A.  (Affirmative head nod).
24    Q.  Turning your attention to part of the EEOC
25  file, it is, I believe, your letter to the EEOC, it

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY,STE 100,NORCROSS,GA 888-486-4044

305

1  starts on Bates stamp 355.
2    A.  Okay.
3    Q.  It goes through 3 -- well, there's a bunch
4  of pages -- drawing your attention to page 7 of
5  it. This is, in fact, a part of the letter that
6  you or -- you drafted or was drafted on your
7  behalf; is that true?
8    A.  Yes, I wrote every word.
9    Q.  Okay. Specifically as it relates to the
10  issues regarding Ms. Hemenway, in this paragraph
11  you are claiming "Had" -- you are talking about not
12  starting -- failure to start the process over,

**CONFIDENTIAL**

Page  122

13  reposting it?
14      A.  Yes.
15      Q.  "Had that been done" -- meaning the
16  reposting -- "Ms. Hemenway could have become a
17  legitimate candidate." You mean that in the sense
18  of appropriately considered; I assume that doesn't
19  mean you are varying your position that she was not
20  better, not better qualified?
21      A.  No, absolutely not, but -- right.
22      Q.  Okay.  Now, your damages that you are
23  claiming in this case, you are seeking damages for
24  the intentional infliction of emotional distress;
25  is that correct?
            ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                        306
1       A.  Yes.
2       Q.  Okay.  And can you tell me please how that
3   has -- and one of your contentions is that the
4   stress associated with the '96 action has
5   contributed to your second bypass in January of
6   '97.
7       A.  Yes.
8       Q.  Not to put words in your mouth, but I know
9   where we are going, so no point in wasting time.
10          In what other ways did the emotional
11  stress you claim to have suffered as a result of
12  the company's actions in 1996 manifest itself?
13      A.  I believe in a shorten life expectancy, to
14  the extent that -- that the deterioration of my
15  health at that point was so rapid and to what I
16  went through, but --
17          THE WITNESS:  Do you want me to leave that
18  to you or --
19          MR. RAYL:  Is that all you can think of
20  right now?
21          THE WITNESS:  Well, no, it -- I mean I'm
22  convinced I won't live as long as I would have.
23      Q.  (BY MR. POOR)  Okay.  And what leads you
24  to that?
25      A.  Basically, anyone who has undergone a
            ESQUIRE CORPORATE SERVICES
    6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
                        307
1   bypass operation, it seldom is totally permanent
2   and totally resolves the problem.  I believe that
3   the deterioration of mine was accelerated, causing
4   me to have that prematurely and to whatever extent
5   that happened, I also don't know what the overall
6   impact will be on of the second one and how
7   permanent it will be or how lasting it will be.
8   And I don't assume I can continue to have bypass
9   operations for the rest of my life.
10      Q.  Any other way in which you believe the
11  emotional distress you suffered manifested itself?
12      A.  I had to work through tremendous personal
13  devastation, and there were a lot of --
14          MR. RAYL:  Excuse me for a second.  Could
15  you clarify that question?  Are you asking him for
16  physical manifestations?
17          MR. POOR:  In any way it manifested
18  itself.
19          MR. RAYL:  Okay.
20          MR. POOR:  I could give you, trust me, I
21  have heard lots of different things, and I can give
22  you lots of examples.
23          MR. RAYL:  Okay.
24      Q.  (BY MR. POOR)  I don't mean just that you
25  felt bummed out, generally; I mean in what way
            ESQUIRE CORPORATE SERVICES

CONFIDENTIAL

6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
308

1  would emotional distress have manifested itself in
2  a way that someone else could have observed it?  I
3  understand you may have suffered internal turmoil
4  and felt bad and all that stuff, and I don't mean
5  to minimize that?
6      A.  No, right.
7      Q.  But if someone were observing you, what
8  would they say they observed changes in your sleep
9  patterns, behavior, whatever.  That's what I am
10  asking.
11      A.  I don't think there's any doubt that
12  anyone had any trouble knowing that I had lost —
13  had a tremendous sense of loss, which was very
14  evident in my behavior to the extent that I was
15  very subdued, just in various ways in my behavior.
16      Q.  Okay.  Any other ways?
17      A.  Not that I know of right now.
18      Q.  Okay.  Now, you are also seeking economic
19  damages?
20      A.  Yes.
21      Q.  Based upon the pay differential between
22  the site leader position as ultimately compensated
23  and your current position?
24      A.  The promotional opportunities, the
25  incentive compensation associated with all of that,

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
309

1  and where my income would have gone had I become an
2  officer of the company.
3      Q.  And that relates to which position?
4      A.  The site leader position and the Barbara
5  Gardner position.
6      Q.  On the site leader position, what is it
7  that — the Barbara Gardner position, is that an
8  officer position?
9      A.  Yes, it is.
10      Q.  That is an officer position?
11      A.  Yes, it is.
12      Q.  What is it about the site leader position
13  that leads you to believe that you had a reasonable
14  probability of being an officer of the company by
15  going into that position?
16      A.  The fact that one of the site leaders that
17  was selected in spite of the fact that the job was
18  not posted at an officer level, was already an
19  officer, accepted the position, did not lose that
20  officer title, and the reasonable expectation based
21  on my own experience in MetLife Express and
22  everything else that I truly envisioned that it was
23  going to become an officer position as a result of
24  the new organization, which they all did.
25      Q.  Is Ms. Hemenway an officer of the company?

**CONFIDENTIAL**

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
310

1      A.  Yes, she is.
2      Q.  Okay.  Now, you indicate that in your
3  answers to interrogatories, specifically
4  Interrogatory No. 7, that you are projecting a loss
5  of salary for ten years until plaintiff would
6  become eligible for retirement?
7      A.  Yes.
8      Q.  I can show that to you.
9      A.  (Affirmative head nod).
10      Q.  Okay.  Have you ever indicated to
11  anyone — that would be the year 2008.
12      A.  Yes.

13    Q.    2008?
14    A.    Whatever.
15    Q.    Call it?
16    A.    Yes.
17         MR. RAYL:  Yes, I believe you would turn
18    65 in 2007, wouldn't you?
19         THE WITNESS:  Whatever.
20    Q.    (BY MR. POOR)  Whatever.  Late 65, let
21    it's put it that way.
22    A.    (Affirmative head nod).
23    Q.    Have you ever indicated anyone the
24    intention to retire earlier than 65?
25    A.    Yes, prior to MetLife Express, I was quite

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
311

1    frustrated, and I don't think it was my intention,
2    I didn't see anything dramatic happening with my
3    career, I didn't see anything dramatic happening
4    with Teleservices, so I didn't see that, but, in
5    essence, I was rejuvenated as a result of the
6    MetLife Express and my belief that I thought some
7    of these things were finally going to come to
8    fruition, and certainly the prospect if I became an
9    officer, I would not have considered early
10    retirement.
11    Q.    In fact, I will show you plaintiff's --
12    part of what will be marked as Deposition Exhibit
13    45. This is Bates stamped 01431, I can show you
14    the entire letter, I suspect you know what it is.
15    This is a letter you wrote to Bob Crimmins and part
16    of the letter to Bob Crimmins January 19th,
17    1994, --
18    A.    Uh-huh.
19    Q.    -- which indicates at the middle of the
20    page --
21    A.    That I could last another three years and
22    four months.
23    Q.    Three years and four months until you
24    would have been at that point what age?
25    A.    55 I would have been, yes.

ESQUIRE CORPORATE SERVICES
6000 LIVE OAK PARKWAY, STE 100, NORCROSS, GA 888-486-4044
312

1    Q.    55.
2         MR. POOR:  We would like to get a medical
3    release at some point --
4         MR. RAYL:  Okay.
5         MR. POOR:  -- so we can get the documents.
6         MR. RAYL:  Absolutely, no problem.
7         MR. POOR:  That's all I have.
8    (A certain document was marked Deposition
9    Exhibit No. 45 for identification by the reporter.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ESQUIRE CORPORATE SERVICES

**CONFIDENTIAL**

MP4011069670

313

1
2
3
4
5
6       _____
        JAMES L. RAYL
7
8
9
10 STATE OF OKLAHOMA )
11            )  ss.
12 COUNTY OF OKLAHOMA )
13
14
15    Subscribed and sworn to before me this
16 ___ day of _____, 1998.
17
18
19
20      _____
21     Notary Public, State of Oklahoma
22
23
24   My commission expires _____.
25

      ESQUIRE CORPORATE SERVICES

314

1      C E R T I F I C A T E
2
  STATE OF OKLAHOMA )
3          )  ss.
  COUNTY OF OKLAHOMA )
4
5    I, Maynard E. Peterson, RPR, RMR, a
  Certified Shorthand Reporter within and for the
6  State of Oklahoma, do certify that the witness in
  the foregoing deposition, JAMES L. RAYL, was duly
7  sworn to testify the truth, the whole truth and
  nothing but the truth, in the within-entitled
8  cause; that said deposition was taken at the time
  and place herein named; that the deposition is a
9  true record of the witness's testimony as reported
  by me and thereafter transcribed into typewriting
10  by computer.
11    I do further certify that I am not
  counsel, attorney or relative of either party, or
12  clerk or stenographer of either party, or otherwise
  interested in the event of this suit.
13
     I do further certify that I am a duly
14  qualified and acting Certified Shorthand Reporter
  within and for the State of Oklahoma, Certificate
15  No. 00325.
16    IN WITNESS WHEREOF, I have hereunto set
  my hand and affixed my CSR stamp at my office in
17  Oklahoma City, Oklahoma, this 5th day of March,
  1998.
18
19      _____
     Maynard E. Peterson, RPR, RMR
20     Oklahoma Certified Shorthand Reporter
    Certificate No. 00325
21     Exp. Date: December 31, 1998
22
23 COSTS: $ _____
  Paid by Defendant
24

**CONFIDENTIAL**

(1195544.1)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

JAMES L. RAYL,                    )
                                  )
        Plaintiff,                )
                                  ) No. 97-CV-
    vs.                           ) 505H(M)
                                  )
METROPOLITAN LIFE INSURANCE       )
COMPANY, INC.,                    )
                                  )
        Defendant.                )
————————————————————)

**CONFIDENTIAL**

DEPOSITION OF JAMES L. RAYL
New York, New York
Monday, April 13, 1998
Reported by:
LINDA SALZMAN
JOB NO. 69579

2

April 13, 1998
4:00 p.m.
Deposition of JAMES L. RAYL, held
at the offices of Seyfarth, Shaw,
Fairweather & Geraldson, Esqs., 900 Third
Avenue, New York, New York, pursuant to
Notice, before Linda Salzman, a Notary
Public of the State of New York.

3

1
2

3      A P P E A R A N C E S:
4
5          PARKER, STAGGS & ASSOCIATES, P.C.
6          Attorneys for Plaintiff
7              Southern Ridge
8              6506 South Lewis, Suite 220
               Tulsa, Oklahoma 74136
9
       BY:   J. BRIAN RAYL, ESQ.
10
             JEFFREY PARKER, ESQ.
11
12
13         SEYFARTH, SHAW, FAIRWEATHER &

           GERALDSON, ESQS.
14
       Attorneys for Defendant
15
               900 Third Avenue
16
               New York, New York
17
18     BY:   J. STEPHEN POOR, ESQ.
19
20     A L S O   P R E S E N T:

           MARCELO RIVERA, Videographer
21
22
23
24
25

4

1
2          STIPULATIONS
3
4          IT IS HEREBY STIPULATED AND AGREED by
5      and between the attorneys for the respective

6   parties herein, that filing and sealing be
7   and the same are hereby waived.
8      IT IS FURTHER STIPULATED AND AGREED
9   that all objections, except as to the form
10  of the question, shall be reserved to the
11  time of the trial.
12     IT IS FURTHER STIPULATED AND AGREED
13  that the within deposition may be sworn to
14  and signed before any officer authorized to
15  administer an oath, with the same force and
16  effect as if signed and sworn to before the
17  Court.
18
19
20         - oOo -
21
22
23
24
25

**CONFIDENTIAL**

MP40110050062

                        5
1
2      MR. POOR:  Mark this as 55.
3         (Defendant's Exhibit 55, Second
4   Amended Complaint, marked for
5   identification, as of this date.)
6         THE VIDEOGRAPHER:  This is tape No.
7   1 of the videotape deposition of James
8   Rayl taken by defendants in the matter
9   James L. Rayl, the plaintiff, versus
10  Metropolitan Life Insurance Company, Inc.,
11  the defendant, in the United States
12  District Court for the Northern District
13  of Oklahoma, No. 97 CV 505HM.
14        This deposition is being held at
15  the law offices of Seyfarth, 900 Third
16  Avenue, New York, New York, on April 13,
17  1998 at approximately 4:03 p.m.
18        My name is Marcelo Rivera from the
19  firm of Esquire Video Services, and I am
20  the legal video specialist.  The court
21  reporter is Linda Salzman, in association
22  with Esquire Deposition Services, 216 East
23  45th Street, New York, New York.
24        Will counsel please introduce
25  themselves.
                        6
1
2      MR. POOR:  Stephen Poor, counsel
3   for the defendant.
4      MR. RAYL:  Brian Rayl, counsel for
5   the plaintiff.
6      MR. PARKER:  Jeffrey Parker,
7   co-counsel for the plaintiff.
8      THE VIDEOGRAPHER:  Will the court
9   reporter please swear in the witness.
10  J A M E S  L.  R A Y L,
11     called as a witness, having been first
12     duly sworn by a Notary Public, was
13     examined and testified as follows:
14  EXAMINATION BY
15  MR. POOR:
16     Q.    Good afternoon, Mr. Rayl.
17     A.    Hi.
18     Q.    It's good to see you again.
19     A.    Same here.
20     Q.    This is the -- as you recall, we've
21  been through a day or so of your deposition
22  before.
23     A.    Right.
24     Q.    This is to — the purpose of this
25  is to cover a few of the additional counts in the
                        7
1            Rayl

CONFIDENTIAL

MPA011050063

2  second amended complaint filed after our
3  deposition.
4          I presume that you recall the basic
5  ground rules of the deposition. I'm going to ask
6  you some questions, you're going to answer them.
7      A.   I do.
8      Q.   Okay. I hand you what's been
9  marked as deposition No. Exhibit 55, which is the
10 second amended complaint; which is, unless there
11 has been one filed since I left Chicago, the most
12 recent complaint.
13         And you recognize that, don't you,
14 Mr. Rayl?
15     A.   Yes, I do.
16     Q.   Okay. And if I turn your attention
17 to page 6, please, which is where I believe the
18 new counts are added, starting with Count 7,
19 negligence.
20     A.   Yes.
21     Q.   Okay. If you would, take a second
22 and just read that count, sir. It carries over
23 to page 7.
24     A.   Okay.
25     Q.   Now specifically addressing

                           8
1          Rayl
2  paragraph 62, you're talking about, you say
3  "During 1996," then there's a clause, "at the
4  time of the events involving Mr. Rayl."
5          And what events are you referring
6  to, sir?
7      A.   That would be the events basically
8  encompassing all of 1996, I guess, from my
9  experience on MetLife Express through my posting,
10 through my appointment as interim site
11 coordinator, to my ultimate dismissal from the
12 position.
13     Q.   So we're talking about that chain of
14 events from the time you became -- from the time
15 you were -- I'm sorry, your title prior to
16 becoming interim site leader, remind me?
17     A.   Was the director of Call Center.
18     Q.   So that sequence of events we're
19 talking -- and again, Mr. Rayl, I don't want to
20 cover today things we covered over a couple of
21 days, that's not my purpose.
22         That series of events we've talked
23 about from the time you were Call Center director
24 through then the interim, Mr. St. John, the
25 application process and the failure to receive

                           9
1          Rayl
2  that --
3      A.   And I guess it would have to also
4  encompass the events that transpired after that
5  because of the impact it had on me and my health.
6      Q.   And what events after that are we
7  talking about?
8      A.   Which was in essence -- I'm trying
9  to think of the best way -- rapid degeneration of
10 my heart disease, manifested by the increasing
11 symptom level that occurred from June of 1996
12 till January of 1997 when I had the surgery.
13     Q.   Until when in 1997?
14     A.   January 28th.
15     Q.   What events are you talking about
16 in terms of actions or failures to act on the
17 part of MetLife?
18         I understand you had a worsening
19 heart condition, but in terms of what people at
20 MetLife did after you failed to receive the
21 position, what are you talking about?
22     A.   Well, we can start with Mr.
23 Friedewald, Dr. Friedewald I guess.

CONFIDENTIAL

MF4011050064

24    Q.   Okay.

25    A.   And to the extent that he was very

10

Rayl

1

2  much aware of how I felt about the position, what

3  I was trying to accomplish, how much I expected

4  the position, and the act of appointing me as

5  interim site coordinator, never giving me a clue

6  as to the possibility that I wouldn't be

7  appointed the site leader.

8       But it really encompasses that,

9  plus it is my recollection that he does have

10  knowledge of my health situation at that time.

11       So knowing those facts, I feel he

12  was negligent in the way that whole situation was

13  handled, and the company was negligent.

14    Q.   "That situation" being the failure

15  to give you that job?

16    A.   It's much more than just the

17  failure to give me that job. It is again the

18  whole series of events from the posting process,

19  to prolonging the posting process, to creating

20  the expectations, to giving me additional

21  responsibilities, and then to come in and take

22  the job away from me the way they did.

23       But it's that whole series of

24  events.

25    Q.   What is it that Dr. Friedewald

11

Rayl

1

2  specifically did, or conversely should have done

3  that he didn't do, that you believe was

4  negligent?

5    A.   Well, I guess some of that will be

6  determined in our deposition tomorrow with Dr.

7  Friedewald.

8       To the extent that throughout the

9  period of MetLife Express, throughout the period

10  of phase two, phase three interim site

11  coordinator position, if anyone had any

12  difficulty with any aspect of my performance,

13  that was never — it was never mentioned.

14       I was never given any kind of an

15  indication that I would not be basically selected

16  to keep the job I had.

17       So to the extent that at whatever

18  point I ceased to become a candidate for the

19  position or if they felt there were serious

20  performance issues with me, which they did not

21  address with me, then to deny me the position at

22  that point, again, I think that's what I would

23  construe as negligence, again knowing the

24  potential impact that it would have on me.

25    Q.   So it's your belief that Dr.

12

Rayl

1

2  Friedewald should have told you either when he

3  discovered performance problems, to use your

4  term, or realized that you were not going to get

5  the job?

6    A.   Dr. Friedewald had a better

7  knowledge probably of, than anyone, the extent to

8  which I loved the job, I wanted the job, I had

9  performed the job, and with all the contributions

10  I've made to the whole Call Center initiative on

11  MetLife Express and the things that I tried to

12  accomplish.

13       I can't say specifically what he

14  should have done when, because I don't know what

15  was in his mind. But clearly he should have

16  certainly -- well, we could debate what I think

17  the company should have done all day long.

18    Q.   Let me ask it this way, Mr. Rayl,

19  because we covered in some length contributions

CONFIDENTIAL

MP401105006S

20  you think you made and your dedication to the
21  job, and I don't mean to minimize it, but we
22  covered all that; and for sake of time, we will
23  take that as a given.
24      A.    Okay.
25      Q.    What I'm more interested in is your

13

1               Rayl
2   belief, and again I'm not here to debate with
3   you, I'm not going to argue with you, I just want
4   to know from you what it is, and you say Mr. St.
5   John and others, and one of the others you
6   identified is Dr. Friedewald.
7               What is it that Dr. Friedewald
8   either did or failed to do that you believe was
9   negligent and caused you the — well, I guess we
10  will get to the damages, the injuries here in a
11  minute.
12      A.    Both he and Mr. St. John failed to
13  give me any fair indication that there was any
14  issues associated with my performance, that there
15  was any issues associated with my potential
16  selection for the position.
17      Q.    Anything else? I don't mean to
18  infer there was, Mr. Rayl, but —
19      A.    I think it's hard to sit here and
20  say is there anything else.
21      Q.    With regard to those two
22  individuals.
23      A.    With respect to those two
24  individuals, based on the facts I know today, I
25  hope my statement covers it, but I don't want to

14

1               Rayl
2   sit here and unequivocally say that I may not
3   remember or think that there is some other aspect
4   to it.
5       Q.    Okay. You understood that your
6   position was labeled interim site coordinator,
7   correct?
8       A.    Yes.
9       Q.    And you were interviewed by Dr.
10  Friedewald in the springtime, correct?
11      A.    April 30th.
12      Q.    You are aware that they're in the
13  process of selecting site leaders, correct?
14      A.    Yes.
15      Q.    And you're aware that that process
16  went on for a certain period of time, correct?
17      A.    The selection process shouldn't
18  have gone on. The announcement is what dragged
19  on. The selection process should have been over.
20      Q.    Well, what should or should not
21  have happened, Mr. Rayl, is not what I'm asking.
22              You were aware that the process was
23  continuing on up until the point you were told,
24  correct?
25      A.    Yes. And I guess I would also say

15

1               Rayl
2   that dragging that process out that way was
3   negligent.
4       Q.    I understand your position on that,
5   Mr. Rayl.
6       A.    Okay.
7       Q.    Now you also indicated in your
8   complaint "and others, other employees of MetLife
9   in terms of the actions."
10              We've talked about Mr. St. John and
11  we've talked about Dr. Friedewald.
12      A.    Yes.
13      Q.    Anyone else? And you don't have to
14  qualify it by saying you may learn stuff later.
15  I understand that.

16
16     My questions are now based on what
17  you know and what you're aware of as we sit here
18  today.
19     A.   What I know and what I'm aware of
20  today, no, but I have every reason to think that
21  other people may have been involved in the
22  decision; but I do not know that for a fact
23  today.
24     Q.   But as we sit here today, it's Dr.
25  Friedewald and Mr. St. John that are the people

CONFIDENTIAL

MP401105009G

16

1        Rayl
2  involved in your Count 7, to the best of your
3  knowledge?
4     A.   They are certainly involved in the
5  count, yes.
6     Q.   I understand they are, but my
7  question obviously was as you sit here today, can
8  you name anyone else specifically who you
9  believed engaged in acts of negligence, defined
10  as either acts or omissions to act?
11     A.   Not knowing what discussions took
12  place, no, I don't.  But again I suspect there
13  are others that are involved.
14     Q.   And those would be others involved
15  in this process that dragged on?
16     A.   It could be, for example, the
17  degree to which they did or did not consult with
18  human resources, the degree to which human
19  resources did or did not condone their actions.
20     Q.   I'm not asking you to speculate,
21  Mr. Rayl.  I'm just trying to --
22     A.   But I don't want to be -- sit here
23  and say that I am only alleging --
24     MR. RAYL:  Answer to the best of
25     your knowledge today.

17

1        Rayl
2     THE WITNESS:  Okay.
3     Q.   Now you indicate that "The failure
4  of Mr. St. John and at least Dr. Friedewald, was
5  a direct cause of injuries sustained by Mr.
6  Rayl."
7     A.   Yes.
8     Q.   And that's your heart condition you
9  alluded to?
10     A.   Yes.
11     Q.   Is there anything else?  I don't
12  mean to say that that's not enough.
13     A.   No.  It certainly was the mental
14  and emotional distress and everything that I went
15  through at that period of time; in addition to
16  the heart condition, the adjustment I had to make
17  after losing that position, and what it meant to
18  me.
19     Q.   And how did the -- I understand you
20  encountered further coronary difficulties and had
21  surgery in January --
22     A.   Yes.
23     Q.   -- of '97.
24     Other than your heart condition and
25  that physical manifestation, how did the

18

1        Rayl
2  emotional stress, trauma, whatever term you care
3  to use, manifest itself?
4     A.   Certainly in a fairly deep initial
5  depression, and ongoing periods of depression
6  until I began to feel a sense of value in the
7  organization again.
8     Q.   And when was that, from when to
9  when?  Give me a time frame.
10     A.   Probably in -- let's see, this is
11  1998, it was probably mid 1997 before I began to

12    feel halfway decent about what I was doing.
13        Q.    So from mid '96 to mid '97?
14        A.    Yes.
15        Q.    During that time period did you
16    seek any help from any mental health care
17    professionals?
18        A.    No, I did not.
19        Q.    So when you say you suffered a deep
20    depression, those are your terms, not a diagnosis
21    given to you by a mental health professional?
22        A.    Yes.
23        Q.    Did you take any medication or any
24    drug regime as a result of this, quote,
25    depression, close quote?

19
1                    Rayl
2        A.    No, I did not.
3        Q.    Turning your attention to Count
4    8 --
5        A.    Yes.
6        Q.    -- you refer to the operations
7    officer for IB client support services.
8            Do you see that in paragraph 68?
9        A.    Yes.
10       Q.    Who is that?
11       A.    That was the Barbara Gardner
12   position.
13       Q.    That Sharon Condello received?
14       A.    Yes.
15       Q.    And it's your position that hiring
16   Ms. Condello for that position as opposed to
17   promoting you was age discrimination, if I could
18   summarize your count here, correct?
19       A.    Yes.
20       Q.    When did you first express interest
21   in that position, and to whom?
22       A.    I can't really recall, other than
23   the fact that it was only natural that I would be
24   interested in that position.
25           And I did have a conversation, or

20
1                    Rayl
2    perhaps I should say Rich Anderson had a
3    conversation with me, telling me essentially that
4    I would not be considered a candidate for the
5    position.
6        Q.    Now Ms. Gardner moved out of that
7    position.  When did that position open?
8        A.    I think it officially opened
9    somewhere around December of 1996.
10       Q.    When Ms. Gardner moved on to
11   another position?
12       A.    She may have assumed the
13   responsibilities in January or December, I'm not
14   real sure, but it was known in December that she
15   was leaving the position.
16       Q.    Okay.  And at that time you were
17   back working for Ms. Gardner, correct?
18       A.    Yes.
19       Q.    Remind me of your job title at the
20   time, manager of enforce?
21       A.    I'm not sure that I officially had
22   that job title.  In other words, I posted for
23   that position and it was some weeks or months
24   before the position title became effective.
25           I'm almost thinking that it did not

21
1                    Rayl
2    become effective until January, and so I'm not
3    sure how I was carried on the books at that
4    point.
5        Q.    Okay, but that's the job you were
6    doing?
7        A.    I think we were creating the new

CONFIDENTIAL

MP401105006?

8  organization at that time, yes.
9      Q.   Now, there was a period of time,
10 let's just use January of '97; I understand it
11 may have been December of '96, but let's just use
12 January of '97.
13         From that point forward there was a
14 period of time where the operations officer
15 position was vacant, correct?
16     A.   Yes.
17     Q.   When was Ms. Condello actually --
18 when did she show up for work?
19     A.   She was actually appointed to the
20 position in November of 1997. Her first couple
21 of months on the job were here in New York. She
22 was back and forth, but she was officially in the
23 position November.
24         She showed up on site to take full
25 responsibility I believe in January of '98.

CONFIDENTIAL

MP401105006B

                        22
1            Rayl
2      Q.   But for approximately ten months
3  the position was empty?
4      A.   That's correct.
5      Q.   Who was covering the functions of
6  that -- or what people were covering the
7  functions of that position during that ten
8  months?
9      A.   The responsibilities were
10 theoretically split between Mr. Jim Judd and
11 myself.
12     Q.   Jim Judd?
13     A.   Yes.
14     Q.   J-U-D-D?
15     A.   Yes.
16     Q.   And Rich Anderson was at that point
17 in time your direct report?
18     A.   Yes.
19     Q.   Or your direct supervisor, I'm
20 sorry.
21     A.   Yes.
22     Q.   And with Ms. Condello coming in you
23 now report to Ms. Condello, who in turn reports
24 to Mr. Anderson?
25     A.   Yes.
                        23
1            Rayl
2      Q.   What is the job of the operations
3  officer for IB client support services?
4      A.   Basically what has now been defined
5  under the new organization as client support
6  services, which encompasses enforce management,
7  my organization, planning and development, the
8  death claims area, the policyholder services
9  area, cash loan and dividend, which is cash loan
10 and dividend operations, annuities, beneficiary
11 and assignment, mail microfilm supply, all report
12 to Ms. Condello.
13     Q.   Approximately how many people are
14 in her organization?
15     A.   I think the number is something in
16 the neighborhood of 250 to 280.
17     Q.   How many people does she have
18 directly reporting to her now in addition to you
19 and Mr. Judd?
20     A.   There was a total of seven,
21 counting Mr. Judd and myself.
22     Q.   How does this job compare with the
23 job held by Ms. Gardner mainly prior to moving
24 out of that job, if you know?
25     A.   Well, the job was diminished while
                        24
1            Rayl
2  Ms. Gardner had it as a result of the
3  reorganization, but it is essentially the same

4   job that Ms. Gardner had when she left the
5   position.
6      Q.   And this conversation you had with
7   Mr. Anderson --
8      A.   Yes.
9      Q.   -- is this the one and only
10  conversation you can recall that you had with Mr.
11  Anderson about this job or your candidacy, for
12  lack of a better term for that job?
13      A.   Yes.
14      Q.   When did this conversation occur?
15      A.   I believe it was in January of '97.
16  I believe it was before my surgery. It's
17  possible it was later, but after I returned from
18  disability.
19      Q.   Now, prior to the conversation had
20  you and Mr. Anderson exchanged any documents,
21  correspondence, memoranda, about this position or
22  your candidacy for it or interest in it, or
23  anything like that?
24      A.   Not that I recall.
25      Q.   Was that conversation with Mr.

25

1          Rayl
2  Anderson in person or on the phone?
3      A.   It was in person. It was during a
4  visit I believe to Tulsa. And he essentially had
5  the same conversation with Mr. Judd, as I recall.
6      Q.   Were you two present at the same
7  time?
8      A.   No.
9      Q.   Is this Mr. Judd relating it to
10  you?
11      A.   Yes, it is.
12      Q.   And the conversation he had with
13  you, please walk me through it.
14      A.   If I could remember it I would. I
15  don't really remember much of it other than he
16  had indicated, I'm not sure whether it was in
17  response to a question on my part what did he
18  plan to do about the position and my candidacy,
19  but he had indicated that he was going to take
20  his time, he was going to look for an external
21  candidate, and essentially I would not be a
22  candidate.
23      Q.   Were there other topics on the
24  agenda for Mr. Anderson to come to Tulsa at least
25  to deal with you, or is this the only thing you

26

1          Rayl
2  and he talked about?
3      A.   He typically made routine visits.
4  I would assume that he probably wanted to get
5  that message out there as quickly as possible,
6  but I'm sure there were other things he discussed
7  also.
8      Q.   What else did you and Mr. Anderson
9  discuss about this job or the selection process,
10  other than he was going to take his time and you
11  were not a candidate?
12      A.   I really don't recall specifically.
13  I'm sure I expressed some level of disappointment
14  and disagreement that I would not be considered a
15  candidate, but I wasn't in a mental state, I
16  guess, to fight that at the time.
17      Q.   And you say Mr. Judd had a similar
18  conversation with Mr. Anderson?
19      A.   Yes.
20      Q.   Do you know whether he had any
21  conversation with other members of management in
22  Tulsa?
23      A.   Not that I know of.
24      Q.   Now this job was not posted,
25  correct?

CONFIDENTIAL

MP401105069

27

Rayl

1  A.    Correct.
2  Q.    As an officer level, under the
3  policies it didn't have to be posted, correct?
4  A.    Correct.
5  Q.    Did you ever see anything in
6  writing that defined the qualifications or the
7  functions of that job, what they were looking
8  for?
9
10  A.    No. Only my observations over the
11  years, and plus the fact that my peer in Warwick
12  had received that job for that operation.
13  Q.    Who was that?
14  A.    Kathy Schoos, S-C-H-O-O-S, Kathy
15  with a K.
16  Q.    At the time had you seen Ms.
17  Schoos -- is that how you pronounce that -- the
18  reviews of Ms. Schoos?
19  A.    No, I had not.
20  Schoos was good person. She
21  deserved the job.
22  Q.    Did you and Mr. Anderson ever have
23  any conversations about what he was looking for
24  on the job, what the skill sets were, what the
25  dimensions were of the job that he was looking

28

Rayl

1  for, other than what you have told me?
2  A.    It's possible he told me other
3  things at the time, but I don't remember what
4  they might have been.
5  Q.    What do you know about Ms.
6  Condello's background?
7  A.    I think she had essentially a
8  similar capacity, but at a much, much smaller
9  company.
10  Q.    Similar capacity --
11  A.    In terms of operations
12  management -- or I don't know whether she was an
13  officer of the company she came from or not.
14  Q.    So similar capacity is the job
15  she's doing now, but at a smaller company as
16  opposed to some of the capacity you --
17  A.    Yes.
18  Q.    Do you know where she came from?
19  A.    Ameritas Life in Nebraska,
20  A-M-E-R-I-T-A-S.
21  Q.    Did you know her before she started
22  at MetLife?
23  A.    No, I did not.
24  Q.    Have you ever seen a resume on her,

29

Rayl

1  or any written information about her background?
2  A.    No.
3  Q.    Do you believe you are better
4  qualified for the job than she?
5  A.    I believe she is qualified for the
6  job, but I do believe I was better qualified
7  considering all the positions I've had in that
8  office, the things I've managed, what I knew
9  about it.
10
11  But I would take nothing away from
12  her. She's a good, competent person.
13  Q.    Now you indicated that that
14  position supervises, and I may not have written
15  them all down, enforce management, right?
16  A.    Yes.
17  Q.    And that was a job you had begun to
18  take over at the time, correct?
19  A.    Yes.
20  Q.    And then I wrote down P&D.
21  A.    Planning and development.

CONFIDENTIAL

MP401105070

22 Q. Which has evolved over '97?
23 A. Yes.
24 Q. Also under your area of
25 responsibility?

30

1 Rayl
2 A. Yes, parts of it have evolved.
3 Q. Parts were there and parts had
4 evolved.
5 And death claims --
6 A. Yes.
7 Q. -- have you ever had any
8 responsibility for supervising that function?
9 A. Not death claims per se, no.
10 Q. You said policyholder services?
11 A. Yes. That's the cash loan dividend
12 transactions.
13 Q. That's the same as the CLD?
14 A. CLD, right.
15 Q. And you had some responsibility for
16 that when you had the Call Center operations,
17 correct?
18 A. Yes. I had responsibility for
19 actually taking that particular operation from a
20 staff of 30 people to a staff in excess of a
21 hundred when we consolidated work from several
22 other offices.
23 Q. You said annuities?
24 A. Yes.
25 Q. Did you ever have any supervisory

31

1 Rayl
2 responsibilities over annuities?
3 A. No. That was a new function that
4 was brought into our office with the
5 reorganization.
6 Q. I think you listed some more
7 functions, but I confess I got tired and stopped
8 writing them down.
9 A. There was beneficiary and
10 assignment, mail microfilm and supply. I'm
11 trying to think. Let me see. I think that
12 pretty much covers it.
13 Q. Had you ever had any supervisory
14 responsibility over the beneficiary and assigns
15 area?
16 A. No.
17 Q. Same question for the mail
18 microfilm and supply area.
19 A. I have had mail and supply report
20 to me in the past, as well as other pieces of the
21 organization that are no longer a part of it.
22 Q. What is it that makes you think
23 that age was a factor in the decision to hire Ms.
24 Condello as opposed to promote you?
25 This would have been a promotion,

32

1 Rayl
2 right?
3 A. Yes, it certainly would.
4 Q. What makes you think that age was a
5 factor in the decision to hire Ms. Condello as
6 opposed to promoting you?
7 A. To the extent that I still believe
8 that I was more qualified, I should have been,
9 with my experience and background, a better
10 candidate.
11 The conclusion has to be that there
12 was some reason, and age could certainly be a
13 consideration in that decision.
14 Q. Nobody ever told you that, correct?
15 A. Nobody told me that, no.
16 Q. You never saw anything in writing
17 to indicate that, correct?

CONFIDENTIAL

MFА011050071

18   A.   No.
19   Q.   Turning your attention to Count 10.
20       MR. POOR:  Mark this 56, please.
21      (Defendant's Exhibit 56, memo to
22  Richard Anderson, marked for
23  identification, as of this date.)
24       MR. POOR:  Mark this 57.
25      (Defendant's Exhibit 57, E-mails,

33

**CONFIDENTIAL**

1         Rayl
2  marked for identification, as of this
3  date.)
4       MR. POOR:  Mark this 58.
5      (Defendant's Exhibit 58,
6  performance and compensation review,
7  marked for identification, as of this
8  date.)
9       MR. POOR:  These may have been
10  previously marked, Brian.  I don't know.
11  57 is E-mails.  58 is a thing called
12  performance and compensation review.
13    A.   Okay.
14    Q.   Now, in Count 10 you refer to
15  performance review given to you on the 14th day
16  of January 1998 that you contend is retaliatory.
17    A.   Yes.
18    Q.   I assume that performance review is
19  the one which has been marked for purposes of
20  identification as Deposition No. 58, correct?
21    A.   Yes.
22    Q.   And then Deposition Exhibit No. 56
23  is your response to that, correct?
24    A.   Yes.
25    Q.   The memo to Richard Anderson?

34

1         Rayl
2    A.   Yes.
3    Q.   And in Deposition Exhibit No. 57 is
4  the -- are the E-mails, or in your words, the
5  exchange of communications?
6    A.   But it is only part of the exchange,
7  it is not the full file.
8    Q.   Okay.  It's a few of the E-mails,
9  but not all?
10    A.   Well, maybe it is in here.  I need
11  to look at the dates.  Okay, it may or may not
12  be.
13    Q.   Anything specifically you're
14  thinking of that you don't think is included?
15    A.   No.  Actually, the second one -- I
16  brought a copy of the file.  I didn't remember
17  this one as being the last one on the subject,
18  but -- oh, this is for Karen, okay.
19    Q.   Okay.  So Mr. Anderson, who as of
20  January 14th -- I guess Ms. Condello had -- was
21  on board by that point in time, but had only been
22  directly monitoring you for a short period of
23  time?
24    A.   Yes.
25    Q.   So it was Mr. Anderson that gave

35

1         Rayl
2  you your review for '97?
3    A.   Yes.
4    Q.   Was anyone else present in the
5  room?
6    A.   No.
7    Q.   Did he give you Deposition Exhibit
8  No. 58 at the time?
9    A.   Yes, he did.
10    Q.   Did he walk through it with you?
11    A.   Yes, he did.
12    Q.   Tell me what you recall him saying
13  during your meeting.

MP401105007Z

14    A.  He pretty much went through what he
15 wrote on here. I took strong exception to it,
16 particularly the part where he said "Jim's
17 accomplishments during the year have been fair at
18 best.
19      "First, I am not confident that the
20 procedural development role for which Jim bears
21 supervisory responsibility is" --
22    Q.  I see the section you're referring
23 to. It's the middle part of the page under
24 "Achievements."
25    A.  And he proceeded to tell me that he

36

1         Rayl
2 felt the procedural development function for
3 other parts of the organization, namely cash flow
4 and dividend, did not meet his expectations.
5    Q.  Did he say to you why?
6    A.  It didn't matter. I had no
7 responsibility for that function.
8    Q.  Whether you had responsibility for
9 it or not, and we'll get to that in a second, did
10 he explain what was going on in that area that
11 was not up to his expectations?
12    A.  No. He didn't really specify what
13 was not up to his expectations.
14    Q.  At that point you did not have the
15 CLD area?
16    A.  And I still don't.
17    Q.  You didn't have it in '97?
18    A.  No,
19    Q.  Did he talk about -- the next
20 paragraph starts "Second, and most
21 significantly."
22    A.  Yes.
23    Q.  Did he -- and we don't need to read
24 it.
25    A.  Okay.

37

1         Rayl
2    Q.  What else did he say about that
3 topic, the need to foster partnership, critical
4 incidents causing harm, and the ability to work
5 as a team, et cetera, what did you and he
6 discuss?
7    A.  He expressed concern over the
8 exchange with Theresa.
9    Q.  Those are the E-mails we --
10    A.  Yes, and some of the issues on the
11 Call Center.
12      However, earlier in 1996 Mr. St.
13 John from the Call Center had basically spoken to
14 Rich to ask that I be refrained from even
15 supplying information about the Call Center when
16 I attempted to draft a service level agreement.
17      I think those notes were turned
18 over. Also his notes on that subject were turned
19 over to us in the document production.
20    Q.  So is that something you knew at
21 the time?
22    A.  I knew, I was told by Mrs. Gardner
23 that I was supposed to refrain from being
24 involved with the Call Center, when that was a
25 little difficult since that is what my

38

1         Rayl
2 organization did.
3      The Call Center in 1997 under the
4 leadership of Ms. Hemenway, and to some extent
5 some of the people in the office, namely Theresa
6 Hornsby, did not really understand the
7 organizational considerations that were taking
8 place.
9    Q.  Is this the conversation you and

CONFIDENTIAL

MPH01150073

10    Mr. Anderson were having on January 14th?
11        A.   I'm sure that I mentioned some of
12    those things.
13        Q.   Well, what I'm really interested in
14    is what you remember saying to Mr. Anderson and
15    what you remember him saying to you on this
16    second point here.
17            We will cover background later if
18    you want to.
19        A.   I told him that I believed he was
20    reacting to one specific situation, and that his
21    absence during the course of the year and his
22    direction, and basically the way he left the
23    organization, made it impossible to effectively
24    deal with the Call Center, because the Call
25    Center didn't see anybody in Tulsa on the

**CONFIDENTIAL**

MF401105074

                                    39
1                Rayl
2    individual business side as having responsibility
3    to deal with them.
4            And the absence of the officer
5    position —
6        Q.   And what did Mr. Anderson say in
7    response to that?
8        A.   I'm not sure.  I don't remember.
9        Q.   What else do you recall he and you
10   discussing at the time of your performance
11   review?
12       A.   I'm sure I discussed that the Lotus
13   notes development that we had done that we had
14   given a presentation to Mr. Benmoshe, which
15   commanded a lot of attention — and in fact
16   resulted in the employee working for me being
17   offered and receiving a very, very substantial
18   promotion and pay increase to come to New York —
19       Q.   Who was that?
20       A.   — and to continue the work.
21            Charles Skipper.
22            And the impact that had on the
23   organization, the fact that we had been charged
24   with trying to continue that development work,
25   and the fact that we did and were continuing that

                                    40
1                Rayl
2    development work, all of that would never have
3    happened had I not been the individual in that
4    position.
5        Q.   And you felt that contribution was
6    overlooked in the review?
7        A.   That contribution as well as what
8    we did procedurally in terms of the procedural
9    development that had to be handled for the Call
10   Center, to move the annuity and group annuity
11   work into the Call Center.
12            There was any number of things that
13   he overlooked.  He only focused on what few
14   negatives he could find.
15       Q.   What else do you recall discussing
16   with Mr. Anderson at your meeting?
17       A.   Other than the performance
18   appraisal, nothing.
19       Q.   By "performance appraisal," you
20   mean the rating at the end?
21       A.   Yes.
22       Q.   What do you recall discussing about
23   the generally effective rating?
24       A.   That I felt that it was inaccurate.
25       Q.   You then wrote Mr. Anderson, I

                                    41
1                Rayl
2    assume overnight or the next day, this memo
3    that's dated — marked Deposition Exhibit 56 and
4    dated January 15, 1998?
5        A.   Yes.

CONFIDENTIAL

MP401105075

6    Q.    And just a couple of points I want
7  to ask you about this memo.
8    A.    Sure.
9    Q.    The second paragraph of the first
10  page starts "As I stated to you, you talked about
11  the particular exchange of communications with
12  Ms. Hornsby."
13         Those are the E-mails we talked
14  about, right?
15    A.    Yes.
16    Q.    And then under "Call Center
17  communications issues, lack of officer position,"
18  first paragraph, you're referring to you had a
19  piece of the organization involving support for
20  the Call Center and Jim Judd had to manage all
21  the administrative operations, but neither of you
22  had the authority to address such as the officer
23  position would have?
24    A.    Correct.  And particularly since
25  Mr. St. John had made it a point that he didn't

                    42

1                   Rayl
2  want the Call Center to deal with me.
3    Q.    Now you talk about Kathy Schoos in
4  the second paragraph?
5    A.    Yes.
6    Q.    First paragraph you're talking
7  about you and Mr. Judd and your respective
8  responsibilities?
9    A.    Yes.
10    Q.    Sort of a power sharing
11  relationship here.
12         In the next paragraph you're
13  talking about Kathy Schoos?
14    A.    Yes.
15    Q.    Now what was her role in this
16  process?  She was in Warwick, correct?
17    A.    Right.  She was the officer, and as
18  issues arose with the Call Center, in general
19  terms let's say Call Center issues that were
20  universal or that -- well, that crossed both
21  Tulsa and Warwick, Kathy Schoos was the person
22  they looked to deal with those.
23         Issues or Call Center issues
24  between individual business and the Tulsa Call
25  Center, there was no nobody to deal with those

                    43

1                   Rayl
2  issues.
3    Q.    Okay.  And Mr. Anderson was
4  actually in New York, correct?
5    A.    Yes.
6    Q.    Was he Ms. Schoos' boss as well?
7    A.    Yes.
8    Q.    How often did he come out to Tulsa?
9    A.    I would guess once a quarter or
10  thereabouts.
11    Q.    When he would come out, would he
12  spend a day or two or stay for longer than that?
13    A.    No.  He would typically spend about
14  a day.
15    Q.    Now did you and Mr. Anderson ever
16  talk about your lawsuit or charge of
17  discrimination?
18    A.    No.
19    Q.    He never raised it with you in any
20  way?
21    A.    No.
22    Q.    Did you talk about your lawsuit or
23  your charge of discrimination with anyone else at
24  MetLife?
25    A.    Not that's currently an employee.

                    44

1                   Rayl

CONFIDENTIAL

2  I have spoken to -- Mr. Lyons knows about it.
3      Q.   Who is Mr. Lyons; remind me.
4      A.   He is a former director, retired.
5      Q.   He's the only person you've talked
6  to about it?
7      A.   Ms. Condello is aware of it.
8      Q.   And she's aware of it because?
9      A.   I told her.
10     Q.   Now why is it that you believe that
11 this performance review, the performance rating,
12 was done in retaliation or because you filed your
13 lawsuit or the age claim with the EEOC?
14     A.   I found the circumstances to be a
15 little coincidental that throughout the course of
16 the year Mr. Anderson never made a single comment
17 or reference to performance issues.
18          When we received notification that
19 he was coming to Tulsa, I was given no indication
20 whatsoever that he had any intent of discussing
21 my performance.
22          Had I known then, I would have been
23 better prepared to have had a meaningful
24 discussion with him, and one in which I would
25 have assumed I would have been able to provide

45

1          Rayl
2  some input; but the fact that he came out wham,
3  bam.
4      Q.   And what's that got do with your
5  lawsuit or your charge?
6      A.   I am sure he's aware of it.
7      Q.   How do you know he's aware of it?
8      A.   I don't know he's aware of it for
9  sure.
10     Q.   But let's assume he is.
11          What is it that makes you think
12 your charge or the lawsuit influenced what kind
13 of review he gave you?
14     A.   Because to write a review that
15 encompasses nothing positive and only focuses on
16 a couple of negative situations and one lousy
17 communication that upset somebody, is hardly
18 grounds to sit there and give me no credit for
19 carrying the responsibility we did out there in
20 terms of trying to manage an operation that he
21 left in the state that he did, without appointing
22 an officer, or any recognition of those positive
23 things that were done; to only come out, tell me
24 the negative, "I am reducing your rating," and
25 then get up and leave, seemed to me it was an

46

1          Rayl
2  intentional act.
3      Q.   Have you ever gotten a review from
4  Mr. Anderson before?
5      A.   No.
6      Q.   Do you know how he normally handles
7  reviews?
8      A.   No, I don't.
9      Q.   Do you know how he handled Mr.
10 Judd's review?
11     A.   Same way I believe.
12     Q.   Did Mr. Judd file a charge of
13 discrimination, to your knowledge?
14     A.   Not to my knowledge.
15     Q.   When was your lawsuit filed?
16     A.   March of '9 -- March or April of
17 '96.
18     Q.   Spring of '96?
19     MR. RAYL:  Yes, that's fair.
20     Q.   About ten or eleven months before
21 your review?
22     A.   Yes.
23     Q.   And your charge of discrimination

24    was filed about the same time, shortly thereafter
25    I think?

47

1            Rayl
2          MR. RAYL: It was filed before
3    that.
4       A.   I think I filed with the EEOC in
5    January of '97.
6          MR. RAYL: '96.
7       A.   '96, yes.
8       Q.   In the two-year period while your
9    EOOC charge was filed or pending, or between the
10    time you filed it more precisely in January of
11    '96, you and Mr. Anderson had no conversations
12    about your charge or your lawsuit, correct?
13       A.   No.
14       Q.   And other than through a retired
15    director's name I have already forgotten, you
16    didn't have any other conversations with anyone
17    at MetLife other than Ms. Condello, who you since
18    told about your charge or your lawsuit; is that
19    correct?
20       A.   Not to my knowledge, no.
21          MR. POOR: That's all I have.
22          MR. RAYL: Great.
23          THE VIDEOGRAPHER: The time is now
24    4:56 p.m., April 13, 1998, and this
25    completes the videotaped deposition of

48

1            Rayl
2    James L. Rayl.
3          (Time noted: 5:00 p.m.)
4
5
     _____
6          JAMES L. RAYL
     Subscribed and sworn to before me
7    this_____day of_____1998.
8    _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

49

1
2         C E R T I F I C A T E
3   STATE OF NEW YORK   )
                ) s.s.:
4   COUNTY OF NEW YORK   )
5
6       I, LINDA SALZMAN, a Notary Public
7    within and for the State of New York, do
8    hereby certify:
9       That JAMES L. RAYL, the witness
10    whose deposition is hereinbefore set forth,
11    was duly sworn by me and that such
12    deposition is a true record of the testimony
13    given by such witness.
14       I further certify that I am not
15    related to any of the parties to this action
16    by blood or marriage; and that I am in no
17    way interested in the outcome of this

CONFIDENTIAL

MP401105007?

18  matter.
19     IN WITNESS WHEREOF, I have hereunto
20  set my hand this ____ day of _____, 1998.
21
22
23                                         **CONFIDENTIAL**
24     LINDA SALZMAN
25

50

1
2      —————I N D E X—————
3  WITNESS    EXAMINATION BY    PAGE
4  James L. Rayl   Mr. Poor     5
5
6     ————E X H I B I T S————
7
    DEFENDANT'S              FOR I.D.
8
9  55    Second Amended Complaint   5
10  56    Memo to Richard Anderson   32
11  57    E-mails      33
    58    Performance and compensation
12         review      33
13
14
15
16
17
18
19
20
21
22
23
24
25

XP40101050478