Appendix B

Re    Household Information Regarding Policies Under the Accelerated Payment
      Arrangement

The report will be distributed to Regional Vice-President and will include the
following information:
- For each agency all policies on the Accelerated Payment arrangement
- For those policy owners with a policy on the Accelerated Payment
  arrangement, other MetLife products in-force in the household

There will be separate reports for agency managers and for the servicing agents.
The agency manager report will include a control list indicating the number of
policies assigned to each active servicing account representative in the agency,
regardless of where the policy owner resides. It will also include orphaned
contracts that have to be assigned to an agent. The number of policies will be
broken down to show those whose values are still sufficient and those with
insufficient values. It will look like the following:

| Manager's Control List Policies Under the Accelerated Payment Arrangement Sales Office: A18 (Alderwood, WA) | | | |
|---|---|---|---|
| This list contains the agencies in your sales office with policies under the Accelerated Payment arrangement that are assigned to an active servicing agent. Orphaned policies are listed on a separate page and should be assigned to an active agent. The numbers of policies that are sufficient and the number insufficient are shown separately. | | | |
| Agency Index   Name of Servicing Agent | # of Sufficient Policies | # of Insufficient Policies | # Insufficient Within 5 Years |
| xxxx-y        John Doe | 4 | 2 | 1 |
| aaa-b         Sally Smith | 1 | 3 | 0 |
| Total | 14 | 9 | 3 |

For each policy under the Accelerated Payment arrangement a household report
for each account representative will be provided in duplicate–one for the
account representative and one for the agency manager. The report will look like
the following:

| Sales Office: A18 (Alderwood, WA) Servicing Agent: xxx  John Doe | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Address | Policy Suffix | Owner | Plan | Issue Date | Acct Bal/ Face Amt | Date When Insufficient | Date Phoned | Appt Date |
| 123 Street Any City, State Tel:1111111111 | 1234567 A 4567890 O 3425678 AB | Name Name Name | Life MPC Pen | 5/2/87 9/17/91 11/2/83 | 150,000 67,444 | 5/2/03 | –/–/– | –/–/– |
| 456 Street Any City, State Tel:1111111111 | 2345567 A 6785321 AB | Name Name | Life Pen | 10/16/65 12/1/71 | 50,000 36,743 | NA | –/–/– | –/–/– |

**CONFIDENTIAL**

7

MP40110710980

Appendix C

Re    Single Premium Life Policy for AP Option Program

The Single Premium Life policy provides a guaranteed death benefit at no less than 70% of the original policy's face amount, all riders and supplementary benefits are eliminated, and no further premiums are payable. The policy is not paid-up. Instead, the cash value is credited with interest and reduced each year to pay for the cost of insurance and administration (as in our UL policies). The cash value may eventually become zero, but the death benefit remains in effect for the rest of insured's life. This policy does not earn dividends.

It is important that you compare the Single Premium Life policy design with the nonforfeiture reduced paid-up option of the basic policy. The nonforfeiture reduced paid-up insurance is of the same type as the original basic policy, except that the face amount may be reduced to an amount less than 70% of the original policy's face amount, all riders and supplementary benefits are eliminated, and no further premiums are payable. But, since the reduced paid-up policy continues to be eligible for dividends, the cash value and death benefit will continue to grow.

Thus, in time, the death benefit under the reduced paid-up policy could surpass the death benefit provided by the Single Premium Life policy.

Please Note: If the Reduce Face option is elected and the cash value from the Life @95 policy is being 1035 exchanged to the Single Premium Life, all 1035 exchange rules apply. Thus, for example, the policy owner and insured cannot be changed. State required replacement forms and the replacement checklist must be completed.

CONFIDENTIAL

8

MP401107081

## Appendix D

**Re    Request for a Modified Accelerated Payment Arrangement**

MP4011070982

| REQUEST FOR A MODIFIED ACCELERATED PAYMENT ARRANGEMENT | |
|---|---|
| Sales Office # and Name:_____ | Agency: _____ |
| Policy #:_____  Suffix: _____  Policy owner's Name: _____ | |
| Policy owner's Address: _____  Insured's Name (if Different): _____ | |
| Telephone #: _____  Current Dividend Option: _____ | |
| Taxpayer ID: ☐☐☐ ☐☐ ☐☐☐☐ | |

**PAY NONE**

☐ *"Wait & See"*—I understand my policy's values might not be sufficient to pay all subsequent annual premiums when due, but I elect to Wait and See what happens.

☐ *"Reduce Face"*—I elect to Reduce my Face Amount of insurance coverage to $_____ and exchange my policy for a non-participating Single Premium Life Policy. I understand by electing this option I will not ever have to pay another premium out-of-pocket for coverage under this policy provided there is no subsequent withdrawal or loan. I further understand that once reduced, I cannot reinstate coverage under this policy and that my current cash value will be used to pay for the cost of the insurance. Finally, I understand this option is available only if I have paid premiums in full for at least 7-11 years (depending on my plan and underwriting class), my only dividend option since issue has been AI or DWI, I have never made a withdrawal from my policy, and there are no outstanding policy loans. I understand election of this option is subject to MetLife's approval.

☐ *"Reduced Paid-Up"*—I elect the Reduced Paid-Up option described in my policy.

**PAY SOME**

☐ *"Pay Full"*— I elect to pay the next __ annual premium(s) for the above policy out-of-pocket.

☐ *"Pay Part"*—I elect to pay $_____ of my annual premium for the above policy out-of-pocket each year with the balance being paid as indicated below

☐ *"Pay the Difference"*— I elect to use future dividends to reduce the amount of annual premium I pay each year and to pay the balance of my annual premium(s) for the above policy out-of-pocket each year.

☐ *"Pay Every 4 Years"*—I elect to pay my annual premium for the above policy out-of-pocket once every 4 years and to pay the annual premium in the other three years as indicated below.

Further, I authorize that each year the balance of the annual premium for the above policy that I do not pay out-of-pocket be paid via a withdrawal of the policy's dividend balance 1st. If the cash value of the dividend balance is not sufficient to pay the full premium, the balance of the premium should then be paid by a withdrawal from the cash value of the Paid-Up Additions Rider, if any. With regard to any of the "PAY SOME" options, I understand that future dividends are not guaranteed. If future dividend scales decrease and/or I make a withdrawal from or take a loan against the policy, it may not be possible to have all future premiums paid under the Accelerated Payment arrangement. In such case, I understand that the Accelerated Payment arrangement will terminate and if I want the policy to remain in effect, out-of-pocket premium payments will be required.

**SIGNATURE**

_____    _____
(Signature of Policyowner)                    (Date)

CONFIDENTIAL

MP401107 0983

## Accelerated Payment
Providing Our Customers With Options

**MetLife**
Metropolitan Life Insurance Company
Home Office: New York, NY
For internal use only
6740211094.eq/1200/AR.E-LB

---

## Accelerated Payment
### Agenda

- AP Guiding Principles
- Current AP Situation
- Industry and MetLife Response
- New Illustration Demonstration

---

## AP Program
### Guiding Principles

- We Are In the Agent Business
- Sales Rep/Customer Interaction is Fundamental
- Market Forces Cannot Be Resisted
- Things Do What They Do
- All Customers Are Not Created Equal
- Range of Options
- Fairness
- Meet Customer Expectations

**CONFIDENTIAL**

NYP401107098 4

### Accelerated Payment

*Current Situation*

- Expectations Not Met
  - Sales Rep ⎫ "I/my client will pay X
  - Customer ⎭ premium for Y years."
- Reason ➡ Market Forces
  - Declining Interest Rates
  - Expenses



*Industry Response*



### A Sampling of Industry Responses

- Enhanced Value Policy
- Optional Enhanced Loan
- Enhanced Value Annuity

**CONFIDENTIAL**

MP40110709985



*Industry Reponses in Simpler Terms*

● Pay More (Policy)

● Pay More (Loan)

● Pay Once (Annuity)

---

*Enhanced Value Policy Option*     Pay More

● New policy subject to underwriting (liberalized)
● No Commissions
● 1st year premium must be paid
● Enhancement = 50% of new policy premium deposited into a PUAR



*Here's An Example....*

---

*Enhanced Value Policy Option*     Pay More

| Issue Age | 35 | 42 | |
|---|---|---|---|
| Original Premium | $1,500 | $2,050 | $550 |
| | | × 50% | Prem Diff. |
| Enhanced Amount | | $1,025 | |

Policyholder buys a new policy increasing his/her premium payment by $550 (new prem minus orig. prem) in order to receive the enhancement.

---

**CONFIDENTIAL**

3

MP4011070986

---

**Pay More**

## Optional Enhanced Loan

- Loan Rate = Cost of Funds + 50 bp
- Maximum Loan = Annual Premium (up to 6 loans)
- Loans secured by policy values
- *Summary*
- Loans reduce the Death Benefit
- With a $2500 premium, the interest saved is $37.50/yr (based on average difference of 150bp between regular loan rate and enhanced rate

---

**Pay Once**

## Enhanced Value Annuity Option



Life Insurance  →  and/or  →  Single Premium Deferred Annuity

---

**Pay Once**

## Enhanced Value Annuity Option

- Nonqualified SPDA
- No commissions
- Payment amount:
  - Minimum = $2,500
  - Maximum = $10,000 to $50,000 (depending upon original face amount)

---

**CONFIDENTIAL**

MP4011070987

---

Pay Once

### Enhanced Value Annuity Option
#### (Cont'd)

_Enhancements_

- 1% above current credited rate (1st year only)
- Payment:
  - 2% on single payments of ≤ $25,000
  - 3% on single payments > $25,000
- Surrender charges waived at later of 59 1/2 or 4th contract year

---

NEW YORK LIFE

### Industry Response Summary

⊕ Phoenix Home Life

| Option | Death Benefit | Cost |
|---|---|---|
| Life Insurance (Pay More) | New | Increased |
| Loan (Pay More) | Reduced | Increased |
| Annuity (Pay Once) | None (Possibly) | None |

---

### Accelerated Payment

_Current Situation_

- Expectations Not Met
  - Sales Rep ⎫
  - Customer ⎭ "I/my client will pay X premium for Y years."
- Reason ➤ Market Forces
  - Declining Interest Rates
  - Expenses

---

**CONFIDENTIAL**

5

MP401107098B

*AP Issue*

<u>*MetLife's Action Plans*</u>
- *Educate reps/customers*
- *Provide options to facilitate trade-offs*



YOUR METLIFE POLICY
...AND THE
ACCELERATED PAYMENT ARRANGEMENT

*Reviewing Your Whole Life Policy*
*(From Trackbook)*

**CONFIDENTIAL**

6

*Whole Life Insurance—A Choice
to Last a Lifetime*
(From Trackbook)



*The Accelerated Payment
Arrangement*
(From Trackbook)



*How Dividends Are Determined*
(From Trackbook)

**CONFIDENTIAL**

MPA0101070689

Dividends Are The MetLife
Portfolio
*(From Trackbook)*

Dividends — A Long-term View
*(From Trackbook)*

AP Issue

<u>MetLife's Action Plans</u>
- Educate reps/customers
- *Provide options to facilitate trade-offs*

**CONFIDENTIAL**

8

MP401107099-1

## AP Issue
### Options

Principle
- All customers are **NOT** equal



Irate Guy
"I want to pay
X Premium for Y years"

Not So Irate Guy
"I'd rather pay X Premium
for Y years, but what are
my options?"

---

## AP Issue
### Current Options
- Pay full premium
- APL
- Elect "Dividends to Reduce"
- Elect nonforfeiture provision
  - Extended term
  - Reduced paid-up
- Wait and see
- Lapse

---

### Payment Options
(From Trackbook)

---

CONFIDENTIAL

MP401107092

*Payment Options (Cont'd)*
*(From Trackbook)*

_____
_____
_____
_____
_____
_____
_____



*AP Issue*
*Options*
*Irate Guy*

Pay None

Reduce Face          Wait and See

_____
_____
_____
_____
_____
_____
_____



*Pay None*
*Reduce Face*
*2 Choices*

Face Reduction          Reduced Paid-Up
                        (Nonforfeiture)

_____
_____
_____
_____
_____
_____
_____

**CONFIDENTIAL**

1(







CONFIDENTIAL

*11*

MP040107094

*Pay None — No Out-of-Pocket
Outlay Required
(From Trackbook)*

---
---
---
---
---
---
---

*Pay None
Wait and See*



Trade-offs

| Positive | Negative |
|---|---|
| · Market forces could yield dividend scale increase, no out-of-pocket payments needed | · Total out-of-pocket payment could be more if dividend scale doesn't increase |

---
---
---
---
---
---

**AP Issue**
*Options*
Not So Irate Guy

Pay Some

Pay It Again    Pay 25%    Leap Year    Pay the Difference

---
---
---
---
---
---

**CONFIDENTIAL**

MP4011070995

*Pay Some — Out-of-Pocket*
*Outlay Required*
*(From Trackbook)*

*Pay Some — Out-of-Pocket*
*Outlay Required (Cont'd)*
*(From Trackbook)*

*MetLife's AP Program*

*Coming September 1!*

**The Same Illustrative and
Administrative Support for Your Inforce
That You Now Have for New Business**

**CONFIDENTIAL**

MP4011070996

---

### MetLife's AP Program
### The Value to You

- Rep Driven
- Information to you before your client
- Household Information
- New options:
  - Reduce Face
  - Pay Some
  - Leap Year
- Existing options now easier to use

---

### Request Form

| Sales Officer No. and Name | | Agency |
| --- | --- | --- |
| Policy No. | Insured | Policyholder's Name |

**Pay None**

- "WAS and See—I understand my policy values might not be sufficient to pay all
- "Reduce Face"—I elect to reduce my policy for a non-participating Single

This option I don't ever have to pay another premium out-of-pocket for this coverage. I understand that once reduced, I cannot reinstate coverage under this policy and that

**Pay Some**

- "Pay Part"—I elect to pay the next annual premium(s) for the above policy out-of-pocket.
- "Pay Part"—I elect to pay _____ of my annual premium

to reduce the amount of annual premium I pay each year and to pay the balance of my annual premium(s) for the above policy out-of-pocket

- "Pay Every 4 Years"—I elect to pay annual premium for the above policy out-of-pocket

---

Inforce Life: LIFE PAID UP AT 95

| Insured | | Policy on AP Arrangement |
| --- | --- | --- |
| MALE 25 PREFERRED N SM | State: OH | Policy #: 9xxxxxxx |
| Face Amount: $250,000 | | Issue Date: 02/13/1967 |
| Dividend Option: Additional Insurance | | Enter "X" to CANCEL. |

**AP Options**

Pay None
1 Wait and See
2 Reduce Face
Pay Some Options
3 Calculate natural AP year
4 Enter "Dummy" AP year
5 Pay the difference
6 Solve for level amount of premium
7 Pay each Leap Year (every 4th year)
Minimum Value Option
8 Pay Full Ledger

---

**CONFIDENTIAL**

MP40110770997

```
DIST:XXXX          AGENCY:NNN          STATE
PREPARED FOR JOHN DOE
PLAN: LIFE PAID-UP AT 95          POLICY # 870 243 727PR
                                  ISSUE DATE: 2/12/97
CLASSIFICATION    ISSUE AGE  SEX  INITIAL AMOUNT OF INSURANCE
PREFERRED NONSMOKER   25    M              $250,000
                                       PREMIUM MODE: ANNUAL
                        ANNUAL PREMIUM  YEARS PAYABLE
                                        FROM DATE OF ISSUE
BASIC POLICY              $2,617.50          70
DISABILITY WAIVER            56.00           40
ACCIDENTAL DEATH BENEFIT    134.75           45
  TOTAL PREMIUM          $2,907.25
  ADDITIONAL INSURANCE BALANCE AS OF 3/18/97:        $30,328.80
```

**THE ILLUSTRATIVE VALUES THAT FOLLOW ARE BASED ON
THE 1997 DIVIDEND SCALE AND ARE NOT GUARANTEED.**

---

Pay None

## WAIT & SEE
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | NONE | 2,808 | 1,702 | 5,878 | 17,123 | 293,183 |
| 12 | NONE | 2,808 | 1,782 | 5,092 | 18,052 | 285,535 |
| 13 | NONE | 2,808 | 1,886 | 4,372 | 19,372 | 276,468 |
| 14 | NONE | 2,808 | 1,987 | 3,861 | 20,551 | 272,553 |
| 15 | NONE | 2,808 | 2,107 | 2,887 | 22,147 | 267,536 |
| 16 | NONE | 2,808 | 2,225 | 2,320 | 23,829 | 263,385 |
| 17 | 448 | 2,320 | 2,350 | 2,350 | 26,100 | 262,842 |
| 18 | 456 | 2,330 | 2,467 | 2,467 | 28,751 | 263,071 |
| 19 | 520 | 2,447 | 2,577 | 2,577 | 31,377 | 263,186 |
| 20 | 180 | 2,827 | 2,785 | 2,785 | 34,835 | 263,350 |
| 21 | 25 | 2,785 | 2,950 | 2,950 | 38,955 | 263,512 |
| 22 | NONE | 2,808 | 3,042 | 3,193 | 38,843 | 293,862 |
| 23 | NONE | 2,808 | 3,115 | 3,843 | 43,843 | 294,835 |
| | | | | | | |
| AGE 65 | NONE | 2,808 | 5,627 | 38,884 | 142,834 | 332,851 |

---

Pay None

## REDUCE FACE
### NON-PARTICIPATING

| END OF POLICY YEAR | COST OF INSURANCE | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE* | DEATH BENEFIT |
|---|---|---|---|---|---|
| 11 | 453.78 | 0 | 0 | 17,128 | 187,500 |
| 12 | 484.15 | 0 | 0 | 17,329 | 187,500 |
| 13 | 529.80 | 0 | 0 | 17,501 | 187,500 |
| 14 | 563.46 | 0 | 0 | 17,804 | 187,500 |
| 15 | 610.33 | 0 | 0 | 17,733 | 187,500 |
| 16 | 667.53 | 0 | 0 | 17,775 | 187,500 |
| 17 | 724.74 | 0 | 0 | 17,761 | 187,500 |
| 18 | 784.08 | 0 | 0 | 17,644 | 187,500 |
| 19 | 653.89 | 0 | 0 | 17,341 | 187,500 |
| 20 | 929.09 | 0 | 0 | 17,315 | 187,300 |
| 21 | 996.55 | 0 | 0 | 17,006 | 187,500 |
| 22 | 1,087.34 | 0 | 0 | 16,621 | 187,500 |
| 23 | 1,151.24 | 0 | 0 | 16,135 | 187,500 |
| | | | | | |
| AGE 65 | 4,247.54 | 0 | 0 | 4,250 | 187,500 |

* Non-guaranteed values can increase the cash value

---

**CONFIDENTIAL**

MP401107G998

**Pay None**

### REDUCED PAID-UP
#### PARTICIPATING-NON-GUARANTEED VALUES

| END OF POLICY YEAR | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | TOTAL CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|
| 11 | 519.97 | 825.50 | 17,138 | 100,879 |
| 12 | 865.04 | 1,518.33 | 18,782 | 107,616 |
| 13 | 613.27 | 1,766.27 | 19,854 | 110,517 |
| 14 | 665.84 | 2,442.20 | 21,166 | 114,079 |
| 15 | 729.28 | 3,266.34 | 22,946 | 117,660 |
| 16 | 781.84 | 4,172.40 | 24,028 | 121,373 |
| 17 | 845.81 | 5,147.44 | 25,389 | 126,132 |
| 18 | 913.61 | 6,246.91 | 26,881 | 128,928 |
| 19 | 863.97 | 7,347.05 | 28,432 | 132,798 |
| 20 | 1,000.87 | 8,665.80 | 30,383 | 136,738 |
| 21 | 1,138.04 | 10,055.23 | 32,403 | 140,672 |
| 22 | 1,222.55 | 11,564.33 | 33,813 | 144,661 |
| 23 | 1,304.43 | 13,183.06 | 34,212 | 148,738 |
| AGE 65 | 3,354.64 | 45,731.84 | 60,590 | 213,864 |

**Pay Some**

### NATURAL AP YEAR=PAY 1
#### NON-GUARANTEED VALUES
ANNUAL DIVIDENDS USED TO PURCHASE ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | 1,702 | 5,079 | 17,138 | 293,142 |
| 12 | 2,808 | NONE | 1,792 | 8,051 | 21,026 | 300,174 |
| 13 | 2,808 | NONE | 1,890 | 7,434 | 22,454 | 299,530 |
| 14 | 2,808 | NONE | 1,997 | 8,806 | 23,808 | 293,853 |
| 15 | 2,808 | NONE | 2,107 | 4,464 | 25,704 | 288,071 |
| 16 | 2,808 | NONE | 2,225 | 8,081 | 27,041 | 285,186 |
| 17 | 2,808 | NONE | 2,350 | 8,430 | 29,340 | 282,111 |
| 18 | 2,808 | NONE | 2,447 | 8,589 | 31,830 | 279,809 |
| 19 | 2,808 | NONE | 2,627 | 8,979 | 34,429 | 278,560 |
| 20 | 2,808 | NONE | 2,785 | 8,825 | 37,075 | 277,838 |
| 21 | 2,808 | NONE | 2,956 | 9,343 | 40,143 | 278,140 |
| 22 | 2,808 | NONE | 3,047 | 9,571 | 43,321 | 279,748 |
| 23 | 2,808 | NONE | 3,135 | 7,114 | 46,614 | 281,157 |
| AGE 65 | NONE | 2,808 | 5,637 | 47,357 | 151,127 | 350,859 |

**Pay Some**

### DESIRED AP YEAR=PAY 3
#### NON-GUARANTEED VALUES
ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | PREMIUM OUTLAY | AMOUNT WITHDRAWN | ANNUAL DIVIDENDS | CASH VALUE OF ADDITIONAL INSURANCE | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | NONE | 1,702 | 8,876 | 17,138 | 293,142 |
| 12 | 2,808 | NONE | 1,792 | 8,051 | 21,031 | 300,174 |
| 13 | 2,808 | NONE | 1,890 | 10,412 | 20,412 | 319,346 |
| 14 | 2,808 | NONE | 1,997 | 13,044 | 30,844 | 332,834 |
| 15 | 2,808 | NONE | 2,107 | 12,864 | 32,214 | 328,440 |
| 16 | 2,808 | NONE | 2,225 | 12,982 | 34,483 | 325,007 |
| 17 | 2,808 | NONE | 2,350 | 13,144 | 30,884 | 322,382 |
| 18 | 2,808 | NONE | 2,482 | 13,437 | 39,347 | 320,432 |
| 19 | 2,808 | NONE | 2,627 | 13,883 | 42,833 | 319,678 |
| 20 | 2,808 | NONE | 2,785 | 14,508 | 45,758 | 319,520 |
| 21 | 2,808 | NONE | 2,956 | 15,331 | 49,331 | 320,225 |
| 22 | 2,808 | NONE | 3,043 | 16,286 | 53,024 | 321,317 |
| 23 | 2,808 | NONE | 3,135 | 17,368 | 56,684 | 322,802 |
| AGE 65 | NONE | 2,808 | 5,627 | 71,730 | 175,480 | 402,464 |

**CONFIDENTIAL**

19

MP4011070999

Pay Some

## PAY THE DIFFERENCE
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TOWARDS PAYMENT OF PREMIUM

| END OF POLICY YEAR | GUARANTEED CONTRACT PREMIUM | ANNUAL DIVIDENDS | PREMIUM OUTLAY AFTER PRIOR YEAR DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|
| 11 | 2,808 | 1,792 | 1,016 | 17,138 | 282,364 |
| 12 | 2,808 | 1,792 | 1,105 | 18,254 | 282,791 |
| 13 | 2,808 | 1,890 | 1,013 | 21,583 | 283,230 |
| 14 | 2,808 | 1,997 | 914 | 23,387 | 283,662 |
| 15 | 2,808 | 2,197 | 610 | 26,648 | 284,141 |
| 16 | 2,808 | 2,225 | 700 | 29,335 | 284,611 |
| 17 | 2,808 | 2,350 | 803 | 32,045 | 285,082 |
| 18 | 2,808 | 2,447 | 458 | 35,634 | 285,590 |
| 19 | 2,808 | 2,677 | 220 | 38,046 | 286,094 |
| 20 | 2,808 | 2,785 | 100 | 41,083 | 286,618 |
| 21 | 2,808 | 2,850 | 23 | 44,418 | 287,157 |
| 22 | 2,808 | 3,042 | NONE | 47,690 | 887,825 |
| 23 | 2,808 | 3,133 | NONE | 60,946 | 288,064 |
| AGE 65 | 2,808 | 8,627 | NONE | 139,109 | 297,737 |

Pay Some

## SOLVE FOR LEVEL PREMIUM
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | CONTRACT PREMIUM | AMOUNT WITHDRAWN | PREMIUM OUTLAY | ANNUAL DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | 2,808 | 141 | 1,792 | 17,138 | 293,183 |
| 12 | 2,808 | 2,667 | 141 | 1,792 | 18,201 | 290,361 |
| 13 | 2,808 | 2,667 | 141 | 1,890 | 19,380 | 290,523 |
| 14 | 2,808 | 2,667 | 141 | 1,897 | 21,028 | 273,541 |
| 15 | 2,808 | 2,667 | 141 | 2,107 | 27,802 | 271,502 |
| 16 | 2,808 | 2,667 | 141 | 2,225 | 24,864 | 266,266 |
| 17 | 2,808 | 2,667 | 141 | 3,350 | 26,627 | 265,848 |
| 18 | 2,808 | 2,667 | 141 | 2,447 | 28,801 | 264,253 |
| 19 | 2,808 | 2,667 | 141 | 2,527 | 31,425 | 263,427 |
| 20 | 2,808 | 2,667 | 141 | 2,785 | 34,064 | 263,387 |
| 21 | 2,808 | 2,867 | 141 | 2,850 | 37,065 | 264,135 |
| 22 | 2,808 | 2,667 | 141 | 3,042 | 40,236 | 265,255 |
| 23 | 2,808 | 2,842 | 141 | 3,133 | 43,500 | 266,756 |
| AGE 65 | 2,808 | 3,667 | 141 | 8,627 | 147,573 | 343,148 |

Pay Some

## PAY EACH LEAP YEAR
### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TO PURCHASE PAID-UP ADDITIONAL INSURANCE

| END OF POLICY YEAR | CONTRACT PREMIUM | AMOUNT WITHDRAWN | PREMIUM OUTLAY | ANNUAL DIVIDEND | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|---|
| 11 | 2,808 | 2,808 | NONE | 1,792 | 17,138 | 293,183 |
| 12 | 2,808 | NONE | 2,808 | 1,792 | 21,831 | 308,174 |
| 13 | 2,808 | 2,808 | NONE | 1,890 | 22,413 | 299,536 |
| 14 | 2,808 | NONE | 2,808 | 1,897 | 23,803 | 293,853 |
| 15 | 2,808 | 2,808 | NONE | 2,197 | 23,766 | 289,671 |
| 16 | 2,808 | NONE | 2,808 | 2,225 | 30,907 | 302,345 |
| 17 | 2,808 | 2,808 | NONE | 3,350 | 32,734 | 299,486 |
| 18 | 2,808 | NONE | 2,808 | 2,447 | 35,280 | 297,466 |
| 19 | 2,808 | 2,808 | NONE | 2,827 | 37,067 | 290,258 |
| 20 | 2,808 | NONE | 2,808 | 2,785 | 43,791 | 310,116 |
| 21 | 2,808 | 2,808 | NONE | 2,850 | 47,548 | 310,667 |
| 22 | 2,808 | NONE | 2,808 | 3,042 | 50,636 | 311,676 |
| 23 | 2,808 | 2,808 | NONE | 3,133 | 54,590 | 313,963 |
| AGE 65 | 2,808 | NONE | 2,808 | 8,627 | 192,791 | 438,261 |

**CONFIDENTIAL**

XP40110071000

**Pay Some**

### PAY FULL LEDGER
#### NON-GUARANTEED VALUES

ANNUAL DIVIDENDS USED TOWARDS PAYMENT OF PREMIUM

| END OF POLICY YEAR | PREMIUM OUTLAY | ANNUAL DIVIDENDS | TOTAL ADDL. INS. PURCHASED BY DIVIDENDS | CASH VALUE | DEATH BENEFIT |
|---|---|---|---|---|---|
| 11 | 2,808 | 1,702 | 43,163 | 17,126 | 293,162 |
| 12 | 2,808 | 1,792 | 92,174 | 21,251 | 308,174 |
| 13 | 2,808 | 1,890 | 69,346 | 25,412 | 319,376 |
| 14 | 2,808 | 1,997 | 87,834 | 30,044 | 332,834 |
| 15 | 2,808 | 2,107 | 99,302 | 34,182 | 346,802 |
| 16 | 2,808 | 2,225 | 110,450 | 40,424 | 360,450 |
| 17 | 2,808 | 2,350 | 124,988 | 46,637 | 374,853 |
| 18 | 2,808 | 2,447 | 139,011 | 63,095 | 389,011 |
| 19 | 2,808 | 2,627 | 163,727 | 69,360 | 403,727 |
| 20 | 2,808 | 2,782 | 166,768 | 66,436 | 418,768 |
| 21 | 2,808 | 2,850 | 184,137 | 74,300 | 434,137 |
| 22 | 2,808 | 2,942 | 199,464 | 82,316 | 449,464 |
| 23 | 2,808 | 3,111 | 214,004 | 90,906 | 464,004 |
| AGE 65 | 2,808 | 8,627 | 488,411 | 332,582 | 738,411 |

### Summary @ Age 65

| Option | Non-Guaranteed Death Benefit | Cash Value |
|---|---|---|
| Wait & See | $332,651 | $142,634 |
| Reduce Face | $187,500 | $4,250 |
| Reduced PU | $213,984 | $80,590 |
| Natural AP | $350,659 | $151,107 |
| Desired AP | $402,464 | $175,480 |
| Pay the Difference | $297,737 | $129,189 |
| Level Premium | $343,148 | $147,573 |
| Leap Year | $439,261 | $192,791 |
| Full Ledger | $736,411 | $332,592 |

### AP Program
#### Face Reduction Option
#### Tradeoffs

| | | |
|---|---|---|
| •All Life Plans | •All Life Plans | •L95 |
| •75% Guarantee | •75% Guarantee | •70% Guarantee |
| •1.9 Million Policies | •Premiums Paid at Least 7-11 years | •Premiums Paid in Full at Least 7-11 years |
| | •1 Million Policies | •173,000 Policies |




| $1.8 Billion Potential Reserve Strain | $1.0 Billion Potential Reserve Strain | $530 Million Potential Reserve Strain |

**CONFIDENTIAL**

18

## The Next Steps

- Field Release (draft completed)
- Track Book (completed)
- Bills and Statements will reflect the option selected
- Roll-out
  - State Approvals
  - Conference Calls
  - Training Meeting
  - Illustration Capability

MP4011071001

CONFIDENTIAL

*19*

REDACTED - ATTORNEY
CLIENT

MP4011071002



**Jim L Rayl**
08/25/97 01:55 PM

To:     KATHLEEN SCHOOS [NYVK.NEPIKS] @ SNAPI, Jim Ancharski/Ind/MetLife/US, Bill
        Barnewold/Bsg/MetLife/US
cc:     Richard Anderson/Bsg/MetLife/US, Jim L Judd/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US
Subject:  AP Program

Kathy

I am not exactly certain what all issues we will attempt to address on the Tuesday conference call,
but I would like to share a few thoughts and concerns.  First of all, I cannot help but wonder if
senior MetLife management really has any grasp of exactly what is happening.  Based on all the
comments and dialogue, it would appear that their expectation was similar to mine, in that it was
believed that a proactive program was being developed to effectively deal with our policyholders on
this issue.

During the OCR meeting in New York, ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████████████ Based on
what was presented in New York at the AP meeting, the program is definitely not a comprehensive
or fully proactive program to deal with AP.  I cannot help but wonder if MetLife's senior
management fully recognizes that fact or if they are under the impression that it is much more
aggressive than it really is.

It seemed obvious to me that the design and implementation of the current program is far more
geared to providing options to the existing representatives who, for whatever reason, have to deal
with their own clients on this issue.  This is as opposed to developing a program to fully address
the concerns of ALL the affected policyholders.  There was no proactive effort mentioned whereby
representatives would contact anyone other than their own clientele.

I suspect that for the vast majority of the policyholders affected by the AP issue, the writing
representative is long gone.   Consequently, the existing program is clearly not going to be a
proactive effort to contact ALL policyholders currently on AP or those who might be expecting their
policies to be eligible for AP at some specific future date.  I suspect that the contacts made by the
agency force involving their own clientele will be no more than 10% to 20% of the affected
customer base if even that.

I suppose some may see the letter going to the L95 policyholders as being a proactive AP effort.
However, I see that letter as being so vague that most policyholders will not understand the
significance of calling to explore or discuss the "options."  While it may serve as some form of legal
"notification" to those policyholders, I suspect that few will comprehend the significance of the
letter or the situation.  Furthermore, it was obvious that no real consideration was given to
addressing those policyholders who come directly to the administrative organization either through
the call center or through direct correspondence.  While it was stated that an attempt should be
made to refer them to "their rep," this will not be a viable option for the orphans.  And, I suspect it
will not be a viable option in any situation where the "servicing rep" is also not the "writing rep."

Consequently, I see these as still leaving some very big issues on the table with respect to AP for
MetLife and the administrative side of the house.  I believe there are some very fundamental issues

CONFIDENTIAL



DEPOSITION
EXHIBIT
44

to address. And, I see most of these as requiring a very high level decision within Individual Business. These would include:

- If the current (Field) program is not going to proactively or even reactively address the AP situation for the vast majority of affected policyholders, is there any intent to have or design a program that will?

- Once the new program is officially introduced, what is the responsibility/obligation of the Business Unit to inform affected policyholders that new and different options exist? How does this apply to the following groups of affected policyholders:

  - Those policyholders currently on AP with collapse dates within five years and options already provided on the billing statement.

  - Those policyholders currently on AP with collapse dates beyond five years with no options indicated on the billing statement

  - Those policyholders who are or were expecting their policy to be eligible for AP on some past, present or future date but remain ineligible because of the dividend inadequacies.

- What are sales offices going to be instructed to do when policyholders affected by AP call the sales office and are either not in force in that office or who do not have a representative assigned to service them from that office?

- Is Field Management and/or the sales offices going to be given specific responsibilities with respect to what "servicing" reps are expected to handle with regard to AP issues and inquiries?

- What will the responsibilities will/should the call center have in attempting to administer this program? The quick answer in New York was that the CSC could sent them a brochure and/or to refer them back to "their" rep. But what constitutes "their" rep. The "writing" rep or a "servicing" rep?

- Based on the sentiments voiced by some of the Product Wholesalers, it is questionable whether "servicing" reps, who are not also the writing rep, will really deal with customers on the AP issue. Consequently, does it make sense for the call center to refer the policyholder back to the rep whenever the "servicing rep" is not the "writing rep?" My concern is that this will only set an expectation with the customer that will not be met, thereby further aggravating the customer and making the situation worse.

- Consequently, whenever a call or complaint is received regarding AP (either before or after a brochure is mailed), should the CSC be required to check and see if the policy is still serviced by the writing rep before referring the policyholder back to the rep?

- And, perhaps more importantly, what about all the customers who do not have either a writing rep OR a servicing rep? How are they to be handled?

- Should new and different procedures be established for the call center with respect to handling some or all of the AP related calls? While it was mentioned that the first step may be to just have the call center mail the brochure, what about phone calls received after the brochure has been sent? Does the call center handle them? If so, should it be restricted to a limited number of CSCs? Or, do they refer them to the administrative operation?

- Under what circumstances does a given AP situation or call become the responsibility of the administrative "back office?"

**CONFIDENTIAL**

MP401107I003

- Under what circumstances does either the CSC and/or the back office tell policyholders questioning any aspect of the AP arrangement that there are options available?

- Will orphan policyholders responding to the L95 letter be told something different from other policyholders questioning the arrangement? In other words, it would appear that the Company is fully obligated to tell all L95 policyholders receiving the letter about ALL the options available. This may or may not be true for other policyholders.

- In those situations where the full options will be explained, who will handle the calls? Should this be a fully detailed process whereby the customer is presented with illustrations of all the options and then given the opportunity to discuss them? If so, by call back or appointment?

- Will this expectation be changed if licensing is required?

Kathy, I suppose I could go on and on. But, the real question remains, to what length or degree is the administrative operation going to go in terms of addressing the entire AP issue. And, to what degree will additional resources be available to deal with this program?

Jim Rayl

MP4011071004

**CONFIDENTIAL**

MP401071005



**Jim L Rayl**
08/26/97 04:12 PM

To:    Karen Hemenway/Bsg/MetLife/US, Leslie Sanderson/Bsg/MetLife/US, Marilyn Weaver/Bsg/MetLife/US
cc:    Jerri McCraw/Bsg/MetLife/US
Subject:  AP Program

For your personal information. Inasmuch as we discussed AP in our meeting, this might provide you with some additional insight into the current state of the AP program. It is still unclear as to the level of responsibility that will be assumed by the call center and administrative operations. And, I'm not sure where the call center responsibilities will end and those of the administrative operation will begin. However, in order to make this work, I think there will have to be a lot of dialogue and collaboration between the business unit and the call center.

Jim

———————— Forwarded by Jim L Rayl/Ind/MetLife/US on 08/26/97 03:58 PM ————————



**Jim L Rayl**
08/25/97 01:55 PM

To:    KATHLEEN SCHOOS [NYVK.NEPIKS] @ SNAPI, Jim Ancharski/Ind/MetLife/US, Bill
       Barnewold/Bsg/MetLife/US
cc:    Richard Anderson/Bsg/MetLife/US, Jim L Judd/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US
Subject:  AP Program

Kathy

I am not exactly certain what all issues we will attempt to address on the Tuesday conference call, but I would like to share a few thoughts and concerns. First of all, I cannot help but wonder if senior MetLife management really has any grasp of exactly what is happening. Based on all the comments and dialogue, it would appear that their expectation was similar to mine, in that it was believed that a proactive program was being developed to effectively deal with our policyholders on this issue.

During the OCR meeting in New York ███████████████████████████████████████████████████████

████████████████████████████████████████████████ Based on what was presented in New York at the AP meeting, the program is definitely not a comprehensive or fully proactive program to deal with AP. I cannot help but wonder if MetLife's senior management fully recognizes that fact or if they are under the impression that it is much more aggressive than it really is.

It seemed obvious to me that the design and implementation of the current program is far more geared to providing options to the existing representatives who, for whatever reason, have to deal with their own clients on this issue. This is as opposed to developing a program to fully address the concerns of ALL the affected policyholders. There was no proactive effort mentioned whereby representatives would contact anyone other than their own clientele.

I suspect that for the vast majority of the policyholders affected by the AP issue, the writing representative is long gone. Consequently, the existing program is clearly not going to be a proactive effort to contact ALL policyholders currently on AP or those who might be expecting their policies to be eligible for AP at

**CONFIDENTIAL**                              **REDACTED - ATTORNEY
                                              CLIENT**

some specific future date. I suspect that the contacts made by the agency force involving their own clientele will be no more than 10% to 20% of the affected customer base if even that.

I suppose some may see the letter going to the L95 policyholders as being a proactive AP effort. However, I see that letter as being so vague that most policyholders will not understand the significance of calling to explore or discuss the "options." While it may serve as some form of legal "notification" to those policyholders, I suspect that few will comprehend the significance of the letter or the situation. Furthermore, it was obvious that no real consideration was given to addressing those policyholders who come directly to the administrative organization either through the call center or through direct correspondence. While it was stated that an attempt should be made to refer them to "their rep," this will not be a viable option for the orphans. And, I suspect it will not be a viable option in any situation where the "servicing rep" is also not the "writing rep."

Consequently, I see these as still leaving some very big issues on the table with respect to AP for MetLife and the administrative side of the house. I believe there are some very fundamental issues to address. And, I see most of these as requiring a very high level decision within Individual Business. These would include:

- If the current (Field) program is not going to proactively or even reactively address the AP situation for the vast majority of affected policyholders, is there any intent to have or design a program that will?

- Once the new program is officially introduced, what is the responsibility/obligation of the Business Unit to inform affected policyholders that new and different options exist? How does this apply to the following groups of affected policyholders:

  - Those policyholders currently on AP with collapse dates within five years and options already provided on the billing statement.

  - Those policyholders currently on AP with collapse dates beyond five years with no options indicated on the billing statement

  - Those policyholders who are or were expecting their policy to be eligible for AP on some past, present or future date but remain ineligible because of the dividend inadequacies.

- What are sales offices going to be instructed to do when policyholders affected by AP call the sales office and are either not in force in that office or who do not have a representative assigned to service them from that office?

- Is Field Management and/or the sales offices going to be given specific responsibilities with respect to what "servicing" reps are expected to handle with regard to AP issues and inquiries?

- What will the responsibilities will/should the call center have in attempting to administer this program? The quick answer in New York was that the CSC could sent them a brochure and/or to refer them back to "their" rep. But what constitutes "their" rep. The "writing" rep or a "servicing" rep?

- Based on the sentiments voiced by some of the Product Wholesalers, it is questionable whether "servicing" reps, who are not also the writing rep, will really deal with customers on the AP issue. Consequently, does it make sense for the call center to refer the policyholder back to the rep whenever the "servicing rep" is not the "writing rep?" My concern is that this will only set an expectation with the customer that will not be met, thereby further aggravating the customer and making the situation worse.

- Consequently, whenever a call or complaint is received regarding AP (either before or after a brochure is mailed), should the CSC be required to check and see if the policy is still serviced by the writing rep before referring the policyholder back to the rep?

**CONFIDENTIAL**

MP401107I006

MP4011071007

- And, perhaps more importantly, what about all the customers who do not have either a writing rep OR a servicing rep? How are they to be handled?

- Should new and different procedures be established for the call center with respect to handling some or all of the AP related calls? While it was mentioned that the first step may be to just have the call center mail the brochure, what about phone calls received after the brochure has been sent? Does the call center handle them? If so, should it be restricted to a limited number of CSCs? Or, do they refer them to the administrative operation?

- Under what circumstances does a given AP situation or call become the responsibility of the administrative "back office?"

- Under what circumstances does either the CSC and/or the back office tell policyholders questioning any aspect of the AP arrangement that there are options available?

- Will orphan policyholders responding to the L95 letter be told something different from other policyholders questioning the arrangement? In other words, it would appear that the Company is fully obligated to tell all L95 policyholders receiving the letter about ALL the options available. This may or may not be true for other policyholders.

- In those situations where the full options will be explained, who will handle the calls? Should this be a fully detailed process whereby the customer is presented with illustrations of all the options and then given the opportunity to discuss them? If so, by call back or appointment?

- Will this expectation be changed if licensing is required?


Kathy, I suppose I could go on and on. But, the real question remains, to what length or degree is the administrative operation going to go in terms of addressing the entire AP issue. And, to what degree will additional resources be available to deal with this program?

Jim Rayl

**CONFIDENTIAL**

MP4011071008

Bill Barnewold
Sr. Business Systems Consultant
Traditional Portfolio & Dividends
Personal Insurance
Bridgewater - AREA   3E-2

Re Field Announcement for AP Anniversary Statements

Bill, I have reviewed the proposed *Field Announcement* and *Anniversary Statements*. I would just like to go on record one last time saying that I think the Company is making a serious mistake. Using only the *Anniversary Statements* to notify those policyholders who are currently on AP that their dividends are now insufficient to maintain the policy is going to create confusion and has the potential to create a backlash of complaints and ill will unlike anything to date.

The vast majority of policyholders who are currently on the AP arrangement believe that no further premiums will be due on their policies. Many of these policies have been represented to the customers as having been *"paid up."* Consequently, they will be confused by the rather terse statement that *"Your dividends will pay the premiums until _____"* and the balance of the text. I would be. In spite of our statement that *"dividends are not guaranteed,"* these customers will not automatically understand how *or why* their policy has been affected. And, in the absence of any meaningful explanation, many are likely to become outraged once they realize that more premiums may become due at some point in the future.

For the life of me I do not understand why all these people couldn't have been sent a letter that explains the impact of the economy on the dividends and its corresponding impact on AP. We are going to great lengths to make certain our "new" AP customers understand the arrangement. Why shouldn't we do the same with these? Many would still be upset, but that number would most likely be much smaller than what we're going to encounter now. Again, I stand by my perception that we are not fully considering our actions from the *CUSTOMER'S* perspective. And, in light of everything else that has transpired, I can't believe the Company would want to risk handling such a sensitive issue in such a cavalier manner.

If anyone believes that the majority of our Field Representatives will actually approach these customers and explain it, they're living in a dream world. Many of the writing reps are long gone and the others have no vested interest in communicating this kind of *bad news* to the customer.

The *Anniversary Statements* included in the proposal don't make any reference to the 800 number. I assume the 800+MET-5000 number is now on them so perhaps we can salvage a few when they call. But, I hope everyone is truly prepared for the consequences of handling these AP cases in this manner.

J. L. Rayl,  ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 3, 1995

cc  LaBadia, Gardner & Schoos                    **CONFIDENTIAL**

Barbara J. Gardner, ACS
Vice-President
MetLife Customer Service Center - Tulsa

Re   Consumer Education "Wish List"

Barbara, many of our problems and complaints with customers are due, in part, to their lack of understanding of insurance principles in general and/or the lack of understanding of specific aspects of their policy or transaction.  The problems we are experiencing and are going to face with "AP" *(Accelerated Payment)* cases are a prime example.  Policyholders believe their policies are supposed to be "paid-up" in "X" years.  Or, those currently on AP believe their policies are already paid up.  Many, if not most, of these policyholders do not begin to understand the true concept of AP.  They do not fully realize that premiums are still due on these policies until age 95 or 98 and that the "AP" arrangement is really only a method of using the dividends to pay those policies.  As you know, because of the changing dividend scales, we have continued to experience ongoing complaints because premium payments continue to be required on many of these policies.  And, we face a similar problem with UL policies in that *Target Premiums* are going to be inadequate to maintain some of them.

Now admittedly, this monster was created primarily because of the marketing approach used by some of our Field Force and their own lack of understanding of the implications of this concept.  But, with proper consumer education, we could have greatly reduced the negative impact that we have already experienced as well as that which is going to explode in the future.

A significant percentage of our Field Force does not understand many aspects of the policies they sell or the impact of some of the policy provisions.  For example, some don't understand the complications that can arise from improper or ill advised beneficiary designations *(minor children)*.  In C/L/D, we encountered many complaints and "reversals" because representatives did not understand or adequately explain to their client the differences between a *Partial Cash Withdrawal* versus a *Loan* on a UL policy.

My point is this; *we are not ever going to be able to fully resolve the problem with our Field Force.*  With the number of new representatives that we appoint each year and the heavy demands of just learning how to sell, it will take these people years to become knowledgeable in all the administrative nuances of our products.  This problem is also compounded by the fact that the level of administrative knowledge or training varies greatly from branch office to branch office.

Many of the problems and complaints we experience would be non-issues had the policyholder thoroughly understood their policy or the administrative aspects associated with various transactions.  The establishment of a Consumer Education department supported through advertising and Teleservices provides MetLife with an opportunity that may be unparalleled in the industry right now.  At the very least, it gives us a definite edge on the competition as well as the opportunity to do a far better job of educating our policyholders, thereby avoiding many of the complaints and misunderstandings in the future.  As we have witnessed, while almost everyone owns a life insurance policy, very few really understand how it works or the many benefits and options that are available to them as a policy owner.

CONFIDENTIAL

MP4011071009

MPF04011071010

The best part is that instead of looking at consumer education as an expense, it should be viewed as an *investment as well as a marketing strategy*. If handled properly, many of our consumer education activities could easily be turned into advertising and marketing opportunities. Our Consumer Education effort should not be limited to MetLife policyholders. Instead, we should embark on an effort to educate all consumers. Done well, many non-customers could surely be turned into MetLife clients.

As I see it, there are three different types of opportunities to provide information that will educate our customers as well as promote our products and services. These are:

### STRICTLY METLIFE CONSUMER INFORMATION/EDUCATION

An example would be like one of the examples from Kathy's list such as providing better information on how to read a *Dividend Anniversary Statement* and providing an explanation of terms.

### CONSUMER EDUCATION/PRODUCT PROMOTION & EXPLANATION

An example might be providing information on the differences between a *Whole Life* policy versus *Term* versus *Universal Life*. This could serve to educate both our own policyholders or be offered to non-policyholders. In both cases, it offers opportunity for follow-up contact and potential sale. A similar example would be a generic piece which provides an explanation of how mutual funds work, the various types *(Aggressive Growth, Money Market, Tax-Exempt, Etc.)*, and how they might be used to help an individual meet specific investment objectives.

### SPECIFIC PRODUCT INFORMATION

In this scenario, we may have a more sophisticated customer or current non-customer who understands the concepts, but wants product specific information such as something that describes our various mutual funds and illustrates performance history. Or, something that provides specifics on our annuity, whole life or term products. While some effort would always be made to have this provided through the Career Agency Force, it should be recognized that some percentage of respondents *will not want to talk to a representative for the initial contact.* However, "follow-up" calls should be made to these individuals to see if a Representative can be of assistance once they have had time to review the material.

Having said this, I will attempt to categorize and list some of the types of material we have considered. Also attached is the list which Kathy Schoos prepared for John Abela. We are in agreement with everything on Kathy's list.

**CONFIDENTIAL**

2

## Pure Consumer Education

| | | |
|---|---|---|
| **Various Brochures or "Automated Letters" Providing Detailed Explanations of the Impact of Some Policy Transactions** | Policy Loan<br><br><br>Dividends<br><br>Payments | - A detailed explanation as to the impact of taking out a policy loan, effect of unpaid interest, potential termination of policy - tax consequences, etc.<br>- Explanation of Dividend Options, advantages of "Paid-Up" insurance - Potential Tax Consequences<br>- Advantages/Disadvantages of various payment arrangements "AP" - Non-Forfeiture Options associated with Lapse & non-payment of premiums. |
| **TAX RELATED Considerations and Consequences Associated with Life Insurance** | There should be a general, but comprehensive booklet, which describes all the various tax issues associated with life insurance. This would include an explanation of the tax deferred status of most policies, those that are classified as "MECs" *(Modified Endowment Contracts)* and their tax implications, the concept of general taxable gain on a policy as well as the taxable implications associated with dividends *(DWI, potential taxable gain from dividends, etc.)*. It could also explain and advise how some of these consequences might be avoided *(i.e., using dividends to purchase paid-up additional insurance as opposed to DWI or cash)*. | |
| **General Company History Including Financial Stability** | With people expressing concern or interest in the Company, we should have something in the way of a "PR" piece to send them that tells them about MetLife, a little of its history and traditions, its size in relation to the other companies and its financial stability. | |
| **Industry Ratings** | We should be able to send a piece of literature that explains the various organizations rating the insurance industry and how to read the ratings. There should probably be a separate attachment which can be kept current as to MetLife's ratings by these organizations. | |
| **Contract Considerations When Purchasing a Life Insurance Policy** | This could explain in plain English the important contract considerations; Rights of the policyowner - explanation and purpose of naming a contingent owner - things to consider when naming a beneficiary *(minor children)* and types of bene designations - explanation of rights and reasons for naming contingent beneficiary(ies). How and when to change ownership or beneficiaries. | |
| **Glossary & General Information on Policy Riders and Provisions** | This could include a layman's explanation of what the following riders/provisions are and why you might need or want them: *Disability Waiver, Accidental Death, Accelerated Death Benefit Rider, Paid-Up Additions Rider, AIB, SIB, etc.* | |
| **Explanation of Policy Values** | Information on how policies accumulate cash value. Differences between "Guaranteed Cash Value." Dividends, Cash Value of Additional Insurance purchased by Dividends, etc. It could also explain how value information can be accessed and how these values can be used *(income at retirement, etc.)*. | |
| **800 Customer Service** | Some type of brochure or "PR" piece is needed that touts the availability of PI Customer Service (800+MET-5000) and provides a list of the information and services that can be obtained. While our number appears on many documents, we don't have anything that makes reference to the services & information available. This same brochure should provide a strong "reminder" to be sure and give us a call whenever the person moves or has an important life event. The same or similar brochure may want to touch on the services available through 800+MET-LIFE. | |
| **Replacement** | We have some literature available but we need something more comprehensive. It should be sent in any instance where a CSR perceives the customer may be surrendering their policy or considering replacement. The material should provide the policyholder with a clear and objective explanation of *"churning."* describe the marketing strategies of some companies with respect to replacement and the "Term Versus Whole Life" argument, and it should cover the many potential benefits associated with policies that have been inforce for awhile such as the growth in guaranteed cash value and possible current dividend performance versus annual premium cost. | |

CONFIDENTIAL

MP401071011

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| **Whole Life Versus Term Versus UL - ULII** | This was also the first item on Kathy's list. We could offer this via advertising and also have this available for customer inquiries. There continues to be more and more focus on the argument of permanent insurance versus term. A thorough but objective pamphlet or booklet should be available which explains the basic concepts and differences between permanent and term insurance. This could include a long term net cost comparison, concept of a level premium and death benefit, tax deferred savings features, etc. It should also cover the general uses and application of both types of insurance as well as some of the pros and cons and explain why everyone should have a basic program that includes some permanent insurance. Perhaps a separate section could then explain how Universal Life differs from Whole Life as well as the differences with multi-funded Universal Life. While the tone of the booklet should not be to try and "sell" something. It could certainly provide a list of our basic offerings with a bold imprint to call 1 + 800 + MET-LIFE if there are any questions. In some instances it might be appropriate for a CSR or account representative to call the recipient a week or two after the booklet is sent just to see if they have any questions or are interested in speaking with an Account Representative. |
| **Estate Planning** | This could also be offered via advertising to a targeted market or audience. It should also be available to our customer base so it could be sent by the CSR in appropriate situations. It should be an objective booklet or pamphlet on when and why estate planning becomes a serious need. It should outline the primary elements or considerations in general estate planning. It could cover the high cost of dying, the risks associated with improper planning and/or how someone's estate or insurance benefits may not be handled as they anticipated if proper planning was not done. Consideration could be given to including a video, a worksheet or a PC program that would permit the individual to determine the value of their estate. Again, the tone should not be to try and sell anything. However, as an example it could illustrate how our Survivorship Whole Life *(or any life insurance policy)* can be used to address specific estate problems. Again, a call could be made to the recipient to determine if they have any additional questions *(offer booklet on Trusts?)* or if they would like to speak with an Account Representative. |
| **Trusts** | This might go hand in hand with the Estate Planning booklet and could also be offered via advertising or to our customers in the appropriate situations. It should provide *general* information on the various types of trusts and trust agreements and their common usages and purpose. It should cite a few examples as to how life insurance policies are affected and used in conjunction with estate planning. It should also explain how an individual might get a trust established. Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |
| **Planning For The Future** *(Not Just Retirement)* **Family Insurance Needs and Other Considerations** | Most of the younger generation go through life giving very little thought to the future and some of the implications. Part of this brochure should be a "checklist" of things to consider. For example:<br>• The need for a will and the dangers of not having one<br>• Guardianship of children - who gets the kids if both parents were to die<br>• Problems with elderly and/or incapacitated parents - Power of Attorney<br>• The high cost of dying in general - funeral and final expense considerations<br>• Life insurance needs for self - why have insurance on spouse and children? - *(Level premium - protection plus tax deferred savings, etc.)*<br>• Include a list of lifestyle changes that trigger a need for financial review; i.e., having a baby, marriage, divorce, death of spouse, parents, new home, etc.<br>• The odds against collecting retirement from existing or single employer<br>• Property and Casualty needs - Personal liability issues - what else should be covered and for how much?<br>Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |

CONFIDENTIAL

4

MP401107I012

## Consumer Education With Advertising/Marketing Related Potential

| | |
|---|---|
| **Basic Or "Preliminary" Financial Needs Analysis** | This could be offered in many ways. However, many people might be interested in doing their own "Basic or Preliminary" Financial Needs Analysis. We could advertise and offer at no cost a simple (but objective) worksheet that highlights some of the key areas and allows an individual to determine on their own some of their areas of need and compare that to their existing program. It should be clearly stated that it is not intended for detailed *needs analysis*, but is only to provide a basic understanding and example of some of the considerations involved. This could be offered free and kept to a reasonable level of expense. We might also consider offering at nominal cost, a videotape that takes a person through the general Financial Needs process. Also, at nominal cost or perhaps free, a PC program diskette that will walk them through a basic Financial Needs Analysis and allow some "modeling" of insurance and/or savings aspects. All of this should be relatively generic, objective, but with strong recommendation that a formal needs analysis be done by a competent professional. Again, whenever this is sent, a follow-up call should be made to determine if we can be of additional service and/or arrange for contact by an Account Representative. |
| **Retirement Planning** | The detailed Retirement Planning Guide that was recently prepared by Pensions is outstanding but obviously expensive. Perhaps a modified version of that could be made available on a more general basis. Again, a follow-up call should be made. |
| **Investment Guide** | A general guide to saving and investing could be prepared which outlines some of the reasons as to why this is needed, not only for retirement, but college, home purchase, starting a family, etc. Like the Retirement Guide, it should have savings tables illustrating the amount of savings required to generate money in the future at varying rates of return. It should also cover tax deferred versus non-tax deferred savings issues. It could suggest an initial foundation of life insurance, but should also cover and explain other savings and investment options such as mutual funds and annuities. The booklet could encourage the individual to call us for more specific information on any of the various investment options or vehicles. Again, a follow-up call should be made. |
| **Encourage Communication** | We should offer or routinely send a sticker or refrigerator magnet that encourages customers to call the 800 number every year to discuss any important life events that may have occurred or questions they might have about their policy or insurance in general. Perhaps this could be sent in the "Welcome to MetLife" letter that will go out from Ted A. The "welcome" letter might also stress the contact and service available through our toll-free number. A major objective here would be the establishment and maintenance of a *permanent ongoing* relationship between the customer and the Company in addition to any relationship that might exist with the representative which, in most cases, *will only be temporary.* |
| **Mutual Funds** | We are getting more and more questions or opportunities to discuss our Mutual Funds. We should have two separate pieces of literature available. One should be for the first time investor who is interested in learning more about Mutual Funds. This piece should explain how mutual funds work and the various types of funds and their objectives *(aggressive growth, income, money market, etc.).* We should then have a piece that can be sent to the more sophisticated investor that is familiar with mutual funds, but is interested in the types of funds we have available and their performance history. Again, a follow-up call should be made. |
| **Checklists** | Offer a variety of *checklists* for *things to consider* when:<br>• Buying a New Home - Homeowners, Mortgage Protection, schools, taxes, etc.<br>• Selling a Home - New paint, selling costs, etc.<br>• You find yourself unemployed (laid off) - Vested Retirement funds & lump sum distributions, COBRA, Unemployment Compensation, Debt/payment modification, etc.<br>• You are starting a small business - Operating capital, insurance, workers comp, etc.<br>• You're going to have a baby - Things you need, how it changes your life, why purchase life insurance, cost of college, etc. |

CONFIDENTIAL

5

MP401107013

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| Premium/Plan Quotes | We continue to get people calling to ask if we can provide them with an "approximate" quote over the phone as to how much a given amount of insurance might cost. With the increased exposure and advertising of 800 + MET-LIFE, we are likely to get many more *"curiosity"* calls. While we would always try and refer them to an Account Representative, there is always going to be some percentage of callers that are going to want some preliminary information *before* he or she will be willing to speak with a representative. While we should be able to quote these online *(based on personal data entered into the terminal)*, all verbal quotes should be followed-up by generating a professional looking written quote that would provide approximate premium amounts for basic plans of insurance, both term and permanent. Perhaps only "standard" rates should be quoted and all such quotes should carry a disclaimer to the effect that the premium amount can be influenced either way by underwriting factors as well as optional riders that may be elected for the policy. However, many people have no idea as to what life insurance might cost them and would be open to seeing an Account Representative if we could first provide some basic information. And, in doing so, we might even make the sale easier. Whenever a quote is provided, we could also emphasis the need for a full Financial Needs Analysis. But, the customer would still have a general idea as to the cost of life insurance. |

As I indicated, in addition to all the above, we are in agreement that material should be available on all the items listed in the memo from Kathy Schoos.

Barbara, again, by combining the power of advertising with Consumer Education and our Teleservicing operations, there is tremendous opportunity to make great strides towards achieving our market reach strategies. But, it should also be recognized that while our primary thrust should always be to support these efforts through our Career Agency Force, the reality is that in some geographic areas we are not going to have an Account Representative presence to follow-up on all the marketing opportunities that can be generated. A fundamental decision must be made as to whether or not we are going to ignore these opportunities or find other methods to seize them. Wherever possible, we need that personal relationship established with a local representative but, as evidenced by some of what has been already been achieved with some policyholders *(Mr. ▇▇ for example)*, it is possible to maintain a close and personal relationship with our policyholders through an effective teleservicing and customer service support organization.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

October 28, 1994

cc Valentino, Porpora, Cross & Schoos

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

6

Frank Lynch
Senior Vice-President
P.I. Customer Service

MP4011071015

Re  Customer Complaint - Changing Dividend Scale

Frank, I have been trying to make this point for a long time, particularly as it applies to the impact on *Accelerated Payment* and its effect on eligibility dates and what we are going to encounter when our policyholders are confronted with their *"collapse dates."*

I thought you might find this first hand feedback from one of our policyholders to be of interest, particularly as it relates to his comparison of MetLife with other companies. We should be doing a much better job of informing and educating our customers. Our anniversary statements should be revised to provide complete information including cash values. In doing so, we could easily "promote" the positive aspects and benefits of their contract.

For those policies currently on AP with values which are deemed inadequate to cover all future premiums, it's my understanding that we really don't even plan to write them a letter to explain it. The *collapse date* is just going to appear on their statement. We continue to get complaints every day because we are not informing policyholders about the dividend situation and the fact that their "AP" date is now off into the future. Just wait until those who are on "AP" find out their policy will not be continued as "paid up" as they were led to believe. As I understand it, 25% of the cases on AP do not have sufficient values to carry them to the end of the premium paying period.

Had we informed them a year or two ago and really tried to explain things, it would have been very easy to point to the economy as the reason for the changing the dividend scales and its impact on AP eligibility. As it is now, interest rates are climbing and people will not relate as well to the economic situation. And, worse than that, many will blame the situation on all our recent troubles and the fines we have had to pay, in spite of our protestations that it will not affect dividends.

J. L. Rayl,  ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

September 29, 1994

cc    Barbara Gardner

**CONFIDENTIAL**

Frank Lynch
Senior Vice-President
P.I. Customer Service

MP401107101G

Re   Customer Complaint - Changing Dividend Scale

Frank, I have been trying to make this point for a long time, particularly as it applies to the impact on *Accelerated Payment* and its effect on eligibility dates and what we are going to encounter when our policyholders are confronted with their *"collapse dates."*

I thought you might find this first hand feedback from one of our policyholders to be of interest, particularly as it relates to his comparison of MetLife with other companies. We should be doing a much better job of informing and educating our customers. Our anniversary statements should be revised to provide complete information including cash values. In doing so, we could easily "promote" the positive aspects and benefits of their contract.

For those policies currently on AP with values which are deemed inadequate to cover all future premiums, it's my understanding that we really don't even plan to write them a letter to explain it. The *collapse date* is just going to appear on their statement. We continue to get complaints every day because we are not informing policyholders about the dividend situation and the fact that their "AP" date is now off into the future. Just wait until those who are on "AP" find out their policy will not be continued as "paid up" as they were led to believe. As I understand it, 25% of the cases on AP do not have sufficient values to carry them to the end of the premium paying period.

Had we informed them a year or two ago and really tried to explain things, it would have been very easy to point to the economy as the reason for the changing the dividend scales and its impact on AP eligibility. As it is now, interest rates are climbing and people will not relate as well to the economic situation. And, worse than that, many will blame the situation on all our recent troubles and the fines we have had to pay, in spite of our protestations that it will not affect dividends.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

September 29, 1994

cc   Barbara Gardner

CONFIDENTIAL

Xun /FYI

092794 0010340        Base 01 Edit                McDaniel, Chris
Policy    Suff First Name    Last Name        Trans Codes    Ltr R Date    C
91███A      ███████        █████        DVI CPL CHA        N

MP401107I017

Campaign: LIFI Source: RPT          Code1: Y (Y/N)        TNotes: N
Caller Name.... First: ████         Last: ██████          XNotes: Y
Relationship/Status..: O C/O:                             Script:
 Street: ██████████                          Suppress Notification?: N (Y/N)
 City  : ████        State: ██  Zipcode: ████    DO/BR: G75 R51
 Phone : █████     Alt Phone:              SOUTHWEST BR IL    MAHO
 Sex   : M (M/F)      Alt Ext  :           708 560 8000
Notes: RECORDED:  THE CALLER WANTED TO AIR HIS DISAPPOINTMENT IN METLIFE THAT
WE DID NOT NOTIFY OUR POLICYHOLDERS OF THE RECENT DECREASES IN THE DIVIDEND
SCALE THE PAST FEW YEARS.  HE STATES THAT HE HAS OTHER INVESTMENT PRODUCTS
WITH OTHER COMPANIES AS WELL AS OTHER LIFE INS POLS.  HE STATES THAT ALL OF
HIS OTHER COMPANIES HAVE ADVISED HIM OF THEIR RECENT DIVIDEND SCALE DECREASES
& HE DOES NOT UNDERSTAND WHY METLIFE TRIES TO KEEP THIS SECRET.  HE SAYS IT
LOOKS BAD FOR METLIFE TO DO THIS BECAUSE IT MAKES IT SEEM LIKE OUR THINKING
IS "IF WE DON'T SAY ANYTHING, NO ONE WILL NOTICE".  HE WANTED ME TO ALERT
SOMEONE THAT IT WOULD BE IN THE BEST INTEREST OF NOT ONLY METLIFE BUT ALSO
OUR CUSTOMERS IF WE WOULD PUBLISH A NOTICE AT THE BEGINNING OF EACH YEAR
ADVISING OUR POLICYHOLDERS OF A DIVIDEND SCALE DECREASE.  HIS ADVISE WAS IF
WE TREAT OUT CUSTOMERS OPENLY & HONESTLY WE WILL BE LESS LIKELY TO LOOSE
THEM.  HE SAYS ESPECIALLY SINCE THIS IS AN INDUSTRY WIDE PROBLEM WITE THE
DIV SCALE DROPPING ITS NOT LIKE OUR CUSTOMERS COULD "SHOP" FOR BETTER
DIVIDEND SCALE, & SAYS OURS IS STILL ONE OF THE BEST ANYWAY.  HE ASKED IF I
WOULD MAKE HIS SUGGESTION KNOWN, I ADV I WOULD.
======================================================================
DEL:  TERRY MILLIGAN/JUST FYI.
Select:    2-ENote 3-ESale 4-ERef  6-ECorr 7-Index

CONFIDENTIAL                    REDACTED
                               CONFIDENTIAL POL INFO

Robert J. Crimmins
Executive Vice-President
Personal Insurance

Dear Bob

I have tried to refrain from writing or bothering you unless I felt I had something really important to say because I know you are wrestling with far more important issues. But, in your recent conference call *(which was very well received)* you stated that more people needed to be able to reach you. In view of recent events, I thought it might be timely to give you a little reality check with the front lines to let you know how the situation looks from here. I will try and be as brief as possible but there is a lot of ground to cover.

I just learned that Vince was going to be leaving Customer Services to become your chief Planning Officer. On the one hand, that makes perfect sense. If there's anything you need, it is more people like Vince who hold the Company's interests first and then calls it as he sees it. Right or wrong, agree or disagree, you know he's not operating for some personal gain or based on some irrelevant personal agenda. I am sure he will be an extremely valuable asset to you in his new role.

At the same time, Customer Services and PI Administration is suffering a loss that may spell the difference between the success or failure of our customer service goals. And, because of everything that has, or is likely to transpire, these goals have become more important than at any time in my career with the Company. The media attention that was being focused on the Company is starting to shift to the industry as a whole. When that occurs, it may have an even greater impact *(and policyholder reaction)* on the Company than the specific MetLife publicity. But, it still brings with it a tremendous *opportunity* for the Company to strengthen its image by capitalizing on its customer service operations as well as its Field Force. Jim Valentino was just here and mentioned that one of the new Corporate strategies was to: *Build customer relationships based on; Service, Education and Trust.*

*Sound familiar?* It seems to me that you and I were discussing these potential benefits of Teleservicing *back in 1982 after you first envisioned it.* What an opportunity we have. For a long time I didn't think I would ever see the senior levels of management begin to be genuinely concerned with customer service, much less talk about it as a major strategy and priority. But, because of what's happened in the market place, it is recognized that it's become a necessity if we are to attract and retain business. And, the recent events give us an opportunity to make Teleservicing an even more valuable resource for Personal Insurance. But, the real question is: *Can PI actually begin to capture the full potential of this resource and its impact on the customer?*

I now have some grave doubts. If it's going to happen, from the customer's perspective it will have to happen at this level of the organization. All the discussion at the high levels of the Company will not change customer perception. WE WILL! While I think we're running 200 miles an hour trying to make this happen, much of the organization has become an anchor that is only dragging us down. From my own personal perspective, with Vince, *there was hope.* Without him, I'm inclined to say there's not much chance that we can really achieve these goals unless other significant changes are forthcoming.

CONFIDENTIAL

MP040107L018

MP4011071019

A couple of years ago, when Frank took over as the first senior officer actually responsible for Customer Service, I told you I was pleased with the decision. This finally positioned us *(at least organizationally and on paper)* to make some dramatic progress. The centralization of the administrative work to Warwick and Tulsa combined with Teleservicing created a powerful customer service operation. It also provided many new opportunities for change and progress with respect to our customers and the delivery of customer service. But, for the most part, the moment and opportunity was lost.

While there was some change, it was basically *"business as usual"* and everybody continued working on their own personal agendas and would not listen to this level of the organization. The incompetent leadership of this office only exacerbated that problem. Most of the change continued to be driven from the top down instead of from the bottom up. Major *strategic change* which was trying to come from the bottom up continued to run into brick walls or be ambushed along the way. Bear in mind that the two Customer Service Centers were now dealing with our entire customer base. Having that scope to our operations put us in touch with what was happening all over. It gave many issues a new level of magnitude and priority. We saw many things happening with our customer base.

In spite of this, great things have still been accomplished at the front line employee level. The employee growth of the two Customer Service Centers actually enabled us to change our *"culture"* with respect to the way we think about and deal with our customers. But the fact is, at the upper organization level few people really wanted to hear our ideas. They did not want to discuss the new opportunities and possibilities this organization change created. While there were valid distractions in our Corporate organization *(i.e., Bridgewater move)* that had some impact on the level of progress we could make, the organization was, and still is, primarily consumed with its own self-interests and personal agendas.

I spent years trying to get people to listen to the potential of proactively addressing the customer complaints that came through Teleservicing *(including those from nurses)*. Some of these were truly frightening and deserved swift and decisive action. We *long ago* proposed a centralized Consumer Relations organization that would oversee the marketing complaints. It needed to have some real authority and be empowered to take corrective action with the Regions and/or Branches. The *one and only attempt* to address this was a valiant effort made by Vince during that brief period when he was responsible for Teleservicing before. But, the organization changed and it became apparent that this was an exercise in futility so for once in my life I actually *gave up* and dropped the issue. Based on complaints over the past three years, I tried to convince people we were *(and are)* sitting on a *"time bomb"* with the way *"Accelerated Payment"* was presented and sold to our customers. We are now moving, albeit very slowly, to address this issue, but again, nobody wanted to listen until it got really serious. I see this issue as being equally or perhaps even more dangerous than the Florida situation.

To effect change, our general modus operandi is to form *"Task Forces"* or *"Natural Work Teams"* to study the issues. In most cases, these are driven from the top down, controlled by personal agendas, and don't even involve the appropriate players. There almost seems to be an overt conspiracy against involving or even asking the opinions of the people who do the work or would have to live with the consequences.

CONFIDENTIAL

The current Teleservicing and Corporate 800 number Task Forces had no representation from Kathy or I until Vince stepped in and insisted upon it. We have jerked around and failed to take significant action with "*address changes*" since my days as manager of FES. Our current effort has gone on for over two years and we appear destined to develop a separate system that most of the users don't want, at least in the form it is taking. Again, we have a task force comprised primarily of "systems" people and a couple of token "users." Had people listened years ago, we wouldn't be considering this a major problem today.

*Single Image* is another example. This has been debated for on to three years now. Vince has had a dramatic impact on the progress of this project but we should be much further ahead than we are. The competition has leap frogged us on this. But, this was a "*bottom up*" project as opposed to a "*top down*" so getting the necessary support and action *(prior to Vince)* has been all but impossible. It still wasn't easy for Vince to get it off the dime and it is finally progressing, but at a pace that still puts full installation a couple of years away if not more. This, while we take 120 programmers off their projects to look for "expense savings." It almost borders on absurdity. Give the users the systems we want and need and we'll eventually get the savings, but not without the up front investment.

The Baldrige feedback was right on target with the statement that "*Planning for operational improvement is not as rigorous as planning for cost reduction.*" We always go for the short term solutions. It's easier for people to cover their fannies by achieving the short term expense reductions than stretch for the long term savings by delivering the systems to meet the future needs. At the same time, we allow resources and money to be devoted to "*pie in the sky*" electronic projects coming from the top down that won't serve the users, aren't wanted, and we know won't work. *(I can cite examples but won't waste the space.)* Single Image is living testimony to our short sighted vision and the unwillingness of our people to take a risk. But, the Company has created the culture because this behavior continues to get recognized and rewarded.

With many of our change issues around the organization, we have a propensity to get everyone involved and let *everyone decide*. This is not effective participative management or a democracy. All it does is allow people to cover their fanny by having no individual to hold accountable or responsible. Every democracy needs a leader. All we should be guaranteed is that the affected parties to any change will be heard. Letting everyone *decide* only wastes time and impedes progress. After we have had our say, we need someone with a little vision, a little common sense, some savvy and the authority to make the decision and move forward. We try and get a consensus on too many things from the wrong people so we become impotent on the strategic issues that really matter. On the small decisions, we delegate everything upward because we don't hold people accountable. Consequently, we can't even get the small decisions made.

Kathy and I could probably help develop a *realistic and workable* strategy on the Corporate 800 number in a day. Instead, people have been involved that don't begin to understand the call center complexities. I have devoted hours upon hours trying to make people understand that the current direction would bring disaster, especially for the *customers of Personal Insurance*. But, again, nobody *(other than Vince)* wanted to listen to the facts and consider involving those who would be expected to make it work.

*(Although Vince has been extremely supportive since he took over, are you aware that we have been <u>intentionally</u> returning a "busy" signal to thousands of policyholder calls because we have been in a battle to play "catch up" on the staffing from 1992?)*

CONFIDENTIAL

3



While I guess Barbara is theoretically supposed make certain these issues are heard and understood, there isn't a chance. She isn't about to worry about the Company, the PI Customer or anyone else if it gets in the way of her own personal agenda or she can score more points by keeping her mouth shut and fully support Mr. Valentino's slightly flawed idea. But fortunately, I had a *one on one* with Jim Valentino and I think he finally began to understand the problems and issues at stake. But, someone still has to lead the charge if we are really going to make the changes required to meet *the needs of the PI customer* while implementing 800+MET-LIFE as the "Corporate" number.

Bob, there has been a revolution going on at this level of the organization. The size and scope of the two Customer Service Centers has dramatically changed the way every employee in this building looks at our customers. The revolution in the market place with respect to customer service is also very apparent to our employees. It is this level of the organization that should be driving change. This office represents about 42% of our customer base. If Barbara is to be the sole representative of that constituency within the organization, God help us, the customers and the Company. Her real impact and damage may not be visible for several years, but it will be there. I see no way our customers' interests will ever be adequately expressed and they will absolutely never come ahead of her own. We have changed so much at this level of the operation that most of those who have not been here in the midst of the battle cannot begin to comprehend what has taken place. She doesn't have a clue and most others are too busy to listen because of their own interests or agendas.

I've been knocking myself out trying to manage 200 people and tolerating all of Barbara's nonsense because, with Vince in place, there was hope. There was someone *listening* whose first concern was what was best for the Company. There was someone *brave enough* to be less worried about what was *politically correct* and who would stand up and be counted on the critical issues. And, it certainly didn't hurt that it was someone I considered a friend and who made it possible for me to tolerate this horrible environment.

Bob, now more than ever, we are confronted with opportunity. The opportunity exits to truly capitalize on everything that's happened. Between the establishment of a "Corporate" 800 Number and the further development of Teleservicing, we could use this resource to create a new image for the Company. In the process, we could:

+ Build or substantially reinforce the *relationships* with our customers through *easy access* and a concerted effort to make certain they are *educated*

+ Build or substantially reinforce the *trust level* of our customers

+ Develop *Sales Opportunities* beyond anything currently imagined

Bob, I know you've heard all of this before, but what you're hearing me say now is that IT ISN'T going to happen unless some dramatic changes take place in the administrative organization. With Vince gone, you need somebody who will *listen to the front lines*. You need some *(realistic)* visionaries and some risk takers. But, most of all, you need someone who is capable of driving this change within the organization and can make it happen. And, that's where it all falls apart as I'm not sure that such a person exists. I thought if anybody could do it, Vince could. But, even then, I wasn't sure he would be able to get past all the organizational blockades and barriers.

CONFIDENTIAL

4

MP4011071021

MP4011071022

I recently told you that I thought you were the only person who could lead Personal Insurance out of this current situation. I meant that. You are the only one who can truly *inspire* the organization. But I was also operating on the assumption that Vince would continue to be there to challenge and shake-up the administrative organization. In fact, I really thought he would be the heir apparent to Frank, and would then be in a position where he could really make the needed changes. But, I have no doubts that he will have equal, or perhaps greater impact in his new role. But, the entire PI organization needs to be shaken up to meet the challenge and seize the opportunity that we face.

Bob, I hope this does not come across as just being my frustration or that I'm just griping and complaining. I am trying to convey my sense of loss with the repositioning of Vince and also give you a picture of the way it looks from here. I have long since accepted that I'm not going to change the Company. Vince did give me a glimmer of hope that it might really change but, at this point, my expectations are pretty low.

I also hope you realize that I am in no way trying to blame you for what I perceive to be the problems in Customer Services. You placed your faith and trust in people and as far as I'm concerned, it is they who let you down. You are at far too high a level to be able to know or control what's happening at this level of the organization. To a degree, we are today the product of a 125 years of a *"Corporate culture"* that is really hard to change, although some progress has definitely been made.

As I have told some people lately, I am glad that I am approaching the end of my career rather than the beginning. After everything that transpired a couple of years ago over my difficulties with Barbara, and Frank made it clear that I really had no choice but to leave or endure, I knew where I stood. I have no real expectation that things will change at this office so if I can last another three years and four months, I fully expect to be out of here. I won't take one more day of this environment than I have to. And, I certainly can't fight all the Corporate and customer issues on my own. I'll have to work when I leave, but I really think I can go sell telephone switches or find work in the call center/telephone field to supplement my retirement. But, I would really much rather be here if things were going to change and we were going to make a legitimate effort to become all we can be.

The fate of Personal Insurance will be determined by that time. MetLife will either be well on the road to being recognized as "The Company noted for the high ethics and integrity of its Field Force as well as its genuine caring and concern for its customers as demonstrated by its Customer Service operation" . . . . . . or it will probably continue to be *just* the *"second largest life insurance company."*

Even Jim Valentino acknowledged that PI is on the leading edge within the Company with respect to our Teleservicing and customer service. But, we should be on the leading edge within the entire industry. That's not going to happen unless there are some changes. We do have the opportunity in front of us, but I have serious doubts that enough of the organization is truly up to the challenge and commitment it will take to capitalize on the situation and go after the long term rewards and success that are possible.

**CONFIDENTIAL**

5

Bob, I have a feeling that Vince will be much happier in his new role and, in some ways, he's probably breathing a sigh of relief that he won't have to deal with the organization in the same way as he did in Customer Services. But, he will be sorely missed. I truly wish both of you all the best as you grapple with the overwhelming challenge that faces Personal Insurance. If it can be done, it is only you who can do it.

Please don't feel that I expect or want any personal response. All I want is to be heard, for whatever it's worth. But, do know that you, the Company and the customers have the loyalty, commitment and dedication of myself and my entire management team to do our very best to see that your visions are carried out, no matter what the obstacles. It is you who has inspired me and, in turn, enabled me to inspire them. If anything happens to that, it will be real hard to find a good reason to care anymore.

Warmest personal regards


J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 19, 1994

CONFIDENTIAL

MP4011071023

6

MP4011071024

Thomas M. La Badia
Vice-President
P.I. Customer Services
Bridgewater
Area 2-E

RE    REFERRAL OF ACCELERATED PAYMENT PLAN AS "PAID UP"

Tom, I received a copy of your memorandum of January 12 directed to Frank Lynch.  In
it, you make reference to the fact that Pam Duffy responded to me last month.  I just want
to make you aware of the fact that I have no record of receiving any response, direct or
otherwise, from Pam.

The only thing I have is a copy of a memo that Dick Schramm wrote to Pam on December
11.  Did Pam perhaps respond to Dick?

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 15, 1993

CONFIDENTIAL

▲▲                                    𝒮.

MP4011071025

Kathy Schoos
Director
Customer Services & Communications
MetLife Customer Service Center - Warwick

Re   Accelerated Payment Plan

Kathy, I just want to say "Thanks" for your letter of support on this to Tom LaBadia. In one of
my conversations with Tom, he indicated that the "marketing" people felt that the number of
representatives using the term "paid-up" was limited to a very small number. Needless to say,
I disagreed with this and have been trying to illustrate that this is not the case. Your letter of
support should also help make the point.

I don't remember the exact details, but Tom mentioned that Dave Martin was one of the people
involved in the discussions that took place on this issue. If I remember correctly, I think Dave
is chairman of some field committee that was supposed to address how we dealt with the
dividend scale change, etc. I also assume it was Dave that felt the use of the term "paid-up"
was not widespread.

It just so happened that I received a great complaint case and the policyholder had a letter from
one of Dave's Branch Managers using the term "paid-up." Consequently, I wrote the attached
letter to Dave. Although he may have been aware of it, I also sent him a copy of my entire file
on this including the TMOS files from several complaints we received. I considered also
sending this to Tom LaBadia and/or Frank Lynch, but considering my already strained
relationship with Dave, I decided against it as I'm sure it would have annoyed him. I am just
in hopes that this makes enough of a point that he might be willing to change his position.

But anyway, thanks for the letter. I'm not particularly optimistic, but no one will be able to say
we didn't try and tell them.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 31, 1992

CONFIDENTIAL

David G. Martin
Vice-President
MidAmerica Territory

Re    Referral of Accelerated Payment Plan as "Paid-Up"

Dave, as the attached file will indicate, I have been expressing my serious concern about the impact of our
changing dividend scales and how it affects policyholders currently on *AP* and those who are expecting their
policies to go on *AP*. From our perspective, the problem has been seriously compounded because of the
marketing strategy used to sell or explain the concept of *AP*. It is very apparent from our experience that
a substantial percentage of these policyholders were told that once *AP* took effect, they were *"paid up"*
policies. With another dividend scale change for 1993, this problem is going to become even more serious.

The feedback I received from New York was that the Marketing side of the house did not feel that the use
of the term *"paid-up policy"* was a widespread practice. Based on the phone calls and letters we receive,
I believe it is much more common than is realized. Considering the number of cases we encounter, if it was
not widespread, it was still widespread enough that it may cause significant problems. These situations are
occurring now on policies that were supposed to become *paid up* and it will impact us in the future when
policies currently on *AP* will not have sufficient dividend balances to cover all future premiums.

Dave, attached is one such case which is a classic example. Inasmuch as it involves a sales office in
MidAmerica, I thought you might be interested in seeing it. The policyholder became concerned and sought
confirmation from the branch manager. Attached is a copy of the letter from the Branch Manager. While the
Branch Manager may have attempted to cover himself in the second paragraph, the first paragraph would
appear to be very clear as to when AP would take effect and the fact that future premiums would not be
required. The letter states:

> *"Once the premiums are paid for six years and the Automatic Premium Payment is selected by you,
> the policy is paid-up."* (Emphasis Mine)

Dave, I am also attaching my file so you will have more of the background. This is having a growing negative
impact on some of our policyholders as well as our administrative operation. But I am much more concerned
about the potential impact it could have on our future marketing efforts if we don't attempt to address this
issue with our policyholders soon.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 23, 1992

cc    Barbara Gardner  *(Current Attachments Only)*

CONFIDENTIAL

MP401107102G

MP4011071027

David G. Martin
Vice-President
MidAmerica Territory

Re    Referral of Accelerated Payment Plan as "Paid-Up"

Dave, as the attached file will indicate, I have been expressing my serious concern about the impact of our changing dividend scales and how it affects policyholders currently on *AP* and those who are expecting their policies to go on *AP*. From our perspective, the problem has been seriously compounded because of the marketing strategy used to sell or explain the concept of *AP*. It is very apparent from our experience that a substantial percentage of these policyholders were told that once *AP* took effect, they were *"paid up"* policies. With another dividend scale change for 1993, this problem is going to become even more serious.

The feedback I received from New York was that the Marketing side of the house did not feel that the use of the term *"paid-up policy"* was a widespread practice. Based on the phone calls and letters we receive, I believe it is much more common than is realized. Considering the number of cases we encounter, if it was not widespread, it was still widespread enough that it may cause significant problems. These situations are occurring now on policies that were supposed to become *paid up* and it will impact us in the future when policies currently on *AP* <u>will not</u> have sufficient dividend balances to cover all future premiums.

Dave, attached is one such case which is a classic example. Inasmuch as it involves a sales office in MidAmerica, I thought you might be interested in seeing it. The policyholder became concerned and sought confirmation from the branch manager. Attached is a copy of the letter from the Branch Manager. While the Branch Manager may have attempted to cover himself in the second paragraph, the first paragraph would appear to be very clear as to when AP would take effect and the fact that future premiums would not be required. The letter states:

> *"Once the premiums are paid for six years and the Automatic Premium Payment is selected by you,* <u>*the policy is paid-up.*</u>*"  (Emphasis Mine)*

Dave, I am also attaching my file so you will have more of the background. This is having a growing negative impact on some of our policyholders as well as our administrative operation. But I am much more concerned about the potential impact it could have on our future marketing efforts if we don't attempt to address this issue with our policyholders soon.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 23, 1992

cc    Barbara Gardner   *(Current Attachments Only)*

**CONFIDENTIAL**

Metropolitan Life Insura.     Company
Metropolitan Property and Liability Insurance Company

Highland Place, Suite 306
6151 Wilson Mills Road, Highland Heights, OH 44143
(216) 449-3900



**Craig J. Ruthsatz**
Branch Manager

Registered Representative
Leaders Conference
2 Times Qualified

Dr. ████████
████████████████

Dear Dr. ██████

This letter is in response to some of the concerns you have
on policy #90████████ PR.  Once the premiums are paid for six
years and the Automatic Premium Payment is selected by you,
the policy is paid-up.  Thus you do not have to pay any more
and the extended term insurance would not apply after
payment is made for six years.

The dividends are decided by the Board of Directors of
Metropolitan Life Insurance Company.  To the best of our
capabilities, we pay the illustrative cash value as shown on
the illustration.  An illustration and a comparison with CD
is attached.  However, the illustrative dividends are not
guaranteed.  A 20 year dividend comparison is also attached.

I hope, I have answered all your questions.  However, feel
free to call me at 216-449-3900 if you would like any more
clarification.

Sincerely,



Craig J. Ruthsatz
Branch Manager

**CONFIDENTIAL**

**REDACTED CONFIDENTIAL
POL INFO**

Life/Health/Annuities • ˈAutomobile• ˈHomeowners•
•Not yet available in all states

MP4011071028

ATTN:  Dividend Plan Unit
MetLife, P. O. Box 21209
Tulsa, Oklahoma - 74121-1209                                November 16, 1992

REF:  Paid up policy in six years for Policy #90████████PR issued to ████████

Dear Sir/Madam:
        This is regarding some concerns I have regarding the policy sold to me by your
sales  agent Ranjan Jagetia (in Highland Heights branch, Ohio). He sold  this policy
emphasizing that the policy will be paid in full in five years, and at worst in six years. I
bought this policy because I was assured by Metlife sales representatives that this insurance
scheme is an investement scheme  compared to simpler  but cheaper term insurance
schemes. I was also told that this policy will almost guarantee 12% rate of interest in
addition to life insurance, and act as money sheltering plan in future.

Upon receipt of the contract, I was puzzled by the wordings of the letter which seemed to
imply, I  may have to pay indefinitely depending upon the dividend rate.. I was very much
concerned, and  sought clarifications from the branch manager Mr. Craig Ruthsatz. I was
told that it was  certain that I would not have to pay more than six  annual premiums of
$3427.50 for six continous years even under the worst circumstances. The branch manager
further assured me that METLIFE  is best in the business, and will follow its dividend scale
although it is decided yearly by the board of directors, and it could go through minor
variations. I requested him to give these assurances in writing as the representatives of
METLIFE insurance company. I was given the enclosed letter signed by Mr. Craig
Ruthsatz which clearly  assured me of METLIFE's commitment to have the policy paid up
by the end of  six years. The contract was accepted by me subject to these assurances.

Recently,  I came to know that payment period is being changed by insurance companies. I
contacted Ranjan Jagetia, and he told me that main office has my policy as being paid up
on November 1997 at the current dividend rate. I was very much concerned, and sent  a
photocopy  of the written commitment to Ranjan Jagetia who in turn promised to send to
the main office immediately.

After Ranjan Jagetia failed to give satisfactory answer, I talked to Kim - the costomer
representative at the main office ( 1-800-MET-LIFE) on November 16, 1992, and she said
that the  written commitment  from the branch manager will be honored, and I should
explain the situation to your office. I hope that you would find this explanation
satisfactory.  As suggested by Kim, I am enclosing a copy of the letter given by the branch
manager. Please let me know if you need any more information. I am also enclosing my
third premium as a token of trust. However, I will request a written assurance from the
main office that the confusion has been taken care of.  If I have to pay more and possibly
indefinitely simply to have life insurance, I will prefer to choose much cheaper group term
insurance  for next  ten to fifteen years  ( After which I will have sufficient savings to
support my family without any insurance) from other agencies of which I am a member.
instead of sinking my money.

With best regards



Dr. ████████

████████(home)        ████████(work)

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

```
                      121692 0010323     Base 01 Retrieval  CEHO TS  MELCHER, CHERYL
                      Suff First Name    Last Name          Trans Codes      Ltr R Date  C
Policy                                                      DVI                   Y
 0              PR
```

```
Campaign: LIFI Source: RPT              Code1: Y (Y/N)          TNotes: N
Caller Name.... First:                  Last:                   XNotes: Y
Relationship/Status..: O C/O:                                   Script:
 Street:                                        Suppress Notification?: N (Y/N)
 City  :                      State:    Zipcode:
 Phone :                     Alt Phone:              MAYFIELD BR OH      NCHO
 Sex   : M (M/F)             Alt Ext  :              216 449 3900
Notes: CALLER MAILED IN PMT W/COPY OF LETTER FROM AGENT ADV AFTER 6 YRS
HIS POLICY W/BE PD UP.  ADV CALLER WE HAVE RECD PMT AND HIS POL IS PD
TO 11-93.  EXPL HE CANNOT W/DRAW DIV THAT THIS IS HOW HIS POL IS CONSIDERED
FPU AFTER A CERTAIN PERIOD OF TIME.
=============================================================================
DIVIDENDS:  CALLER REQ CONFIRMATION OF LTR HE SENT IN FROM HIS AGENT
GUARANTEEING HIS POL W/BE PD UP AFTER 6 YRS.  CALLER WAS ADV BY PRIOR CSR
TO SEND COPY OF LTR AND REQ FOR MET TO HONOR THAT LTR W/HIS 11-92 ANNUAL
PREM.  WIP NOTES SHOWS UNASSIGN 12-03-92 ADVISE PREM PMTS.
=============================================================================
DEL.  RESOURCE/WALKOVER TO DIVIDENDS.
```

```
Select:    1-EBase 2-ENote 3-ESlaf 4-ERef  6-ECorr 7-Index 8-Keys  10-RNte
```

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL INFO

DO/BR: A74 R13

```
                111692 0010326    Base 01 Retrieval  CEHO TS  PIERCE, KATHLEEN
Policy     Suff First Name      Last Name        Trans Codes     Ltr R Date   C
)0█████    PR  ██████           ██████           AVI                    N
```

MP401071031

```
      Campaign: LIFI Source: RPT          Code1: Y (Y/N)        TNotes: N
      Caller Name.... First: ██████       Last: ██████          XNotes: N
      Relationship/Status..: I C/O:                             Script:
       Street: █████                         Suppress Notification?: N (Y/N)
       City  : █████          State: ██  Zipcode: ██████       DO/BR: A74 R13
       Phone : █████          Alt Phone:             MAYFIELD BR OH      NCHO
       Sex   : M (M/F)        Alt Ext  :
      Notes: CSR: VERIFIED MAILING ADDRS TO CEHO DIV UNIT
```

```
      Select:     1-EBase 2-ENote 3-ESlaf 4-ERef  6-ECorr 7-Index 8-Keys  10-RNte
```

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL
INFO

```
                   111692 0010329      Base 01 Retrieval   CEHO TS  PHILLIPO, KIMBERLY
Policy             Suff First Name      Last Name          Trans Codes       Ltr R Date   C
0█████             PR    █████                             DVI API                  N
```

```
Campaign: LIFI Source: OTH            Code1: Y (Y/N)        TNotes: N
Caller Name.... First: █████          Last: █████          XNotes: Y
Relationship/Status..: O C/O:                              Script:
  Street: █████                                            Suppress Notification?: N (Y/N)
  City   : █████           State: ██ Zipcode: █████        DO/BR: A74 R13
  Phone  : █████        Alt Phone:           MAYFIELD BR OH       NCHO
  Sex    : M (M/F)      Alt Ext  :           216 449 3900
Notes: OTH-FORGOT TO ASK. CALLER STATES HIS REP GAVE HIM A LETTER WHICH
GUARANTEES HIS POLICY WILL BE FPU IN 6 YEARS. APP QUOTE ON WCLD NOW INDICATES
SEVEN YEARS. CALLER WANTS MET TO STAND BY LETTER REP WROTE. ADVISED CALLER
TO SEND A COPY OF THE LETTER WITH REQUEST FOR MET TO HONOR THAT LETTER.
ADVISED TO SEND IN ANNUAL PREMIUM AS WELL. PROVIDED DIVIDEND UNIT ADDRESS.
```

```
Select:   1-EBase 2-ENote 3-ESlaf 4-ERef  6-ECorr 7-Index 8-Keys  10-RNte
```

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                                POL INFO

```
====================================================================
                          Work In Process
                    Printed by: TULTELES GRANT

Case#: 00429451   Created By: TULCLDDS REPLOGLE Status: C      Priority: 3
Type.:                                    Source:             Recvd: 123192

Type    S Unit    Operator Description            Start  CU/END TN
-------- - -------- -------- ------------------------------ ------ ------ --
        C TULDICOR UNASSIGN ADVISE PREMIUM PAYMENTS 120392 122292
        C TULDICOR COTHREN  PULLED CASE FROM BIN    122292 122292
        C TULDICOR COTHREN  SEE OTHER WIP           122292 122292

Policy Numbers:
  90█████████ PR

Names:
  ██████████████

Keywords:
                                      City: ███████████████
Addr.: ████████████████              Br: A74  MAYFIELD BR OH
St/Zp:          Phne: ██████████         216 449 3900
```

**CONFIDENTIAL**                    **REDACTED**
                                    **CONFIDENTIAL POL**
                                    **INFO**

MP401107I033

```
================================================================
                        Work In Process
                    Printed by: TULTELES GRANT

Case#: 00445823   Created By: TULTELES MELCHER   Status: A      Priority: 2
Type.: REF4    REFERRAL TO TULDICOR          Source: PHONE    Recvd: 121692

Type     S Unit      Operator  Description             Start    CU/END TN
-------- - --------  --------  -----------             ------   ------ --
TELREF   C TULDICOR  UNASSIGN  REFERRAL TULTELES TO TULDICOR  121692 121692
         C TULDICOR  COTHREN   WALKOVER                121692   122392
         C TULDICOR  COTHREN   PULLED CASE FROM BIN    122292   122292
         C TULDICOR  COTHREN   TO CHERYL FOR ADVISE    122292   122292
         C TULDICOR  COTHREN   SENT AUTO CORR-ACKN LETTER  122392 122392
         A TULDICOR  COTHREN   IN PC FOR 1993 AP QUOTE  122392  010693
```

Policy Numbers:
90&#9608;&#9608;&#9608;PR          **REDACTED CONFIDENTIAL POL INFO**

Names: &#9608;&#9608;&#9608;&#9608;&#9608;

Keywords:

Addr.: &#9608;&#9608;&#9608;&#9608;        City: &#9608;&#9608;&#9608;&#9608;&#9608;
St/Zp: &#9608;&#9608;&#9608;&#9608;  Phne: &#9608;&#9608;&#9608;&#9608;    Br: A74  MAYFIELD BR OH        NCHO
                                           216 449 3900

-------------- Note added by TULTELES MELCHER  12/16/92 10:46---------------

CSR: MELCHER, CHERYL
POLICY         SUFF          INSURED NAME            DATE OF CALL: 12-16-92
90&#9608;&#9608;&#9608;         PR           &#9608;&#9608;&#9608;&#9608; &#9608;&#9608;&#9608;&#9608;

CALLER NAME....: &#9608;&#9608;&#9608;&#9608;&#9608;
CALLER STREET..: 
CALLER CITY....: &#9608;&#9608;&#9608;       STATE: &#9608;&#9608;  ZIPCODE: &#9608;&#9608;&#9608;&#9608;
CALLER PHONE...: &#9608;&#9608;&#9608;        ALTERNATE PHONE:
RELATIONSHIP...: OWNER                 DO/BR: A74

NOTES: CALLER MAILED IN PMT W/COPY OF LETTER FROM AGENT ADV AFTER 6 YRS
HIS POLICY W/BE PD UP.  ADV CALLER WE HAVE RECD PMT AND HIS POL IS PD
TO 11-93.  EXPL HE CANNOT W/DRAW DIV THAT THIS IS HOW HIS POL IS CONSIDERED
FPU AFTER A CERTAIN PERIOD OF TIME.
========================================================================
DIVIDENDS:  CALLER REQ CONFIRMATION OF LTR HE SENT IN FROM HIS AGENT
GUARANTEEING HIS POL W/BE PD UP AFTER 6 YRS.  CALLER WAS ADV BY PRIOR CSR
TO SEND COPY OF LTR AND REQ FOR MET TO HONOR THAT LTR W/HIS 11-92 ANNUAL
PREM.  WIP NOTES SHOWS UNASSIGN 12-03-92 ADVISE PREM PMTS.
========================================================================
DEL.  RESOURCE/WALKOVER TO DIVIDENDS.

-------------- Note added by TULDICOR COTHREN  12/23/92 14:15 ---------------
SENT AUTO CORR-ACKN LETTER.  WAITING FOR THE 1993 UPDATES TO SEE IF THE
AP ELIGIBILITY WILL BE DELAYED AN EXTRA YEAR.

CONFIDENTIAL    ----------------- End Of Notes ---------------

Vincent J. Donnelly
Vice-President
P.I. Customer Services

MP401107103S

Dear Vince

I was hoping to put off trying to address this issue until after the first of the year. However, Teleservices is in dire need of additional space and with the relocation of NBSS, we are considering some major moves. Aside from this, things have reached the point where I am contemplating requesting an organizational change. If this is done, it really should be factored into any new floor plans we might develop.

Vince, the problem boils down to the fact that I need some relief. As you know, there are many issues rapidly emerging with Teleservices. *Sales Opportunities*, the *Corporate 800 Number, Managing to Service Level* are all items which will require extensive amounts of manager/director time and involvement in spite of the fact that I am blessed with good subordinate support. Also, there are any number of actions or decisions flowing down from the top of the Company that land right on our operation. In the current environment, this is only likely to increase.

The administrative work reorganization has also created very large C/L/D operations. This has resulted in the identification of many new systems and procedural issues which need to be addressed. Many of these require or deserve more manager/director time and attention than I am currently able to provide. And, when you put it all together, having 200+ people is just too many for one director to try and manage *under the current organization structure.*

I've had the opportunity to be with Kathy twice in the last few weeks and while I cannot really speak for her, I think we are both feeling many of the same things. There is so much going on in our operations that I know I feel like I have the equivalent of a herd of elephants sitting on my head . . . and on the heads of my key subordinates. I think Kathy and I have had no choice but to delegate increasing amounts of responsibility to our subordinates which, in some cases, has gone well beyond the level of responsibility we should reasonably expect from people in these positions. Particularly when these people cannot be given an adequate level of manager/director time and support to help them carry out this responsibility. It is becoming apparent to me that I have long since delegated more than these people can handle. There are more and more things not getting done because it is just too much and the work and stress is now beginning to take its toll on some members of my staff.

The demands and expectations for our Teleservicing organizations by both the Company *and our customers* are changing and growing at warp speed. Add to this all the increased emphasis on Baldrige, and improved customer service in general, and there's a massive challenge with this piece of the organization *(assuming we're really going to continue to try and "walk the talk" and can maintain adequate resources).*

**CONFIDENTIAL**

MP401071036

There is also a high level of frustration being created by the fact that few outside the division fully understand the issues associated with Call Center Management nor do most want to hear them. We have consumed vast amounts of time and energy trying to educate people about our customers and our Call Center operations in general. I can't help but wonder where MetLife would be today if people other than yourself had really listened to my repeated concerns over marketing related complaints a few years back. The same is true with "AP" *(Accelerated Payment)* which we're finally beginning to address. But, in the current environment, it may prove to be too little too late if the Insurance Departments decide to latch onto that one.

The Corporate 800 number is another current example. While you listened, learned and understood our concerns, it has been almost impossible to get others *to even listen* to the implications of a seemingly "simple" decision. It is one thing when people make a decision after hearing all the facts. It is entirely another when they aren't interested in listening and don't understand the consequences.

Vince, I think both Kathy and I have demonstrated that there is a definite synergy and customer benefit by having the C/L/D organization closely tied to Teleservices. In my case I know it has created a totally new *"customer awareness"* within C/L/D and it has certainly shaped their priorities and procedures. Long term, I also believe that the only solution to our *"Managing to Service Level"* will be in having some portion of the workforce that can be quickly and easily shifted between C/L/D and Teleservices as dictated by call volume fluctuation.

But, the reality is that one manager/director for both of these areas is no longer a viable approach. Both areas just have too many of their own needs and activities. Both need competent managers to oversee their operations on a day to day basis. However, having both of these managers report to one entity responsible for maintaining the synergy and enhanced customer service would be an ideal solution *(providing they are the right managers).*

I am at the point where I am ready to ask Barbara to just split off C/L/D. But, I also know that if I do, both Teleservicing and the customers will be losers in the deal. If she selects the manager and he/she reports directly to her, the focus and priorities of C/L/D will be away from the customer service synergy that has developed between C/L/D and Teleservices. The focus will most likely turn to whatever happens to be Barbara's current pet management philosophy *(of the week)* or something as equally superficial. I also have a good idea as to who is on her list of candidates and my assessment is that most of them couldn't manage their way out of a paper bag.

Down in Florida you mentioned that something might happen for Kathy and I in 1994. In view of all the recent Company difficulties and events, I cannot help but suspect that getting this accomplished in the near future will be extremely difficult *in spite of your best efforts and intentions.* And, I will understand. I certainly know by now that nothing in Met is a "sure thing" until it happens. Perhaps it could still be accomplished by elevating the Director level to encompass subordinate managers but that also might take some doing.

**CONFIDENTIAL**

MP4011071037

However, the potential advancement is not the real issue. I would gladly trade any advancement for having my life simplified in other ways which I know you understand. The root issue here is whether or not both C/L/D and Teleservices can and should have their own managers and whether those managers should report to an intermediate entity ahead of the Operations Vice-President. Previously it was my expectation that if you were able to pull off what you discussed, not only would both areas report to me, *but I thought I would also be able to select the managers*. Thus, I didn't feel much of the synergy would be lost by each area having their own manager. But, I would only want responsibility for both areas if I could choose the managers.

But, like I said, I'm beginning to think the timing is probably not right for this to happen. Even if it occurred, I fully suspect there would be a major battle over the managerial selections. Consequently, with our tentative move under consideration, I feel like telling Barbara to just take C/L/D and whatever happens, happens. Having so much responsibility under the current organization is just giving her more "targets" to shoot at with respect to me personally anyway. And, the reality is that I am not currently able to do justice to either side of the organization. Even if I assume responsibility only for Teleservices, I will have to ask someone to assume a large part of the managerial activity for overseeing the multiple CSR supervisors and the associated day to day activities. There are just too many things at a higher level demanding my attention considering the magnitude of the challenges immediately in front of us.

Vince, please trust me that I am not trying to put you on the spot or get some kind of commitment. And, I am not trying to force any issues. The simple fact is that something has to give sometime, and depending upon the way the move goes, now might be the appropriate time. I need some help and some guidance and I'm turning to you to give me some advice if you can. *Should I just let it go or do you really think there's a reason to hold on?* If I give up C/L/D, I suspect Kathy would be asked to do the same. I'm not sure she's particularly opposed to it, but I think we both hate to lose the benefits for the customer of having them together.

Any thoughts or insight you can share would be most appreciated.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 21, 1993

**CONFIDENTIAL**

3

MP4010071038

Tom LaBadia
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater
    AREA 2-E


Re   Referrals to "AP" as Paid-Up


Tom, as you know, in my previous correspondence concerning *Accelerated Payment*, I indicated that our Account Representatives usually referred to the policy as being *"paid-up"* once the AP took over.  I think the attached may help to support this statement.  Just over the course of a few days, I ran into several complaints in which the policy was referred to as being paid-up.

I am also attaching a couple other ones relating to the dividend scale change and the change in AP eligibility dates.  These give a little flavor as to the sensitivity of this issue with some policyholders.

It should be recognized that these are only the *complaint* cases.  We receive many other *non-complaint* phone calls where the policy was referred to as being *paid-up* under this arrangement but no formal complaint was involved.


J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 7, 1992

cc   Barbara Gardner



**CONFIDENTIAL**

MP401071039



TMC537    112092    BASE 01 RETRIEVAL    CEHO TS    CAPRON, TAMMY
POLICY    Suff First Name    Last Name    Trans Codes    Ltr R Date    C
874    A *    CHA PFI DVI PPI    Y
                                    CPL

Campaign: LIFI Source: RMT
Caller Name: First:
Relationship/Status: 0/0:
Street:    Alt Phone:    State:    Last:    TNotes: N
Phone:    Alt Ext:    Zipcode:    Suppress Notification: N (Y/N)    XNotes: Y
Sex: F (M/F)    Alt Ext: 0    MACHING BR    DO/BR: OH    Script: Y
Notes: CSR:    EXPLD LAST. CALLER STATED    218 728 868    JB4 R13
8/28/ CALLER VERY UPSET THAT SHE REC'D A BILL & LATE NOTICE (PTD 8/28/92).    NCHO
EXPLD DIV PROVISION. GAVE ROBERT SCHWARTZ'S NAME & NWO ADDRESS, AT HER
REQUEST    ADV APQ AS OF 8/28/92. * 8/28/94: EXPLD THIS IS BASED ON CURRENT
DIV SCALE & IS SUBJECT TO CHANGE.
***STANDARDIZED ADDRESS*

*********** CALLER VERY UPSET THAT THIS POLICY
QLHO-CONSUMER RELATIONS, 1ST COMPLAINT; CALLER TOLD HER THIS POLICY W/O FPU 8/92.
IS NOT FPU. CALLER STATED HER AGENT TOLD HER THIS MEANT DIVS WOULD PAY PREMS; CALLER
STATED SHE UNDERSTOOD THAT PREMS WOULD ONLY BE PAYABLE FOR 7 YRS. PER THE
CALLER STATED SHE DID NOT READ HER POLICY PROVISIONS NOR DID SHE READ THE
AREA OF THE DIV PROJECTION STATING THAT IT IS NOT GUARANTEED    CALLER DOES
NOT FEEL IT IS HER RESPONSIBILITY TO READ ANYTHING; STATED THE AGENT'S
WORDS/HE ALL SHE NEEDS.    CALLER DID NOT REQUEST ANY FURTHER ACTION AT THIS
TIME. STATED SHE INTENDS TO CONTACT AN ATTORNEY. STATED SHE FEELS BREACH OF
CONTRACT & WRITE TO OUR CEO TO HAVE HER POLICY *STRAIGHTENED OUT.*
*****************

Select:    1-EBase 2-ENotes 3-ESlat 4-ERef 5-ETNotes 6-Index 7-Keys

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO



MP4011071040

TM0537    120192    POLICY  Suff  First Name
BY POLICY    A

BASE OF RETRIEVAL
CENO IS    JOHNSON, PAULETTE
Trans Code    Ltr- R Date    C
CVQ CSU DVI CPL    N

Campaign: LIF1  Source: RNT
Caller Name:  First:    Last:
Relationship/Status:    O C/O:
Street:
City:    State:    Zipcode:
Phone:  H (W/)    Alt Phone:
Sex:  M (W/)    Alt Ext:

Notes: RECORDED: CALLER WOULD LIKE TO CASH SURR POLICY BECAUSE OF
THE MISUNDERSTANDING BETWEEN THE ISSUING AGENT AND HIM. CALLER
FEELS HE DID NOT BELIEVE THAT THE POLICY WOULD BE PAID UP IN 3 YEARS
BY DEPOSITING MONEY INTO THE PUAR RIDER AND STILL PAYING A PREM OF
1023.30 ANNUALLY. CALLER STATES HE DID NOT WANT TO REINSTATE THE
POLICY WITH MONEY FROM THE PUAR RIDER/CV 1443.87. CALLER STATES HE WOULD
RATHER CASH THE POLICY IN. CALLER STATES HE HAS WRITTEN LETTER TO METLIFE
EXPLAINING THE MATTER AND FOUND OUT THE ISSUING AGENT IS NO LONGER
WITH METLIFE. CALLER STATE THAT JIM BERTRAM CONTACTED HIM IN OCTOBER
BUT HE HAS HAD NO FURTHER CONTACT. CALLER FEEL ITS BEST JUST TO CASH
SURR POLICY.
*SENT AUTO CORRES WITH PRF.

TNotes: N
XNotes: Y
Scr1pt:
HDat: N (Y/N)

Suppress Notification:
SIERRA OF MADRE  BR  CA
916 788 9101
DO/BR: 744 R48
WHO

Select:    1-EBase 2-ENotes 3-ESlsf 4-ERef 5-ETNotes 6-Index 7-Keys

CONFIDENTIAL

REDACTED
CONFIDENTIAL POL INFO



MP401107I041

TMQS37
POLICY    120192    Suff First Name          BASE 01 RETRIEVAL  CEHO TS  MCDANIEL, CHRIS
3 ¦       A                                                Last Name
                                                           Trans Codes  Ltr R Date
                                                           PFI SII DVI CPL    Y    C

Campaign: LIFI Source: RNT
Caller Name: ____ First: ____
Relationship/Status: S C/01
Street: ____                State: ____ Zipcode: ____     TNotes: N
City: ____                   Alt Phone: ____              XNotes: Y
Phone: ____                                Last: ____     Script: Y
Sex:: F (M/F)                Alt                          DO/BR: 285 RS8
No time ADV CALLER OF HER COMPLAINT & SEND A MESSAGE     Y (Y/N)
TO THE AGENT TO MAKE SURE EVERYTHING IS OK.              CREDIT FALLS  IA
THE AGENT.                                               319 234 2010 GLMO
*****************************
GLMO/CONSUMER RELATIONS, 1ST COMPLAINT, FIELD RELATED: THE CALLER IS
VERY UPSET ABOUT THE PAST DUE NOTICE SHE RECD TODAY ADVISING THIS POLICY IS
GOING TO LAPSE FOR NONPMT OF THE 10-10-92 PREM THIS CONCERNS HER VERY MUCH
BECAUSE THEY PUT OVER $11,000.00 INTO THE PLAN ON THIS POLICY & WERE TOLD
BY THEIR AGENT JOANNE CULLEN (285-885-1) THAT THE POLICY WOULD BE FULLY
PAID UP THEY WERE CONFUSED BY THE BILL & CALLED HER THEN & SHE ADV THEM
NOT TO WORRY & THEN LAST WEEK THE AGENT ADV THEM THEY NEEDED TO COME IN TO
SIGN A FORM & THEN THIS WK SHE IS NOT SURE WHAT FORM IT WAS BUT I ADV IT IS
PROBALY THE ACCELERATED PMT FORM I EXPLD AP TO HER & ADV THE MONEY IN THE
PUR CAN BE USED TO PAY HER PREMS. SINCE SHE IS NOT SURE WHAT FORM THEY
HAD HER HUSBAND SIGN AT THE LOCAL OFFICE SHE JUST WANTS TO BE SURE THAT THIS
IS ALL TAKEN CARE OF & THE POLICY DOES NOT LAPSE. AP HAS NOT BEEN ACTIVATED
YET & NMPAP DOES NOT SHOW THE FORMS HAVE BEEN RECD AT THIS TIME.

Select:   1-ENote 2-ENotes 3-ESlnf 4-ERef 5-ETNotes 0-Index 7-Keys

CONFIDENTIAL                          REDACTED CONFIDENTIAL
                                      POL INFO

MP4011071042

TM0537    120282
Policy    Suff First Name
901    A

BASE 01 RETRIEVAL    CEHO TS    SIFFERATH, KIMBERLY
                                Trans Codes    Last Name
                                CPL CVI    LTP R Date C

Campaign: LIFI    Source: SOR
Caller Name:    First:
Relationship/Status:    O C/O:
Street:    Alt Phone:
City:    State:    Zipcode:    Last:
Phone:    Alt Ext.:    Suppress Notification:
Sex: M (M/F)    Session:    DO/BR:
    SOLON BR OH    TMNotes: N
    218 248 8450    XNotes: Y
    Script:
    N (Y/N)
    D34 R13
    NCHO

Notes: GLHO/CONS REL/1ST COMPLAINT/MISREP; OWNER PUT OVER 12,000.00 IN POL.
WHEN IT WAS PURCHASED AND WAS TOLD BY THE AGENT RICHARD TRIVISONNO, D34 IT
WOULD BE FULLY PD UP AND ADV PREM ARE BEING PAID FROM PUAR. HE
ASKED HIS AGENT FOR THE CASH VALUE CASHED AND THE AGENT ADV IT WOULD BE
ABOUT 3000.00 LESS THAN WHAT HE PAID IN. HE TRIED SEVERAL TIMES TO EXPLN
TO HIM WHY HE CANNOT REC A REFUND OF ALL THE PREM HE'S PAID INTO THE
POL BECAUSE THE INSD WAS COVERED SINCE SEPT OF 1880 AND IF HE MADE A FULL
REFUND THAT WOULD BE LIKE GIVING AWAY FREE INS AND WE CANNOT DO THAT. HE
NEVER UNDERSTAND AND KEEP SAYING HE WAS TOLD THIS AND THAT HE WAS
MISREP. ADV TO SEND IN STMT EXPLAINING WHY HE FEELS HE WAS MISREP. HE IS
REALLY MAD AND SAID HE REALLY UNDERSTOOD WHY THE CASH VALUE WAS
FIRST PLACE OTHER THAN THE FACT THE CASH VALUE WAS NOT WHAT HE PAID IN.
HE WILL SEND TO MISREP STMT AND REQ TO YOUR OFFICE.

Select:    1-ENote 2-ENotes 3-ESief 4-ERef 5-ETNotes 6-Index 7-Keys



CONFIDENTIAL

REDACTED
CONFIDENTIAL POL INFO

MP401071043



TMOS37    11192         BASE 01 RETRIEVAL    CEHO TS    JOHNSON, PAULETTE
POLICY    Suff First Name                  Trans Codes  R Date    C
84                     Last Name            CPL    DVI
84                                          DVI

Campaign: Lift Source: RMT
Caller Name: First:          Last:
Relationship/Status: B-C/O:                          Tnotes: N
Street:              State:        Zipcode:          XNotes: Y
City:                     Suppress Notification?:    Script: Y
Sex: F (M/F)    All Phone:        NORTHWEST          DO/BR: H86 R52
Phone:          All Ex.:         312 286 1191       BR IL    GLHO

Notes: GLHO/CONSUMER RELATIONS/FIELD RELATED. CALLER IS EXTREMELY
UPSET BECAUSE SHE WAS ADVISED BY THE AGENT THAT HER POLICIES
WOULD BE ELIGIBLE FOR APP IN 7 YEARS, AFTER THE ISSUE, CALLER
WOULD BE ELIGIBLE. THE POLICY ARE NOT ELIGIBLE AND SHE WOULD LIKE A WRITTEN
EXPLANATION ON WHY THE POLICY ARE NOT ELIGIBLE. CALLER WANTS A WRITTEN
REP TO SET UP APPOINTMENT TO REVIEW OR GIVE OTHER ALTERNATIVE TO PAYMENT
ON THE POLICIES. CALLER STATES THAT METLIFE SHOULD HAVE ADVISED POLICY-
HOLDERS OF THE DIVIDEND SCALE REDUCTION AND THEY SHOULD HAVE CONSIDERED THE
POLICYHOLDERS SITUATION AND THE EXPECTATION OF NOT PAYING THE
PREMIUM IN 7 YEARS. CALLER STATED SHE WILL BE HOLDING HER PREMIUM UNTIL
SHE HAS A RESPONSE THE HER COMPLAINT.

Select:    1-EBase 2-ENotes 3-ESllef 4-ERef 5-ETNotes 6-Index 7-Keys

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                               POL INFO

MP4011071044



Campaign: LIFI Source: RPT
Caller Name.: First:
Relationship/Status:            O/CB:
Street:
City:                State:    Zipcode:
Phone.:
Sex.: F (M/F)
Alt Phone:
Alt Ext.:

Select:    1-Ebase 2-ENotes 3-ESlsf 4-ERef 8-ETNotes 0-Index 7-Keys

Last:

Suppress Notification?:
Script:

TMCS37   113302
Policy     Suff First Name
Be

Last Name

BASE 01 RETRIEVAL
Trans Codes     GEHO TS   SMITH, DYVANDA
               CHA CPL DVI   Lif R Date

TNotes: N
XNotes: Y
Script:     N (Y/N)
DO/BR: H40 R12
BR MI     MCHO

GENO TS
CHA CPL DVI
Lif Y     C

517 788 1316
SADINAW VLLY

Notes: EXPLD APP DATE IS AN APPROXIMATE DATE BECAUSE DIVIDENDS ARE GUARANTEED
AND DUE TO NEW DIV SCALE FOR LAST YR & THIS YR DATE. ADVISED AGENT COULD
HAVE CHANGED. ADV ACCEL PAY ST DT 12 23 94 BUT AGAIN IS AN APPROXIMATE
DATE. GAVE WRLD AMERICAL ADRS FOR CALLER TO WRITE TO ABOUT DIVS.CALLER
FEELS THIS WAS A MIS REP.

GLMO/CONSUMER RELATIONS/IST COMPLAINT/MISREP/ CALLER FEELS SHE SHOULD HAVE
BEEN ADVISED THE ACCELERATED PAYMENT PLAN ELIGIBILITY DATE WAS NOT
GUARANTEED. CALLER WILL BE SUBMITTING A WRITTEN STMT. CALLER FEELS THE
PMT OF DIVIDENDS TO THE POL SHOULD HAVE BEEN EXPLAINED.

CONFIDENTIAL

REDACTED CONFIDENTIAL
POL INFO

```
                111892 0010345    Base 01 Retrieval  CEHO TS  SMITH, TRACI
       Policy   Suff First Name   Last Name         Trans Codes    Ltr R Date   C
       90█████  PR  █████         █████             DVI CPL            Y
```

MP401107104S

```
       Campaign: LIFI Source: RPT        Code1: Y (Y/N)        TNotes: N
       Caller Name.... First: █████       Last: █████           XNotes: Y
       Relationship/Status..: O C/O:                            Script:
        Street:                                Suppress Notification?: N (Y/N)
        City  :                   State: █ Zipcode: █████
        Phone :                Alt Phone:                CRESCENT CTY BR LA    CEHO
        Sex   : M (M/F)        Alt Ext  :                504 464 7464
       Notes: CSR:  TRANSFER BY JOY HENDRIX.
       ================================================================================
       CEHO/CONSUMER RELATIONS/2ND COMPLAINT:  THIS WILL FOLLOW THE 1ST COMPLAINT
       FILED 8/11/92.  THE CALLER STATES HE WILL HAVE HIS ATTORNEY SEND IN A LETTER
       ADVISING US OF THE ACTION HE WILL REQUEST BE TAKEN ON THIS POLICY.  HE WILL
       SEND IT TO KARIN WESTERLUND OF CONSUMER RELATIONS.  HE INDICATES HE HAS HAD
       LETTERS FROM KATIE SEWARD AND THE ANSWERS TO HIS PROBLEMS HAVE NOT BEEN SUF-
       FICIENT.  THE LETTERS ANSWER QUESTIONS BUT HE IS NOT SATISFIED THAT HIS AGEN
       CHRIS EICHHORN TOLD HIM ON 12/11/91 THAT THERE WOULD NOT BE A DIVIDEND SCALE
       REDUCTION WHEN THE COMPANY HAD BEEN ADVISED OF THE REDUCTION 11/91.  HE SAYS
       IT IS NOT GOOD ENOUGH THAT THE AGENT ACKNOWLEDGES THAT HE KNEW OF THE REDUC-
       TION BUT DID NOT KNOW HOW IT WOULD EFFECT HIS SPECIFIC POLICY.  I ASKED DR.
       █████ WHAT ACTION HE WANTED AND HE INDICATED HE WAS NOT PREPARED TO ANSWER
       THAT RIGHT NOW.  HE WILL HAVE HIS ATTORNEY ADVISE IN WRITING.  HIS BASIC PRO
       BLEM IS A.P. WAS TO GO INTO EFFECT IN 92 AND NOW THAT THE SCALE WILL DROP
       AGAIN HE FEELS IT WILL BE PAST 93 BEFORE IT IS ELIGIBLE.  HE FEELS HE HAS
       INVESTED ENOUGH FOR A.P. AND IF MET WAS AS "SOUND" AS OUR FINANCIAL REPORTS
       INDICATE THEN WE WOULD NOT HAVE THESE REDUCTIONS. **** TMOS 1 OF 2 ****
       Select:   1-EBase 2-ENote 3-ESlaf 4-ERef  6-ECorr 7-Index 8-Keys 10-RNte
```

CONFIDENTIAL                    REDACTED CONFIDENTIAL
                                POL INFO

*⅃▲*                                        *ℱ.*

Thomas LaBadia
Vice-President
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater — AREA 2-E

MP401107104б

Re   "Reappearing UL Premiums" - Accelerated Payment Cases

Tom, the article which follows appeared in the *National Underwriter* and it dealt with the idea of "reappearing premiums" on UL policies. Of equal or perhaps even greater concern to me are the reappearing premiums we are likely to encounter on existing "AP" cases. I raised this issue with Paul Garavaglia and John Hodel during their recent visit so perhaps it is being addressed. But I had not heard anything and this article prompted me to think about it again.

As I'm sure you're aware, as a result of the change in dividend scale this year we had cases where eligibility quotes were done by our sales offices at year end 1992 which indicated policies were eligible. However, when they came into us in early 1993 after our electronic systems had been modified for the new scale, these cases became ineligible and could not be placed on AP. This change in dividend scale has undoubtedly impacted the eligibility status of many of the policies currently on AP. I'm sure it goes beyond those that were placed on AP last year but would have been declared ineligible this year. As I understand it, once a policy is placed on AP, there is no ongoing "eligibility testing."

In some cases, it may not surface for several years that the dividends have become inadequate to fund the policy premiums. The point I tried to make to John and Paul was that it would be a lot easier to explain this situation to our policyholders now than it might be in the future. In otherwords, the national economy and the dramatic decline in interest *(and earnings)* rates is very obvious. If we notify these policyholders now that they may well have a problem in the future, they should be able to recognize what is happening in our economy. If, on the other hand, we wait until their policies run out of dividend values, it might be at a time when the economy and interest rates are much higher. And it would be more difficult to explain and harder for the policyholder to accept.

We are currently dealing with many complaints where policies were sold on the basis that they would be eligible for AP in "X" years. "X" years is now here and, because of the dividend scale change, eligibility has been pushed into the future. In spite of the "disclaimer" on the illustration about dividend projections, the policyholders get pretty upset and want to claim "misrepresentation." But, we have found that if you can get them to calm down and "look around" at what has happened, they will usually accept it. This would not be the case if the changes that have taken place in the economy weren't so obvious.

CONFIDENTIAL

MP401107104

NOTE:  THE CURRENT PROBLEM IS ALSO COMPOUNDED BY THE WAY THESE POLICIES WERE SOLD. IN THE VAST MAJORITY OF CASES WE SEE, "AP" WAS SOLD AND EXPLAINED BY THE REPRESENTATIVE THAT THE POLICY WOULD BECOME "PAID-UP" IN "X" YEARS. WHILE THIS MAY HAVE BEEN THE EASIEST WAY TO EXPLAIN THE CONCEPT TO THE POLICYHOLDER, IT ONLY COMPLICATES OUR EXPLANATION OF CURRENT INELIGIBILITY. WE NEED TO PROVIDE POLICYHOLDERS WITH A BETTER UNDERSTANDING AND EXPLANATION OF "AP" AS WELL AS THE POTENTIAL IMPACT OF ECONOMIC CONDITIONS. WE WOULD BE MUCH BETTER OFF TO EXPLAIN THIS AT THE TIME THE POLICY IS PLACED ON "AP" THAN AT SOME POINT IN THE FUTURE WHEN DIVIDENDS BECOME INADEQUATE TO COVER PREMIUMS.

Tom, my recommendation would be to run new eligibility tests on all cases *currently on AP*. If they fail the eligibility testing or perhaps are even close to failing, we should notify those policyholders NOW that they may run into a problem in the future. I think our explanation will be much more readily accepted now. On the other hand, if any significant number of policyholders are so affected in the future, it could do great damage to our image of financial stability and all the great strides we have made in becoming a customer oriented Company. For cases where eligibility is inadequate or "close," we could recommend that the policyholder pay one *(or more)* additional year's premium.

I would also recommend a couple other steps. One, we may wish to consider "tightening" up our eligibility testing. I have heard that we may be going to have another change in dividend scale. If this occurs, we will have another whole block of policies that could potentially have the same problem.

In addition, I think some type of letter or a little brochure should be prepared and sent to policyholders when they place their policies on AP. It should explain the AP concept in plain english as well as where dividends come from and why they are impacted by the general economy. In doing so, this would help to reinforce the initial disclaimer on dividend projections.

We cannot afford to leave policyholders with the impression that AP is a *"done deal"* or that their policies are *"paid-up"* and no future premiums will ever be required unless we can be absolutely, positively sure of it *(assuming the policyholder leaves the dividend balance undisturbed)*. This is the impression many of them have because of the way the policies were sold or explained.

Tom, perhaps I'm crying "wolf" a little too soon, but from where I'm sitting and what I see, I think this could be a real problem unless we take some proactive measures to deal with it.

CONFIDENTIAL

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

November 7, 1992

cc   Barbara Gardner

# Companies Are Tackling 'Reappearing' Premiums

### By Linda Koco

"It's not a pretty story, but it's a real story, and one we're going to hear about more in the future," said Ben Hannum, a partner of Safe Harbor Financial brokerage in Philadelphia.

He was referring to the arrival of so-called "reappearing" premiums on universal life policies that were written on a vanish- or single-premium basis during the 1980s.

News reports have recently surfaced about companies notifying owners of such policies that they'll have to pay additional premiums—sometimes whopping ones—just to keep their policies in force. The reason most often cited is lower-than-projected investment performance, stemming from the nation's falling interest rate environment, and sometimes complicated by policy loans, skipped premiums, or failure to pay dump-in premiums as intended.

Mr. Hannum tells of one man with a $50,000 single premium UL who was upset to learn that "he will run out of policy by the time he is 67 years old, even if he lowers the face amount to $25,000." To keep the policy in force, the man had to deposit more money.

"Four or five years ago, I don't think agents or companies ever envisioned this would happen," he said.

The extent to which it is happening is a matter of dispute. Company executives contacted by *National Underwriter* indicated that most of their companies' existing UL policies have "no problems." This may be because their companies wrote very little vanish-premium business in the 1980s or because they used conservative interest assumptions, the executives said.

Some also questioned the implications which UL critics draw from reappearing premium stories. The premiums may have come back due to heavy policy loan activity rather than lower-than-expected investment performance, they said.

Even so, the executives indicated that if today's low interest rate environment continues much longer, there will be more reappearing—and more increasing—UL premiums, and policy lapses may follow as angry and financially-strapped policyholders cancel out. Because of this, a number of companies are taking steps to "preempt" the problem.

Penn Mutual Life, for instance, is piloting a program that will detect existing contracts with declining cash values. "We will send a letter to the client and agent that will say what might happen if there is no change in the future," said Tom Harr, assistant vice president and product manager of the Philadel-

Cont'd on Page 18

CONFIDENTIAL

MP40110048

# Cos. Go Proactive On Reappearing UL Premiums

*Cont'd from Page 15*

phia Insurer. Included will be recommendations about "what can be done to stop the decline, and maybe even create growth."

That is the title of the company's lapse modification procedures," he added. "only now, we'll do it sooner."

The pilot is in addition to the company's existing practice of giving rate projections, on both a current and guaranteed basis. In the annual statement sent to policyholders and, complete with that footnote showing when the policy will lapse on both a guaranteed and current basis.

Another proactive program comes from New England Mutual Life, Boston. Thus may go whole life, Mr. Ridge, assistant officer of individual product management, is suggested that customers "delay the vanish... too three years. This pe..." ...one to three years. This way, the customer will pay an additional premium now and avoid having a larger premium reappear later on. To do this, the company sends its agents a list of targeted clients, its agents then work with the cli-

cuts an what to do.

New England is also focusing on agent education. "Through seminars and classroom training, we talk about how vanish works, why it breaks down, how our deployment program works," and what optimal changes, said Mr. Ridge. This helps the agent confidence when discussing the subject with clients, he said.

Kemper Life Cos., Long Grove, Ill., is sending letters to clients. "We explain that interest rates are down, and we remind customers that the vanish is based on an interest rate," said Robert A. Miller, director of marketing services. When the company started the program two years ago, it had about "world in force" some lapses, but that has flattened out now."

Agents are instrumental in keeping business on the books, Mr. Miller added, explaining that the personal relationship with clients put them in a position to help clients understand. Also, he said the contract, about potential reappearing premium, places the agent with a good opportunity to work with clients on "active management" of their UL.

Other companies are currently looking into proactive programs. For example, Alexander Hamilton Life, Farmington Hills, Mich., is looking at ways to notify policyholders, in a positive way, about the impact of lower interest rates on policy performance, said Jim Rentfrew, assistant vice president, product planning. It's also considering encouraging agents to undertake annual or semi-annual policy reviews.

Alexander, ITT Life, Minneapolis, is considering developing a program that analyzes policies and communicates with clients about options, in cases of potential reappearing premiums.

"It's not only UL policies that are vulnerable, stressed Mr. Ridge. "It can happen to any interest sensitive policy written on a vanish basis, including dividend-paying whole life.

Some people favor the reappearing premium more as a UL problem than a WL problem, he suggested, because UL was initially more sensitive to falling interest rates, due to its heavy reliance on new money rates—which, in the 1980s, were

very high. (Today, the interest sensitivity of the two are more comparable, he added, because UL's are based on longer-term obligations, as are WL's.)

Another reason for the UL focus: "The premium that causes back on a vanished UL is often larger than the original premium, and it's on a contract that has no underlying cash value," said Mr. Miller.

The policy essentially becomes an annual renewable term plan with high premiums," added Mr. Rentfrew.

"By contrast, said Mr. Ridge, the most an ordinary life policyholder will be asked to pay is the actual premium, if there are no missed premiums (that they may need to repay the premium for several years)."

The problem can be compounded, for both UL and WL contracts, "if the interest sensitivity of contracts was not explained to clients very well in the first place," said Mr. Harr.

"If companies and agents do nothing, and let the policy lapse makes both the company and agent look bad, the bottom line for us," said Mr. Miller. "In the end, it will be much larger."

○

CONFIDENTIAL

MP40110071049



**Jim Rayl**
06/02/97 04:56 PM

To:      KATHLEEN SCHOOS [NYVK.NEPIKS]@SNAPI
cc:      CHARLES FARUGIA [NYVK.NEPICJF]@SNAPI, Karin Westerlund/Bsg/MetLife/US, Lori
         Grant/Bsg/MetLife/US, Darlene West/Bsg/MetLife/US, Jerri McCraw/Bsg/MetLife/US
Subject: Re: call center procedures - marketing complaints

Kathy

I assume you received the call center file that Jerri faxed. I am disappointed that Rich didn't realize that he should have come to you in the first place. I also disagree with his statement that "we have made many attempts to define exactly what a complaint is" and then infers that there isn't a definition. The two IB call centers never had a problem defining a complaint. It was only in getting others to accept that definition.

I suspect you don't have it, but if you have a copy of the memo that Bob Shroeder sent to Rich, I would be appreciate getting a copy. I am curious as to what precipitated this and what he wanted to happen.

As I recall, the requirement that policyholders put their "misrep" allegations in writing was something that Consumer Relations wanted, not the call center. Therefore, I suppose this is something Russ Gramlich will have to decide but, as I recall, the reason was to make certain the customer was willing to actually put their allegations in writing. A customer who is being "coached" to claim misrep by a competing agent as a means of getting their money back may be more inclined to do it if all they have to do is call. However, asking them to put it in writing does add another level of commitment to the claim.

I would just like to confirm that we understand what needs to be done. It really isn't much of a change for us since we did not send the form. But, as I understand all of this, the CSC should:

1.       Outline the general facts of the misrep allegation/complaint in the TMOS file.

2.       Refer the TMOS file to Johnstown Consumer Relations.

3.       Do not ask the caller to put the complaint in writing.

4.       Advise the caller that the matter will be referred to Johnstown Consumer Relations
         and provide the caller with Johnstown's address.

5.       Notify the sales office? Rich alludes to this but this could be a dangerous practice when the customer has indicated they do not want contact by the Rep.

If any of this is incorrect, please let me know.

Jim


NYVK.PPRAWYRK @ SNAPI


         NYVK.PPRAWYRK @ SNAPI
         05/29/97 05:37 PM

**DEPOSITION EXHIBIT**
45

**CONFIDENTIAL**

MP401071050

To:   CHARLES FARUGIA[NYVK.NEPICJF] @ SNAPI, Dennis Tedino[NYVK.NEPIDENT] @ SNAPI, Jim
      Rayl[NYVK.PIOJAMES] @ SNAPI, KARIN WESTERLUND[NYVK.PIOKARIN] @ SNAPI, Russ
      Gramlich[NYVK.IPRJGR] @ SNAPI, Leonard R. Niczky[NYVK.IPNICZKY] @ SNAPI, NOTES
      ~JMCRAW[NOTES.JMCRAW] @ SNAPI, Rich Anderson[NYVK.IPANDER] @ SNAPI
cc:
Subject:  call center procedures - marketing complaints

***** DO NOT REPLY TO THIS NOTE *****

AWA110I This mail item is being routed to you from NEPIKS at NYVK
on behalf of PIOJAMES at NYVK.

Subject: call center procedures - marketing complaints

rich left me a voicemail message today asking me to change the
call center's procedure for handling marketing complaints.  i'm
not sure if tulsa's is the same, but warwick handled them as
follows:  if the customer indicated possible misrepresentation,
the csr would ask him/her to put the request in writing.  a "form"
was mailed which provided space to list the name, address, policy
number, etc as well as a lot of blank lines for the customer to
use in telling the story.  we did this because consumer relations
was not able to act on a complaint of this nature without a
written document, and we thought it would avoid delays by telling
the customer this up front.  at the same time, a tmos record was
referred to consumer relations.

rich is concerned that csr's may not be referring all complaints
to johnstown.  therefore, he has asked that all field related
complaints be sent to them via tmos.  johnstown could then exercise their
judgement on whether any written documentation is required.

i'm copying everybody who i think needs to know this, and i'm
asking charlie farugia to take the lead in working out details/
concerns, documenting the new procedure for both the warwick and
tulsa call centers, and following through to be sure they are
implemented as quickly as possible.  please keep me informed.

kathy

CONFIDENTIAL

MP4011071051

Charlie Farugia
Director
Planning, Development & Inforce Management
Client Support Services
MetLife Customer Service Center - Warwick

MP4011071052

Re    Complaints

Charlie, it is my assumption that the primary differences in how complaints are handled between the two offices relates to those complaints received through the call center. Based on everything I'm told, the procedures for handling Insurance Department, Officer and direct written complaints are essentially the same. As an editorial comment, however, I suspect that many of the "direct" complaints which are included in correspondence requesting some type of service or information never find their way to our Consumer Relations area for recording and tracking. However, the numbers of such cases would generally be relatively small compared to the number of complaints coming through the call center.

The following is an outline of the procedures as they were prior to the OCR meeting in New York. I have also covered how we are modifying them for the short term. However, they will obviously have to be modified extensively to bring both offices into complete consistency on the procedures and any revised definition as to what will constitute a formal complaint.

**Current Definition of a Complaint**

> *"Any expression of dissatisfaction by a customer with respect to an employee, product, service, or, when a customer's expectations have otherwise not been met."*

**Complaint Coding**

Everything falling into the above description is coded as a complaint whether or not it is referred to Consumer Relations. The "CPL" code is only used once on the TMOS file regardless of the number of policies involved. I believe Warwick changed their procedure recently to adopt this same approach.

**Complaint Classifications**

Call Center complaints are broken down into the following classifications:

**Referred Complaints** - The customer is satisfied or dissatisfied with the response from the CSC *but further action is required* by some part of the Company with respect to the caller's complaint.

> All *Referred Complaints* are reported to Consumer Relations and tracked as formal complaints.

**Field Related Referred Complaints** - All Field related complaints fall into the *Referred* category. However they differ from regular referred complaints in that ALL were being referred to Johnstown Consumer Relations even when *no further action* is required. This included those "marketing related" complaints that were associated with the circumstances of the sale as well as those that were related to "poor service" by either the representative or the sales office.

**CONFIDENTIAL**

MP401071053

> **Note:** The complaint procedures related to "misreps" were recently changed at Rich's request. Previously we asked policyholders having any complaint about the circumstances of the sale to document their situation and mail it to Johnstown. A "Referred Complaint" was also sent to Johnstown by the call center. This has since been changed to just make the referral to Johnstown and let them ask for documentation as they see fit.
>
> At the New York OCR meeting, I believe it was agreed that Field "service" related complaints would no longer be referred to Johnstown (Tulsa) or sent to the sales office (Warwick) if there was a service transaction involved. Instead, they would be sent to the appropriate unit/division within the Customer Service Center for a determination as to whether the service delay actually occurred in the sales office. If it could be handled and resolved by the Service Center, that would be done. However, Field complaints related to such things as rude treatment by a representative or sales office clerk would be referred to Johnstown Consumer Relations.

**Resolved Complaints** - The customer has been satisfied by the CSC and *no further action is required* by any part of the Company *and the complaint does not involve an error or an oversight on anyone's part.*

> *Resolved Complaints* are NOT reported to Consumer Relations or tracked as formal complaints

**Recorded Complaints** - The customer remains dissatisfied with the response from the CSC and *no further action is required* by any part of the Company *and the complaint does not involve an error or an oversight on anyone's part.*

> *Resolved Complaints* are NOT reported to Consumer Relations or tracked as formal complaints

**FYI Complaints** - The customer is satisfied or dissatisfied with the response from the CSC but *no further action is required* by any part of the Company. However, the complaint **was the result** of an error or oversight or the customer is expressing general dissatisfaction with MetLife. Where appropriate, these complaints are brought to the attention of the responsible supervisor in the appropriate department.

> *FYI Complaints* are NOT formally reported to Consumer Relations or tracked as formal complaints. However, our Consumer Relations unit gets copies of the TMOS files and they are reviewed by the Supervisor and, where appropriate, referred for further review or any potential action.

**CONFIDENTIAL**

MP4011071154

**Proposed Definition  - Complaints versus "Service Concerns"**

I forwarded a copy of Lisa Ostermueller's note regarding her discussion with Rich.  While Rich is willing to move away from the complaint having to be *"the primary reason for the call"* definition put forth by OCR, the approach stated by Lisa may be equally difficult to define.  I'm not sure how CSCs will effectively differentiate a *"service concern"* versus *"a blatant statement of dissatisfaction."*  But, I don't much care what is used as a definition for a complaint *providing* it can be adequately defined and described so that the vast majority of CSCs will all understand the distinctions that need to be made and be reasonably consistent in what they do and don't label as a complaint.

I did not attempt to cover all the known differences between the Tulsa and Warwick procedures.  Dennis and Lori Grant have discussed these in considerable detail and I assume Dennis can provide you with the differences.  However, if there are any questions or any additional clarification is needed, please feel free to give me a call on 8+252-8427 or Lori on 8+252-8629.


J. L. Rayl
Director
Planning, Development & Inforce Management
MetLife Customer Service Center - Tulsa

September 4, 1997


cc  Kathy Schoos

**CONFIDENTIAL**



**Jim L Rayl**
09/03/97 08:24 AM

To:    Lori Grant/Ind/MetLife/US, Darlene West/Ind/MetLife/US, Karin Westerlund/Ind/MetLife/US
cc:    Tammy Capron/Ind/MetLife/US, Jeannie Eidschun/Ind/MetLife/US
Subject:  Complaints

FYI. At the moment, Kathy Schoos is charged with the responsibility of preparing a document for Rich and Bob. I don't know why Lisa didn't also copy her but I will. We will have to work with Warwick to come up with parameters for complaints versus "service concerns."

Jim

─────────── Forwarded by Jim L Rayl/Ind/MetLife/US on 09/03/97 08:22 AM ───────────

**Lisa Ostermueller**             **09/02/97 10:57 PM**

To:    Jim L Rayl/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US
cc:
Subject:  Complaints

On Friday I discussed with Rich, at length, the compliant issues. His definition of a complaint is consistent with that of corporate. "Client contacts us to express displeasure or dissatisfaction with service provided or sale made or attempted where the complaint is the primary reason for the call." In sum, a blatant statement of dissatisfaction.

Despite this agreement with the established definition, Rich did agree that there may be additional elements of a call. We need to make sure that a complaint about how a form is laid out or not receiving a statement are not processed as complaints but rather as service concerns. These issues should indeed be addressed and tracked. However, they should not be identified as complaints.

This distinction is consistent with our discussions in that there are varying degrees of complaining. We need to make the definitions consistent between the two administrative sites and inform the marketing organization of our concerns and decision on handling these differing degrees of complaints.

In addition, I would appreciate someone developing a file of the different kinds of cases currently identified as complaints. Rich and Bob Benmosche would like to see these.

Finally, I know that no formal minutes were produced after the OCR meeting. If there are additional items we need to discuss, please let me know.

**CONFIDENTIAL**

MP401107105S



**Jim L Rayl**
09/03/97 08:27 AM

To:     CHARLES FARUGIA [NYVK.NEPICJF]@SNAPI, KATHLEEN SCHOOS [NYVK.NEPIKS]@SNAPI
cc:     Dennis Tedino [NYVK.NEPIDENT]@SNAPI
Subject:  Complaints

I guess Tulsa and Warwick will have to try and develop a way for CSCs to distinguish "service concerns" from "blatant statements of dissatisfaction."

Please note Lisa's request to set up files of the different kinds of complaints. We can do this, but I don't know that it should be done separately from whatever document you are preparing for Rich and Bob already. But, if you want us to do anything, please let me know.

Jim

--------- Forwarded by Jim L Rayl/Ind/MetLife/US on 09/03/97 08:25 AM ---------
**Lisa Ostermueller**                                    **09/02/97 10:57 PM**

To:     Jim L Rayl/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US
cc:
Subject:  Complaints

On Friday I discussed with Rich, at length, the complaint issues. His definition of a complaint is consistent with that of corporate. "Client contacts us to express displeasure or dissatisfaction with service provided or sale made or attempted where the complaint is the primary reason for the call." In sum, a blatant statement of dissatisfaction

Despite this agreement with the established definition, Rich did agree that there may be additional elements of a call. We need to make sure that a complaint about how a form is laid out or not receiving a statement are not processed as complaints but rather as service concerns. These issues should indeed be addressed and tracked. However, they should not be identified as complaints.

This distinction is consistent with our discussions in that there are varying degrees of complaining. We need to make the definitions consistent between the two administrative sites and inform the marketing organization of our concerns and decision on handling these differing degrees of complaints.

In addition, I would appreciate someone developing a file of the different kinds of cases currently identified as complaints. Rich and Bob Benmosche would like to see these.

Finally, I know that no formal minutes were produced after the OCR meeting. If there are additional items we need to discuss, please let me know.

**CONFIDENTIAL**

MP401107105б

 

**Jim L Rayl**
08/27/97 10:14 AM

To:    Lisa Ostermueller/Ind/MetLife/US
cc:    KATHLEEN SCHOOS [NYVK.NEPIKS]@SNAPI, CHARLES FARUGIA [NYVK.NEPICJF]@SNAPI, Lori
       Grant/Ind/MetLife/US, Dennis Tedino [NYVK.NEPIDENT]@SNAPI, Karin Westerlund/Ind/MetLife/US, Jerri
       McCraw/Bsg/MetLife/US, Darlene West/Ind/MetLife/US
Subject:  Complaint Procedures for Call Center

Lisa

I received the copy of Stan St. John's reply to Phil Caponigro in response to the letter Jim Connor sent to Bill Toppeta. As an editorial comment, this was a classic AP situation where the policyholder was quite willing to voice their concerns and complaint over the 800 number but was probably less inclined to do so when confronted by the Agency Manager. The TMOS file clearly supports that the policyholder was under the impression he only had to pay premiums for a fixed number of years. And, the allegations against the CSC are highly improbable.

But, aside from that, the complaint procedures for the call center were already under intense review by Tulsa and Warwick prior to the OCR meeting. Steps were being taken to eliminate the inconsistencies in how they were handled by the two offices. To further complicate the issue, there were areas where Johnstown was not in agreement with either Tulsa or Warwick on how some complaints should be handled.

The intent was to wait until the OCR meeting to see how many of these issues could be resolved at that time. However, while some issues were resolved, OCR apparently established a new definition for a complaint that was not consistent with either Tulsa or Warwick's approach. As you know, the OCR definition stated that the complaint had to be the primary reason for the call. This is a very difficult definition to try and administer.

In other words, if a person calls to cash surrender their policy and, in the process, states that they are unhappy with either the policy's performance or with aspects of the sale, what is the primary reason for the call? I would assume that some CSCs would view the primary reason as being a cash surrender - not as a complaint. This is only likely to be compounded if the procedures for handling a complaint call are more detailed and take more time than for just handling the cash surrender (or any other transaction). With all the emphasis on times in the call center, CSCs are bound to make the "easy decision" and say that the primary reason for the call was NOT to complain.

At any rate, Warwick and Tulsa will continue with their work to revise the complaint procedures to eliminate inconsistencies. I'm not sure how the "definition" issue will be resolved.

Jim Rayl

**CONFIDENTIAL**

MP401107105?

 

Jim L Rayl
08/27/97 04:45 PM

To:       Darlene West/Ind/MetLife/US
cc:       Karin Westerlund/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US, Lori Grant/Ind/MetLife/US, Tammy
          Capron/Ind/MetLife/US, Jeannie Eidschun/Ind/MetLife/US
Subject:  Re: Complaint Procedures for Call Center

Darlene

Most of what Dennis and Lori did was focused on the actual procedures and I don't believe encompassed any in-depth analysis of the actual complaints. That was never the issue. The definition used by both sites for what constitutes a complaint was virtually the same. However, as I recall, there were procedural differences related to complaints about the sales office and resolved and recorded complaints. Complaints involving the sales office went directly back to the sales office. I'm not sure what Warwick did with respect to Resolved and Recorded complaints.

However, there is also a call center issue with respect to how diligent each office is in actually classifying and reporting complaints. We know from experience that this can be a very difficult issue. There is an open question whether all the complaints - as defined by today's definitions and procedures - are actually being reported by either site.

Dennis and Lori can work out all the issues relative to the differences in procedures and ensure that the revised procedures are identical for both sites. That still doesn't mean that the results will be accurate if the procedures are not followed to the same degree in one site or the other. But, right now its not going to make any difference what the procedural differences are. We need to focus on how we're going to go forward, not what has been done in the past or present.

At the root of everything is "what will constitute a complaint." Once that is defined, we can then work out the procedures as to how they will be handled. However, it has to be a definition that has a minimum of "interpretation" or latitude for the CSCs. If it's not crystal clear and can be easily understood, there will always be differences in what is being reported by one site or the other.

At the same time, your unit needs to address any inconsistencies that might exist in the actual practices and procedures in the two complaint organizations. Do you know that the Warwick organization is actually reporting everything it receives from the call center? Or, is it possible there are procedures within the complaint organization whereby they make additional judgements as to what gets formally classified and/or controlled as a complaint? And, what about the complaint procedures throughout the back office? Are they the same? Are they actually being followed in both sites? I suspect not.

In short, we need a firm definition and then I think we can all work out the procedures. And, you may disagree with the motivation, but I heard a loud and clear message during the short time I was in the meeting that MetLife did not want to be reporting more complaints to the Insurance Departments than other companies. And, I doubt that any (insurance) company attempted to deal with the whole complaint issue the way Individual Business did. Bottom line: Does MetLife want to understand the real level of complaint and dissatisfaction with its customer base or not? The answer appears to be Not! Particularly since there appear to be virtually no procedures or controls in many of the other lines of business.

Jim
Darlene West

Darlene West                          08/27/97 03:55 PM

**CONFIDENTIAL**

MP4011071058

MP4011071059

To:      Jim L Rayl/Ind/MetLife/US, Karin Westerlund/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US, Lori
         Grant/Ind/MetLife/US
cc:      Tammy Capron/Ind/MetLife/US, Jeannie Eidschun/Ind/MetLife/US
Subject: Re: Complaint Procedures for Call Center

I agree this needs more discussion. I don't agree that the sole reason for the definition by OCR is to
reduce the number of complaints. I understand that we need to record complaints accurately, however,
we also need to be aware of the ramifications to the company when a case is recorded as a complaint.
My issue/consern is the major difference in the complaint receipts between Tulsa and Warwick. It does
not look well for this office when there are such big discrepancies. I would like to see the results of Lori's
and Dennis's analysis of the differences between the call centers recording of complaints first. I think we
need that information as a basis for our discussion.

These are the reported AWD receipt counts for both offices. Tulsa is receiving 251% more than Warwick.
For Tulsa, the majority of complaints received are from CCO. This needs to be addressed posthast..

| Date | Tulsa | Warwick |
|------|-------|---------|
| 7/9  | 146   | 61      |
| 7/16 | 149   | 51      |
| 7/23 | 152   | 46      |
| 7/29 | 91    | 57      |
| 8/6  | 52    | 34      |
| 8/13 | 142   | 55      |
| 8/19 | 133   | 28      |
| 8/26 | 85    | 46      |
| Total | 950  | 378     | 251% increase in Tulsa over Warwick |

---------------- Forwarded by Darlene West/Ind/MetLife/US on 08/27/97 04:39 PM ----------------



**Jim L Rayl**
08/27/97 10:57 AM

To:      Darlene West/Ind/MetLife/US, Karin Westerlund/Ind/MetLife/US, Jerri McCraw/Bsg/MetLife/US, Lori
         Grant/Ind/MetLife/US
cc:      Tammy Capron/Ind/MetLife/US
Subject: Re: Complaint Procedures for Call Center

I would say we need to talk. Do any of you have a recommendation on a better definition that would be
agreeable to all parties. I assume that Rich is the one that has to go along with it more so than OCR, but
OCR is clearly interested in bringing the "number" of complaints down.

Jim

---------------- Forwarded by Jim L Rayl/Ind/MetLife/US on 08/27/97 10:56 AM ----------------
**Lisa Ostermueller**                          **08/27/97 11:00 AM**

To:      Jim L Rayl/Ind/MetLife/US
cc:
Subject: Re: Complaint Procedures for Call Center

**CONFIDENTIAL**

Jim, I responded to your note and included the cc: on the distribution list. I am interested in re opening this discussion or at least making sure that we are all on the same page. I appreciate you drafting your comments. I also approached Jerri for her perspective from the call center organization. I hope that we can have a meeting/conference call to discuss this definition, its implications and our procedures.

Thank you
Jim L Rayl



Jim L Rayl
08/27/97 11:14 AM

To:     Lisa Ostermueller/Ind/MetLife/US
cc:     KATHLEEN SCHOOS [NYVK.NEPIKS] @ SNAPI, CHARLES FARUGIA [NYVK.NEPICJF] @ SNAPI, Lori
        Grant/Ind/MetLife/US, Dennis Tedino [NYVK.NEPIDENT] @ SNAPI, Karin Westerlund/Ind/MetLife/US,
        Jerri McCraw/Bsg/MetLife/US, Darlene West/Ind/MetLife/US
Subject:  Complaint Procedures for Call Center

Lisa

I received the copy of Stan St. John's reply to Phil Caponigro in response to the letter Jim Connor sent to Bill Toppeta. As an editorial comment, this was a classic AP situation where the policyholder was quite willing to voice their concerns and complaint over the 800 number but was probably less inclined to do so when confronted by the
Agency Manager. The TMOS file clearly supports that the policyholder was under the impression he only had to pay premiums for a fixed number of years. And, the allegations against the CSC are highly improbable.

But, aside from that, the complaint procedures for the call center were already under intense review by Tulsa and Warwick prior to the OCR meeting. Steps were being taken to eliminate the inconsistencies in how they were handled by the two offices. To further complicate the issue, there were areas where Johnstown was not in agreement with either Tulsa or Warwick on how some complaints should be handled.

The intent was to wait until the OCR meeting to see how many of these issues could be resolved at that time. However, while some issues were resolved, OCR apparently established a new definition for a complaint that was not consistent with either Tulsa or Warwick's approach. As you know, the OCR definition stated that the complaint had to be the primary reason for the call. This is a very difficult definition to try and administer.

In other words, if a person calls to cash surrender their policy and, in the process, states that they are unhappy with either the policy's performance or with aspects of the sale, what is the primary reason for the call? I would assume that some CSCs would view the primary reason as being a cash surrender - not as a complaint. This is only likely to be compounded if the procedures for handling a complaint call are more detailed and take more time than for just handling the cash surrender (or any other transaction). With all the emphasis on times in the call center, CSCs are bound to make the "easy decision" and say that the primary reason for the call was NOT to complain.

At any rate, Warwick and Tulsa will continue with their work to revise the complaint procedures to eliminate inconsistencies. I'm not sure how the "definition" issue will be resolved.

Jim Rayl

**CONFIDENTIAL**

MP40110710G0

 

**Jim Rayl**
07/18/97 10:56 AM

To:      Lisa Ostermueller/Ind/MetLife/US
cc:      Richard Anderson/Bsg/MetLife/US, KATHLEEN SCHOOS [NYVK.NEPIKS]@SNAPI, CHARLES FARUGIA
         [NYVK.NEPICJF]@SNAPI, Dennis Tedino [NYVK.NEPIDENT]@SNAPI, Lori Grant/Bsg/MetLife/US, Bruce
         Hemer/Crp/MetLife/US, Walter Rhodes [NYVK.IPCUST10]@SNAPI, Leonard R Niczky
         [NYVK.IPNICZKY]@SNAPI, Darlene West/Bsg/MetLife/US, Jim Judd [NYVK.GPJJUDD]@SNAPI
Subject:  Complaints

Lisa

As you may recall, Rich had recently asked Charlie Farugia to coordinate a change in the way the call centers were handling "misrep" complaints. The past practice for Tulsa had been to ask the policyholder to outline their complaint in writing and send it to Johnstown while the Warwick call center mailed out a special form for the policyholder to complete and return. The change Rich wanted was essentially a procedure whereby the CSCs in the call center did not send a form or request anything in writing. Instead, a referral was made to Johnstown and that office would decide if additional documentation was to be requested from the policyholder. This procedure was implemented.

However, during this process and as a result of the conference call that took place among Warwick, Tulsa and Johnstown, a number of complaint related issues were raised aside from the misreps. This included differences between the two offices and how they handle complaints and what was, or was not, referred to Consumer Relations and/or tracked as a formal complaint.

The Warwick and Tulsa procedural development organizations have been holding extensive dialogue on this subject. We are in the process right now of identifying the inconsistencies in how complaints are categorized between the two offices and how they are handled procedurally. The general perception seems to be that Tulsa generates far more complaints than Warwick. But, in reality, this does not appear to be true. When it comes down to it, Warwick actually appears to classify more calls as complaints than Tulsa. But, Tulsa does formally refer more of these to the Consumer Relations organization to have them logged and tracked as complaints.

It is important to understand that the IB call centers have developed the most detailed complaint procedures to be found anywhere within the Company. They also have the broadest definition of a complaint which was essentially "any expression of dissatisfaction." While this is similar to the definition used by Corporate Customer Relations, it is not the definition used throughout the Company. During my stint on MLX, I found vast differences with respect to how other MetLife call centers and lines of business defined or recorded complaints. In many of these areas, complaints received by phone were never formally defined or recorded as complaints. And, the only complaints formally recorded or tracked for some were those that were received in writing.

Consequently, there is a real question here as to whether or not Individual Business Call Centers should be defining complaints so broadly when it is not done elsewhere within the Company. There are also decisions needed with respect to whether all of the situations currently classified as complaints by IB should really be categorized as such and whether or not they should be formally referred to Consumer Relations or tracked.

Based on the discussions that have taken place between Tulsa and Warwick, I am trying to put a document together that will illustrate the differences in how complaints are currently defined within the two IB call centers and how the action differs. At issue, however, is how the two offices should go forward in establishing new and consistent guidelines and procedures.

**CONFIDENTIAL**

As you know, there is a meeting of the Consumer Relations organizations in New York in August. I believe that Warwick and Johnstown are expecting additional clarification as to how complaints should be defined and recorded to come out of that meeting. However, I have some concerns that the level of resolution that is needed cannot be done by the Corporate organization. Currently, IB is at a much higher standard than the other call centers or LOBs with respect to classifying a call as a complaint. While I suspect that Corporate Consumer Relations would like to continue following that standard, or a similar one, the real question is:

> Why should IB maintain a higher standard than is being followed anywhere else within Metlife? And, accordingly, since Corporate Customer Relations can't enforce a universal definition and standard across the Company, isn't it really a departmental decision as to what will be formally classified and recorded as a complaint?

The bottom line is that in order to establish consistent complaint procedures in the two call centers, either the department and/or Corporate Customer Relations is going to have to provide guidance on the definition and handling of some of the current complaint situations.

My own expectation is that these issues will not be resolved at the August Customer Relations meeting. But, I do believe that it is imperative that the Tulsa and Warwick call center procedural development organizations are represented at that meeting. I know you had a conversation with Jerri McCraw on this subject and she will be attending as the IB/CCO Product Coordinator. I believe she also recommended that the Procedural Development organizations be represented. Therefore, if no one has any objections, I expect Lori Grant will attend to represent Tulsa's PPD. If you see this as a problem, please let me know.

Jim Rayl
Director
Planning, Development & Inforce Management
Individual Business Client Support Services
MetLife Customer Service Center – Tulsa

CONFIDENTIAL

MP4011071062

MP4011071063

Robert J. Crimmins
Executive Vice-President
Personal Insurance

Dear Bob

I have tried to refrain from writing or bothering you unless I felt I had something really important to say because I know you are wrestling with far more important issues. But, in your recent conference call *(which was very well received)* you stated that more people needed to be able to reach you. In view of recent events, I thought it might be timely to give you a little reality check with the front lines to let you know how the situation looks from here. I will try and be as brief as possible but there is a lot of ground to cover.

I just learned that Vince was going to be leaving Customer Services to become your chief Planning Officer. On the one hand, that makes perfect sense. If there's anything you need, it is more people like Vince who hold the Company's interests first and then calls it as he sees it. Right or wrong, agree or disagree, you know he's not operating for some personal gain or based on some irrelevant personal agenda. I am sure he will be an extremely valuable asset to you in his new role.

At the same time, Customer Services and PI Administration is suffering a loss that may spell the difference between the success or failure of our customer service goals. And, because of everything that has, or is likely to transpire, these goals have become more important than at any time in my career with the Company. The media attention that was being focused on the Company is starting to shift to the industry as a whole. When that occurs, it may have an even greater impact *(and policyholder reaction)* on the Company than the specific MetLife publicity. But, it still brings with it a tremendous *opportunity* for the Company to strengthen its image by capitalizing on its customer service operations as well as its Field Force. Jim Valentino was just here and mentioned that one of the new Corporate strategies was to: *Build customer relationships based on; Service, Education and Trust.*

*Sound familiar?* It seems to me that you and I were discussing these potential benefits of Teleservicing *back in 1982 after you first envisioned it.* What an opportunity we have. For a long time I didn't think I would ever see the senior levels of management begin to be genuinely concerned with customer service, much less talk about it as a major strategy and priority. But, because of what's happened in the market place, it is recognized that it's become a necessity if we are to attract and retain business. And, the recent events give us an opportunity to make Teleservicing an even more valuable resource for Personal Insurance. But, the real question is: *Can PI actually begin to capture the full potential of this resource and its impact on the customer?*

I now have some grave doubts. If it's going to happen, from the customer's perspective **it will have to happen at this level of the organization.** All the discussion at the high levels of the Company will not change customer perception. **WE WILL!** While I think we're running 200 miles an hour trying to make this happen, much of the organization has become an anchor that is only dragging us down. From my own personal perspective, with Vince, *there was hope.* Without him, I'm inclined to say there's not much chance that we can really achieve these goals unless other significant changes are forthcoming.

**CONFIDENTIAL**



MP4011071064

A couple of years ago, when Frank took over as the first senior officer actually responsible for Customer Service, I told you I was pleased with the decision. This finally positioned us *(at least organizationally and on paper)* to make some dramatic progress. The centralization of the administrative work to Warwick and Tulsa combined with Teleservicing created a powerful customer service operation. It also provided many new opportunities for change and progress with respect to our customers and the delivery of customer service. But, for the most part, the moment and opportunity was lost.

While there was some change, it was basically *"business as usual"* and everybody continued working on their own personal agendas and would not listen to this level of the **organization.** The incompetent leadership of this office only exacerbated that problem. Most of the change continued to be driven from the top down instead of from the bottom up. Major *strategic change* which was trying to come from the bottom up continued to run into brick walls or be ambushed along the way. Bear in mind that the two Customer Service Centers were now dealing with our entire customer base. Having that scope to our operations put us in touch with what was happening all over. It gave many issues a new level of magnitude and priority. We saw many things happening with our customer base.

In spite of this, great things have still been accomplished at the front line employee level. The employee growth of the two Customer Service Centers actually enabled us to change our *"culture"* with respect to the way we think about and deal with our customers. But the fact is, at the upper organization level few people really wanted to hear our ideas. They did not want to discuss the new opportunities and possibilities this organization change created. While there were valid distractions in our Corporate organization *(i.e., Bridgewater move)* that had some impact on the level of progress we could make, the organization was, and still is, primarily consumed with its own self-interests and personal agendas.

I spent years trying to get people to listen to the potential of proactively addressing the customer complaints that came through Teleservicing *(including those from nurses)*. Some of these were truly frightening and deserved swift and decisive action. We *long ago* proposed a centralized Consumer Relations organization that would oversee the marketing complaints. It needed to have some real authority and be empowered to take corrective action with the Regions and/or Branches. The *one and only attempt* to address this was a valiant effort made by Vince during that brief period when he was responsible for Teleservicing before. But, the organization changed and it became apparent that this was an exercise in futility so for once in my life I actually *gave up* and dropped the issue. Based on complaints over the past three years, I tried to convince people we were *(and are)* sitting on a *"time bomb"* with the way *"Accelerated Payment"* was presented and sold to our customers. We are now moving, albeit very slowly, to address this issue, but again, nobody wanted to listen until it got really serious. I see this issue as being equally or perhaps even more dangerous than the Florida situation.

To effect change, our general modus operandi is to form *"Task Forces"* or *"Natural Work Teams"* to study the issues. In most cases, these are driven from the top down, controlled by personal agendas, and don't even involve the appropriate players. There almost seems to be an overt conspiracy against involving or even asking the opinions of the people who do the work or would have to live with the consequences.

**CONFIDENTIAL**

2



The current Teleservicing and Corporate 800 number Task Forces had no representation from Kathy or I until Vince stepped in and insisted upon it. We have jerked around and failed to take significant action with *"address changes"* since my days as manager of FES. Our current effort has gone on for over two years and we appear destined to develop a separate system that most of the users don't want, at least in the form it is taking. Again, we have a task force comprised primarily of "systems" people and a couple of token "users." Had people listened years ago, we wouldn't be considering this a major problem today.

*Single Image* is another example. This has been debated for on to three years now. Vince has had a dramatic impact on the progress of this project but we should be much further ahead than we are. The competition has leap frogged us on this. But, this was a *"bottom up"* project as opposed to a *"top down"* so getting the necessary support and action *(prior to Vince)* has been all but impossible. It still wasn't easy for Vince to get it off the dime and it is finally progressing, but at a pace that still puts full installation a couple of years away if not more. This, while we take 120 programmers off their projects to look for "expense savings." It almost borders on absurdity. Give the users the systems we want and need and we'll eventually get the savings, but not without the up front investment.

The Baldrige feedback was right on target with the statement that *"Planning for operational improvement is not as rigorous as planning for cost reduction."* We always go for the short term solutions. It's easier for people to cover their fannies by achieving the short term expense reductions than stretch for the long term savings by delivering the systems to meet the future needs. At the same time, we allow resources and money to be devoted to *"pie in the sky"* electronic projects coming from the top down that won't serve the users, aren't wanted, and we know won't work. *(I can cite examples but won't waste the space.)* Single Image is living testimony to our short sighted vision and the unwillingness of our people to take a risk. But, the Company has created the culture because this behavior continues to get recognized and rewarded.

With many of our change issues around the organization, we have a propensity to get everyone involved and let *everyone decide*. This is not effective participative management or a democracy. All it does is allow people to cover their fanny by having no individual to hold accountable or responsible. Every democracy needs a leader. All we should be guaranteed is that the affected parties to any change will be heard. Letting everyone *decide* only wastes time and impedes progress. After we have had our say, we need someone with a little vision, a little common sense, some savvy and the authority to make the decision and move forward. We try and get a consensus on too many things from the wrong people so we become impotent on the strategic issues that really matter. On the small decisions, we delegate everything upward because we don't hold people accountable. Consequently, we can't even get the small decisions made.

Kathy and I could probably help develop a *realistic and workable* strategy on the Corporate 800 number in a day. Instead, people have been involved that don't begin to understand the call center complexities. I have devoted hours upon hours trying to make people understand that the current direction would bring disaster, especially for the *customers of Personal Insurance*. But, again, nobody *(other than Vince)* wanted to listen to the facts and consider involving those who would be expected to make it work.

*(Although Vince has been extremely supportive since he took over, are you aware that we have been <u>intentionally</u> returning a "busy" signal to thousands of policyholder calls because we have been in a battle to play "catch up" on the staffing from 1992?)*

**CONFIDENTIAL**

3

MP4011071065



While I guess Barbara is theoretically supposed make certain these issues are heard and understood, there isn't a chance. She isn't about to worry about the Company, the PI Customer or anyone else if it gets in the way of her own personal agenda or she can score more points by keeping her mouth shut and fully support Mr. Valentino's slightly flawed idea. But fortunately, I had a *"one on one"* with Jim Valentino and I think he finally began to understand the problems and issues at stake. But, someone still has to lead the charge if we are really going to make the changes required to meet *the needs of the PI customer* while implementing 800+MET-LIFE as the "Corporate" number.

Bob, there has been a revolution going on at this level of the organization. The size and scope of the two Customer Service Centers has dramatically changed the way every employee in this building looks at our customers. The revolution in the market place with respect to customer service is also very apparent to our employees. It is this level of the organization that should be driving change. This office represents about 42% of our customer base. If Barbara is to be the sole representative of that constituency within the organization, God help us, the customers and the Company. Her real impact and damage may not be visible for several years, but it will be there. I see no way our customers' interests will ever be adequately expressed and they will absolutely never come ahead of her own. We have changed so much at this level of the operation that most of those who have not been here in the midst of the battle cannot begin to comprehend what has taken place. She doesn't have a clue and most others are too busy to listen because of their own interests or agendas.

I've been knocking myself out trying to manage 200 people and tolerating all of Barbara's nonsense because, with Vince in place, there was hope. There was someone *listening* whose first concern was what was best for the Company. There was someone *brave enough* to be less worried about what was *politically correct* and who would stand up and be counted on the critical issues. And, it certainly didn't hurt that it was someone I considered a friend and who made it possible for me to tolerate this horrible environment.

Bob, now more than ever, we are confronted with opportunity. The opportunity exits to truly capitalize on everything that's happened. Between the establishment of a "Corporate" 800 Number and the further development of Teleservicing, we could use this resource to create a new image for the Company. In the process, we could:

✦     Build or substantially reinforce the *relationships* with our customers through *easy access* and a concerted effort to make certain they are *educated*

✦     Build or substantially reinforce the *trust level* of our customers

✦     Develop *Sales Opportunities* beyond anything currently imagined

Bob, I know you've heard all of this before, but what you're hearing me say now is that IT ISN'T going to happen unless some dramatic changes take place in the administrative organization. With Vince gone, you need somebody who will *listen to the front lines*. You need some *(realistic)* visionaries and some risk takers. But, most of all, you need someone who is capable of driving this change within the organization and can make it happen. And, that's where it all falls apart as I'm not sure that such a person exists. I thought if anybody could do it, Vince could. But, even then, I wasn't sure he would be able to get past all the organizational blockades and barriers.

**CONFIDENTIAL**

4

MP4011071066



I recently told you that I thought you were the only person who could lead Personal Insurance out of this current situation. I meant that. You are the only one who can truly *inspire* the organization. But I was also operating on the assumption that Vince would continue to be there to challenge and shake-up the administrative organization. In fact, I really thought he would be the heir apparent to Frank, and would then be in a position where he could really make the needed changes. But, I have no doubts that he will have equal, or perhaps greater impact in his new role. But, the entire PI organization needs to be shaken up to meet the challenge and seize the opportunity that we face.

Bob, I hope this does not come across as just being my frustration or that I'm just griping and complaining. I am trying to convey my sense of loss with the repositioning of Vince and also give you a picture of the way it looks from here. I have long since accepted that I'm not going to change the Company. Vince did give me a glimmer of hope that it might really change but, at this point, my expectations are pretty low.

I also hope you realize that I am in no way trying to blame you for what I perceive to be the problems in Customer Services. You placed your faith and trust in people and as far as I'm concerned, it is they who let you down. You are at far too high a level to be able to know or control what's happening at this level of the organization. To a degree, we are today the product of a 125 years of a *"Corporate culture"* that is really hard to change, although some progress has definitely been made.

As I have told some people lately, I am glad that I am approaching the end of my career rather than the beginning. After everything that transpired a couple of years ago over my difficulties with Barbara, and Frank made it clear that I really had no choice but to leave or endure, I knew where I stood. I have no real expectation that things will change at this office so if I can last another three years and four months, I fully expect to be out of here. I won't take one more day of this environment than I have to. And, I certainly can't fight all the Corporate and customer issues on my own. I'll have to work when I leave, but I really think I can go sell telephone switches or find work in the call center/telephone field to supplement my retirement. But, I would really much rather be here if things were going to change and we were going to make a legitimate effort to become all we can be.

The fate of Personal Insurance will be determined by that time. MetLife will either be well on the road to being recognized as "The Company noted for the high ethics and integrity of its Field Force as well as its genuine caring and concern for its customers as demonstrated by its Customer Service operation" . . . . . . or it will probably continue to be *just* the *"second largest life insurance company."*

Even Jim Valentino acknowledged that PI is on the leading edge within the Company with respect to our Teleservicing and customer service. But, we should be on the leading edge within the entire industry. That's not going to happen unless there are some changes. We do have the opportunity in front of us, but I have serious doubts that enough of the organization is truly up to the challenge and commitment it will take to capitalize on the situation and go after the long term rewards and success that are possible.

**CONFIDENTIAL**

5

MEP40101010647

Bob, I have a feeling that Vince will be much happier in his new role and, in some ways, he's probably breathing a sigh of relief that he won't have to deal with the organization in the same way as he did in Customer Services. But, he will be sorely missed. I truly wish both of you all the best as you grapple with the overwhelming challenge that faces Personal Insurance. If it can be done, it is only you who can do it.

Please don't feel that I expect or want any personal response. All I want is to be heard, for whatever it's worth. But, do know that you, the Company and the customers have the loyalty, commitment and dedication of myself and my entire management team to do our very best to see that your visions are carried out, no matter what the obstacles. It is you who has inspired me and, in turn, enabled me to inspire them. If anything happens to that, it will be real hard to find a good reason to care anymore.

Warmest personal regards


J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 19, 1994

CONFIDENTIAL



MP4011071068

6

Vincent J. Donnelly
Vice-President
P.I. Customer Services

Re   Organizational Considerations  -  Consumer Relations

Vince, for what it's worth, I would like to share my thoughts on the future and direction of our Consumer Relations activities and organization. As you may recall, for many years I attempted to draw focus to the potential of Teleservices in dealing with and *addressing* customer complaints. During that former brief period when you were directly responsible for Teleservices, you were the only individual who tried to initiate some action on the whole complaint issue. You established a Task Force headed by Bob Pizzute and Bob Szigethy. Our one and only meeting was held in Dallas with representatives of the various Consumer Relations organizations.

At that time, there was strong sentiment that we needed to revamp our entire complaint and Consumer Relations activities. I think it was also generally agreed that there should be a responsible party or organization at the Corporate P.I. level that would oversee the entire Consumer Relations operation with specific focus on the overall marketing related complaints with much greater attention on those received through 800 + MET-LIFE. Unfortunately, shortly after this meeting, you no longer had direct responsibility for Teleservices and this Task Force and whole issue was lost in the shuffle.

We are now preparing to do what was being proposed years ago, in that we are centralizing primary responsibility for ALL complaint handling in the two Customer Service Centers. As I understand it, you have also brought someone on board to oversee the whole Consumer Relations operation from within your organization, also as was proposed. All of this is very positive with respect to the *potential* it creates for monitoring complaint activity. But, there are a number of questions which it also raises. Among these;

- *Just how far do you want to go with strengthening and revamping our entire complaint handling process? Are the two Consumer Relations Units going to serve in a "watchdog" capacity for the entire marketing organization?*

- *Are they going to be empowered, or is there going to be empowerment at your level of the organization, to ensure that appropriate action is taken when serious marketing irregularities are suspected or disclosed? Without some authority, this organization could become a future scapegoat.*

- *Are we finally going to capitalize on the fact that an increasing majority of the complaints reach us through Teleservices? Throughout all these years, very little effort has been made to profit from this aspect of our operation. As a result, from a CSR's perspective, we have lost much of the incentive to even record a marketing complaint because of the concerns or doubts in their mind as to whether or not it would really be acted upon. We clearly have the opportunity to change not only this perception, but also the reality of the situation. In addition, handled properly, these complaints can be transformed from a "negative" into a "positive" - particularly when everyone is assured they will be acted upon.*

**CONFIDENTIAL**

MP4011071069

Vince, there is a lot of history here and I don't want to rehash my past seven years of dialogue regarding Teleservices and complaints. However, it seems obvious to me that recent events are going to have a dramatic impact on the Company and how we deal with these issues in the future. At the same time, perhaps now is the time to become fully proactive in terms of our response. Please consider the following:

- A substantial portion of the difficulty we encountered in Tampa and Pittsburgh are not a "MetLife" problem. They are an "industry" problem. Life insurance products are generally sold to meet a specific need. At the time of sale, all that is often explained is how the product will meet that need. The product itself is not fully explained. And, in many cases it cannot be explained in great detail as it would only confuse the customer or put them into "information overload" where nothing is understood and the sale could be lost. Our business and products have become so complex that the average consumer can't begin to comprehend all the features and fine points of any contract in one or two discussions.

Where we fall short is in our failure to effectively communicate **and educate** our customers about their purchase **after the sale.** Not only should we be reinforcing how the product will meet the original need, but we should then be helping them to learn and understand more about what they have purchased. All too often this does not happen. I have personally dealt with many irate policyholders who are upset because they felt they were "misled," with *Accelerated Payment* being at the top of the list. However, once they become educated and begin to understand, they will often accept the situation. However, it all could have been avoided if they had been *educated* sooner.

While this should ideally be done by the representative, in the absence of the representative, **a recognized responsibility of Teleservices and the entire administrative organization should be the continuing education of our policyholders.** While we try to do this, it is usually on a "reactive" basis rather than a "proactive" basis. It should be done proactively. A substantial portion of our policyholders have a poor understanding of their product.

- The degree of publicity focused on MetLife, or even the industry as a whole, could cause unnecessary alarm or concern to many of our policyholders. Consequently, we may want to consider being much more proactive in encouraging people to call and get answers to any questions they may have about their contract. We could do such a promotion locally or even nationally depending upon the situation or need. And, for the future, we may even want to promote a separate number for complaints or as a "hot-line" *(1 + 800 + TELL-MET is available).*

Bottom line, . . . I have no idea where all of this recent publicity is going to go, but it would seem prudent to be prepared to respond more aggressively if it becomes necessary. And, it may be the appropriate time to address how we might like to approach things differently for the future.

**CONFIDENTIAL**

2

- Lastly, I think an organization structure should be considered which promotes a much stronger link between Teleservices and Consumer Relations. I can't begin to enumerate the benefits that have come to both the organization and the policyholders as a result of the marriage of Teleservices and Cash/Loan/Dividend a few years ago. The potential exists to develop this same synergy with the Consumer Relations function. I am not sure as to the best way to achieve it, but the "culture" of Consumer Relations needs to be changed. We need to bring it closer to the customer *(as well as the field)* and being closely involved or tied to the Teleservicing organization would help achieve this.

Vince, I know these are very difficult times. But the potential exists to come out of this a stronger and even better organization. At least that's the view from where I'm sitting.

J. L. Rayl,  ACS
Director
Customer Services & Communications
**MetLife Customer Service Center - Tulsa**

November 4, 1993

CONFIDENTIAL

3

MP401107107l

*To   Francis P. Lynch*
      ***Senior Vice-President***
      ***Customer Services***

MP4011071072

Dear Frank

***Congratulations & Welcome Back!*** Frank, I just heard the news. I'm not sure I know exactly how all this will come together, but I am thrilled to know that you will have overall responsibility for Customer Services.

The centralizing of most of our administrative activities in the two 800+MET-LIFE call centers has *positioned* us to be able to develop and achieve superior levels of customer service to our policyholders. However, this potential could not be maximized in the past because of the organization structure. Obviously, this has been recognized and addressed with your appointment to this position.

Customer Service operations needed to be viewed and measured *(both financially and in performance)* as a single entity. With only two Customer Service Centers, our operations are in need of a *single* Corporate focus and direction. In spite of the number of years Teleservicing has been in place, we have yet to fully capitalize on its capabilities or effectively promote our full level of customer service to our policyholders. We made some great progress in the year or so that we reported to Vince Donnelly. But, with the organization changes that have taken place since then, it has been very difficult to develop a *uniform* approach or philosophy to any of our long range Customer Service objectives.

Frank, we are now getting in a position to do some great things from a Customer Service perspective. Not only for our policyholders, but also our sales offices. Warwick and Tulsa will shape policyholder and sales office perception of our "post issue" service *for the entire nation*. As a result of our involvement with Teleservicing, I think Warwick and Tulsa have developed an exceptional working relationship and share more of the same ideals than any two offices I've seen in my career. With a senior officer like yourself *providing a single point of leadership and focus,* our potential is limitless.

As I see it, ***Customer Service is the issue for MetLife in the 90's.*** We already have a our Career Agency Force and our financial strength going for us in the marketplace. If we also provide a superior level of customer service *(which is promoted and recognized),* I think we can also make our contribution to increasing market share. However, there are still many issues which need to be addressed to make our customer service operations all they should be. For what it's worth, I would like to give you a few of my thoughts:

**CONFIDENTIAL**

- A long term **Corporate** Customer Service strategy should be developed. Included in this should be the long term goal and objectives for the Teleservicing function as well as the impact on regular administrative operations. Had Teleservicing made more progress over the years, this current reorganization and work transfer would have been greatly simplified *with less staffing required*. We would have more actively promoted 800 customer service and shifted a much larger portion of our policyholder contact to the telephones. As it is, we are still struggling to deal with large amounts of paper requests and the complexities and confusion they create.

    **In excess of 40% of our policyholders do not currently receive "ongoing" notification of the availability of 800 + MET-LIFE.**

- We must continue aggressive electronic systems development *geared towards the Teleservicing environment and the users*. Our future cost savings will come from being able to provide most of our information and service via the telephone. Enhancements to our existing systems should also be done on the basis that this is the way we will be providing service. The users should play an integral part in determining systems direction. The "techies" should not dictate the systems to the users. They should keep the users aware of what is available and what can be done, but decisions should be made jointly with the users.

    The *"Single Image"* project currently underway in Wichita is a good example and holds a lot of promise. It is a customer/user driven system much like TMOS. TMOS was a user driven system and has been the envy of many an outside visitor to this office. As an aside, our Scranton folks have been doing an *outstanding* job of making user/customer driven enhancements. We need to keep this environment going.

- I know this will now be done, but I believe it has been a key problem in the past. All expenses associated with Customer Services need to be separate and viewed in their entirety. We need to know the *expense impact of "service" decisions* and the *"service impact" of expense decisions."* By isolating our Customer Services expenses, the decisions being made which may affect the level of service delivered to our policyholders can be more effectively measured as to their impact on costs and/or savings. This evaluation can then become an ingredient in the decision making process.

- We need to change our thinking with respect to signature requirements. When we are satisfied that we are speaking with a policyowner, we should not require a signature to effect such transactions as loans or dividends to pay premiums. Instead of requiring a signature in these and other transactions, we should be geared to send a "confirmation letter" and/or perhaps maintain a copy of the call record on file. However, we should eliminate the delay and additional processing associated with the need to "mail and return" forms wherever possible.

**CONFIDENTIAL**

MP401107107

MP4011071074

- There has been a lot of discussion but no resolution as to what constitutes "post-issue" customer service versus "New Business" transactions. New Business Centers and divisions are performing activities that are clearly "customer service" transactions. *(Post Issue Check-O-Matic activity - Cash, Loan & Dividend transactions, etc.)* There may have to be some duplication. For example; New Business units should be able to "install" new policies on Check-O-Matic. But, COM activities unrelated to issue should be handled in the Customer Service Centers. On the other hand, New Business Centers should not be processing Cash/Loan/Dividend transactions on inforce policies. While these may be related to issue, there are far too many potential problems. The Customer Service Centers need to work with the New Business Centers on these transactions. *(See enclosed memo on 1035's)*

- Personal Insurance needs to reconsider the services we should be expected to provide to our customers free of charge. We frequently do some manually intensive work that would disappear if there were a charge associated with it. Any negative impact associated with reducing this level of service could be offset by actively promoting the services we can provide toll-free. *(See Memo Enclosed)*

- A long term strategy needs to be developed as to how the Customer Service Centers and particularly Teleservices will contribute more to the "bottom line" in terms of generating sales. Rather than just "generating leads," we need to know more from our customers as to how they would like to learn about new products and services. I believe that Teleservicing can play an important role in this process but it will mean approaching our customers differently. An incentive compensation plan for the CSRs also needs to be a part of the long term strategy.

- Complaints - As a result of the 800 number, we receive more customer feedback and complaints than ever before. In conjunction with our efforts to go for the Baldrige Award, we need to determine if a change in philosophy and organization is appropriate to deal with the nature and volume of customer complaints.

- Human Resource activity for all of Customer Services operation needs to report separately rather than through the Territorial Human Resources Officer as is done currently. All Customer Services employees should be subject to the same basic compensation "philosophy" and program.

**CONFIDENTIAL**

MP4011071075

Frank, I hope you will forgive me if you really didn't want to hear all of this. I don't know exactly where you are with respect to being up to speed on the customer service and administrative issues. As I think you know, because of my involvement with customer service over the years, I have always been a strong proponent for improving our service levels. The reorganization and transfer has placed heavy demands on us. I think without a doubt, last year and this year will be the most challenging and difficult years in my career. But, they are also filled with opportunity and I have had faith that we were moving in the right direction.

Your appointment as a senior officer responsible for Customer Service indicates to me that we, as a Company, are very serious about customer service. The dream and vision that my supervisors and I share is that we will set the standard for industry. We will be the "role models" for others to strive to achieve. With this organization change, *I am truly excited and enthusiastic*. The potential is here. All we have to do is unleash it, focus it and move forward. I think you know that the Tulsa staff is committed to these goals.

So Frank, again, welcome back. If there is anything I can do personally in terms of supplying information or even just an opinion now and then, you know where I am. In the meantime, I wish you all the best in your new role and responsibilities. I think there will be some real challenges and great successes in store for you.

Warmest Regards

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

February 27, 1992

CONFIDENTIAL

Robert J. Pizzute
Director
Personal Insurance Quality & Planning

Re    Breakdown of 1989 Teleservicing Complaints

Bob, as a follow-up to our recent discussion on complaints, I thought I would provide you with some of the statistics for those received in Teleservices in 1989. At that time, all complaints were categorized and recorded on a PC. This was based on our own classification as to *"Type"* and *"Category."* This was separate from the recordkeeping and reporting done by Consumer Relations.

In 1989, Teleservices recorded the *"complaint"* transaction on more than 4,000 policies associated with incoming calls. A total of 2,516 "cases" were recorded on the PC. These break down as follows:

### 1989 Complaints By *"Type"*

| | | |
|---|---|---|
| (All) Head Office Related Complaints | 1153 | 45.8% |
| Field *Service* Related Complaints | 679 | 27.0% |
| Field *Sales* Related Complaints | 357 | 14.2% |
| General Company Complaints | 202 | 8.0% |
| Home Office Complaints | 125 | 5.0% |

### 1989 Complaints By Major *"Category"*

| | | |
|---|---|---|
| Dividend Related Complaints | 304 | 12.1% |
| Check-O-Matic Related | 244 | 9.7% |
| Cash Value Payment/Quote Related | 244 | 9.7% |
| Loan Payment/Repayment Related | 241 | 9.6% |
| 10 Day FL/Misrep/Replacement Related | 212 | 8.4% |
| Billing/Payment/DLP Discrepancy Related | 180 | 7.1% |
| Policy Cancellation/Reinstatement | 169 | 6.7% |
| PHI Related | 87 | 3.5% |
| Change Of Mode Related | 65 | 2.6% |
| "Other" | 770 | 30.6% |

**CONFIDENTIAL**

MP401107107б

The *"Other"* category includes 75 complaints in a few minor categories and 695 complaints specifically classified as *"Other"* because they did not fall into one of the stated categories. Of the 695 complaints labeled as "Other," 47% are Field related. 233 are *Field Service* related and 104 are *Field Sales* related.

As illustrated, 41% of the complaints received in Teleservices deal with the Field. If the same complaint definition were used and the same ratios were to hold true for a nationwide Teleservicing operation, this site alone would receive about 6,700 complaints once we have fully expanded. Of this, about 3,000 would be Field complaints. If you then double these numbers for the two sites, we are looking at a pretty significant number of customers who experienced some form of dissatisfaction

At any rate, Bob, perhaps this information will be of some value whenever we meet to discuss the complaint issue.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

July 12, 1990

cc   Szigethy  &  Schoos

**CONFIDENTIAL**

MP4011071077

Robert J. Pizzute
Director
Quality Programs
Personal Insurance Quality & Planning

MP40110710??

Re    Complaint Handling - Teleservices

Bob, I'm not sure what correspondence you have reviewed concerning complaint handling by Teleservices. I have written a number of memo's concerning the opportunity that exists for the Company to monitor complaints and obtain enhanced customer feedback through 800+MET-LIFE.

In 1989, the Central Teleservicing operation recorded over 4,000 complaint "transactions" on TMOS. The actual number of "cases" is somewhat less as some transactions were counted on multiple policies within a household.

Complaints involving Central's administrative operation are directed to the appropriate work unit with copies forwarded to our Consumer Relations unit. Complaints involving our Field operations are referred to Consumer Relations for handling. Field or administrative complaints involving other territories or the Home Office *(such as PHI/EBP)* are referred to the Consumer Relations Unit in the respective office.

For the record, there are a number of inconsistencies in the Company's complaint procedures. These include:

## What is a complaint?

There is not a uniform definition within the company as to what constitutes a "direct" complaint. For the most part, it appears that only *Insurance Department* and *Presidential/Other Officer* complaints are accurately tracked.

There have been no formal *Corporate (P.I.)* procedures or complaint definition established for Teleservicing. Both Teleservicing sites have established their own definition for complaints and associated procedures. There are several issues here that should be resolved.

Central's Teleservices has been heavily involved in complaint tracking for a number of years. Based on our experience and our belief that a new approach to complaint tracking was appropriate, we established a very liberal definition of a complaint. It basically boils down to *"any expression of dissatisfaction"* with any aspect of our service or Company operations. The customer does not have to be irate nor do they have to specifically say they wish to file a complaint. If the customer has indicated any type of *dissatisfaction,* we classify it as a complaint. This may or may not be the way we would want to do this on a Corporate basis.

**CONFIDENTIAL**

MP4011071079

Another issue are the complaints that are "resolved" at the time of the call. In otherwords, a caller may be upset or dissatisfied with something but after listening to the CSR's explanation, he or she is now "satisfied." We (Central) would still record this as a complaint even though no further action is required on anyone's part. However, I don't know that this practice is consistent between the two sites.

There are also some complaints which cannot be answered or resolved. A customer may be dissatisfied with some Company form or procedure such as our lack of a dividend option to apply dividends to a loan or loan interest. Even after our situation is explained by the CSR, the policyholder is still dissatisfied. There's nothing further we can do so no action is taken on these cases other than to record them as complaints.

### Different Requirements By Different Offices Before Action Will Be Taken

A significant percentage of the complaints received via the 800 number involve claims of misrepresentation or improper action on the part of the Account Representative. The practice is to refer the complaint *(TMOS File)* to the appropriate Consumer Relations Unit. However, some offices *require that the customer put the complaint in writing before they will act on it.*

This is essentially a procedure that is part of a pre-Teleservices mentality and needs to be changed. If a customer calls Metropolitan with a complaint, we should be prepared to act on that complaint on the basis of a phone call. The Consumer Relations Unit should be willing to contact the individual for further information if needed, but should not *require* that the customer put the complaint in writing before they will take action.

### Development of a Corporate (P.I.) Policy/Strategy For Teleservices Complaints

Many of our customers do not have or will not take the time to write to express their dissatisfaction. However, with the availability of a toll-free number, they will not hesitate to pick up the phone to let us know what they think.

As Teleservicing expands, the result is going to be a dramatically higher level of customer complaint and feedback. If any attempt is going to be made to analyze or track the complaints received through Teleservicing as a whole, different recording procedures will need to be established at the two Teleservicing offices. As it is now, the Teleservicing complaints that are referred to other offices lose their *"identity"* and may or may not find their way into the Corporate Consumer Services statistics.

Teleservicing will soon become the primary recipient of customer complaint and feedback for all of Personal Insurance. If there is Corporate *(P.I.)* interest in accurately tracking these complaints, it would seem that some separate recordkeeping should be done for all complaints recorded through Teleservicing. Perhaps the Consumer Relations Units at the two Teleservicing sites could assume responsibility for maintaining this information.

CONFIDENTIAL

Bob, complaints have been a major concern of ours for a long time. The nationwide expansion of Teleservices does provide the Company with an unprecedented opportunity to obtain meaningful complaint data. However, there are many issues which must be addressed, not the least of which is a determination as to exactly what information the Company wishes to obtain and track.

I'm enclosing a couple past memo's that you may find of interest. If you would like to discuss any of this further, please feel free to give me a call at 252-8427.


J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

June 6, 1990

cc    Lyons, Szigethy

**CONFIDENTIAL**

MP4011071080

Vincent J. Donnelly
Vice-President

Re    Teleservices Complaint Tracking

Vince, I think there may be some misunderstanding as to what I envision with regard to the tracking and control of complaints received by Teleservices. In your memo of March 9, you stated that the complaints surfaced through Teleservicing could be brought to your attention. While this might be appropriate for some complaints or where specific customer needs are identified which are not being addressed by the organization, this is not what I had in mind with respect to our complaint handling.

Without going into my whole routine, Teleservices' complaints are an opportunity for the Company. A nationwide Teleservicing operation will provide more centralized customer feedback *(and complaints)* than the Company has ever seen. At the present time, our sole focus appears to be on only "Presidential" and "Insurance Department" complaints. The Company is making a big mistake if it is trying to evaluate customer perception or complaint performance on the sole basis of those received at that level.

Most policyholders won't take the time to write unless it is a serious complaint and they have no other alternative. Instead of complaining in writing, one option some unknown number of dissatisfied policyholders take is to cash surrender their policy or just let it lapse. However, Teleservices has proven that even though many won't take the time to write, they won't hesitate to pick up the phone to tell us what they think when they know the 800 number is available.

Vince, the real question is; Are we *(Personal Insurance)* going to seize this opportunity and try and do something with it or are we just going to be content with *"business as usual"* ????

When I refer to "tracking," I don't just mean *counting.* We are already doing that. I guess what I really have in mind is a totally redefined Consumer Relations organization *(for Personal Insurance)* that has some *"teeth"* in it. I envision an organization that would take this customer feedback from Teleservices, analyze it, investigate it, summarize it, and seek changes in the organization.

Some of this change would be sought by bringing critical issues to an appropriate level of awareness within the organization. This could be accomplished by publishing a report on a quarterly basis which goes to senior management. This report should highlight issues that are of general customer or Company concern.

**CONFIDENTIAL**

MP401107108Z

The centralized customer feedback through Teleservices will surface many problem areas that would go undetected or be viewed as *"isolated"* situations in our present environment. It could be extremely valuable to senior management if complaint information was properly illustrated *(with graphs)* showing trends and specific areas of customer dissatisfaction.

You indicated you would like to have some idea of the numbers. Based on the complaint definition we adopted in Central, we recorded over 4000 complaint transactions *(by policy)* in 1989. This translated into 2,516 individual cases which were entered on our computer file. Assuming the same definition and rate of complaints in 1990, we would record approximately 4,400 individual cases this year and 6,600 in 1991. Bear in mind that this is only from one of two sites. That's a lot of unhappy customers.

As I indicated, we are already "tracking" *(counting)* these complaints by entering some basic information on a PC. Enclosed for your information are two different reports of the 1989 complaints. One is by *"Type"* and the other is by *"Category."* At the present time, this tracking is pointless as the reports don't go anywhere on a formal basis. Additionally, the reports themselves don't tell you anything except numbers such as the fact that we had almost 250 complaints involving Check-O-Matic, 300 involving dividends, etc. It is the content of these complaints that someone needs to be examining.

Vince, as it stands now, this feedback is going unheeded at the Corporate level. While each of the affected units acts on the individual complaints *"in its own way,"* there is no Corporate or Personal Insurance strategy in place for dealing with customer dissatisfaction. There are areas of customer discontent that continue to go unanswered because the complaints go nowhere and the Company position is that *"nothing can or will be done,"* or at least not in the foreseeable future on the particular issue. Under our procedures, we carry some of these complaints as just being *"recorded"* because we know that no action can be taken.

A typical example is attached. We have received numerous calls asking for, or criticizing us because we do not have a dividend option that permits the dividend to be applied to loan interest and/or principal. At one point I sent a collection of these complaints to the project people to try and get action on this dividend option. It has been on and off the electronic agenda for a number of years but continues to remain inactive. Consequently, *we can only listen to the complaint from the policyholder.* We cannot provide an acceptable response other than to say *"we're sorry."* I cannot help but believe that if some of these complaints were periodically presented to senior management, some things would get done sooner.

2

**CONFIDENTIAL**

There are a number of other issues that have been surfaced in this manner involving both the administrative and the Field side of the house. However, in our present organizational hierarchy, no one is responsible for, or focuses on these from a total Corporate or Personal Insurance perspective.

Vince, I consider this my last hurrah. Over the past several years I have begged, cajoled, antagonized and bored anyone who would listen in my efforts to try and make people understand this issue. I have done everything I know how to get some attention focused on the opportunity and potential that lies in exploring the entire complaint issue.

I have persisted because I have felt that I just haven't gotten to the right person. Everyone seems to agree that complaints are important, but not important enough to change our organization or our outdated philosophy with respect to our treatment of customer feedback.    NOW IS OUR CHANCE!

If we are going to get serious about our relationship with our customer base and become a customer driven (or perhaps even better, a *customer led*) organization, then we ought to have some unit in place that is charged with the responsibility _TO LISTEN_ to our customers and provide senior management with an analysis of this feedback. If you don't envision that this, or something like this is apt to happen, then please let me know. I'm tired of fighting this one and we can easily focus our energies elsewhere.


J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

March 29, 1990

Attachments


cc    McDowall, Schoos & Szigethy   *(Minus Report Attachments)*


P.S.    In addition to the reports, I am also enclosing a few examples of some of the recent complaints just so you can get a flavor for them.

3

**CONFIDENTIAL**

MP4011071083

MP4011071084

Mr. James L. Rayl, Manager
Central Territory

                 (Separate Copy to Each)

Mrs. Kathy Schoos, Manager
Northeastern Territory


Re  Complaint Tracking/Family Reunion


Two items to be shared with you.  The first being the issue of
complaint tracking which was discussed by the Teleservicing
Natural Work Team.  I ask that complaints surfaced through Tele-
servicing be brought to my attention.  However, I would like to
get a handle on the volume and type of complaints you are receiv-
ing.  Also, please let me know how you propose to bring com-
plaints to my attention.

The second item is the Family Reunion Campaign.  As you know,
our efforts in locating industrial policyholders are now moving
to Florida, and we value your continued support through Tele-
servicing.  The project will not be successful without you!

Vincent J. Donnelly
Vice-President

March 9, 1990


cc  J. Abela
    B. Gardner
    M. Spalter
    R. Szigethy


**CONFIDENTIAL**

Barbara J. Gardner
Vice-President

Re    Complaints

Barbara, I would like to offer a few comments in response to your memo of December 15.

First of all, I would like to assure you that the number of cases appearing on our weekly "overdue" list is no indication that there is any lack of concern or emphasis being placed on complaints. Most of the C/L/D complaints are generated through calls to Teleservices. With this in mind, there is also another important consideration. By existing **Company standards and procedures, practically none of the cases on the list for C/L/D would be classified as complaints.**

Teleservices has chosen to call any expression of dissatisfaction, however mild, a "complaint." As a point of comparison, through the month of October, NeHO recorded a total of 554 complaint transactions which was **0.5%** of all answered calls. CeHO recorded a total of 3,343 complaint transactions which was **2.4%** of all answered calls. This is no excuse or justification for the delays encountered in responding to the C/L/D complaints. However, to keep things in perspective, I think it is relevant to remember that we are classifying many more cases as "complaints."

We could easily reduce the numbers by changing our definition as to what constitutes a complaint. However, I continue to believe that a person does not need to be irate to register a "complaint." Consequently, I would rather err in favor of calling something a complaint that isn't, rather than not call something a complaint that is.

As I have indicated in the past, I still personally review the TMOS file on **every** complaint call recorded by Teleservices. Where appropriate, we are still forwarding copies periodically to the Regional Executives. In instances where there is a serious or urgent complaint dealing with C/L/D, I will personally follow-up. In several instances I have obtained the necessary information and responded to the complaint personally.

This still does not alter the fact that these complaints are **not** receiving the prompt response that they deserve. However, I can assure you that this situation will improve over the next Quarter as we get more of the Correspondents trained to handle them and our general work condition improves.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

December 29, 1989

**CONFIDENTIAL**

MP401071085

MP401107108б

**Mr. Nathan Vogel**
**Market Research**
**Personal Insurance Marketing &**
**Life Product Management**


Re    Teleservices  Complaints


Nathan, just for your information, I am enclosing some of the correspondence on complaints. I am
sending you a copy which shows some "sample" management reports.  I can produce any one of
these reports for any time period you want.

I am also enclosing copies of our TMOS files for some recent complaints.  If you have time, you
may want to review a few of these just to get a "flavor" for what we get.  You should understand that
we are willing to tolerate some lapses in grammar and spelling on these files in the interest of
keeping Talk Times and After Call Work times low.  We are more interested that these files be an
accurate "description" of what took place during the call.

If, after you have reviewed these, you want or need any additional information, please let me know.


J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

October 12, 1989


**CONFIDENTIAL**

MP401107108

Donald P. Fiedler
Vice-President

RE    Policyholder Complaints Received on 1+800+MET-LIFE
January 1, 1989 Through June 30, 1989

Don, I am enclosing two separate reports of the complaints received in Teleservices for the first six months of 1989.  This first is broken down by *Type* with a secondary sort by *Category.*    The second is broken down by *Category* with a secondary sort by *Territory.*

We recorded a total of 1,359 complaints during this period against a total of 68,000 *answered* calls on MET-LIFE.  *This gives a complaint ratio of 2.0% of the calls received.*  If you measure the complaints against all calls answered *(including MET-PAYS, etc.)* it drops to 1.8%.    However, this is not a valid comparison as it is the exceptional complaint that would come in on one of the other lines.

Don, two out of a hundred calls may not seem like much of a problem.  However, it is disturbing to think how many customers may have some form of dissatisfaction if you project this out on a nationwide basis.  The sheer numbers are alarming.    Of particular concern is the fact that the vast majority of these policyholders *do not have knowledge of 1+800+MET-LIFE* where they can express their unhappiness with MET and give us the opportunity to correct it.

At any rate, I thought you might find the numbers and the reports to be of interest.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
**Central Head Office**

August 7, 1989

cc    Martin, Gardner, Goodman & Donnelly    *(Graphs Only)*
Miller & Schoos    *(Graphs and Reports)*

**CONFIDENTIAL**





## TELESERVICES
### 1989 Complaints By Type

- Field Sales
- Field Service
- General Company
- Head Office
- Home Office



## TELESERVICES
### 1988 Complaints By Type

- Field Sales
- Field Service
- General Company
- Head Office
- Home Office

**CONFIDENTIAL**

XP401107108B





**CONFIDENTIAL**

MP401071089

Mr. Donald P. Fiedler
Vice-President
Personal Insurance Administration &
Information Services

MP4011071090

Re    Teleservices Complaints

Don, enclosed are some P.C. reports covering the complaints received in Teleservices. These reports break down the complaints by *"Type"* and *"Category."* Attached are some graphs which compare these breakdowns for 1989 versus 1988.

Before these reports will have much significance, you need to understand our procedures. No "Company" procedures have been established for the handling or tracking of Teleservices complaints. The procedures we are following were developed here. We established our own definition of a complaint which is as follows:

> *"Any expression of dissatisfaction by a customer with respect to any employee, product or service or when customer expectations have otherwise not been met."*

We also established our own definitions for both *"Type"* and *"Category"* of complaint. Neither of the above are based on any standard Company definition or procedure that I know of.

We have established six different *"Types."* A copy of the procedures is enclosed which gives a more thorough definition but the *"Types"* are as follows:

Head Office    *(All Head Offices - Not Just Central)*

Home Office

General Company

Field - *Sales Related*    *(All Field - Not Just Central)*

Field - *Service Related*    *(All Field - Not Just Central)*

Other

We have established twenty (20) different *"Categories"* which are primarily transaction related. For illustration purposes on the attached graphs, I have combined the twenty into ten. However, the reports give a complete breakdown of all categories.

We have been attempting to track complaints and generate Corporate interest for a couple of years. For the most part, no one has been particularly interested and reports have not been generated on a regular basis.

**CONFIDENTIAL**

The proper recording of these complaints by the CSR requires considerable extra time and effort. Consequently, the number of complaints reported is directly related to the amount of emphasis placed on them by supervision and management. This has varied over the past couple of years depending upon other priorities. It was difficult to keep this a high priority when there was very little outside interest in the activity.

In late 1988, we placed renewed emphasis on the complaint recording. We thought we would make one more attempt at trying to determine if there was real Corporate interest in addressing this issue. As a result, we are now recording substantially higher complaints in 1989 than we did in 1988. We recorded a total of 688 complaints in 1988. So far in 1989, we have recorded 564. Again, I believe this is the product of better reporting rather than any real increase in complaints.

Don, as I indicated, I think there is a tremendous opportunity for the Company with respect to Teleservices complaints. It can provide valuable information and feedback that really doesn't come in written form. Because of the volume, it is much easier to see what is a real issue versus what is an isolated situation. However, it does not come without cost.

We pay a price in *Talk Times, After Call Work* times, and regular clerical time just for the proper handling and recording of the complaints. Some of my people also invest a substantial amount of time to track many of these cases down. We spend a fair amount of time working with other offices trying to get the more serious complaint situations resolved. There is no point in going to some of this work and expense if there is not going to be any Corporate recognition or focus on these complaints.

In a nationwide Teleservices environment, there needs to be a mechanism in place throughout the Company to ensure that complaints received through Teleservices and forwarded to other locations receive some type of special attention. The phone call itself sets up a different level of expectation on the part of a policyholder than does a letter. The Company should also examine whether the existing procedures in Consumer Relations would adequately address the volume of Field related complaints that are received.

Don, the Company has never really had good centralized feedback from its customers. I think you realize that the vast majority of "direct" complaints are handled as "just another case" in the work areas. Over the years the Company deceived itself into thinking ALL service was good by conducting policyholder service surveys. However, these were always geared towards satisfaction with payment transactions. *We do payment transactions very well.* In my experience, the Company has never really had a good picture of its customers's perception of service *for non-payment related transactions.*

2

CONFIDENTIAL

MP401107109Z

If we are truly intent on providing *Quality Service*, Teleservices provides the Company with some tremendous opportunities. If we act on complaints promptly and effectively, the potential is there to turn these dissatisfied customers into some of our most loyal. It also provides us with the opportunity to constantly monitor and get meaningful feedback on our customers' perceptions of our quality and our service.

If we are going to commit to this kind of effort, then some uniform procedures and standards need to be developed for both Teleservicing sites. If it is to be meaningful, we must both define complaints the same way, and record, report and track them the same way. There is very valuable information in these complaints if we choose to make use of it.

If you have any question about our procedures or any aspect of our complaint tracking, please let me know.

J. L. Rayl
Manager
Teleservices
Central Head Office

March 31, 1989

cc    Goodman, Donnelly & Gardner

**CONFIDENTIAL**

3



## TELESERVICES
### 1989 Complaints By Type

Field Sales
Field Service
General Company
Head Office
Home Office



## TELESERVICES
### 1988 Complaints By Type

Field Sales
Field Service
General Company
Head Office
Home Office

**CONFIDENTIAL**

MP401107109



## TELESERVICES
### 1989 Complaints By Category

Legend:
- Other
- COM
- Loan
- CV Pmt/Quote
- Discrep/Bill
- Misrep/Repl/10 Day
- Div
- PHI
- Chg Mode
- Cancel/Reinst

Pie chart values: (32%), (10%), (10%), (8%), (12%), (9%), (9%), (4%), (2%), (4%)



## TELESERVICES
### 1988 Complaints By Category

Legend:
- Other
- COM
- Loan
- CV Pmt/Quote
- Discrep/Bill
- Misrep/Repl/10 Day
- Div
- PHI
- Chg Mode
- Cancel/Reinst

Pie chart values: (22%), (7%), (14%), (9%), (10%), (18%), (9%), (7%), (2%), (3%)

CONFIDENTIAL

MP401107I094

MP4011071095

Barbara J. Gardner
Assistant Vice-President

Re    Complaints Received By Teleservices

Barbara, I received a phone call today from Don Fiedler concerning my memo about the complaints received in Teleservices. He wanted to assure me that he hadn't "forgotten" it.

We discussed the philosophy behind the tracking of only Presidentials and Insurance Departments for a little bit and I expressed my opinion concerning the value of tracking the Teleservices complaints. Don wanted to know what kind of reports we could generate and I explained that we could do quite a bit on the P.C.

I agreed to generate some reports and send them to Don for review by the Correspondence Task Force so they could "take a look at it" and determine if there was something more we should be doing. We also discussed the fact that, to my knowledge, New England was **not** doing any similar tracking.

I found it interesting that **in less than an hour the attached memo was faxed to me.** What I find most interesting is who was copied. Inasmuch as a copy went to Vince Donnelly, I'm willing to bet that Don's sudden interest originated with the copy of my memo that was sent to Crimmins.

It really doesn't make much difference, I would just welcome the Company taking some kind of a position on this whole issue. Categorizing and formatting these complaints on TMOS as we do and then putting them on the P.C. is a lot of work on our part. If the Company isn't going to take an aggressive position with respect to utilizing the information, then we should discontinue all the work and special tracking. Maybe we can now bring this whole issue to some permanent resolution.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

March 28, 1989

**CONFIDENTIAL**

CONFIDENTIAL

C.I.J

MP4011071096

*The response should be interesting*

---

**MEMORANDUM from   DONALD P. FIEDLER**

To:  Mr. John Abela
     Vice-President

Re: Teleservices Complaints

John, does Northeastern have any
procedures for the handling or
tracking of Teleservices
complaints?

Please see the attached memo
from Jim Rayl.  I would also
appreciate any thoughts you have
on this matter and a copy of any
complaint tracking reports you
prepare.

Thanks for your assistance.

Vice-President

April 14, 1989

cc: Rayl, Donnelly

MP4011071097

Mr. James L. Rayl
Manager
Teleservices-Cash/Loan/Dividend
Central Head Office

Re:  Complaints

Jim this will supplement our recent conversation concerning your
memo relating to complaints.

I welcome your input and agree Teleservicing is capable of
providing valuable input as to the level of customer
satisfaction.  Jim, it is hard to draw a conclusion from a
sampling of calls. However, I was most appreciative when you
agreed to put a package together that would attempt to put
together a complaint trending analysis report.

If you could get this PC report to me  prior to April 5th, it
would really be great as I am meeting with the Correspondence
Task Force April 5th.  As you know Don Lyons is on this
committee.

Jim, I would like to see a meaningful report developed that could
be extended to Northeastern.  A good report would go along way in
setting our direction towards happy customers.

I'll keep you posted and involved.  Thank you for your input.

Sincerely

Vice-President

March 28, 1989

cc:  Goodman, Donnelly

**CONFIDENTIAL**

**Barbara J. Gardner**
**Assistant Vice-President**

Re  Business Plan/Status Report

Barbara, attached are copies of the revised plans for Len, Bruce, John, Bob and yourself. You raised some good points and I have made all the changes you indicated except one. That is the one that deals with the CSR specialization, particularly as it relates to B&A.

IF, the Company were to change its requirement on endorsing the policy, we would be producing the turnaround document with the change indicated at the time of the call. Consequently, I feel that we need the expertise in Teleservices. I would like to leave it as is in the plan to support the concept. Whether or not this is the way it goes down remains to be seen. We have been pushing the endorsement issue for some time with little success. Maybe this will help to get some attention focused on it once again. We can always explore alternative ways to handle these specialization issues once we have some firm direction.

The other area I would like to comment on is complaints. We have been going to a great deal of work for over a year to track them. I have told everyone that will listen what an opportunity this is for the Company. As you know, I also wrote Matt Galbraith recently on this subject.

Thus far, **no one** has shown any particular interest. I was hoping that by saying we should stop the work, I would get someone to commit to the fact that we shouldn't. By the same token, if we're going to be tracking these, Northeastern should be doing the same.

Please let me know if you have any other questions. Thanks for the careful review. It definitely improved it.

J. L. Rayl
Manager
Teleservices

October 3, 1988

**CONFIDENTIAL**

Mr. Donald P. Fiedler
Vice-President
Personal Insurance Administration &
Information Services

Re    Teleservices Complaints

Don, enclosed are some P.C. reports covering the complaints received in Teleservices.    These reports break down the complaints by *Type* and *Category.*    Attached are some graphs which compare these breakdowns for 1989 versus 1988.

Before these reports will have much significance, you need to understand our procedures.  No *Company* procedures have been established for the handling or tracking of Teleservices complaints.    The procedures we are following were developed here.  We established our own definition of a complaint which is as follows:

> *Any expression of dissatisfaction by a customer with respect to any employee, product or service or when customer expectations have otherwise not been met.*

We also established our own definitions for both *Type* and *Category* of complaint.    Neither of the above are based on any standard Company definition or procedure that I know of.

We have established six different *Types.*    A copy of the procedures is enclosed which gives a more thorough definition but the *Types* are as follows:

Head Office  *(All Head Offices - Not Just Central)*

Home Office

General Company

Field - *Sales Related*      *(All Field - Not Just Central)*

Field - *Service Related*      *(All Field - Not Just Central)*

Other

We have established twenty (20) different *Categories* which are primarily transaction related.  For illustration purposes on the attached graphs, I have combined the twenty into ten.    However, the reports give a complete breakdown of all categories.

We have been attempting to track complaints and generate Corporate interest for a couple of years.  For the most part, no one has been particularly interested and reports have not been generated on a regular basis.

**CONFIDENTIAL**

REC'D. APR 04 1989

MP401071099

MP401107110O

The proper recording of these complaints by the CSR requires considerable extra time and effort. Consequently, the number of complaints reported is directly related to the amount of emphasis placed on them by supervision and management. This has varied over the past couple of years depending upon other priorities. It was difficult to keep this a high priority when there was very little outside interest in the activity.

In late 1988, we placed renewed emphasis on the complaint recording. We thought we would make one more attempt at trying to determine if there was real Corporate interest in addressing this issue. As a result, we are now recording substantially higher complaints in 1989 than we did in 1988. We recorded a total of 688 complaints in 1988. So far in 1989, we have recorded 564. Again, I believe this is the product of better reporting rather than any real increase in complaints.

Don, as I indicated, I think there is a tremendous opportunity for the Company with respect to Teleservices complaints. It can provide valuable information and feedback that really doesn't come in written form. Because of the volume, it is much easier to see what is a real issue versus what is an isolated situation. However, it does not come without cost.

We pay a price in *Talk Times, After Call Work* times, and regular clerical time just for the proper handling and recording of the complaints. Some of my people also invest a substantial amount of time to track many of these cases down. We spend a fair amount of time working with other offices trying to get the more serious complaint situations resolved. There is no point in going to some of this work and expense if there is not going to be any Corporate recognition or focus on these complaints.

In a nationwide Teleservices environment, there needs to be a mechanism in place throughout the Company to ensure that complaints received through Teleservices and forwarded to other locations receive some type of special attention. The phone call itself sets up a different level of expectation on the part of a policyholder than does a letter. The Company should also examine whether the existing procedures in Consumer Relations would adequately address the volume of Field related complaints that are received.

Don, the Company has never really had good centralized feedback from its customers. I think you realize that the vast majority of "direct" complaints are handled as "just another case" in the work areas. Over the years the Company deceived itself into thinking ALL service was good by conducting policyholder service surveys. However, these were always geared towards satisfaction with payment transactions. *We do payment transactions very well.* In my experience, the Company has never really had a good picture of its customers's perception of service *for non-payment related transactions.*

**CONFIDENTIAL**                                    2

If we are truly intent on providing *Quality Service*, Teleservices provides the Company with some tremendous opportunities. If we act on complaints promptly and effectively, the potential is there to turn these dissatisfied customers into some of our most loyal. It also provides us with the opportunity to constantly monitor and get meaningful feedback on our customers' perceptions of our quality and our service.

If we are going to commit to this kind of effort, then some uniform procedures and standards need to be developed for both Teleservicing sites. If it is to be meaningful, we must both define complaints the same way, and record, report and track them the same way. There is very valuable information in these complaints if we choose to make use of it.

If you have any question about our procedures or any aspect of our complaint tracking, please let me know.

J. L. Rayl
Manager
Teleservices
Central Head Office

March 31, 1989

cc    Goodman, Donnelly & Gardner

CONFIDENTIAL

3



## TELESERVICES
### 1989 Complaints By Type



| | |
|---|---|
| ▥ | Field Sales |
| ▦ | Field Service |
| ▤ | General Company |
| ▥ | Head Office |
| ■ | Home Office |

MP4011071102

## TELESERVICES
### 1988 Complaints By Type



| | |
|---|---|
| ▥ | Field Sales |
| ▦ | Field Service |
| ▤ | General Company |
| ▥ | Head Office |
| ■ | Home Office |

**CONFIDENTIAL**







MP4011071103

CONFIDENTIAL

Barbara J. Gardner
Assistant Vice-President

Re    Teleservices  Complaints

Barbara, attached are reports for 1988 and 1989 showing the number of complaints received in Teleservices. These reports are sorted by Head Office and then "Type" but the information can be sorted by any of the different fields.

As these reports indicate, we recorded a total of **684** complaints in 1988. We placed renewed emphasis on complaint tracking in 1989 and thus far we have recorded a total of **388** complaints this year. This would be approximately double the rate of complaints recorded for 1988. **This is not a real increase in complaints, only the product of better reporting.**

The breakdown by territory for the complaints is as follows:

| Territory | 1988 | 1989 |
|---|---|---|
| Central | 388 | 229 |
| Eastern | 26 | 4 |
| Great Lakes | 43 | 23 |
| North Central | 44 | 6 |
| Northeastern | 40 | 52 |
| New York Home Office | 13 | 24 |
| Southeastern | 88 | 48 |
| Western | 42 | 2 |

It should be noted that in the later part of 1988, phone calls from the states in the Eastern and North Central Territories were transferred to the Northeastern Teleservices operation. This accounts for the much lower numbers in 1989. The complaints involving Northeastern are from various parts of the country but primarily relate to Annuities or payment processing.

Please let me know if you would be interested in any additional information on these complaints.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

March 16, 1989

cc  David G. Martin

**CONFIDENTIAL**

MP401107110

MP401107105

Barbara J. Gardner
Assistant Vice-President

Re    Teleservices Complaints

Barbara, attached are reports for 1988 and 1989 showing the number of complaints received in Teleservices. These reports are sorted by Head Office and then "Type" but the information can be sorted by any of the different fields.

As these reports indicate, we recorded a total of **684** complaints in 1988. We placed renewed emphasis on complaint tracking in 1989 and thus far we have recorded a total of **388** complaints this year. This would be approximately double the rate of complaints recorded for 1988. **This is not a real increase in complaints, only the product of better reporting.**

The breakdown by territory for the complaints is as follows:

| Territory | 1988 | 1989 |
|---|---|---|
| Central | 388 | 229 |
| Eastern | 26 | 4 |
| Great Lakes | 43 | 23 |
| North Central | 44 | 6 |
| Northeastern | 40 | 52 |
| New York Home Office | 13 | 24 |
| Southeastern | 88 | 48 |
| Western | 42 | 2 |

It should be noted that in the later part of 1988, phone calls from the states in the Eastern and North Central Territories were transferred to the Northeastern Teleservices operation. This accounts for the much lower numbers in 1989. The complaints involving Northeastern are from various parts of the country but primarily relate to Annuities or payment processing.

Please let me know if you would be interested in any additional information on these complaints.

J. L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

March 16, 1989

cc David G. Martin

CSRs — TRAINERS —
APPROVERS

FOR YOUR INFO.

**CONFIDENTIAL**

Mr. Donald P. Fiedler
Vice-President
Personal Insurance Administration and
Information Services


Re    Complaints


Don, I have just reviewed your recent report to the Operations Officers on
Presidential and Insurance Department complaints.   Because I am looking at
our complaint situation from a very unique perspective, I am amazed that we
want to believe that things are "good" because of a decrease in Presidential
and Insurance Department complaints.    It does not appear that you have
factored in the following to your assessment:

- Have you considered that some Presidentials and Insurance
  Departments are avoided because many policyholders now have the
  availability to complain on 800+MET-LIFE?

- Is there a universal decline of written complaints throughout the
  industry because *many people no longer have the time or will not
  take the time to complain in writing except in truly exceptional
  circumstances?*

Don, believe me when I tell you that you are only looking at *the tip of the
iceberg.*   To give you some idea, enclosed are copies of complaint calls to
Central's Teleservices for only FIVE (5) days.   Multiply this out and consider
that we are not even close to being nationwide and you will get some idea of
the magnitude of our customer *dissatisfaction and complaints.*


James L. Rayl
Manager
Teleservices - Cash/Loan/Dividend
Central Head Office

February 24, 1989

cc    Crimmins, Goodman, Gardner


**CONFIDENTIAL**

MP401071106



To:     Personal Insurance Operations Officers
        Head/Administrative Offices

Re:     Presidential and Insurance Department Complaint Analysis Report

Attached is a copy of P. I.'s latest complaint analysis report which was
sent to John Falzon for forwarding to the CHO. The report shows that
your quality improvement efforts are continuing to pay off in terms of
steadily decreasing numbers of complaints. Please thank your people.

Combined P. I. and PHI/EBP complaints were down by 26% in 1988. This was
preceded by very similar percentage drops in 1987 and 1986.

Head and Administrative Office activities that are contributing to
complaint reductions are also described in the report. Those
descriptions are based on input which you recently sent to me. So
that highlights of the current steps being taken by your office to
improve customer satisfaction may be included in the next quarterly
report, please send a brief summary of those activities to me by the
end of March.

If there is anything I can do to help you in your drive to reduce
complaints, please let me know. Together, I'm sure, we can make 1989
another quality year in Personal Insurance.

Donald P. Fiedler
Vice-President
Personal Insurance Administration
and Information Services

February 14, 1989

cc:  Goodman, Anderson, Miller, Naaman

**CONFIDENTIAL**

MP401107110 7

David G. Martin, CLU, FLMI, ChFC
Vice-President
Central Territory

MP4011071108

Re    Policyholder Complaints

Dave, in response to your question concerning the number of complaints we receive, attached are two reports. These cover the complaints received from July 1, 1988 through the current date. One report is strictly for the Central Territory while the other covers all complaints.

During this period, we received a total of 315 phone complaints involving the Central Territory. Of this, 118 were classified as being *"Head Office"* related, 71 were classified as being *"Field Sales"* related and 74 were classified as being *"Field Service"* related.

I would like to point out that no action can be taken on some complaints other than to listen sympathetically and try and explain the Company's position. An example is the *Loan Repayment Letter* that is sent. Some policyholder's have called to complain that they do not want to receive the letter. At this point, there is no way to inhibit production of the letter for specific loans. Consequently, we attempt to explain this but still record the call as a complaint.

We do not have any direct reporting to the regions. Most of the field related complaints are referred to Consumer Relations for control and action (if appropriate). I do not know what, if any, reporting they do with the regions. Consumer Relations receives copies of all complaints involving the Central Territory.

The second report shows all complaints we have received by Territory. During the same period, we have received a total of 562 complaints. Thus, 56% of the complaints have come from within Central while 44% have been from outside the territory. This ratio closely parallels the distribution of total calls from inside and outside the territory.

I think these numbers illustrate that we get a lot more feedback from our customers via Teleservices than we are ever likely to get by mail.

James L. Rayl
Manager
Teleservices - Cash/Loan/Dividend

December 30, 1988

cc    Barbara Gardner

**CONFIDENTIAL**

MEMORANDUM from ....                          **JIM RAYL**

To: Dave

In my MBO meeting the other day you
expressed an interest in our complaint
handling.

Over the past year and a half or so we
have been doing extensive tracking and
recording of complaints. We have
shared our procedures and reports
with anyone who expressed any interest.
This includes Consumer Relations in
New York as well as Don Fiedler.

When Matt Galbraith visited we spent
some time discussing complaints. He
indicated he was reading every
residential and Insurance Department
that came into the Home Office.

When I saw the article in MLQ, I
felt compelled to raise the issue
once again. To date, I have never
received any reply or acknowledgement
to the attached letter and material.

*Jim*

December 15, 1988

DEC 15 REC'D

MEMORANDUM from . . . .                     **DAVID G. MARTIN,**
                                              FLMI, CLU, ChFC

To:

*Jim
How many of these
do we get? Do regions
ever see them?

Dan*

M40110711O9

**CONFIDENTIAL**

MP4011071110

---

MEMORANDUM from ....                          **JIM RAYL**

To: Dave

In my MBO meeting the other day you
expressed an interest in our complaint
handling.

Over the past year and a half or so we
have been doing extensive tracking and
recording of complaints. We have
shared our procedures and reports
with anyone who expressed any interest.
This includes Consumer Relations in
New York as well as Don Fiedler.

When Matt Galbraith visited we spent
some time discussing complaints. He
indicated he was reading every
residential and Insurance Department
that came into the Home Office.

When I saw the article in MLQ, I
felt compelled to raise the issue
once again. To date, I have never
received any reply or acknowledgement
to the attached letter and material.

Jim

December 15, 1988

DEC 15 REC'D

---

MEMORANDUM from . . . :          **DAVID G. MARTIN,**
                                   FLMI, CLU, ChFC

To: Jim

How many of these
do we get? Do regions
ever see them?

Dave

---

**CONFIDENTIAL**

Matthew W. Galbraith
Senior Vice-President
Customer Advocacy

Re  Complaints - Teleservices  *(1+800+MET-LIFE)*

Matt, I received this month's edition of our *"MLQ"* magazine and saw the article on the complaint handling done by our Consumer Relations Department in New York. Based on my experience in Metropolitan, I feel obligated to comment on how I see things from my past experience as an operations manager as well as from my Teleservicing perspective.

It is my strong feeling that Metropolitan has little idea of the extent of its customer dissatisfaction. While procedures have always been in place for the control and recording of all complaints, they are, for the most part, ignored. The only complaints that are effectively controlled are the Insurance Department, Presidential and other complaints that find their way to an Officer or Consumer Relations unit.

I believe the existing Company procedures for *"direct"* complaints require they be controlled through Consumer Relations. Any unit or division that gets a direct complaint is supposed to either forward it *(or at least a copy)* to their respective Consumer Relations unit for control and recording purposes. However, the simple fact is that this is practically *never done*, at least within most Personal Insurance operations.

There are valid reasons for this.  First of all, when a direct complaint or correspondence is received, it only delays it further to route it to Consumer Relations for control.  With the many years of emphasis that have been placed on "production," it is also viewed by the workers *(and supervision and management?)* as a waste of time.  *(Who pays any attention to complaints anyway?)*  If the complaint is received by phone, there is *"nothing to send"* to Consumer Relations *(except in the Teleservicing environment)* and the case is just handled by the operating unit.

Another problem is the fact that there is no clear definition of a *"complaint."* Every manager and supervisor have their own opinion as to what actually constitutes a complaint.  Consequently, the vast majority of complaints are handled routinely and, for the most part, are given little or no special consideration unless they are really unique.

The Presidential and Insurance Department complaints are only the tip of the iceberg.  I do not feel they provide a accurate reflection of our complaint situation.  As I discussed when you were here, I believe Teleservices is the only means of getting a true perspective on the extent of our complaint situation.  It can help identify the real problem areas within the Company. There is also the opportunity to provide senior officers with *meaningful* management information regarding complaints and the attitudes of our customers.

CONFIDENTIAL

MP4011071112

To this end, Teleservices in Central has again revamped our complaint procedures. We have established our *"own definition"* of what constitutes a complaint and developed our own categories for control and recording purposes. We are maintaining our own record of these complaints on a PC. Some sample reports are enclosed to illustrate the type of information that is available. We have also established a new category of complaint called *"recorded."* This is used for those complaints where, after the call, the customer is still dissatisfied and it appears there is no other action the Company can take. I am enclosing copies of the procedural reference cards used by our CSR's in handling their complaints.

To illustrate the varied nature of the complaints we receive, I am also enclosing copies of the TMOS files for a few of the calls we have received just during the past couple of weeks. If you get a chance to review these, it might be interesting to see if they have the same flavor as the Insurance Departments and Presidentials you have reviewed.

1+800+MET-LIFE makes it very easy for our customers to complain. Very few consumers will take the time these days to write us a letter, much less go to the Insurance Department. I wouldn't even be surprised if this isn't a factor in our decline in Presidential and Insurance Department complaints. However, as evidenced by our experience, our customers will have no hesitation to pick up the phone and tell us what they think.

Matt, I would hope that we, as a corporation, will focus the proper amount of energy and resources to this tremendous opportunity. Our entire concept of customer complaint *(and Company response)* needs to be reconsidered. Each complaint is the opportunity to turn a dissatisfied customer into one of our most loyal.

It can also be an effective *"early warning system."* Some complaints surface problems that affect many policyholders rather than just the ones that complain. I would like to see Teleservices play the major role in this great challenge but it will not happen unless there is an appropriate amount of *Corporate* focus and support.

James L. Rayl
Manager
Teleservices
**Central Head Office**

August 24, 1988

cc  Barbara Gardner

**CONFIDENTIAL**

MP401107113

**Mr. Bruce Hemer**
**Director**
**Consumer Affairs**

Re 1+800+MET-PAYS

Bruce, sorry for the delay in responding to your note from several months back. Initially I wasn't sure whether or not a response was even in order but, after further consideration, I decided you should at least know what we found out.

A memo is attached from my Customer Service Supervisor outlining what she was able to determine on the case. Also attached are copies of our TMOS (Telemarketing Online System) messages from the original phone calls. As indicated, our CSR did not perceive Mr.█████ as complaining nor does the file indicate there was any indication of misrepresentation.

I'm sorry you had such a difficult time tracking down the source of the **MET-PAYS** number. Perhaps someone should be keeping you better informed as to some of the programs that involve our policyholders. Awhile back we were asked to provide support for two different Metropolitan/LIMRA policyholder surveys. In order to do this, we used the **MET-PAYS** number rather than **MET-LIFE** so these calls would be segregated. I assume this is the "survey" Mr.█████ was referring to.

**MET-PAYS** is also used to support ULII. When that product was introduced, the Marketing folks wanted a number where policyholders could call to check the current Unit Values. Again, we wanted these calls segregated from regular service calls on **MET-LIFE** so we made **MET-PAYS** available.

I am in agreement that policyholders should have access to one number that will provide them with most anything they want. At this point, that number is **I+800+MET-LIFE**. Even if we can't handle their inquiry (such as for P&L), we can still provide them with the correct number. I also see **MET-LIFE** as the primary number that should be used for customer complaints. I have documented and submitted our efforts in this area various times but, thus far, most attention seems to be focused only on Officer and Insurance Department complaints rather than the many "direct" complaints the company receives and does not accurately track.

James L. Rayl
Manager
Teleservices/Financial Control
**Central Head Office**

April 27, 1988

**CONFIDENTIAL**

REDACTED CONFIDENTIAL
POL INFO

 **MEMORANDUM** from
**Bruce J. Goodman
Vice-President**

**PERSONAL INSURANCE ADMINISTRATION**

Robert J. Crimmins
Executive Vice-President
Personal Insurance Administration
Area 5-H

Thought you'd be interested in seeing
John Creedon's comments concerning the
attached report.

Over the past 18 months, complaints
have dropped significantly thanks
to the efforts of the Head Offices
and system improvements.

*Bruce*

BJG:ytk

December 30, 1987

cc: Operations Officers

JAN 13 REC'D

**CONFIDENTIAL**

MP4011071114

MEMORANDUM from .... ⌐ , ⌐⌐ JOHN J. FALZON

To: - MR. DONALD P. FIEDLER
VICE-PRESIDENT
PERSONAL INSURANCE ADMINISTRATION

DPF
REC'D. DEC 2 3 1987

Please note Mr. Creedon's
comments.

These reports and the
progress are very important.
Please continue your high
level of interest.

Thank you.

December 21, 1987

CONFIDENTIAL

MP401107115

MEMORANDUM from ....                    JOHN J. FALZON

TO: MR. JOHN J. CREEDON
PRESIDENT AND
CHIEF EXECUTIVE OFFICER

• Attached is the latest
report on administrative
changes designed to reduce
complaints in Personal
Insurance.  I have high-
lighted the more interesting
activities for your review.

It appears that progress is
being made as complaints
continue to decline.

December 16, 1987

**Quality Starts Here**

MEMORANDUM from
Donald P. Fiedler
Vice-President

PERSONAL INSURANCE ADMINISTRATIO

John J. Falzon
Senior Vice-President
Corporate Quality
Area 9-E

The results for the third quarter
continue on a positive trend.

One should keep in mind that the
1986 PLI complaints were down by
23% over 1985 and PHI/EBP showed
a drop of 28%.

DPF:ytk

December 10, 1987

cc:  Crimmins, Goodman

MP4011071116

**CONFIDENTIAL**

MEMORANDUM from ....                    JOHN J. FALZON

To: MR. JOHN J. CREEDON
    PRESIDENT AND
    CHIEF EXECUTIVE OFFICER

- Attached is the latest
  report on administrative
  changes designed to reduce
  complaints in Personal
  Insurance.  I have high-
  lighted the more interesting
  activities for your review.

  It appears that progress is
  being made as complaints
  continue to decline.

December 16, 1987

---

**Quality Starts Here**    MEMORANDUM from

Donald P. Fiedler
Vice-President

PERSONAL INSURANCE ADMINISTRATIO

John J. Falzon
Senior Vice-President
Corporate Quality
Area 9-E

The results for the third quarter
continue on a positive trend.

One should keep in mind that the
1986 PLI complaints were down by
23% over 1985 and PHI/EBP showed
a drop of 28%.

DPF:ytk

December 10, 1987

cc:  Crimmins, Goodman

MP401107117

**CONFIDENTIAL**

To All Head Office Operations Officers

Re:  Third Quarter – Presidential/Insurance Departmental
     Complaint Analysis.

The attached report reflects the activity taking place to reduce
policyholder complaints.

The results show that your actions are paying off.

As a matter of fact, the complaint volume for the third quarter
is the lowest of the most recent 10 quarters.

Please share this report with your people who are making it
happen.  Also, I'd like hearing from you by January 20th of any
other steps that you have taken or plan to take to improve
customer satisfaction.

I know Eastern is just winding up a correspondence seminar for
64 people and plan to get started on a Telephone Customer
Relations Seminar.  So, if you have any news along these lines,
I'd like to hear about it.  Your comments would be appreciated
by January 20th.

As for the Telephone Customer Relations Seminar, it is a package
put together by LOMA.  If anyone is interested, I do have a
package, just let me know and I'll ship it to you.  The only
thing I ask for in return is that you use it and let me know
what you think of it.  The package itself runs approximately one
thousand dollars.

Donald P. Fiedler
Vice-President
Personal Insurance Administration
And Information Systems

December 11, 1987

cc:  Anderson, Goodman, Miller, Nasman

**CONFIDENTIAL**

CONFIDENTIAL

MP4011071119

# QUALITY IMPROVEMENT
## THROUGH
## COMPLAINT ANALYSIS

## PERSONAL INSURANCE ADMINISTRATION
## AND INFORMATION SYSTEMS

**Third Quarter 1987**

This is the first
meaningful analysis of
report that I've seen.
I'm very encouraged and
I am hopeful that this kind
of approach can be magnified
and improved further.
8/18/87

"This is the first meaningful
analysis and report that I have
seen.  I am very encouraged and
hopeful this kind of approach can
be magnified and improved further."

John J. Creedon
President and
Chief Executive Officer

"Trends look good.  Looks like good
process to attack the problem."

Richard Blackwell
Office of the President
Vice President and Secretary

CONFIDENTIAL

MP401107I1120

## SUMMARY OF COMPLAINTS FOR PRESIDENTIAL AND INSURANCE DEPARTMENT ONLY (PHI/EBP NOT INCLUDED) 1987

| COMPLAINT CATEGORY | JAN. | FEB. | MARCH | APRIL | MAY | JUNE | JULY | AUG. | SEPT. | OCT. | NOV. | DEC. | YTD TOTAL | % CHG. OVER PRIOR MONTH | % CHG. OVER PRIOR Y-T-D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER/ISSUE (OTHER) | 7 | 6 | 4 | 9 | 26 | 24 | 6 | 9 | 9 | 0 | 0 | 0 | 63 | 200 | -11 |
| CLAIM (OTHER) | 20 | 15 | 27 | 28 | 16 | 8 | 18 | 21 | 24 | 0 | 0 | 0 | 209 | 14 | -10 |
| QUOTATION OF VALUE | 14 | 14 | 21 | 28 | 16 | 12 | 15 | 16 | 12 | 0 | 0 | 0 | 164 | 47 | -28 |
| STATUS OF POLICY/INFO | | | | | | | | | | | | | 128 | -20 | -28 |
| CHANGE OF ADDRESS | | | | | | | | | | | | | 12 | | -56 |
| CHG OF INFO — CD RECS | | | | | | | | | | | | | 41 | | -38 |
| CHANGE IN POLICIES | 22 | 25 | 41 | 35 | 27 | 26 | 25 | 27 | 24 | 0 | 0 | 0 | 273 | -22 | -39 |
| ISSUANCE OF CHECK | | | | | | | | | | | | | 33 | -75 | -18 |
| DUPLICATE POLICIES | | | | | | | | | | | | | 2 | -80 | -27 |
| REINSTATEMENT | | | | | | | | | | | | | 282 | | -37 |
| PAYMENT DISCREPANCIES | | | | | | | | | | | | | 24 | 21 | -28 |
| BILL/PREMIUM NOTICE | | | | | | | | | | | | | 24 | -6 | -27 |
| DIVIDENDS | | | | | | | | | | | | | 167 | -61 | -19 |
| PAID-UP POLICIES | | | | | | | | | | | | | 109 | | -29 |
| ISSUE OF SUPP. CONTRACT | | | | | | | | | | | | | 203 | | -50 |
| FREE LOOK | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | | |
| MISCELLANEOUS | 11 | 11 | 7 | 10 | 12 | 11 | 6 | 7 | 6 | 0 | 0 | 0 | 14 | -14 | -22 |
| TOTAL | 161 | 164 | 213 | 204 | 183 | 145 | 167 | 160 | 158 | | | | 1555 | -1 | -24 |

QUARTERLY TOTAL:  1ST QUARTER... 538   2ND QUARTER... 532   3RD QUARTER... 485
% CHANGE OVER PRIOR QTR.:  -25%   -1%   -9%

## SUMMARY OF COMPLAINTS FOR PRESIDENTIAL AND INSURANCE DEPARTMENT ONLY - PHI/EBP ONLY 1987

| COMPLAINT CATEGORY | JAN. | FEB. | MARCH | APRIL | MAY | JUNE | JULY | AUG. | SEPT. | OCT. | NOV. | DEC. | YTD TOTAL | % CHG. OVER PRIOR MONTH | % CHG. OVER PRIOR Y-T-D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UNDER/ISSUE (PHI/EBP) | 7 | 7 | 2 | 8 | 7 | 9 | 6 | 6 | 5 | 0 | 0 | 0 | 50 | -50 | -46 |
| CLAIM (PHI/EBP) | 18 | 10 | 7 | 6 | 7 | 9 | 16 | 8 | 15 | 0 | 0 | 0 | 160 | -16 | -47 |
| STATUS OF POLICY/INFO | 4 | 4 | 1 | 1 | 2 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | | -56 |
| CHANGE OF ADDRESS | | | | | | | | | | | | | | | -80 |
| CHANGE IN POLICIES | | | | | | | | | | | | | 7 | | -36 |
| ISSUANCE OF CHECK | | | | | | | | | | | | | 7 | | -50 |
| DUPLICATE POLICIES | | | | | | | | | | | | | | 400 | 50 |
| REINSTATEMENT | | | | | | | | | | | | | | | 15 |
| PAYMENT DISCREPANCIES | | | | | | | | | | | | | 0 | | 0 |
| BILL/PREMIUM NOTICE | | | | | | | | | | | | | 19 | | 11 |
| DIVIDENDS | | | | | | | | | | | | | 20 | -100 | |
| FREE LOOK | | | | | | | | | | | | | | | |
| MISCELLANEOUS | 2 | 2 | 2 | 2 | 2 | 1 | 2 | 2 | 2 | 0 | 0 | 0 | 10 | 18 | -24 |
| TOTAL | 36 | 29 | 15 | 29 | 26 | 27 | 22 | 22 | 26 | | | | 276 | | |

1ST QUARTER... 120   2ND QUARTER... 81   3RD QUARTER... 73
% CHANGE OVER PRIOR QTR.:  71%   -32%   -7%

NOTE: These charts are shown depicting complaints from Presidential & Consumer Affairs and do not reflect complaints from Presidential ...

PERSONAL INSURANCE

## QUALITY IMPROVEMENT THROUGH COMPLAINT ANALYSIS

MP4011071121

### How Personal Insurance Is Doing in Satisfying Customers

Presidential and Insurance Department complaints continued to drop during the third quarter of 1987. There were 9% fewer PLI complaints and 7% fewer PHI/EBP complaints than in the preceding quarter. There were even larger quarterly percentage drops for many of the categories which account for the majority of complaints. For example, Issuance of Check complaints were down by 22%, PLI Claim complaints were down by 14%, Dividend complaints were down by 18%, and PHI/EBP Claim complaints were down by 13%. For the first nine months of the year, both PLI and PHI/EBP complaints were 24% lower than for the comparable period last year. The above figures were derived from the Summary of Complaints which appears on the opposite page.

P.I.'s progress in complaint reduction is due largely to complaint analysis which has determined that most complaints can be avoided through improved systems, communications, and procedures. The balance of this report cites examples of the increased attention being devoted to these areas.

### Electronic Systems

Universal Life policies are increasing in number and so are enhancements to the UL system. The recently installed interface between the UL system and the Consolidated Warrant System expedites processing of disbursement transactions and provides for online quotation of available cash value. This is expected to have a long-term favorable impact on the Issuance of Check and Quotation of Value complaint categories. The excerpt below shows that these categories account for a large number of complaints, but it also shows that there is a considerable drop compared to last year. Other electronic enhancements, like single-cycle processing and improved electronic valuation (referenced in last quarter's report) are also continuing to exert a favorable influence.

| Complaint Category | Y-T-D Total | % Chg. Over Prior Y-T-D |
|---|---|---|
| Issuance of Check | 282 | -22% |
| Quotation of Value | 164 | -29% |

CONFIDENTIAL

Another UL system enhancement is the installation of an online Product Descriptor File which provides a complete explanation of the terms and provisions of all Universal Life plan codes. This facilitates prompt and accurate replies to inquiries.

System revisions are in progress to further reduce complaints associated with updating of address changes on the Account Business files. This should also further reduce the number of dividend complaints as fewer dividend checks will go astray. There are very few complaints in the Change of Address category, but address changes can trigger complaints in the Dividends category. Figures for these categories are shown in the following excerpt from the Summary of Complaints:

| Complaint Category | Y-T-D Total | % Chg. Over Prior Y-T-D |
|---|---|---|
| Change of Address | 12 | -56% |
| Dividends | 203 | -29% |

Complaint analysis has uncovered other problems to account for the number of complaints in the Dividends category (as shown in the chart above). Consequently, more systems support is under consideration. Specific problems include dividends too large for the electronic system and the amount of time and manual effort necessary to produce dividend histories for policyholders. Head and Home Office personnel are categorizing and quantifying the problems so that acceptable and cost-effective solutions may be reached.

Communications

The North Central Administrative Office is reviewing the use of form letters and replacing them with specialized word processing libraries. The letters in each unit/transaction library permit the use of standardized paragraphs as well as free-form to accommodate various situations. This gives a personalized and professional touch to correspondence while reducing the time needed to compose and type letters.

For Universal Life policies, a special library of model responses has been provided to each Head/Administrative Office. The sample letters assist the correspondents in replying accurately to complex or sensitive policyholder inquiries.

CONFIDENTIAL                     - 2 -

MP40110711122

Consideration is being given to establishing a dedicated
organizational unit which would review P.I. correspondence
(including all P.I. Forms and Form Letters) on an ongoing basis,
recommend changes, and administer a P.I. correspondence training
program. Although most Head/Administrative Offices have or are
setting up correspondence training and review procedures, a unit
dedicated to improving correspondence quality can avoid
duplication of effort and produce results by disseminating
proven ideas to all P.I. offices.

LOMA's video-based Telephone Customer Relations training package
has been purchased for Home and Head Office use. This
insurance-specific program teaches employees how to be
customer-driven, to project a courteous and professional image
over the telephone, and to handle the needs of angry, upset
callers.

The Western Administrative Office is beginning to train the
nucleus of a staff for a specialized inquiry unit which will
provide information concerning virtually any Metropolitan
product. This type of unit is expected to be extremely valuable
to policyholders and branch office clerical personnel who are
becoming increasingly confused or bewildered by Metropolitan's
vast array of products being administered by various offices
throughout the country.

The Great Lakes Head Office has found that a lack of
communication between the sales representatives and
policyholders is often responsible for complaints involving
Underwriting, Issue and Change. (See excerpt below). Many of
these complaints involve adverse underwriting decisions. For
example, clients do not understand why their policies are rated
even though they may have received a letter from the Company.
The GLHO, then, is stressing the importance of communications to
the field force so that correct information is promptly given to
policyholders and clients. They are also continuing their SONIC
training which educates the branch office staff to make proper
use of the information resources available to them.

| Complaint Category | Y-T-D Total | % Chg. Over Prior Y-T-D |
|---|---|---|
| Under/Issue (PL1) | 63 | +11% |

CONFIDENTIAL

~ 3 ~

MP401071123

Seminars conducted by development personnel are being used to improve product knowledge which is vital for effective communications. For example, the Policyholder Services Seminar conducted in Tulsa earlier this year provided a thorough and intensive review of Universal Life products. Another seminar next year will emphasize the Vantage-One System and multifunded products.

## Procedures

Since Head and Administrative Offices also receive complaints directly from policyholders, the North Central Administrative Office developed a post-action review procedure designed to keep such complaints from escalating to the Presidential or Insurance Department level. After each direct complaint has been resolved, it is reviewed outside of the operating unit to gauge completeness and effectiveness from a policyholder's point of view. Any problem areas are brought to the attention of the unit supervisor.

A procedure has also been implemented in the NCAO to handle correspondence involving multiple transactions across divisional lines. The procedure outlines processing and encourages a complete response that directly addresses the policyholders' concerns.

Complaint analysis is continuing in Personal Insurance. It is expected to target additional areas needing improvement and effect a further decline in the number of complaints.

Donald P. Fiedler
Vice-President
Personal Insurance Administration
and Information Systems

December 8, 1987

CONFIDENTIAL

- 4 -

Donald P. Fiedler's
Distribution List B

## Personal Insurance Head Office Operation Officers

**Canadian Head Office**
John Shane
Assistant Vice-President

**Central Head Office**
Barbara J. Gardner
Assistant Vice-President

**Eastern Administrative Office**
Harold J. Coster, Sr.
Vice-President

**Great Lakes Head Office**
Donald M. Stadler
Vice-President

**New England Head Office**
John P. Abela
Vice-President

**North Central Administrative Office**
Salvatore R. Masucci
Vice-President

**Southeastern Head Office**
Jack F. Smith
Vice-President

**Western Administrative Office**
John E. Reynolds
Assistant Vice-President

**CONFIDENTIAL**

MP401107112S

Barbara J. Gardner
Assistant Vice-President
Central Head Office

Re Complaints

Inasmuch as I had previously sent my comments to Don Fiedler *(copy attached)* I didn't feel any additional response to your August 25 memo would be required.

The only additional comments I would have is the fact that I don't feel the monitoring of only our Presidential and Insurance Department complaints is very meaningful. I don't feel that these complaints provide a true picture of our general complaint situation or policyholder perception. Naturally, I believe Teleservices can ultimately provide much better statistics and information relating to customer complaints.

James L. Rayl
Manager
Teleservices/Financial Control

September 14, 1987

CONFIDENTIAL

MP4011071127

Don, with the anticipated nationwide expansion of Teleservices, the Company has the opportunity to put a much more accurate and informative complaint tracking system in place. In addition and if desired, the Company could even go a step further and have a consumer "hotline." Either way, the Company can be much more responsive in the Teleservicing environment. It will enable us to keep our hand on the "pulse" of the customer and it will be much easier to see developing trends or problems (or perceived problems) within our operations.

Please refer to the attached material on our complaint handling. I would welcome the opportunity to discuss this with you in more detail and see how it fits into the Company's future plans to exceed customer expectations in dealing with complaints.

J. L. Rayl
Manager
Teleservices
Central Head Office

July 6, 1987

cc  Barbara Gardner, Assistant Vice-President

**CONFIDENTIAL**

MP401071128

Barbara J. Gardner
Assistant Vice-President
Central Head Offices


Re  Teleservices - Complaints


Barbara, as you well know, the Teleservicing concept offers the Company a unique opportunity to get a handle on its complaint situation. Although no one at the Corporate level has expressed any clear interest in doing this, I felt it was important that we put a system in place to monitor the complaint activity.

Initially, our biggest problem was in defining exactly what was to be classified as a complaint. The development of a definition and firm complaint procedures was given to the CSR Natural Work Team as part of our Quality Program. Procedures were put in place and we have been tracking each case classified as a complaint on the PC.

Attached are examples of the various reports that can be generated. These reports cover all available cases from 1986. Reports can be produced on just about any basis you can think of.

We will produce reports periodically during 1987. If there's any particular format or area of interest, please let me know and I'll see that apropriate reports are generated.


J. L. Rayl
Manager
Human Resources - Teleservices

February 18, 1987


**CONFIDENTIAL**