# EXHIBIT
# B

# PLAINTIFF EXHIBIT 33

Tom LaBadia
Policy Administration & Customer Services
P.I. Customer Services
Bridgewater
    AREA 2-E


Re  Referrals to "AP" as Paid-Up


Tom, as you know, in my previous correspondence concerning *Accelerated Payment*, I indicated that our Account Representatives usually referred to the policy as being *"paid-up"* once the AP took over.  I think the attached may help to support this statement.  Just over the course of a few days, I ran into several complaints in which the policy was referred to as being paid-up.

I am also attaching a couple other ones relating to the dividend scale change and the change in AP eligibility dates.  These give a little flavor as to the sensitivity of this issue with some policyholders.

It should be recognized that these are only the *complaint* cases.  We receive many other *non-complaint* phone calls where the policy was referred to as being *paid-up* under this arrangement but no formal complaint was involved.

J. L. Rayl
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

December 7, 1992

cc   Barbara Gardner

CONFIDENTIAL

FAGER

M06970225O153

To  Jim Rayl and Darlene West

Re  Barbara Glittone's Request Dated 11/5  -  "AP" Processing

Jim, we are not having the problem NEHO is encountering.  Whenever we set a policy up on AP, the AP 9 letter is sent to the policyholder with a copy to the enforce district office.  This notifies them that the policy is set up on AP and premiums would be paid by the AP processing.

Barbara also requested electronic notification be sent to the enforce branch office whenever the AP processing for the payment is completed.  This would be nice but the branch office has the capability to look this information up.  Since AP processing is done 21 days after the due date, allowing for callup dates and such they should check the policy approximately 30 days after the anniversary date to see if the premiums are paid.

I called Kathy Craven's (Notice Billing) and checked to see if any type of notification is sent to the district office whenever a withdrawal by AP is processed.  She indicated that at this time nothing is generated but it could be done by setting up a link with the billing trail and Sonic.  She said that there was several possibilities on what criteria would be used to produce a report.

I think we have higher priorities on our wishlist that need to be addressed before this is addressed.

Mark Davis sent me copies of Barbara Glittone's memos and has asked for our comments (copy attached).  Do you want me to address these or should Darlene?  Several items mentioned by Barbara are already on our wishlist and has been discussed with Mark.

Cheryl

December 16, 1992

M06970225O153

Notice:"Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct."

M0697 0225 0128

**FAGER**

To:      Mark Davis, Project Manager
         PHIOS
         Scranton Information Systems Center

From:    Barbara Glittone, Business Analyst
         Customer Services and Communications Dept
         Warwick Customer Service Center

Re:      Accelerated Payment Eligibility Quote

We would like to share with you some situations we've encountered
in our AP eligibility testing that we would like changed, if
possible.

1. When a policy is paid to its anniversary date and we test for
   eligibility after the anniversary, we get a "yes" with next
   year's anniversary date. We've learned that AP could really
   be effective for this year's premium if we insert the proper
   coding on the B1 screen and wait to see if all is well. In
   most cases we are happy to find that AP will work for the
   current premium. However, by continually doing this we delay
   our response to the policyholder and we sometimes find
   ourselves doing all this work and then still get the same
   response from the original eligibility test - more times than
   not, however, we find that we can use AP for the current year.
   We would like PHIOS to value these cases so we will know if AP
   can be used the pay the current year's premium and not just
   look beyond to the next year's premium due. I've attached
   several val briefs and copies of the PH screen to support what
   we currently receive. (Exhibit 1)

2. Similar to this situation is not allowing AP because the
   annual dividend exceeds the premium. When this note appears
   and we check PIOS B1 screen, we find that the dividend does
   not exceed the premium, but we assume the note is based on a
   1993 projection. Is this true? Does this projection include
   the downward trend of dividends? Also, if the above is true,
   might the note be changed to tell us that it's next year's
   dividend that will exceed. Although we can be sure to instruct
   our people of this, we find that more detailed information is
   needed for our sales offices. I've attached 2 eligibility
   quotes to show you what we currently receive. (Exhibit 2)

3. When dividends are encumbered, does PHIOS consider this in its
   calculation? Reason for asking is the attached two policies.
   (Exhibit 3) Both have loan stops on file. there is no
   restrictive note on the eligibility quote warning us of the
   loan stop and the net value appears to be rather small to
   carry these policies on AP from 1993. We would like to be sure
   that when PHIOS values these cases, it considers the net
   dividend value available and not the gross amount.

M069702250128

FAGER

EXHIBIT 1

MDL 1091

CONFIDENTIAL

M069702250130

M069702250130

Notice:"Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct."

# PLAINTIFF

# EXHIBIT

# 47

Frank Lynch
Senior Vice-President
P.I. Customer Service

Re   Customer Complaint - Changing Dividend Scale

Frank, I have been trying to make this point for a long time, particularly as it applies to the impact on *Accelerated Payment* and its effect on eligibility dates and what we are going to encounter when our policyholders are confronted with their *"collapse dates."*

I thought you might find this first hand feedback from one of our policyholders to be of interest, particularly as it relates to his comparison of MetLife with other companies. We should be doing a much better job of informing and educating our customers. Our anniversary statements should be revised to provide complete information including cash values. In doing so, we could easily "promote" the positive aspects and benefits of their contract.

For those policies currently on AP with values which are deemed inadequate to cover all future premiums, it's my understanding that we really don't even plan to write them a letter to explain it. The *collapse date* is just going to appear on their statement. We continue to get complaints every day because we are not informing policyholders about the dividend situation and the fact that their "AP" date is now off into the future. Just wait until those who are on "AP" find out their policy will not be continued as "paid up" as they were led to believe. As I understand it, 25% of the cases on AP do not have sufficient values to carry them to the end of the premium paying period.

Had we informed them a year or two ago and really tried to explain things, it would have been very easy to point to the economy as the reason for the changing dividend scales and its impact on AP eligibility. As it is now, interest rates are climbing and people will not relate as well to the economic situation. And, worse than that, many will blame the situation on all our recent troubles and the fines we have had to pay, in spite of our protestations that it will not affect dividends.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

September 29, 1994

cc   Barbara Gardner

CONFIDENTIAL

MP401107101G

# PLAINTIFF

# EXHIBIT

# 48

Barbara J. Gardner, ACS
Vice-President
MetLife Customer Service Center - Tulsa

Re   Consumer Education "Wish List"

Barbara, many of our problems and complaints with customers are due, in part, to their lack of understanding of insurance principles in general and/or the lack of understanding of specific aspects of their policy or transaction. The problems we are experiencing and are going to face with "AP" (*Accelerated Payment*) cases are a prime example. Policyholders believe their policies are supposed to be "paid-up" in "X" years. Or, those currently on AP believe their policies are already paid up. Many, if not most, of these policyholders do not begin to understand the true concept of AP. They do not fully realize that premiums are still due on these policies until age 95 or 98 and that the "AP" arrangement is really only a method of using the dividends to pay those policies. As you know, because of the changing dividend scales, we have continued to experience ongoing complaints because premium payments continue to be required on many of these policies. And, we face a similar problem with UL policies in that *Target Premiums* are going to be inadequate to maintain some of them.

Now admittedly, this monster was created primarily because of the marketing approach used by some of our Field Force and their own lack of understanding of the implications of this concept. But, with proper consumer education, we could have greatly reduced the negative impact that we have already experienced as well as that which is going to explode in the future.

A significant percentage of our Field Force does not understand many aspects of the policies they sell or the impact of some of the policy provisions. For example; some don't understand the complications that can arise from improper or ill advised beneficiary designations (*minor children*). In C/L/D, we encountered many complaints and "reversals" because representatives did not understand or adequately explain to their client the differences between a *Partial Cash Withdrawal* versus a *Loan* on a UL policy.

My point is this; *we are not ever going to be able to fully resolve the problem with our Field Force.* With the number of new representatives that we appoint each year and the heavy demands of just learning how to sell, it will take these people years to become knowledgeable in all the administrative nuances of our products. This problem is also compounded by the fact that the level of administrative knowledge or training varies greatly from branch office to branch office.

Many of the problems and complaints we experience would be non-issues had the policyholder thoroughly understood their policy or the administrative aspects associated with various transactions. The establishment of a Consumer Education department supported through advertising and Teleservices provides MetLife with an opportunity that may be unparalleled in the industry right now. At the very least, it gives us a definite edge on the competition as well as the opportunity to do a far better job of educating our policyholders, thereby avoiding many of the complaints and misunderstandings in the future. As we have witnessed, while almost everyone owns a life insurance policy, very few really understand how it works or the many benefits and options that are available to them as a policy owner.

**CONFIDENTIAL**

The best part is that instead of looking at consumer education as an expense, it should be viewed as an *investment as well as a marketing strategy*. If handled properly, many of our consumer education activities could easily be turned into advertising and marketing opportunities. Our Consumer Education effort should not be limited to MetLife policyholders. Instead, we should embark on an effort to educate all consumers. Done well, many non-customers could surely be turned into MetLife clients.

As I see it, there are three different types of opportunities to provide information that will educate our customers as well as promote our products and services. These are:

## STRICTLY METLIFE CONSUMER INFORMATION/EDUCATION

An example would be like one of the examples from Kathy's list such as providing better information on how to read a *Dividend Anniversary Statement* and providing an explanation of terms.

## CONSUMER EDUCATION/PRODUCT PROMOTION & EXPLANATION

An example might be providing information on the differences between a *Whole Life* policy versus *Term* versus *Universal Life*. This could serve to educate both our own policyholders or be offered to non-policyholders. In both cases, it offers opportunity for follow-up contact and potential sale. A similar example would be a generic piece which provides an explanation of how mutual funds work, the various types *(Aggressive Growth, Money Market, Tax-Exempt, Etc.)*, and how they might be used to help an individual meet specific investment objectives.

## SPECIFIC PRODUCT INFORMATION

In this scenario, we may have a more sophisticated customer or current non-customer who understands the concepts, but wants product specific information such as something that describes our various mutual funds and illustrates performance history. Or, something that provides specifics on our annuity, whole life or term products. While some effort would always be made to have this provided through the Career Agency Force, it should be recognized that some percentage of respondents *will not want to talk to a representative for the initial contact*. However, "follow-up" calls should be made to these individuals to see if a Representative can be of assistance once they have had time to review the material.

Having said this, I will attempt to categorize and list some of the types of material we have considered. Also attached is the list which Kathy Schoos prepared for John Abela. We are in agreement with everything on Kathy's list.

CONFIDENTIAL

MF40107010

XP4011071011

| Pure Consumer Education | | |
|---|---|---|
| Various Brochures or "Automated Letters" Providing Detailed Explanations of the Impact of Some Policy Transactions | Policy Loan | - A detailed explanation as to the impact of taking out a policy loan, effect of unpaid interest, potential termination of policy - tax consequences, etc. |
| | Dividends | - Explanation of Dividend Options, advantages of "Paid-Up" insurance - Potential Tax Consequences |
| | Payments | - Advantages/Disadvantages of various payment arrangements "AP" - Non-Forfeiture Options associated with Lapse & non-payment of premiums. |
| TAX RELATED Considerations and Consequences Associated with Life Insurance | There should be a general, but comprehensive booklet, which describes all the various tax issues associated with life insurance. This would include an explanation of the tax deferred status of most policies, those that are classified as "MECs" (Modified Endowment Contracts) and their tax implications, the concept of general taxable gain on a policy as well as the taxable implications associated with dividends (DWI, potential taxable gain from dividends, etc.). It could also explain and advise how some of these consequences might be avoided (i.e., using dividends to purchase paid-up additional insurance as opposed to DWI or cash). | |
| General Company History Including Financial Stability | With people expressing concern or interest in the Company, we should have something in the way of a "PR" piece to send them that tells them about MetLife, a little of its history and traditions, its size in relation to the other companies and its financial stability. | |
| Industry Ratings | We should be able to send a piece of literature that explains the various organizations rating the insurance industry and how to read the ratings. There should probably be a separate attachment which can be kept current as to MetLife's ratings by these organizations. | |
| Contract Considerations When Purchasing a Life Insurance Policy | This could explain in plain English the important contract considerations: Rights of the policyowner - explanation and purpose of naming a contingent owner - things to consider when naming a beneficiary (minor children) and types of bene designations - explanation of rights and reasons for naming contingent beneficiary(ies). How and when to change ownership or beneficiaries. | |
| Glossary & General Information on Policy Riders and Provisions | This could include a layman's explanation of what the following riders/provisions are and why you might need or want them: Disability Waiver, Accidental Death, Accelerated Death Benefit Rider, Paid-Up Additions Rider, AIB, SIB, etc. | |
| Explanation of Policy Values | Information on how policies accumulate cash value. Differences between "Guaranteed Cash Value," Dividends, Cash Value of Additional Insurance purchased by Dividends, etc. It could also explain how value information can be accessed and how these values can be used (income at retirement, etc.). | |
| 800 Customer Service | Some type of brochure or "PR" piece is needed that touts the availability of Pf Customer Service (800+MET-5000) and provides a list of the information and services that can be obtained. While our number appears on many documents, we don't have anything that makes reference to the services & information available. This same brochure should provide a strong "reminder" to be sure and give us a call whenever the person moves or has an important life event. The same or similar brochure may want to touch on the services available through 800+MET-LIFE. | |
| Replacement | We have some literature available but we need something more comprehensive. It should be sent in any instance where a CSR perceives the customer may be surrendering their policy or considering replacement. The material should provide the policyholder with a clear and objective explanation of "churning," describe the marketing strategies of some companies with respect to replacement and the "Term Versus Whole Life" argument, and it should cover the many potential benefits associated with policies that have been inforce for awhile such as the growth in guaranteed cash value and possible current dividend performance versus annual premium cost. | |

CONFIDENTIAL

3

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| **Whole Life Versus Term Versus UL - ULIf** | This was also the first item on Kathy's list. We could offer this via advertising and also have this available for customer inquiries. There continues to be more and more focus on the argument of permanent insurance versus term. A thorough but objective pamphlet or booklet should be available which explains the basic concepts and differences between permanent and term insurance. This could include a long term net cost comparison, concept of a level premium and death benefit, tax deferred savings features, etc. It should also cover the general uses and application of both types of insurance as well as some of the pros and cons and explain why everyone should have a basic program that includes some permanent insurance. Perhaps a separate section could then explain how Universal Life differs from Whole Life as well as the differences with multi-funded Universal Life. While the tone of the booklet should not be to try and "sell" something, it could certainly provide a list of our basic offerings with a bold imprint to call 1 + 800 + MET-LIFE if there are any questions. In some instances it might be appropriate for a CSR or account representative to call the recipient a week or two after the booklet is sent just to see if they have any questions or are interested in speaking with an Account Representative. |
| **Estate Planning** | This could also be offered via advertising to a targeted market or audience. It should also be available to our customer base so it could be sent by the CSR in appropriate situations. It should be an objective booklet or pamphlet on when and why estate planning becomes a serious need. It should outline the primary elements or considerations in general estate planning. It could cover the high cost of dying, the risks associated with improper planning and/or how someone's estate or insurance benefits may not be handled as they anticipated if proper planning was not done. Consideration could be given to including a video, a worksheet or a PC program that would permit the individual to determine the value of their estate. Again, the tone should not be to try and sell anything. However, as an example it could illustrate how our Survivorship Whole Life (or any life insurance policy) can be used to address specific estate problems. Again, a call could be made to the recipient to determine if they have any additional questions (offer booklet on Trusts?) or if they would like to speak with an Account Representative. |
| **Trusts** | This might go hand in hand with the Estate Planning booklet and could also be offered via advertising or to our customers in the appropriate situations. It should provide general information on the various types of trusts and trust agreements and their common usages and purpose. It should cite a few examples as to how life insurance policies are affected and used in conjunction with estate planning. It should also explain how an individual might get a trust established. Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |
| **Planning For The Future** (Not Just Retirement) **Family Insurance Needs and Other Considerations** | Most of the younger generation go through life giving very little thought to the future and some of the implications. Part of this brochure should be a "checklist" of things to consider. For example:<br>• The need for a will and the dangers of not having one<br>• Guardianship of children - who gets the kids if both parents were to die<br>• Problems with elderly and/or incapacitated parents - Power of Attorney<br>• The high cost of dying in general - funeral and final expense considerations<br>• Life insurance needs for self - why have insurance on spouse and children? - (level premium - protection plus tax deferred savings, etc.)<br>• Include a list of lifestyle changes that trigger a need for financial review; i.e., having a baby, marriage, divorce, death of spouse, parents, new home, etc.<br>• The odds against collecting retirement from existing or single employer<br>• Property and Casualty needs - Personal liability issues - what else should be covered and for how much?<br>Again, a call could be made to the recipient to determine if they have any additional questions or if they would like to speak with an Account Representative. |

CONFIDENTIAL

4

MP401107I012

## Consumer Education With Advertising/Marketing Related Potential

| | |
|---|---|
| Basic Or "Preliminary" Financial Needs Analysis | This could be offered in many ways. However, many people might be interested in doing their own "Basic or Preliminary" Financial Needs Analysis. We could advertise and offer at no cost a simple (but objective) worksheet that highlights some of the key areas and allows an individual to determine on their own some of their areas of need and compare that to their existing program. It should be clearly stated that it is not intended for detailed *needs analysis*, but is only to provide a basic understanding and example of some of the considerations involved. This could be offered free and kept to a reasonable level of expense. We might also consider offering at nominal cost, a videotape that takes a person through the general Financial Needs process. Also, at nominal cost or perhaps free, a PC program diskette that will walk them through a basic Financial Needs Analysis and allow some "modeling" of insurance and/or savings aspects. All of this should be relatively generic, objective, but with strong recommendation that a formal needs analysis be done by a competent professional. Again, whenever this is sent, a follow-up call should be made to determine if we can be of additional service and/or arrange for contact by an Account Representative. |
| Retirement Planning | The detailed Retirement Planning Guide that was recently prepared by Pensions is outstanding but obviously expensive. Perhaps a modified version of that could be made available on a more general basis. Again, a follow-up call should be made. |
| Investment Guide | A general guide to saving and investing could be prepared which outlines some of the reasons as to why this is needed, not only for retirement, but college, home purchase, starting a family, etc. Like the Retirement Guide, it should have savings tables illustrating the amount of savings required to generate money in the future at varying rates of return. It should also cover tax deferred versus non-tax deferred savings issues. It could suggest an initial foundation of life insurance, but should also cover and explain other savings and investment options such as mutual funds and annuities. The booklet could encourage the individual to call us for more specific information on any of the various investment options or vehicles. Again, a follow-up call should be made. |
| Encourage Communication | We should offer or routinely send a sticker or refrigerator magnet that encourages customers to call the 800 number that may have occured or questions they might have about their policy or insurance in general. Perhaps this could be sent in the "Welcome to MetLife" letter that will go out from Ted A. The "welcome" letter might also stress the contact and service available through our toll-free number. A major objective here would be the establishment and maintenance of a *permanent ongoing* relationship between the customer and the Company in addition to any relationship that might exist with the representative which, in most cases, *will only be temporary*. |
| Mutual Funds | We are getting more and more questions or opportunities to discuss our Mutual Funds. We should have two separate pieces of literature available. One should be for the first time investor who is interested in learning more about Mutual Funds. This piece should explain how mutual funds work and the various types of funds and their objectives *(aggressive growth, income, money market, etc.)*. We should then have a piece that can be sent to the more sophisticated investor that is familiar with mutual funds, but is interested in the types of funds we have available and their performance history. Again, a follow-up call should be made. |
| Checklists | Offer a variety of *checklists* for *things to consider* when:<br>* Buying a New Home - Homeowners, Mortgage Protection, schools, taxes, etc.<br>* Selling a Home - New paint, selling costs, etc.<br>* You find yourself unemployed (laid off) - Vested Retirement funds & lump sum distributions, COBRA, Unemployment Compensation, Debt/payment modification, etc.<br>* You are starting a small business - Operating capital, insurance, workers comp, etc.<br>* You're going to have a baby - Things you need, how it changes your life, why purchase life insurance, cost of college, etc. |

CONFIDENTIAL

5

MP40110710113

| Consumer Education With Advertising/Marketing Related Potential | |
|---|---|
| Premium/Plan Quotes | We continue to get people calling to ask if we can provide them with an "approximate" quote over the phone as to how much a given amount of insurance might cost. With the increased exposure and advertising of 800 + MET-LIFE, we are likely to get many more "curiosity" calls. While we would always try and refer them to an Account Representative, there is always going to be some percentage of callers that are going to want some preliminary information *before* he or she will be willing to speak with a representative. While we should be able to quote these online (based on personal data entered into the terminal), all verbal quotes should be followed-up by generating a professional looking written quote that would provide approximate premium amounts for basic plans of insurance, both term and permanent. Perhaps only "standard" rates should be quoted and all such quotes should carry a disclaimer to the effect that the premium amount can be influenced either way by underwriting factors as well as optional riders that may be elected for the policy. However, many people have no idea as to what life insurance might cost them and would be open to seeing an Account Representative if we could first provide some basic information. And, in doing so, we might even make the sale easier. Whenever a quote is provided, we could also emphasis the need for a full Financial Needs Analysis. But, the customer would still have a general idea as to the cost of life insurance. |

As I indicated, in addition to all the above, we are in agreement that material should be available on all the items listed in the memo from Kathy Schoos.

Barbara, again, by combining the power of advertising with Consumer Education and our Teleservicing operations, there is tremendous opportunity to make great strides towards achieving our market reach strategies. But, it should also be recognized that while our primary thrust should always be to support these efforts through our Career Agency Force, the reality is that in some geographic areas we are not going to have an Account Representative presence to follow-up on all the marketing opportunities that can be generated. A fundamental decision must be made as to whether or not we are going to ignore these opportunities or find other methods to seize them. Wherever possible, we need that personal relationship established with a local representative but, as evidenced by some of what has been already been achieved with some policyholders (Mr. ███ for example), it is possible to maintain a close and personal relationship with our policyholders through an effective teleservicing and customer service support organization.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

October 28, 1994

cc Valentino, Porpora, Cross & Schoos

REDACTED CONFIDENTIAL
POL INFO

CONFIDENTIAL

6

# PLAINTIFF

# EXHIBIT

# 51

MF401071008

Bill Barnewold
Sr. Business Systems Consultant
Traditional Portfolio & Dividends
Personal Insurance
Bridgewater - AREA  3E-2

Re Field Announcement for AP Anniversary Statements

Bill, I have reviewed the proposed *Field Announcement* and *Anniversary Statements*. I would just like to go on record one last time saying that I think the Company is making a serious mistake. Using only the *Anniversary Statements* to notify those policyholders who are currently on AP that their dividends are now insufficient to maintain the policy is going to create confusion and has the potential to create a backlash of complaints and ill will unlike anything to date.

The vast majority of policyholders who are currently on the AP arrangement believe that no further premiums will be due on their policies. Many of these policies have been represented to the customers as having been *"paid up."* Consequently, they will be confused by the rather terse statement that *"Your dividends will pay the premiums until _____"* and the balance of the text. I would be. In spite of our statement that *"dividends are not guaranteed,"* these customers will not automatically understand how *or why* their policy has been affected. And, in the absence of any meaningful explanation, many are likely to become outraged once they realize that more premiums may become due at some point in the future.

For the life of me I do not understand why all these people couldn't have been sent a letter that explains the impact of the economy on the dividends and its corresponding impact on AP. We are going to great lengths to make certain our *"new"* AP customers understand the arrangement. Why shouldn't we do the same with these? Many would still be upset, but that number would most likely be much smaller than what we're going to encounter now. Again, I stand by my perception that we are not fully considering our actions from the *CUSTOMER's* perspective. And, in light of everything else that has transpired, I can't believe the Company would want to risk handling such a sensitive issue in such a cavalier manner.

If anyone believes that the majority of our Field Representatives will actually approach these customers and explain it, they're living in a dream world. Many of the writing reps are long gone and the others have no vested interest in communicating this kind of *bad news* to the customer.

The *Anniversary Statements* included in the proposal don't make any reference to the 800 number. I assume the 800+MET-5000 number is now on them so perhaps we can salvage a few when they call. But, I hope everyone is truly prepared for the consequences of handling these AP cases in this manner.

J. L. Rayl, ACS
Director
Customer Services & Communications
MetLife Customer Service Center - Tulsa

January 3, 1995

cc  LaBadia, Gardner & Schoos          CONFIDENTIAL

# PLAINTIFF

# EXHIBIT

# 54

FAGER

Barbara Gardner, ACS
Vice President
MetLife Customer Service Center - Tulsa

Re      AP - Accelerated Payment arrangement

Barbara, in the fall of 1993, an AP NWT was established to address the growing concerns associated with the AP arrangement. Even at that time there was a clear recognition that immediate attention must be given to educating our policyholders about AP.

Since many of these policyholders believe that their policy is *paid-up* or at the very least that *no further premiums will ever be due*, it was the goal of the AP NWT to initiate an educational program. This program included: a *Welcome letter* that would be sent out on every policy placed on AP and any policy changes that affected the AP arrangement would generate a letter to the policyholder. In addition, the billing documents and anniversary statements would contain information about the projected collapse date for the AP arrangement.

Even with all these efforts, I have a concern that we are not doing enough nor are we doing it fast enough. For example: an AP Consumer Brochure was developed to provide information about the AP arrangement and how it works. The original intent of this brochure was to send it to all new AP policyholders along with the AP *Welcome letter*. However, I have recently learned that it is only going to be given to our field associates. While I agree that this brochure should be available to the field, it should also accompany the AP *Welcome letter*. We can't continue to always rely on our field associates to communicate policy provisions to our policyholders. We have to start ensuring that all affected policyholders are notified in a uniform and informed manner.

Also, in the next couple of weeks, the billing documents to carry the AP *collapse date*. Our policyholders will not understand. Attached is a copy of a memo from Jim Rayl stating his concerns about how we are communicating this information. **I am in complete agreement.** A short statement on a billing document is not enough. We need to be providing a complete explanation about the AP problems **before** we place any information on the billing documents.

In today's environment, if we are not careful how and what we communicate, the situation will become explosive. To further illustrate that this is not a problem to be taken lightly, I am attaching an article from the December issue of Best's Review on this very subject. If we are going to provide *World Class Customer Service*, we have to do a better job of informing our policyholders.

Darlene West
Darlene West, ACS
Manager
Cash/Loan/Dividend/Maturities
MetLife Customer Service Center - Tulsa

January 11, 1995

M069702251058

Notice: Production and Use Subject to Case Management and Protective Orders in MDL No. 1091. United States Dist. Ct.

FAGER

# Calling the BOMB SQUAD

*by Sean Armstrong*

"Hi, Bob. Do you remember that life insurance policy I sold you in 1984? Yeah, back when Bobby Jr. was in little league. Anyway, you know how I said you'd be able to stop paying premiums in 10 years. Well, it's going to be a little longer than that. Ah—actually, quite a bit longer. Could be as much as 10 years. Oh, by the way, did Bobby's baseball scholarship come through?"

M069702251059

Notes. "Production and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

FAGER

It's a financial adviser's nightmare: You felt comfortable projecting a 10-year vanish on your client's whole life policy when you sold it. It all made sense. You'd heard the mantra a hundred times. "This company has not lowered its dividends in 50 years." Well, times have changed drastically, and if you're an agent or a company executive and you have clients who bought life insurance thinking their premiums were going to go away, you may be sitting on a time bomb.

Forget about NAIC regulations and "plain English" illustrations. The real problem is potentially more damaging. Although one company is going to spend $10 million to contact policyholders throughout the country, the industry has failed to alert thousands of other customers who can't hear the bomb ticking. It's impossible to tell how many cases there are, but the wide popularity of the vanishing premium concept in the mid-to-late-1980s coupled with the fact that the typical vanish period was between 8 and 10 years, paints a disturbing picture. Today, that same premium is unlikely to "vanish" before the 12th and, sometimes, the 18th year or longer.

Unfortunately, what began as a simple and understandable concept in the marketing department of now-defunct Executive Life Insurance Co., Los Angeles, mutated in the heat of competition. Then technology set the monster loose. Able to generate illustrations from their personal computers, agents caught ledger fever. What started as agent abuse became part of built-in policy mechanics. It got to the point where agents could be misleading even if they were going by the book. "I don't think companies paid much attention to this as a big lie," says Roger Heath, a principal at Towers Perrin's insurance general management consulting practice, Dallas.

The high inflation of the 1970s began to ebb toward the end of the decade. Interest rates peaked in 1982 and began declining steadily. Because of a lag effect on company investment returns,



Thomas Wolfe speaks out.

it took agents and companies several years to digest the fact that rates would no longer continue their steady uphill climb. "We were all kind of this period of blissful unawareness," says Rhitms Weber, chairman of the American Society of CLU & ChFC's life insurance illustration questionnaire task force. "And everyone's shocked when, in 1987, Northwestern Mutual lowers its dividend scale. In 1988, a few more companies lowered their dividends. Everyone was in shock."

As with other interest-sensitive products, a small adjustment in an interest rate will amplify over time, resulting in an enormous difference between reality and expectations. It's the derivatives debacle on a personal scale. But many agents reacted to the news by ignoring the problem, according to Weber. Many, according to Heath, simply went on plugging the same high interest rates into their illustrations.

When they began to get a grasp of the problem, agents were confused and anxious. "I think that troubled a lot of us. The idea of going back to clients and having to say 'remember that illustration we looked at? Well it didn't work out,'" says Weber. Ideally, agents would have clearly explained that an illustration was not a guarantee. However, perhaps out of ignorance, or to keep the sales pitch

simple, agents mislead their clients. "Now we've got to go back and say those things," says Weber, "and it's embarrassing and we're concerned about getting blamed and concerned about letting down clients."

Thomas Wolfe, a well known agent and author, raised these concerns in a speech delivered at the American Society of CLU & ChFC's annual meeting in October. He said there is a huge amount of life insurance, sold using the vanishing premium concept, that's just waiting to blow up. Companies most at risk are those that aggressively pushed the vanishing premium concept in their sales efforts. Wolfe says agents lack support from carriers in the effort to contact unwitting policyholders. Many carriers have directed their agents to conduct in-force reviews, but most have not made it mandatory.

Weber says the only company that's developed a program to that effect is Manulife Financial of Toronto. According to John Barr, in-force management director, Manulife plans to have its agents and representatives visit each of its 35,000 policyholders in the United States by December 1995. The goal of the project, with an estimated price tag of $10 million, is to explain the effect of lower interest rates on each customer's policy. "We know the majority of the policies were sold on a vanish basis," Barr says. "In most cases, we do have some original illustrations on them. We plan to take them and go from there."

Even at Manulife, the effort is just beginning. "There's a lot of business out there where the client hasn't been contacted yet," says Weber. Delivering the news is not going to be easy. Agents have to prepare themselves psychologically for a hostile situation. "There is going to be anger," he says. But the reality is: If agents or company representatives don't make the call—no matter how ugly the conversation may turn out to be—they may soon be hearing from angry customers. Or worse yet, their lawyers.

30    SUBJECT TO PROTECTIVE ORDER
Notice, Evidentiary and Use Subject to Case Management and Protective Orders in MDL No. 1091, United States Dist. Ct.

M069702251060

Attorney Thomas Tew of Tew & Garcia-Pedrosa, who masterminded a massive lawsuit against Metropolitan Life Insurance Co., New York, and its agents, costing the company more than $20 million in fines, says the environment has changed. A recent case illustrates the threat. In October, an Alabama state judge upheld a jury award of $25.4 million against Prudential from a couple who claimed they were defrauded by the company and one of its former agents. In the suit, the plaintiffs, Leslie and Rebecca Gallant of Eufala, alleged that agent Charlie Whatley told them their policy would be paid up in 10 years. They later found out that payments would be due for the rest of their lives. After the MetLife case, Tew says he's been getting a lot of phone calls, the majority of which are from companies seeking to insulate themselves from similar lawsuits.

When companies turn to their nemesis for advice, it's a good indication they're scared. Of course, all company approved illustrations include footnotes explaining that they are based on many non-guaranteed performance variables and that, technically, a premium will be due as long as the policyholder lives. "The courts are not looking so much to the contract," says Weber. "They're saying, 'What was the substance of what was communicated to this client, not only in the contract, but in the illustration.'"

Because of the agents' autonomy in the sales process, companies have no way of knowing how the product was presented. The safest sales pitch would point out that illustrations are not predictions of future performance, Weber says. Rather they are meant to show a policyholder how his pattern of premium payments and the carrier's future experience might interact. Weber demonstrates the dangerous approach: "There are eight remains here and don't worry about all that footnote stuff. This company has never decreased its

dividend scale. I can tell you, what's in my illustration is conservative. It's not aggressive." In response to the dangerous example, Weber says, "I think you've got yourself a lawsuit there."

Despite the growing risk of legal action, the typical insurance company, according to Heath, is not giving this problem the attention it should. Now that time has elapsed, Heath says he's starting to see big lawsuits like the one in Alabama. He says he gets one or two calls a month from consumer plaintiffs looking for advice. He also gets one or two calls a month from insurance companies asking for litigation support.

## ALERTING POLICYHOLDERS

Some companies still don't know there's a problem, according to Heath. Customers are unaware that if they have stopped paying premiums in accordance with the illustrated plan, the policy may be headed toward a lapse. It's a slow process that won't show up on in-force statements. They may not know there's a problem until they get a termination notice in the mail. A lot depends on how a company's service department works, according to Heath. But the situation may be out of control. Insurance companies have



Richard Weber, chairman of the American Society's illustration task force, predicts growing problems with vanishing premiums that don't go away.

let attorneys who are rabble rousing create expectations for large punitive damages," he says.

According to Tew, there has been no major change in the underlying liability inherent in illustrations. What's changed, he says, is an awareness among policyholders that certain illustrations may be suspect and that they may have been exploited by an unscrupulous agent. "There's a growing consumer awareness that they ought to be a little more skeptical," he says. "The premium isn't vanishing. The policy is cannibalizing itself."

Tew says the attention to compliance within companies and the government is being driven by lawsuits. "Do you think we would have this reform if there weren't lawsuits like this? I don't think so." He foresees more cases like the Gallants'. He says companies are handicapped by tension between management and company marketing departments. "No one wants to tell marketing the bad news," he says. And it is bad news for salespeople. As in MetLife's case, a sweeping overhaul of compliance procedures and sales practices can severely curtail sales. Tew, says sometimes the only person who can deliver that news is an outsider.

Policyholders are equally in the dark. The annual statement they get from their insurance companies showing cash values and dividends doesn't tell policyholders what they need to know. Many people who bought insurance in the mid-80s with the expectation that they would pay eight or 10 premiums have no way of knowing that the number has probably gone up to between 12 and 18 premium payments, according to Weber. "The customer gets the premium notice, and then says, 'Wait a minute, I wasn't supposed to pay this,' and they call the company and then call the agent," says Weber. "And, of course, the company has no idea what the custom-

M0697025I061

...er is talking about." Weber cites one case where a customer found out he would have to pay 32 annual premiums, when the illustrated projection was nine. The problem, warns Weber, is huge. "So I think there isn't a single illustration that was based on current assumptions in 1985 through 1989 that is going to come true."

Not sure who's to blame, companies haven't decided whether they or their agents should be breaking the bad news. In many cases, they realize that they need the agents' cooperation. Agents have information the carrier doesn't. They know how the sales pitch was made. "So I think there's a turf disagreement as to who should be doing what," says Weber. Agents claim they are not getting enough support from the companies. But the carriers might not think they're getting the cooperation they need from agents. Or the information may simply not be there. With agents leaving the business all the time, there are a lot of orphan policyholders who may not know their coverage is about to vanish.

### CREATING POSITIVE SPIN

There is a way to put a positive spin on this difficult situation, Weber cites one agent who handled it this way: "Five years ago," he said, "client, we identified the estate liquidity need, and you were delighted to be able to solve that problem for 20 cents on the dollar. There was no other product or investment you could make that could solve your problem so inexpensively. Now I'm coming back to you today, and it's going to cost you 30 cents on the dollar. It's still a good deal. There still isn't anything that comes close to doing what you need it to do when you need to do it for as low a price, even though that price tag has gone up substantially."

Beyond dumping more money into the contract, reactivating a vanished premium or reducing face amounts, Manulife policyholders may opt for underwriting-free conversions to certain term or variable life products. Of course, conversion to term involves using the cash value of a permanent policy to pay premiums for a less permanent one. With the variable option, policyholders—by betting on the policy's investment risk—may be able to achieve the originally projected performance.

Weber has conducted focus groups with dozens of policyholders who owned substantial amounts of life insurance. In a mock-up of a communication to policyholders, researchers explained that the amount of premiums they had expected to pay was now going to increase substantially. "The reactions we got from them," he says, "were a valuable learning experience. The first lesson: A customer is never happy about bad news. But they are much more accepting of it when it comes from the person who sold them the policy." The other extreme, according to Weber, is that they are angriest when bad news comes from an impersonal letter from some president whose name is scrawled by a machine on the bottom of the page. "That was important for us because we were about to do a mail campaign, and what that told us was no, it's got to be face-to-face contact," he says.

The other lesson was that customers want to hear the bad news as soon as the agent knows it. And they want to know specifically how it affects them. The agent has to go to the client, explain the impact and then help the client determine whether the original needs still exist. There is a reason why that may not still exist: That client may have bought a lot of insurance with the anticipation of a lot of inflation, which would increase the value of their estate along with their future tax liability. "Inflation didn't continue, it's not there. Maybe they don't need so much insurance any longer," says Weber. Perhaps that client's solution is to reduce the number of premium payments to their original number by decreasing the death benefit. "This may not be appropriate for everyone, but we certainly have seen it," says Weber.

The end result, according to Weber, is a new way of looking at life insurance. Trying to teach agents and brokers that a life insurance policy is simply another asset that has to be managed. When I came into the business in 1967, it was still true that when you bought life insurance, you bought it, you signed the paperwork and you put it in a safe place, and you never looked at it again. You can't do that anymore. Too much has happened in the last 15 years. Agents vanish, companies vanish, the premium does not vanish." ∎

> *There isn't a single illustration that was based on current assumptions in 1985 through 1989 that is going to come true.*

## THE BEST MAILING LISTS FOR THE INSURANCE AND FINANCIAL SERVICE INDUSTRIES

### LISTS FOR RECRUITING
**LICENSED INSURANCE AGENTS AND FINANCIAL PLANNERS**

| | | | |
|---|---|---|---|
| Life & Disability Agents | 1,053,492 | Life Insurance Agencies | 206,877 |
| Fire & Casualty Agents | 488,663 | Property & Casualty Agencies | 271,742 |
| Financial Planners, CLU's, MDRT's | 97,795 | Insurance Company Home Offices | 3,851 |

Send For Free Brochure Showing Breakdowns By Sectional Centers

### LISTS FOR PROSPECTING

| | | | |
|---|---|---|---|
| Age & Income | Homeowners | Top Executives | Small Business Owners |
| New Movers | Working Women | Senior Citizens | School Children |
| Real Estate Agents | Doctors, Lawyers | Military Retirees | Stockbrokers |
| Accountants, Bankers | Postal Workers | Opportunity Seekers | Nurses, Teachers |
| Investors | Affluent Americans | | |

Call Us For All Your List Needs — If the List Exists, We Can Get It for You

**GEORGE STERNE AGENCY**
254 E. Grand Ave.
Escondido, CA 92025

Phone 800/772-8174
619/432-6913
Fax 619/432-9570

M069702251062

# PLAINTIFF

# EXHIBIT

# 61

SEP-05-95 15:09 FROM-NORTHEASTERN TERRITORY        ID:                                    PAGE

Metropolitan Life Insurance Company
Northeastern Territory
700 Quaker Lane, Warwick, RI 02886

**THORESZ**

🐾 **MetLife**

Lawrence J. Brewster, CLU, LUTCF
Marketing Vice-President
Northeastern Territory

Mr. Anthony C. Cannatella, CLU
Executive Vice-President
New York Home Office

Re: Vanishing Premium

Dear Tony:

I believe we need to be proactive in our approach and take the offensive. The following items illustrate our exposure to potential consumer complaints.

- There is both an existing and potential problem in Northeastern Territory. Currently on a year-to-date basis, there are an estimated 360 complaint AP cases.

- The problem started, of course, when dividends began to decline.

- Some of the problem is rooted in the lack of training in this specific area.

- Some of it is rooted in the perceived opportunity by some policyholders that it is a good approach to get a full refund of premiums. Some of this motivation is coming from Company bashing and unscrupulous sales people with other companies.

- Although the concept was widely used, sometimes it was not sold properly or understood by a large segment of the field force.

- We have had a number of cases where handwritten notations have been made on policies and illustrations specifically stating that the policy will be fully paid-up in a specific number of years.

- Some proactive action can be taken to address both training and cut down on the number of future complaints by instituting a policyholder communications/service program now for cases that may have an anticipated AP date of two+ years down the road.

- The training needs can be answered by the development of a training module for use in the BYB and post BYB training seminars.

Source: Producers and Life Subject to Case Management and Protective Orders in MDL No. [illegible]

M059701650621

SEP-05-95 15:09 FROM NORTHEASTERN TERRITORY    ID.    PAGE

**THORESZ**

By providing account representative training that stresses illustrative values are based on current dividend scales, which are subject to change, we can hopefully avoid the pitfalls that arise when performance does not reflect illustrative values.

I would also recommend that an in force program be developed for policyholder contact to conserve these cases wherever possible.

Sincerely,

Lawrence J. Brewster, CLU, LUTCF
Marketing Vice-President
Northeastern Territory

September 1, 1995

MDL 1091
CONFIDENTIAL

Notice: "Production and Use Subject to Case Management and Protective Order in MDL No. 1091, United States District Court..."

M059701650622