## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD M. GONDA, | ) | Civil Action No. 00-2286 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Chief Judge Donetta W. Ambrose |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY and WILLIAM FRIEDT, JR., | ) | |
| | ) | |
| Defendants | ) | |

---

### PLAINTIFF'S BRIEF IN RESPONSE TO METROPOLITAN LIFE INSURANCE COMPANY'S MOTION IN LIMINE TO EXCLUDE FROM EVIDENCE UNRELATED TESTIMONY AND EXHIBITS OF JAMES RAYL

---

### PRELIMINARY STATEMENT

In this Motion in Limine, Defendants argue that the testimony of Jim Rayl is irrelevant and prejudicial. The testimony of Jim Rayl was admitted into evidence in both **Tran v MetLife, et al**. Civil Action No. 01-262 and in **Solarchick v MetLife**, Civ Act. No. 01-444. Mr. Rayl was the Director of MetLife's Tulsa Ok, Customer Service Center during relevant time periods to this case.

This Court found that the documents were relevant and admissible. See Exhibit 1. Also, Plaintiff intends to read in the same transcript excerpts from Mr. Rayl's testimony as were permitted by this Court to be introduced into evidence in the Tran and Solarchick cases. The objected to exhibits are exhibits attached his deposition.

The transcript excerpts that were read into evidence in Tran and Solarchick of Mr. Rayl's testimony are directly on point for the use of the deceptive sales tactic in the 1992

The sales presentations of policies with "vanishing" premiums were an ongoing problem at

MetLife that started in the 1980's and continued into the 1990's, including the sales to plaintiffs. Therefore Mr. Rayl's testimony and the exhibits discussing the "vanishing" premium problem at MetLife are relevant and admissible business records of MetLife contemporaneous with the time period of the sales to plaintiffs.

Plaintiff was provided a "vanishing" premium illustrations for the 1992 whole life policy. The evidence plaintiffs seek to introduce supports that fact that MetLife had a regular business practice of selling "vanishing" premium policies.

The identical problem that occurred in the APP sales in the 1980's continued into the mid-1990's and the plaintiffs are evidence of this problem. The sales illustration provided to plaintiffs is identical to the sales illustration provided to Mr. Tran and to the Kintners and the sales presentation is identical, i.e. after 10 years the sales illustration demonstrates that no further cash outlay is required and uses the word "NONE."

The sales methods used in the instant case are identical to the sales methods that Mr. Rayl was concerned about as being deceptive as set forth in the exhibits to Mr. Rayl's deposition. Indeed, the evidence demonstrates that the same deceptive sales practices were used by Metropolitan Life sales agents on a national basis. Therefore, the fact that Mr. Rayl is not specifically mentioning Pennsylvania is irrelevant.

The plaintiffs allege that MetLife had a business practice of selling both universal life and whole life policies based upon misrepresentations as to the number of years that the policyholder would be required to make out-of-pocket premium payments on their life insurance policies. See Complaint. The evidence will demonstrate that MetLife, through its sales agents, used this deceptive business practice routinely, widely and repeatedly, and further MetLife condoned this

business conduct either directly through awards and bonuses, or tacitly by not taking appropriate measures to stop such practices once senior management had knowledge they were occurring.

Moreover, this very same business conduct occurred in the sale of the policy at issue in this case and plaintiffs were harmed thereby. This evidence will tend to prove the allegations of plaintiffs are true and supports the credibility of the plaintiffs and the lack of credibility of the defendants.

Furthermore, plaintiffs seek to introduce this evidence for the purpose of establishing the context of MetLife's knowledge, intent and corporate culture which permitted this business practice of selling life insurance policies by misrepresenting the actual cost of the policies. The pattern and practice evidence demonstrates that MetLife is liable for the sale to the plaintiffs through misrepresentations as to the performance and cost of the three universal life policies and the whole Life life insurance policy.

The testimony of the former and current MetLife executives, as well as the documents sought to be introduced by the plaintiffs, are relevant to the plaintiffs' claims and should be admitted by this Court as they were admitted in the <u>Tran</u> case.

Finally, MetLife is incorrect in its reading of Rule of Evidence 404(b) and Rule 803(6). The documents are clearly business records and are admissible. Indeed, this Court properly found that these documents are relevant and admissible in the <u>Tran</u> case.

## ARGUMENT

## I.    THE PROPOSED EVIDENCE IS RELEVANT TO THIS CASE.

As the Court may recall, the testimony excerpts of Mr. Rayl read to the jury did not mention anything concerning employment discrimination. They excerpts were streamlined and narrowly targeted to provide his work history at MetLife, his communications concerning the "vanishing"

premium problems and MetLife's response thereto. Not one comment was read regarding any claims made by Mr. Rayl against MetLife.

MetLife's argument is premised on a contorted concept of the relevance of evidence in a fraud case. This Court has already rejected these exact same legal arguments repeatedly. See generally the rulings made in Tran v MetLife and Kintner v. MetLife.

"Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 402." Garvey v. Dickinson College, 763 F. Supp. 799, 801 (M.D.Pa. 1991).

The problems with the earlier "vanishing" premium sales are identical to the "vanishing" premium sales problem with the sales to plaintiff in 1992. The premiums did not disappear when the dividend and interest rates were reduced and MetLife had no reasonable basis for using either the interest or dividend rates that were used in the illustrations since the rates of returns could not be projected with any accuracy beyond one year.

## II.    THE PROPOSED DOCUMENTS ARE RELEVANT TO THIS CASE.

### A.    Relevancy of Evidence under Rule 401 and  406.

MetLife again argues that the documents do not reference the plaintiffs and therefore are irrelevant. MetLife's argument is premised on a contorted concept of the relevance of evidence in a fraud case. This objection is without merit, since the evidence is relevant to the Plaintiff's claims that MetLife had a business pattern and practice to sell policies with "vanishing premiums" that was also used on the plaintiffs.

"Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 402."  Garvey v. Dickinson College, 763 F. Supp. 799, 801 (M.D.Pa. 1991).

Mr. Rayl was in a position to provide evidence of MetLife's corporate knowledge as to the extent of the use of the business practices, as such, the evidence is relevant under F.R.E. Rules 404(b) and 406 to the issues in this case, particularly Plaintiff's claim for liability, since MetLife's motive, intent, opportunity, preparation, plan knowledge, or absence of mistake are all at issue.

Federal Rule of Evidence Rules 404(b) and 406 have been interpreted to permit the admission of business practices evidence.  The United States District Court for the Western District of Pa in Com. of Pa. v. Porter, 480 F.Supp. 686, (W.D. Pa. 1979) found:

> This suit was filed October 5, 1977.  The defendant Baranyai has throughout the trial objected to evidence of any events back of the one or two year period preceding the bringing of suit claiming that such evidence should not be permitted under the statute of limitations.  **It should be sufficient answer that such evidence is admissible under Rule 404(b) to show motives, intent, preparation, knowledge or absence of mistake or accident and to show plan or design.  It is also admissible under Rule 406 to show a pattern or routine practice of a defendant or organization.**

Com. of Pa. v. Porter, 480 F.Supp. 686 at 688 (W.D. of Pa. 1979).  This reasoning was upheld by the United States Court of Appeals for the Third Circuit, finding:

> . . . **Evidence of the prior actions was admitted, as the trial court noted, under Fed. R. Evid. 404(b), "to show motives, intent, preparation, purpose, knowledge or absence of mistake or accident and to show plan or design.  It is also admissible under Rule 406 to show a pattern or routine practice of a defendant or organization."  This ruling was correct.**

Com. of Pa. v, Porter, 659 F.2d 306 at 320 (3rd Cir.1981) (Citations omitted)(emphasis added); see also, Rosenburg v. Lincoln Am. Life Ins. Co., 883 F.2d 1328, 1336 (7th Cir. 1989) (evidence

admissible to establish a routine practice that defendant's agents regularly gave or were trained to "give oral assurances that insurance coverage was effective immediately despite written conditions to the contrary"); United States v. Quezada, 754 F.2d 1190, 1195 (5th Cir. 1985)(proper for INS agent to describe "the normal procedure followed in executing a warrant of deportation" by his agency to establish conformity with those procedures in instant case); Holley v. Seminole Cty. Sch. Dist., 755 F.2d 1492, 1505 (11th Cir. 1985) (evidence that school board had not punished others who engaged in similar conduct should have been admitted); Wells Fargo Business Credit v. Ben Kozloff, Inc., 695 F.2d 940, 944 (5th Cir. 1983) (placing letters in mail "may be proved by circumstantial evidence, including customary mailing practices used in the sender's business"), cert. denied, 464 U.S. 818; Williams v. Anderson, 562 F.2d 1081, 1086 & n. 7 (8th Cir. 1977)(evidence of prior racially discriminatory practices admissible to support inference that discrimination continued); Amoco Prod. Co. v. United States, 619 F.2d 1383, 1389-1390 (10th Cir. 1980) (proper under FRE 406 to receive evidence of the routine practice of the Federal Farm Mortgage Company "to reserve a one-half mineral interest in all property transferred during the relevant period" to prove that such a provision was contained in the deed in question); see also John H. Strong, McCormick on Evidence § 195 (4th ed. 1992); 1A John A. Wigmore, Evidence § 95 (Tillers rev. 1983).

Reliance on FRE 406 is necessary only where a litigant seeks to prove conduct on a specific occasion by evidence of routine practice. Where a litigant seeks to prove a pattern or practice that has independent relevance, such evidence is admissible under FRE 401. See Pennsylvania v. Porter, 659 F.2d 306, 320 (3d Cir. 1981) (in litigation seeking equitable relief, evidence of pattern of constitutional violations by police is admissible; court erroneously cites FRE 406), cert. denied, 458 U.S. 1121. United States v. Santa, 180 F.3d 20, 29 (2d Cir. 1999) (practice of police department

supported court finding that it returned to village court a request to vacate warrant).

Although there are no "precise standards" for determining whether a behavior pattern has matured into a habit, two factors are considered controlling as a rule: "adequacy of sampling and uniformity of response." Fed.R.Evid. 406, advisory committee's notes; McWhorter v. Birmingham, 906 F.2d 674, 679 (11th Cir. 1990).    Therefore, the evidence should be admitted in this case as it was admitted previously in the Tran and Solarchick cases.

The business practices and knowledge of MetLife itself are at issue, since MetLife is also a defendant, along with the manner in which it supervised its employees.    The inability to present any evidence of the business practices and knowledge of MetLife itself would prejudice and harm plaintiffs' proof of their claims as to liability against MetLife regarding its business practices and how they directly relate to the sale of the polices to plaintiffs.

This principal of permitting evidence of the business practices in fraud cases is based upon the concept that evidence of similar business practices evidence is admissible to prove a course of conduct, if the evidence falls into one of five exceptions to the general rule that this evidence is inadmissible because it generally is prejudicial.    The five exceptions are: "(1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial — in other words, where there is such a logical connection between the [frauds] that proof of one will naturally tend to show that the accused is the person who committed the other."    See Commonwealth v. Peterson, 307 A.2d 264 (Pa.1973); see also Commonwealth v. Marsh, 566 A.2d 296 (Pa. Super. 1989); citing Commonwealth v. Clayton, 532 A.2d 385, 392 n.8 (Pa. 1987).

All five of these exceptions exist in the evidence that plaintiffs seeks to offer at trial. The Pennsylvania Supreme Court in Commonwealth v. Peterson, further held that where evidence relates **to any one of these five issues** it is admissible: **"When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value."** Id. at 307 A.2d 264 at 269-270 (Emphasis added).

Moreover, there is a procedure for resolving any possibility of confusion or misunderstanding of the jury as to purpose of the admission of the evidence. Any possible misunderstanding can be clarified through instructions by the trial court. If evidence is admissible for one purpose, but not for another, the trial judge should instruct the jury on the restricted purpose for which the evidence has been admitted. F.R.E. 105 requires the judge to give such and instruction if a party requests it. A party should request that instructions be given to insure that the jury make the proper use of the evidence and that it is not used for an improper purpose. This exact issue was also discussed and explained in Commonwealth v. Peterson, and the Pennsylvania Supreme Court held that any possible confusion of the purpose for the admission of the prior bad acts or any possible prejudice that might be caused thereby could be explained and clarified through cautionary charges by the trial court:

> The trial judge informed the jury at the outset that they were in effect trying two separate cases at one time and for this reason would have to pay especially close attention to the evidence so as to be able to properly segment it. **At the close of trial an extensive cautionary instruction was given which again directed the jury to confine the relevant evidence to each offense. This instruction was precise and unassailable.**

Commonwealth v. Peterson, 307 A.2d 264 at 271.

Moreover, in a fraudulent misrepresentation, the standards of evidence are relaxed for plaintiffs to prove their claims. As Henry on Pennsylvania Evidence stated:

> **The rule which excludes evidence of other acts to prove a particular act is greatly relaxed in cases of fraud.** Thus allegations of misrepresentations as to financial condition and of conveyance of property to defraud creditors may be supported by showing similar misrepresentations to others and transfers of other property as a series of acts constituting a general scheme to defraud. And **where a conspiracy to cheat and defraud in a particular instance is charged, evidence of a scheme to cheat and defraud the public generally may be given.** If notes are alleged to have been fraudulently raised in amount, evidence of raising or of other notes by the same person is admissible where it tends to show a general scheme to obtain money on raised notes.

See <u>Pennsylvania Evidence by Henry</u>, Volume 1, Chapter 1 §36 Similar Facts, Conditions or Conduct - Fraud, p.73 (Emphasis Added); <u>See also</u> <u>Wigmore on Evidence, Third Edition, Vol. II, § 367</u>; <u>Lisenba v. The People of the State of California</u>, 314 U.S. 219, 62 S. Ct. 280, 86 L. Ed. 179 (1941); <u>Snayberger v. Fahl</u>, 195 Pa. 336, 342 (1900)("Where fraud is alleged, great latitude of proof is allowed and every fact or circumstance from which a legal inference of fraud may be drawn is admissible."); <u>Gee v. CBS, Inc.</u>, 471 F. Supp. 600, 617-634 (E.D. Pa., 1979).

Evidence of prior acts to establish and prove a system or method of fraud is admissible also to demonstrate that a party's conduct was consistent with a general course of conduct on their part, a general design, or purpose:

> **Where a series of acts indicates a general design, purpose or course of conduct on the part of the person who committed them, they become competent evidence on the question of whether or not a similar particular act was done by the same person.** Even though an act is so remote in point of time from that charged that the statute of limitations would bar a prosecution for it, it would still be admissible if one of a series of acts tending to show guilt of the party charged. ...

<u>Pennsylvania Evidence by Henry</u>, Chapter 1, §36 Similar Facts, Conditions or Conduct - Course of Conduct, p.67. (emphasis added).

There is no merit to Defendants argument that the admission of this testimony and the documents in his possession would violate Pa.R.E. 403. To the contrary, evidence is not prejudicial

for purposes of Rule 403 merely because it is 'detrimental to a party's case." See Whistler

Sportswear, Inc. v. Rullo, 433 A.2d 40,47 (Pa. Super 1981). The Superior Court has further stated

that the exclusion of relevant evidence as prejudicial is only necessary where the evidence would:

> inflame the jury to make a decision based upon something other than the legal
> propositions relevant to the case. As this court has noted, a trial court is not required
> to sanitize the trial to eliminate all unpleasant facts from the jury's consideration
> where those facts form part of the history and natural development of the events and
> offenses with which [a] defendants is charged.

Commonwealth v. Palmer, 700 A.2d 988, 992-993 (Pa. Super. 1997).

The testimony, and the documents supporting the testimony of MetLife's knowledge of the

use of the sales methods regarding the sale of policies through the use of the "vanishing premium

scheme" are also directly relevant to the issue of whether Defendants' conduct was egregious. As

the United States Supreme Court has determined:

> **Certainly, evidence that a defendant has repeatedly engaged in prohibited
> conduct while knowing or suspecting that it was unlawful would provide
> relevant support for an argument that strong medicine is required to cure the
> defendant's disrespect for the law.** See [TXO] id., at 462, n. 28. Our holdings that
> **a recidivist may be punished more severely than a first offender recognize that
> repeated misconduct is more reprehensible than an individual instance of
> malfeasance.** See Gryger v. Burke, 334 U.S. 728, 732 (1948).

BMW v. Gore, 517 U.S. 559 at 576-77 (Emphasis added).

In TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 462, 113 S.Ct. 2711, 125

L.Ed.2d 366 (1993), the United States Supreme Court addressed the relevancy and admissibility of

similar improper out-of-state business conduct. If out-of-state business conduct is relevant to the

harm suffered by the plaintiff, so is in-state improper business conduct. Thus, this out-of-state and

in-state unlawful conduct properly may be considered by a jury in the context of imposing punitive

damages. The U.S. Supreme Court held in TXO that the defendant's unlawful out-of-sate conduct

-10-

was admissible for consideration by the fact finder, stating:

> **TXO also contends that the admission of evidence of its alleged wrongdoing in other parts of the country**, as well as the evidence of its impressive net worth, led the jury to base its award on impermissible passion and prejudice. Brief for Petitioner 22-23. **Under well-settled law, however, factors such as these are typically considered in assessing punitive damages.** Indeed, the Alabama factors **we approved in Haslip** included both. See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21-22 (1991) ("**(b) . . . the existence and frequency of similar past conduct**; . . . (d) the 'financial position' of the defendant").

TXO, 509 U.S. at 462, fn28. (Emphasis added). The decision in Haslip is referenced with approval in the Pennsylvania Suggested Standard Civil Jury Instructions. See Chapter XIV Punitive Damages, p.9. ("Although Haslip dealt with an Alabama punitive damage award, the opinion provides guidance in assessing punitive damage awards under Pennsylvania law").

Furthermore, the holding in TXO was not altered by the decision in State Farm v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 1522 (2003)("**...[O]ut-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious**, but that conduct must have a nexus to the specific harm suffered to the plaintiff.")(Emphasis added).

## III.    PLAINTIFFS EXHIBIT NO 41 IS A BUSINESS RECORD AND IS ADMISSIBLE.

Defendants cite to no caselaw in support of the premise that the business records of MetLife are inadmissible hearsay. They only reference generically to Federal Rule of Evidence 803(6). As the documents objected to by the Defendants are not privileged and are admissible under the Business Records Exception to the hearsay rule, the fact that the documents were made at or near the time of the events it purports to relate; generated as a regular practice of the business; and trustworthy as to the source of information or the method or circumstances of preparation, the

business records of MetLife are clearly admissible.

The justification for the business records exception rests on the assumption that business records are reliable because they are created on a day-to-day basis and "[t]he very regularity and continuity of the records are calculated to train the recordkeeper in habits of precision." McCormick on Evidence § 286 5th ed.). The business records exception to the hearsay rule applies only if the person who makes the statement "is himself acting in the regular course of business." Florida Canal Industries, Inc. v. Rambo, 537 F.2d 200, 202 (5th Cir. 1976).

In U.S. v. Pelullo, 964 F.2d 193 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit addressing Rule 803(6) explained when business records are admissible:

> The business records exception permits admission of documents containing hearsay provided foundation testimony is made by `the custodian or other qualified witness,' that: (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.

Id. at 200.

The documents meet all four requirements: (1) Jim Rayl, through sworn testimony authenticates the letters and he describes that he personally wrote the letters based upon his knowledge and information gained as the head of the Tulsa Customer Service Center; 2) he wrote the letters in the early nineties when the problems regarding the sales agents selling policies as paid-up when they were not was taking place; (3) he wrote the letters in the regular course of business to bring the information regarding the numerous complaints received in the Customer Service Center regarding the use of deceptive sales tactics of "paid-up" policies to the attention of his superiors; and (4) records regarding complaints in the manner in which sales agents are selling policies are kept in

-12-

the regular course of business - they are required to be kept by every Insurance Department in the country.

Additionally, these documents should be admissible under either Rule 801(d)(2)(A) (statement by a party offered against that party) or Rule 803(6) (business records exception). The letters and testimony of Jim Rayl are of an employee of MetLife concerning events that took place in the company and was communicated to the highest levels of the company and also comprises a statement of MetLife offered against MetLife.

Therefore, the documents are admissible as business records. However, MetLife objects that they are not trustworthy documents. They provide no support for this accusation, that one of their own employees reports of wrongdoing in the sale of policies as paid-up policies, which was confirmed by MetLife's own internal investigation as well as investigations of various insurance departments, e.g. Pennsylvania, Connecticut and Florida.

The basic requirements (regular business with regularly kept record; source with personal knowledge; record made in a timely fashion; foundation testimony) are enough in the run of cases to justify the conclusion that the record is trustworthy. The phrasing of the exception points toward this conclusion: It applies unless problems of trustworthiness appear. The objecting party bears the burden of raising the trustworthiness issue and showing the record is untrustworthy. Shelton v. Consumer Products Safety Commission, 277 F.3d 998, 1109 (8th Cir. 2001) (in enforcement suit against maker and importer, admitting private laboratory report to show that fireworks were banned hazardous substances; **party objecting to evidence fitting exception bears burden of raising trustworthiness issues and showing that record is untrustworthy**)(emphasis added). MetLife cites to no specific material reasons or any caselaw in support thereof as to why the materials are

untrustworthy.  Indeed, MetLife ignores that fact that Mr. Rayls observations were supported by several Insurance Commissioners, who also found that MetLife was deceptively selling policies as paid-up policies, e.g. Pennsylvania, Connecticut and Florida.  Thus, MetLife has failed to meet its burden.

In Hertz v. Luzenac America, Inc., 370 F.3d 1014 (10th Cir. 2004), the Tenth Circuit set forth the necessary indicia of trustworthiness for a document to be admitted as a business record, holding: "We have identified several factors that relate to trustworthiness: (1) the business significance of the document outside the litigation context, (2) the level of experience of the preparer in creating such documents, and (3) the neutrality of the preparer." Id. at 1020; see also 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 450, at 534-36 (2d ed. 1994) (listing as factors showing trustworthiness "extent to which the matter recorded is important to the business outside the context of litigation," experience of preparer, and absence of motive on behalf of preparer).

Again, instantly all of the elements exist as to the evidence; (1) there is business significance of the documents outside of the litigation since it is presumed that MetLife Senior Management would want to know that the sales force is using deceptive and illegal sales techniques; (2) Mr. Rayl worked a MetLife for over twenty years in various capacities prior to the promotion to rune the Tulsa Customer Service Center and he oversaw 200 employees; and (3) Mr. Rayl was an employee of MetLife and was not writing the document in preparation for litigation, he was writing the letters based upon his personal knowledge obtained as the supervisor of the Tulsa Customer Service Center.

Although satisfying the basic requirements brings the exception into play, many more decisions cite trustworthiness as a reason to admit records than untrustworthiness as a reason to exclude. Many factors support a finding of trustworthiness: Foremost among them is the extent to

which the matter recorded is important to the business outside the context of litigation.  United States v. Frazier, 53 F.3d 1105, 1110 (10th Cir. 1995) (audit report having use in areas other than suit and prepared by neutral party); Coates v. Johnson & Johnson, 756 F.2d 524, 549-550 (7th Cir. 1985) (disciplinary memoranda kept for routine business purpose).  A point that is especially persuasive if the report was acted on in some serious, costly, or elaborate way that tends to verify the point it is offered to prove.  Matador Drilling Co. v. Post, 662 F.2d 1190, 1198-1199 (5th Cir. 1981) (oil drilling rig reports, relied on for payroll); United States v. Ullrich, 580 F.2d 765, 771-772 (5th Cir. 1978) (inventory schedule used to keep track of collateral in floor-plan financing).

The fact that a record was prepared with no eye toward litigation counts.  See Selig v. United States, 740 F.2d 572, 578 (7th Cir. 1984); Tupman Thurlow Co. v. S.S. Cap Castillo, 490 F.2d 302, 310 (2d Cir. 1974).  Also tending to show trustworthiness is the fact that a record was prepared by trained or experienced people.  American Intl. Pictures, Inc. v. Price Enters., Inc., 636 F.2d 933,935 (4th Cir. 1980) (reports by checkers surveying attendance at movie theaters; officers detailed procedures for selecting, training, and supervising checkers), cert. denied, 451 U.S. 1010; United States v. Stonehouse, 452 F.2d 455, 459 (7th Cir. 1971)(cable diagrams; likelihood of misunderstanding or misdescription was remote).

Independent corroborative evidence helps too. Extensive corroboration supports an inference that the record as a whole is trustworthy, and specific corroboration of the point the record is offered to prove also alleviates trustworthiness concerns. See United States v. Cincotta, 689 F.2d 238, 243 (1st Cir. 1982) (admitting driver notebook; delivery tickets signed by commercial customers corroborated notebook), cert. denied, 459 U.S. 991; United States v. Wigerman, 549 F.2d 1192, 1193-1194 (8th Cir. 1977) (admitting records of motel registrations, car rentals, airline shipments;

witnesses corroborated documents).

Further, this Court has permitted the admission of these exact same documents in the <u>Tran</u> and cases, where the identical objections were raised by MetLife and rejected by this Court.

## II. A.   EXHIBIT 38 TO JIM RAYL'S DEPOSITION IS RELEVANT.

Exhibit 38 addresses the Pennsylvania Market Conduct Examination Report that was publicly released on March 11, 1994, and specifically mentions there were intentional sales practices problems occurring in Pittsburgh.  The memorandum was authored by James Raly on March 4, 1994 and provided to the Customer Service Representatives, Trainers & Resource personnel in anticipation of the flood of calls expected from policyholders with questions regarding whether their policies were deceptively sold. This Court previously determined that relevant portions of the Pennsylvania Market Conduct Examination were admissible in both <u>Kintner</u> and in <u>Tran</u>.  In the instant case there are allegations regarding the use of several deceptive sales tactics: (i) improper replacement, (ii) underfunded UL policies with "vanishing" premiums, (iii) "vanishing" premium whole life sale using MetLife's APP.  Exhibit 38 makes reference to all of these sales practices, for example:

> Now the advent of the Universal Life policies and the PUAR on Whole Life further complicated this whole replacement issue and , unfortunately, some of the tactics [] were used in convincing the client to update their insurance.  UL and PUAR provided a vehicle whereby the money form the old policy(ies) could be transferred ("*dumped*") to the new policy to further assist with covering higher premiums and/or higher insurance amount requirements. [Bates No. MP4011070652]

> The total opposite of this scenario is apparently what happened in Pittsburgh. As I understand the situation, there was an organized effort on the part of some representatives to actively churn business while taking specific measures to circumvent the Company's auditing and system controls on FIP and Rewritten Business.  [Bates No. MP4011070653]

... I suspect that many of these policyholders did not understand the whole concept of "AP" and the potential for additional premiums being required. The subsequent investigation revealed that these tactics were fairly widespread in the Pittsburgh area ... [Bates No. MP4011070653]

You should be alert to the fact that you may need to respond to a variety of questions regarding the new policy. There is also a fair probability that you could get into some questions regarding the premiums payments and/or when the policy will be eligible for "AP." It si very possible that "AP" was discussed in conjunctions with the sale of the new policy. [Bates No. MP4011070653]

As to the legal argument in support of this issue, rather than restate everything already presented to this Court, on the relevance issue under the Federal Rules of Evidence, plaintiffs refer the court to the legal arguments made in detail in Plaintiffs' brief in response to Metropolitan Life Insurance Company's Motion in Limine to Exclude the PA Market Conduct Exam and adopt them herein as if set forth at length.

Further, this Court has permitted the admission of these same type of documents in the Tran case, where the identical objections were raised by MetLife and rejected by this Court.

## II.C.  EXHIBITS 42, 43, 44, 45, AND 46 TO JIM RAYL'S DEPOSITION ARE RELEVANT.

Exhibit 42 contains a series of documents related tot he APP sale problem. Some examples demonstrating their relevance include, the first of which is authored on December 29, 1996, one year after the 1995 whole life APP sale to plaintiff and references the problems associated with whole life policies. The memorandum was sent to seven different areas of MetLife and to over 60 employees fo be reviewed in anticipation of a meeting on January 15, 1997 regarding an APP Options meeting discussing what to do about the APP problem. Another is a memo dated December 4, 1995 that explains because of the there are 149,482 policies currently on APP, and that MetLife has no idea how many additional policies were sold as APP policies but are not yet on APP and the because of

-17-

the reduction in the 1996 dividend scale that "it is now expected that 23% of our Ap arrangements will collapse before the policy life expectancy. is reached." Bates No. MP4011070899.

Exhibit 43 is a memo authored on August 25, 1997 regarding the AP Program. In this memo to Kathy Shoos Director of the Warwick Customer Service Center from Jim Rayl, Director of the Tulsa Customer Service Center, Mr. Rayl expresses his concerns that "I cannot help but wonder if senior MetLife management really has any grasp of exactly what is happening. Based on all the comments and dialogue, it wold appear that their expectation was similar to mine, in that it was believed that a proactive program was being developed to effectively deal with our policyholders on this issue. ... Based on what is presented in New York at the AP meeting, the program is definitely not a comprehensive or fully proactive program to deal with AP. He also was concerned that the program to contact existing AP customers is deficient since "I suspect that the contacts made by the agency force involving their own clientele will be no more than 10% to 20% of the affected customer base if even that. Bates No. MP4011070965.

Also is a memo sent to the field force dated August 18, 1997 that because of the 1997 dividend scale reduction, nearly one third of the 175,000 customers on APP (50,000) will have to pay additional out-of-pocket premiums. Bates No. MP4011070973.

Exhibit 44 contains a series of letters authored by Jim Rayl from 1992 through January of 1995, several of which were used in the Tran case authored by Jim Rayl and are all relevant to the issue of whether the sales agents were systematically selling policies with "vanishing" premiums as describing the policies as "paid-up" after a set number of years. The se letters are also located in other places and are objected to MetLife in other Motions in Limine. Also, there are copies of e-mail messages regarding the AP problem written in 1997. An example of the relevance of the documents

is the letter of January 3, 1995 from Jim Rayl stating that the proposed method of notification of policyholders through placing a notice in the Anniversary Statement that the dividends are insufficient to pay premiums will not work and will only cause additional confusion and problems for MetLife.  Also, he again addresses the concern that many policyholders have been sold policies as if they were "paid-up" after a set number of years, when the policies are not "paid-up."  Bates No. MP4011071008.

Exhibit 45 is a series of documents authored in 1997 attempting to define what is meant by the term "complaint" with reference to a customer complaint regarding sales issues received in any area of the life insurance at MetLife, i.e. the customer service centers, or at a branch office, or at the Home Office, etc.  Discussed is whether the complaint is only via a phone call should it actually be considered a "complaint" since it was not put into writing. One e-mail written on August 27, 1997 reference the fact that the complaint under consideration was "a classic AP situation...".  Bates No. MP4011071060.

Exhibit 46 is a November 4, 1995 letter written by Jim Rayl regarding the APP problem and that the problem began appearing over three years prior to the letter date in 1992.  As of the date of the letter in 1995 Metlife was aware of 93,000 policyholders were on APP. and that at least 25% of those policies were going to collapse within 5 years.   The letter states that "many of our representatives DID misrepresent AP to our customers.  The letter further discusses the effect of the dividend reduction in 1996 and that the 25% figure of policies that will collapse in five years is probably now low.  The letter also addresses the fact that there is a problem not only with policies on APP, but **"as well as those that are expecting their policies to go on AP at some future date."** Bates No. MP4011071129-1132 (emphasis added).  This last group includes the plaintiffs.  Exhibit

-19-

46 is relevant and supports plaintiffs' allegations.

All of the objections raised in this argument were raised by MetLife and rejected by this Court in <u>Tran</u>.

Further, this Court has permitted the admission of some of these exact same documents in the <u>Tran</u> case, where the identical objections were raised by MetLife and rejected by this Court.

Accordingly, the documents demonstrate the necessary trustworthiness and should be admitted into evidence.

## <u>CONCLUSION</u>

For all the foregoing reasons, Defendants Motion in Limine should be denied

Respectfully Submitted,

/s/Kenneth R. Behrend
Kenneth R. Behrend
PA I.D. # 37961
Behrend and Emsberger, P.C.
306 Fourth Ave.  - Suite 300
Pittsburgh, PA 15222
(412) 391-2515   (phone)
(412) 391-2762 (fax)

## CERTIFICATE OF SERVICE

I, Kenneth R. Behrend, do hereby certify that I have served a true and correct copy of the within Plaintiffs' Memorandum of Law in Response to Defendants' Motion In Limine was served upon the below listed counsel and parties by U.S. First Class mail, postage pre-paid on the 7th day of May, 2006.

B. John Pendleton, Jr., Esquire
McCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652


                                        /s/Kenneth R. Behrend
_____         Kenneth R. Behrend
                                        PA I.D. # 37961
                                        Behrend and Emsberger, P.C.
                                        Union Bank Building - Suite 300
                                        306 Fourth Ave.
                                        Pittsburgh, PA 15222
                                        (412) 391-2515   (phone)
                                        (412) 391-2762   (Fax)